### DECLARATION OF MR. JAMES JOSEPH ROSS WHEELER

1. My name is James Joseph Ross ("J.R.") Wheeler.  I reside in Crandall, Texas.

2. I am a U.S. citizen.  I have never been charged with or convicted of a felony.  I am able to legally purchase and possess firearms.

3. I also have a Federal Firearms License and am the 50% owner of a small business selling firearms and ammunition.

4. I am aware that the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has claimed that forced reset triggers qualify as "machineguns."

5. In the past, I have owned and sold forced reset triggers.

6. In my experience, I would place the pre-installation and tuned value of a forced reset trigger at approximately $425.

7. I intend to continue to buy and sell forced reset triggers.  However, I am chilled from doing so by the government's interpretation of "machinegun," and am not willing to risk civil or criminal prosecution for doing so.

8. In addition, I currently personally own 1 forced reset trigger.  My business has 2 forced reset triggers in its inventory.

9. I would like to continue to own and possess forced reset triggers.  However, I am concerned that by doing so, I place myself at risk of having my property seized by the federal government.

10. If I am not able to obtain judicial relief, I will be forced to surrender 3 forced reset triggers, valued at approximately $1,275 to the ATF.

01

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 28, 2023.

By: _____
Mr. James Joseph Ross Wheeler

02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**_____ DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| | ) | Case No. _____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF MR. TRAVIS SPEEGLE

1. My name is Travis Speegle. I reside in Austin, Texas.

2. I am a U.S. citizen. I have never been charged with or convicted of a felony. I am able to legally purchase and possess firearms.

3. I am aware that the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has claimed that forced reset triggers qualify as "machineguns."

4. I currently own 10.

5. I would like to continue to own, possess, and enjoy the use of my forced reset triggers. However, I am concerned that by doing so, I place myself at risk of having my property seized by the federal government.

6. If I am not able to obtain judicial relief, I will be forced to surrender 10 forced reset triggers, valued at approximately $4,000.00 to the ATF.

7. In addition, I intend to purchase additional forced reset triggers. I am currently unable to do so due to the ATF's interpretation, which places myself and anyone who sells a forced reset trigger to me at risk of civil and/or criminal prosecution.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 18, 2023.

By: _Mr. Travis Speegle_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
_____ DIVISION

NATIONAL ASSOCIATION FOR GUN )
RIGHTS, INC., ET AL., )
                                  )     Case No. _____
           Plaintiffs, )
     v. )
                                    )
MERRICK GARLAND, )
IN HIS OFFICIAL CAPACITY AS )
ATTORNEY GENERAL )
OF THE UNITED STATES, ET AL, )
                                    )
           Defendants. )
_____ )

## DECLARATION OF MR. PATRICK CAREY

1. My name is Patrick J. Carey. I reside in Zachary, Louisiana.

2. I am a U.S. citizen. I have never been charged with or convicted of a felony. I am able to legally purchase and possess firearms.

3. Prior to August 22, 2022, I purchased and owned two "FRT-15—Rarebreed Trigger."

4. The purchase price for each FRT-15 was $ _300/450_ .

5. On August 22, 2022, agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") visited my house. They provided me with a letter asserting that that "ATF has information that you have acquired one or more Forced/Hard Reset Trigger (FRT) devices," that "[t]hese items have been classified as machineguns that were unlawfully manufactured. Possession of these devices is a violation of law due to their illegal manufacture," and that "*the unlawful receipt and possession of any of these devices is a felony violation of Federal law*" (emphasis in the original). A true and correct copy of this letter is attached to this Declaration.

6. In response to the ATF's assertion that the continued possession of a forced reset trigger is a felony violation of federal law, and in fear of civil or criminal prosecution, I surrendered two FRT-15 forced reset triggers to the ATF. A true and correct copy of the "Consent to Forfeiture or Destruction of Property and Waiver of Notice" form is attached to this Declaration.

7. I did not want to get rid of my FRT-15 forced reset triggers. I would like to own forced reset triggers. I would like to purchase new forced reset triggers. But for the ATF's threat of federal prosecution, I would purchase new forced reset triggers.


Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on July 28, 2023.

By: _____
    Mr. Patrick J. Carey



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*[Baton Rouge] Field Division*

*[Date]* 8-22-22

www.atf.gov

TO: Patrick Carey
5016 Knight Drive
Zachary, LA

<u>**WARNING NOTICE**</u>

# <u>YOU MAY BE IN VIOLATION OF FEDERAL LAW</u>

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is responsible for enforcing Federal firearms laws. ATF has information that you have acquired one or more Forced/Hard Reset Trigger (FRT) devices [*Insert exact description of purchased item(s) if available*] from Gunbroker.com account "RifleRemedy2000". These items have been classified as machineguns that were unlawfully manufactured. Possession of these devices is a violation of law due to their illegal manufacture. As such, due to their illegal manufacture, the registration of these devices in the National Firearms Registration and Transfer Record (NFRTR) is also a violation of law.

*This letter officially notifies you that the unlawful receipt and possession of any of these devices is a felony violation of Federal law and devices that are unlawfully received or possessed are subject to seizure and forfeiture by the Federal government. Continued possession of any of the devices could result in prosecution for criminal violations of Federal law as well as potential State criminal violations. Any future purchase or possession of such devices may subject you to prosecution as well.*

The National Firearms Act (NFA), Title 26 U.S.C. Section 5845(b), defines the term "machinegun" as:

> "…any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

1

The Gun Control Act of 1968 (GCA), as amended, Title 18 U.S.C. Section 922(o), prohibits an individual from possessing or transferring any machinegun not lawfully possessed prior to May 19, 1986. Federal regulation at Title 27 C.F.R. Section 479.105(c) generally permits qualified importers or manufacturers to manufacture or import machineguns after May 19, 1986, for sale or distribution to the government. However, it has been determined that these FRT machineguns, at least one of which is in your possession, were not lawfully manufactured pursuant to this regulation. Therefore, it is not lawful for you to possess the FRT machinegun(s).

Immediately contact your local ATF office at [*phone number*] within 30 days of receipt of this letter to coordinate the abandonment of any, and all, of the FRT machinegun(s) described above.

Thank you for your prompt attention to this matter.

Sincerely yours,

[*J. Hutchison*]
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives
[Baton Rouge] Field Division

## DECLARATION OF MICHAEL COLUMBO

I, Michael Columbo, have personal knowledge of the following facts set forth below, and if called as a witness I would testify as follows:

1.       I am an attorney with Dhillon Law Group and represent Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, Lawrence DeMonico, and Kevin Maxwell in their ongoing litigation with the Department of Justice in *United States of America v. Rare Breed Triggers, LLC, et. al.*, Case No. 1:23-cv-369-NRM-RML.

2.       The facts set forth in this declaration are based on my personal knowledge obtained from direct communication with Assistant United States Attorneys.

3.       During a phone call on July 11, 2023, with Assistant United States Attorneys related to the aforementioned litigation, they represented to me that elements within the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and Department of Justice are "chomping at the bit" to seize certain forced-reset triggers in the possession of Rare Breed Triggers, LLC, including triggers located in a Rare Breed Triggers, LLC, office in Fargo, North Dakota.

4.       On August 4, 2023, I received an email from Assistant U.S. Attorney Michael Blume of the U.S. Attorney's Office for the Eastern District of New York stating that "a search was conducted" at the office of my client, Rare Breed Triggers, LLC, in Fargo, North Dakota, earlier that day. My clients confirmed that that ATF executed a search warrant at that office and that the ATF seized the forced reset triggers that were stored there.

09

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 9, 2023.

By:   _____

Michael Columbo

10

## DECLARATION OF COLE LELEUX

Pursuant to 28 U.S.C. § 1746 I, Cole Leleux, declare under penalty of perjury that the following

is true and correct to the best of my present knowledge, information and belief:

1.  I am currently the CEO of Spike's Tactical, an AR-15 Manufacturer

2.  I directed the creation of two videos at the request of Rare Breed Triggers.

3.  One video shows a Spike's Tactical receiver assembled into an AR-15 and fitted with a FRT-15 Rare Breed forced reset trigger. The receiver is milled out to make the internal mechanisms readily visible.  This alteration did not impact the function of the trigger or receiver.

4.  The firearm described above is mounted in device that attaches to the buffer tube. That device was then mounted in a common vice.  The vice was attached to a fabricated wood sled.   All of this was an attempt to mount the firearm and weight it down so that the natural recoil of the firearm would not confuse the viewer or inhibit their ability to see the triggers movement that causes the function.

5.  There is still some minimal bounce and movement of the firearm as mounted but no so much as to make it hard to tell that the trigger is in fact moving.

6.  The video depicts the trigger in the firearm described above being pulled.

7.  The description of what the video of the AR-15 with the FRT-15 installed shows is as follows:

    a.  The video starts with the bolt carrier moving to the rear.  This rearward movement causes the bolt carrier to push the hammer down into the trigger.
    b.  When the hammer pushes down on the trigger it forces trigger forward to the reset position.
    c.  Once the trigger has been forced forward a locking bar pivots into a locked position preventing the shooter from being able to pull the trigger.
    d.  Once the locking bar is in position preventing a pull of the trigger that could cause a function, the carrier is returned forward by the buffer spring.
    e.  As the carrier is moving forward once it is past the hammer (meaning the carrier is no longer actively pushing down on the hammer) you can see the trigger move slightly to the rear.
    f.  This rearward movement is the take up being removed from the trigger.  In this moment (pictured below), the hammer is captured by the trigger sear surface just as it is with any other standard AR-15 Semi-Automatic trigger



g. As the carrier continues to move forward it moves into a substantially in battery position. At that time the bolt carrier hits the locking bar which pivots it out of the locked position.

h. At this point the trigger can be pulled causing it to function. When the trigger is pulled the sear surface that makes contact with the hammer notch rotates down and the hammer is then free to move forward under spring pressure striking the next round.

i. With the trigger reset being forced with greater force than a standard AR-15 trigger (which is forced forward with a spring) the reset is much faster and allows for much faster follow up shots.

j. Both the FRT-15 and any standard AR-15 Semi-Automatic operate by the trigger being pulled causing the function of the trigger sear surface to release the hammer.

8. While firing the firearm, the shooter's finger moved to the rear and again to the forward reset position for each round that was fired. As shown in the video, the trigger also moved to the rear and to the forward reset position for each round that was fired.

9. I repeated this same experiment with a legally registered machinegun.

10. This machinegun was mounted using the same procedure described above for the AR-15 firearm fitted with a forced reset trigger.

11. The machinegun being fired is depicted in the video.

12

12. This video shows the trigger being pulled once causing it to function and multiple rounds being expelled from the machinegun with that one function of the trigger.

13. While firing the machinegun, the shooter's finger did not move for each round that was fired.  As shown in the video, the trigger did not move forward and back to the reset position for each round that was fired as it must with an FRT-15.

Executed on July 25, 2023.

By: _____

Mr. Cole Leleux

13

## DECLARATION OF DANIEL G. O'KELLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I declare under penalty of perjury the following:

1.     I have been retained by the Plaintiffs in this case as an expert witness on firearms and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") procedure.

2.     My curriculum vitae is attached hereto as Attachment A.

3.     I am the owner and founder of International Firearm Specialist Academy, Inc. in Grand Island, Florida.

4.     The facts set forth in this declaration are based on (1) my personal knowledge; knowledge obtained in my role as owner and Director of International Firearm Specialist Academy; (2) knowledge obtained in my 23 years of service as a Special Agent with the ATF; (3) knowledge obtained in my 46 years of professionally handling and analyzing firearms; (4) knowledge obtained from handling and reviewing the Rare Breed Triggers FRT-15 directly and from reviewing its patent and design specifications;(5) knowledge obtained from reviewing the design specifications for the Wide Open Trigger ("WOT") and Powered By Graves ALAMO-15 trigger ("ALAMO"); (6) knowledge obtained from reviewing the ATF's reports on the FRT-15, including its reports from July 15, 2021, and its report from April 27, 2023; and (7) knowledge obtained from reviewing the ATF's reports on the Wide Open Triggers WOT from October 21 , 2021, and January 13, 2023, and report on the Powered By Graves ALAMO-15 from April l, 2022. This report is for the purpose of explaining the function of the FRT-15 and the WOT, and the issues with the ATF's analysis of both trigger systems, specifically the ATF's analysis in the July 15, 2021, report and in the April 27, 2023, report. Prior to this report, I produced two other reports concerning the FRT-15. One regarded its function and design (attached as Attachment B) and the other addressed the ATF's July 15, 2021, report (attached as Attachment C).

1

5.      For this Declaration, I relied on the statutory definition of a "machinegun" as set forth in 26 U.S.C. § 5845(b):

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

6.      The FRT-15, the WOT, and the ALAMO triggers are the three most popular forced reset triggers to have been commercially produced and sold. For the purposes of this report, I am focusing on the FRT-15's design and the ATF's reports analyzing the FRT-15. This is for the sake of efficiency and ease of understanding because all of my analysis of the FRT-15 regarding its design, operation, and mechanical function applies to the WOT and ALAMO triggers as well. These trigger systems share a substantially similar design such that my analysis of the FRT-15 is also descriptive of the WOT without the need for modification. Similarly, all of my analysis and criticism of the ATF's reports examining the FRT-15 and ATF's opining that it is a machinegun also applies to the ATF's reports examining the WOT and ALAMO and ATF's opining that they are machineguns. The ATFs reports examining these trigger systems employ the same analysis for all of the designs, engage in the same mischaracterizations of the systems' design and operation, and use the same misleading verbiage to inaccurately portray the systems as enabling automatic fire, despite the physical impossibility of the systems doing so due to their shared design features in which a single function of the trigger shoots only one shot, not more than one shot. *See* definition of "machinegun", *supra.*, 26 U.S.C. § 5845(b).

## The FRT-15 is a Semiautomatic, Non-Machinegun Trigger System

7.     The primary distinction between a semiautomatic firearm and a full-automatic firearm is that a semiautomatic firearm requires the shooter to depress the trigger, causing it to function, separately for each round it fires, whereas an automatic firearm allows the shooter to depress (function) the trigger once to fire multiple shots.  As the U.S. Fifth Circuit Court of Appeals recently pointed out, "[t]he traditional example of a machinegun[] is a rifle capable of automatic fire, like the M-16. Semi-automatic rifles like the AR-15 are not machineguns." *Cargill v. Garland*, 57 F.4th 447, 452 (5th Cir. 2023) (en banc), *petition for cert. filed* (Apr. 6, 2023) (No. 22-976) (footnote omitted); *see also See Hollis v. Lynch*, n.2 (5th Cir. 2016) (The M-16 "is capable of automatic fire, that is to say, firing more than one round per trigger-action . . . . The AR-15 is essentially a semi-automatic version of the M-16, that is to say, it fires only one shot per trigger-action."). In *Cargill*, the Fifth Circuit held that use of a mechanical bump stock with a semiautomatic rifle did **not** make a semiautomatic rifle a machinegun. Thirteen of sixteen members of the Fifth Circuit agreed in the *en banc* decision that "an act of Congress is required to prohibit bump stocks" based upon the existing statutory definition in 26 U.S.C. Sec. 5845(b).


8.     With a semiautomatic trigger, one depression results in one shot fired when the trigger functions—assuming the firearm is not in its "safe" condition, in which the trigger does not function even if the trigger is depressed. After each shot, the trigger must reset by moving forward to its original position. Both the depression of the trigger causing a release of the hammer, and its reset causing re-engagement with the hammer are functions of the trigger that are necessary for a semiautomatic firearm to fire one shot. A semiautomatic firearm cannot fire more than one shot from a single function of the trigger.

3

16

9.    The FRT-15 is a semiautomatic trigger and thus requires the shooter to depress the trigger separately, causing a single function of the trigger for each shot he fires. As with any other semiautomatic trigger, the FRT-15 also requires the trigger to reset by moving forward to its original position after each shot. It cannot fire more than one shot from a single function of the trigger. This analysis comports with the Fifth Circuit analysis in *Cargill* in which the Court stated: "In summary, a bump stock combines with a semi-automatic weapon to facilitate the repeated function of the trigger. To be sure, it makes the process faster and easier. But the mechanics remain exactly the same: the firing of each and every shot requires an intervening function of the trigger. This does not alter the form of manual input that the user must provide to discharge the weapon. Without a bump stock or the use of an alternative bump technique, the user must provide manual input by pulling the trigger with the muscles of his trigger finger. With a bump stock, the shooter need not pull and release his trigger finger. But the shooter must still apply forward pressure to the weapon's forebody in order to maintain the shooting mechanism. Again, the manual input remains, even though its form changes." *Cargill v. Garland*, 57 F.4th at 454.

10.    In a typical AR-15 type semiautomatic firearm, and all other modern firearms, the trigger resets to its original position due to forward pressure from a trigger-return spring. This spring puts constant forward pressure on the trigger. To depress the trigger and fire a shot, the shooter must overcome this spring's pressure by the rearward pull of his trigger finger, causing it to release a hammer (or striker).

11.    To reset the trigger after firing, a shooter can either break contact with the trigger to allow the trigger- return spring to push it forward or lessen his rearward pressure on the trigger. The latter is preferred practice when firing two or more shots rapidly to avoid "trigger slap" and increase accuracy.

4

17

12.    The only difference between the FRT-15 and a traditional semiautomatic AR-15 trigger is how the trigger reset is accomplished. While a traditional semiautomatic trigger uses the trigger return spring, the FRT-15 uses the motion of the firearm's hammer to strike the top of the trigger and mechanically force the trigger back to its original position. This results in a more forceful . push moving the trigger forward to reset, compared to a traditional trigger-return spring.

13.    The advantage provided by the FRT-15's design is that the trigger resets rapidly after each shot. This allows the shooter to depress the trigger again more quickly causing it to function again for a subsequent shot.

14.    For any AR-15-type firearm with a semiautomatic trigger, the only limiting factors preventing a shooter from achieving a fire-rate comparable to a full-automatic firearm are his reflexes and fine motor skills. AR-15-type firearms use a self-loading type of mechanical action. That is, they accomplish the eight steps of the cycle of operation for firing a shot and preparing another shot to fire extremely quickly — within less than 1/5 of a second. They do so, using either the gas pressure or the recoil produced by the previously fired shot, depending on iteration. It is possible for a shooter to fire a second shot using a traditional semiautomatic trigger within 1/5 of a second after firing the first. The shooter only needs to have the dexterity to react and act within 1/5 of a second. Thus, rate of fire is not referenced in the statutory definition of a machinegun.

15.    The FRT-15 facilitates higher rates of semiautomatic fire compared to a traditional semiautomatic trigger by resetting the trigger between shots more quickly and reliably than a trigger-return spring. As with all semiautomatic triggers, the FRT-15 still requires the user to depress the trigger causing the trigger to function, which releases the hammer, for each shot fired, and then to require the trigger to reset to its ready position before repeating this sequence to fire an additional shot. This is the same type of trigger action which the Fifth Circuit stated in *Cargill* is that of a semiautomatic, non-machinegun rifle.

16.   In contrast, a machinegun operates by providing a second sear independent of the trigger's sear. When a machinegun trigger is pulled (functioned), the trigger sear is moved to release the hammer, but the trigger remains unmoving in the pulled position while the auto sear operates to shoot, automatically more than one shot, without manual reloading, without an additional function of the trigger. While the trigger remains in the pulled position, the hammer is forced back by the bolt carrier. The auto sear catches the hammer in the cocked position between shots and then releases the hammer again automatically when struck by the bolt carrier returning to the forward position without the trigger being functioned (pulled) again. When the trigger is reset by the user allowing the trigger spring to force it forward, the trigger sear catches the hammer (instead of the auto sear), and it stops firing until the trigger is functioned (pulled by the user) again.

In a forced reset trigger, there is only one sear—the sear on the trigger —just like any other semiautomatic trigger. When the trigger functions by being pulled to the rear, the sear releases the hammer to fire one shot. Movement of the bolt carrier forces the hammer back. The design of the trigger causes the hammer to also force the trigger back to the reset position where the trigger sear catches the hammer. Once the trigger is reset, a locking bar prevents the trigger from being functioned (pulled) again until the bolt carrier is safely forward in the ready-to-fire position. This prevents "hammer follow," which is a condition that can allow a second shot to fire or for an unsafe "out-of-battery" ignition of a cartridge. The forward movement of the bolt carrier moves the locking bar away to allow the trigger to be functioned (pulled) again to fire a subsequent shot.

This process is illustrated in the video demonstration available here:

https://dhillonlaw.box.com/s/83pwi4a97id478fl nv31 rv050kda2ccd. *See* Declaration of Cole Leleux.

The Fifth Circuit in *Cargill* included this moving image regarding a mechanical bump stock as part of the decision at:

6

19

and this moving image of the mechanics of the firing process of a semiautomatic, non-machinegun rifle at:

As the Fifth Circuit stated in Cargill,

> The first phrase we consider is "by a single function of the trigger." At the time the statute was passed, "function" meant "action." *Webster's New International Dictionary* 1019 (2d ed. 1934); *see Guedes* , (Henderson, J., concurring in part and dissenting in part); *Aposhian* , (Tymkovich, C.J., dissenting). Thus, the relevant question is whether a semi-automatic rifle equipped with a non-mechanical bump stock fires more than one shot each time the trigger "acts."
>
> It does not. As illustrated above, a semi-automatic weapon utilizes a simple mechanical process: the trigger disengages the hammer from the sear, the hammer strikes the firing pin, the bullet fires, and the recoil pushes the hammer against the disconnector, which resets the trigger. This process happens every single time one bullet is fired. To be sure, a non-mechanical bump stock increases the rate at which the process occurs. But the fact remains that only one bullet is fired each time the shooter pulls the trigger. … The statute "uses 'single function of the trigger,' not single function of the shooter's trigger finger." *Guedes* , (Henderson, J., concurring in part and dissenting in part); *see also Aposhian* , (Tymkovich, C.J., dissenting) ("The statute speaks only to how the trigger acts, making no mention of the shooter.").

*Cargill v. Garland*, 57 F.4th 447, 459-460 (5th Cir. 2023).

### The ATF's Reports

17.   Each of the ATF's evaluations and reports relies on ATF's re-interpretation of the statute that was expressed in 27 CFR 478.11 and/or 479.11. [1] While I always disagreed that this was a proper interpretation of the statutory definition and that it improperly expanded the scope of the criminal statute, as discussed above, I have been informed of and read the Fifth Circuit's rejection of ATF's interpretation in *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc), that invalidated the ATF's expanded re-interpretation.

7

**20**

---

[1] The report dated January 13, 2023, does not expressly reference 479.11, but it relies on the same re-interpretation.

## The ATF's Report from July 15, 2021, is Misleading and Inaccurate

18.   The ATF's report from July 15, 2021, analyzing the FRT-15 and classifying it as a machinegun is misleading and inaccurate. It is riddled with technical mistakes and misuses of language.

19.   The report misleadingly states that a shooter using an FRT-15 can fire multiple shots through "constant rearward pressure to the trigger," "one continuous pull of the trigger," or a "single constant [trigger] pull." July 15 Report at 4. This language leads a reader to think that a shooter can depress an FRT-15 trigger once and hold it down while firing multiple shots. This is physically impossible, given the FRT-15's design. The report acknowledges as much in its technical description of how the FRT-15 operates, which recognizes that "the hammer is driven into the top of the trigger forcing it forward" after each shot and that the trigger is locked in its forward position between shots until the hammer and bolt are finished resetting. Id.

20.   All of the reports rely on a modified interpretation of the statute expressed in 27 CFR § 479.11 that has been determined by the Fifth Circuit Court of Appeals (en banc) to be improper and invalid.

21.   What the report refers to as "one continuous pull of the trigger" is misleading and disingenuous. The word "pull" does not appear in the statutory definition of a machinegun under 26 U.S.C. 5845(b) and is a non-issue. It is immaterial to cite what the shooter's finger does when determining whether the FRT-15 is a machinegun. The determining issue is whether the trigger functions once for each shot fired. The ATF is simply deflecting and blurring the real issue by focusing on how much pressure the shooter's finger applies to the trigger and/or whether that pressure is continuous during the firing of two or more shots. Any pressure applied by the shooter while the trigger resets after each shot is inconsequential. Because the trigger of an FRT-15 is forcefully reset by the hammer after each shot, the shooter can maintain some pressure on the trigger between shots, but he must actually move (i.e., "pull") the trigger rearward again to "function" it, thus releasing the hammer, for each shot fired. It is extremely important to note that every time the trigger is forced forward into the reset position, the shooter's finger is forced forward also. This is what results in the shooter being required to again depress the trigger to the rear until it functions, by again releasing the hammer. The FRT-15 trigger must be depressed (functioned) and then reset separately for each shot fired, like any other semiautomatic trigger.

22.   It is irrelevant whether the operation is described as a "single function" or "single pull" of the trigger. As the Fifth Circuit in Cargill discussed, it is the action of the trigger, not the user's finger, that is considered.

23.   Placing "constant pressure" on the FRT-15 trigger, which ATF focuses upon, also accomplishes nothing. Unlike with a machinegun trigger, wherein moving the trigger to the rear once and holding it there causes the firearm to fire multiple shots, constant pressure on the FRT-15 trigger does nothing. Even when constant pressure is applied to the FRT-15 trigger, the trigger still must move aft and fore, from the function of releasing the hammer to the function of reengaging the hammer, for each shot fired. And it does. Constant pressure by the shooter's finger

does not cause the trigger to fire multiple shots from the initial depression and it does not prevent the trigger from resetting after the first shot is fired.

24.     It is also misleading for the report to imply that a traditional semiautomatic trigger requires the shooter to release it before depressing it again for another shot. As previously explained, a shooter never needs to break contact and physically release a traditional trigger for it to reset because of the trigger-return spring. He only needs to lighten his pressure enough for the spring to move the trigger forward against his resistance. A shooter can fire any standard AR-15 type semiautomatic firearm repeatedly without either breaking contact with the trigger or ceasing constant rearward pressure on it.

25.     Additionally, the report's description of the FRT-15's mechanical operation is obtuse and misleading. The report fails to note that when the FRT-15's locking bar releases the trigger after the hammer resets, it releases the trigger from a locked position. This omission is misleading because it is important to identify that the trigger is locked in the forward position after each shot is fired and that a separate function of the trigger (moving it to the rear to effect hammer release) is required after the trigger unlocks to fire the next shot. Despite the FRT-15 automatically forcing the trigger to reset, the FRT-15 requires a separate function of the trigger to fire each shot at all times.

### The ATF's Report from April 27. 2023, is also Inaccurate and Misleading

26.     The ATF's report on the FRT-15 from April 27, 2023, is inaccurate and misleading in much the same manner as the ATF's July 15, 2021, report. To support the conclusion that the FRT-15 is a machinegun, this report mischaracterizes the locking bar (which prevents the trigger from being depressed and functioning after it is reset until the hammer and bolt-carrier group also reset) as a form of automatic sear trip (the part directly responsible for an M-16's automatic fire). April 27

10

23

Report at 4-5. This is a gross error. It is akin to describing a car's brake pedal as equivalent to its accelerator.

27.     The only thing the locking bar and an automatic sear trip have in common is that they both are pivoted upon being contacted by the bolt-carrier as it moves forward. Otherwise, they perform completely different functions. Whereas the pivoting movement of an automatic sear trip serves to release the hammer so that it will automatically fire a subsequent shot (while the trigger remains held in the pulled position), the pivoting of the locking bar has absolutely nothing to do with the release of the hammer. The pivoting of FRT- 15's locking bar only serves to unlock the trigger after it has been moved forward to its "reset" position, thereby allowing the shooter to function the trigger again if he chooses to by depressing it to the rear once more. In the FRT- 15, the hammer does not move until the shooter physically depresses the trigger to the rear, once for each shot fired.

28.     In fact, the report admits that the locking bar specifically causes the FRT-15 to require a separate trigger function for each shot when it cites U.S. Patent No.: 10,514,223 Bl:

> The locking bar is pivotally mounted in a frame and spring biased toward a first position in which it mechanically blocks the trigger member against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in battery position, allowing the trigger member to be moved by an external force to a released position.

Exhibit 2 at 5. The "external force" referred to as being required for each movement of the trigger to the released position is the shooter's finger. This external force is required to be applied separately for each shot fired.

The report likens the FRT-15 to other trigger mechanisms and firearm accessories that the ATF previously analyzed and opined to be machineguns: the Akins Accelerator, the Freedom Ordnance trigger, and the Fleischli device. Comparing the FRT-15 to these devices is illogical

and misleading. Page 3 of the report misleadingly cites court cases affirming the ATF's opinion

of these other devices:

> Courts have specifically affirmed ATF's interpretation that a single act of the shooter to initiate the firing sequence is a single function of the trigger. Akins v. United States, 312 F. App'x 197, 200 (llth Cir. 2009); Freedom Ordnance Mfg., Inc. v. Brandon, No. 3:16-cv-00243-RLY-MPB (S.D. Ind. Mar. 27, 2018). United States v. Fleischli, 305 F.3d 643, 655 (7th Cir. 2002) (in which electronic switch was the trigger when it served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted). In the Freedom Ordnance case, the United States District Court of Indiana held that ATF was not arbitrary and capricious in the classification of an "electronic reset assist device" as a machinegun even though the firearm's trigger reset before each shot by pushing the trigger forward. Freedom Ordnance Mfg., Inc, No. 3:16-cv-00243-RLY-VIPB. In these cases, a firearm is a machinegun when it uses an internal mechanism or operation that automatically forces the trigger forward allowing the weapon to fire more than one shot by a continuous pull of the trigger.

Contrary to the last sentence above, there is nothing in the statutory definition concerning internal

mechanisms that automatically force the trigger forward. Nor is there anything about a continuous

pull of the trigger.

29.     Concerning the Akins case, this device was a "bump stock"; a shoulder-stock which allowed

the frame/receiver of the firearm to repeatedly rock aft and fore between a spring and the shooter's

stationary finger, which allowed a much quicker rate of semiautomatic fire, which required the

functioning of the trigger once for each shot fired. Bump-fire devices, which were produced by a

number of companies beginning in the 1980's, were publicly stated by ATF to be legal and not

machineguns until March 26, 2019, when ATF began calling them machineguns only due to

pressure after the tragic events that occurred in Las Vegas on October 1, 2017 when a deranged

gunman murdered dozens of innocent men and women. The Akins, as with all bump stocks, is a

completely different device than the FRT-15 or any other forced reset trigger. The only

commonality between the two devices is that they both fire one shot for each function of the trigger.

A major difference between the Akins device and the FRT-15 is that while the Akins allowed the

frame/receiver of the firearm to recoil aft and fore between a spring and the shooter's stationary

12

25

finger, the FRT requires the shooter to physically move the trigger again to the rear causing it to function for each shot fired.

30.     The Freedom Ordnance device was an electronic battery-operated trigger reset device, which electronically reset the trigger. It has nothing whatsoever in common with the FRT-15 which uses no electronics. The Freedom Ordnance device used a motor. Its first iteration employed a lever behind the trigger. The motor used this lever to force the trigger forward into the reset position after each shot fired. The second iteration used a "fork" with tines on each side of the trigger, which were parallel to the trigger. These tines forced the finger forward and off the trigger after each shot fired, which allowed the trigger's spring to move the trigger forward into the reset position. The third iteration actually forced the trigger forward into the reset position after each shot. However, the motor did nothing more, and did not serve to fire any shots. The only commonality between the FRT-15 and the various Freedom Ordinance devices is that the FRT-15 and two iterations of the Freedom Ordinance devices cause a forced reset of the trigger. There is no relevant commonality between the design and operation of the FRT-15 and the iteration of the Freedom Ordinance trigger that used the 'fork;' moreover, there is no commonality between the FRT-15 and any of the Freedom Ordinance designs generally because the FRT-15 does not use a motor.

31.     Considering that "trigger" is not defined in federal law, the "trigger" of a firearm is that part which initiates the firing of one or more shots. ATF has long opined that button-actuated motors used to repeatedly fire a firearm are machineguns because the button serves as the trigger. I agree with that opinion. When a firearm uses an electric motor to actuate a trigger, the button or switch of that motor which actuates what used to be considered the trigger now becomes 'the trigger."

32.     Likewise, the Fleischli device was an electronic motor operated by a button. The motor continued to fire the gun automatically as long as the button was actuated. It, however, has nothing

13

**26**

in common with the FRT-15, which is neither electronic nor motor-operated. The Fleischli device only required a single function of the electronic button as a trigger to fire multiple shots, whereas the FRT-15 needs a separate function of its trigger, caused by the shooter, for each shot.

33.    In the last sentence of the report's quote concerning Akins, Freedom, and Fleischli, the report takes the liberty of speaking for the courts when it summarizes their findings by saying that "[i]n these cases, a firearm is a machinegun when it uses an internal mechanism or operation that automatically forces the trigger forward allowing the firearm to fire more than one shot by a continuous pull of the trigger." Id. This is false and misleading, as it adds elements to the statutory definition of "machinegun" that the text itself does not contain. 26 U.S.C. 5845(b) says nothing about a "continuous pull of the trigger."

34.    Along these same lines, the report insists on using the phrases "self-acting or self-regulating" when describing the FRT-15. The use of these phrases is misleading, as all firearms in the category of both machineguns (full-automatic) and semiautomatic guns are self-acting or self-regulating with regard to at least seven of the eight steps in the cycle of operation which occurs between the firing of two shots (firing, unlocking, extracting, ejecting, cocking, feeding, chambering, locking). Every semiautomatic firearm and every full-automatic firearm falls within a broader category called "self-loading" firearms. While no firearm loads the first cartridge into its chamber, firearms in this broad category do load their own chambers with a subsequent cartridge after the first shot is fired. They do so by using power generated from either the gas or the recoil produced by firing the previous cartridge. Regardless of whether it is powered by gas or recoil, the first seven steps of the cycle of operation (except firing) are automatic and "self-acting" or "self-regulating" for both full-automatic and semiautomatic firearms.

14

27

35.    The only difference between the cycle of operation of full-automatic guns (machineguns) and semiautomatic guns is the way in which the hammer is released to fire each shot. In a machinegun, there is only one function of the trigger during multiple shots. While it is held to the rear, it serves to release the hammer for the first shot, but for the remainder of a given string of shots the trigger is held fully to the rear and kept in that position without further movement. All subsequent shots in a given string are the result of a chain reaction caused by the cycle of operation being completed and continually repeated. In a typical semiautomatic firearm, the trigger releases the hammer for the first shot, but the hammer is captured and held rearward aner firing that first shot. The hammer is not released again to fire another shot until the trigger returns to the reset position to engage with the hammer and is then moved rearward again by the shooter's finger, thereby releasing the hammer again. This is exactly what happens with the FRT-15.

36.    In a machinegun/full-automatic firearm, the firing step for the second or subsequent shot happens automatically as a result of the trigger's initial function when the shooter depressed the trigger to fire the first shot; and the full cycle of operation perpetuates, firing round after round, so long as the shooter keeps the trigger depressed after its initial function. Whereas for an FRT-15 and any other semiautomatic firearm, the step for firing a subsequent shot requires the trigger to again perform the function of releasing the hammer from its captive engagement with the trigger. Only upon the shooter making this happen again by moving the trigger to the rear to the point of again releasing the hammer does the gun fire a subsequent shot. This happens independently and separately from the function that fired the first shot. Unlike a machinegun/full-automatic firearm, the FRT-15 does not fire a subsequent shot without an additional manual function of the trigger.

### ATF Improperly Modified the FRT-15 to Make It Operate Like a Machinegun.

37.    34.    Some of the ATF examinations included modifying the FRT-15 by adding an external force in the form of a spring in an attempt to make it operate as a machinegun. The triggers were

15

28

modified by adding a zip-tie, cable tie, or hose clamp to apply spring force to the trigger while allowing it to reset. When formed into a loop, each of these added devices becomes a spring that provides an external force on the trigger to pull the trigger automatically after it has been reset. The devices do not need to "stretch" to act as a spring. Each time the stiff, but bendable, loop is deformed, it resiliently returns toward its at-rest state. Thus, each time the shape of the loop is temporarily deformed by the trigger being reset, the loop provides an external spring force to function the trigger again.

38.     The reports state that the trigger is "retained in a fixed position" by the added loop spring device. But this is patently false. The trigger clearly functions each time a round is fired by moving between the reset and pulled positions. If the trigger were actually "retained" in the pulled position and not allowed to move, no more than one shot could be fired before it would malfunction, requiring removal of the clamping device and manually cycling the action to clear the chamber.

39.     All of these modifications are impractical for use outside a testing laboratory setting because they require the firing sequence to be initiated by releasing the action from an open bolt and then cannot be stopped until the magazine is emptied. In any event, they required the addition of an extra part that is not part of the forced reset trigger to modify how the trigger works. Even if these tests produced automatic fire with an FRT-15 through the addition of a zip-tie or cable-tie, or hose clamp, the accessory that would be considered a machinegun under the ATF's own standards and the statute is the zip-tie, cable-tie, or hose clamp. These ties would be comparable to the "shoestring machinegun" the ATF addressed in 2007, when the ATF opined that a standard shoestring that had loops tied in it and was then affixed to a rifle in a manner that enabled it fire automatically by a function of the trigger was a machinegun. Attachment D. Only the shoestring was determined to be the machinegun, not the firearm itself that had fired semiautomatically before the shoestring was introduced.

16

29

40.     Both the July 15, 2021, report and the April 27, 2023, report also omit the crucial point that if the shooter exerts enough rearward pressure while pulling the trigger back that he prevents it from moving forward again to reengage the hammer, the FRT-15 malfunctions and the cycle of operation is interrupted. If the shooter pulls too hard on the trigger and prevents it from resetting, the firearm malfunctions and ceases to operate. This exposes the ATF's implication in both reports that a shooter can simply pull the trigger once, hold it back, and cause the FRT-15 to fire multiple shots to be a lie. It is a physical impossibility given the FRT-15's design, and attempting to do so will only cause the FRT-15 to stop firing.

## The ATF Previously Approved a Forced Reset Trigger that is Substantially Similar to the FRT-15

41.     Further, I refer to the October 31, 2013, letter from Earl Griffith (former Chief of Firearm and Ammunition Technology Division) to Michael Stakes concerning the 3MR forced reset trigger. The 3MR trigger is a forced reset trigger similar in operation to the FRT-15 that was also designed for the AR-15 platform. In this letter, after examining and test-firing the 3MR trigger, Mr. Griffith admits that the 3MR has a "positive reset characteristic" and that "it is also intended to provide positive resets between each shot." October 31 letter at 2. The letter states that the

3MR trigger functions based on how:

> the reset lever pivots forward, and the hammer engages/contacts the lever during the cycling of the rifle. In this position, the hammer contacts the reset lever during cocking which applies force to the trigger, forces the shooter's finger forward, and allows the trigger to reset rapidly

> ...a function test was performed before live fire was conducted. The 3MR functioned only semi automatically during both the field test and live-firing.

> In conclusion, FTB has determined that the 3MR trigger assembly is not a part or combination of parts that will convert a semiautomatic firearm into a machinegun. Id. Since the hammer forces the 3MR trigger forward into the reset position after

17

30

each shot, the shooter must again depress the trigger rearward to the firing position
for each shot fired.

This is exactly what the FRT-15 requires.

42.     In a firearm equipped with a 3MR trigger, like one equipped with an FRT-15, after a shooter

fires a shot the cycle of operation loads and prepares a subsequent shot to be fired but stops short

of firing it. After firing any shot, both the FRT-15 and the 3MR trigger systems cause the trigger

to reset and require the shooter to then function the trigger to the rear again causing a release of

the hammer to fire again. Continuous rearward pressure on either an FRT-15 or on a 3MR will not

create a continuous cycle of firing because the trigger must engage in separate functions, moving

back and forth, for each shot fired; and each movement rearward to depress the trigger to the point

of releasing the hammer and firing a shot must be manually and intentionally done by the shooter.

There is no basis by which the ATF can consider the FRT-15 a machinegun while also considering

the 3MR trigger not to be one as well.

43.     Finally, it is worth noting that the ATF has previously used a trigger-movement-based

standard for determining whether a firearm fires multiple rounds automatically "by a single

function of the trigger." In 2009, when I was an ATF Special Agent, the ATF Firearm Technology

Branch promulgated an email to me and hundreds of other ATF personnel (attached as Attachment

E), stating that " [t]he ATF-counsel-approved interpretation of 'single function of the trigger' is a

single movement of the trigger."

## Conclusion

44.     For the forgoing reasons, my expert opinion is that the FRT-15 is a semiautomatic trigger

and is in no way a machinegun under the statutory definition. This is because the FRT-15 requires

separate functions of the trigger for each shot fired and it ceases to function if the trigger does not

reset after each shot. The ATF's report from July 15, 2021, and its report from April 27, 2023,

analyzing the FRT-15 and classifying it as a machinegun are inaccurate and misleadingly worded. They give a false impression that the FRT-15 functions like a traditional automatic trigger — which it does not.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August __7__, 2023.

By: Daniel O'Kelly

19

32

# RESUME OF
# DANIEL G.  O'KELLY
## DIRECTOR
## INTERNATIONAL FIREARM SPECIALIST ACADEMY, INC.
### GUNLEARN.com

### FIREARM EXPERT/CONSULTANT

---

**PO Box 350760**                                          **(813) 422-4674**
**Grand Island, Florida 32735**
**E-mail: Info@GunLearn.com**
**Website: www.GunLearn.com**


**EDUCATION:**
College: -Valparaiso University, Valparaiso, Indiana
            Attended from fall 1974 through Spring of 1975.
         -Indiana University
          Transferred to Indiana University in fall 1975 and
          graduated January, 1981 (Bachelor's degree).

**EXPERIENCE:**

I have over 40 years of full-time experience as a Police Officer, ATF Agent/Firearm Specialist, Criminal Investigator, Range Instructor, teacher of firearm technology, ammunition and firearm manufacturer, and collector. I have examined well over 100,000 firearms and even more pieces of ammunition. I've been involved in numerous investigations concerning them, and I have testified continually in criminal & civil cases in State, Superior, Circuit, District and Federal Courts since 1978. I have been recognized as an expert witness in Federal and State courts since 1990 and have given numerous depositions in criminal and civil cases. I have testified and/or consulted as an expert on the topics of use of force, self-defense with a firearm, ballistics, gunshot residue, interstate nexus, federal and state firearm regulations, trade dress, ATF rulings, ATF compliance and procedures, shooting reconstruction, firearm classification, firearm design, and wrongful death. My testimony in four trials on the topic of federal firearm definitions from 2014 to 2019 resulted in the Bureau of ATF undertaking a 2-5 year rewrite of the definition of a firearm "frame or receiver", as the one which they have applied for 48 years does not match 60% of the firearms on the market. That change was ratified 8/24/22, and then ATF was enjoined from enforcing it two days later by a Federal Judge.

I have worked undercover in three illicit international arms dealing cases, and am one of only two ATF Agents who have performed an undercover investigation of illicit international firearm trafficking in Europe.  I was the undercover Agent in the investigation of international arms dealer Efraim Diveroli; a case which resulted after the activity portrayed in the 2016 movie "War

**33**

Resume of Daniel G. O'Kelly
June 30, 2023 **Page 2**

Dogs". Since 1996 I have been a full-time instructor of most facets of the field of firearms, including ballistics, forensics, ATF compliance and regulations, markings, manufacture, classification, and specialize in establishing the interstate nexus of firearms and ammunition in federal court. I have taught these topics countless times from coast to coast, and several times each, in Europe and Africa, and am a Technical Advisor to the Association of Firearm and Tool Mark Examiners, as well as an Advisory Board Member of the Sonoran Desert Institute. I co-wrote the lesson plans for the ATF National Academy, and the firearm technology and compliance training program for Cabela's, Inc., which is the largest firearm retailer in the world. I also served for two years as one of Cabela's corporate ATF Compliance Managers. My training is also approved as continuing education by the American Board of Medico-legal Death Investigators and the International Association for Identification, and I am a contracted instructor for the FBI. I also am a firearm designer and hold a patent, as registered with the U.S Patent Office.

**WORK EXPERIENCE:**

11/11 to Present:     **DIRECTOR & CONSULTANT**
                            International Firearm Specialist Academy
                            Denton, Texas

Self-employed consultant with a staff of fellow consultants, specializing in firearm and forensics-related services for law enforcement, the legal profession, the firearm industry, and the insurance industry.

Clients include civil Attorneys, prosecuting and defense Attorneys, law enforcement agencies and individual law enforcement personnel, licensed firearm dealers, manufacturers, importers and collectors.

Services offered include firearm and ammunition identification, training seminars on firearm technology, subject-matter expert court testimony, shooting scene reconstruction, shooting accident investigations & reconstructions, gun safety & design-related consultations, ATF compliance consultation and examinations/audits, armorer schools, range instruction, tool mark examinations, crime scene examinations & reconstruction, general criminalistics related examinations, gunshot residues issues, distance determination examinations, forensic pathology casework consultations, etc. I have provided training, testing and certification to over one thousand people as Certified Firearm Specialists.

11/11 to 12/13:     **CORPORATE SENIOR MANAGER**
                            **FIREARM COMPLIANCE TEAM**
                            Cabela's, Inc.
                            Sidney, Nebraska

2

**34**

Resume of Daniel G. O'Kelly
June 30, 2023 **Page 3**

Responsible for the auditing and inspection of the firearm departments of the company's 50 stores. This was in order to ensure and maintain ATF compliance, for one of the world's largest firearm retailers.  I also co-wrote and delivered their training program to hundreds of employees on firearm ID, ATF compliance, Ammunition, the Gun Control Act and the National Firearms Act.

03-01 to 11/11:          **ATF SENIOR SPECIAL AGENT**
                                        Tampa, Florida

Duties included investigations of violations of the federal gun laws and explosives laws, bombings, arsons and undercover investigations of organized crime. Further, it included firearm interstate nexus determinations and the teaching of same, firearm technology determinations, court testimony, and the training of ATF Agents and Investigators and other law enforcement personnel on all aspects of firearms. I was the commonly preferred Agent of the U.S Attorney's Office, for testimony on firearm matters.

05/02 to 05/03:          **FIREARM INSTRUCTOR COORDINATOR (as ATF Agent)**
                                        Tampa Field Division, Florida

During my tenure as an ATF Agent in Tampa, I served for 2 years in this capacity also. Duties included the firearm training of ATF personnel for the northern 2/3 of the State of Florida. This supervisory responsibility included:
- Firearm identification
- Ammunition casing, bullet and cartridge identification
- Firearm Interstate Nexus determinations for U.S. District Court
- NFA firearm examinations/determinations
- Oversight of 15 Range Instructors
- Maintenance of the firearm training budget, maintenance of over 200 firearms in inventory and maintenance of over 50,000 rounds of ammunition
-Assisting U.S. Attorneys and other Agents in firearm and ballistics related determinations
- Teaching seminars statewide, to thousands of police, legal, medical, and other personnel, on firearm and ammunition- related topics.
- Made determinations as to whether an item is a non-gun vs. a firearm, according to Title 18 and Title 26, U.S. Code
- Performed function checks on firearms as to their ability to fire
- Acted as the Armorer/repairman for all duty-issued firearms
- Purchased supplies- ammunition, equipment, etc... as needed for the Field Division.
- Testifying in court (local, state, and Federal) concerning my examinations. (several hundred times at last count).

3

Resume of Daniel G. O'Kelly
`June 30, 2023` **Page 4**

01-96 to 03/01    <u>**ATF SENIOR SPECIAL AGENT/ PROGRAM MANAGER**</u>
ATF National Academy
Glynco, Georgia

I was the Chief Firearm Technology Instructor at the ATF National Academy, where I wrote and co-wrote the entire firearm technology course of study that is still taught to new Agents and compliance Investigators. I also instructed courses for U.S. Customs on firearm importation. I also was custodian of the firearm reference vault which contained over 800 firearms, including numerous NFA firearms. It was my duty to maintain, repair and have a teaching-level familiarity with the operation of all of them.

I also became certified by ATF as an Interviewing (Train-The Trainer) Instructor, and administered several Interviewing Schools around the U.S., as sponsored by the ATF National Academy. I also served as the Program Manager of ATF's Undercover School during 1998-99. I delivered and co-instructed numerous 2-week undercover courses to State, Local and Federal law enforcement officers, including ATF.

03-00 to 5-00    <u>**Temporary Duty as Supervisory ATF Resident Agent-in-Charge**</u>
Wilmington, Delaware

Tasked with correcting the multitude of problems in a rogue office which was being considered for closure due to the many failures of its Agents. Success was achieved in only six weeks as the Agent in Charge of the State of Delaware, resulting in my being awarded for Special Service by the Baltimore Field Division.

09-88 to 01-96    <u>**ATF SPECIAL AGENT**</u>
Merrillville, Indiana

Duties included investigations of violations of the federal gun law, explosives laws, bombings, arsons and organized crime. Heavy emphasis was given to undercover investigations of armed narcotics dealers and organized crime. Further, duties included firearm interstate nexus determinations, firearm technology determinations, court testimony, and the training of ATF Agents, Investigators and other law enforcement personnel on all aspects of firearms. I was the commonly preferred Agent of the U.S Attorney's Office for testimony on technical firearm matters.

03-77 to 09-88    <u>**POLICE OFFICER**</u>
**Porter County, Indiana**

Duties included public safety and service, investigations and arrests for violations of municipal ordinances, State and Federal law.  Also included was routine traffic patrol, and answering calls

4

36

Resume of Daniel G. O'Kelly
June 30, 2023 Page 5

and taking reports of crimes. I served also as department firearm range instructor, providing range oversight, and classroom instruction. I also served for two years in a full-time undercover capacity attached to the Porter County Drug Unit. My duties there were to make purchases of narcotics, firearms and other contraband and investigate the perpetrators. I served the last two years as a Detective Corporal, doing follow-up investigation of everything from misdemeanors to violent felonies.

**Specialized Training:**
- Completed Foreign Weapons Armorer's School at Phoenix Defence, Henderson, NV – 10/22
- Attend the Vickers Machinegun Armorer School at Phoenix Defence, Henderson, NV – 6/22
- Attend the CMP M1 Advanced Maintenance Class, Anniston, AL – 7/20
- Tour of Franklin Armory manufacturing plant in Minden, NV – 9/18
- Recognizing an 80% Receiver in Casework (AFTE 2018 - Kingery) – 6/18
- Tour of LRB firearm manufacturing facility Floral Park, NY - 1/18
- Tour of the Museo Del Ejercito (Army Museum) in Toledo, Spain – 9/17
- Tour of the Imperial War Museum London, England – 9/17
- Tour of War and Peace Museum Oban, Scotland – 9/17
- Staged Homicide Crime Scenes seminar (Forensic Pieces) - 5/17
- Shooting Incident Reconstruction Course (40 hours, by Tritech Forensics) - 5/17
- Tour of Military Musem Menege (Finnish Government Military) museum in Suomenlinna, Finland - 9/16
- Tour of Freedom Ordnance mfg. facility – Chandler, IN 2016
- Tour of Armemuseum (Swedish Government Military) museum in Stockholm, Sweden – 9/16
- Barrel Making Techniques (AFTE 2016 – Offringa) -6/16
- The Silencer in Court for the Expert Witness (ATF FTB – Kingery) - 4/15
- The Machineguns and Machinegun Conversions (ATF FTB – Kingery) - 4/15
- Tour and research at HS Precision Rifles mfg. facility in Rapid City, SD, and Dakota Arms mfg. facility in Sturgis, SD – 2013
- Tour and research at Connecticut Shotgun in New Britain, CT., and Charter Arms in Sheldon, CT. – 2013
- Tour and research at STI Firearms mfg. facility in Austin, TX.- 2013
- Tour and research at North American Arms in UT. - 2013
- International Exchange of Military Technology, Titusville, FL - 2012
- Tour and research at Patriot Ordnance Factory, Phoenix, AZ. – 2012
- Tour and research at Arms Tech Ltd. in Phoenix, AZ. - 2012
- Tour and research at Windham Weaponry in Windham, ME.- 2012
- Armorer training, Kimber Firearms, West Palm Beach, FL. – 2011
- Tour and research at the Bundesamt fur Wehrtechnick und Beschaffung (BWB) (Federal Office of Defense Technology and Procurement) in Koblenz, Germany. – 2010
- Armorer training, DS Arms (FAL), Springfield Armory (XD), and Smith & Wesson (M&P), San Antonio, TX. - 2010

5

37

Resume of Daniel G. O'Kelly
June 30, 2023 **Page 6**

-Tour and research at Kel-Tec CNC Industries, Cocoa Beach, FL. – 2009
-Tour and research at Diamondback Arms, Titusville, FL. - 2009
-Tour and research at the German Police (BKA) firearm technology reference collection, Wiesbaden, Germany - 2005
-Tour and research at Vektor Firearms factory, and the New Generation Ammunition Factory, Pretoria, South Africa. – 2004
- Remington Armorer School (870, 1187 and 700), Cape Girardeau, Missouri. – 2003
- Tour and research at MFS ammunition factory, Sirok, Hungary. – 2003
- International Association of Law Enforcement Firearm Instructors (IALEFI) annual training conference, Orlando, Florida. – 2003
- Tour and research at Sellier & Bellot ammunition factory, Vlasim, Czech Republic. – 2003
- Tour and research at the U.S. Military Academy firearm museum at West Point, NY. – 2003
- Firearm Instructor Recertification/Enhancement Workshop, ATF Special Operations Division, Orlando, Florida. – 2002
- Colt Armorer school (AR-15/M-16/M-4 series), (Model O pistols), Fairfax, Virginia. – 2002
- Beretta Armorer school (model 92/96), San Diego, California. – 2002
- Fabrique Nationale Herstal (FNH) Armorer school (P90) San Diego, California. – 2002
- Tour and research at Pretoria Metal Pressings (PMP) ammunition factory, Pretoria, South Africa. - 2002
-Tour and research at Vektor firearm mfg., Pretoria, South Africa.- 2002
- IALEFI Training Conference, San Diego – 2002
- Tour and research at Fegarmy firearm factory (2nd tour), Budapest, Hungary. -2001
- Tour and research at the Hungarian Police Laboratory firearm reference collection, Budapest, Hungary -2001
- Tour and research at Ceska Zbrojovka (CZ) firearm factory (my 2nd tour) and the Czech government Proof House, Uhersky-Brod, Czech Republic. – 2001
- Tour and research at Glock firearm factory (my 2nd tour), Deutsch-Wagram, Austria. -2001
- Tour and research at the Vienna proof house in Deutsch- Wagram, Austria. – 2001
- Tour and research at Carl Walther firearm factory (my 2nd tour), Ulm, Germany. - 2001
- Tour and research at the government proof house, Ulm, Germany – 2001
- Tour and research at Heckler & Koch firearms (my 2nd tour), Oberndorf, Germany. -2001
- Tour and research at Sig-Sauer firearms (my 2nd tour), Eckernforde, Germany. – 2001
- Tour and research at the Kiel proof house, Eckernforde, Germany – 2001
- Tour and research at the Fabrique Nationale (FN) firearm Factory, Liege, Belgium. -2001
- Tour and research at the government proof house, Liege, Belgium -2001
- Tour and research at the Austrian Police Headquarters Waffen Referat (Weapons Reference Collection), Vienna, Austria. – 2001
- Tour and research at the Heeresgeschichtlen (Military History) Museum, Vienna, Austria. – 2001
- ATF Youth Crime-Gun Interdiction Initiative Instructor school, Washington, D.C. – 2000
- Tour and research (my 2nd tour) at the Heeresgeschichtlichen (Military History) Museum, Vienna, Austria. – 1999
- ATF Advanced Firearm Interstate Nexus course on ammunition manufacturing. Included tours

Resume of Daniel G. O'Kelly
June 30, 2023 **Page 7**

and research at Hornady in Grand Island, Nebraska, 3D in Doniphan, Nebraska, Lake City
Army Ammunition Depot in Independence, Missouri, Starline Brass and Sierra Bullets in
Sedalia, Missouri, and the Winchester-Olin ammunition plant in East Alton, Illinois - 1999
- ATF Advanced Firearm Interstate Nexus course on firearm manufacturing. Included tours and
research at Sturm-Ruger (my 2nd tour) and Pine Tree Castings in New Hampshire, Smith &
Wesson and Springfield Armory in Massachusetts, and Colt and Mossberg in Connecticut. –
1998
- Sturm-Ruger Armorer course (Mini-14, Police Carbine, P89, P95) Newport, NH – 1997
- Tour and research at Sturm-Ruger firearm factory, Newport, New Hampshire. - 1997
- Tour and research at Pine Tree (firearm) Castings facility, Newport, New Hampshire. – 1997
- Tour and research at Ceska Zbrojovka (CZ) firearm factory in Uhersky-Brod, Czech Republic.
 - 1997
- Tour and research at Steyr firearm mfg. plant, Steyr, Austria.- 1997
- Tour and research at the Fegarmy' firearm mfg. plant, Budapest, Hungary. – 1997
- Tour and research at Glock pistol mfg. plant, Deutsch- Wagram, Austria. 1997
- Heckler & Koch Armorer, Sterling, Virginia. – 1996
- Sig-Sauer Armorer course (P225, P226, P228) Fort McClellan, Alabama. – 1996
- Reid Interviewing Seminar – 1996
- ATF Interviewing Instructor and Neuro-Linguistic Programming School – 1996
- SIMUNITIONS Scenario-Based (Train the Trainer) Seminar – 1996
- Tour and research at Sig-Sauer mfg plant, Eckernforde, Germany, - 1995
- Tour and research at Carl Walther firearm mfg. plant, Ulm, Germany, where I consulted on
development of the model P99 pistol. – 1995
- ATF Advanced Arson and Explosives Investigation School – 1995
- Violent Crime/Homicide Investigation School (USDOJ) – 1994
- Tour and research at the Ministry of Defense, Pattern Room, Nottingham, England. – 1994
- Tour and research at Holland & Holland, Ltd., firearms London, England. – 1994
- Bureau of ATF Academy Instructor Certification – 1994
- Glock Armorer Course, Springfield, Illinois. – 1993
- Advanced Interviewing and Interrogation (Portage PD)- 1992
- Sig-Sauer Armorer Course, Greenwood, Indiana. - 1990
- FLETC Distinguished Weapons Expert Certification – 1990
- ATF Basic Firearm Interstate Nexus course, Washington D.C., (included examination of over
4,500 firearms) - 1990
- Firearm Instructor certification course at the Federal Law Enforcement Training Center,
Marana, AZ. – 1990
- New Agent Training at the Federal Law Enforcement Training Center, Glynco, Georgia. –
1988
-Criminal Investigator School, at the Federal Law Enforcement Training Center, Glynco,
Georgia. – 1988
- Smith & Wesson Revolver Armorer Course, Kent State University -1987
- Smith & Wesson's Scope -Sighted Rifle School - 1987
- Indiana L.E. Training Board, Instructor Certification – 1987

Resume of Daniel G. O'Kelly
June 30, 2023 Page 8

- Aerko International Chemical Weapons Specialist School, Camp Atterbury, Indiana. – 1987
- NRA Police Firearms Instructor Certification - 1985
- FBI Hostage Negotiator School – 1984
- Firearm Instructor Training Course at the Indiana Law Enforcement Academy, Plainfield, IN. – 1982
- Monadnock PR-24 Police Baton (Portage PD) – 1981
- Police Officer Street Survival (L/SPSTC) – 1981
- Chemical Tests for Intoxication Certification (ILEA) - 1979
- Police Officer Certification, Indiana Law Enforcement Academy, Plainfield, Indiana. – 1979
- NRA Police Expert (Range Qualification) - 1978

**PROFESSIONAL AFFILIATIONS**

> NSSF (The National Shooting Sports Foundation)
> ARIN (ATF's Ammunition Research and Identification Network)
> IAA (The International Ammunition Association)
> NDIA (The National Defense Industrial Association)
> IALEFI (The International Association of Law Enforcement Firearm Instructors)
> NRA (The National Rifle Association)
> ABMDI (Association of Medico-legal Death Investigators)
> PEAF (Property an Evidence Association of Florida)
> FDIAI (Florida Division- International Association of Identification)
> IAI (International Association for Identification – National Chapter)
> ILEETA (International Law Enforcement Educators and Trainers Association)
> AFTE (Association of Firearm and Tool Mark Examiners)

**PRESENTATIONS**

1. Certified Firearm Specialist Course (3-day seminar) – West Palm Beach, FL 2/23
2. Certified Firearm Specialist Course (3-day seminar) – Albuquerque, NM 9/22
3. Certified Firearm Specialist Course (3-day seminar) – Honolulu, HI 6/22
4. Certified Firearm Specialist Course (3-day seminar) – Pensacola, FL 2/22
5. Certified Firearm Specialist Course (3-day seminar) – Seattle, WA 9/21
6. Certified Firearm Specialist Course (3-day seminar) – El Cajon, CA 9/21
7. Certified Firearm Specialist Course FBI (3-day seminar) – Little Rock, AR 5/21
8. Certified Firearm Specialist Course (3-day seminar) – Seattle, WA 9/20
9. Certified Firearm Specialist Course FBI (3-day seminar) – Kansas City, MO 8/19
10. Certified Firearm Specialist Course FBI (3-day seminar) – Las Vegas, NV 8/19
11. Certified Firearm Specialist Course (3-day seminar) – St. Louis, MO 8/19
12. Certified Firearm Specialist Course FBI (3-day seminar) – Charlotte, NC 7/19
13. Certified Firearm Specialist Course (3-day seminar) – Oceanside, CA 7/19
14. Certified Firearm Specialist Course FBI (3-day seminar) – San Antonio, TX 7/19
15. Certified Firearm Specialist Course FBI (3-day seminar) – New Haven, CT 6/19

Resume of Daniel G. O'Kelly
June 30, 2023 **Page 9**

16. How to Identify "Other" Firearms – AFTE 50th Annual Conf. Nashville, TN 5/19
17. Machineguns and Clandestine Conversions – Nashville Police Department/AFTE 5/19
18. Certified Firearm Specialist Course Seattle, WA – 5/19
19. Certified Firearm Specialist Course Orlando, FL – 5/19
20. Certified Firearm Specialist Course Skokie, IL – 4/19
21. Certified Firearm Specialist Course FBI (3-day seminar) – Chicago, IL 7/18
22. Advanced NFA Firearm Training – Houston, TX 6/18
23. "Other Firearms" (AFTE 2018) - Charleston, WV  6/18
24. Firearm Technology and Specialist Training (3-day seminar) – Boston, MA 5/18
25. Firearm Technology and Specialist Training (3-day seminar) – Brighton, CO 4/18
26. Firearm Technology and Specialist Training (3-day seminar) – Santa Cruz, CA 3/18
27. Firearm Technology and Specialist Training (3-day seminar) – Floral Park, NY 1/18
28. Firearm Technology and Specialist Training (3-day seminar) – Oceanside, CA 11/17
29. Firearm Technology and Specialist Training (3-day seminar) – Pensacola, FL 11/17
30. Firearm Technology and Specialist Training (3-day seminar) – St. Louis, MO 8/17
31. Firearm Technology and Specialist Training (3-day seminar) – Kissimmee, FL 6/17
32. Firearm Technology and Specialist Training (3-day seminar) – Seattle, WA – 4/17
33. Firearm Technology and Specialist Training (3-day seminar) – Chicago, IL – 4/17
34. Firearm Technology and Specialist Training (3-day seminar) – Escondido, CA – 10/16
35. Firearm Technology and Specialist Training (3-day seminar) – Ft. Myers, FL – 10/16
36. Home-made Firearms, Silencers, Disguised Firearms, and Court Testimony – SWAFS - Galveston, TX - 9/16
37. Firearm Classification and Markings – IAI/Cincinnati, OH – 8/16
**38.** Certified Firearm Specialist Course (3-day seminar) – FDLE Jacksonville, FL - 7/16
**39.** Firearm Technology and Specialist Training (3-day seminar) – New Jersey St. Police – 7/16
**40.** Firearm Technology and Specialist Training (3-day seminar) – Pensacola, FL PD - 7/16
**41.** Firearm Technology and Specialist Training (3-day seminar) – CSI Academy Alachua, FL – 7/16
42. Firearm Classification and Markings – AFTE/New Orleans, LA – 6/16
**43.**  Discerning real guns from fakes with video/photo evidence – AFTE/New Orleans, LA – 5/16
**44.** Firearm Technology and Specialist Training (3-day seminar) – Santa Fe, NM – 5/16
**45.** Firearm Technology and Specialist Training (3-day seminar) – St. Louis, MO – 4/16
**46.**  Firearm Technology and Specialist Training (3-day seminar)– Seattle, WA – 4/16
**47.** Firearm Technology and Specialist Training (3-day seminar) – Miami, FL – 1/16
**48.** Firearm Technology and Specialist Training (3-day seminar) – Biddeford, Maine – 1/16
**49.** Firearm Technology and Specialist Training (2-day seminar) – Jacksonville, FL – 9/15
**50.** Firearm Technology and Specialist Training (2-day seminar) – Windham, Maine – 8/15
**51.** ATF Firearm Licensee Compliance; Jeffersonville, IN – 8/15
**52.** Firearm Technology and Specialist Training (2-day seminar) –Pensacola, FL PD – 7/15
**53.** Firearm Technology and Specialist Training (2-day seminar) - Kissimmee, FL – 7/15
**54.** Firearm Technology and Specialist Training (2-day seminar) – Seattle, WA - 5/15

9

41

Resume of Daniel G. O'Kelly
June 30, 2023 **Page 10**

55. Firearm and Ammunition Classification – PNWIAI Conference – Portland, OR 5/15
56. Firearm Technology and Specialist Training (2-day seminar) – Miami, FL – 3/15
57. Firearm Technology and Testimony (2-day seminar) – Orange Beach, AL - 11/14
58. Firearm Technology and Testimony (2-day seminar) – Albuquerque, NM – 10/14
59. Basic Firearm Technology and Testimony – Ft. Myers, FL – 7/14
60. Advanced Firearm Technology – Institute of Military Technology – Titusville, FL. 10/12
61. Firearm Recognition/Handling/Testimony – Orange Co. Sher. Ofc. – Orlando, 7/5/12
62. Firearm Recognition/Handling/Testimony – Florida Dept. of Law Enf. - Orlando, 6/4/12
63. Firearm ID – How to Read a Gun – Florida Assn. of Lic. Inv. – Tampa, FL 6/11/11
64. Firearm Hist. and Development – A Primer/ Becoming an Expert – W. P. Bch, FL, 5/26/11
65. Contributor to the book **Cartridges & Firearms Identification** by Robert Walker, ISBN #9781466502062 – 2010
66. Firearm Technology and Enforcement – Int'l LE. Academy – Budapest, Hungary, 7/10
67. Crime-Gun Safety, Recognition and Handling – Daytona Beach Police Department, 09/09
68. Crime-Gun Safety, Rec. and Handling – Brevard County, FL Sheriff's Office, 06/09
69. Ammunition Technology – Property and Evidence Association of Florida, Orlando, 02/09
70. Firearm Interstate Nexus – ATF and South African Police Service - Orlando, FL, 01/09
71. Industry Operations Investigator Basic Course – Glynco, GA, 10/07
72. Firearm Technology and Enforcement – Gabarone, Botswana (Africa), 08/07
73. Small Arms Trafficking – ILEA – Gabarone, Botswana (Africa), 08/07
74. Firearm Recognition, Technology and Anti-Smuggling – ILEA Budapest, Hungary, 12/08
75. Firearm Recognition/Technology – Orange County Sheriff Orlando, FL 08/08
76. Crime-Gun Rec., Handling, Tech. and Prosecution – FDIAI – Panama City, FL, 11/05
77. Reloading Metallic Cartridges - Florida Dept. Of Law Enforcement – Tampa, FL 03/08
78. New Developments in Ammunition – FDLE Orlando, FL, 10/04
79. Firearm Technology and Enforcement – Gabarone, Botswana (Africa), 09/04
80. Small Arms Trafficking – ILEA – Gabarone, Botswana (Africa),
81. Man-Portable Air Defense Systems – Florida Intelligence Unit – Daytona Bch, FL 07/04
82. Reloading Metallic Cartridges - Florida Dept. Of Law Enforcement – Tampa, FL, 08/03
83. Firearm Recognition, Technology and Anti-Smuggling – ILEA Budapest, Hungary, 06/03
84. Firearm Technology and Enforcement – Gabarone, Botswana (Africa), 08/02
85. Firearm Recognition, Technology and Anti-Smuggling – ILEA Budapest, Hungary, 02/97
86. Firearm Technology for Law Enforcement Gary, IN, 12/95

## AWARDS & ACHIEVEMENTS

Fraternal Order of Police (Past-President) Westchester Lodge #152 - 1980
Presented Distinguished Weapons Expert Award by FLETC - 1990
Presented Special Act or Service Award by ATF - 1993
Presented U.S. DOJ Award for Public Service by U.S Attorneys Office - 1995
Presented Special Act or Service Award by ATF - 1999
Presented Special Act or Service Award by ATF - 2000
Presented Certificate of Appreciation by ATF National Academy – 2001

Resume of Daniel G. O'Kelly
June 30, 2023  **Page 11**

Presented Special Act or Service Award by ATF - 2002
Presented Award for Educational Support by PEAF - 2005
Invited to join ATF's ARIN (Ammunition Research & ID Network) – 2005
Featured Speaker- "<u>Firearm Technology</u>"- Property and Evidence Association of
Florida Annual Conference - 2006
Research of ammunition company history determination on interstate nexus,
on metallic cartridges found in the State of Florida.- 2009
Presented IALEFI Guest Instructor Award - 2010
Invited onto the Advisory Board of the Sonoran Desert Institute – 2014 - Present
Recognized as a Technical Advisor to the Assn. of Firearm and Tool Mark Examiners –
2017 - Present

**Daniel O'Kelly**
**Recent Prior Testimony, Statement, Declaration, or Consultation**

U.S. vs Joseph Roh #SACR 14-00167-JVS (Los Angeles 2018)
U.S. vs Caleb Andrew Bailey 8:16-cr-246 (Maryland 2018)
U.S. vs. Alan Bruce Pichel SACR 14-00167-JVS (Los Angeles 2018)
US. vs. Andrew Kowalczyk 2018 (Portland, OR)
U.S. vs. Stephen Powers (2018 Richmond, VA)
U.S. vs Alan Balagtas Rivers (17-00478YGR) (Sacramento, CA)
Leapers Inc. vs. TRARMS Inc. 1:15-cv-01539-SEB-MJD (Indianapolis, IN)
U.S. vs. Adam Michael Webber 2:14-cr-00443 (Salt Lake City, UT)
U.S. vs. Hasson (Greenbelt, MD) 8:19-cr-00096
U.S. vs. Matthews-Amos (Reno, NV) 3:18-cr-083
U.S. vs. Steven Robison and Richard Rowold (Toledo, OH) 3:18 -cr-00387
U.S. vs. Groves, Paul 2:16-CR-041 (Columbus, OH)
U.S. vs Grimes, Eric 2020-229-JLB 312918 (Columbus, OH)
Jonathan Perinetti vs. Scottsdale Gun Club, et al CV2018-013381 (Phoenix, AZ)
Florida vs. Jermaine Burney 19CF014124A Tampa, FL
U.S. vs. Joshua Seekins 3:19-CR-563-M (Dallas, TX)
U.S. vs. Steven Grijalva ED CR 20-00042-JGB (Riverside, CA)
Texas vs. Jaqualyn Davis F18-75814X (Dallas)
California vs. Fernando Carlos Beltran BA473833-02 (Los Angeles, CA)
Texas vs. Ray Battles Atty. Clark Birdsall (Dallas, TX)
US v. John Hammond 2:19-CR-517 Atty. Caroline Cinquanto (Philadelphia, PA)
US v. Cesar Isais (Los Angeles, CA) Atty. Waseem Salahi
US V. Roberto Osborne (St. Louis, MO) 2020 Atty. Rachael Korenblat
Florida v. Delvin Rojas-Rivera 2020 Atty. Lillian Odongo (Tampa Fl)
Texas v. Destin Bailey 2021 (Dallas, TX) Atty. Clark Birdsall
US v. Howard Davis (Raleigh, NC) 2022 Atty. Elliot Abrams
US v. Brian Downey 2021 (NY, NY) Atty. Andrew Quinn
US v. Kristopher Ervin 2021 (Jacksonville, FL) Atty. Alex King
US v. Alex Friedmann (Nashville, TN) 2021 Atty. Ben Russ
US v. Alan Garcia 2:19-cr-0179-KJM (Sacramento, CA) 2021 Atty. Douglas Beevers
US v. Taylor Gates (Dallas, TX) Atty. Douglas Palmer 2021
Griggs v. Ghost inc. No 17-1491 (Monroe, LA) 2017 Atty. Robert Baldwin
US v. Steven Grijalva CR20-0042-JGB (Riverside, CA) Atty. Andrew Byrd 2020
US v. Ronald Grab (Toledo, OH) 3:20-cr-00618-JJH 2020 Atty. Thomas Kurt
US v. Gregory Hay 19-CR-170 2021 (Western District of NY) Atty. Cheryl Meyers Buth
US v. Jordan Holt 2021 MJ21-147-KEW (Oklahoma) Atty. Callie Steele
NY v. Jerry's Firearms 2021 Atty. Joseph Indusi (Hauppage, NY)
US v. Aaron Johnson 2021 Atty. Chris Wilson (Harrisburg PA)
Rare Breed Triggers v. US 2021 (Orlando, FL.) Atty. Kevin Maxwell
Texas v. Kevin Mock 2021 (Navasota, TX) Atty. John Choate Jr.
US v. Calvin Padgett Atty. Wade Iverson 2022 (Lubbock, TX)

44

US v. Jonathon Perez, et al. 2022 Atty. Ted Tedford

California v. Polymer 80 2021 Atty. David L. Borges

US v. Yousef Mohammad Ramadan Cr. No. 17-20595 (Detroit, MI) Atty. Andrew Densemo 2021

US v. Marc Taylor II (St. Louis, MO) 2021 Atty. Mellissa Goymerac

Texas v. Petrina Thompson F20-17-211 2020 (Denton, TX) Atty. Mick Meyer

Stanley Wagner v. Weatherby, Inc. 2019 (Minnesota) Atty. Stephen Gabrielson

Texas v. Christopher Wall 2020 (Ft. Worth, TX) Atty. Andrew Deegan

US v. Kevion K. Wallace 2021 (Oklahoma) Atty. Donald Haslam

US v. Chrizawn White 2021 (Houston, TX) Atty. Dennis Hester

Texas v. Victor Williams, 2021, (Dallas, TX), Atty. Wayne Lacy

Rarebreed Triggers v. ATF, 2021, (Orlando, FL) Atty. Kevin Maxwell

Texas v. Christopher Wall, 2019, (Weatherford, TX) Atty. Andrew Deegan

Texas v. Jaqualyn Davis, 2021, (Dallas) Atty. Clark Birdsall

Texas v. Destin Bailey, 2022, (Dallas) Atty. Clark Birdsall

Texas v. David McMillian, 2022, (Dallas) Atty. Michael J. Todd

US v. Terry Bruggeman, 2022, (Corpus Christi) Atty. Paul Kratzig

US v. Wilmer Curras 2022 (Puerto Rico) Atty. Suzette Brito

US v. Jose Acquino, 2022 (Puerto Rico) Atty. Allan Rivera- Fernandez

US v. Adamiak, 2023 (Norfolk, VA) Atty. David Good

**Daniel O'Kelly**
**Recent Prior Testimony, Statement, Declaration, or Consultation**

U.S. vs Joseph Roh #SACR 14-00167-JVS (Los Angeles 2018)
U.S. vs Caleb Andrew Bailey 8:16-cr-246 (Maryland 2018)
U.S. vs. Alan Bruce Pichel SACR 14-00167-JVS (Los Angeles 2018)
US. vs. Andrew Kowalczyk 2018 (Portland, OR)
U.S. vs. Stephen Powers (2018 Richmond, VA)
U.S. vs Alan Balagtas Rivers (17-00478YGR) (Sacramento, CA)
Leapers Inc. vs. TRARMS Inc. 1:15-cv-01539-SEB-MJD (Indianapolis, IN)
U.S. vs. Adam Michael Webber 2:14-cr-00443 (Salt Lake City, UT)
U.S. vs. Hasson (Greenbelt, MD) 8:19-cr-00096
U.S. vs. Matthews-Amos (Reno, NV) 3:18-cr-083
U.S. vs. Steven Robison and Richard Rowold (Toledo, OH) 3:18 -cr-00387
U.S. vs. Groves, Paul 2:16-CR-041 (Columbus, OH)
U.S. vs Grimes, Eric 2020-229-JLB 312918 (Columbus, OH)
Jonathan Perinetti vs. Scottsdale Gun Club, et al CV2018-013381 (Phoenix, AZ)
Florida vs. Jermaine Burney 19CF014124A Tampa, FL
U.S. vs. Joshua Seekins 3:19-CR-563-M (Dallas, TX)
U.S. vs. Steven Grijalva ED CR 20-00042-JGB (Riverside, CA)
Texas vs. Jaqualyn Davis F18-75814X (Dallas)
California vs. Fernando Carlos Beltran BA473833-02 (Los Angeles, CA)
Texas vs. Ray Battles Atty. Clark Birdsall (Dallas, TX)
US v. John Hammond 2:19-CR-517 Atty. Caroline Cinquanto (Philadelphia, PA)
US v. Cesar Isais (Los Angeles, CA) Atty. Waseem Salahi
US V. Roberto Osborne (St. Louis, MO) 2020 Atty. Rachael Korenblat
Florida v. Delvin Rojas-Rivera 2020 Atty. Lillian Odongo (Tampa Fl)
Texas v. Destin Bailey 2021 (Dallas, TX) Atty. Clark Birdsall
US v. Howard Davis (Raleigh, NC) 2022 Atty. Elliot Abrams
US v. Brian Downey 2021 (NY, NY) Atty. Andrew Quinn
US v. Kristopher Ervin 2021 (Jacksonville, FL) Atty. Alex King
US v. Alex Friedmann (Nashville, TN) 2021 Atty. Ben Russ
US v. Alan Garcia 2:19-cr-0179-KJM (Sacramento, CA) 2021 Atty. Douglas Beevers
US v. Taylor Gates (Dallas, TX) Atty. Douglas Palmer 2021
Griggs v. Ghost inc. No 17-1491 (Monroe, LA) 2017 Atty. Robert Baldwin
US v. Steven Grijalva CR20-0042-JGB (Riverside, CA) Atty. Andrew Byrd 2020
US v. Ronald Grab (Toledo, OH) 3:20-cr-00618-JJH 2020 Atty. Thomas Kurt
US v. Gregory Hay 19-CR-170 2021 (Western District of NY) Atty. Cheryl Meyers Buth
US v. Jordan Holt 2021 MJ21-147-KEW (Oklahoma) Atty. Callie Steele
NY v. Jerry's Firearms 2021 Atty. Joseph Indusi (Hauppage, NY)
US v. Aaron Johnson 2021 Atty. Chris Wilson (Harrisburg PA)
Rare Breed Triggers v. US 2021 (Orlando, FL.) Atty. Kevin Maxwell
Texas v. Kevin Mock 2021 (Navasota, TX) Atty. John Choate Jr.
US v. Calvin Padgett Atty. Wade Iverson 2022 (Lubbock, TX)

US v. Jonathon Perez, et al. 2022 Atty. Ted Tedford

California v. Polymer 80 2021 Atty. David L. Borges

US v. Yousef Mohammad Ramadan Cr. No. 17-20595 (Detroit, MI) Atty. Andrew Densemo 2021

US v. Marc Taylor II (St. Louis, MO) 2021 Atty. Mellissa Goymerac

Texas v. Petrina Thompson F20-17-211 2020 (Denton, TX) Atty. Mick Meyer

Stanley Wagner v. Weatherby, Inc. 2019 (Minnesota) Atty. Stephen Gabrielson

Texas v. Christopher Wall 2020 (Ft. Worth, TX) Atty. Andrew Deegan

US v. Kevion K. Wallace 2021 (Oklahoma) Atty. Donald Haslam

US v. Chrizawn White 2021 (Houston, TX) Atty. Dennis Hester

Texas v. Victor Williams, 2021, (Dallas, TX), Atty. Wayne Lacy

Rarebreed Triggers v. ATF, 2021, (Orlando, FL) Atty. Kevin Maxwell

Texas v. Christopher Wall, 2019, (Weatherford, TX) Atty. Andrew Deegan

Texas v. Jaqualyn Davis, 2021, (Dallas) Atty. Clark Birdsall

Texas v. Destin Bailey, 2022, (Dallas) Atty. Clark Birdsall

Texas v. David McMillian, 2022, (Dallas) Atty. Michael J. Todd

US v. Terry Bruggeman, 2022, (Corpus Christi) Atty. Paul Kratzig

US v. Wilmer Curras 2022 (Puerto Rico) Atty. Suzette Brito

US v. Jose Acquino, 2022 (Puerto Rico) Atty. Allan Rivera- Fernandez

US v. Adamiak, 2023 (Norfolk, VA) Atty. David Good



**International Firearm Specialist Academy**
**PO Box 338 Lake Dallas, TX 75605**
**Email: Info@GunLearn.com**

August 6, 2020

Kevin Maxwell, esq.
Rarebreed Triggers
Geneva, Florida

Dear Mr. Maxwell,

This letter serves to explain the results of our recent examination and testing of your "Rare Breed, LLC FRT trigger system", which you recently submitted to us.

Before I explain my findings, it is necessary for me to clarify a few issues as they relate to firearm technology. First, allow me to differentiate between the term semi-automatic and fully-automatic (machinegun). As you know, Title 26 of the U.S Code defines a machinegun (fully-automatic) in subsection 5845(b) as:

*The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.*

It is important to note that by contrast, a semi-automatic is any firearm which shoots <u>only one</u> shot "automatically" by a single function of the trigger. The practical difference between fully-automatic and semi-automatic is referred to as the "cyclic rate of fire" (i.e. the number of shots which can be fired within a minute). This number is merely a ratio. Since few firearms have the capacity to hold a full minute's worth of ammunition, that number is determined by multiplying the number of shots which can be fired in a faction of a minute. For example, if a firearm can fire 12 shots in 10 seconds, its cyclic rate of fire is 72 rpm (rounds per minute).

Also, many devices have been invented in recent years which increase a semi-automatic firearms cyclic rate of fire. Bump-stocks and other bump-fire devices are some of them. Despite the fact

48

p.2
Kevin Maxwell, esq.
August 6, 2020

that the U.S. Government recently reversed themselves by re-defining their years-long position on the word "automatically" as used in the definition of a machinegun, please note that bump-fire devices, including bump-fire stocks do nothing "automatically", and firearms equipped with them require a separate trigger pull and release to fire each shot.

Please also note that all firearms have a "cycle of operation" which must be completed between the firing of one shot and the firing of a subsequent shot. There are eight steps which must occur during the cycle of operation (i.e. firing, unlocking, extraction, ejection, cocking, feeding, chambering, locking), and the order in which they occur depends upon the type of mechanical operation which the firearm employs (bolt-action, lever-action, break-action, pump-action, revolving action, self-loading, etc…).

Considering that an AR15-type firearm is a self-loading type of mechanical action (i.e. it uses the energy generated by a fired cartridge to reload its own chamber for a subsequent shot), the eight steps of the cycle of operation all occur extremely quickly (i.e. within less than 1/5 second). Therefore, a second shot may be fired by the shooter within 1/5 of a second after the first. Therefore, the cyclic rate of fire of a semiautomatic firearm is only limited by the physical dexterity of the operator of it. While many shooters may not have the physical dexterity to react each 1/5 second, the Rare Breed, LLC FRT trigger system allows a shooter to keep pressure on the trigger in anticipation of the end of a cycle of operation. Although the shooter may in fact hold pressure against the trigger during the cycle of operation, the trigger is not moving nor performing any "function" and is in fact locked in its non-firing position. Please note that "pressure" is not addressed in the definition of a machinegun, nor is the word "pull". The word "function" is the key word in the definition, and "function" is defined at Dictionary.com as;

*"to perform a specified action or activity; work; operate: to have or exercise a function; serve:"*
https://www.dictionary.com/browse/function

It is imperative that it be recognized that in the Rare Breed, LLC FRT trigger system, keeping pressure on the trigger serves no function. It is akin to leaning on a locked door, and then falling through it once unlocked, rather than waiting for the unlocking and then pushing it open.

In the case of a machinegun, it isn't the fact that the shooter holds continuous pressure against the trigger, it's the fact that he "functions" the trigger by pulling it to the rear only once and holding it there, and multiple shots result from this "single function of the trigger".

49

p.3
Kevin Maxwell, esq.
August 6, 2020

The advantage of the Rare Breed, LLC FRT trigger system is that when a shooter holds pressure against the locked trigger during the cycle of operation, he is able to pull (function) it again immediately after the cycle of operation ends, and avoid the normally much slower reaction time needed when using a traditional trigger. A traditional trigger relies on the shooter to hear the report and feel recoil while reacting to them, and then make the decision to release and re-pull the trigger, and then do so, all of which serve to slow reaction time and as a result, reduce the cyclic rate of fire.

The fact is, that a semiautomatic firearm, such as the AR15-type firearm, takes only a fraction of a second to cycle from one shot to another. There are videos on the internet of professional shooters firing 5 shots from an AR15 within one second. Regardless of whether the ability to fire that quickly semi-automatically is perceived as acceptable by ATF, the mechanical operation of a firearm equipped with an "Rare Breed, LLC FRT" trigger system is still done semi-automatically as defined in federal law. While it is true that a shooter may fire successive shots quickly by keeping pressure on the trigger of a firearm equipped with an "Rare Breed, LLC FRT" trigger system, the shooter must nevertheless make a subsequent movement of the trigger to the rear for each shot fired. The only thing which keeping continuous pressure on the trigger does, is to allow the shooter to be ready to make his next trigger movement immediately after the cycle of operation is complete.

We note that the only thing which happens "automatically" in the Rare Breed, LLC FRT trigger system is the return of the trigger to the set position when it is impinged upon by the hammer. It is also noteworthy that previous ATF rulings since 2009 concerning other devices for use in firing an AR15-type firearm more rapidly, such as the "fire-on-release" (i.e. Franklin Armory's "binary" trigger) type of mechanisms, have defined a single function of the trigger as a "single movement of the trigger". In fact the Franklin Armory Binary trigger system allows 2 shots to be fired with each pull-release of the trigger, yet ATF has opined that these are acceptable and not within the definition of a machinegun.  The Rare Breed, LLC FRT trigger system in fact, requires two separate movements of the trigger (rearward and forward) for each single shot fired.

The Rare Breed, LLC FRT trigger system is a self-contained body which fits into the firing-control cavity of an AR15-type firearm. The body utilizes the conventional trigger pivot pin and hammer pivot pin to be held into place. The body houses a trigger, trigger-return spring, hammer, hammer-return spring, and a proprietary "locking bar".

50

p.4
Kevin Maxwell, esq.
August 6, 2020

The "Rare Breed, LLC FRT" trigger system was examined as installed into a Spikes Tactical model SR15 rifle, serial #SKU0092, chambered in 5.56 x 45mm caliber. My examination revealed that the Rare Breed, LLC FRT trigger is designed such that upon firing a shot, as the bolt-carrier moves to the rear it cocks the hammer as normal. However, the hammer in turn forces the reset of the trigger to its original position. Upon doing so, a locking-bar locks the trigger into the reset position, making it physically impossible to move the trigger rearward during the remainder of the cycle of operation. I note that whereas a traditional semiautomatic AR15-type trigger must consciously be released by the shooter in order for it to reset, the "Rare Breed, LLC FRT" type of trigger system forces the reset of the trigger and makes it impossible for the shooter to hold the trigger to the rear. This actually prevents the fully-automatic firing which could result in the case of parts malfunction, and therefore makes an AR15 equipped with a Rare Breed, LLC FRT" trigger system less susceptible to fully-automatic firing than a conventional AR15.

This is accomplished as follows. The bolt-carrier group already having completed the extraction and ejection of a fired cartridge case, begins moving forward under the energy of the buffer-spring. As the bolt goes back into battery, having fed and chambered the next cartridge into the chamber, the lower-tail of the bolt carrier impacts the top of the locking block, causing it to pivot out of engagement with the trigger. Only then, once the next cartridge has been chambered and the breech is locked, is the shooter able to again pull the trigger to fire a follow-up shot. Upon pulling the trigger to fire another shot, the above -described procedural cycle begins again.

The testing of the submitted rifle was done on June 13, 2020, at an outdoor range in Geneva, Florida, in the form of a live-fire session, using factory-loaded ammunition.

While in the "Safe" position, the rifle was found to be incapable of firing as the result of a trigger-pull. While in the "Fire" or "semiautomatic" position, the rifle was found to operate as a semi-automatic firearm as originally designed, firing only one shot for every pull of the trigger. During the rapid firing of full 30 rd. magazines, which were fired as rapidly as possible, there were no instances of "hammer-follow".

At no time did the firearm fire more than one shot per function of the trigger, no matter how quickly in succession the trigger was pulled and released.

In summary, the "Rare Breed, LLC FRT" trigger system did not perform in any way which would make it or a firearm in which it is properly installed, subject to the National Firearms Act. It is also my professional opinion that the "Rare Breed, LLC FRT" trigger system for AR-type

p.5
Kevin Maxwell, esq.
August 6, 2020


firearms as submitted, is not a firearm under the purview of the Gun Control Act, nor under the National Firearms Act.

I trust that my findings have been helpful.
Respectfully,

Daniel O'Kelly
Director


*Daniel G. O'Kelly*

**Rebuttal statement of Daniel G. O'Kelly**

In ATF's Report of Technical Examination (UI #163080-21-0006) to Special Agent Michael T. Nuttall, I first noticed that they cite 28 CFR 0.130, adding that the Attorney General provides ATF with the authority to investigate, administer, and enforce the laws related to firearms. And pursuant to that, the Firearms and Ammunition Technical Division (FATD) "provides expert technical support" on firearms and ammunition to federal, state, and local law enforcement. However, shortly thereafter FATD "determines" that the item at issue is a machinegun, rather than merely offering their expert opinion as such. I find it disturbing that they offer their opinion as a determination because this "determination" is outside the scope of their authority. Any such determination is only within the authority of a court. Also, if FATD is going to offer "expert technical support", then that support should be in the form of expert technical opinions and should be based on facts and their ability to clearly interpret the elements called for in a definition within the U.S Code. However, they go on throughout the remainder of the report making "determinations" as though they are fact, while using vague and unclear terminology, often evading the pivotal point of the definition. They do so while making statements which are not only untrue but at times physically impossible. In their "Findings" on page 2, FATD cites the fact that "FTISB previously examine (sic) a "forced reset trigger" from (name redacted) (holder of U.S. Patent 10514223) and **determined** it to be a combination of parts, designed and intended for converting a weapon into a machinegun; and therefore a machinegun as defined in the GCA and NFA ... (bold added)"

This citation is also obviously a leap in logic which is being offered as "support" for their later-stated opinion that the Rarebreed FRT is a "machinegun". The reason that I find this disturbing is the fact that ATF's FTISB, previously known as "FTB" has commonly reversed themselves months or even years later as to their opinions of other items as firearms under the purview of the NFA, and then back again in some cases[1]. In this respect, how can logic dictate that item B should be classified as something because item A previously was, since item A can later be re-classified as something else? Also, I find it disturbing that ATF takes so much liberty with the use of the words "classify" and "classification" as they refer to a device or item. While it is the Court which is the finder of fact, ATF serves to give opinions as to which definition or "class", if any, an item falls according to the definitions in the CFR and the U.S. Code. They are supposed to do this according to their training and experience by applying the required elements contained in a given definition, and by further taking notice of the adjectives and adverbs found in said definition which further qualify a given element(s). However, the "classification" of an item as to whether it satisfies a given definition is an act which can be performed by anyone with enough command of English to read the definition in detail and comprehend its nuances, along with enough knowledge of the mechanical features of the item in question. This is a feat easily done by may laypersons and especially by those in the firearm industry. However, due to the lack of one or both of

---

[1] On 11/26/12 ATF's FTB letter to Alex Bosco (903050:MMK, 3311/2013-0172) stated that a forearm brace does not alter the classification of the firearm and would not be subject to the NFA, although the intentional shouldering of the brace would. Then on 3/5/14, ATF's FTB letter to Sergeant Joe Bradley (903050:AG 3311/301737), stated that even the intentional shouldering of a brace-equipped firearm would not violate the NFA. Then on 10/28/14, ATF's FTB letter to Eric Lemoine (907010:MCP, 3311/302492) again stated that should a person shoulder a brace as a stock, that it would be "classified" as a firearm within the NFA. Then on 3/21/17, ATF's FTB letter to Mark Barnes, Esq. (90000:GM 5000), stated that shouldering a forearm brace is "not necessarily a violation". Then on 6/10/21 ATF filed an NPRM in the Federal Register, proposing to make braces fall within the NFA.

1

these abilities, individuals and companies have acquiesced to ATF for decades, asking them to make such "determinations" or "classifications" for them. In years of being a paid Consultant for a number of licensed firearm manufacturers, I have repeatedly seen FATD take great advantage of the opportunity to get away with "classifying" or "ruling" items to be something that it does not satisfy the definition of. They are often completely subjective in their findings. This has clearly been the result of the latitude that FATD has been afforded by those with insufficient knowledge to apply the item to the definition themselves. Countless times FATD has taken advantage of the opportunity to call something as they prefer it be classified when either no one knew better, or was afraid to challenge them, or could not afford to due to because ATF has numerous Attorneys on salary who can bankrupt a challenger who would need to pay enormous legal fees. Too often, FATD also says that they determine something to be an NFA firearm based on elements which do not even appear in said definition[2].

Further in ATF's "Findings" in the second paragraph on page 3, they make a statement that the item covered in U.S. Patent 10514223 does not function by "hammer-follow". I find this issue disturbing as it is being offered as a "red herring". Even firearms which do experience "hammer-follow"[3] merely jam in most cases. Although a firearm which does fire more than one shot with a single function of the trigger due to hammer-follow would qualify as a machinegun, hammer-follow itself is not illegal.

At the end of the fourth paragraph on page 3 ATF incorrectly quotes the definition of a machinegun in their favor by saying that "Machinegun classifications are based on ... whether the device converts a weapon to shoot automatically." Here they have conveniently left out the phrase of the definition which adds," ... by a single function of the trigger". This is especially disturbing because the missing phrase is the key difference between what ATF alleges that the FRT does and what it in fact does. That is, fire fewer than one shot per function of the trigger.

In the fifth paragraph on page 3, ATF erroneously explains the meaning of the word "automatically" as it is defined in 27 CFR 479.11. Mr. Curtis states that "automatically" "means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger". As true as that may be, it has no application to the FRT. The FRT requires two separate functions of the trigger to fire each shot. Despite the fact that the FRT automatically assists the resetting of the trigger to the ready position, the FRT still requires a second manual and intentional function of the trigger, on the part of the shooter, to fire each shot. The FRT does not shoot automatically. He only thing that it does automatically is to reset its trigger to the ready position. In order for an item to qualify as a machinegun within the specified definition it must satisfy all of the several qualifiers in the definition. For example, the adverb "automatically", describes how the weapon must shoot. The adjectival phrase "more than one shot" describes what it must shoot. And further, the weapon must do these qualified things "without manual reloading". Finally, it must do all of the aforementioned actions "by a single function of the trigger". ATF Chief Counsel's Office has repeatedly

---

[2] FATD letter to Standard Manufacturing re the DP12 being a Destructive Device because it weighs eleven pounds.
[3] Hammer follow is a condition which may occur in a malfunctioning semiautomatic firearm, wherein the hammer can fail to remain in the cocked position during cocking, and then ride the bolt forward. In some cases, this can cause chain-firing and result in the gun becoming a machinegun as defined in 26 USC 5845. It most cases it only results in a jammed firearm which must be cleared before firing a subsequent shot.

2

determined that "a single function of a trigger means a single movement of a trigger.[4]" The below email was addressed to me as well as to hundreds of other ATF personnel at the time.

*From: Galbraith, A.*
*Sent: Friday, March 20, 2009 8:51 AM*
*To: Turner, R.; TPD-NEXUS*
*Subject: A system that fired upon release of the trigger also.*
*All,*

*FTB looked at the original device back in the day. As long as the gun only fires one shot on the pull and one on the release, it is NOT a machinegun. The ATF-counsel-approved interpretation of "single function of the trigger" is a single movement of the trigger, making systems like this OK.*
*A. Galbraith*

*Firearms Enforcement Officer*
*Firearms Technology Branch*
*244 Needy Road, Suite 1600*
*Martinsburg, WV 25405*

Since that time, Franklin Armory has developed and marketed their BFS Binary Triggers©. A Binary Trigger© is an ATF-approved trigger system which allows a firearm to fire one shot upon the pull function of the trigger, and another shot upon the release function of the trigger. FATD has considered this to be a legal and semiautomatic device since approximately 2015. Extremely fast follow up shots can be fired with a Binary Trigger©, which only requires one function of the trigger per shot fired, however ATF has an issue with the FRT which requires two functions of the trigger per shot fired. I find it very arbitrary that ATF has a problem with a device which requires twice the trigger functions per shot as one which they consider perfectly legal, let alone the fact that the FRT does not satisfy the definition.

In his examination report, Mr. Smith references a letter, regarding a different trigger, from Mr. Curtis. In his letter Mr. Curtis cites Staples by pointlessly saying that "...once it's trigger is depressed the weapon will automatically continue to fire until it's trigger is released or the ammunition is exhausted." Here he is playing with the various connotations of the word "pressed". At risk of being redundant, upon "functioning" the trigger of an FRT by moving it rearward from the ready position to the fire position, the weapon only fires one shot. To fire a second shot, the shooter must wait for the FRT to force the trigger forward into the ready position. Only then can the shooter fire another shot by again pulling (functioning) the trigger to the rear, causing it to release the hammer. As a result of the design of the FRT, two separate functions of the trigger must occur for each shot fired. This is double the number of functions required for legal semiautomatic firing[5]. Mr. Curtis, in his *Staples* quote, attempts to use the word "depressed" as though it means "functioned". I notice throughout the ATF Report that

---

[4] See email from ATF FEO Adam Galbraith on 3/20/09 at 8:51am to Richard Turner and all ATF-trained Interstate Nexus Agents (TPD-Nexus).
[5] Compare to a machinegun, which fires two or more shots for each time the trigger performs the single function of releasing the hammer. Further, compare it to the Binary© type of legal semiautomatic triggers which fire a shot upon functioning the trigger to the rear, and fire another shot by functioning the trigger forward to the ready position.

3

the words "pressure", "pull", and "depressed" are used as though they are synonymous with "function". They are not. Function is defined as *"an activity or purpose natural to or intended for a person or thing. Verb: Work or operate in a proper or particular way*[6]*."*

With an FRT, the shooter may exert constant "pressure" against the trigger, although the trigger cannot be "pulled" (moved) to the rear again until after each time it is forced forward by the hammer, at which point it can be "functioned" again by intentionally moving it to the rear with the finger. Constant pressure on a trigger does nothing. It is akin to leaning against a locked door until someone unlocks the door from the other side, which then allows the door to be pushed open by the weight leaning against it. It is only then that the weight of the person who is leaning against it functions the door to the open position. Upon the person falling through the then open door, the door is again forced closed, and locked by a mechanical apparatus (e.g. FRT's locking bar). During this time, another person leans against the door waiting for it to be unlocked so that their weight allows them to fall through it once unlocked.

Mr. Smith then cites the Freedom Ordnance 3:16-cv-00243-RLY-MPB case, stating that " ... a firearm is a machinegun when an internal mechanism or operation automatically forces the individuals finger forward instead of requiring that the shooter release the trigger." Again, there is nothing in the National Firearms Act to support this. The definition of a machinegun makes no such claim. This is yet another example of FATD's decades long practice of insisting that items fall within definitions which they clearly do not satisfy the elements of[7]. The word "automatically" is used in the definition to describe how the gun must shoot. That is, with a single function of the trigger. The FRT's trigger's return to the reset and forward position is forced by the FRT's hammer, but this movement (function) is still a "release". The definition says nothing about requiring the shooter to "release" or to remove their finger from the trigger.

At the top of page 4, Smith erroneously states that "If a device is designed to assist in preventing the hammer from positively resetting or which utilizes a spring, electric motor or non-manual source of energy which assists in the automatic resetting of the hammer and causes the firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, such an item or device would be classified as a combination of parts designed and intended, for use in converting a weapon into a machinegun; ... " Firstly, this verbiage is not found in any definition of a machinegun within the U.S. Code. It is merely another example of FATD writing their opinion to suit a situation. Additionally, the FRT does none of these things. It does not "assist in preventing the hammer from resetting". In the FRT the hammer positively resets and re-engages with the trigger after each shot. Secondly, every semiautomatic firearm ever made utilizes a "non-manual source of energy which assists in the automatic resetting of the hammer". That is the energy generated by burning gunpowder to drive

---

[6] Google.
[7] From 1968 to 2021 ATF insisted that a part of 60% of new firearms on the market have a part which qualifies as a firearm "frame or receiver" as defined in 27 CFR 478.11. However, based on my testimony in the Lycurgan, Jiminez, Roh, and Rowold/Robison cases, Attorney General Loretta Lynch notified Speaker of the House Paul Ryan in 2015 that ATF needed to correct the issue. ATF took no action. In 2018 Judge Selna, and in 2020 Judge Carr, ruled that ATF was wrong. In June of 2021 ATF finally filed a New Proposed Rulemaking in the Federal Register to change the definition of a "frame receiver" to include the previously referred to parts. The process is ongoing.

4

the bolt or breechblock[8] to the rear, which in turn causes the reset of the hammer by its reengagement with the trigger[9]. This is a non-manual source of energy, so if FATD's above position were to be given merit, then every semiautomatic firearm in the U.S. would be deemed a machinegun. Further, the phrase "and causes a firearm to shoot automatically more than one shot" precludes the FRT from FATD's position because it does not shoot more than one shot per function of the trigger.

On page 4, 8th paragraph, Mr. Smith states that "This differs from a cycle of eoprations (sic) in a typical AR-type semiautomatic firearm in which the shooter must release and pull the trigger to fire a second projectile". His statement here is misleading, because in a typical AR-type firearm, the shooter does not have to release the trigger to allow the trigger to reset. The trigger resets due to the fact that it is under spring pressure to return to the forward position. In fact, the trigger-return spring in a typical AR-type firearm performs the same function as the FRT hammer. It returns the trigger to the forward/reset position. The only difference between the way the typical system works vs. the FRT is the amount of force with which the trigger is forced forward. The shooter must only lessen the pressure that he/she is exerting against the trigger in a typical AR-type firearm to allow the spring to do its job. The finger is never required to break contact with the trigger. In an FRT the hammer performs the movement (function) of returning the trigger to the forward position without the need for the shooter to break contact with the trigger.

Mr. Smith continues by saying that "… a firearm assembled with the FRT requires no such release and subsequent pull by the shooter to fire a second projectile. … the shooter may fire a second projectile merely by maintaining the initial trigger pull and allowing the self-acting internal mechanism to complete its automatic cycle of operation". Although Mr. Smith is correct that an FRT equipped firearm doesn't require a "release" (break in contact from the finger) with the trigger to fire a subsequent shot, it does require the trigger to <u>function</u> by moving back to the reset position before firing another shot. However, he is incorrect by stating that the "shooter may fire second projectile by maintaining the initial trigger pull." This is physically impossible, due to the forced return (function) of the trigger to the reset position by the steel hammer, and then by the locking bar which holds it locked into that position until the cycle of firing that shot is complete. In this instance ATF again takes liberty in blurring the lines between "pull", "pressure", and "function". The truth is, that a shooter of an FRT may maintain pressure on the trigger throughout the firing of a string of several shots, but even then, the trigger functions to release the hammer and then functions to reset the hammer/trigger for each shot fired. Of course, the shooter must consciously cause one of these functions to occur for each shot.

The most disturbing statement in Mr. Smith's' entire report is on page 5 in the second paragraph. He describes his test-firing of the FRT, stating that he "…fired two rounds automatically with a single pull/function of the trigger" and that he repeated this an additional time. The reason that I say this statement is so disturbing is because his claim is physically impossible. Unless he was test-firing some other device, this could not have occurred. As I've previously stated, every time an FRT-equipped firearm fires a shot, the trigger is forced to return to the forward reset position where it began before

---

[8] Depending on it's design, every firearm utilizes either a bolt or breechblock to support the rear of a cartridge upon firing. This support prevents pressure from moving rearward until after the bullet exits the barrel and prevents injury to the shooter.

[9] Some semiautomatic firearms utilize a striker instead of a hammer. A striker is a spring-loaded firing-pin which is released from the cocked position by the sear upon a function of the trigger.

5

firing. Resultingly, during a string of rapidly fired shots, the shooter will physically feel his finger moving rearward and forward once each, for each shot fired. This movement is approximately .13 inch both fore and aft. It is imperative to note here that firearms are precise machines which rely on extremely close tolerances in order to function, and to do so safely. There is no measurable "play" or "stretch" in an operable firearm. The trigger of an FRT must make this movement both aft and then again forward for each shot fired. Therefore, I'm at a loss as to how Mr. Curtis can make this impossible claim. As such, Mr. Smith should reconsider this statement before testifying to it under oath. In the next paragraph, he claims to have fired 5 shots "by a single function of the trigger". This is again physically impossible as the trigger would have made the above-described movements (functions 2 time for each shot fired).

I note that this is the first time that ATF acknowledges the "pull" of a trigger as a function. This is a double-edged sword however, because Mr. Smith, and FATD in general, is noticeably liberal in their usage of the various connotations of this word "pull" as it suits their collective aim. I offer that a person can "pull" or add "constant pressure" on the knob of a locked door without causing a "function" to occur, whereas one can also "pull" or add "constant pressure" on the same door when not locked and effect the "function" of opening or closing the door in the process. Likewise, a person can or add "pressure" onto the steps of an escalator by stepping onto it. Yet the escalator continues to perform the "function" of moving the person up or down the incline by working against that pressure. There is a huge difference between "pull", "pressure" and "function", which is exactly why writers of the definition chose to use "function" as the definitive issue concerning what a trigger must do.

In referencing a prior examination of a different trigger, On page (46) Mr. Curtis states in the last sentence on the page that "... a single constant rearward *pull* will cause the firearm to fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." (italics added) Here is yet another misleading statement which is poorly worded, in an effort to support FATD's position. Not to mention the fact this is not an examination of the FRT-15. The accurate way to have stated this would be "a single rearward movement will cause the trigger to function twice for each shot fired, by repeatedly functioning the release of the hammer, and then functioning to reengage the hammer with the trigger." In summary, ATF regularly confuses the issue by saying "pressure" where it is immaterial because "function" is the issue. At other times ATF uses the word or "pull" despite the fact that they are referring to a pressure which is causing no function.

Again referencing a examination of a trigger which is not the FRT-15, On page (50), Mr. Curtis states in the second paragraph that "...after firing several cartridges the sear failed to retain the hammer which simply followed the bolt forward leaving a substantial firing-pin mark on the primer of the chambered cartridge without firing the cartridge." Here I fail to see the point, as this merely resulted in a stoppage, commonly known as a "jammed gun". This is hardly a violation of the U.S. Code or a public safety issue. It would only be of consequence if the gun had fired multiple shots as a result.

Again referencing a examination of a trigger which is not the FRT-15, On page (51) Mr. Curtis describes a test-firing sequence wherein ATF modifies the gun by attaching a zip-tie around the trigger. This is a laughable demonstration because it has nothing to do with ATF's erroneous assertion that the FRT fires more than one shot by a single function of the trigger. Zip-ties have nothing to do with the FRT. If a person were to modify a firearm from its original legal design by redesigning it as a machinegun as defined in 26 USC, then the criminal violation would have been committed by the modifying individual. This "test" also gives no acknowledgement to the fact that a plastic zip-tie has some degree of elasticity

6

58

and that the installation of one as depicted still allows the firing to occur as a semiautomatic, with one shot being fired with at least one function of the trigger occurring each time. Further, if such a modified firearm were received from the field by FTSIB for determination, they would "classify the zip-tie as the machinegun, as they have other items in the past, such as shoestrings, pieces of a coat hanger, etc... In such cases their determination is that the item has been redesigned as an item solely intended for use in converting a weapon into a machinegun, under the third definition of a machinegun in 26 USC 5845(b). In fact, any, and every semiautomatic firearm can be modified to fire fully-automatically. However, this doesn't make every semiautomatic a machinegun.

Again referencing a examination of a trigger which is not the FRT-15, On page (52), Mr. Curtis states in paragraph 2 that " ... ATF has long held that a single function of the trigger is a "single pull" or alternatively, a single release of a trigger." Here FATD's statement fully supports my earlier point about Binary Triggers©. The ATF stated position clearly supports that either a function of the trigger to the rear for each shot fired is legal, or alternatively, a single function of the trigger forward is alone sufficient for the FRT to be recognized as a legal semiautomatic. Therefore, the FRT could ironically fire two shots for each pull and return of the trigger, regardless of the fact that it is mechanically returned to the reset position, and still be legal. Yet FATD erroneously argues otherwise.

Again referencing a examination of a trigger which is not the FRT-15, In paragraph 4 of page (52), Mr. Curtis begins by citing that "Federal courts have noted that automatically means the weapon "fires repeatedly with a single pull of the trigger"". Still, he blurs the issue with the use the word "pull". No firearm fires by merely adding pressure to a trigger without that trigger actually moving a distance. So, "pull" certainly does not mean "add pressure without movement". Clearly, the federal courts have intended the word "pull" to mean a movement which causes a function therefore we see the word "function" in the definition. Once again, the FRT fires one shot per rearward movement/function of the trigger.

Again referencing a examination of a trigger which is not the FRT-15, At the start of paragraph 5 on page (52), Mr. Curtis falsely states "FTISB testing indicated that continuous rearward pressure after the initial pull of the trigger initiates a "firing sequence" which discharges multiple rounds with a single function of the trigger." I can only shake my head at such an outlandish claim. The facts are that maintaining rearward pressure on the trigger after the initial pull of the trigger, initiates the repetition of a cycle wherein the firing of one shot occurs with each time the trigger is functioned aft and then functioned forward.

Finally in referencing a examination of a trigger which is not the FRT-15,, on page (53) in paragraph 2, Mr. Curtis says that "A device designed to prevent the hammer from positively resetting could cause a firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, and would also be classified as a combination of parts designed and intended, solely and exclusively, for use in converting a weapon into a machinegun;..." I'm at a loss to see his point here as he again attempts to use technical descriptions and definitions which have zero applicability here. The hammer in an FRT absolutely makes a positive reset by interlocking with the trigger after each shot fired. Further, how does he propose to call something illegal by virtue of what it "could do"? Obviously, a baseball bat "could" be used as a deadly weapon, but until or unless it is that doesn't make them illegal. Even further, an FRT fires one shot per two trigger functions, let alone one per trigger function

7

(i.e. Binary Triggers©), let alone more than one shot per trigger function (i.e. machineguns). Lastly, since an FRT does not convert a firearm into a machine gun, it is not designed and intended for that purpose.

I reserve the right to amend my report.

_____        8/26/21
Daniel O'Kelly            Date



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

**SEP 8 0 2004**

903050:RDC
3311/2004-379

www.atf.gov

Mr. Brian A. Blakely

Dear Mr. Blakely:

This refers to your letter of February 6, 2004, to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), in which you inquired about the legality of a small section of string intended for use as a means for increasing the cycling rate of a semiautomatic rifle.

As you may be aware, the National Firearms Act, 26 U.S.C. § 5845(b), defines "machinegun" to include the following:

...any weapon that shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. This term shall also include the frame or receiver of any such weapon, **any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,** and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person [bolding added].

In 1996, FTB examined and classified a 14-inch long shoestring with a loop at each end. The string was attached to the cocking handle of a semiautomatic rifle and was looped around the trigger and attached to the shooter's finger. The device caused the weapon to fire repeatedly until finger pressure was released from the string. Because this item was designed and intended to convert a semiautomatic rifle into a machinegun, FTB determined that it was a **machinegun** as defined in 26 U.S.C. 5845(b).

We thank you for your inquiry, regret the delay in response, and trust the foregoing has been responsive.

Sincerely yours,

Sterling Nixon
Chief, Firearms Technology Branch

61



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Martinsburg, WV 25401    903050:JPV
www.atf.gov                          3311/2007-615

**JUN 2 5 2007**

Mr. Brian A. Blakely

Dear Mr. Blakely:

On February 6, 2004 you wrote to the Firearms Technology Branch (FTB) of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) inquiring about the legality of a small section of string intended for use as a means for increasing the cycling rate of a semiautomatic rifle. We responded on September 30, 2004. In that letter we stated:

> In 1996, FTB examined and classified a 14-inch long shoestring with a loop at each end. The string was attached to the cocking handle of a semiautomatic rifle and was looped around the trigger and attached to the shooter's finger. The device caused the weapon to fire repeatedly until finger pressure was released from the string. Because this item was designed and intended to convert a semiautomatic rifle into a machinegun, FTB determined that it was a **machinegun** as defined in 26 U.S.C. 5845(b). (Emphasis in original).

Upon further review, we have determined that the string by itself is not a machinegun, whether or not there are loops tied on the ends. However, when the string is added to a semiautomatic firearm as you proposed in order to increase the cycling rate of that rifle, the result is a firearm that fires automatically and consequently would be classified as a machinegun. To the extent that prior ATF classification letters are inconsistent with this letter, they are hereby overruled.

We hope that this clarifies our position. Should you have any questions, please do not hesitate to contact us.

Sincerely,

Richard Vasquez
Acting Chief, Firearms Technology Branch

62



63

*From: Galbraith, A.*
*Sent: Friday, March 20, 2009 8:51 AM*
*To: Turner, R. ; TPD-NEXUS*
*Subject: A system that fired upon release of the trigger also.*

*All,*

*FTB looked at the original device back in the day. As long as the gun only fires one shot on the pull and one on the release, it is NOT a machinegun. The ATF-counsel-approved interpretation of "single function of the trigger" is a single movement of the trigger, making systems like this OK.*

*A. Galbraith*
*Firearms Enforcement Officer*
*Firearms Technology Branch*
*244 Needy Road, Suite 1600*
*Martinsburg, WV 25405*

## DECLARATION OF BENJAMIN SLEY

I, Benjamin Sley, have personal knowledge of the facts set forth below.

1. I am an attorney with the firm Eggleston King Davis, LLP and represent Plaintiffs National Association of Gun Rights, Inc., Texas Gun Rights, Inc., Patrick Carey, James Joseph Wheeler, and Travis Speegle.

2. On August 11, 2023, I reached out telephonically to Mr. Brian Soltz, an attorney with the U.S. Attorney's Office for the Northern District of Texas.

3. Mr. Stolz referred me to Mr. Michael Clendenen, an attorney with the U.S. Department of Justice, and indicated that Mr. Clendenen will be handling *National Association of Gun Rights, Inc., et al. v. Garland, et al*., Case No. 4:32-cv-00830-O.

4. On August 11, 2023, I spoke by telephone with Mr. Clendenen to confer regarding Plaintiff's Motion for Temporary Restraining Order and Motion for Preliminary Injunction.

5. Mr. Clendenen stated: "My contact at ATF stated, 'We have no plans at this time to do anything with respect to these three plaintiffs [Mr. Carey, Mr. Wheeler, and Mr. Speegle] but we are unwilling to make any assurance regarding this in the future.'"

6. Mr. Clendenen further indicated that Defendants would oppose Plaintiffs' Motions.


Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 14, 2023.


By: _____
Benjamin Sley