UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION FOR** | § | |
| **GUN RIGHTS, INC.,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 4:23-cv-00830-O** |
| **v.** | § | |
| | § | |
| **MERRICK GARLAND,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## OPINION & ORDER ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Before the Court are Plaintiffs' Motion for Temporary Restraining Order (ECF No. 17), Brief in Support (ECF No. 18), and Appendix (ECF No. 19), filed August 14, 2023; Defendants' Response (ECF No. 32), filed August 21, 2023; and Plaintiffs' Reply (ECF No. 33) and Appendix (ECF No. 34), filed August 25, 2023. Having considered the parties' briefing and applicable law, the Court **GRANTS** Plaintiffs' Motion for Temporary Restraining Order (ECF No. 17) to preserve the status quo until either September 27, 2023 or such time that the Court rules on Plaintiffs' Motion for Preliminary Injunction (ECF No. 22), whichever is earlier. Therefore, the Court **ORDERS** that Defendants—along with their officers, agents, servants, and employees—are **ENJOINED** from implementing or enforcing, in any civil or criminal manner, against Plaintiffs Patrick Carey, Travis Speegle, and James Wheeler the ATF's challenged definition of "machinegun."

## I.    BACKGROUND

The United States Congress delegated to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") authority to regulate firearms in interstate commerce under the Gun Control

Act of 1986. In a 2018 regulation, the ATF expanded the definition of "machinegun." A few years later, the ATF determined that additional types of firearms qualify as machineguns and are thus illegal to possess or transfer. One of those prohibited firearms is a forced reset trigger. Plaintiffs brought this suit under Administrative Procedure Act ("APA")[1] to challenge the legality of the ATF's broadened definition.[2]

## A. Forced Reset Triggers[3]

A forced reset trigger ("FRT") is a semi-automatic assembly that allows the trigger to reset quicker than it otherwise would using a traditional trigger-return spring. This assembly enables the user to fire the firearm at a quicker rate than with a traditional trigger.

Reviewing the basic mechanism of a firearm is necessary to understand how an FRT works. The function of any trigger is to release the hammer. This occurs when the trigger is pulled back to the point that a "trigger sear" releases the hammer from its retained position. Once released by the trigger, the hammer pivots to contact the firing pin. Once contacted, the firing pin then strikes a chambered ammunition cartridge or "round," which causes the gunpowder in the cartridge to combust. The combustion effect propels the cartridge's bullet out of the barrel of the firearm. Once fired, a standard semi-automatic trigger returns to its "reset" state—ready-to-fire or "set" position—by allowing the firearm to function once again by starting the mechanism anew. In other words, the firearm only fires again by the user pulling the trigger to release the hammer.

An FRT is a device that forcibly returns the trigger to its reset state. FRTs are designed to achieve this by the hammer resetting the trigger when the bolt carrier cycles to the rear. A

---

[1] 5 U.S.C. §§ 701 *et seq.*
[2] Pl.'s Compl., ECF No. 1.
[3] This description of the mechanical workings of FRTs is taken from Plaintiffs' Complaint. Pls. Compl. 6–7, ECF No. 1. Defendants do not dispute these descriptions in their responsive filing opposing the temporary restraining order. Defs.' Resp., ECF No. 32.

"locking bar" mechanically locks the trigger in its reset state, preventing the user from moving the trigger rearward to function by releasing the hammer, until the bolt has returned to the in-battery position and the firearm is safe to fire. When firing multiple shots using an FRT, the trigger must still reset after each round is fired and must separately function to release the hammer by moving far enough to the rear in order to fire the next round.

### B.  Statutory & Regulatory Background[4]

The National Firearms Act of 1934 ("NFA")[5] regulates certain firearms in interstate commerce. At the time of its proposal, the NFA "was known to many as the 'the Anti-Machine Gun Bill.'" *Cargill v. Garland*, 57 F.4th 447, 450 (5th Cir. 2023), *pet. for cert. filed*, No. 22-976 (2023). Among other things, the NFA criminalized the possession or transfer of certain unregistered firearms while also prohibiting the registration of firearms otherwise prohibited by law. 26 U.S.C. §§ 5812(a), 5861. In the decades following its enactment, the possession or transfer of machineguns was prohibited when Congress enacted the Gun Control Act of 1968 (the "GCA").[6] It is a federal crime today to possess a machinegun.

The GCA provides that it is "unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(o)(1). A "machinegun" is defined by the NFA as

> [a]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

---

[4] This description of the regulatory events after 2018 is taken from Plaintiffs' Complaint. Pls. Compl. 9–11, ECF No. 1. Defendants do not dispute these descriptions in their responsive filing opposing the temporary restraining order. Defs.' Resp., ECF No. 32.
[5] 26 U.S.C. §§ 5801 *et seq.*
[6] 18 U.S.C. §§ 921 *et seq.*

26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(a)(24) (incorporating the NFA's definition of "machinegun" into the GCA). In other words, a machinegun is a "rifle capable of automatic fire." *Cargill*, 57 F.4th at 452. Firearms incapable of automatic fire are thus not machineguns. *Id.*

For decades, ATF regulations mirrored the federal statutory definition of "machinegun." 27 C.F.R. §§ 478.11, 479.11 (2017). The statutory parity was disrupted in 2018, when the ATF broadened the meaning of machinegun in its most recent regulation by re-interpreting the statutory definition to add additional language:

> Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person. *For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*

27 C.F.R § 479.11 (2018) (emphasis added).

Three years after the ATF broadened its interpretation of the statutory definition, two of the ATF's divisions issued reports regarding FRTs. The Firearms Technology Criminal Branch ("FTCB") issued its Technical Examination Report on July 15, 2021, which purportedly classified the FRT-15—a version of the FRT—as a machinegun.[7] The FTCB issued a similar report several months later on October 21, 2021 regarding the Wide Open Enterprises "WOT"

---

[7] Pls.' Compl. 9–10, ECF No. 1.

version of the FRT.[8] At the beginning of the next year, the FTCB issued its "Open Letter to All Federal Firearms Licensees" (the "Open Letter") on March 22, 2022, advising that the ATF "recently examined devices commonly known as 'forced reset triggers' (FRTs) and has determined that *some* of them are 'firearms' and 'machineguns' as defined in the [GCA]."[9] Most important for this case, the Open Letter further explained that "ATF's examination found that *some* FRT devices allow a firearm to automatically expel more than one shot with a single, continuous pull of the trigger" and that "any FRT that allows a firearm to automatically expel more than one shot with a single, continuous pull of the trigger is a 'machinegun.'"[10] One month later, the ATF's Firearms and Ammunition Technology Division ("FATD") issued yet another report on the FRT-15 trigger.[11]

### C. The Parties

Plaintiffs comprise of both individuals and organization plaintiffs. Plaintiffs Patrick Carey, Travis Speegle, and James "J.R." Wheeler are three individual citizens located in the Texas–Louisiana area (the "Individual Plaintiffs"). Each Individual Plaintiff has owned, currently owns, and/or plans to own FRTs in the future. Plaintiffs also include two organizations—National Association for Gun Rights, Inc. and Texas Gun Rights, Inc.—with thousands of members in the Northern District of Texas (the "Institutional Plaintiffs").

Plaintiff Carey owned two FRTs prior to receiving a warning notice from the ATF on August 22, 2022.[12] The warning notice informed Plaintiff Carey that "ATF has information that you have acquired one or more [FRTs]," that "[t]hese items have been classified as machineguns that were unlawfully manufactured," that "[p]ossession of these devices is a violation of law due

---

[8] Pls.' Compl. 10, ECF No. 1.
[9] *Id.* (quoting the Open Letter).
[10] *Id.* (quoting the Open Letter).
[11] *Id.*
[12] *Id.*

to their illegal manufacture," and that "*the unlawful receipt and possession of any of these devices is a felony violation of Federal law*."[13] Due to the direct threat of civil and criminal enforcement, Plaintiff Carey surrendered his two FRTs to ATF agents.[14] Plaintiff Wheeler personally owns one FRT and has a 50% ownership stake in a small firearms and ammunition business that owns two additional FRTs.[15] Plaintiff Speegle personally owns ten FRTs.[16] Both Plaintiffs Wheeler and Speegle wish to maintain possession of their FRTs, but fear they are at risk of civil and criminal prosecution for continued possession.[17]

The Individual Plaintiffs' prior or current conduct—possession or transfer of FRTs—is subject to enforcement on account of the ATF's broadened definition of machinegun. Without immediate relief, the Individual Plaintiffs are at risk of civil and criminal prosecution. For that reason, Plaintiffs are suing various government officers and entities—the Attorney General of the United States, the Department of Justice ("DOJ"), the ATF, and the Director of the ATF (collectively, the "Defendants")—over the ATF's broadened definition and implementation of the machinegun regulation.[18] In the instant action, Plaintiffs bring an APA challenge to the validity of Defendants' interpretation of the "machinegun" definition.[19] According to Plaintiffs, this definition is unlawful because "Defendants' interpretation of the law and their specific actions to threaten and potentially initiate enforcement actions against Plaintiffs are thus arbitrary, capricious, and otherwise contrary to law."[20]

To protect the status quo during the pendency of the lawsuit, the Individual Plaintiffs

---

[13] Pls.' Compl. 3, ECF No. 1 (emphasis in original).
[14] *Id.*
[15] *Id.* at 4.
[16] *Id.*
[17] *Id.*
[18] *Id.* at 5, 14–16.
[19] *Id.* at 14–15 (citing 5 U.S.C. § 706(2) as the basis for their declaratory judgment action).
[20] *Id.* at 4.

seek a temporary restraining order ("TRO") enjoining Defendants from enforcing or otherwise implementing the novel definition against the Individual Plaintiffs until the Court is able to rule on the forthcoming preliminary injunction motion. The parties have briefed the issues and the motion is now ripe for the Court's review.

## II.     THRESHOLD ISSUES

Defendants raise two threshold issues: (1) standing and (2) judicial review of pre-enforcement challenges. Before turning to the question of whether a TRO is warranted in this situation, the Court first addresses these issues.

### A.  Standing

Defendants first argue that the Individual Plaintiffs lack standing because there is no credible threat of prosecution.[21] Additionally, Defendants contend that they have no *current* plans to prosecute the Individual Plaintiffs. But this phrasing reveals the implicit threat that the Individual Plaintiffs fear: the Defendants could change their *current* plans at any time by deciding to prosecute. That is why, as the Fifth Circuit makes clear, standing exists here. *See Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (emphasizing that "plaintiffs have standing in the face of similar prosecutorial indecision," including when an agency "has not to date evaluated" whether it will pursue enforcement); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018) (explaining that standing in pre-enforcement challenges requires a showing "of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, . . . as well as credible threat of prosecution"). Defendants do not proffer any Fifth Circuit precedent in support of their particular standing

---

[21] Defs.' Resp. 3–5, ECF No. 32.

argument. Instead, Defendants point to out-of-circuit cases that differ considerably from the Fifth Circuit's jurisprudence on credible threats of prosecution conferring standing.[22]

Applying Fifth Circuit precedent here, the Individual Plaintiffs successfully satisfy standing requirements. There is no dispute that the Individual Plaintiffs "inten[d] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Zimmerman*, 881 F.3d at 391. Each Individual Plaintiff currently possesses—or previously possessed—a newly proscribed FRT. What is disputed is whether engaging in the newly proscribed FRT ownership carries "a credible threat of prosecution." *Id.* Defendants liken Plaintiffs concern to no more "than a general threat of prosecution" that cannot support pre-enforcement relief, particularly because the "ATF has no *current* intention to arrest or bring charges against the Individual Plaintiffs."[23] The Court disagrees and instead finds that a sufficiently credible threat exists to establish standing.

By bringing this action, the Individual Plaintiffs place themselves in potential jeopardy due to acknowledging their possession of FRTs. This is not an imaginary or speculative concern. Indeed, Defendants' recent enforcement activity breathes life into this very fear and the factual record bears this out. Plaintiff Carey has already experienced armed ATF agents arriving at his home to warn that he could face prosecution by not surrendering his FRTs and by purchasing additional FRTs in the future.[24] Plaintiffs also cite to examples of enforcement activity and

---

[22] Defs.' Resp. 4, ECF No. 32 (citing two Sixth Circuit cases and one case from the Eastern District of Kentucky). As Plaintiffs point out in their reply, "[t]hese cases are inapposite." Pls.' Reply 4, ECF No. 33. In fact, as one court pointed out, "[t]he Sixth Circuit's jurisprudence on standing, in particular, the issue of whether there exists a credible threat of prosecution, bears considerable differences from the Fifth." *Am. Coll. of Pediatricians v. Becerra*, No. 1:21-cv-195, 2022 WL 17084365, at *13 (E.D. Tenn. Nov. 18, 2022).
[23] Defs.' Resp. 4, ECF No. 32 (emphasis added).
[24] Decl. of Patrick Carey, Pls.' Br. App'x 5, ECF No. 19.

8

search warrants carried out against other individual owners of FRTs.[25] Specifically, at least three individuals are currently facing prosecution and there have been sixty-seven ATF seizures to date.[26] Based on this record, Defendants certainly appear to be "chomping at the bit" to seize FRTs.[27] Further evidence of this is Defendants' refusal to disavow prosecuting the Individual Plaintiffs during the pendency of this case—the exact type of "prosecutorial indecision" that the Fifth Circuit has "repeatedly held" as more than enough to "have standing." *Franciscan All., Inc.*, 47 F.4th at 376. Given this flurry of recent enforcement activity—stemming from the same interpretation of the law that proscribes Plaintiffs' conduct here—and Defendants refusal to guarantee that no action will be taken against the Individual Plaintiffs during pending disposition of this action, there is more than a specter of enforcement sufficient to confer standing.

Because Plaintiffs face a credible threat of civil or criminal prosecution for prior and current ownership of FRTs, the Court finds that this constitutes more than a *de minimis* harm to confer standing to seek a TRO.

### B.  Pre-Enforcement Challenges

Defendants next call into question the veracity of pre-enforcement judicial review of laws carrying criminal penalties. According to Defendants, such review encroaches on the prosecutorial discretion that properly rests with the executive branch.[28] Based on this, Defendants contend that granting a TRO enjoining civil and criminal prosecution violates constitutional separation-of-powers principles.[29] Although the basic contours of Defendants' contentions are true, separation of powers does not mean pre-enforcement judicial review of laws

---

[25] Pls.' Compl. 11, ECF No. 1; Pls.' Br. 2, ECF No. 18.
[26] Pls.' Reply 2, 5, 9 n.3, ECF No. 33. In their reply brief, Plaintiffs reference the ATF's Official Notification showing multiple seizures of FRTs. Pls.' Reply App'x 66, ECF No. 34.
[27] Decl. of Michael Columbo, Pls.' Br. App'x 9, ECF No. 19.
[28] Defs.' Resp. 6–8, ECF No. 32.
[29] *Id.* at 6.

carrying criminal penalties is never allowed. *See Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (emphasizing that a plaintiff facing "a credible threat of prosecution . . . should not be required to await and undergo a criminal prosecution as the sole means of seeking relief") (internal quotation marks omitted)); *see also Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) ("Although in regard to criminal statutes, courts are wary of . . . intervening prior to prosecution and foreshortening the prosecutor's action, courts have allowed pre-enforcement review of a statute with criminal penalties.").

On top of that, courts have even more authority to review challenges to agency actions. The APA specifically provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" is "entitled to judicial review thereof." 5 U.S.C. § 702. And the APA expressly provides that criminal proceedings are *included* in such review. *Id.* § 703. It is also notable that the APA empowers courts with even greater authority to "hold unlawful and set aside agency action, findings, and conclusions found to be" unlawful. *Id.* § 706. This is a marked increase of judicial authority over executive branch actions.[30] *See id.* § 705 (authorizing the "reviewing court" to "issue all necessary and appropriate process . . . to preserve status or rights" from "irreparable injury" caused by agency action).

In line with longstanding precedent and the APA's express authorization, Plaintiffs bring a facial challenge to the lawfulness of Defendants prosecuting *anyone* for FRT possession. At no point do Plaintiffs challenge Defendants' discretion to prosecute certain individuals but not others. If Defendants lack the ability to prosecute anyone, there is no prosecutorial discretion to even exercise in the first place. That the challenged regulation carries the potential for criminal penalties does not insulate Defendants from pre-enforcement judicial review.

---

[30] *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012–17 (2018) (explaining that, although the power of judicial review is not akin to an executive veto, the APA expressly grants courts additional authority to review agency action).

Moreover, Defendants aver that certain safeguards also weigh in favor of no pre-enforcement intervention by the judicial branch. To allay any concerns about potential abuses by executive officials insulated from judicial review, Defendants note that "federal criminal procedure provides a host of opportunities to test the lawfulness of the government's exercise of prosecutorial authority."[31] However, this line of argument runs afoul of multiple Supreme Court decisions. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("When an individual is subject to such a threat [of enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."). And that is to say nothing of the potential harm that such insulation from pre-enforcement judicial review would likely cause individuals subject to prosecution. Without access to courts to bring pre-enforcement challenges, vulnerable citizens may surrender the ability to promptly challenge unlawful executive branch actions. This cannot be.

Alexander Hamilton stressed the importance of judicial review over the other branches of government: "There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void." THE FEDERALIST NO. 78 (Alexander Hamilton) (emphasis added). This check is an essential component of constitutional separation-of-powers principles for the judicial branch of government to oblige another branch to control itself. And this remains just as important today as it was at the Founding. Not only would Defendants have this Court ignore decades of Supreme

---

[31] Defs.' Resp. 6, ECF No. 32.

Court precedent and the plain text of the APA, they would also have this Court twist the foundational value of separation of powers into something it is not. The Court declines the invitation. Instead, the Court finds that it possesses both constitutional and statutory authority to review pre-enforcement challenges to agency action with criminal consequences.

*     *     *     *

Having considered Defendants' threshold issues and finding no bars to the Court's authority to afford equitable relief to the Individual Plaintiffs, the Court proceeds with its analysis of the requested TRO.

## III.   LEGAL STANDARDS

The decision to grant or deny injunctive relief is committed to the district court's discretion. *See Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). "A [temporary restraining order] is simply a highly accelerated and temporary form of preliminary injunctive relief, which requires that the party seeking such relief establish the same four elements for obtaining a preliminary injunction." *Greer's Ranch Café v. Guzman*, 540 F.Supp.3d 638, 644–45 (N.D. Tex. 2021) (O'Connor, J.) (cleaned up). To establish entitlement to any form of injunctive relief, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the movant, it is the party seeking relief who bears the burden of proving all four elements of the requested injunctive relief. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*, 760 F.2d at 621.

12

Upon determining that a party is entitled to injunctive relief, a court must also decide the appropriate scope of that prospective injunction. "[T]he scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And because it is considered an extraordinary remedy, an injunction or TRO "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994) (cleaned up). Thus, an injunction or TRO must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted).

## IV.   ANALYSIS

### A.  Substantial Likelihood of Success on the Merits

To show a substantial likelihood of success on the merits, Plaintiffs need not show they are entitled to summary judgment on their claim, but must instead present a prima facie case. *Daniels Health Servs.*, 710 F.3d at 582. Plaintiffs have met that burden at this stage with respect to their claim that the expanded definition of machinegun exceeds the scope of ATF's statutory authority. Therefore, Plaintiffs have satisfied "arguably the most important" of the four factors. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

The Administrative Procedure Act ("APA") instructs courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Plaintiffs contend that the ATF's regulation broadening the machinegun definition is an arbitrary and capricious expansion of the agency's authority.[32] Plaintiffs are likely correct.

---

[32] Pls.' Compl. 15, ECF No. 1.

The Fifth Circuit's recent analysis of the exact statutory language at issue here shows that Plaintiffs are very likely to succeed on the merits. *See Cargill*, 57 F.4th at 463 (explaining that the National Firearms Act unambiguously "requires that a machinegun be capable of firing automatically once the *trigger* performs a single function"). According to the en banc Fifth Circuit, a weapon that qualifies as a machinegun must be capable of (1) firing multiple rounds by a single function of the trigger and (2) do so automatically. *Id.* at 460. The definition of machinegun "utilizes a grammatical construction that ties the definition to the movement of the trigger itself, and not the movement of a trigger finger" such that "the statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger." *Id.* Because FRTs do not enable a weapon to automatically fire multiple rounds with a single function of the trigger itself, the Court finds that FRTs most likely are not machineguns under *Cargill*'s reasoning.

Similar to the government in *Cargill*, the Defendants here "offer[] nothing to overcome this plain reading" of the statutory language. *Id.* When the ATF revised its definition of machinegun to state that a "single function of the trigger" is the same thing as "a single pull of the trigger and analogous motion," its definition conflicts with the definition provided by the statute. 27 C.F.R. § 479.11 (2018). By comparison, the statutory definition does not define "machineguns" "according to how quickly they fire." *Cargill*, 57 F.4th at 464. To qualify as a machinegun under the statute, a weapon must only be capable of firing automatically once the trigger itself performs a single function. *Id.* at 460, 465. And where an agency regulation contradicts the statute, not only is that regulation likely arbitrary and capricious, but the statute governs. *Id.* at 458–60. Because of this contradiction, the ATF's broadened definition is likely unlawful.

14

Defendants offer almost no rebuttal to the holding of *Cargill* controlling here. In fact, their response is relegated to a single footnote. This lone footnote contains the conclusory statement that Plaintiffs "have not carried their burden of demonstrating a substantial likelihood of success on the merits of their claim.[33] All that Defendants offer to support the conclusion that "Plaintiffs are incorrect" is a reference to *Guedes v. ATF*—a case from the District of Columbia Circuit that disagrees with *Cargill* on the conclusion that bump stocks are not machineguns.[34] 45 F.4th 306, 319 (D.C. Cir. 2022). Beyond this reference, Defendants provide no analysis showing why the Court should vary from Fifth Circuit precedent to accept the reasoning in *Guedes*. Instead, Defendants promise that their future briefing at the preliminary injunction stage will set out to explain why *Guedes*—and not *Cargill*—controls here.

Whether or not Defendants will successfully make this showing in future briefing is an issue the Court will address once that argument is fully briefed. But for purposes of what is before the Court now, Defendants have offered no support for their conclusion that Plaintiffs are unlikely to succeed on the merits. More importantly, the Fifth Circuit has held that placement of the responsive argument in a perfunctory footnote may constitute waiver by inadequate briefing. *See United States v. Thames*, 214 F.3d 608, 611 n.3 (5th Cir. 2000) (citing *L&A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 113 (5th Cir. 1994)).

Because Plaintiffs point to binding Fifth Circuit precedent that appears squarely dispositive of the issue in this case, the Court finds that Plaintiffs have carried their burden at this stage as to this factor and are entitled to a TRO. Defendants' brief response—if not waived—is nothing more than a conclusory rebuttal in a footnote.[35] Therefore, for the reasons discussed, the Court finds that Plaintiffs have demonstrated a strong likelihood of success on the merits of their

---

[33] Defs.' Resp. 9 n.1, ECF No. 32.
[34] *Id.*
[35] *Id.*

15

APA claim. It is substantially likely that the ATF's regulation containing a broadened definition of "machinegun" exceeds the scope of its authority under the GCA.

### B. Substantial Threat of Irreparable Harm

In the Fifth Circuit, it is "well-established" that a harm is considered "irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). A showing of economic loss is usually insufficient to establish irreparable harm because damages are typically recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 599–601 (5th Cir. 2011). However, where costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, irreparable harm is generally satisfied. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)). Likewise, "complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.* For harms that are non-pecuniary, the alleged irreparable injury must also be concrete—"speculative injury is not sufficient" and "there must be more than an unfounded fear on the part of the applicant." *Daniels Health Servs.*, 710 F.3d at 585 (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). So long as "'the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

Without a TRO, Plaintiffs allege that they are suffering, and will continue to suffer, irreparable harms. The identified harms take the form of unrecoverable compliance costs and

non-pecuniary injuries, such as credible threats of prosecution and deprivations of ownership and constitutional rights. Defendants contest Plaintiffs' alleged injuries on grounds that "there is no substantial threat of injury, irreparable or otherwise, *at this time*."[36] According to Defendants, Plaintiffs do no more than claim that they will "suffer irreparable injury based on the hypothetical consequences of a hypothetical criminal prosecution or other enforcement action."[37] The Court disagrees and instead finds that Plaintiffs have carried their burden to show that irreparable harms exist at this stage.

> i.   <u>Credible Threat of Prosecution</u>

First, Plaintiffs face a credible threat of criminal prosecution. As explained earlier in this Opinion, Plaintiffs place themselves in potential jeopardy by bringing this challenge to the ATF's regulation of FRTs. Defendants' recent enforcement activity validates those fears. Armed FBI agents visited Plaintiff Carey at his home, prompting him to surrender his FRTs to avoid prosecution.[38] Other individual FRT owners have experienced similar enforcement activities, such as seizures and search warrants.[39] And Defendants are presently prosecuting at least three individuals.[40] The Individual Plaintiffs and these other FRT owners share an important commonality: they are all engaging in conduct proscribed by the ATF's interpretation of "machinegun." Combined with the amount of recent enforcement activity and Defendants refusal to disavow taking any action against the Individual Plaintiffs during this lawsuit, the Court agrees that a credible threat of prosecution exists.

---

[36] Defs.' Resp. 8, ECF No. 32.
[37] *Id.*
[38] Pls.' Compl. 3, ECF No. 1.
[39] *Id.* at 11–12.
[40] Pls.' Reply 5, 9 n.2, ECF No. 33.

Finding that Plaintiffs face a credible threat of civil or criminal prosecution for prior and current ownership of FRTs, the Court further finds that this constitutes more than a *de minimis* harm justifying the need for equitable protection.

      ii.   <u>Compliance Costs</u>

Second, Plaintiffs risk potential compliance costs. These costs stem from the Hobson's choice the Individual Plaintiffs face: continue to exercise ownership and constitutional rights while risking federal prosecution *or* forfeit those rights to avoid civil and criminal consequences. Without immediate relief, the Individual Plaintiffs will continue to suffer under the illusion that an actual choice exists due to Defendants' refusal to disavow prosecution during this lawsuit.

Compliance with an impermissible or illegal interpretation of the law carries the potential for economic costs. *Texas v. EPA*, 829 F.3d at 433 ("Indeed, 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'" (citation omitted)). Threats that lead to an individual surrendering FRTs—as was the case for Plaintiff Carey—often lack compensation after the fact for the deprived use and enjoyment of the surrendered weapons (assuming the weapons are even returned). *See VanDerStok v. Garland*, 625 F.Supp.3d 570, 584 (N.D. Tex. Sept. 2, 2022) (explaining that "compliance costs are 'likely unrecoverable,' usually 'because federal agencies generally enjoy sovereign immunity for any monetary damages'") (quoting *Texas v. EPA*, 829 F.3d at 433)). Because Defendants in this case are entitled to sovereign immunity, and therefore not liable for damages, any economic injuries to the Individual Plaintiffs likely cannot be recovered.

Likewise, compliance can also cause non-pecuniary harms and need not be financial in nature. Even "alleged" deprivations of constitutional or procedural rights may justify injunctive relief. *See, e.g.*, *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 294–97 (5th

Cir. 2012) (finding irreparable harm where plaintiffs "alleged" violations of constitutional rights on grounds that "[t]he loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 500 (W.D. La. July 26, 2022) (finding irreparable harm where plaintiffs alleged the government exceeded its statutory authority and violated the APA).

Plaintiffs' Complaint alleges that deprivations of both their constitutional and ownership rights hang in the balance. For instance, Plaintiffs' use and enjoyment of FRTs is "chilled . . . by virtue of Defendants' impermissible interpretation of law."[41] Defendants do not address this point and simply reiterate that "ATF has no plans to seize Plaintiffs' property in the *immediate future*."[42] But therein lies the problem. Plaintiffs face potential pressure to comply with a regulation that is likely unlawful due to ATF's arbitrary and capricious interpretation of "machineguns." The Court is unpersuaded by Defendants' argument that there are "no plans to seize Plaintiffs' property in the immediate future."[43] Without disavowing that these plans will not change during this lawsuit, Plaintiffs face endemic uncertainty and pressure to comply with Defendants' interpretation of the definition to avoid prosecution.

Simply put, Plaintiffs face irreparable injury in whichever course they choose—suffer injury by complying with a regulation they allege Defendants lack the authority to enforce *or* risk civil and criminal enforcement by not complying. For this reason, and because Defendants' contrary arguments overlook clear Fifth Circuit precedent identifying compliance costs as irreparable harms, the Court is satisfied that Plaintiffs' alleged injuries are based on a credible threat of prosecution, placing them in immediate danger of irreparable injury.

---

[41] Pls.' Reply 7, ECF No. 33.

[42] Defs.' Resp. 8, ECF No. 32 (emphasis added).

[43] *Id.*

Accordingly, the Court finds that the Individual Plaintiffs have demonstrated a substantial threat of irreparable harm at this stage and are entitled to a TRO.

### C. Balance of Hardships and the Public Interest

The final factor the Court must weigh is the balance of the equities and the public interest, which "merge" when the Government is a party. *Nken*, 556 U.S. at 435. A court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). At the same time, a court must weigh any purported injuries the enjoined party may experience against the strong likelihood that they will not succeed on the merits. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021) (explaining that "any injury to [the enjoined party] is outweighed by [a] strong likelihood of success on the merits" by the requesting party).

Both parties offer interests that the Court now weighs. On one side, the Individual Plaintiffs assert interests in "lawfully exercising freedoms they have enjoyed for several years."[44] As law-abiding citizens, this includes the ability possess firearms that are not machineguns.[45] Absent protection from a TRO, the Individual Plaintiffs contend that they would suffer compliance costs from any civil and criminal enforcement actions, in addition to experiencing a chilling effect on the exercise of their freedoms going forward.[46] On the other side, Defendants argue that their interests in avoiding confusion, retaining prosecutorial discretion, and protecting public safety tilt the equitable scale in their direction.[47] Weighing these interests, the Court finds that, on balance, the equities favor the Individual Plaintiffs at this stage. The Court will address each of Defendants' arguments in turn.

---

[44] Pls.' Br. 8, ECF No. 18.
[45] *Id.*
[46] *Id.*
[47] Defs.' Resp. 6, 9–10, ECF No. 32.

Defendants first recycle their threshold arguments to insist that the equities weigh against a TRO in this case. According to Defendants, because the "Individual Plaintiffs' asserted injuries are hypothetical, and principles of equity do not permit injunctions against criminal prosecutions," a TRO that "block[s] the initiation of actions that ATF has no present intent to pursue would simply cause confusion."[48] The Court is not persuaded. If anything, it seems that the ATF's incongruent definition and refusal to disavow prosecution of the Individual Plaintiffs during the pendency of this lawsuit jointly form the source of any confusion. Moreover, the Court has already rejected Defendants' threshold arguments. Plaintiffs have standing due to credible threats of prosecution against them. And the concern that pre-enforcement judicial intervention in this case would strip the Defendants' of their prosecutorial discretion is similarly misplaced. The Court has already found that the Plaintiffs are facially attacking the lawfulness of Defendants' ability to prosecute *anyone* for FRT possession under the ATF's expanded definition. There is no present attack on prosecutorial discretion because no such discretion can even exist if the ATF's definition of "machinegun" does not hold. Combined with the Court's determination that Plaintiffs are very

---

[48] Defs.' Resp. 9, ECF. No. 32. Defendants cite to two cases in support of this point: *Christoforu v. United States*, 842 F. Supp. 1453, 1456 (S.D. Fla. 1994), and *Younger v. Harris*, 401 U.S. 37, 46 (1971). From the Court's reading of these cases, they are inapposite. To begin with, *Christoforu* advised that courts should "not grant equitable relief when [a] preemptive civil suit is filed *for the purpose of* terminating a pending criminal action." 842 F. Supp. at 1455 (emphasis added). But the parties have identified no pending criminal actions against the Individual Plaintiffs and there is no evidence that the injunctive relief is sought *for the purpose of* terminating or otherwise impeding a criminal action. Furthermore, *Younger*'s abstention doctrine, as cited by Defendants, applies to the power of federal courts to enjoin *ongoing state prosecutions*. 401 U.S. at 43–46. This carries significantly different considerations than pre-enforcement judicial review of a federal criminal law. But even if *Younger*'s holding applies to federal prosecutions, the Supreme Court recognized that "the threat to the plaintiff's federally protected rights" is precisely the type of irreparable injury that equitable relief is designed to prevent. *Id.* at 46. In contrast, the cost of criminal prosecution to the accused party is not an "irreparable" injury. *Id.* at 44–46. The reason for differentiating between these types of harms is due to the importance of avoiding duplicative legal proceedings. *Id.* at 42–44. When the alleged injury from a criminal prosecution is merely "the cost, anxiety, and inconvenience of having to defend," the initiation of civil proceedings seeking equitable relief would be duplicative since the issues are capable of resolution via the criminal action. *Id.* at 44–46. But where important "federally protected rights" are in jeopardy, equitable relief is proper when those rights cannot be sufficiently protected in "a single criminal prosecution." *Id.* at 46. Therefore, the Court finds that *Christoforu* and *Younger* do not bar equitable relief in this case.

likely to succeed on the their APA claim that this expanded definition violates the law, Defendants' asserted interests do not tip the equitable scale in their favor.

Defendants next assert their primary argument as to why the balance of equities favors them: "[p]ublic safety would be jeopardized by the injunction."[49] According to Defendants, enjoining the ATF from taking future action regarding FRTs "imposes harms that outweigh any possible harms to the Individual Plaintiffs, who could defend against such actions in the usual course."[50] These harms to Defendants are grounded in their "strong and continuing interest in being able to enforce [the] laws restricting the possession and sale of deadly machine guns."[51] Defendants do not dispute that the Individual Plaintiffs are law-abiding citizens who wish to engage in the lawful conduct of possessing specific firearms—conduct that was lawful until the ATF said otherwise. Instead, Defendants argue that Plaintiffs "provide no explanation for why the government's general public safety concerns would apply any less readily to them than other individuals who possess deadly machineguns."[52] But it is actually Defendants who lack an explanation—not Plaintiffs. The fact that Plaintiffs assert they are "law-abiding citizens" who "have possessed [FRTs] without incident"[53] differentiates them from individuals who "create public health hazards" and "carry out . . . large-scale attack[s]."[54] Plaintiffs' assertion supplies more substance than Defendants' deflection.

Yet perhaps most damaging to Defendants are their irreconcilable positions. On the one hand, Defendants generally argue that possession of FRTs by anyone—including possession by *these* three individuals (who have no criminal history)—poses a threat to public safety. But, on

---

[49] Defs.' Resp. 10, ECF No. 32.
[50] *Id.* (citing *Proctor v. Dist. of Columbia*, 310 F. Supp. 3d 107, 117 (D.D.C. 2018) (finding public safety justified balancing the equities in favor of the government)).
[51] *Id.*
[52] *Id.*
[53] Pls.' Reply 9, ECF No. 33.
[54] Defs.' Resp. 10, ECF No. 32.

the other hand, Defendants aver that they have no *current* plans to enforce the ATF Rule against these individuals based on the *historic* practice of enforcing their interpretation against large sellers only. Even if Defendants' representation is true that they have only prosecuted large sellers in the past, how can they now claim that the threat to public safety is so grave *because of individual ownership* by these specific law-abiding citizens at the same time there are no current plans to prosecute these individuals?

The Court is unable to reconcile this contradiction. Taking Defendants' representation that there are no current plans to prosecute as true, this dissonance here suggests a lack of substance underlying the proffered public safety concern. Defendants offer no argument specifically showing how public safety would be harmed by the Court granting the narrow TRO—at most twenty-eight days—to enjoin enforcement actions for possession (and not some other unlawful use of the FRT) by *these* Individual Plaintiffs. Because Defendants have no current plans to prosecute, the Court concludes that they must not seriously object to the issuance of a TRO memorializing the status quo: no prosecution for prior or current FRT possession by these three individuals. Thus, the Court finds that Defendants would experience little, if any, harm by issuance of a narrow TRO.

In contrast, the Individual Plaintiffs face the very real potential to experience harms if the TRO is not granted. These harms include a credible threat of civil or criminal prosecution, compliance costs, and a chilling of ownership and constitutional rights. On balance, the equities and public interest weigh in favor of Plaintiffs.[55] And any injury to Defendants is further

---

[55] The Court has previously noted that there is also an interest in ensuring that the Government adheres to its constitutional and statutory obligations. *Polymer80, Inc. v. Garland*, 4:23-cv-00029-O, 2023 WL 3605430, at *11 (N.D. Tex. Mar. 19, 2023). Indeed, there is undoubtedly "an overriding public interest [in] . . . an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). And "[t]he public interest is served when administrative agencies comply

outweighed by Plaintiffs' strong likelihood of success on the merits of its APA statutory interpretation claim. *Mack*, 4 F.4th at 316.

*       *       *       *

In sum, Plaintiffs have successfully demonstrated to the Court that they are entitled to a TRO. Having considered the arguments, evidence, and law, the Court holds that the relevant factors weigh in favor of **GRANTING** the TRO. Accordingly, the Court temporarily **ENJOINS** Defendants—along with their officers, agents, servants, and employees—from initiating criminal or civil enforcement actions against Plaintiffs Carey, Speegle, and Wheeler, in any manner, based on their current or prior possession of one or more FRTs. Further, the Court temporarily **ENJOINS** Defendants—along with their officers, agents, servants, and employees—from requesting that Plaintiffs Carey, Speegle, and/or Wheeler surrender, voluntarily or involuntarily, any FRTs in their possession.

### C.  Scope of the Temporary Restraining Order

Having determined the Individual Plaintiffs carried their burden showing that equitable relief is warranted in this situation, the Court must next decide how to provide those parties with complete relief. When ordering equitable relief, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). In keeping with that obligation, the Court will tailor the scope of the temporary restraining order with careful attention to avoid upsetting the balance of the competing interests. Thus, the Court enjoins Defendants from implementing or enforcing the ATF's expanded definition of "machinegun"—that proscribes FRT possession—against these

---

with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

Individual Plaintiffs. This relief should alleviate Plaintiffs' demonstrable injuries without unnecessarily burdening Defendants.

Crucially, this Court's temporary injunctive relief does not offer blanket immunity to the Individual Plaintiffs from prosecution for all firearm-related offenses. The implications of this TRO's narrow scope bear further explanation. This TRO protects only the Individual Plaintiffs from civil or criminal enforcement of the challenged rule during the life of the TRO. Other unnamed individual members of the Institutional Plaintiffs are *not* covered under this TRO. Additionally, this TRO only covers the current or prior possession of FRTs by the Individual Plaintiffs. This TRO does *not* cover any future purchases by the Individual Plaintiffs of FRTs after the date of his order. Importantly, the Plaintiffs may still be prosecuted for violating otherwise lawful provisions of the NFA and GCA, as well as other lawful firearms regulations. Accordingly, the Court finds that the aforementioned limitations appropriately narrow the scope of this extraordinary relief in order to maintain the status quo without overly burdening Defendants.

### D.  Timing of the Temporary Restraining Order

Normally, a TRO remains in place for a maximum of fourteen days. Fed. R. Civ. P. 65(b). The Federal Rules of Civil Procedure provide the option to extend a TRO an additional fourteen days for good cause shown. *Id.* at 65(b)(2). The wording of Rule 65 does not foreclose the Court extending the TRO prior to receiving a subsequent renewal request from the party seeking the TRO. *See id.* ("The order expires at the time after entry—not to exceed 14 days— that the court sets, unless before that time *the court, for good cause, extends it* for a like period or the adverse party consents to a longer extension.") (emphasis added)). Other courts have done the same in similar circumstances. *See, e.g.*, *State of Maine v. Fri*, 483 F.2d 439, 441 (1st Cir.

1973) ("[A]s long as the hearing on the preliminary injunction is held expeditiously within the appropriate time frame, the district court should be able to extend the restraining order while it prepares its decision."); *Fernandez-Roque v. Smith*, 671 F.2d 426, 431 (11th Cir. 1982) ("A district court possesses inherent powers of equity sufficient to enable it to preserve the status quo until [other pending legal questions] can be resolved.").[56]

Plaintiffs request that the TRO remain in place until such time that the Court can rule on their imminent preliminary injunction motion.[57] The Court construes this as a request for an extension and finds good cause to extend the TRO an additional fourteen days. Without this extension, the TRO would otherwise expire six days prior to when the Plaintiffs' impending Motion for Preliminary Injunction ripens. And this would occur despite no change in the very circumstances justifying the TRO. Not only will this extension protect the status quo by ensuring that there is not a short gap between the temporary relief granted by this Order and any further injunctive relief that may be granted in the near future, it will also conserve finite judicial resources spent on addressing subsequent renewal requests.

Because the parties' agreed schedule for the preliminary injunction briefing comes ripe on September 19, 2023,[58] the Court will extend the TRO for one additional fourteen-day period. Therefore, the TRO will either expire twenty-eight days from the date of this order, on September 27, 2023, *or* on the date the Court issues its ruling on the forthcoming preliminary injunction motion, whichever is earlier.

---

[56] For other examples, see *Women's Med. Prof'l Corp v. Taft*, 199 F.R.D. 597, 598 (S.D. Ohio 2000) (extending a TRO sua sponte); *Long Island R.R. Co. v. Int'l Ass'n of Machinists & Aerospace Workers*, 709 F. Supp. 376, 377 (S.D.N.Y. 1989) (discussing the prior sua sponte extension of the TRO in order to preserve the status quo pending the ruling on the preliminary injunction); *Hous. Study Grp. v. Kemp*, 739 F. Supp 633, 635 n.4 (D.C.C 1990) (discussing the prior sua sponte extension of the TRO to "afford the parties adequate time to complete briefing.").
[57] Pls.' Br. 1, ECF No. 22.
[58] Joint Proposed Briefing Schedule, ECF No. 25.

## V.      CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Temporary Restraining Order (ECF No. 17) to preserve the status quo until September 27, 2023 or until such time that the Court rules on Plaintiffs' Motion for Preliminary Injunction (ECF No. 22). The Court **ORDERS** that Defendants—along with their officers, agents, servants, and employees—are **ENJOINED** from implementing or enforcing against Plaintiffs Carey, Speegle, and Wheeler, in any manner, the ATF's expanded definition of "machinegun" that this Court has determined is likely unlawful. Further, the Court waives the security requirement of Federal Rule of Civil Procedure 65(c).[59] *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (holding that the district court has discretion to waive the security requirement).

**SO ORDERED** this **30th day** of **August, 2023**.

Reed O'Connor

**UNITED STATES DISTRICT JUDGE**

---

[59] Because neither party raises the security requirement in Rule 65(c), no security is ordered. *See* FED. R. CIV. P. 65(c).