**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

NATIONAL ASSOCIATION FOR GUN
RIGHTS, INC., *et al.*,

                Plaintiffs,

    v.

MERRICK GARLAND, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
OF THE UNITED STATES, *et al.*,

                Defendants.

Case No. 4:23-cv-00830-O

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

SUMMARY ........................................................................................................................1

STANDARD OF REVIEW ................................................................................................2

ARGUMENT.....................................................................................................................3

I.      Plaintiffs Are Not Likely to Succeed on the Merits of Their Claim. ........................3

        A.     FRTs Are Machineguns Under Federal Law.................................................3

        B.     Plaintiffs Lack Standing. ............................................................................10

               1.     The Associational Plaintiffs Lack Standing.....................................10

               2.     Plaintiffs Do Not Have Standing to Assert a Pre-Enforcement
                      Challenge. ........................................................................................11

II.     Plaintiffs Do Not Face a Substantial Threat of Irreparable Injury. .......................15

III.    The Balance of Harms Weighs Against a Preliminary Injunction. .........................18

IV.   This Court Should Decline to Enjoin a Hypothetical Enforcement Action Based on
       Principles of Equity.................................................................................................20

V.     Any Injunctive Relief Should Be Appropriately Limited. .....................................22

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Akins v. United States,*
  312 F. App'x 197 (11th Cir. 2009) .......................................................................8

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
  878 F.2d 806 (5th Cir. 1989) ..............................................................................2

*Anderson v. Jackson,*
  556 F.3d 351 (5th Cir. 2009) ..............................................................................2

*Aposhian v. Barr,*
  958 F.3d 969 (10th Cir. 2020), *en banc granted but previous order reinstated,*
  989 F.3d 890 (9th Cir. 2021) ....................................................................... 18, 21

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
  627 F.3d 547 (5th Cir. 2010) .............................................................................10

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ............................................................................. 12, 15, 21

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017) .............................................................................11

*Bevis v. City of Naperville,*
  --- F. Supp. 3d ----, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ................. 17, 19

*Blum v. Holder,*
  744 F.3d 790 (1st Cir. 2014) .............................................................................13

*Cargill v. Garland,*
  57 F.4th  (5th Cir. 2023), *pet. for cert. filed*, No. 22-76 (U.S. Apr. 7, 2023).....................................*passim*

*Christoforu v. United States,*
  842 F. Supp. 1453 (S.D. Fla. 1994), *aff'd,* 61 F.3d 31 (11th Cir. 1995)..................................18

*Cronin v. U.S. Dep't of Agric.,*
  919 F.2d 439 (7th Cir. 1990) ..............................................................................4

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724 (2008) ..........................................................................................23

*Dep't of Homeland Sec. v. New York,*
  140 S. Ct. 599 (2020) .................................................................................. 23, 24

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
  762 F.2d 464 (5th Cir. 1985) ..............................................................................2

*Fontenot v. McCraw,*
  777 F.3d 741 (5th Cir. 2015) ..................................................................................................23

*Francisan Alliance, Inc. v. Becerra,*
  47 F.4th 368 (5th Cir. 2022) ..................................................................................................12

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ................................................................................................... 17, 22

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) ..................................................................................................21

*Hunt v. Wash. St. Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ................................................................................................................10

*La. ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.,*
  70 F.4th 872 (5th Cir. 2023) ..................................................................................................13

*Leaf Trading Cards, LLC v. Upper Deck Co.,*
  No. 3:17-CV-3200-N, 2019 WL 7882552 (N.D. Tex. Sept. 18, 2019) ...............................16

*League of United Latin Am. Citizens v. Abbott,*
  604 F. Supp. 3d 463 (W.D. Tex. 2022) ..................................................................................10

*Lewis v. Casey,*
  518 U.S. 343 (1996) ......................................................................................................... 22, 23

*Louisiana v. Becerra,*
  20 F.4th 260 (5th Cir. 2021) ..................................................................................................23

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................................................11

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ......................................................................................................... 17, 22

*Martinez v. Mathews,*
  544 F.2d 1233 (5th Cir. 1976) ..................................................................................................2

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ..................................................................................................................2

*N.A.A.C.P. v. City of Kyle, Tex.,*
  626 F.3d 233 (5th Cir. 2010) ........................................................................................... 10, 11

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
  804 F.3d 242 (2d Cir. 2015) ..................................................................................................18

*Nat'l Rifle Ass'n of Am. v. Magaw*,
  132 F.3d 272 (6th Cir. 1997) ...................................................................................21

*Nken v. Holder*,
  556 U.S. 418 (2009) ...............................................................................................18

*Opulent Life Church v. City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) ..................................................................................16

*Parker v. Dist. of Columbia.*,
  478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom. Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) ............14

*Rare Breed Triggers, LLC v. Garland*,
  No. 6:21-CV-1245, 2021 WL 4750081 (M.D. Fla. Oct. 12, 2021) ......................24

*Rupp v. Becerra*,
  No. 8:17-CV-00746, 2018 WL 2138452 (C.D. Cal. May 9, 2018) ......................20

*Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms, & Explosives*,
  No. 3:21-CV-0116-B, 2023 WL 4304760 (N.D. Tex. June 30, 2023) ..................23

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir.), *as revised* (Oct. 30, 2020) .............................................12

*Staples v. United States*,
  511 U.S. 600 (1994) ..................................................................................................3

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ..........................................................................................20, 21

*Stolt-Nielsen, S.A. v. United States*,
  442 F.3d 177 (3d Cir. 2006), *as amended* (May 16, 2006) ..................................20

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................................................10

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................................... 12, 13, 15, 21

*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) ..........................................................................................10, 23

*Tracy Rifle & Pistol LLC v. Harris*,
  118 F. Supp. 3d 1182 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016) ...............20

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ......................................................................................23, 24

*United States v. Camp*,
343 F.3d 743 (5th Cir. 2003) ................................................................. 7, 10

*United States v. Jokel*,
969 F.2d 132 (5th Cir. 1992) ................................................................. 9

*United States v. Rare Breed Triggers, LLC*,
--- F. Supp. 3d ---- , 2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023) ................................. *passim*

*United States v. Rare Breed Triggers, LLC*,
No. 1:23-CV-00369, 2023 WL 504992 (E.D.N.Y. Jan. 25, 2023) ................................. 13-14

*United States v. Salerno*,
481 U.S. 739 (1987) ................................................................. 19

*W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*,
751 F.2d 721 (5th Cir. 1985) ................................................................. 25

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ................................................................. 18

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................. 2, 18

*Wireless Agents, LLC. v. T-Mobile USA, Inc.*,
No. 3:05-CV-0094-D, 2006 WL 1540587 (N.D. Tex. June 6, 2006) ................................. 16

*Younger v. Harris*,
401 U.S. 37 (1971) ................................................................. 17, 18

*Zimmerman v. City of Austin, Texas*,
881 F.3d 378 (5th Cir. 2018) ................................................................. 12, 15

## STATUTES

5 U.S.C. § 702 ................................................................. 22

18 U.S.C. § 921 ................................................................. 1, 3

26 U.S.C. § 5845 ................................................................. *passim*

## RULES

Fed. R. Crim. Proc. 41 ................................................................. 17

## REGULATIONS

ATF, Final Rule, *Bump-Stock-Type Devices*,
83 Fed. Reg. 66514 (Dec. 26, 2018) ................................................................. 3

**OTHER AUTHORITIES**

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
Federal Practice and Procedure § 2948.1 (2d ed. 1995)......................................................................16

**SUMMARY**

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has for years classified certain "forced reset trigger" devices ("FRT") as machineguns under the Gun Control Act. *See* 18 U.S.C. § 921(a)(24); 26 U.S.C. § 5845(b); Compl. Ex. F, ECF No. 13-6 (Report of Technical Examination RE: Rarebreed Firearms FRT-15). Plaintiffs in this case include two firearms rights groups (the "Associational Plaintiffs") and three individuals (the "Individual Plaintiffs") who own, owned, and/or would like to own one or more FRTs. Plaintiffs seek a far-reaching preliminary injunction against prospective enforcement of federal law, among other broad relief, against anyone concerning FRTs.

For several reasons, the Court should not grant this extraordinary relief. First, Plaintiffs' claim is unlikely to succeed on the merits because the plain meaning of the statutory definition of "machinegun," as interpreted by the Fifth Circuit, includes FRTs. As this Court recognized, "a weapon [that] automatically fire[s] multiple rounds with a single function of the trigger itself" is a machinegun. ECF No. 36 at 14 ("TRO Order"). FRTs do just that; when the trigger of an FRT-equipped firearm is pulled and subject to constant rearward pressure, the firearm continues to fire without any further manual input, exactly like that of fully automatic weapons. In this way, firearms equipped with FRTs, which are mechanical triggers, are unlike the firearms equipped with non-mechanical bump stocks at issue in *Cargill v. Garland*, 57 F.4th 453 (5th Cir. 2023) (en banc), *pet. for cert. filed*, No. 22-976 (U.S. Apr. 7, 2023), which require additional manual input to continue to fire after the trigger is pulled.

Plaintiffs have also not shown a credible threat of enforcement against them that would establish standing to justify such broad preliminary emergency relief. Plaintiffs cannot identify a single prosecution against a small-scale, otherwise law-abiding owner of a FRT, as they claim to be. Even more tellingly, Associational Plaintiffs have not identified even one person amongst their allegedly 17,000 members in the Northern District of Texas that has actually experienced an injury related to possession of a FRT. Compl. ¶¶ 4, 5. And Individual Plaintiffs cannot plausibly claim any credible

1

threat of prosecution where ATF has both represented that it has no current intention to arrest or bring charges against them and committed to notifying the Court in advance of doing so.

Furthermore, Plaintiffs have not demonstrated a threat of irreparable harm due to the lengthy delay between ATF's classification and Plaintiffs' effort to seek broad relief, and because the cost of defending against a hypothetical enforcement action cannot be considered irreparable. On the other hand, the relief sought would cripple ATF's ability to take virtually any enforcement actions related to any manufacturing, sale, or possession of a FRT, creating a significant risk to public safety that weighs against an injunction. In any event, the Court should follow the clear mandates of equity and decline Plaintiffs' inappropriate invitation to enjoin hypothetical federal prosecutions. Finally, if the Court grants Plaintiffs' motion, it should grant relief to address only the harms Plaintiffs have demonstrated.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should only be granted when the movant has clearly carried the burden of persuasion," *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). Plaintiffs must "by a clear showing" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and emphasis omitted). Failure to satisfy any of these requirements precludes injunctive relief, *see Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and Plaintiffs bear a heavy burden as to each, *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). Plaintiffs' burden is even higher because they seek a preliminary injunction that would alter the status quo. *See, e.g.*, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (such injunctions are "particularly disfavored").

## ARGUMENT

### I.     Plaintiffs Are Not Likely to Succeed on the Merits of Their Claim.

#### A.     FRTs Are Machineguns Under Federal Law.

Plaintiffs argue that FRTs are not machineguns under 26 U.S.C. § 5845(b). They are unlikely to succeed on the merits of that contention. The statutory definition of a machinegun requires that the weapon "shoot[] automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(a)(24).[1] Plaintiffs acknowledge (Pls.' Mot. for Prelim. Inj. at 11, ECF No. 22 ("Mot.")), that definition encompasses at least weapons for which "once [the] trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). FRTs fall within that definition because ATF found across multiple classifications of multiple FRTs that a single constant rearward pull of the trigger causes the firearm to shoot more than one shot. *See* ECF No. 13-6 at 5; ECF No. 13-7 at 5-6 (ATF Firearms Technology Criminal Branch Report of Technical Examination re: Wide Open Trigger); ECF No. 13-9 at 15 (ATF Firearms Technology Criminal Branch Report of Technical Examination re: Rare Breed Triggers). In other words, after a FRT is depressed, the firearm will "fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." ECF No. 13-6 at 47. Accordingly, a FRT is a machinegun, as the only other federal court to consider the question has found "highly likely." *United States v. Rare Breed Triggers, LLC*, --- F. Supp. 3d ---- , 2023 WL 5689770, at *15 (E.D.N.Y. Sept. 5, 2023) ("[T]he Government … is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun.").

---

[1] This Court applied the same definition: "To qualify as a machinegun under the statute, a weapon must only be capable of firing automatically once the trigger itself performs a single function." TRO Order at 14 (citing *Cargill*, 57 F.4th at 464). And because this definition is derived directly from the statute, Plaintiffs' attack on a regulation interpreting that statute in the context of bump-stock-type devices is beside the point. *See* Compl. ¶ 42 (citing ATF, Final Rule, *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018)).

Plaintiffs' purported expert, Daniel G. O'Kelly,[2] does not dispute the operative definition. O'Kelly states that "the primary distinction between a semiautomatic firearm and a full-automatic firearm"—a machinegun—"is that a semiautomatic firearm requires the shooter to depress the trigger, causing it to function, separately for each round it fires, whereas an automatic firearm allows the shooter to depress (function) the trigger once to fire multiple shots." ECF No. 19 at 16. The dispositive question is thus whether a FRT allows the shooter to fire multiple shots by depressing the trigger just once through a single constant rearward pull. The evidence unequivocally establishes that it does.

ATF Firearms Enforcement Officer (FEO) Anthony Ciravolo conducted a test, examination, and classification analysis of the Rare Breed Triggers, model FRT-15, on April 20, 2023. ECF No. 13-9 at 1–17. The FRT-15 is a type of "drop-in" FRT designed to replace the trigger of a standard AR15-type firearm to "increase the rate" of fire. *Id.* at 54. As the patent inscribed on the FRT-15 explains, "[s]ometimes this is simply for entertainment and the feeling of shooting a machinegun." *Id.* Ciravolo's classification report explains that the FRT-15 accomplishes this increase in rate of fire by eliminating the disconnector, which is a small metal part in semi-automatic triggers that catches the hammer after it fires and disconnects it from the firing sequence so that the weapon will not fire a second shot automatically. *Id.* at 14; *see also Rare Breed Triggers*, 2023 WL 5689770, at *5-6.[3] Accordingly, the

---

[2] O'Kelly states that he has been "retained by the Plaintiffs in this case as an expert witness on firearms and [ATF] procedure." ECF No. 19 at 14. By addressing O'Kelly's submissions, Defendants do not concede the admissibility of O'Kelly's testimony as an expert witness or the propriety of Plaintiffs' reliance on evidence outside the administrative record to contest the merits. *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 444 (7th Cir. 1990) (government does not waive objections to evidence beyond the administrative record in later proceedings even when admitted at the interim relief stage). And even at this stage, O'Kelly's conclusions on the proper classification of FRTs cannot be credited because he "has no such experience" with "the classification of a device as a machinegun based on its mechanical operations," *Rare Breed Triggers, LLC*, 2023 WL 5689770, at *32, and his "live and written testimony also provide other reasons to doubt his general credibility," *id.* at n.38.

[3] The FRT-15 is extremely effective at increasing rate of fire to that of a machinegun. Without any limitation on the amount of ammunition, a semi-automatic AR15-type rifle equipped with an FRT-15 would fire at an average rate of 840.8 rounds per minute. ECF No. 13-9 at 16. By comparison, the average rate of fire for a M16-type, M4 machinegun is 870.4 rounds per minute. *Id.* Obviously, the average shooter of a semi-automatic firearm could not achieve a firing rate of over 800 rounds per minute by pulling *and releasing* the trigger repeatedly.

classification report concluded that the FRT-15 is a machine gun under 26 U.S.C. § 5845(b). ECF No. 13-9 at 1-17. Multiple firing tests performed during that analysis demonstrated that a semi-automatic firearm equipped with the FRT-15 fired multiple rounds automatically with a single depression of the trigger. *See id.* at 15. A semi-automatic firearm equipped with the FRT-15 and loaded with a two-round ammunition fired both rounds with a single, constant depression of the trigger across all three tests. *Id.* The same occurred with a five-round ammunition load, also across three different tests. *Id.*

These results replicated those obtained after testing by ATF FEO David A. Smith on June 7, 2021. ECF No. 13-6 at 1-7. FEO Smith's analysis also concluded the FRT-15 was a machinegun. *Id.* Specifically, Smith assessed a firearm equipped with an FRT-15 and multiple-round ammunition loads, and found the firearm fired *all* available rounds "automatically by a single pull/function of the trigger" on each of four tests. *Id.* at 6. Accordingly, a firearm equipped with an FRT-15 shoots, automatically, more than one shot with a single, constant pull of the trigger. It is thus a machinegun.

Function tests conducted on other, non-Rare Breed FRTs also showed that such devices transform semi-automatic firearms into machineguns. ATF FEO Cody Toy conducted an examination, test, and classification analysis on an AR Triggers Wide Open Trigger ("WOT") FRT. ECF No. 13-7 at 2. He found that the WOT FRT fired all available rounds "automatically by a single function (pull) of the trigger" across four different tests in which multiple-round ammunition loads were inserted into the firearm's magazine. *Id.* at 6. And Plaintiffs concede that the WOT "operates on the same mechanical principles as the Rare Breed FRT-15." Compl. ¶ 44.[4]

The zip-tie test ATF conducted on a model AR1 FRT also demonstrates that firearms equipped with FRTs are machineguns because they fire automatically with a single constant depression of the trigger. In this test, a zip-tie was installed around the rear of the grip and the front of the FRT, and that zip-tie was gradually tightened until the trigger was retracted just enough to release the hammer. ECF No. 13-6 at 52. A ten round-ammunition load was placed into the firearm's magazine,

---

[4] Plaintiffs' purported expert also acknowledges that the FRT-15, WOT, and Powered By Graves ALAMO-15 FRTs "share a substantially similar design such that [his] analysis of the FRT-15 is also descriptive of the [other FRTs] without the need for modification." ECF No. 19 at 15.

and once the first cartridge was chambered, the weapon "fired *five cartridges automatically* without the trigger being released." *Id.* (emphasis added). Michael Curtis, the Chief of the Firearms Technology Industry Services Branch, repeated this test multiple times to demonstrate that the FRT fired more than one shot with a single function of the trigger. *Id.* With each test, the firearm fired from three to ten cartridges (out of ten available) before a malfunction was encountered or the ammunition load expended. *Id.*[5] The same zip-tie test was conducted on an FRT-15-equipped firearm with the same results. Declaration of Daniel Hoffman ("Hoffman Decl.") ¶ 4.

Plaintiffs nonetheless assert that "[i]f a shooter attempts to resist the reset and hold the trigger in a depressed position, the weapon will malfunction." Mot. 11-12. But that is not what ATF found FRTs do, nor what the zip-tie test shows. In tests with multiple ammunition loads, repeated multiple times, firearms equipped with FRTs fired multiple rounds from a single constant rearward pull. ECF No. 13-9 at 15; *see also id.* at 22 ("With pressure still maintained from the original continuous function (pull) of the trigger, the trigger, which was momentarily kept in the forward position into which it was automatically forced, is now free to fire subsequent shots with continuous pressure from the original function (pull) of the trigger, due to the self-acting or self-regulating mechanism.").

Indeed, even the O'Kelly declaration, to which Plaintiffs cite for the proposition that the weapon will malfunction if the shooter attempts to "hold the trigger in a depressed position" (Mot. 12), is consistent with the conclusion that a firearm equipped with a FRT will fire multiple rounds from a single continuous depression. O'Kelly states only that "[i]f the shooter pulls *too hard* on the trigger and prevents it from resetting, the firearm malfunctions and ceases to operate." ECF No. 19 at 30 (emphasis added). What this statement implicitly acknowledges is precisely what ATF found: so long as the right amount of force is applied continuously, a weapon equipped with a FRT will continue

---

[5] O'Kelly asserts that the zip-tie test does not establish a firearm equipped with a FRT constitutes a machinegun because the "zip-tie, cable-tie, or hose clamp" used in the test would be considered a machinegun. ECF No. 19 at 29. But the addition of the zip-tie did not create a machinegun, as a zip-tie is not "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b). The zip-tie merely illustrates that once the trigger is depressed, the firearm continues to fire, without the need to pull *and* release *and* pull again. A finger would (and did, in ATF's other tests) serve the same purpose.

to fire. Again, the zip-tie test confirms that no additional input from the shooter is required after the initial and continuous pull of the trigger. ECF No. 13-6 at 11; Hoffman Decl. ¶ 4.

In this way, the FRT is analogous to the replacement trigger mechanism that the Fifth Circuit held to be a machinegun in *United States v. Camp*, 343 F.3d 743 (5th Cir. 2003). In that case, the court considered whether an added mechanism that would cause "the original trigger to function in rapid succession" once switched on qualified as a machine gun. *Id.* at 744. And, as with the FRTs at issue in this case, ATF was able to cause "the weapon to fire two three-shot bursts" using the added mechanism. *Id.* The defendant argued that the added mechanism was merely a legal "trigger activator" because the original trigger still functioned with each shot. *Id.* at 745. The Fifth Circuit rejected that argument because the defendant's "weapon, however, required only one action—pulling the switch he installed—to fire multiple shots." *Id.* That logic compels the same outcome here because a single action—a single constant rearward pull—causes a firearm equipped with a FRT to fire multiple shots. *See also Rare Breed Triggers, LLC*, 2023 WL 5689770, at *23 ("The FRT-15 is much more akin to the trigger mechanism in *Camp* . . . it replaces a semi-automatic rifle's standard trigger and allows for rapid sequential fire as long as the shooter simply pulls and holds the trigger.").

*Cargill v. Garland* confirms, rather than calls into question, that FRTs are machineguns. In *Cargill*, the Fifth Circuit considered "whether a semi-automatic rifle equipped with a non-mechanical bump stock fires more than one shot each time the trigger 'acts.'" 57 F.4th at 459. A plurality of the Court answered that question in the negative because a non-mechanical bump stock requires the shooter to provide *additional* manual input *after* the initial pull of the trigger to maintain a rapid firing sequence. *Id.* at 463. Thus, "[b]ump firing does not maintain if all a shooter does is initially pull the trigger. Rather, to continue the firing after the shooter pulls the trigger, he or she must maintain manual, forward pressure on the barrel and manual, backward pressure on the trigger ledge." *Id.*

In a non-mechanical bump stock, "the trigger activates because the recoil of the previous shot re-engages the trigger and the shooter's maintained force on the gun's forebody bumps the trigger against the shooter's finger." *Id.* at 459. "[A] rifle equipped with a non-mechanical bump stock does not fire automatically because the shooter must manually apply forward pressure on the barrel with

his or her non-trigger hand." *Id.* at 463.  But a bump stock "is a completely different device from the FRT-15 or any other forced reset trigger," as Plaintiffs' purported expert concedes. ECF No. 19 at 25. Unlike firearms equipped with non-mechanical bump stocks, firearms equipped with FRTs *do not* require any additional input beyond the single constant rearward pull of the trigger to fire multiple projectiles. If a shooter operating a semi-automatic firearm equipped with a FRT "maintains constant rearward pressure from the original single function (pull) of the trigger, the FRT-15 trigger will automatically perform the functions described above in a self-acting or self-regulating mechanism, allowing subsequent projectiles to be fired during the continuing cycle of operation." ECF No. 13-9 at 14. "This is done as an automatic function utilizing the operation of the AR15-type system, *with no input needed from the shooter.*" *Id.* (emphasis added). Thus, even under the *Cargill* plurality's view, FRTs are machineguns.

Indeed, the *Cargill* plurality recognized that the outcome would have been different if it were considering a mechanical bump stock that only required the shooter "pull the trigger once to activate the firing sequence" such that the "mechanical bump stock then maintained the bump fire of its own accord." 57 F.4th at 462 n.8 ("Precisely for that reason, our decision today would not apply to an Akins Accelerator [mechanical bump stock]," which *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009), held to be a machinegun). The plurality expressly noted that non-mechanical bump stocks are differentiated from "mechanical bump stocks" that "are equipped with springs or other internal mechanical devices that automatically assist the shooter to engage in bump firing," in which "the shooter does not have to maintain pressure on the barrel and trigger ledge in order to maintain this firing sequence." *Id.* at 454. The plurality's carve-out from the scope of its holding of mechanical bump stocks, which transform the switch that mechanically activates the bump stock into a new trigger, almost perfectly describes FRTs, which act as drop-in replacements for factory triggers. *See id.* at 462 ("It could be the case that a switch activating a mechanical bump stock would be the legal trigger."). Another federal court to have examined the relevance of *Cargill* to FRTs reached this very conclusion, explaining that "[t]he FRT-15 is a *mechanical* device that automatically 'resets' the trigger to repeat the firing cycle until the shooter releases the trigger shoe." *Rare Breed Triggers, LLC*, 2023 WL

5689770, at *23; *id.* at *24 ("Unlike non-mechanical bump stocks, FRT-15s allow for rapid, automatic firing 'if all a shooter does is initially pull the trigger,' and the firing cycle will continue until that pressure is released." (quoting *Cargill*, 57 F.4th at 454)).

And Plaintiffs cannot argue that the single continuous pull that FRTs require is comparable to the manual, forward pressure necessary to maintain bump firing: this argument is not only factually inaccurate, but also was rejected by the *Cargill* plurality. In explaining why automatic weapons qualify as machineguns, the plurality emphasized that "the act of pulling *and holding* the trigger is *one function*, and that function produces more than one shot. *That force must be maintained on the trigger does not change this conclusion.*" *Cargill*, 57 F.4th at 463 (emphasis added); *see also id.* ("No one doubts that a traditional automatic weapon is a machinegun for purposes of federal law. And so it cannot be that a process is not automatic simply because it requires sustained input.").

Like a traditional automatic weapon, a FRT-equipped weapon fires multiple shots through the single function of "pulling and holding the trigger." Indeed, ATF FEO Ciravolo found that a firearm equipped with a FRT functions like a machine gun: "With both an FRT-15 equipped AR15-type firearm, and an M16-type machinegun (with the selector set in its 'automatic' position), the shooter maintains a constant rearward pull of the trigger to fire subsequent shots with a single function (pull) of the trigger, through both the M16-type machinegun and FRT-15 equipped AR15-types self-acting or self-regulating mechanisms during the operating cycle of the firearms." ECF No. 13-9 at 5. And this is by design. U.S. Patent No. 10,514,223 B1, which is marked on the side of an FRT-15, explains that the "locking bar" in a FRT serves the same function as an automatic sear in a typical machinegun to facilitate continuous firing. *Id.* And like a machinegun, the FRT-15 lacks a disconnector that prevents additional rounds from being fired until the trigger is released. *Id.* at 11. Instead, the FRT uses the firing sequence to automatically reset itself along with the locking bar to lock and then automatically time the re-release of the hammer so that as soon as the bolt locks into battery the next round will automatically be fired. *Id.* That certain functions in the firing sequence recur before each round is fired is irrelevant because those are not functions of the trigger, which "is just the 'mechanism . . . used to initiate the firing sequence.'" *Cargill*, 57 F.4th at 447 (quoting *United States v. Jokel*, 969 F.2d

9

132, 135 (5th Cir. 1992)). Like the switch held to constitute a machinegun in *Camp*, 343 F.3d at 745, the FRT trigger only starts the firing sequence once—when subject to a single constant rearward pull.

For these reasons, FRTs meet the definition of a machinegun under 26 U.S.C. § 5845(b). Plaintiffs are therefore unlikely to prevail on the merits of their Administrative Procedure Act ("APA") claim.

**B.      Plaintiffs Lack Standing.**

But even putting aside that FRTs are appropriately classified as machineguns, Plaintiffs are unlikely to succeed on the merits for a more basic reason: they have failed to show standing for the relief they seek. *See Town of Chester v. Laroe Ests., Inc.,* 581 U.S. 433, 439 (2017) ("[P]laintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (citation omitted)).

**1.  The Associational Plaintiffs Lack Standing.**

This action is brought both by individuals and by two associations: the National Association for Gun Rights, Inc. and Texas Gun Rights, Inc. But neither association has demonstrated standing to sue in the first instance, much less irreparable harm, as they must to obtain an injunction.

As an initial matter, neither association can claim to be vindicating its own interests.  They plead no facts to support that they themselves have suffered an injury in fact, much less irreparable harm, *see N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010), but rather "seek[] to vindicate the rights of [their] members who are lawfully able to possess firearms," Mot. at 16. That effort to vindicate the rights of others falls well short of establishing standing. "[A]n association has standing to bring suit on behalf of its members when," *inter alia*, "its members would otherwise have standing to sue in their own right." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). This requires the organization to "identify 'a specific member' to assert standing on his behalf," *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 483 (W.D. Tex. 2022); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (observing that "plaintiffs claiming an organizational

standing" must "identify members who have suffered the requisite harm"). And, that member must himself have an alleged injury that is "concrete []or imminent" to confer standing. *N.A.A.C.P.*, 626 F.3d at 237 (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992) (requiring an injury in fact that is concrete and actual or imminent, not conjectural or hypothetical)).

Associational Plaintiffs offer no evidence to satisfy this standard. Instead, they merely plead (but do not demonstrate) that they have unnamed members in the Northern District of Texas "who own forced reset triggers ('FRTs') or who wish to acquire them." Compl. ¶¶ 4, 5. These bare allegations are insufficient: at the preliminary injunction stage, Plaintiffs may not rest on "general allegations" to establish standing, *Lujan*, 504 U.S. at 561 (citation omitted), and instead must adduce specific facts clearly showing standing to sustain their claims on the merits, *see Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). Associational Plaintiffs do not demonstrate even a hint of ATF action against their members that is "actual or imminent," *Lujan*, 504 U.S. at 560 (citation omitted). They do not provide evidence, for example, that any member has ever surrendered an FRT or been contacted by ATF, let alone threatened with or subject to any criminal or civil enforcement action. Nor, as is true for the Individual Plaintiffs, do the Associational Plaintiffs adduce any evidence that ATF will deviate from its historic practice of focusing enforcement efforts on major manufacturers and distributors of FRTs, and instead undertake criminal action against its small-scale-owner members. *See infra* at Part I.B.2. Because Associational Plaintiffs have not demonstrated that any member has or will suffer harm beyond a speculative level, they lack standing to seek any preliminary injunctive relief.

### 2. Plaintiffs Do Not Have Standing to Assert a Pre-Enforcement Challenge.

Because the Associational Plaintiffs' basis for seeking an injunction falls entirely flat, only the Individual Plaintiffs could provide even a theoretical basis for extraordinary preliminary relief.  But they, too, fall well short of demonstrating standing to sue. This is a pre-enforcement challenge to possible civil or criminal federal enforcement against the Individual Plaintiffs who own, would like to own, and/or previously owned one or more FRTs. As the Court recognized, TRO Order at 7, pre-enforcement challenges require a plaintiff to "produce evidence of [1] an intention to engage in a

11

course of conduct [2] arguably affected with a constitutional interest, but proscribed by statute, . . . as well as [3] a credible threat of prosecution." *Zimmerman v. City of Austin, Texas*, 881 F.3d 378, 391 (5th Cir. 2018) (citations omitted). Plaintiffs' claim fails at the outset because they have not demonstrated a credible threat that ATF will bring charges against them based on individualized, small-scale possession of FRTs. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (an "imaginary or speculative" prospect of future enforcement is insufficient to confer standing (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979))).

　　While the Court determined, in the TRO context, that Plaintiffs met this standard, *see* TRO Order at 7, Defendants respectfully disagree with the Court's application of *Franciscan Alliance, Inc. v. Becerra* to the facts here. *See* 47 F.4th 368 (5th Cir. 2022). In that case, the government "repeatedly refused to disavow enforcement [of the rule at issue] against" plaintiff, and further represented that it had "not to date evaluated whether it will" do so, effectively "conced[ing] that it may." *Id.* at 376. Far from engaging in "prosecutorial indecision," TRO Order at 9 (quoting *Franciscan All.*, 47 F.4th at 376), ATF has been unequivocal in communications with Plaintiffs and in its filings with this Court that it has no current intention to arrest or bring charges against the Individual Plaintiffs (and affirms that representation here). ECF No. 32 at 4 (Defs.' Resp. in Opp'n to Pls.' Mot. for TRO). And while the Court suggested Defendants "could change their *current* plans at any time," TRO Order at 7, it neglected to consider that Defendants further assured that they would "notify this Court prior to issuing any . . . warning notice or taking other enforcement action against the Individual Plaintiffs in this case," ECF No. 32 at 6. Defendants reaffirm that representation here. In other words, unlike in *Franciscan Alliance*, Defendants here *have* "determined [their] position," 47 F.4th at 376 (citation omitted). And, they have provided a "guarantee," *see* TRO Order at 9, that if that position somehow changed, they would notify the Court, ensuring Plaintiffs an opportunity to *then* challenge an actually credible threat of enforcement, *see Zimmerman*, 881 F.3d at 391.[6]

---

[6] Plaintiffs' reliance on *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir.), *as revised* (Oct. 30, 2020) is also misplaced. *Speech First* involved "statutes that facially restrict *expressive activity*," where courts "assume a credible threat of prosecution." *Id.* (citation omitted and emphasis added). No such

The lack of a credible threat is further underscored by ATF's "history of past enforcement"—which has not focused on individual gun owners like Plaintiffs. *Susan B. Anthony List*, 573 U.S. at 164 ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." (citation omitted)); *see also Blum v. Holder*, 744 F.3d 790, 798 (1st Cir. 2014) ("In assessing the risk of prosecution as to particular facts, weight must be given to the lack of a history of enforcement of the challenged statute to like facts . . . ."). Associational Plaintiffs plead that their members are current or future owners of FRTs, Compl. ¶¶ 4, 5, and Individual Plaintiffs include former, current, and/or future owners of FRTs, *id.* ¶¶ 6-10, 14-16, 19-20, as well as a partial owner of a small firearms retail business (itself not a party) that possesses and intends to continue selling FRTs, *id.* ¶¶ 14-16 & Ex. B (ECF No. 13-2).[7]

ATF, meanwhile, has focused its enforcement efforts against large-scale manufacturers and distributors of FRTs like Rare Breed Triggers, LLC. *See Rare Breed Triggers, LLC*, 2023 WL 5689770, at *50 (preliminarily enjoining Rare Breed Triggers, LLC from "engaging in any sales" of FRTs). Indeed, Plaintiffs themselves reference the execution of a search warrant (approved by a North Dakota judge) on Rare Breed Triggers, LLC's office. But they plead no facts to suggest they—private small-scale owners—are similarly situated to a company that has manufactured tens of thousands of FRT-15s. Nor do they explain how the charges in *Rare Breed Triggers*, which primarily focus on fraud, not mere possession of machineguns, create any specter of enforcement against Plaintiffs given their representations in briefing that, but for their possession of FRTs, "Plaintiffs are law-abiding citizens," ECF No. 33 at 9 (Pls.' Reply in Supp. of Mot. for TRO); Mot. at 15. *See United States v. Rare Breed Triggers, LLC*, No. 1:23-CV-00369, 2023 WL 504992, at *1-3 (E.D.N.Y. Jan. 25, 2023) (finding

---

presumption attaches to statutes that do not implicate expressive activity, and there is no claim that ownership of a FRT so does.

[7] Plaintiff James Wheeler, a private owner, alleges that he is a partial owner of a business that owns and sells FRTs. However, that business is not a party to this lawsuit, and Plaintiff Wheeler provides no information (much less competent evidence) about its identity, corporate form, or even ownership structure to suggest that he has standing to assert any alleged injury on its behalf. *See* Compl. ¶¶ 14-16; *La. ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 878 (5th Cir. 2023) ("[P]laintiff . . . bears the burden of establishing standing.").

probable cause for various instances of fraud, but not referring to the prohibition on sale or possession of machineguns generally); *Rare Breed Triggers, LLC*, 2023 WL 5689770, at *1 (finding "Defendants fraudulently induced their customers to buy a product that is illegal to possess"). Such actions suggest no more "than a general threat of prosecution," which is insufficient to support a pre-enforcement injunction. *Parker v. Dist. of Columbia.*, 478 F.3d 370, 374 (D.C. Cir. 2007), *aff'd sub nom. Dist. of Columbia v. Heller*, 554 U.S. 570 (2008).

While Plaintiffs and this Court have suggested that a handful of criminal cases—only one of which was filed in Texas—establishes that ATF has brought enforcement actions against private owners of FRTs, the defendants in those cases are not similarly situated to plaintiffs here. *See* ECF No. 33 at 2; TRO Order at 9. None of those defendants was charged solely for possessing a FRT. Rather, they were each charged with multiple other gun-related felonies.[8] Given Plaintiffs counsel's representations that, but for their possession of FRTs Plaintiffs are law abiding owners, they cannot claim to be similarly situated to individuals who have engaged in multiple felony gun offenses.

Plaintiffs' inability to point to a criminal prosecution against a similarly situated FRT owner is no surprise when considering that, between the three Individual Plaintiffs and the over 17,000 purported members of Associational Plaintiffs in the Northern District of Texas, the only action Plaintiffs manage to identify against *any* Plaintiff is a single warning notice issued to Plaintiff Patrick Carey. *See* Compl. ¶¶ 4, 5, 8. That warning was issued over a year ago in Louisiana, explaining to Carey that possession of a FRT is unlawful. *See id.* ¶ 8. But Carey already voluntarily surrendered his FRTs in response to that notice. *Id.* ¶ 9. Because he is not currently in possession of a FRT, Carey falls short of demonstrating the material threat of prosecution necessary to warrant this Court's preemptive

---

[8] *See United States v. Bruggeman*, No. 2:22-cr-185, ECF No. 33 (Second Superseding Indictment) (S.D. Tex. Nov. 9, 2022) (counts two through four charging defendant with possession of unregistered firearm silencers); *United States v. Augusto*, No. 3:22-cr-30025, ECF No. 19 (Superseding Indictment) (D. Mass. Sept. 1, 2022) (count one charging defendant with "thirty-eight 'switch-type'" Glock machinegun conversion devices; counts two through seven charging defendant with unregistered firearms and firearms silencers); *United States v. Berrios-Aquino*, No. 3-22-cr-473, ECF No. 42 (Superseding Indictment) (D.P.R. Apr. 20, 2023) (count one charging defendant with possession of a machinegun distinct from machineguns modified with FRTs charged in count two).

intervention. If anything, ATF's history of issuing "warning notices" to individuals who possess a FRT suggests that the risk of imminent enforcement action is very low. Prior to initiating any enforcement action against a Plaintiff or conducting a seizure, ATF is likely to provide a similar warning notice to Plaintiffs or their members.[9] If such circumstances arise, Plaintiffs may then attempt to seek relief from the Court. But, in the current posture, there is no imminent action that could provide grounds to entertain the possibility of emergency injunctive relief.

Finally, that Plaintiffs have somehow "place[d] themselves in potential jeopardy," TRO Order at 8, by filing this suit cannot, without more, establish standing. By that logic, any plaintiff challenging a rule that might hypothetically apply to them would have standing simply by virtue of filing suit. It is also false; ATF was already aware of at least one Individual Plaintiff's identity far in advance of this suit, as evidence by the warning notice issued to Carey in August 2022. Nor have these theoretical concerns borne fruit. Plaintiffs do not contend that ATF has taken any enforcement action against any Plaintiff in connection with a FRT in the month since they filed suit, and they have obtained representations from ATF that it has no present intent to do so.

Simply put, Plaintiffs do not demonstrate the "credible threat of prosecution" necessary for pre-enforcement standing. *Zimmerman*, 881 F.3d at 391 (citation omitted). They identify not a single enforcement action undertaken against an otherwise law-abiding, small-scale owner of a FRT device. And, even if they could do so, Defendants' representations that they do not have any present intent to take any enforcement action against Individual Plaintiffs—and would provide notice to the Court in advance of doing so—makes the specter of imminent enforcement virtually null. *See Susan B. Anthony List*, 573 U.S. at 165 ("imaginary or speculative" prospect of future enforcement is insufficient to confer standing (quoting *Babbitt*, 442 U.S. at 298)).

## II.   Plaintiffs Do Not Face a Substantial Threat of Irreparable Injury.

Plaintiffs also have failed to demonstrate a substantial threat of irreparable injury. They seek to disrupt the status quo in which FRTs have been classified as machineguns for years by requesting

---

[9] And, as noted *supra* at 12, Defendants have already committed to notifying this Court in advance of any enforcement action against Individual Plaintiffs.

broad relief against *any* enforcement of ATF's classification of FRTs as machineguns, even as to individuals who are not a party to this case and future purchases of these devices. ATF classified the FRT-15 as a machinegun in July 2021, over *two years* before this lawsuit was brought. *See* ECF No. 13-6. The lengthy delay between ATF's determination and Plaintiffs' action in seeking relief demonstrates a lack of irreparable harm. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012) ("[A] 'long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.'" (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)); *Wireless Agents, LLC. v. T-Mobile USA, Inc.*, No. 3:05-CV-0094-D, 2006 WL 1540587, at *4 (N.D. Tex. June 6, 2006) ("Absent a good explanation, . . . a substantial period of delay . . . militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." (quotation omitted)); *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-3200-N, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (collecting cases demonstrating that "courts generally consider anywhere from a three-month delay to a six-month delay enough to militate against issuing injunctive relief"). Nor would the denial of a preliminary injunction mean that Plaintiffs would not obtain an effective remedy; *Cargill*, for example, was decided on a final judgment, and not on a preliminary injunction. *See* 57 F.4th at 457. Plaintiffs do not explain why any non-Individual Plaintiffs face irreparable harm or how other unnamed individuals—who have not sought relief in the two years since ATF's classification of the FRT-15—will now be irreparably harmed absent a preliminary injunction.

Plaintiffs themselves have also not demonstrated a substantial threat of irreparable harm. As explained above, *see supra* Part I.B.2, the record is devoid of any evidence of criminal enforcement action against a small-scale owner of a FRT device who is otherwise law-abiding. That one Plaintiff in Louisiana received a *warning* about his legal non-compliance (after which no enforcement action was undertaken) a *year ago* further underscores that any threat of irreparable injury is remote. The year-long delay between when Mr. Carey received that warning and the filing of this lawsuit demonstrates that even Plaintiffs did not believe it established a meaningful risk of irreparable harm. And Plaintiffs do

not explain why, upon a hypothetical future receipt of such a warning, they would be unable to then seek judicial relief to avoid any harm.

Furthermore, "[c]ertain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Younger v. Harris*, 401 U.S. 37, 46 (1971). To the extent Individual Plaintiffs claim that they will suffer irreparable injury based on the hypothetical consequences of a hypothetical criminal prosecution or other enforcement action, such injuries do not create a substantial threat of irreparable harm. Likewise, there is no irreparable harm from a hypothetical seizure of Plaintiffs' property. Any seized property could be returned via a forfeiture action or some other proceeding (*e.g.*, a motion under Federal Rule of Criminal Procedure 41(g)), so the loss of property would not be irreparable. The return of property as a result of such a proceeding would not be affected by sovereign immunity, and Plaintiffs do not cite any other monetary loss that would be irreparable due to sovereign immunity. *See Bevis v. City of Naperville*, --- F. Supp. 3d ----, 2023 WL 2077392, at *17 (N.D. Ill. Feb. 17, 2023) (finding no irreparable harm demonstrated by ban on assault weapons and high-capacity magazines because "the financial burden and loss of access to effective firearms would be minimal"). Any claim of compliance costs is therefore misplaced, particularly as to *new* purchases of FRTs. Finally, Plaintiffs ask the Court to enjoin ATF from "[r]equesting that any person 'voluntarily' surrender their forced reset trigger to the government based on the claim that forced reset triggers are machineguns." Mot. at 17. But Individual Plaintiffs do not explain how they would suffer irreparable harm from being "[r]equest[ed]" to do something "voluntarily." *Id.*

In any event, even if the Individual Plaintiffs could establish irreparable injury, it would be insufficient to justify the broad injunction sought. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Plaintiffs have not shown that individuals who are not parties to this lawsuit will suffer irreparable harm absent

17

a preliminary injunction, even assuming that Plaintiffs have standing to raise claims on their behalf. Moreover, the proposed preliminary injunction would apply not only to current owners of FRTs, but anyone who seeks to obtain new FRTs in the future, and Plaintiffs have not shown how an inability to purchase new FRTs constitutes irreparable harm. As this Court recognized in issuing the TRO, such extraordinary relief should not cover "any future purchases" of FRTs. TRO Order at 25. For these reasons, injunctive relief should at a minimum not extend beyond the Individual Plaintiffs in this case to the extent they currently own FRTs.

## III.   The Balance of Harms Weighs Against a Preliminary Injunction.

The two final prongs of the preliminary injunction analysis—assessing the harm to plaintiff and weighing the public interest—"merge" when "the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). As explained above, Plaintiffs' asserted injuries are hypothetical, and, if any enforcement action were against them, they would have an opportunity to challenge it. *See Christoforu v. United States*, 842 F. Supp. 1453, 1456 (S.D. Fla. 1994), *aff'd*, 61 F.3d 31 (11th Cir. 1995); *see also Younger*, 401 U.S. at 46 (recognizing that the cost of criminal prosecution to the accused party is not an "irreparable" injury). On the other hand, issuing a wide-ranging preliminary injunction presents serious public safety risks. *See N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) (acknowledging "substantial, indeed compelling, governmental interests in public safety and crime prevention.").

Plaintiffs seek a broad sweeping injunction that would cripple the government's ability to take virtually any enforcement action with regard to a FRT device anywhere in the United States. The public safety would undoubtedly be jeopardized by removing restrictions on the manufacturing, sale, and possession of these deadly devices. *See Aposhian v. Barr*, 958 F.3d 969, 991 (10th Cir. 2020) (holding that "the public has a strong interest in banning the possession and transfer of machine guns" based on "the safety of the public in general," "the safety of law enforcement officers," and the safety of

18

"first responders"), *en banc granted but previous order reinstated*, 989 F.3d 890 (10th. Cir. 2021); *Bevis*, 2023 WL 2077392, at *17 (N.D. Ill. Feb. 17, 2023) (finding "compelling[]" that firearm law "protect[s] public safety by removing particularly dangerous weapons from circulation"). Similarly, the government has a strong and continuing interest in being able to enforce its laws restricting the possession and sale of machineguns where the circumstances warrant action in the government's law enforcement discretion. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) ("primary concern of every government" is "the safety and indeed the lives of its citizens"). A broad injunction would undermine ATF's ability to respond in real time to serious future threats implicating FRTs.

In granting the TRO, the Court questioned ATF's claim that public safety would be put at risk by an injunction, given that ATF had conceded it had no present intent to take action against Individual Plaintiffs. TRO Order at 22-23. As an initial matter, the calculus here is radically different where Plaintiffs seek an injunction far broader than at the TRO stage; they ask the Court to enjoin not only enforcement actions related to *their possession* of FRTs, but *all* potential enforcement actions against *anyone*, including manufacturers and sellers.

But even Individual Plaintiffs could pose risks to public safety. That the government has generally decided to expend its limited resources enforcing the statute against the largest manufacturers and sellers of these deadly devices does not mean that it considers individual owners to pose no threats. Individual Plaintiffs ask ATF to trust their representations in briefs that they are law-abiding and will not misuse their weapons. Even if that is presently true, Individual Plaintiffs cannot guarantee that will inevitably be the case and that their ownership of such devices will not, in the future, create public safety risks that would warrant action by the government. For example, Individual Plaintiffs cannot guarantee that they or another individual in their household will not become unstable and potentially misuse the firearm; they also cannot guarantee that they will not in the future violate other gun laws that heighten concerns about the risks posed by their continued

possession of a FRT—as was true in the handful of criminal prosecutions in which the government brought charges including but not limited to charges related to possession of FRTs. *See supra* at 14. And as other courts have recognized, "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on []gun crime, violence, and suicide, would be grave" and "would affect members of the public." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016); *Rupp v. Becerra, No.* 8:17-CV-00746, 2018 WL 2138452, at *13 (C.D. Cal. May 9, 2018) (quoting same).   Acting *ex ante* to entirely hobble the government's ability to enforce its laws related to deadly machineguns imposes serious public safety risks that outweigh any possible harm to Plaintiffs.

## IV.   This Court Should Decline to Enjoin a Hypothetical Enforcement Action Based on Principles of Equity.

Plaintiffs' demand that the Court restrain the federal government from investigating and, potentially, prosecuting a violation of federal law is contrary to long settled principles constraining courts' equitable powers. *See* ECF No. 32 at 6-7. As this Court recognized, "the basic contours of [these] contentions are true," albeit not in all circumstances. TRO Order at 9-10 ("[S]eparation of powers does not mean pre-enforcement judicial review of laws carrying criminal penalties is never allowed."). The exception to this general principle on which the Court appeared to rely at the TRO stage, however, does not apply to these Plaintiffs.

Specifically, there exists a "narrow exception" to the rule that courts lack jurisdiction to enjoin criminal enforcement proceedings "in those cases in which the very act of filing an indictment may chill *constitutional rights*." *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 187 (3d Cir. 2006), as amended (May 16, 2006) (emphasis added). Indeed, the plaintiffs in every single decision authorizing equitable relief to enjoin enforcement of criminal statutes on which this Court relied brought *constitutional* claims to vindicate *constitutional* rights. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute

20

that he claims deters the exercise of his *constitutional rights*." (emphasis added)); [10] *Susan B. Anthony List*, 573 U.S. at 159 ("[W]e have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a *constitutional interest*, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" (quoting *Babbitt*, 442 U.S. at 298) (emphasis added)); *Babbitt*, 442 U.S. at 293 n.1 (1979) ("Appellees . . . commenced suit in federal court to secure a declaration of the *unconstitutionality of various sections of the Act*, as well as of the entire Act, and an injunction against its enforcement." (emphasis added)); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 283 (6th Cir. 1997) (holding "plaintiffs have standing to challenge the prohibitions . . . of the Act on *Commerce Clause and Equal Protection* grounds" (emphasis added)).

That exception does not apply here. Plaintiffs do not seek to vindicate constitutional rights—their sole claim is brought under the APA. *See* Compl. ¶¶ 65-72. Nor could they. The Second Amendment does not protect machineguns. *See, e.g.*, *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) ("Machineguns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection."). And, even judges in other circuits that would have held bump stocks *not* to be machineguns declined to invoke the Second Amendment in their analysis. *See, e.g.*, *Aposhian v. Barr*, 958 F.3d at 993 (Carson, J., dissenting).

This Court also cited the text of the APA as conferring "even more authority to review challenges to agency actions." TRO Order at 10. But none of the cited provisions expand the equitable powers of district courts to enjoin enforcement of federal criminal law beyond those limited circumstances in which a plaintiff seeks to vindicate constitutional rights through pre-enforcement review. The APA's general conferral of authority to review certain agency actions and to grant interim relief has no bearing on whether the particular equitable remedy sought here is available. Indeed, the APA expressly makes this point, emphasizing that it does not affect "the power or duty of the court

---

[10] Separately, *Steffel v. Thompson* is inapposite because that case addressed the availability of final declaratory relief "regardless of whether injunctive relief may be appropriate." 415 U.S. at 475. The Court did "not reach" the question of whether injunctive relief was available because "petitioner . . . abandoned his request for that remedy." *Id.* at 463.

to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702. Accordingly, the APA does not expand a district court's authority to enjoin hypothetical federal criminal enforcement proceedings beyond the narrow exception for constitutional claims available at equity.

Plaintiffs' attempts to justify their extraordinary demand for an injunction against future criminal enforcement—not only for themselves, but all "persons for possessing forced reset triggers" or "representing to the public or potential buyers and sellers that [FRTs] are not machineguns," ECF No. 24 (Proposed Order)—thus ring entirely hollow. The Court should reject this invitation to ride roughshod across constitutional limitations on the judiciary's equitable powers to enjoin hypothetical future law enforcement action. *See also infra* Part V (discussing risk of conflicting decisions based on Plaintiff's geographically unlimited relief request).

## V.   Any Injunctive Relief Should Be Appropriately Limited.

If the Court disagrees with Defendants' arguments, any preliminary relief granted must be no broader than necessary to remedy any demonstrated irreparable harms of the Plaintiffs in this case. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill*, 138 S. Ct. at 1934, and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen*, 512 U.S. at 765 (citation omitted). The Court should, at a minimum, limit any injunctive relief in three important respects.

*First*, any relief must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Plaintiffs provide no evidence that any purported harm they have or may suffer would be remedied by several categories of requested injunctive relief. As private owners and associations whose members are private owners, no Plaintiff has adduced any evidence that they have or likely will face any risk of: (1) "civil proceedings" for "selling[] or manufacturing forced reset triggers," ECF No. 24 at Req. 2; (2) "criminal prosecutions . . . for representing to the public or potential buyers and sellers that forced reset triggers are not machineguns," *id.* at Req. 3; (3) "civil actions . . . for representing to the public or potential buyers and sellers that forced reset triggers are not machineguns," *id.* at Req. 4; and (4) interference with their

"exchange of forced reset triggers," *id.* at Req. 8. For this reason alone, these categories of hypothetical government actions should be excluded from any preliminary relief the Court may grant. *See Lewis*, 518 U.S. at 357 ("[D]emonstrated harm from one particular inadequacy in government administration" does not provide "authoriz[ation] to remedy *all* inadequacies in that administration.").

*Second*, any relief granted should only apply to the Individual Plaintiffs, as Associational Plaintiffs fail to demonstrate standing, *see supra* Part I.A.1. Plaintiffs "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester.*, 581 U.S. at 439 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)); *see also Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) ("[S]tanding is not dispensed in gross.") (quoting *Lewis*, 518 U.S. at 358 n.6). Their failure to do so as to the Associational Plaintiffs precludes the broader relief sought as to the Associational Plaintiffs, even if this Court finds that the Individual Plaintiffs have standing. Similarly, there has been no showing of irreparable harm as to individuals not parties before the Court. *See supra* Part II. The Court's TRO explicitly does not extend to "unnamed individual members of the Institutional Plaintiffs," TRO Order at 25, and the Court should, at minimum, adopt those same restrictions here.

*Third,* and in the alternative, if the Court believes that injunctive relief is necessary to remedy harms suffered by Plaintiffs beyond the Individual Plaintiffs, its relief should be limited to the Northern District of Texas. "Both the Fifth Circuit and the Supreme Court have suggested that nationwide injunctions are, at best, reserved for extraordinary circumstances." *Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms, & Explosives*, No. 3:21-CV-0116-B, 2023 WL 4304760, at *3 (N.D. Tex. June 30, 2023) (citing *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (staying nationwide injunction of COVID-19 vaccination mandates as "an issue of great significance" that "will benefit from the airing of competing views in our sister circuits." (citation omitted)) and *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions)); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (suggesting universal injunctions are inconsistent with "limits on equity and judicial power"). As Justices Gorsuch, joined by Justice Thomas, explained, "[b]ecause plaintiffs generally are not bound by adverse decisions

in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *Dep't of Homeland Sec*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This creates risks of "conflicting nationwide injunctions," with "asymmetric" stakes where "a single successful challenge is enough to stay the challenged rule across the country." *Id.*; *see also Trump*, 138 S. Ct. at 2425 (Thomas, J., concurring) (Universal relief "take[s] a toll on the federal court system— preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.").

This case presents the exact circumstances that militate against nationwide relief. The Eastern District of New York is presently considering the exact question before this Court, and recently determined that FRT-15s are highly likely illegal machineguns, including under the *Cargill* plurality's reasoning. *See United States v. Rare Breed Triggers, LLC*, 2023 WL 5689770, at *15, 49-50 (issuing preliminary injunction against Rare Breed Triggers). Similarly, a federal court in Florida earlier declined to enjoin ATF from enforcing its decision that the FRT-15 is a machinegun. *See Rare Breed Triggers, LLC v. Garland,* No. 6:21-CV-1245, 2021 WL 4750081, at *3 (M.D. Fla. Oct. 12, 2021). Granting relief beyond the scope of this district would result in conflicting rulings and condone the "gamesmanship and chaos" Justices Gorsuch and Thomas warned against, *Dep't of Homeland Sec.*, 140 S. Ct. at 601 (Gorsuch, J., concurring). In fact, Dhillon Law Group, which represents Plaintiffs here and Rare Breed Triggers, LLC in the E.D.N.Y. case, filed this suit after the E.D.N.Y. court granted a TRO and just days before its hearing on the preliminary injunction motion. It now asks this Court to issue relief that would directly conflict with the New York preliminary injunction, including by preventing the government from pursuing its action against Rare Breed Triggers, notwithstanding that another federal judge after a two-day hearing and several rounds of briefing deemed that case likely meritorious. *See Rare Breed Triggers, LLC*, 2023 WL 5689770, at *1.

Indeed, the *Cargill* plurality noted in similar circumstances that broad relief was not necessarily appropriate even at final judgment, acknowledging disagreement among the circuits about the application of the statute to non-mechanical bump stocks. *See Cargill*, 57 F.4th at 472 (observing that "it may be the case that a more limited remedy [than vacatur] is appropriate in these circumstances").

24

That same respect for coordinate courts counsels against broad relief here. This Court should follow the Fifth Circuit's mandate "to avoid rulings which may trench upon the authority of sister courts," *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985), and decline to issue such broad relief.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction. In the event the Court grants Plaintiffs' motion, relief should be limited and in no event should it extend further than the Northern District of Texas.

DATED: September 8, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEX HAAS
Branch Director

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ Alexander W. Resar
MICHAEL P. CLENDENEN
LAURA B. BAKST
ALEXANDER W. RESAR
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone:   (202) 305-0693
E-mail:   michael.p.clendenen@usdoj.gov

*Counsel for Defendants*

**<u>Certificate of Service</u>**

On September 8, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>/s/ Alexander W. Resar</u>

26