**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| | ) | Case No. 4:23-cv-00830-O |
| Plaintiffs, | ) | |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

I. Plaintiffs are likely to succeed on the merits because FRTs are not machineguns
  under the statutory definition and Fifth Circuit precedent. ........................................................ 1

  A.   Rate of fire is irrelevant to machinegun classifications. ..................................................... 2

  B.   Defendants' proposed shooter-based standards for defining a machinegun
       conflict with the Fifth Circuit's holding that the 'function of the trigger'
       in a hammer-operated firearm is not defined by shooter actions. ....................................... 2

  C.   The Fifth Circuit held in *Cargill* that a gun is not a machinegun if the trigger
       must release the hammer for every shot. ............................................................................ 7

  D.   The FRT-15 is not a machinegun because it requires the trigger to release
       the hammer for every shot fired. ........................................................................................ 9

  E.   Defendants mischaracterize the FRT-15's operation to conclude it is a machinegun. ...... 10

       1.   The FRT-15 does not fire automatically with a single depression of the trigger. .......... 10

       2.   The FRT-15's locking-bar does not serve the same function as an auto sear. .............. 10

       3.   Defendants' zip tie test is flawed and misleading. ...................................................... 13

  F.   Defendants twist *Cargill* beyond recognition to support their case. ................................. 14

  G.   Defendants' comparison of FRTs to the Akins Accelerator and the *Camp*
       device fails because both devices work differently than FRTs in fundamental ways. ...... 17

II.  Plaintiffs have standing. ........................................................................................................ 19

  A.   The associational plaintiffs have standing. ........................................................................ 19

  B.   Plaintiffs have standing to assert a pre-enforcement challenge. ........................................ 20

III. Plaintiffs face a threat of irreparable harm. ........................................................................... 24

IV.  The balance of harms weighs in favor of a preliminary injunction. ........................................ 27

V.   Defendants' argument based on principles of equity would allow the government
     to arrest and prosecute citizens for actions that are not crimes. ............................................ 28

VI.  Enjoining all applications of Defendants' invalid interpretation is the appropriate
     remedy. ................................................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967) ........................................................................................ 29

*Akins v. United States,*
    312 F. App'x 197 (11th Cir. 2009) ................................................................. 18

*Aposhian v. Barr,*
    958 F.3d 969 (10th Cir. 2020) ........................................................................ 28

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) .......................................................................................... 5

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023) .................................................................... passim

*D.C. v. Heller,*
    554 U.S. 570 (2008) .......................................................................................... 5

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................................................ 25

*Fed. Election Comm'n v. Cruz,*
    142 S.Ct. 1638 (2022) ..................................................................................... 29

*Franciscan Alliance, Inc. v. Becerra,*
    47 F.4th 368 (5th Cir. 2022) ............................................................. 21, 29, 30

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) .......................................................................... 15

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2001) ..................................................................................... 5, 6

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ................................................................................. 23, 24

*Opulent Life Church v. City of Holy Springs,*
    697 F.3d 279 (5th Cir. 2012) .......................................................................... 25

*Shaughnessy v. Pedreiro,*
    349 U.S. 48 (1955) .......................................................................................... 29

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020)................................................................. 21

*Staples v. United States*,
    511 U.S. 600 (1994) ..................................................................... 5, 6

*Stolt-Nielsen, S.A. v. United States*,
    442 F.3d 177 (3d Cir. 2006) .............................................................. 28

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................... 23, 24

*United States v. Alkazahg*,
    81 M.J. 764 (N-M. Ct. Crim. App. 2021) ............................................ 2, 3

*United States v. Camp*,
    343 F.3d 743 (5th Cir. 2003) ...................................................... 17, 18, 19

*United States v. Jokel*,
    969 F.2d 132 (5th Cir. 1992)............................................................... 7

*United States v. Rare Breed Triggers, LLC*,
    No. 23CV369NRMRML, 2023 WL 5689770 (E.D.N.Y. Aug. 1, 2023)............................ 3, 5

*VanDerStok v. Garland*,
    625 F.Supp.3d 570 (N.D.Tex. Sept. 2, 2022).................................................... 25, 26

*Webster v. Fall*,
    266 U.S. 507 (1924) ....................................................................... 5

*Zimmerman v. City of Austin*,
    881 F.3d 378 (5th Cir. 2008)............................................................. 20

**Statutes**

26 U.S. Code § 5845 .......................................................................... 4

5 U.S.C. § 702............................................................................... 32

U.S. Code § 5845(b) .......................................................................... 4

Plaintiffs are likely to succeed on the merits.  They have standing, both as individuals and associations.  They face a threat of irreparable harm in the absence of a preliminary injunction. The balance of harms favors the Plaintiffs.  And the remedy is appropriate.  Plaintiffs' Motion for Preliminary Injunction should be granted.

## I.  Plaintiffs are likely to succeed on the merits because FRTs are not machineguns under the statutory definition and Fifth Circuit precedent.

Plaintiffs are likely to succeed on the merits. Nothing in Defendants' Opposition lessens that probability. The central issue before the Court is whether FRTs are machineguns and there is no dispute that the answer to this question is grounded in 26 U.S. Code § 5845, which defines a "machinegun" as a device that enables a firearm to fire multiple shots automatically "by a single function of the trigger." 26 U.S. Code § 5845(b); PI Mot. at 4-5; Opp. at 3.

In *Cargill*, the Fifth Circuit held that this definition of "a single function of the trigger" is solely concerned with the mechanical operation of the trigger, not the actions of the gun user. *Cargill v. Garland*, 57 F.4th 447, 460 (5th Cir. 2023). And the mechanical purpose of the trigger in a hammer-fired gun is to release the hammer and cause a firearm to fire a shot. The trigger in an FRT-15-equipped gun functions by the trigger moving rearward to cause the trigger to release the hammer—and it must do this *for every shot fired*. By contrast, in a machinegun multiple shots can be fired with a single function of the trigger. Because FRT-15s do not fire more than one shot per single function of the trigger they are not machineguns. *See* PI Mot. at 9-12.

To avoid the conclusion that FRTs are not machineguns, Defendants stubbornly ask this Court to substitute a fabricated standard the Fifth Circuit rejected in *Cargill* just a few months ago, engage in obfuscating word-play to evade the impact of the statute and *Cargill* with ambiguous terms, make inapt analogies to other guns, and spotlight irrelevant aspects of FRTs like the FRT-15 that have no bearing on whether they are a machinegun.

**A. Rate of fire is irrelevant to machinegun classifications.**

Defendants' focus on the FRT-15's rate of fire is irrelevant. *See* Opp. at 4 & n. 3. Rate of fire appears nowhere in the statutory definition of a machinegun and the Fifth Circuit has rejected it as irrelevant to determining whether a device is a machinegun in *Cargill*: "Congress did not use words describing the shooter's perspective or the weapon's rate of fire." *Cargill*, 57 F.4th at 461; *accord United States v. Alkazahg*, 81 M.J. 764, 781 (N-M. Ct. Crim. App. 2021) ("Congress could have suggested that a shooter-focused approach or even a rate-of-fire approach was the way to read the statute by enacting those words."). Indeed, the ATF has a history of approving devices that increase a firearm's rate of fire to the same extent as the FRT-15. Among the products the ATF has approved are the Tac-Con 3MR trigger and binary triggers. These devices enable a shooter to fire at similar speeds, yet the ATF approved them without a word about their effect on rate of fire. *See* Oct. 31, 2013, letter from ATF approving the Tac-Con 3MR trigger, App'x at 66-67; Nov. 20, 2013, letter from ATF approving the FosTech binary trigger, App'x at 68. The law defines a machinegun by other standards.

**B. Defendants' proposed shooter-based standards for defining a machinegun conflict with the Fifth Circuit's holding that the 'function of the trigger' in a hammer-operated firearm is not defined by shooter actions.**

Defendants pay lip service to the statutory definition of a machinegun, but quickly pivot to semantic games and artful re-interpretations of the statute. They contend that FRTs are machineguns because "after a FRT is depressed, the firearm will 'fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply.'" Opp. at 3. This evolves to: "The dispositive question is thus whether a FRT allows the shooter to fire multiple shots by depressing the trigger just once through a single constant rearward pull." Opp. at 4. Defendants' use of words like "pull," "release," and "depress" gives the false impression that FRTs can fire multiple rounds in the same way as a machinegun: *i.e.*, by pulling the trigger back

2

to release the hammer for the first shot and then *holding it still* (fixed in that rearward position) while the firearm fires round after round *without any further movement or action of the trigger*. To be clear, that assertion is categorically false.

To make sense of the Opposition, we must first address Defendants' chosen vocabulary and its impact on their analysis. Defendants misleadingly use the word "pull" to obscure the difference between (a) the mechanical movement of the trigger to its rearward position and (b) a user merely exerting rearward pressure on the trigger, regardless of whether that pressure moves the trigger; *i.e.*, Defendants equate a "pull *of* the trigger" with a "pull *on* the trigger." Opp. at 3-9. This linguistic contortion is how Defendants conflate FRT-15s and machineguns as firearms that both fire multiple rounds from a "single pull of the trigger." *Id*. Defendants thereby gloss over the fact that the trigger in an FRT-15 *must* move and function for *every* shot fired, driven by the force applied by a user's finger, *see* ECF No. 13-4 ¶ 15 (Declaration of Plaintiffs' expert Daniel O'Kelly, August 7, 2023) ["O'Kelly Decl."], whereas a machinegun trigger moves rearward only once to fire the first shot and stays there, unmoving and not functioning any further, while the gun keeps firing due to an auto sear or similar component. O'Kelly Decl. ¶ 16; Tr. of Prelim. Inj. Hr'g.177:25-178:6, *United States v. Rare Breed Triggers, LLC*, No. 23CV369NRMRML, 2023 WL 5689770 (E.D.N.Y. Aug. 1, 2023) [*New York Hearing*] [App'x at 81-82].

Defendants' repeated use of the words "depress" and "depression" is incorrect and misleading. "Depress" means "to press down" or to "cause to sink to a lower position." *Depress*, Merriam-Webster, https://www.merriam-webster.com/dictionary/depress (last visited Sept. 20, 2023). "Depression" means "an act of depressing or a state of being depressed." *Depression*, Merriam-Webster, https://www.merriam-webster.com/dictionary/depression (last visited Sept. 20, 2023). Where Defendants use these words, they *should* mean that the trigger is moved to its

rearward position and maintained there (in its "lower position" or remaining in a "state of being depressed"), but Defendants instead use them as a synonym for "pull," with the same equivocation described above.

This is reflected in Defendants' misquotation of the ATF's April 27, 2023, expert report (ECF No. 13-9 at 15). Defendants cite the report as stating that the FRT-15 can fire multiple rounds with "a single depression of the trigger." Opp. at 5. But the ATF report's actual language never uses the word "depress," and uses terms like "rearward pressure" and "single constant pull" instead. As described in the Plaintiffs' expert report, *and as conceded by Defendants' expert in his testimony in the New York case*, the FRT-15 in fact malfunctions and ceases to operate if the trigger is "depressed" and held unmoving. O'Kelly Decl. ¶ 38-40; *New York Hearing* Tr. 178:24-179:8 [App'x at 82-83] (Cross of Government Expert Ciravolo: "Q. So unlike the M16, the FRT-15 would not operate if the trigger were held in its most rearward position and not allowed to move forward, right? A. Are you saying if the trigger was physically held in the rearward position and did not move at all. Q. Was not allowed to move forward. A. Yes, it would not function. It would actually cause the weapon to malfunction. Q. It would get off one shot, would that be fair? A. Yes, it would."). To be clear, an FRT-15's trigger must be depressed (moved to its rearward position) separately for each shot it fires—and Mr. Ciravolo concedes that this is correct.

Defendants similarly fixate on the concept of a trigger's "release" to distract from the actual test of what makes a device a machinegun under *Cargill*. They argue that FRT-15s are machineguns because they allow a gun to fire repeatedly "without the trigger being released." Opp. at 6. This is deceptive because it implies that the trigger does not need to reset between shots and can remain held in its rearward position as the firearm continues firing, as would be the

4

case in an actual machinegun. But the truth is that all that "releasing the trigger" does in a traditional semiautomatic firearm is allow the trigger to be reset by a spring so it can retain the hammer again; once the hammer is retained, the shooter can pull the trigger to release and fire another shot. O'Kelly Decl. ¶¶ 11-12. With FRTs, the mechanical force of the spring is simply replaced by a force generated by the mechanical operation of the gun. Specifically, the trigger resets when it is forced forward by the bolt's rearward movement, instead of resetting by the push of a spring. *Id*. ¶ 12. Nevertheless, with both FRTs and traditional semiautomatic triggers, the trigger *must* reset between shots to retain the hammer, and *every* subsequent shot is caused by the trigger moving rearward to release the hammer. *Id*. ¶ 15; *New York Hearing* 178:4-179:25 [App'x at 82-83] (Cross of Government Expert Cirvavolo: "Q. Okay. So but for an FRT-15, the trigger must move for every shot fired, right? A. Yes, that's correct….Q. That means if you load into and fire five rounds in an FRT-15, the trigger must move to its most rearward position five times, right? A. Yes. Q. But if you load five rounds into an M16 machine gun and then hold the trigger rearward without releasing it, you can fire all five rounds? A. Yes, that's correct.").

Defendants' misuse of these words is why their citation to *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994) is unavailing.[1] Opp. at 3. FRTs like the FRT-15 are not weapons which,

---

[1] Furthermore, the statutory definition of an automatic weapon was not before the Supreme Court in *Staples* and, accordingly, its footnote on that issue does not constitute a holding of the Supreme Court on that or any other issue. *See, e.g., Webster v. Fall*, 266 U.S. 507, 511 (1924) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *see also D.C. v. Heller*, 554 U.S. 570, 625 n.25 (2008) (characterizing statement in previous decision as "dictum" because "the point was not at issue and was not argued" and refusing to follow that "dictum"); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed [it], we are free to address the issue on the merits*."); Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissenting) (explaining that "judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed" and collecting cases).

"once [the] trigger is depressed, [] will automatically continue to fire until [their] trigger is released or the ammunition is exhausted" because each depression of an FRT-15's trigger fires only one bullet, and because the trigger must reset between each shot. Opp. at 3 (quoting *Staples*, 511 U.S. at 602 n.1). While *Staples* refers to "release" of the trigger in determining what is a machinegun, this analysis is in a context where "releasing the trigger" and "resetting the trigger" may have been synonymous terms and were inconsequential to the issue before the Court. *See generally* O'Kelly Decl. ¶¶ 10-12. (explaining the difference between traditional spring-reset triggers and forced-reset triggers). With FRTs, "release" and "reset" are not synonymous.

By leaping from a "single function of the trigger" to "a single constant rearward pull," Defendants seek to transform the machinegun definition from a focus on objective trigger mechanics required by the statutory text and *Cargill* to a focus on the subjective actions of the gun user. But this is the same rewriting of the statute that the Government already tried with bump stocks in *Cargill* only to have the Fifth Circuit emphatically reject it:

> The statutory definition of machinegun utilizes a grammatical construction that ties the definition to the movement of the trigger itself, and not the movement of a trigger finger. . .. The Government offers nothing to overcome this plain reading[.] . . . [T]he statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger.

*Cargill*, 57 F. 4th at 460; PI Mot. at 9-11. "The statute does not care what human input is required to activate the trigger—it cares only whether more than one shot is fired each time the trigger acts." *Cargill*, 57 F.4th at 460. Under *Cargill*, the Court not only does not *need* to look to the shooter's actions in deciding whether FRTs are machineguns, it *cannot* look to them because "the notion that the definition turns on the actions of an unnamed shooter is inconsistent with both the [the definition's] grammatical and statutory contexts." *Id*. at 461.

Rejecting a shooter-action-based definition of the function of a trigger, the Fifth Circuit held in *Cargill* that the function of the trigger is the "follow-on action where the trigger acts out

its mechanical design or purpose" after the shooter has initiated it by some action. *Cargill,* 57 F.4th at 460 (agreeing with a definition quoted from *Alkazahg,* 81 M.J. at 780-81). *Cargill* leaves no doubt that a trigger's function under the statute is defined purely mechanically: "Congress did not use words describing the shooter's perspective or the weapon's rate of fire .... Instead, it made up an entirely new phrase — by a single function of the trigger — that specifically pertains to the mechanics of a firearm. Prudent or not, Congress defined the term 'machinegun' by reference to the trigger's mechanics." *Id*. at 461.

As to the function of the trigger, the Fifth Circuit held that in a hammer-fired gun like the AR-15 (which the FRT-15 was specifically designed for), the trigger's function is to release the hammer as part of a "simple mechanical process:"

> [T]he trigger disengages the hammer from the sear, the hammer strikes the firing pin, the bullet fires, and the recoil pushes the hammer against the disconnector, which resets the trigger. This process happens every single time one bullet is fired.

*Id*. at 459. Prior to *Cargill*, the Fifth Circuit described the role of the trigger in a hammer-fired weapon similarly, as "the part of the action of a firearm moved by the finger *to release the hammer* … in firing." *United States v. Jokel*, 969 F.2d 132, 134 (5th Cir. 1992) (emphasis added).

Accordingly, this Court should reject Defendants' re-assertion of an extra-statutory standard for defining a machinegun, the user-experience-based "single constant rearward pull," or any of its similar variants, that the Fifth Circuit has already considered and foreclosed.

**C. The Fifth Circuit held in *Cargill* that a gun is not a machinegun if the trigger must release the hammer for every shot.**

As the trigger's function in a rifle like the AR-15 is to release the hammer, these firearms are semiautomatic because the trigger must function by "disengag[ing] the hammer from the sear" so it can strike the firing pin and fire a round "every single time [a] bullet is fired." *Cargill*, 57 F.4th at 459; PI Mot. at 11. By contrast, a "fully automatic gun" (*i.e.*, a machinegun) "is

7

equipped with something called an 'auto sear' — a device that serves to re-cock and release the hammer in tandem with the motion of the bolt for so long as the trigger remains depressed." *Cargill*, 57 F.4th at 454. Because of the auto sear, the trigger in a machinegun functions only once in a string of automatic fire: when it releases the hammer for the first shot. *See* O'Kelly Decl. ¶ 16; *New York Hearing* 177:25-178:3 [App'x at 81-82]. After that, the auto sear takes over to retain and release the hammer for all subsequent shots. *See* PI Mot. at 3-4; ECF. No. 13-4 ¶ 16; *New York Hearing* 177:22-178:9 [App'x at 81-82] (Cross of Government expert Ciravolo: "Q. Let's review your comparison of the FRT-15 to an M16. An MS16 [sic] machine gun has a part called an auto sear, right? A. Yes. Q. And the auto sear can repeatedly release the hammer to fire multiple shots without the trigger moving after the first pull, right? A. Yes. Q. That's different from the FRT-15 where the trigger movement is required for every shot fired, right? A. Yes. It's different in how it interacts with the hammer. Q. Okay. So but for the FRT-15, the trigger must move for every shot fired, right? A. Yes, that's correct.").

In *Cargill*, the Fifth Circuit applied this standard to find that bump stocks were not machinegun conversion devices because they did not change a semiautomatic firearm's need for the trigger to release the hammer to fire a shot and then reset to retain the hammer again before firing the next shot: "To be sure, a non-mechanical bump stock increases the rate at which the process occurs. But the fact remains that only one bullet is fired each time the shooter pulls the trigger." *Cargill*, 57 F.4th at 459.

Under this same test—which under *Cargill* is the necessary result of the applicable statutory definition of a machinegun and therefore must be applied here rather than the "single constant rearward pull" standard or any of its variants that Defendants stubbornly insist on trotting out—the FRT-15 is not a machinegun because every shot requires a separate function of

8

the trigger, *i.e.* a release of the hammer to fire a shot and then reset to retain the hammer again before the next shot can be fired.

**D. The FRT-15 is not a machinegun because it requires the trigger to release the hammer for every shot fired.**

Because they insist on substituting their own definition for the one found in the statue and ignoring the Fifth Circuit's holding in *Cargill*, Opp. at 3-4, Defendants never engage in the required analysis to properly assess the FRT-15.

As shown above, *Cargill* teaches that if a gun's trigger must function, that is, release the hammer, for every shot fired, then it is not a machinegun under the statute. In an FRT, the trigger *must* move rearward to release the hammer for every shot fired. PI Mot. at 11 (including video at https://dhillonlaw.box.com/s/83pwi4a97id478f1nv31rv05okda2ccd); Declaration of Cole Leleux -13; App'x at 11-13; O'Kelly Decl. ¶ 15; *New York Hearing* 178:4-25 [App'x at 82]. Consequently, the FRT-15 is not a machinegun.

At the evidentiary hearing on the government's motion for preliminary injunction in the New York case, the Government's expert, Ciravolo, agreed that, for an FRT-15, "the trigger must move for every shot fired," that "the hammer is captured by the trigger sear for each round fired," and that "if you load [] and fire five rounds in an FRT-15, the trigger must move to its most rearward position five times." *New York Hearing* 178:4-19 [App'x at 82]. He further agreed that a machinegun like the M16 works differently from an FRT because the machinegun's "hammer is not captured by the trigger sear for each round fired" and "if you load five rounds into an M16 machinegun and then hold the trigger rearward without releasing it, you can fire all five rounds," whereas if you tried that with an FRT-15 and prevented the trigger from resetting, "it would not function" and doing this "would actually cause the weapon to malfunction." *Id*. 178:13-179:8 [App'x at 82-83].

In other words, Defendants' own expert effectively conceded that the FRT-15 does not meet the test for a machinegun under *Cargill.* And his concession was unavoidable; each shot requires a separate function of the trigger.

**E. Defendants mischaracterize the FRT-15's operation to conclude it is a machinegun.**

In addition to asking this Court to adopt the user-action-based definition of a machinegun that *Cargill* expressly rejected, Defendants also mischaracterize the operation of the FRT-15.

*1. The FRT-15 does not fire automatically with a single depression of the trigger.*

Defendants assert "that firearms equipped with FRTs are machineguns because they fire automatically with a single constant depression of the trigger." Opp. at 5. This is flatly false. Between every shot, the FRT-15 resets the trigger to its starting position, momentarily locking it in that position, before the trigger must be moved rearward anew (by the shooter, not the FRT-15) to cause the trigger to release the hammer again and fire another shot. O'Kelly Decl. ¶ 25.

It is not, as with a machinegun, that the user of an FRT-15 simply holds the trigger back, in place, causing the trigger to function just once while the gun automatically fires subsequent shots without any mechanical action by the trigger or movement of the trigger. *New York Hearing* 177:22-179:6 [App'x at 81-83]. As noted above, in a machinegun a part called the auto sear (or its equivalent) takes over from the trigger to retain and release the hammer for every shot after the first. O'Kelly Decl. ¶ 16; *New York Hearing* 177:25-178:9 [App'x at 81-82]. An FRT-15 has no auto sear.

Because the FRT-15 trigger moves forward to its reset position and is stopped there, requiring it to be moved rearward again by the user for the next shot, it is misleading to describe this operation of the FRT as a "single constant depression of the trigger," or even a "single pull of the trigger." *See* O'Kelly Decl. ¶ 25; *see also supra* discussion of "depression" and "pull."

*2. The FRT-15's locking-bar does not serve the same function as an auto sear.*

Defendants misleadingly contend that the FRT-15 was not only designed to fire multiple shots "with a single function (pull) of the trigger" but also that its patent (U.S. Patent No. 10,514,223 B1) states "that the 'locking bar' in a FRT serves the same function as an automatic sear in a typical machinegun to facilitate continuous firing," and "the FRT uses the firing sequence to automatically reset itself along with the locking bar to lock and then automatically time the re-release of the hammer so that as soon as the bolt locks into battery *the next round will automatically be fired*." Opp. at 9 (citing ECF No. 13-9 at 5 (Ciravolo's April 27, 2023 report on the FRT-15) ["Ciravolo Report"] (internal citation omitted) (emphasis added)). The Defendants offer no specific cite to or quote from the patent. This is because the statement is false. These claims suggest that the FRT-15 automatically causes the hammer to be released again without the shooter moving the trigger rearward. This false claim takes the already misleading language in the Ciravolo Report and twists it further with significant omissions.

Ciravolo's Report states that the FRT-15's locking-bar serves as an auto sear because it is used to "capture a fire control component [*i.e.*, the trigger] until the additional surface on an M16-type bolt carrier contacts it and releases the fire control component to automatically fire a subsequent shot." Ciravolo Report at 5. The assertion that the locking bar releases the trigger "to automatically fire a subsequent shot" is false. Unlike a machinegun, there is no mechanism in an FRT-15 by which the gun automatically fires a subsequent shot without a new function/ movement of the trigger powered by the user, as Ciravolo's Report concedes on the same page.

Defendants' baseless assertion that the FRT-15's patent states that the locking bar facilitates "continuous firing" just like the automatic sear in a machinegun is refuted by the very source they cite for this claim: Ciravolo's Report. That report includes an excerpt from the patent that states (albeit, in technical language) that the locking-bar's purpose is to block the trigger

11

from moving until it is disengaged from the trigger by the bolt returning to its ready-to-fire position, after which the trigger can be moved *by an "external force"* to release the hammer. *Id*. All this excerpt from the patent means is that the shooter's finger (the "external force") moves the trigger to release the hammer again after the locking-bar unlocks it. *Id*.

Thus, there is *nothing* in the patent that supports the suggestion that the locking bar works like a machinegun's auto sear to let the gun fire automatically and continuously with a single function of the trigger. Defendants' claim is all the more audacious for omitting Ciravolo's statement that an "external force" (the shooter's finger) causes the FRT-15 to fire again. In addition to Ciravolo's Report contradicting Defendants' claim, he also conceded in New York that the operation of a machinegun with an auto sear is "different from the FRT-15, where the trigger movement is required for every shot fired." *New York Hearing* 178:4-9 [App'x at 82].

Contrary to Defendants' claims, the FRT-15's locking-bar does not serve as an auto sear because it does not perform an auto sear's functions. All that it does is prevent the shooter from moving the trigger before the bolt is back in place and the weapon is safe to fire. O'Kelly Decl. ¶ 16. Unlike an auto sear, the locking-bar does not 1) retain the hammer, 2) release the hammer, or 3) fire the weapon. *Id*. ¶¶ 26-28. Though the Government tries to portray the locking-bar as firing the weapon automatically once it unlocks the trigger (Opp. at 9-10), this is not possible because the trigger remains *still* after the locking-bar unlocks the trigger. *Id*. ¶¶ 25-28. The only force that would act on the trigger at this point to move it rearward and release the hammer would be the shooter's finger. *Id*. ¶ 28. Ciravolo admitted this directly in New York, agreeing that the only force that ever moves the trigger rearward to release the hammer in an FRT-15 comes from the shooter's finger. *New York Hearing*, 171:18-172:15 [App'x at 75-76].

Because the locking-bar does not cause the hammer to be released or otherwise take over

any of the functions of the trigger, Defendants' claim that it serves the same function as an auto sear is entirely incorrect and obviously so.

### 3. *Defendants' zip tie test is flawed and misleading.*

Defendants point to the so-called zip tie test as evidence that FRT-15s fire with "a single constant depression of the trigger." Opp. at 5-6. But that test is flawed and its result deceptive. In a machinegun, a trigger must be held in in its rearmost position for the gun to continue to fire automatically. O'Kelly Decl. ¶ 16; *New York Hearing* 178:20-179:5 [App'x at 82-83]. A machinegun trigger does not reset in between each shot. O'Kelly Decl. ¶ 16; *New York Hearing* 178:13-23 [App'x at 82]. An FRT-15, like every non-machinegun semiautomatic gun *must* reset in between each shot. O'Kelly Decl. ¶ 15; *New York Hearing* 178:4-19 [App'x at 82]. If a user were to hold the trigger of an FRT-15 still in its most rearward position, and not let the trigger reset, then it would malfunction. O'Kelly Decl. ¶¶ 38, 40; *New York Hearing* 178:24-179:6 [App'x at 82-83].

Defendants' zip tie test does not hold the FRT trigger still in its most rearward position, as would be the equivalent position of the trigger in a machinegun. O'Kelly Decl. ¶¶ 37-38. The zip tie in the test also does not cause multiple shots to be fired by maintaining "a single constant depression" of the trigger, as Defendants claim. Instead, it causes multiple shots to fire by moving the trigger sufficiently rearward to cause the trigger to release the hammer, after which the FRT-15 applies forward force to reset the trigger by moving it to its original position, which the zip tie allows *due its elasticity. Id*. After the FRT-15 forces the trigger and zip tie forward, it locks the trigger in its reset position, and then unlocks the trigger; the elastic zip tie is under strain from being stretched[2] by the trigger's forward movement and therefore is able to re-apply

---

[2] The "elasticity" of the zip tie is not a stretching of its length, but rather results from a relatively stiff material being pulled into a loop that stretches from a circle to an oval and back again. O'Kelly Decl. ¶ 37.

sufficient pressure after the trigger is unlocked to move the trigger back far enough to release the hammer and fire another round. *Id*. What we observe in the zip tie test is a singular function of the *zip tie's elasticity*; not a single function of the trigger. *Id*.

If the zip ties were secured tightly enough that the trigger were fully held in place in its rearward position—equivalent to how a machinegun trigger is held back while it fires—the weapon would malfunction, just as Ciravolo admitted in his testimony in the New York case. *New York Hearing* 178:24-179:6 [App'x at 82-83]; O'Kelly Decl. ¶ 40.

In any event, Defendants' fixation on the user's (or zip tie's) amount and constancy of force is simply irrelevant to the test established by Congress in the statute as correctly interpreted by the Fifth Circuit in *Cargill*.

### F. Defendants twist *Cargill* beyond recognition to support their case.

Incredibly, Defendants claim that *Cargill* actually *supports* finding that FRTs are machineguns. *See* Opp. at 7-9. They quote *Cargill*'s analysis of whether bump stocks are automatic to incorrectly contend that an FRT-15, unlike the bump stock at issue in *Cargill*, is automatic because an FRT-15 allegedly does not require additional manual input to keep firing. *Id.* This argument fails for two reasons. Opp. at 8.

First, under *Cargill*, a device is a machinegun only if it enables a firearm to fire multiple rounds both 1) automatically **and** 2) by a single function of the trigger. 57 F.4th at 462. Both elements are necessary, and the Fifth Circuit determined that it could find non-mechanical bump stocks were not machineguns under *either* element. *Id*. ("Even if a non-mechanical bump stock caused a semiautomatic rifle to operate by a single function of the trigger, the rifle would still need to operate automatically in order to be a machinegun."). The Fifth Circuit was clear that its conclusions regarding both elements were independent of one another and each was binding:

As explained above, because a semi-automatic firearm equipped with a non-
mechanical bump stock does not operate "by a single function of the trigger," such
a weapon is not a machinegun, and we must render judgment for Cargill. Our
conclusions in Parts III.B and V are each independent, alternative holdings. In the
Fifth Circuit, "alternative holdings are binding precedent and not obiter dictum."

*Cargill*, 57 F.4th at 462 n.9 (quoting *Jarkesy v. SEC*, 34 F.4th 446, 459 n.9 (5th Cir. 2022)).

Accordingly, even a finding that FRT's fired automatically is not enough for them to be

machineguns unless they also fire multiple rounds by a single function of the trigger, which is

addressed above and in the Plaintiff's Motion. PI Mot. at 10-11.

Second, FRTs are not automatic. For each function of the trigger, which fires only one

shot, the trigger must move rearward after being reset to its forward and ready position, which

even Defendants' expert concedes. *New York Hearing* 178:4-179:6 [App'x at 82-83]; *see*

O'Kelly Decl. ¶ 15. No mechanical force *automatically* moves the trigger rearward to fire

another shot. *New York Hearing* 172:4-15 [App'x at 76]; *see* O'Kelly Decl. ¶ 15. Only force

supplied by the user's finger moves the trigger rearward for each shot after each time the trigger

is reset. *New York Hearing* 172:4-15 [App'x at 76]; O'Kelly Decl. ¶ 15. That is, the user's

manual input, unaided by any operation of the FRT-15, is required to move the trigger rearward

again to fire each shot. The FRT-15 is, thus, not automatic.

Similarly, Defendants improperly rely on *Cargill*'s statements that "the act of pulling and

holding the trigger is one function, and that function produces more than one shot," and "that

force must be maintained on the trigger does not change this conclusion."  Opp. at 9 (quoting

*Cargill*, 57 F.4th at 463 (emphasis added)). In the quoted passage, the court was answering the

government's protest that the court's holding "prove[d] too much" and would produce the absurd

result that a traditional automatic rifle (for which "the shooter must pull and hold the trigger to

fire more than one round") could not be considered a machinegun. *Cargill*, 57 F.4th at 463. The

Court addressed this concern by explaining that traditional automatic rifles would still be

considered machineguns under its holding because the act of holding the trigger *in place* (that is at its rearward position) after it has been depressed to release the hammer is all one function of the trigger. *Id*. The court was *not* referring to simply holding pressure on the trigger itself *regardless of whether the trigger moved*, as Defendants now suggest the court meant.

In context, the court's description of "pulling and holding the trigger" refers to moving the trigger to its rearward position and holding it there without allowing it to move. As already noted, in an FRT, "pulling and holding the trigger" in its rearward position will cause the gun to malfunction, not to fire multiple shots. O'Kelly Decl. ¶¶ 38, 40; *New York Hearing* 178:24-179:6 [App'x at 82-83]. Defendants' misquotation of the decision is just a repetition of the same "pull *on* the trigger" vs "pull *of* the trigger" equivocation that they use elsewhere to misleadingly conflate how FRTs work with how machineguns work.

Defendants' suggested reading of the court's statement not only defies the clear meaning of the statement in context, but it also directly conflicts with the court's central holding in part III(A) of *Cargill*: the only question when evaluating whether a firearm fires multiple rounds by a single function of the trigger is whether the trigger moves and acts; not what the shooter is doing.

Finally, Defendants misrepresent *Cargill*'s statements about how it might hypothetically analyze mechanical bump stocks, a different device not before the court. Opp. at 8-9. In short, a mechanical bump stock is similar device to the bump stocks at issue in *Cargill*, but they obviate the need for the shooter to push forward on the firearm with his supporting hand to engage in bump fire because they use a system of springs to exert the necessary forward pressure instead. *Cargill*, 57 F.4th at 455. Defendants claim that the Fifth Circuit "recognized that the outcome *would* have been different if it were considering a mechanical bump stock that only required the shooter 'pull the trigger once to activate the firing sequence' such that the mechanical bump stock then

maintained the bump fire of its own accord.'" Opp. at 8 (quoting *Cargill*, 57 F.4th at 462 n.8) (emphasis added). This is not accurate. The Fifth Circuit merely recognized that the only issue before it was whether non-mechanical bump stocks were machineguns, and that the outcome *could* differ for a mechanical bump stock *depending on how it worked*. "[T]he case *might* well be different if we were considering a semiautomatic weapon equipped with a mechanical bump stock. It *could* be the case that *a switch* activating a mechanical bump stock *would be the legal trigger*. But we are not considering that case." *Cargill*, 57 F.4th at 462 (emphasis added). In other words, a device that allows the user to press a switch once to cause a gun to fire multiple shots could be a machinegun, depending on its design, because that switch could be considered the trigger.

To state the obvious, there is no comparison between such a device and FRTs, for which a trigger must function by moving rearward for each shot to be fired and does so solely by the force of the user's finger — like any other semiautomatic rifle or pistol — not automatically by a self-perpetuating spring system set in motion by a switch.

### G. Defendants' comparison of FRTs to the Akins Accelerator and the *Camp* device fails because both devices work differently than FRTs in fundamental ways.

Defendants also compare the FRT-15 and the Fifth Circuit's statements about the Akins Accelerator, a mechanical bump stock. Opp. at 8-9. This argument is unavailing because the court's description of the Akins Accelerator indicates it understood the device as a secondary trigger that replaced the role of the original trigger, similar to the device in *United States v. Camp*, 343 F.3d 743 (5th Cir. 2003), and that it excluded the Akins Accelerator from its holding on that basis. *See Cargill*, 57 F.4th at 462 n.8. In that section of the opinion, the court mentioned that *Camp* did not apply to its analysis of non-mechanical bump stocks because "the definition of 'trigger' [was] not in dispute" between the parties. *Id*. at 462. The court indicated it considered the Akins Accelerator to be similar to the *Camp* device because it placed the footnote mentioning

17

that the Akins Accelerator is excluded from its holding at the end of its explanation that "[i]t could be the case that a switch activating a mechanical bump stock would be the legal trigger[,] [b]ut we are not considering that case." *Id*. The Court intended the Akins Accelerator as an example of the kind of mechanical bump stock that has a switch for initiating bump fire that would be considered the "legal trigger."

In *United States v. Camp*, 343 F.3d 743 (5th Cir. 2003), the device at issue was an electric motor added onto the firearm and was switch-operated. *Camp*, 343 F.3d at 744. When the shooter activated the switch once, the motor would act on the firearm's original trigger and cause it to function repeatedly, automatically firing the gun repeatedly without any further function of the switch. *Id*. The switch legally became the trigger because of this. *Id*. at 744-45. The Fifth Circuit determined that this device was a machinegun because the motor's switch served as the new trigger for the firearm and it required only one function of the switch/new trigger to make the firearm fire multiple rounds automatically. *Id*. at 745. The *Camp* Court contrasted that electric device with legal "trigger activators," devices that push the trigger toward its reset position, which the testifying ATF agent described as "require[ing] a user to separately pull the activator each time the weapon is fired." *Id*.

Defendants claim these devices are relevant because they were determined to be machineguns[3] despite the original trigger moving back and forth for every shot the firearm fired.

---

[3] The Eleventh Circuit determined the Akins Accelerator was a machinegun in an unpublished opinion. *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009). The Eleventh Circuit's analysis does not extend past the determination that the device was a machinegun because it allowed a gun to shoot multiple rounds "[a]fter a single application of the trigger by a gunman." *Akins*, 312 F. App'x at 200. Because the Eleventh Circuit did not describe or analyze the Akins Accelerator's operation in detail, it is not clear if the Eleventh Circuit's decision conflicts with or agrees with the Fifth Circuit's holding in *Cargill*. In *Cargill*, the Fifth Circuit neither agreed nor disagreed with the Eleventh Circuit's finding, it only stated that its decision did not apply to the Akins Accelerator because it was a mechanical bump stock that worked by different principles from the non-mechanical bump stocks under consideration. 57 F.4th at 462 n.8.

Opp. at 7–8. But this argument ignores that the "trigger" for all relevant purposes after these devices were installed was the new "switch," not the physical trigger on the firearm. *Camp*, 343 F.3d at 745; *Cargill*, 57 F.4th at 462.

Thus, Defendants' comparison of these devices with FRTs falls flat. Unlike these devices, FRTs are the one and only trigger in the gun, they are the only thing the shooter interacts with to make the gun fire, and they perform the same mechanical function as any normal trigger: they release the hammer when moved rearward far enough by the shooter's finger. Because, like in *Cargill*, "the definition of 'trigger' is not in dispute," Defendants' comparison to these other devices is unavailing. *See Cargill*, 57 F.4th at 462.

## II.   Plaintiffs have standing.

In addition to raising a longer (but meritless) defense of their claim that FRTs are appropriately classified as machineguns, Defendants claim Plaintiffs lack standing. This argument also fails. The National Association for Gun Rights and Texas Gun Rights have associational standing because at least one of their members has standing to sue in their own right. Moreover, all Plaintiffs have standing to bring a pre-enforcement challenge.

### A.  The associational plaintiffs have standing.

The National Association for Gun Rights and Texas Gun Rights (collectively, "Associational Plaintiffs") each have associational standing because at least one of their members has standing to sue in his or her own right.

Patrick Carey, Travis Speegle, and J.R. Wheeler (collectively, "Individual Plaintiffs") are all members of both the National Association for Gun Rights and Texas Gun Rights. *See* Supplemental Declaration of Patrick Carey, App'x at 106; Supplemental Declaration of Travis Speegle, App'x at 107; Supplemental Declaration of J.R. Wheeler, App'x at 105; Declaration of Ryan Flugaur, App'x at 94. As this Court described in its August 30 Order, these individual

Plaintiffs have standing. ECF No. 36 at 7-9. As set forth more fully below, *see infra* at 23-27, nothing in Defendant's Opposition contradicts the facts the Court relied upon in its August 30 determination.

In addition, at least three other National Association of Gun Rights members have reported receiving warning letters from Defendants, including one in the Northern District of Texas. Declaration of Ryan Flugaur, App'x at 94; Declarations of other NAGR Members, App'x at 85-93, 95-98, 101-04. Defendants are well aware that they are actively enforcing their incorrect interpretation of the law, including by seizing forced reset triggers and sending "warning letters" threatening criminal prosecution. Their attempts to minimize these actions or suggest they are limited to a single plaintiff, Mr. Carey, are disingenuous.

At least one member of each group has standing to pursue the claims asserted in his or her own right. Three are doing just that in this case, along with the Associational Plaintiffs. The Associational Plaintiffs have standing.

### B. Plaintiffs have standing to assert a pre-enforcement challenge.

Defendants next claim that the individual plaintiffs lack standing to bring a pre-enforcement challenge. This argument is largely a re-tread of Defendants' failed arguments in opposition to Plaintiffs' motion for a temporary restraining order and should fail for the same reasons. Nothing in Defendants' Opposition brief changes the operative facts:

It is still undisputed that the individual Plaintiffs are still engaging in or intend to engage in conduct that Defendants contend is illegal. *See generally Franciscan Alliance, 47 F.4th* at 377 (distinguishing *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2008) by observing, "[i]n *Zimmerman v. City of Austin* the plaintiff lacked standing because he failed to show 'a serious intention to engage in conduct proscribed by law.'").

Defendants' interpretation is far from moribund; they are *still* actively pursuing multiple

criminal prosecutions based on their erroneous interpretation of the law, have specifically threatened at least one named Plaintiff with enforcement actions, *see* Declaration of Patrick Carey, App'x at 6-8, and have explicitly threatened at least one or more other members of both associational plaintiffs with prosecution. *See* Declaration of Ryan Flugaur, App'x at 94; Declaration of Chris McNutt, App'x at 99-100; Declaration of John Kordenbrock, App'x at 85-89; Declaration of Lance Benton, App'x at 90-93; Declaration of Lane Watkins, App'x at 95-98; Declaration of William Carey, App'x at 101-104; Supplemental Declaration of J.R. Wheeler, App'x at 105; Supplemental Declaration of Travis Speegle, App'x at 107; *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 336-37 (5th Cir. 2020) ("Where the policy remains non-moribund, the claim is that the policy causes self-censorship among those who are subject to it, and the students' speech is arguably regulated by the policy, there is standing.").

Defendants are also *still* engaging in a "flurry of recent enforcement activity," including seizing at least three additional forced reset triggers *since the Court's August 30 Order. See Bureau of Alcohol, Tobacco, Firearms, and Explosives Official Notice Posted September 21, 2023*, App'x at 69-71. Tellingly, Defendants have *still* refused to disavow enforcement against the individual Plaintiffs, instead emphasizing their "current intention"—an intention that is undercut by Defendants' own speculative and unsupported claim that "Individual Plaintiffs cannot guarantee . . . that their ownership of [forced reset triggers] will not, in the future, create public safety risks that would warrant action by the government." Opp. at 19. Defendants' representations about their "current intention" are not worth the paper they are printed on because, as Defendants candidly acknowledge, they could change their mind at any time. What the Court found on August 30 is still true today: this is "the exact type of 'prosecutorial indecision' that the Fifth Circuit has 'repeatedly held' as more than enough to 'have standing.'" ECF 36 at 9 (quoting *Franciscan*

*Alliance, Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022)).

Moreover, the Individual Plaintiffs are not the only National Association of Gun Rights members who face a credible threat of prosecution. At least three other National Association of Gun Rights members have reported receiving warning letters from Defendants, including one in the Northern District of Texas. Declaration of Ryan Flugaur, App'x at 94. Defendants have provided no specific representations about their "current intentions" with respect to these other National Association for Gun Rights members, let alone a hard and fast disavowal of enforcement.

Defendants are still prosecuting at least three individuals for possessing forced reset triggers. This undermines—if not flatly contradicts—Defendants' claim of a "historic practice of focusing enforcement efforts on major manufacturers and distributors of FRTs" rather than "undertak[ing] criminal action against … small-scale-owners." Opp. at 11.

Defendants try to distinguish these cases by observing Defendants also brought other gun charges against those individuals. *See* Opp. at 14. However, Defendants immediately render this distinction meaningless by their speculative and unsupported assertion that "Individual Plaintiffs … cannot guarantee that they will not in the future violate other gun laws that heighten concerns about the risks posed by their continued possession of a FRT—as was true in the handful of criminal prosecutions in which the government brought charges … related to possession of FRTs." Opp. at 19-20. Once again, Defendants' representations about their "current intentions" are meaningless because Defendants reserve the right to change their minds at any time. If Defendants themselves cannot "guarantee" that Defendants will not view the Individual Plaintiffs as similarly situated to other individuals Defendants have prosecuted, how can the Individual Plaintiffs or the Court take any solace in Defendants' purported distinctions?

Plaintiffs have standing.

To avoid this conclusion, Defendants seek to subtly shift the standard by effectively conflating standing with irreparable injury. For example, Defendants focus on "the specter of *imminent* enforcement."  Opp. at 15 (emphasis added). But this is not the standard for assessing *standing*. Standing requires only a *credible* threat of enforcement, not an *imminent* threat. *See generally Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164-167 (2014).

Defendants' standing arguments would effectively eliminate the prospect of pre-enforcement review and leave the American people at the mercy of prosecutorial whim.

First, Defendants' novel "imminence" theory would effectively force potential Plaintiffs to violate a law before having standing. After all, how can enforcement be "imminent" if a potential violation has not yet occurred?  The Supreme Court has squarely addressed Defendants' argument and rejected it for just this reason, stating "[t]he plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).

Second, how could a prospective Plaintiff possibly know that an enforcement action is "imminent"? Potential plaintiffs are not privy to the internal deliberations of government agencies. They have no reasonable way of determining when a credible threat of enforcement becomes imminent, and are not required to under the law. While the ATF may issue warning letters, it is not legally obligated to do so and does not do so in all cases. Most federal agencies do not.

Furthermore, what qualifies as "imminent"?  Would Plaintiffs have to wait for police to be suiting up in their front yard, readying an armed squad to smash down their doors and expose them to state-sponsored violence, in order to bring a pre-enforcement challenge?  To ask the question is to answer it.

It is well-settled that "where threatened action by the *government* is concerned, we do not

23

require a plaintiff to expose himself to liability before bringing a suit to challenge the basis of the threat." *MedImmune*, 549 U.S. at 128-29; *see also Susan B. Anthony List*, 573 U.S. at 158 ("When an individual is subject to such a threat [of enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law.").

Standing is broader than just the preliminary injunction motion. It is a fundamental predicate to opening the courthouse doors that Defendants would have this Court bar to them based solely on ephemeral representations of their *current* mood towards three individual plaintiffs. This is not and cannot be correct.

## III.   Plaintiffs face a threat of irreparable harm.

First, as the Court found in its August 30 Order and as further described above, Plaintiffs continue to face a credible threat of prosecution that "constitutes more than a *de minimis* harm justifying the need for equitable protection."  ECF 36 at 18. Plaintiffs' current and proposed conduct violates the law as Defendants would interpret it. The law is not moribund; Defendants are actively enforcing it around the country. And Defendants have specifically threatened enforcement against one named Individual Plaintiff and three additional members of the Associational Plaintiffs.

Second, Plaintiffs—including both the individual Plaintiffs and the members of the associational plaintiffs—continue to face compliance costs stemming "from the Hobson's choice … [to] continue to exercise ownership and constitutional rights while risking federal prosecution *or* forfeit those rights to avoid civil and criminal consequences."  ECF 36 at 18 (emphasis in original). Complying with Defendants' illegal interpretation of the law would deprive Plaintiffs of the use and enjoyment of their property and would entail economic costs that likely cannot be recovered. As this Court recognized, "[t]hreats that lead an individual to surrendering FRTs … often lack compensation after the fact for the deprived use and enjoyment of the surrendered

weapons (assuming the weapons are ever returned)."  ECF 36 at 18 (citing *VanDerStok v. Garland*, 625 F.Supp.3d 570, 584 (N.D.Tex. Sept. 2, 2022).

In response, Defendants first cite to *Opulent Life Church v. City of Holy Springs* for the proposition that "[t]he lengthy delay between ATF's determination and Plaintiff's action in seeking declaratory relief demonstrates a lack of irreparable harm."  Opp. at 16 (citing 697 F.3d 279, 297 (5th Cir. 2012)).

There are at least two problems with this argument.

First, Defendants tellingly omit that *Opulent Life Church* considered *and rejected* the argument that plaintiff waited too long to claim an irreparable harm, stating "[w]hether frivolous or not" the argument that plaintiff's "'long litigation delay' suggests it is not suffering irreparable harm" "is unconvincing on these facts." 697 F.3d at 297. This is hardly a ringing endorsement that the Court must reject Plaintiffs' claims of irreparable harm based on Defendants' conclusory claims that the passage of time between the adoption of Defendants' incorrect interpretation and today means there is no harm. *See* Opp. at 16. Rather, it suggests the Court should evaluate harm on the facts before it.

Second, *Opulent Life Church* reiterated that "[t]he loss of [constitutionally protected] freedoms, for even minimal periods of time, unquestionable constitute irreparable injury."  697 F.3d at 295 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). This is true even when the right at issue is merely statutory, rather than, as here, constitutional. *See Opulent Life Church*, 697 F.3d at 295 ("This principle applies with equal force to the violation of [the Religious Land Use and Institutionalize Persons Act].").

As described above, Plaintiffs have stated several ways they will be irreparably harmed in the absence of a preliminary injunction, including through the credible threat of enforcement,

economic compliance costs, and the loss of the use and enjoyment of their firearms, contrary to their Second and Fifth Amendment rights.

Next, Defendants effectively reiterate their claims concerning a credible threat of prosecution to deny that Plaintiffs face irreparable harm. *See* Opp. at 16-17. As set forth above, these claims are unavailing. Plaintiffs need not wait for Defendants to bring an actual prosecution to vindicate their rights.

Defendants also claim "there is no irreparable harm from a hypothetical seizure of Plaintiffs' property" as "[a]ny seized property could be returned via a forfeiture action or some other proceeding." Opp. at 17. But this argument completely ignores that any seizure deprives Plaintiffs of the use and enjoyment of their property. *See* ECF 36 at 18 ("Threats that lead to an individual surrendering FRTs … often lack compensation after the fact for the deprived use and enjoyment of the surrendered weapons." (citing *VanDerStok*, 625 F.Supp.3d at 584). It also blinks reality: the chance that Defendants would leave what they consider dangerous "machineguns" intact to be restored to the owners via process of law is miniscule.

Finally, Defendants claim "Plaintiffs have not shown that individuals who are not parties to this lawsuit will suffer irreparable harm absent a preliminary injunction." Opp. at 17-18. But Defendants do not (and cannot) explain why the harm analysis would be different for any other person who currently owns a forced reset trigger. Each and every one is faced with the same Hobson's choice that forms the basis of standing for the individual plaintiffs.

Perhaps recognizing this defect in their argument, Defendants move on to distinguishing persons who wish to make "future purchases" from current FRT owners. Opp. at 18. While it is true that future purchasers would not face the same economic compliance costs, they would still face other non-pecuniary harms. For example, they would still be forced to forego purchasing an

FRT or risk criminal and civil enforcement proceedings. They would also still be compelled to forego the use and enjoyment of an FRT. Defendants are using the threat of criminal prosecution to illegally persuade individuals to give up property under duress.

Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction.

## IV.     The balance of harms weighs in favor of a preliminary injunction.

Defendants continue to offer no plausible explanation for their incoherent enforcement position. Defendants continue to claim that they do not generally pursue enforcement actions against individual FRT owners, particularly if the individual has not violated other gun laws. *See* Opp. at 13 ("ATF, meanwhile, has focused its enforcement efforts against large-scale manufactures and distributors of FRTs"); Opp. at 14 (claiming "[n]one of those other defendants was charged solely for possessing a FRT"). Yet, Defendants also continue to claim that individuals who own FRTs, including the three named plaintiffs in this case, pose a substantial threat to public safety, in part because "they … cannot guarantee they will not in the future violate other gun laws." *See* Opp. at 19. These positions are irreconcilable and self-defeating.

If Plaintiffs (or anyone else) violate *other* gun laws, they can be charged with violating those *other* laws. If the only individuals Defendants bring enforcement actions against are those who violate *other gun laws* and are charged with violating *other gun laws*, then the prohibition on FRTs does no work to protect the public. It is neither a necessary nor sufficient condition for protecting the public safety, but rather merely an extra charge Defendants tack on after they have determined an individual is a danger for other reasons and after they have brought other charges against them. This is hardly sufficient to sway the balance of harms in Defendants' favor.

More broadly, Defendants offer no specific causal arguments to explain how the public would be harmed by a preliminary injunction. Instead, they offer conclusory claims of "public safety" and cite to cases addressing "the possession and transfer of machine guns."  Opp. at 18

27

(quoting *Aposhian v. Barr*, 958 F.3d 969, 991 (10th Cir. 2020)).[4]  But this begs the question. FRTs *are not machineguns*. If Plaintiffs are likely to succeed on the merits (they are) which asks the Court to determine that FRTs are not machineguns, then the argument that *machineguns* pose a threat to public safety is a *non sequitur*. "Public safety" is never a justification for enforcing an illegal interpretation of a criminal statute.

On the other side of the ledger are law-abiding FRT owners. As detailed above, they will be irreparably harmed if they are not able to possess and buy FRTs. The balance of harms favors entry of a preliminary injunction.

## V.   Defendants' argument based on principles of equity would allow the government to arrest and prosecute citizens for actions that are not crimes.

Next, Defendants claim that the Court should decline to issue an injunction based on principles of equity. Opp. at 20. Specifically, Defendants claim that equitable relief to enjoin criminal enforcement can only be granted in response to a constitutional claim to vindicate constitutional rights. Opp. at 20. But Defendants offer little to support this bold proposition, citing only a single case, *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177 (3d Cir. 2006). While *Stolt-Nielsen* has some broad language arguably consistent with Defendants' thesis, the facts of the case render it inapposite. In *Stolt-Nielsen*, the plaintiff sued to enforce a conditional leniency agreement with the government that the government purported to revoke as a consequence of plaintiff's behavior. The dispute at the heart of *Stolt-Nielsen* was thus fundamentally an individualized determination. It did not concern the validity of a generally applicable law.

And Defendants' position would yield absurd results. Defendants do not and could not challenge the Court's authority to enter a declaratory judgment ruling finding that FRTs are not machineguns and may not be prohibited by administrative fiat. Instead, Defendants argue that,

---

[4] Tellingly, *Aposhian* upheld the same "bump stock" ban that the Fifth Circuit struck in *Cargill*.

even if that is true, Defendants should still be allowed to arrest and prosecute people for possessing them. This is a recipe for blatant Due Process violations. The executive branch cannot arrest and prosecute people for things that are not crimes, and it does not violate the separation of powers for the Court to say as much. *See generally Franciscan Alliance*, 47 F.4th at 378 ("[A]n agency 'literally has no power to act … unless and until Congress authorizes it to do so by statute.'" (quoting *Fed. Election Comm'n v. Cruz*, 142 S.Ct. 1638, 1649 (2022)).

Third, Defendants once again beg the question of whether an FRT is a "machinegun" in order to elide Plaintiffs' Second Amendment rights. To wit, Defendants claim "[t]he Second Amendment does not protect machineguns." Opp. at 21. This argument does no work in this case because the primary merits question is whether FRTs are machineguns (they aren't).

Finally, Defendants reject the Court's prior citation to the APA, claiming "the APA's general conferral of authority to review certain agency actions and to grant interim relief has no bearing on whether the particular equitable remedy sought here is available." Opp. at 21. But Defendants' bold statement would create an exception that swallows the rule and runs counter to the text and purpose of the APA itself.

"[T]he Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)). The APA itself refers to "mandatory or injunctive decree[s]" issued thereunder. 5 U.S.C. § 702. The import of this text is that injunctive relief is available under the APA. Moreover, the entire purpose of section 702 is to ensure that "[a] person suffering a legal wrong because of agency action" is able to obtain an appropriate remedy. 5 U.S.C. § 702. This purpose would be eviscerated if it turns out that section 702 conferred no right to obtain meaningful relief through the courts when wronged by agency action.

In Federalist 47, James Madison warned "[t]he accumulation of all powers, legislative, executive and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." James Madison, The Federalist No. 47 (Jan. 30, 1788). The crux of this case is that the executive branch has improperly usurped legislative authority by enacting criminal prohibitions that are beyond the scope of its legislatively granted authority. Now, Defendants seek to arrogate unto themselves the judicial authority as well by placing their actions beyond the reach of pre-enforcement judicial review. This is not and cannot be correct.

## VI.   Enjoining all applications of Defendants' invalid interpretation is the appropriate remedy.

"[V]acatur of an agency action is the default rule in this circuit." *Cargill*, 57 F.4th at 472;[5] *see also Franciscan Alliance*, 47 F.4th at 374-75 ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."). Defendants' interpretation functions in practice like a regulation. Vacating the agency's action in this case would mean preventing Defendants from seeking to enforce an illegal interpretation against anyone. A broad injunction is not only an appropriate remedy, it is consistent with "the only statutorily prescribed remedy" for an invalid regulatory interpretation. Defendants' arguments to the contrary are unavailing.

First, Defendants claim that since Plaintiffs are private owners, they would not be harmed by a series of enforcement actions directed at manufacturers and sellers of forced reset triggers. This ignores Plaintiffs claim that, but for Defendants' unlawful interpretation, they would buy additional forced reset triggers. It takes two to engage in a voluntary transaction. The ability to buy additional triggers is severely undermined if manufacturers and sellers still face a credible threat

---

[5] Defendants cite *Cargill* for the proposition "broad relief was not necessarily appropriate even at final judgment." Opposition at 24. This misses the forest for the trees. *Cargill* expressly noted that vacatur is the default rule in the Fifth Circuit. It went on remand the case to the district court to determine the scope of the appropriate remedy because "the parties have not briefed the remedial-scope question." *Cargill*, 57 4th at 472.

of enforcement for selling FRTs to Plaintiffs.

Second, Defendants rehash their conclusory arguments that the Associational Plaintiffs lack standing. For the reasons set forth above, *see supra* at 23-27, these arguments are unavailing. The National Association for Gun Rights and Texas Gun Rights have associational standing and thus the ability to pursue appropriate remedies for their members.

Third, Defendants claim that any appropriate injunctive relief should be limited to the Northern District of Texas. First, this ignores the "default rule" of this circuit to vacate invalid rules. Second, it ignores the practical reality that not all Plaintiffs reside in the Northern District of Texas. Plaintiff Carey lives in Louisiana. A remedy that is limited to just the Northern District of Texas is no remedy at all for Plaintiff Carey. Similarly, Texas Gun Rights has members across the state of Texas, not just in the Northern District, and the National Association for Gun Rights has members across the country, including at least two additional members who live outside the Northern District of Texas and report receiving warning letters from Defendants threatening criminal consequences for owning FRTs. Vindicating the rights of the specific Plaintiffs before the court requires a remedy that extends beyond the Northern District of Texas.[6]

---

[6] Defendants claim that Plaintiffs' requested remedy would "prevent[] the government from pursing its action against Rare Breed Triggers."  Opposition at 24. This is false. Plaintiffs' proposed remedy would prevent Defendants from taking *new* enforcement actions. It would have no direct impact on the fraud charges that have already been brought and are already being litigated in that action.

31

Date: September 22, 2023

Respectfully submitted,

/s/ Whitney A. Davis
Whitney A. Davis (TX Bar No. 24084843)
Ben Sley (TX Bar No. 18500300)
EGGLESTON KING DAVIS, LLP
102 Houston Avenue, Suite 300
Weatherford, TX 76086
Telephone: (703) 748-2266
whit@ekdlaw.com
ben@ekdlaw.com

Jonathan M. Shaw (VA Bar No. 98497)
Gary M. Lawkowski (VA Bar No. 82329)
David A. Warrington (VA Bar No. 72293)
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: (703) 748-2266
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
glawkowski@dhillonlaw.com
dwarrington@dhillonlaw.com

Glenn Bellamy (OH Bar No. 0070321)
WOOD HERRON & EVANS
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Telephone: 513-707-0243
gbellamy@whe-law.com

32