# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

NATIONAL ASSOCIATION FOR
GUN RIGHTS, INC., *et al.,*

Plaintiff,

- v. -

MERRICK GARLAND, *et al.,*

Defendants.

4:23-cv-00830-O

## DECLARATION OF SPECIAL AGENT CRAIG SAIER

I, Craig Saier, have personal knowledge of the following facts set forth below, and if called as a witness I would testify as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  I am currently the Assistant Director for the Office of Intelligence Operations (OIO)[1] within the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice (DOJ), which is responsible for the national collection, analysis, and dissemination of crime gun intelligence; managing ATF's portfolio of international liaison and support activities; and managing ATF's Internet Investigations Center.

2.      Prior to being promoted to the role of Assistant Director, I was the Special Agent in Charge of ATF's Tampa Field Division (TFD).  The TFD covers 58 of the 67 counties in the State of Florida, and is comprised of 14 combined criminal enforcement and regulatory offices staffed by approximately 200 personnel.  In my role as the Special Agent in Charge, I was responsible for oversight of all criminal and regulatory enforcement activities within the TFD, including the early stages of ATF's investigation of Rare Breed Triggers (RBT) and associated

---

[1] My directorate was previously named the Office of Strategic Information and Intelligence (OSII).

individuals and entities regarding their manufacture and distribution of the FRT-15, and ATF's investigation into the importation and distribution of the Wide Open Trigger (WOT) by Big Daddy Unlimited (BDU) and associated individuals and entities.

3.      The facts set forth in this declaration are based on my personal knowledge; knowledge obtained as a result of my supervisory roles in OIO and TFD; information from other individuals, including ATF Special Agents and intelligence personnel involved in the investigation into the distribution and possession of the FRT-15, WOT, and similar devices; ATF records; and other sources.  The information contained in this declaration is a summary and does not incorporate all facts known to me regarding these subjects.

## MACHINEGUNS AND MACHINEGUN CONVERSION DEVICES

4.      In 1934, Congress enacted the National Firearms Act (NFA), 26 U.S.C. § 5801 et. seq., The NFA, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954); *see United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 516-17 (1992) (plurality opinion).  The NFA was a direct response to Prohibition-era gang violence.  The NFA defines firearms narrowly to include machineguns, silencers, short barrel rifles and shotguns, and destructive devices, among others.  The NFA imposed registration, approval and background check requirements on the transfer and possession of all NFA firearms.  The NFA also imposed making and transfer taxes on these weapons, and required anyone engaging in the business of manufacturing, dealing, or importing NFA firearms to be licensed, maintain records, and pay a Special Occupation Tax.

5.      In 1986, Congress passed the Firearm Owners Protection Act (FOPA), which amended the Gun Control Act of 1968 (GCA) to include 18 U.S.C. § 922(o). Section 922(o) prohibits any person from transferring or possessing a machinegun unless the machinegun was

lawfully possessed before May 19, 1986, or the transfer or possession of the machinegun is "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof of a State, or a department, agency, or political subdivision thereof." 18 U.S.C. § 922(o).

6.     Federal law defines the term "machinegun" as "any weapon which shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger" and includes a "combination of parts designed and intended for use in converting a weapon into a machinegun." 18 U.S.C. § 921(a)(24); 26 U.S.C. § 5845(b).  Accordingly, a combination of parts that convert a semiautomatic weapon to function automatically are properly classified as a "machinegun" under federal law.

7.     A combination of parts that convert a semiautomatic weapon to function automatically is generally referred to as a machinegun conversion device ("MCD").

### THE FRT-15 AND WOT

8.     On September 5, 2023, in *United States v. Rare Breed Triggers, LLC, et al.*, 23-cv-369 (EDNY), the Eastern District of New York granted the United States' Motion for Preliminary Injunction against RBT, finding the Government was likely to prevail on the merits and that the record established that since December 2020, RBT fraudulently induced their customers to buy an illegal product. The court restrained RBT, Rare Breed Firearms, Lawrence DeMonico, Kevin Maxwell, and their agents, officers and employees, and all other persons or entities in active concert or participation with them, from engaging in any sales of the FRT-15, WOT, forced reset triggers or other MCDs.

9.     On October 7, 2023, the Northern District of Texas, in *National Association of Gun Rights, Inc., et al., v. Merrick Garland, et al.,* 4:23-vc-00830 (NDTX) granted a preliminary

injunction to three individual plaintiffs, two organizational plaintiffs, their members, and any "downstream customer" of a commercial member of the organizational plaintiffs, enjoining ATF from taking any enforcement action, criminal or civil, regarding FRT-15s and WOTs. Because of the injunction issued in EDNY, the NDTX injunction does not extend to the "Rare Breed Parties".[2]

10.     Both the FRT-15 and the WOT have been consistently classified as machineguns by ATF as they are MCDs. The FRT-15 and WOT are drop-in trigger systems designed for AR-type weapons. The WOT is a copy of the FRT-15. These triggers are easily installed into an AR-15 and require no special skills or tools.

11.     Individuals are generally prohibited from possessing or distributing MCDs, except under very limited circumstances. *See e.g.,* 18 U.S.C. § 922(o). Firearms equipped with MCDs are a particularly potent public safety threat as they allow for the rapid fire of several hundred rounds of ammunition per minute, often in an indiscriminate and uncontrolled fashion. As MCDs "make guns deadlier, they also make them far less accurate and harder to control for even the most experienced marksmen."[3]

## <u>HISTORICAL PRACTICE OF CLASSIFYING FORCED RESET TRIGGERS AS MACHINEGUNS</u>

12.     ATF has consistently classified devices functionally similar to the FRT-15 and WOT as "machineguns" going back to the 1970s. As ATF Firearms Enforcement Officer Anthony Ciravolo explained at the preliminary injunction hearing, ATF first classified as a machinegun a trigger device operating on these principles in 1975. Hearing Trans. 54:19-21. ATF subsequently

---

[2] *National Association of Gun Rights, Inc., et al., v. Merrick Garland, et al.,* 4:23-vc-00830, Opinion and Order, October 7, 2023, p. 43 (carving out Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, or any of their agents, officers, and employees).
[3] Stephen Montemayor, *Modern-Day Machineguns*, Star Tribune, October 18, 2023, www.startribune.com/guns-switches-turning-more-firearms-into-automatic/600312536.

classified as machineguns devices materially similar to the FRT-15 and WOT in 1994, 2004, 2005, 2006, and 2017.  *See, e.g.*, *Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770, at *10 (E.D.N.Y. Sept. 5, 2023) (discussing 2006 classification of a device submitted by Hunter Kinetic Innovations).   In total, ATF has classified approximately 17 similar, distinct devices as machineguns.  Examples of such classification letters are attached as Exhibits A – C to this declaration.[4]

13.     In addition, the AR-1, a predecessor device to the FRT-15, was classified by ATF as a machinegun in 2018.  *See* Dkt. No. 40-1 at ATF0081-106.  The AR-1 machinegun classification was known to RBT and its experts before the FRT-15 was marketed and distributed to the public.  *See Rare Breed Triggers,* __ F. Supp. 3d __, 2023 WL 5689770, at *28 ("Having heard witness testimony about the AR-1's and FRT's development and classification, and having reviewed declarations and documentary evidence as to those devices' histories, the Court finds that (1) Defendants were aware of the AR-1 classification as a machinegun, (2) knew that the FRT had a functionally indistinguishable forced-reset trigger that would all but certainly lead the ATF to the same conclusion regarding its illegality, but (3) concealed that information from their customers in marketing the FRT-15 for sale from December 2020 onwards").

**RECENT PROLIFERATION OF FORCED RESET TRIGGERS**

14.     In April 2021, a website selling Rare Breed Triggers, model FRT-15, came to the attention of ATF's Internet Investigations Center.  Concerned that this was a machinegun, ATF purchased the model FRT-15 for examination by ATF's Firearms Technology Criminal Branch

---

[4] ATF has not classified all so-called forced reset trigger devices as machineguns.  One such device, the 3MR, was submitted to ATF for classification in 2013.  Importantly, this trigger system incorporated into its design a disconnector which prevents the weapon from continuing to fire until the shooter releases the trigger and initiates a subsequent firing sequence.  For this device, the shooter must release the trigger for the disconnect to reset, and then pull the trigger for the firearm to fire a subsequent round.

(FTCB). The examination revealed that the FRT-15 was a combination of parts, designed and intended for use in converting a weapon into a machinegun and, as such, was a machinegun. The device was marked with "Rare Breed Triggers U.S. Pat. 10514223," the same patent number of the AR-1 which ATF previously determined to be a machinegun. Based on the FTCB examination, ATF's Tampa Field Division issued a letter dated July 26, 2021, to RBT demanding it "[c]ease and desist all manufacture and transfer of the Rare Breed Trigger FRT-15."

15.     In issuing its preliminary injunction, the EDNY Court concluded that the government was likely to succeed in showing that RBT did not comply and instead proliferated an illicit market for these MCDs (the FRT-15, WOTs, and similar devices) through a conspiracy to defraud the United States and a scheme to defraud its customers. *See Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770 at *27, *46.

16.     As discussed above, ATF has long classified devices that operate like the FRT-15 and WOT as machineguns. As a result, such devices generally were not commercially available to the general public in the nearly fifty years since ATF first examined such a device.

17.     As the EDNY court explained, however, RBT began manufacturing and selling these devices to the public without seeking ATF's opinion with respect to the FRT-15, despite knowing that ATF had previously classified materially similar devices as machineguns, including the AR1 device on which the FRT-15 was based. *See Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770, at *28.

18.     Between approximately November 28, 2022, and January 16, 2023, the government has evidence that RBT shipped approximately 3,461 packages containing a suspected total of 7,700 WOTs to forty-seven states and U.S. territories. These packages represent only a fraction of the number of MCDs suspected to have been sold or distributed by RBT. It is estimated that RBT has

distributed at least 100,000 FRT-15s to almost every State, and it is known that RBT distributed FRT-15s to third-party sellers who distributed FRT-15s to every State.

19.     The WOT was distributed by a company called Wide Open Enterprises (WOE) which is associated with BDU.  It is not known by ATF how many WOTs were distributed by WOE and BDU, though between September 8, 2021, and March 21, 2022, WOE shipped packages to approximately 6,130 unique recipients.  BDU was also, for a period of time, the sole distributor of the FRT-15.  It is not known by ATF how many FRT-15s were distributed by BDU.  It is also not known by ATF if WOE is continuing to distribute WOTs.  While certain sellers may distribute these devices overtly, ATF has determined that some on-line sellers may do so in a manner intended to evade detection by law enforcement.  Further, even where a seller does so overtly, it may not be readily determinable how many such MCDs are available for distribution; whether the devices constitute a finite stock; or whether the seller is capable of replenishment.  ATF is aware for instance, that RBT continues to possess several thousand WOTs at locations which it has thus far refused to disclose.

20.     To put the number of these devices distributed in perspective, the combined manufacture, importation, and distribution of the FRT-15 and the WOT from 2020 through 2023 likely exceeds the number of all lawfully manufactured and imported machineguns in that same period.  For example, in 2020, only 16,161 machineguns were manufactured domestically by federally licensed firearms manufacturers, and only 3,445 were lawfully imported into the United States.[5]  Indeed, excluding those registered to law enforcement agencies, there are less than 40,000 lawfully registered pre-1986 machineguns in the United States in total.  Unlike those lawfully registered machineguns, FRT-15s and WOTs are not registered, their transfer and current

---

[5] *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume One*, Part 1, p. 26-27, App'x 1, p. 196, May 5, 2022.

possession cannot be tracked, and these devices are sold without background checks or identity verification.

21.     Other third-party sellers have also distributed the FRT-15 and the WOT.  In fact, these devices are currently advertised on the secondary online marketplace.  Indeed, a large portion of RBT's customer base was its dealer network to whom RBT sold the FRT-15s for the purpose of resale.  This spawned a secondary market for the FRT-15, WOT, and similar devices, which the preliminary injunction envisions continuing as to individuals or companies covered by the injunction.  Further, other companies developed copycat devices that function in the same way as the FRT-15 and WOT.   It is not known by ATF how many such devices are in the marketplace, what their market share is, or whether those entities are covered by the injunction.  However, it is known that these devices are distributed without background checks, recordkeeping, registration, or identity verification common with firearms, which enables acquisition by persons prohibited under 18 U.S.C. § 922(g) or relevant state law.

**THE FRT-15 AND WOT ARE SUBJECT TO ACTIVE RETRIEVAL EFFORTS**

22.     When machineguns are improperly distributed to the public, ATF must take steps to actively retrieve the devices, or encourage and solicit the voluntary destruction or abandonment of the devices.  This is done to protect the public, to protect law enforcement, and to mitigate the risk of unlawful possession by an unaware or misinformed recipient.  This final consideration is especially important here, where the EDNY Court found it likely that RBT committed fraud by telling customers that the FRT-15 was a lawful product.

23.     The devices sold by RBT, WOE/BDU, and a third-party seller are the subject of an active retrieval effort by ATF, which is being coordinated by the ATF Tampa Field Division.  They have been the subject of prior retrieval efforts of other third-party sellers as well.  The current

retrieval efforts are directed towards approximately 8,849 unique purchasers who represent only a fraction of the recipients of such devices.

24.    Retrievals are prioritized based on multiple factors, including, but not limited to, whether the recipient's criminal history requires heightened review, or the person has received multiple devices indicative of further re-selling or trafficking.  Retrievals are resource intensive. ATF must individually assess each recipient to determine the individual's criminal history or association with criminal activity.  This is necessary both to prioritize the retrievals based on public safety, as well as to ensure appropriate levels of officer safety for ATF personnel and our law enforcement partners.   ATF estimates that each individual retrieval requires a combined expenditure of 16 to 24 man-hours, split between intelligence professionals engaged in analysis, and Special Agents engaged in the retrieval and associated investigatory work.  ATF has expended thousands of man hours on these retrieval efforts nationally.

25.    Retrieval difficulty is compounded by several factors.  First, the volume of retrievals—which continue to represent only a fraction of the FRT-15s and WOTs in the marketplace—makes the process further resource intensive.  Second, the FRT-15 and WOT are readily moveable and easily distributed illicitly.  Transfers and re-transfers make the retrieval process exponentially more difficult because Agents are left to attempt to ascertain the ultimate recipient through chains of subsequent distributions, which, as noted, are generally conducted without records.  These chains of distribution—applicable equally to resellers and in more limited circumstances end-customers—require further analysis of subsequent recipients, where they can be identified, to further assess and prioritize the retrieval process.  Third, ATF is a very small Federal agency, with approximately 2,600 ATF Special Agents nationwide.  ATF's primary mission is to investigate the most violent firearms offenders and investigate interstate and

international firearms trafficking.  Hundreds of thousands of firearms are recovered and traced in the United States each year, any one of which is the potential source or part of a federal investigation.  Engaging in retrievals—a necessary law enforcement function—nonetheless saps resources away from ATF to focus on the core mission of investigating and disrupting violent crime.

26.     Because of the logistical hurdles in conducting retrievals, as explained above, ATF conducts them sparingly, but two factors warrant such action here, the danger to the public of these rapid-fire devices and the fact that machineguns are illegal to possess in all situations.  Unlike other NFA firearms and GCA firearms, there is no way or manner in which to legally possess them.

27.     The preliminary injunction here compounds these difficulties.  As discussed, any retrieval of these devices is extremely time-consuming and complex.  The injunction specifically contemplates further sale and distribution of these devices during the pendency of this litigation— including sales to individuals who are not members of the plaintiff associations.  Each subsequent sale of a device currently held by a distributor would increase the number of such devices that must be retrieved from members of the general public if ATF's longstanding treatment of these devices as machineguns is ultimately upheld.  Each transfer of these devices also makes it more difficult and time-consuming to undertake a retrieval and increases the likelihood that the device will never be recovered if ATF ultimately prevails, because these devices are bought, sold, and distributed outside of the background check and registration requirements generally applicable to firearms.  Indeed, there has already been a YouTube video posted encouraging people to buy and sell the FRT-15 and to those who have turned in these devices during the recall to demand them

back        from        ATF.           See        https://youtu.be/IeUWgzkTxo8?feature=shared (https://youtu.be/IeUWgzkTxo8?feature=shared).

28.    Retrievals of these devices can also be particularly dangerous to law enforcement because ATF prioritizes retrievals from individuals who meet certain risk factors.   These individuals are likely to be armed, and sometimes may be dangerous.  Threats to law enforcement associated with the retrieval of FRT-15s or WOTs have already been documented.   Declaration of ATF Special Agent Cheryl Harrell, *United States v. Rare Breed Triggers, LLC, et al.*, E.D.N.Y 23-cv-369 (ECF No. 56, Exhibit C).

29.    The fact that the RBT Parties are not covered by the injunction does not ameliorate this risk.  Third parties sell these and similar devices.  As of the date of this declaration, there are FRTs (specifically the WOT) for sale on the secondary market from non-manufacturing vendors. A quick internet search revealed numerous sale listings from various sites for the RBT and similar devices. These are marketed on numerous platforms to include traditional vendor websites and do not require much to complete a purchase and have shipped to your location.

30.    In addition, manufacturing of these devices may increase as a result of the injunction here, putting further strain on retrieval efforts and increasing risks to the public even if ATF's view is ultimately upheld.  It is difficult to quantify the numbers of these devices currently being manufactured or imported because ATF's longstanding classification of these devices as machineguns, its retrieval efforts, and the civil lawsuit brought against Rare Breed Trigger in the Eastern District of New York may make manufacturers unlikely to do so overtly.  But insofar as the Court's injunction specifically contemplates that manufacturing of these devices by members of the associations at the time the injunction issued would be permissible, there is a serious prospect that such manufacturing will occur.

31.     ATF would not generally be informed about such manufacturing or distribution, but this prospect is not hypothetical.  After this court's injunction, for example, ATF was contacted by an attorney representing the subject of a previous cease-and-desist letter related to the distribution of the FRT-15, who acquired the devices from RBT for the purpose of further distribution.  The attorney advised ATF that the subject individual intended to resume distribution of the WOT and intended to manufacture the FRT-15 with the authorization of RBT.  The subject individual is a convicted felon prohibited under 18 U.S.C. § 922(g)(1).  Counsel for this individual subsequently advised that the individual does not intend to distribute WOTs or manufacture FRT-15s, but this exchange highlights the inherent risk that additional devices will be manufactured and distributed under the court's injunction.

### THESE DEVICES POSE A RISK TO THE PUBLIC AND LAW ENFORCEMENT

32.     The continued availability of these devices puts the public at risk.  ATF has identified the FRT-15 and WOT being used in or associated with criminal activity.  This is particularly alarming because an AR-type firearm equipped with an FRT-15 or WOT is capable of maintaining a rate of fire similar to the rate of fire of a commercially manufactured M16 machinegun.   For instance, in ATF testing, a commercially manufactured M16-type M-4 machinegun had an average rate of fire of 870.4 rounds per minute, while an AR-15 semi-automatic firearm converted with a WOT had an average rate of fire of 933 rounds per minute. Importantly, both the FRT-15 and WOT allow a shooter to maintain this rate of fire irrespective of the shooter's training, skill, or stamina.

33.     The precise number of incidents of firearms recovered and found to be equipped with an FRT-15, WOT, or similar device is likely underreported.  The inclusion of such a device would not ordinarily be captured during the firearms tracing process, and many state and local law

enforcement agencies may not be well-informed to ascertain whether a recovered AR-type firearm has been retrofitted with a drop-in trigger device such as the FRT-15 or WOT. Many of these triggers can be installed on AR-type rifles without any visible modification to the firearm. Even when such devices are identified, the law enforcement agency may not capture that information in a way in which the true scope of recoveries can be properly assessed by ATF.

34.    ATF has nevertheless encountered such devices in numerous criminal settings. For example, in the Tampa Field Division, I am aware that in July of 2021, an eight-time convicted felon on state probation was found, during the execution of a federal search warrant, to be in possession of 22 firearms, including 15 ghost guns and a non-serialized and unregistered short-barreled rifle, 2,000 rounds of ammunition, narcotics, and drug paraphernalia. The short-barreled rifle was equipped with an FRT-15. Similarly, in January 2023, ATF Special Agents assigned to the Charlotte Field Division recovered an AR-type firearm equipped with a WOT during the execution of a federal search warrant as part of an investigation into an armed narcotics trafficker. Through ballistic evidence, this AR-type firearm was determined to have been involved in seven separate shootings, including a drive-by shooting targeting a home and a shooting directed at an unmarked police vehicle. While it cannot be confirmed that the WOT was equipped in the firearm at the time of the shootings, a witness to one of the shootings reported hearing automatic gun fire, and the number of .223 and .556 shell casings recovered during some of the shootings was indicative of someone firing an automatic weapon, including seventy casings at one shooting and forty-two at another. In another drive-by shooting involving the same firearm, audio of the shooting demonstrated that the shooter fired 14 shots in less than two seconds.

35.    From January of 2021 through October, 23, 2023, the ATF Firearms and Ammunition Technology Division conducted approximately seventy-one criminal examinations

of these types of devices as a part of multiple criminal cases, involving a variety of criminal conduct. For instance, aside from examinations directly related to the manufacture or importation of the FRT-15 or WOT (there have been approximately seven (7) such examinations) and similar devices, these devices and similar devices have been examined in connection with dozens of investigations related to National Firearms Act violations (apart from possession of an FRT-15 or WOT), firearms trafficking, illegal firearms manufacturing (apart from the manufacture or importation of an FRT-15 or WOT), narcotics trafficking, gang investigations, possession of firearms by felons and other prohibited individuals, at least one shooting (involving the suspected illicit discharge of 60 rounds of ammunition), and other criminal activity.

36.     There is additional evidence that these devices are being acquired by individuals who are prohibited from receiving or possessing firearms under 18 U.S.C. § 922(g). ATF has initially determined that RBT, between approximately November 28, 2022, and January 16, 2023, shipped WOTs to approximately 13 such individuals. WOE and BDU, between approximately September 8, 2021, and March 21, 2022, shipped WOTs to at least 45 such individuals. The third-party seller distributed FRT-15s to at least five such individuals between approximately March 17, 2021 through August 22, 2021. Because of the secondary market and other third-party sellers, and because ATF has assessed only a limited number of sales by RBT and WOR/BDU, it is highly likely that this represents only a small portion of the individuals prohibited under 18 U.S.C. § 922(g) that have an FRT-15 or WOT. Although the Court excluded from its preliminary injunction individuals prohibited under 18 U.S.C. § 922(g), these devices are sold without background checks or identity verification. Accordingly, the continued distribution of the FRT-15 and WOT will invariably result in their acquisition by these very individuals, as we have already seen. The continued distribution of these devices will also result in harm to the public because individuals

intent on using them to facilitate criminal activity will similarly be able to easily acquire them, and ATF will have limited ability to disrupt or interdict the acquisition or distribution.

37.     FRT-15 and WOTs may be associated with other types of criminal activities outside of criminal use, possession, or domestic distribution.  For instance, because the FRT-15 and WOT are classified as machineguns under the NFA and GCA, they are subject to stringent importation restrictions under 26 U.S.C. § 5844 and 18 U.S.C. § 922(l).  The Arms Export Control Act (AECA), 22 U.S.C. § 2778, also requires an individual to obtain approval prior to the importation of a defense article as enumerated on the United States Munitions Import List (USMIL). The FRT-15 and WOT are Category 1 defense articles on the USMIL as a component and part of a firearm. *See* 27 C.F.R. Part 447.  It is believed that all WOTs were unlawfully imported from outside the United States.  Similarly, WOTs have been interdicted during at least one attempted illicit exportation.

38.     Additionally, there are ongoing prosecutions in which defendants have been indicted for their possession of the FRT-15, WOT, or both.  These include prosecutions in the Southern District of Texas, the District of Puerto Rico, and the District of Massachusetts.  Some of these defendants were charged with other criminal offenses, which underscores that that these devices are not being distributed solely to law-abiding citizens.

39.     The continued availability of these devices creates other risks to the public.  As stated earlier, a weapon with an FRT-15 or WOT fires 800 to 900 rounds per minute.  Also as stated earlier, it is not obvious by looking at a semi-automatic weapon equipped with an FRT-15 that such weapon will fire automatically, making them extremely dangerous for those who may acquire a firearm equipped with such trigger and may have no idea what they are possessing and have absolutely no skill or ability to handle a weapon with that rate of fire.

40.     In addition, as discussed, law enforcement and members of the public may not be aware that a recovered or possessed firearm is equipped with such a device.  This presents a risk to law enforcement officers who encounter firearms equipped with FRT-15 and WOT triggers and the general public who may not understand what they possess.

41.     More broadly, the threats to the public as a result of these devices are not theoretical.  There is a national, escalating trend of MCDs being used in the commission of violent crimes or being recovered from individuals and criminal organizations.  One national media outlet has reported that "[i]ncidents of machine gun fire have exploded by about 1,400% from 2019 through [2021]," with acoustic sensors in 130 U.S. cities detecting "roughly 5,600 incidents of automatic weapons fire" in 2021.[6]  Between 2017 and 2021, ATF recovered 5,454 MCDs, a 570% percent increase as compared to 2012-2016.[7]

42.     This trend continues.  ATF has determined that as of October 11, 2023, there has been an approximately 44% increase in the number of MCDs recovered by law enforcement as compared to recoveries of MCDs in 2022.  As of the same date, for 2023, the state with highest number of recoveries is Texas.  Further, during the same time-period, there has been an approximately 400% increase in firearm traces involving an MCD in which the trace was also associated with a crime of violence.  The crimes of violence involving MCDs include homicides, aggravated assaults, robberies, car jackings, and the murder of a police officer.

43.     The preliminary injunction will allow for the continued proliferation of these devices.  The risk of their illicit misuse will only increase, both as a result of their continued

---

[6] Scott Glaver and Curt Devine, *A Device that can Turn a Semi-Automatic Weapon into a Machine Gun in Moments is Wreaking Havoc on American Streets*, CNN, August 30, 2022, www.cnn.com/2022/08/30/us/automatic-machine-gun-fire-invs/index.html

[7] *National Firearms Commerce and Trafficking Assessment: Crime Guns – Volume Two, Part VII, p. 4*, January 11, 2023, www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-vii-recommendations (NFCTA Vol. 2).

distribution but also because of the prevention of law enforcement action to remove these devices from the marketplace.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on November 6th , 2023.

By: _____

Craig Saier
Assistant Director, OIO

17

# EXHIBIT A

NOV 1 4 1975

T:T:F:EMO



Dear

This refers to your letter of September 19, 1975, in which you
submitted, for classification under the Gun Control Act of 1968,
a United States Patent Application covering a modification to a
semiautomatic firearm which would permit bursts of automatic
fire which can be varied from one round per second to the
maximum cyclic rate of the particular weapon.

After study of your Patent Application we are in agreement with
your statement in the abstract of disclosure that the modification
permits semiautomatic and automatic operation. Further, we
agree with your statement contained in claim 4 of the application,
that while continuous finger pressure is maintained on the trigger
the weapon will fire continuously. Based on your statements and
an examination of the submitted Patent Application, a firearm
modified according to your design would be classified as a
machinegun as that term is defined in Section 5845(b), Chapter 53,
Title 26, United States Code. In order to manufacture or modify
a firearm utilizing your design feature, the appropriate special
occupational taxes and manufacturing fee would be required prior
to manufacturing the weapons for resale. If you intend to
manufacture or modify a firearm for your own use, a $200.00
making tax must be paid prior to the manufacture or modification
of a weapon.

We trust that the foregoing has been responsive to your inquiry.
If we can be of further assistance, please contact us.

Sincerely yours,

(Signed) Thurman W. Darr

A. Atley Peterson
Assistant Director.

cc: LEGAL
Mr. Keathley
Rep. ~~Gunde~~
Gude

Enclosure

cc: Regional Director
Mid-Atlantic

EMOwen:lse  10/28/75

| CODE | INITIATOR | REVIEWER | REVIEWER | REVIEWER | REVIEWER | REVIEWER | REVIEWER |
|------|-----------|----------|----------|----------|----------|----------|----------|
| | T:T:F | T:T:F | T:T | C | | CC | T |
| SUR-NAME | Owen | Framer | Darr | Keathley | Williams | Hong | Darr |
| DATE | 10/28/75 | 10/30/75 | 10/31 | 11-4-75 | 11-14-75 | 11/14/75 | 11/14/75 |

ATF FORM 92 (9-73)

CORRESPONDENCE APPROVAL AND CLEARANCE    DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS



Secretary of the Treasury
Washington D.C.                                    19 September 1975

Dear Sir,
   I have invented a new type of firearm described in this patent.
The Army has shown some serious interest in the concept, and it
would be very unwise to have extra copies of this document shipped
in the US Mail there for please have your agency make a deturmination
of the disposition of this concept (semi-automatic or machinegun)
and return the document to me.

   Make copies of only those passages and drawings needed for your
records.

   I will on request come to the offices in Washington D.C. and pick-up
the material with a letter of disposition.   The subject is very
important so please have your officers be most concise and site
referances if needed.

                                    Sincerely Yours.



Statement of
Robert J. Scroggie, Firearms Enforcement Officer
Bureau of Alcohol, Tobacco and Firearms
made at
Washington, D.C., on March 26, 1975

On February 20, 1975, ████████████ who gave his
address as ████
appeared in my office with a Valmet M62/S, 7.62X39mm caliber
weapon, identified by the Serial Number 147341.

At that time, ████████ requested that his firearm be
examined and classified under the provisions of the Gun Control Act
of 1968, stating that he had redesigned the lock system of this
semiautomatic civilian model of the Finnish Model 62 Assault Rifle.
He further stated that his redesign would permit the firearm to
achieve what he termed "quick-fire." A term meaning, as he explained,
that the trigger would be forced forward by the rearward movement
of the bolt during the extraction and ejection phases of the firing
cycle.

A preliminary physical examination of the firearm disclosed
that major modifications had been made to the lock mechanism and
lock well. The modifications are depicted in the accompanying
drawing, which were submitted by ████████

After my cursory examination was completed, I took the weapon
to the Northern Virginia Police Academy Firing Range on March 10,
1975. There I loaded the weapon with a magazine containing three
cartridges. I charged the weapon by retracting the bolt handle
and releasing it. The bolt ran forward stripping the top round
out of the magazine and chambering it. I then pulled the trigger
and the cartridge in the chamber and the two cartridges remaining
in the magazine were fired in a single burst. I reloaded the weapon
with a magazine containing three more cartridges, charged the weapon
and again fired a burst of three rounds.

On March 20, 1975, a meeting was held between Messrs. Dessler
and Wachter of the Office of the Chief Counsel and Messrs. Westenberger,
Scroggie and Owen of the Firearms Technology Branch, concerning the
status of this firearm. Mr. Dessler concluded that, if ████████

- 2 -

was not a person prohibited from possessing a firearm by Title
VII, it might be permissible for him to make application to make
and pay the $200.00 making tax and thereby register the firearm in
question. The final determination would only be made subsequent
to the results of Special Agent Gerlands investigation.

During the early afternoon of March 20, 1975, I received a
telephone call from ███████ He asked me if I had had a chance
to test his weapon. I told him I had, and that it was found that
his weapon was a machinegun. He answered that it was not intended to
be a machinegun and further, he was going to contact Representative
Gilbert Cude of Maryland and have the statutory definition of
machinegun changed. I told him that that was his perogative, however,
I would write him a letter confirming our findings. Later in the
afternoon, I received another call from ███████ He stated that
it was not necessary for me to write a letter to him as he did not
wish to embarrass the Bureau. I told him that it would not embarrass
this Bureau and that I would be happy to write the classification
letter.

On Monday, March 24, 1975, I was called to court in Baltimore,
Maryland. I returned to Washington on March 26, 1975, I found that
Special Agent Gerland had picked up the weapon and removed it from
the Bureau Headquarters before I had had an opportinity to complete my
examination.

Robert J. Scroggie
Firearms Enforcement Officer

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO & FIREARMS

## TRANSFER/RECEIPT OF PERSONAL PROPERTY

DATE PREPARED: 2/20/75
NO.

| ITEM NO. | LOC CODE | B/N CODE | BASIC NOMENCLATURE DESCRIPTION | SERIAL NUMBER | TYPE CODE | SIZE CODE | REP'L CODE | COMP YEAR | QUANT | UNIT COST Dollars | Cts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Valmet M62 semiautomatic rifle caliber 7.62X39mm | 147341 | | | | | 1 | | |
| | | | temporarily transferred to ATF Firearms Technology Branch for the purpose of test and evaluation | | | | | | | | |
| | | | received from: ██████████ | | | | | | | | |

| ORIGINAL DOCUMENT NO. | GOVERNMENT BILL OF LADING NO. | SHIPPED VIA | DATE SHIPPED |
|---|---|---|---|
| | | | |

☐ TRANSFER-(TRANSACTION CODES 50, 55)     ☐ LOAN ███

| OFFICE CODE | OFFICE DESCRIPTION | OFFICE CODE | OFFICE DESCRIPTION |
|---|---|---|---|
| FROM ████████████ | | TO: T.T.F: | Firearms Technology Branch |

| SIGNATURE OF LOSING/SHIPPING OFFICER | DATE | SIGNATURE OF GAINING/RECEIVING OFFICER | DATE |
|---|---|---|---|
| *(signature)* | 2/20/75 | Edward M. Owen Jr. | 2/20/75 |

ATF Form 86 (8-73)

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO & FIREARMS

## TRANSFER/RECEIPT OF PERSONAL PROPERTY

| DATE PREPARED | |
|---|---|
| NO. | . |

| ITEM NO. | LOC CODE | B/N CODE | BASIC NOMENCLATURE DESCRIPTION | SERIAL NUMBER | TYPE CODE | SIZE CODE | REP'L CODE | COMP YEAR | QUANT | UNIT COST Dollars | Cts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Valmet M62 semiautomatic rifle #147341 <br><br><br> for seizure | #147341 | | | | | 1 | | |

| ORIGINAL DOCUMENT NO. | GOVERNMENT BILL OF LADING NO. | SHIPPED VIA | DATE SHIPPED |
|---|---|---|---|
| | | | |

☒ TRANSFER–(TRANSACTION CODES 50, 55)   ☐ LOAN

| OFFICE CODE | OFFICE DESCRIPTION | OFFICE CODE | OFFICE DESCRIPTION |
|---|---|---|---|
| FROM: TTF | Firearms Technology Branch <br> Bureau Headquarters | TO: | Bureau of ATF    ( Washington D.C. <br> Falls Church, Va.  Field Office) |

| SIGNATURE OF LOSING/SHIPPING OFFICER | DATE | SIGNATURE OF GAINING/RECEIVING OFFICER | DATE |
|---|---|---|---|
| *Edward M. Owen*  Edward M. Owen  Firearms Enforcement Officer | 3/24/75 | *W.F.X. Perlau  Spl. Agent* | 3/24/75 |

ATF Form 86 (8-73)

Dept of the Treasury
Bureau of Alcohol, Tobacco and Firearms
Washington, D.C.
20226

Dear Sir.
   I have a rifle system which fires once for each

time the trigger is pulled.    However, many persons

do not fully understand that this is a single funtion

of the trigger for each bullet fires.   Please,

give me a letter pertaining to the rapid-fire

system as applied to the m62 Valmet rifle.


                 Thank You

                 Sincerely Yours

1/3

Contrast of machinegun to rapid-fire system

TRIGGER:

Machinegun-the trigger is returned by a spring when the trigger is released.

Rapid fire-the trigger is returned each time the bolt comes to the rear.    The trigger is forced foreward by the action of the camming surface on the bolt carrier strikeing the surface of a plate: this movement is carried downwards to the trigger forceing it foreward into an engaged position.

Damper:

Machinegun- the hammer damper is used every time the system fires more than one round in a burst to retard the fall of the hammer until the bolt is closed. 

Rapid fire- the trigger damper is used only to prevent the trigger form being pulled untill the bolt is safely closed.    After the bolt is closed the trigger may be pulled again.

Note 1.   No removal of parts can cause the system to opperate automatically.
Note 2.   No addition of automatic trigger sear can cause the system to opperate automatically.
Note 3.   No addition of automatic disconnector (hammer damper) can cause the system to opperate in an automatically.    The addition of a the standard AK-47 hammer damper would bend the pin and jam the system so that it would have to be disassembled by cutting.    This is to discourage the missuse of the system!

2/3



RAPID-FIRE RIFLE SYSTEM

Figure 62.   Position of parts with operating rod in extreme rear position, and the striker plate forceing the trigger foreward so that the disconnector disengages.
1 - hammer; 2 - bolt, 3 - firing pin; 4 - operating rod; 5 - return spring; 6 - gas piston; 7 - gas cylinder; 8 - magazine; 9 - magazine catch; 10 - trigger damper; 11 - trigger and hammer spring; 12 - trigger; 13 - rounds. 14-striker plate; 15-disconnector.

Dear Sir.

The reason I backed out of the court case ~~at~~ are:

1  The treasury had me set up so if I lost the appeal I would be held for trial by the court.

2  This operation relieved the ATF of liability for the arrest.

3  The judge does not have to accept the common use of English in court.

4  The treasury could judge shop.

RECEIVED
ATF.

SEP 23 1975

TECHNICAL SERVICES DIVISION

# EXHIBIT B



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

LE:F:TE:RLB
3311.4

**APR 2 6 1994**



Dear ▮▮▮▮▮▮▮

This refers to your letter of April 12, 1994, in which you request that we reconsider our recent determination on a certain trigger attachment device which you submitted for classification.

As defined in Title 26 United States Code (U.S.C.), Chapter 53, Section 5845(b), of the National Firearms Act (NFA), the term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

The sample device which you submitted was examined by technicians, which are assigned to this office. It was determined that the device is powered by the firearm's operating rod or handle and it incorporates a design which substitutes the trigger (i.e. trigger shoe) of the device for the trigger of the weapon. The sample device was attached to a Ruger, Mini-14, semiautomatic rifle, which when test fired, was capable of firing automatically more than one shot by a single function of the trigger. This condition was consistently reproduced.

As a result of the test firing conducted and because of the design of the device, it is determined and affirmed that the sample device is a combination of parts which are designed and intended for use in converting a weapon into a machinegun; therefore, it is a "machinegun" as that term is defined above.

-2-

In the second-half of your letter you request
information necessary for you to obtain a license which
would allow you to manufacture weapons which are
subject to the NFA.  For information regarding the
appropriate licensing, you will need to contact the
following office:

> Bureau of Alcohol, Tobacco and Firearms
> Firearms and Explosive Licensing Center
> Post Office Box 2994
> Atlanta, Georgia  30301

For additional information concerning NFA requirements,
contact the following office:

> Bureau of Alcohol, Tobacco and Firearms
> Chief, NFA Branch, Room 5300
> 650 Massachusetts Avenue, NW.
> Washington, DC  20226

ATF F Form 7 and Form 5630.7 are enclosed for your
convenience.

The sample device which you previously submitted will
continue to be retained by this office pending your
decision as to its disposition.

We regret that we are unable to respond more favorably
at the present time.  If you have further questions
concerning this matter, please contact us.

> Sincerely yours,

> Edward M. Owen, Jr.
> Chief, Firearms Technology Branch

Enclosures

4-404   RLB

April 12, 1994


Mr. Edward M. Owen, Jr.
Department of the Treasury
Bureau of Alcohol, Tobacco and Firearms
650 Massachusetts Avenue, NW
Washington DC  20226


Dear Mr. Owen:

This is in response to your letter of April 4, 1994, that
provided NFA classification action I requested on a sub-
mitted trigger device.  Your letter advised that in your
opinion the device submitted is a NFA machine gun.  The
sole reason stated for that decision was; "Test firing
disclosed that when the sample device was attached, the
ATF test weapon would fire a two-shot burst, without
manual reloading, by a single function of the trigger."
Because the device was primarily designed to not do
what you describe as having occurred, I would like for
you to reconsider the classification or at least your
stated basis.

To elaborate I offer the following rational:  I can
easily understand how you might have reached your conclu-
sion.  I designed this device to allow (but not cause) a
person to fire a semi-automatic weapon very rapidly.  It
truly mimics the effect of a machine gun but, I believe,
not its function.  Being somewhat familiar with the stat-
utory machine gun definition, I carefully tried to ensure
it could not be classified as one.  The operating princi-
ple of this device is probably very different than any
you may have encountered before, and it is also the basis
for my pending patent application.

In operation, as I described in my submission letter
attachment, the sole function of the device is to return
the trigger finger forward to the ready to fire position,
and to restrain the trigger finger in that position until
such time that the weapons action is closed and locked.
At this time in the firing cycle the trigger will be in
its full forward position, and the mechanism will unres-
train the trigger bar/shoe.  The trigger may now be pull-
ed to the rear by manual operation to fire the weapon.
There must be a manual rearward pull exerted on the trigger
to fire each and every shot, and without it none will be
fired.

The function of the weapon is identical with or without
the device attached.  Physical manipulation of the attach-
ed device, as I described in my submission letter attach-
ment, can substantiate what I have described here.  The
device is merely a "gate" or "timing mechanism" that
allows the trigger to be operated, only after the earliest
moment that such action can fire the weapon.  When the de-
vice is operating it does no more than to prevent the op-
erator from pulling the trigger when it would not fire
the weapon.  Single shots may still be fired.  From this
description you can see why I must take exception to your
description of a two-shot burst with a single function
of the trigger.  It would be virtually impossible for any
person to hold the trigger in the rearward position.  If
it was done, the gun would cease to fire until the spent
casing would be ejected and a new round chambered.

The device does allow rapid semi-automatic firing that
could theoretically approach automatic rates of fire.
So does the approved "Hellfire" device, and several
others.  In any event, a high speed camera would demon-
strate a distinctly separate manual trigger pull must,
and does, precede each and every firing of the weapon,
(as it does in any normal semi-automatic weapon).  I do
appreciate that there is a great emotionalism surrounding
firearms at this time, but as I understand the statutes
there is no reference to a maximum allowable rate of fire.

I would like to hold in abeyance my decision regarding
disposition of the submitted sample device for the time
being.  I will, however, respond in plenty of time to
avoid causing your office to begin forfeiture proceedings
as you advised in your letter.

At your earliest convenience, please forward the forms
necessary for me to obtain a NFA firearms (and other
firearms) manufacturing license, along with whatever other
pertinent information that may be available.

At the time I received your letter of classification I
possessed two operable prototypes, and some miscellaneous
components that did not function.  For your information;
I have cut the two protypes, rendering them unusable for
any purpose.  They could only be made to operate if recon-
structed by welding, and if the dimensions necessary are
known.  No functional assemblies can be created from the
remaining components, because they never did work.

Please consider this request for classification reconsid-
eration of the submitted sample.  If you still consider
the device to be a machine gun by statute, I would like
to enter into some discussion with you on how I might
redesign this device to obtain non-NFA classification.

Thank you very much for your attention and responsiveness to my requests. Please advise me if I can be of any help in this matter. I will certainly comply with any direction you may provide, to assure I do not violate any laws. If I may, I will continue to seek your guidance in the future.

Sincerely,

# EXHIBIT C



Bureau of Alcohol, Tobacco,
Firearms and Explosives

Martinsburg, WV   25401
www.atf.gov

903050:MCP
3311/2006-578

**APR 2 7 2006**



Dear

This refers to your correspondence, including accompanying illustrations, and to a firearm
sample, which were submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives
(ATF), Firearms Technology Branch (FTB), and received March 30, 2006.

You submitted the firearm sample to us on behalf of                    Hunter Kinetic
Innovations in Buckley, Washington.

Specifically,           has requested a classification of a submitted Ruger, Model 10/22, .22
caliber semiautomatic rifle, serial number 121-56665, with installed Hunter Kinetic Innovations
trigger device. This is the second submission of this particular firearm and device. Because FTB
could not render a determination regarding the classification of the submission during the initial
examination in 2005 due to the firearm's malfunctioning, it was returned to            in
Aloha, Oregon.

The currently submitted firearm is a Ruger 10/22 semiautomatic rifle with a newly design firing
mechanism. The firing mechanism is designed to function as follows, when the trigger is pulled:

- The hammer falls, thereby firing a shot.
- The hammer is recocked when the bolt comes to the rear.
- The trigger is forced (rotated) to the cocked (forward) position when the bolt comes to
  the rear; this is accomplished when the bolt actually contacts and pushes down on the top
  of the trigger.
- When the bolt travels forward, it contacts the trigger stop.
- The forward pressure of the bolt against the trigger stop pushes the latter forward, thereby
  unlocking the trigger.
- The continuous steady pressure on the trigger from the trigger pull causes the trigger to
  travel rearward and release the cocked hammer, causing a continuation of firing.
- When the firing finger is physically removed from the trigger, the weapon ceases firing.
  If the steady pressure of the trigger pull is not released, the weapon will continue to fire
  until the magazine is empty or a malfunction occurs.

-2-

As defined in the National Firearms Act (NFA), 26 U.S.C. Section 5845(b), the term "machinegun" means—

*...any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*

Our Branch test fired your submitted firearm with a variety of .22 long rifle caliber ammunition and found that it functioned consistently with CCI Stinger brand ammunition.

Based upon a careful review of your submitted sample and plans, including illustrations, FTB has determined that the submitted firearm is a "machinegun," being capable of firing automatically with a single function of the trigger.

Specifically, the trigger device, being a combination of parts designed and intended for use in converting a Ruger 10/22 semiautomatic rifle into a machinegun, is a "machinegun" as defined in 26 U.S.C. 5845(b).

Our Branch reached this finding because it is evident that from the moment of the application of trigger pressure—and as long as rearward pressure is applied to the trigger—the firearm continues to fire until the firing finger is removed; this firing takes place regardless of the rearward bolt travel that pushes the trigger forward into the cocked position.

The shooter does not pull and release the trigger; therefore, FTB has determined this to be one single pull of the trigger which allows the rifle to continue to fire. Upon removing pressure on the trigger, the rifle ceases firing. Pressure is applied on the trigger and the rifle fires; unless the pressure from the trigger finger is removed, the rifle will continue to fire.

We have received your ATF Form 2, *Notice of Firearms Manufactured or Imported*, dated April 20, 2006, with regard to this particular firearm.

To facilitate return of the submitted sample, please provide our Branch with the appropriate billable FedEx or similar account number within 60 days of receipt of this letter.

-3-

We trust that the foregoing has been responsive to your request for an evaluation.

If we can be of any further assistance, please contact us.

Sincerely yours,

Sterling Nixon
Chief, Firearms Technology Branch

Enclosure

Enclosure 1



**U. S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

## Correspondence Approval and Clearance

903050:MCP
3311/2006-578



Dear █████████

This refers to your correspondence, including accompanying illustrations, and to a firearm sample, which were submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), and received March 30, 2006.

You submitted the firearm sample to us on behalf of ███████████████ Hunter Kinetic Innovations in Buckley, Washington.

Specifically, Mr. ██████ has requested a classification of a submitted Ruger, Model 10/22, .22 caliber semiautomatic rifle, serial number 121-56665, with installed Hunter Kinetic Innovations trigger device. This is the second submission of this particular firearm and device. Because FTB could not render a determination regarding the classification of the submission during the initial examination in 2005 due to the firearm's malfunctioning, it was returned to ████████████ in Aloha, Oregon.

The currently submitted firearm is a Ruger 10/22 semiautomatic rifle with a newly design firing mechanism. The firing mechanism is designed to function as follows, when the trigger is pulled:

- The hammer falls, thereby firing a shot.
- The hammer is recocked when the bolt comes to the rear.
- The trigger is forced (rotated) to the cocked (forward) position when the bolt comes to the rear; this is accomplished when the bolt actually contacts and pushes down on the top of the trigger.
- When the bolt travels forward, it contacts the trigger stop.
- The forward pressure of the bolt against the trigger stop pushes the latter forward, thereby unlocking the trigger.
- The continuous steady pressure on the trigger from the trigger pull causes the trigger to travel rearward and release the cocked hammer, causing a continuation of firing.
- When the firing finger is physically removed from the trigger, the weapon ceases firing. If the steady pressure of the trigger pull is not released, the weapon will continue to fire until the magazine is empty or a malfunction occurs.

| Code | Initiator 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer | Reviewer | Reviewer |
|------|------------------|-----------------|-----------------|-----------------|----------|----------|----------|
| Surname | Powell | M/Mytt | Veove | Nyon | | | |
| Date | 4-24-06 | 4-24-06 | 4-26-06 | 4/26/06 | | | |

ATF Form 9310. 3A
Revised May 2004

U. S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Correspondence Approval and Clearance**

-2-



As defined in the National Firearms Act (NFA), 26 U.S.C. Section 5845(b), the term "machinegun" means—

*...any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, <u>any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun</u>, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*

Our Branch test fired your submitted firearm with a variety of .22 long rifle caliber ammunition and found that it functioned consistently with CCI Stinger brand ammunition.

Based upon a careful review of your submitted sample and plans, including illustrations, FTB has determined that the submitted firearm is a "machinegun," being capable of firing automatically with a single function of the trigger.

Specifically, the trigger device, being a combination of parts designed and intended for use in converting a Ruger 10/22 semiautomatic rifle into a machinegun, is a "machinegun" as defined in 26 U.S.C. 5845(b).

Our Branch reached this finding because it is evident that from the moment of the application of trigger pressure—and as long as rearward pressure is applied to the trigger—the firearm continues to fire until the firing finger is removed; this firing takes place regardless of the rearward bolt travel that pushes the trigger forward into the cocked position.

The shooter does not pull and release the trigger; therefore, FTB has determined this to be one single pull of the trigger which allows the rifle to continue to fire. Upon removing pressure on the trigger, the rifle ceases firing. Pressure is applied on the trigger and the rifle fires; unless the pressure from the trigger finger is removed, the rifle will continue to fire.

We have received your ATF Form 2, *Notice of Firearms Manufactured or Imported*, dated April 20, 2006, with regard to this particular firearm.

To facilitate return of the submitted sample, please provide our Branch with the appropriate billable FedEx or similar account number within 60 days of receipt of this letter.

| Code | Initiator | Reviewer | Reviewer | Reviewer | Reviewer | Reviewer | Reviewer |
|---|---|---|---|---|---|---|---|
| | 903050 | 903050 | 903050 | 903050 | | | |
| Surname | | | | | | | |
| Date | | | | | | | |

ATF Form 9310. 3A
Revised May 2004

U. S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

## Correspondence Approval and Clearance

-3-

███████████

We trust that the foregoing has been responsive to your request for an evaluation.

If we can be of any further assistance, please contact us.

Sincerely yours,

Sterling Nixon
Chief, Firearms Technology Branch

Enclosure

| Code | Initiator | Reviewer | Reviewer | Reviewer | Reviewer | Reviewer | Reviewer |
|------|-----------|----------|----------|----------|----------|----------|----------|
| | 903050 | 903050 | 903050 | 903050 | | | |
| Surname | | | | | | | |
| Date | | | | | | | |

ATF Form 9310. 3A
Revised May 2004

*U.S. Government Printing Office: 2005—310-388/92303