IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,<br><br>  Defendants. | Case No. 4:23-cv-00830-O |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY
PRELIMINARY INJUNCTION PENDING APPEAL**

Defendants respectfully request that the Court stay its October 7, 2023 Opinion & Order granting Plaintiffs' Motion for Preliminary Injunction, ECF No. 53 ("Order"), pending Defendants' appeal of that order, *see* ECF No. 63 (Notice of Appeal). Defendants face irreparable harm with each day that the injunction, which disrupts the status quo by reversing decades of ATF classification decisions determining that devices that function similarly to FRT-15s and WOTs are machineguns, remains in effect. The injunction has expanded the market for these particular forced reset triggers ("FRTs") and will continue to do so. Moreover, ATF has no means to track the manufacturing, sales, and transfers of FRTs that are occurring, let alone whether those involved in these actions are covered by the Preliminary Injunction. If ATF is ultimately successful in this litigation, it will never be able to fully locate and retrieve these thousands of devices or prevent them from being used in the commission of violent crimes, and it will be forced to dedicate thousands of man-hours in attempting to mitigate these harms. These irreparable and ongoing injuries to the Government and public

1

outweigh any risk of injury to Plaintiffs if a stay is granted, and for the same reason, a stay is in the public interest. Moreover, Defendants have shown a likelihood of success on the merits, particularly given the court's determination in *United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770, at *15 (E.D.N.Y. Sept. 5, 2023), that the triggers at issue here are "highly likely" to be machineguns. Accordingly, this Court should exercise its discretion to temporarily stay the preliminary injunction during the pendency of Defendants' Fifth Circuit appeal. At a minimum, this Court should stay the parts of the injunction enjoining criminal enforcement proceedings and affording relief beyond named Plaintiffs and for conduct beyond mere possession of FRTs classified as machineguns.

## BACKGROUND

Plaintiffs filed this action on August 9, 2023. Five days later, Plaintiffs moved for a temporary restraining order enjoining Defendants from: initiating criminal or civil enforcement actions against the Individual Plaintiffs[1] based on their current or prior possession of forced reset triggers; seizing Individual Plaintiffs' FRTs; and requesting that Individual Plaintiffs voluntarily surrender FRTs. *See* ECF No. 17 at 1. While that motion was pending, Plaintiffs moved for a preliminary injunction seeking far broader relief enjoining Defendants from taking actions to enforce the FRT-15 classification decision against anyone. *See* ECF No. 34. This Court granted Plaintiff's motion for a temporary restraining order on August 30, 2023, enjoining Defendants from implementing or enforcing the ATF's definition of "machinegun" as against the Individual Plaintiffs. *See* ECF No. 36. On October 7, 2023, the Court preliminarily enjoined Defendants from undertaking enforcement actions related to a forced reset trigger device against "the Individual Plaintiffs and their immediate families," National Association for Gun Rights, Inc. ("NAGR"), Texas Gun Rights, Inc. ("TGR,"

---

[1] The Individual Plaintiffs are Patrick Carey, Travis Speegle, and James Wheeler.

2

and, together with NAGR, the "Associational Plaintiffs"), Associational Plaintiffs' members, "and the downstream customers of any commercial member of an [Associational] Plaintiff." Order at 42-43.

## ARGUMENT

In determining whether to grant a stay pending appeal, this Court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). Additionally, a stay pending appeal is appropriate where an injunction "is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project,* 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers); *see Heckler v. Lopez*, 463 U.S. 1328, 1330 (1983) (Rehnquist, J., in chambers); *see also Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (per curiam). Here, each of the relevant factors weighs heavily in favor of a stay of the injunction pending appellate review.

### 1. The Likelihood of Irreparable Harm to the Government and the Public Interest Favor a Stay

Defendants will suffer irreparable harm absent a stay of the preliminary injunction. For the same reason, a stay is in the public interest. *See Nken*, 556 U.S. at 435 (when the Government is a party, its interests and the public interest "merge"). The Court's preliminary injunction is sweeping in scope, covering an unknown number of unidentified Associational Plaintiff members and their "downstream customers" and broadly applying to any ATF conduct that "interfere[s with] the possession, sale, manufacture, transfer, or exchange of FRTs based on the claim that FRTs are machineguns." Op. 42-43. It also turns the status quo on its head, legalizing devices that ATF has, for decades, unequivocally deemed illegal machineguns. Indeed, ATF has classified devices that function similarly to the FRT-15 and WOT as machineguns as early as 1975, and ATF has consistently

maintained that position in classification decisions issued in 1994, 2004, 2005, 2006, and 2017. Ex. 1 ¶ 12 (Saier Declaration). Allowing—for the first time ever—potentially thousands of unknown individuals and entities to legally manufacture, possess, and distribute these FRTs has and will continue to irreversibly introduce an exceedingly dangerous weapon into public commerce.

It cannot be disputed that firearms equipped with FRT devices like the FRT-15 and WOT are extremely dangerous. An AR-type firearm equipped with an FRT-15 can fire at a rate comparable to an M16 machinegun—roughly 800 to 900 rounds per minute, irrespective of the shooter's skill—and often in an indiscriminate and uncontrolled fashion. *Id.* ¶¶ 11, 39. While crimes involving these types of FRTs are likely underreported, ATF has encountered these devices in numerous criminal settings. *Id.* ¶¶ 33-35. There is further evidence that FRT-15s are being distributed by manufacturers and third-party sellers to countless individuals prohibited from receiving or possessing firearms under 18 U.S.C. § 922(g). *Id.* ¶ 36. Even absent malintent, these devices present a unique risk of injury. Because they look like normal triggers, individuals and law enforcement may unknowingly acquire or recover a firearm that has an FRT-15 or WOT type device installed, presenting safety concerns to users who may not expect or be able to handle a weapon with a rapid rate of automatic fire. *Id.* ¶¶ 39-40.

Even before the Court's Order, ATF faced challenges in addressing the proliferation of these type of FRT devices in the U.S. marketplace. The unlawful manufacture, importation, and distribution of FRT-15 and WOT devices has been substantial. While ATF is unable to identify precise figures due to the illicit nature of the market, from 2020 through 2023, the number of unlawfully manufactured, imported, and distributed FRT machineguns likely exceeded the number of lawfully manufactured and imported machineguns. *Id.* ¶ 20. Critically, ATF has no effective means of tracking the manufacture, transfer, and possession of these types of devices. FRT-15s, and similar devices, are being unlawfully sold, including online, without any of the background checks, identity verification, registration, or recordkeeping required for sales of firearms. *Id.* ¶¶ 20-21. Subsequent transfers on

4

the secondary market make it more difficult, if not infeasible, for ATF agents to ascertain the ultimate recipient of such devices. *Id.* ¶¶ 19, 25. As a result, effectuating a single retrieval is massively resource intensive. Even for those devices that remain with the initial purchaser, retrieval is estimated to consume 16-to-24 ATF man-hours, *id.* ¶ 24, and presents real dangers to law enforcement officials who have faced threats in the course of doing so, *id.* ¶ 28.

The Preliminary Injunction will exponentially worsen the difficulties ATF already faces in enforcing its classification of the FRT-15 and WOT against those not covered by the Order and make it nearly impossible to recover FRT-15s and WOTs acquired under the Preliminary Injunction if ATF prevails in this litigation. First, by insulating Associational Plaintiffs' commercial members and their "downstream customers" from liability, Order at 45, the Court's injunction is anticipated to increase manufacturing of these types of FRT devices and thus the total number of FRT machinegun-conversion devices in circulation. *Id.* ¶ 30. As the Eastern District of New York court recognized in finding the Government would face significant hardships absent an injunction against Rare Breed Triggers, "thousands of illegal machineguns could be added to the current stockpile of FRT-15s scattered throughout the country." *Rare Breed Triggers, LLC*, 2023 WL 5689770, at *48.[2]

Second, by protecting, for the first time, the sale and transfer of FRT-15s and WOTs by Associational-Plaintiff members, *see* Order at 44-45, the Preliminary Injunction will facilitate more transfers of these devices, further obscuring the acquirers' identities from ATF and increasing the risk of illicit misuse, Ex. 1 ¶ 43. Some of these acquirers will be prohibited persons or otherwise not covered by the Preliminary Injunction. *Id.* ¶ 36. But given the lack of recordkeeping, registration, or

---

[2] While this Court excluded Rare Breed Triggers from the scope of its injunction, third-party sellers continue to distribute the FRT-15 and WOT, and other companies have developed "copy-cat" devices that function akin to them. Ex. 1 ¶ 21. These individuals and entities may claim they are covered by the Preliminary Injunction as members of Associational Plaintiffs, and ATF has no ability to independently verify such claims. *See* ECF No. 57 ¶¶ 4, 7 ("Notice of Compliance").

identity verification as well as ATF's inability to identify the Associational Plaintiffs' members, *see* ECF No. 57 ¶¶ 4, 7, ATF will have limited capability to interdict the acquisitions, *id.* ¶ 36.  Indeed, and by way of example, ATF would have no way to identify an FRT-15 or WOT purchaser who did not provide their true name (or any name) upon purchase and who paid in cash.  And, if ATF is ultimately successful in this action, these additional transfers (and re-transfers) will, at best, make recovery even more challenging and resource intensive with each passing day.  *See Rare Breed Triggers, LLC*, 2023 WL 5689770, at *48 (recognizing the Government would face hardship absent injunction because, if ultimately successful, "[t]he Government would then be required to use its finite resources to track these devices down at the expense of other priorities.").  At worst, the injunction will increase the number of FRT-15s and WOTs unlawfully in the public domain that ATF is unable to retrieve, and which may be used for unlawful ends with deadly consequences. *Id.* ¶¶ 27-28.

The irreparable harm to the Government and public interest are compelling here.  ATF has no ability to know how many new weapons are being introduced in the U.S. market with each passing day, who is acquiring them, and whether these manufacturers, sellers, and possessors are even covered by the Court's injunction.  Absent a stay, if ATF is ultimately successful in this litigation, the Preliminary Injunction will "have interfered with the Government's authority to regulate and confiscate FRT-15s" and similar devices, *Rare Breed Triggers,* 2023 WL 5689770, at *48, and effected "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Legalization Assistance Project,* 510 U.S. at 1305-06 (O'Connor, J., in chambers).  And that invasion would be permanent; simply put, this is not a cat that ATF can put back in the bag.

### 2. Plaintiffs Are Not Substantially Injured by a Stay

On the other hand, a stay pending appeal would not "substantially injure" Plaintiffs.  *Nken*, 556 U.S. at 426.  Notwithstanding this Court's conclusions in the Order, Defendants respectfully maintain that Plaintiffs have failed to identify any irreparable harm that is likely to occur absent a

preliminary injunction.  *See* ECF No. 39 at 15-18 (Defs.' Opp. to PI Mot.).  Plaintiffs lived with ATF's classification of the FRT-15 as a machinegun for two years before filing suit, and that classification is consistent with ATF's treatment of similar devices since the 1970s.  *See* Ex. 1 ¶ 12.  Even assuming Plaintiffs suffer any cognizable injury from ATF's classification, there is no substantial harm to Plaintiffs if the Court's injunction is stayed during the pendency of an appeal, and certainly no harm that would outweigh the irreparable injuries that the Government and public would otherwise suffer.  Individual Plaintiffs have already received repeated representations that ATF has no present plan to take enforcement actions against them, and that it would notify the Court in advance of doing so.  And, not a single Plaintiff, nor their thousands of members, has claimed to have ever actually suffered any civil or criminal enforcement action related to a device like the FRT-15 or WOT.  Furthermore, any temporary deprivation of rights would be minimal; Plaintiffs would at most be deprived of a trigger modification device.  They remain fully able (subject to other applicable laws) to continue to enjoy the use of their firearms.  Defendants therefore continue to assert that Plaintiffs failed to show any likelihood of ongoing or imminent harm, as is required to obtain preliminary injunctive relief, *see Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  But at a minimum, any harm to Plaintiffs cannot outweigh the harms to the government created by allowing the unfettered manufacture and transfer of these devices.  Accordingly, there is no reason to conclude that a stay of the injunction pending appeal will cause any substantial injury to Plaintiffs.

### 3.  Defendants Are Likely to Succeed on the Merits of their Appeal.

Defendants' appeal is likely to succeed on the merits.  While this Court concluded that FRTs like the FRT-15 and WOT are unlikely to fall within the statutory definition of machineguns, central to its decision was the Fifth Circuit's plurality opinion in *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (*en banc*), which this Court considered binding, *see* Order at 22-26.  The Supreme Court recently granted the Government's petition for certiorari in *Cargill*. *See Garland, et al. v. Cargill*, No. 22-976 (Nov. 3,

7

2023). And a New York federal court determined that "the Government has demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun," even in light of the *Cargill* plurality's opinion, *Rare Breed Triggers, LLC*, 2023 WL 5689770, at *15. Indeed, the Eastern District of New York court explained that *Cargill* "does not ultimately support the result [Rare Breed] seek[s] when applied to the FRT-15's trigger function" because "[n]ot only is *Cargill* distinguishable . . ., but its analysis of the distinctions between various firearm-modification devices in fact *provides further grounds to find that the FRT-15 is a machinegun*." *Id.* at *23 (emphasis added); *see also id.* at *24 ("[T]his Court respectfully disagrees that *Cargill's* interpretation of § 5845(b) as applied to non-mechanical bump stocks requires the same result as to the FRT-15. Indeed, . . . this Court concludes that much of the reasoning in *Cargill* warrants the opposite conclusion.").

Defendants respectfully submit that the Eastern District of New York reads the *Cargill* plurality correctly, establishing a likelihood of success on the merits pending appeal in this action. The *Cargill* plurality was explicit that its reasoning applied only to non-mechanical bump stocks—devices in which the shooter must both pull the trigger and push the weapon forward to repeatedly cycle the weapon's trigger against the shooter's stationary finger for each shot. 57 F.4th at 453-54. The plurality contrasted these devices with "mechanical" bump stocks like the Akins Accelerator, explaining that its analysis of the term "single function of the trigger" as applied to non-mechanical bump stocks "would not apply to the Akins Accelerator" because "a shooter using an Akins Accelerator need only pull the trigger once to activate the firing sequence" and the device then "maintained the bump fire of its own accord." *Id.* at 462 n.8. Mechanical bump stocks such as the Akins Accelerator resemble in function the FRTs at issue here: as with those devices, the shooter of an FRT-15 or WOT-equipped firearm need only "pull the trigger once to activate the firing sequence," which the device then "maintain[s] . . . of its own accord." *Id.*

This Court nonetheless held that the Akins Accelerator is distinguishable from FRTs like the

8

FRT-15 and WOT because the triggers on weapons equipped with the Akins Accelerator do not "perform the same mechanical function as any normal trigger by releasing the hammer prior to each shot." Order at 30. That is mistaken. As the *Cargill* plurality recognized, for every shot from a weapon equipped with an Akins Accelerator, the spring action of the device must force the weapon's trigger against the shooter's finger to release the hammer, *i.e.*, the firearm and trigger itself moves. *Cargill*, 57 F.4th at 454. Despite this fact, the *Cargill* plurality was clear that its analysis "would not apply to the Akins Accelerator." *Id.* at 462 n.8. Thus, FRTs like the FRT-15 cannot be distinguished from Akins Accelerators on the grounds the Court invoked, and are no less machineguns.[3]

### 4. At a Minimum, the Court Should Stay the Preliminary Injunction in Part.

Even if this Court declines to stay the preliminary injunction in its entirety, it should stay those parts of the injunction that prohibit criminal enforcement proceedings and afford relief beyond named Plaintiffs and for conduct beyond mere possession of FRTs classified as machineguns. Defendants are likely to succeed in showing on appeal that the Preliminary Injunction is substantially overbroad and must be narrowed to cover only the named Individual Plaintiffs and to apply only to civil enforcement, not criminal prosecution, for possession of unlawful FRTs.

1. The Constitution assigns to the Executive Branch the "exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). The Fifth Circuit has therefore long made clear that, as a matter of the "constitutional separation of powers," federal courts should not "interfere with the free exercise of the discretionary powers" of the Executive in initiating criminal prosecutions. *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) (en banc). Yet the Preliminary Injunction does just that, ordering the United States not to maintain

---

[3] *United States v. Camp* similarly recognized that the movement of the factory trigger back and forth for each shot fired does not preclude classification of a firearm as a machinegun so long as the weapon "required only one action—pulling the switch [defendant] installed—to fire multiple shots." 343 F.3d 743, 745 (5th Cir. 2003).

9

or initiate future criminal prosecutions based on treating FRT devices as machineguns. Plaintiffs have identified no sound basis for granting such extraordinary relief in this case. To the contrary, neither the APA nor principles of equity authorize a federal court to "restrain a criminal prosecution," *Younger v. Harris*, 401 U.S. 37, 43-44 (1971), based on a mere disagreement with the Executive's interpretation of a statute.

In any hypothetical future prosecution, a defendant could raise as a defense the argument that FRT-15s and WOTs are not machineguns, and the defendant would therefore have an "adequate remedy at law," foreclosing any anticipatory equitable relief like the Preliminary Injunction. *Id.*; *see also* ECF No. 34 at 6-7 (Defs.' Opp. to TRO Mot); ECF No. 39 at 20-22 (Defs.' Opp. to PI Mot.). This Court should refrain from usurping from sister courts the opportunity to hear and decide these defenses and the appropriateness of the criminal charges filed within their jurisdictions. *See W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985) (recognizing courts should "avoid rulings which may trench upon the authority of sister courts"); Ex. 1 ¶ 38 (noting ongoing criminal prosecutions outside the Northern District of Texas involving charges related to unlawful possession of FRT devices).

The remaining *Nken* factors also strongly favor such a stay of the parts of the Preliminary Injunction that prohibit criminal enforcement proceedings. The Government's criminal enforcement proceedings pertaining to FRT-15s and WOTs have mainly targeted those individuals charged with multiple other gun-related felonies. *See* ECF No. 39 at 14 (Defs.' Opp. to PI Mot.). Given their related criminal conduct and history, those individuals have been determined to pose the greatest threat to public safety. Ex. 1 ¶ 24. And because the Plaintiffs claim to be otherwise "law-abiding" gun owners, ECF No. 33 at 9 (Pls.' Reply in Supp. of Mot. for TRO), they cannot claim that they will suffer substantial injury if the injunction is stayed as to criminal enforcement proceedings.

2. The Preliminary Injunction should also be stayed insofar as it extends beyond the named

Plaintiffs and beyond possession to permit the continued manufacturing, distribution, and transfer of FRTs like the FRT-15 and WOT. As explained, these devices are sold without the background checks or recordkeeping ordinarily required of firearms, which will make it extremely difficult—if not impossible—for ATF to attempt to track down and retrieve these devices if ultimately successful in this litigation. These risks are particularly acute as to the Associational Plaintiffs' unknown members and downstream customers, as ATF cannot identify these thousands of individuals and entities or determine whether they pose public safety threats. Narrowing the injunction to the named Plaintiffs and to possession will strike a better balance between protecting Plaintiffs' alleged interest in accessing these devices while mitigating the irreparable harms that the Government and the public will face from the manufacture, distribution, and transfer of these devices while this litigation proceeds. *See* Order at 40 (describing the "status quo" the Court was preserving as "no prosecution for FRT possession or ownership by these Plaintiffs").

## CONCLUSION

For all these reasons, the Court should stay the preliminary injunction pending the Fifth Circuit's resolution of Defendants' appeal or, at a minimum, stay the preliminary injunction insofar as it enjoins criminal proceedings and affords relief beyond named Plaintiffs and for conduct beyond mere possession of FRTs classified as machineguns. Finally, in light of the significant harms to the Government, Defendants respectfully request that the Court issue an order on this Motion on or before November 16, 2023.

DATED: November 6, 2023                     Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            ALEX HAAS
                                            Branch Director

                                            BRIGHAM J. BOWEN
                                            Assistant Branch Director

                                            /s/ *Laura B. Bakst*
                                            LAURA B. BAKST
                                            MICHAEL P. CLENDENEN
                                            ALEXANDER W. RESAR
                                            Trial Attorneys
                                            Civil Division, Federal Programs Branch
                                            U.S. Department of Justice
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Phone:   (202) 514-3183
                                            E-mail:  laura.b.bakst@usdoj.gov

                                            *Counsel for Defendants*

**<u>Certificate of Service</u>**

On November 6, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>/s/ *Laura B. Bakst*</u>