IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, *et al.*, <br><br> Defendants. | Case No. 4:23-cv-00830-O |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**

The Court's Preliminary Injunction Order, absent a stay, will result in serious, irreparable harm to the public and Government. For nearly fifty years, ATF has regarded devices that operate like the devices here as machineguns, and such devices have never been treated as lawful. Under the injunction, however, unknown persons and entities will be permitted to lawfully manufacture, sell, transfer, and buy devices like FRT-15s and WOTs, which allow individuals to fire at the same rate as military-grade machineguns. Those unknown persons and entities do so without any recordkeeping, registration, identity verification, or background checks necessary to ensure that acquirers do not pose a threat to the public and that ATF has information such that it can retrieve these devices if ultimately successful in this litigation. And that possibility of success is likely, particularly because one other federal court has already concluded that the Fifth Circuit plurality decision this Court considered binding *supported* the conclusion that these devices are machineguns. For all these reasons, the Court should grant a stay of its Preliminary Injunction. But at a minimum, it should limit the scope of its

1

Order during the pendency of Defendants' appeal to enjoin only the Government's civil enforcement efforts to prohibit possession (rather than sale or manufacture) of FRT devices like the FRT-15 and WOT by the Individual Plaintiffs. Such a partial stay would mitigate the Order's infringement upon constitutional separation of powers, as well as the irreparable harms associated with unknown persons gaining untraceable access to these dangerous devices.

## ARGUMENT

### 1. The Likelihood of Irreparable Harm to the Government and the Public Interest Favor a Stay.

Plaintiffs argue that the Government and public face no irreparable harm where—for the first time ever—a conversion device that enables fire at roughly 800 to 900 rounds per minute is legally permitted to be manufactured, bought, and sold on the market without any recordkeeping, registration, or identity verification. ECF No. 64-1 at ¶¶ 20-21, 39 (Saier Decl.). This contention beggars belief. Plaintiffs largely seek to distract from reality by conflating arguments on irreparable harm with arguments about the merits and responding to claims made in briefing on the preliminary injunction motion rather than in this one. Notably absent from Plaintiffs' opposition is any attempt to meaningfully refute the substantial, irreversible dangers that the Government and public will increasingly face if the Court's Preliminary Injunction remains in effect during the pendency of Defendants' appeal, namely, that it is anticipated to increase: (1) manufacturing of FRT devices like the WOT and FRT-15, *id.* ¶ 30, (2) transfers of these devices without any recordkeeping, further obscuring the identities of FRT-owners from ATF and increasing the risk of illicit misuse, *id.* ¶¶ 27, 36, and (3) the number of FRT-15s and WOTs unlawfully in the public domain that will consume substantial ATF resources to retrieve—if they can be retrieved at all, *id.* ¶ 27.

Plaintiffs' primary response is that "any claimed harm to Defendants by virtue of this Court's preliminary injunction [is] immaterial under binding Fifth Circuit case law." ECF No. 69 at 5 (Pl. Opp'n. to Mot. for Stay) (hereinafter "Opp'n"). But the Supreme Court has made clear that irreparable

2

harm is a necessary consideration in adjudicating a stay motion: "Under that standard, a court considers four factors '. . . (2) whether the applicant will be irreparably injured absent a stay[.]'" *Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). Plaintiffs' belief that they are likely to succeed on the merits does not render consideration of irreparable harm irrelevant. As further described *infra* Section 3, Defendants disagree with this Court's preliminary merits conclusion, particularly given the Supreme Court's recent certiorari grant in *Cargill* and the Eastern District of New York's finding that the triggers at issue here are "highly likely" machineguns. *United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770, at *15 (E.D.N.Y. Sept. 5, 2023); *Garland, et al. v. Cargill*, No. 22-976 (Nov. 3, 2023). Under *Nken*, this Court neither may nor should ignore the possibility that, if Defendants are correct, the harms they will suffer absent a stay will be irreparable. The status quo will be irreversibly altered as machinegun conversion devices become irretrievably and untraceably available to the mass public.

To the extent Plaintiffs do attempt to refute the Government's claims of harms, Plaintiffs fundamentally misunderstand the dangers these weapons present and the reality of ATF's criminal enforcement capabilities. *First*, Plaintiffs argue that the Government failed to make a sufficient showing that devices like the FRT-15 and WOT are "uniquely dangerous" or "more dangerous than any other firearm." Opp'n at 6, 7 n.3. Plaintiffs cannot seriously suggest that weapons that operate for all practical purposes like unlawful military-grade machineguns, firing approximately 900 rounds per minute, are not more dangerous than other weapons. And as described in greater detail in Special Agent Saier's declaration, these devices are uniquely dangerous because (a) "an AR-type firearm equipped with an FRT-15 or WOT is capable of maintaining a rate of fire similar to the rate of fire of a commercially manufactured M16 machinegun" even "irrespective of the shooter's training, skill, or stamina" and "often in an indiscriminate and uncontrolled fashion," ECF No. 64-1 at ¶¶ 11, 32; (b) "[u]nlike those lawfully registered machineguns, FRT-15s and WOTs are not registered, their transfer

and current possession cannot be tracked, and these devices are sold without background checks or identity verification," *id.* ¶ 20; (c) this "enables acquisition by persons prohibited under 18 U.S.C. § 922(g) or relevant state law," *id.* ¶ 21; (d) ATF has "encountered such devices in numerous criminal settings," including as part of investigations into "seven separate shootings, including a drive-by shooting targeting a home and a shooting directed at an unmarked police vehicle," "firearms trafficking, illegal firearms manufacturing (apart from the manufacture or importation of an FRT-15 or WOT), narcotics trafficking, gang investigations, possession of firearms by felons and other prohibited individuals, . . . and other criminal activity," *id.* ¶¶ 34-35; and (e) because "it is not obvious by looking at a semi-automatic weapon equipped with an FRT-15 that such weapon will fire automatically, [they are] extremely dangerous for those who may acquire a firearm equipped with such trigger and may have no idea what they are possessing and have absolutely no skill or ability to handle a weapon with that rate of fire" as well as for "law enforcement officers who encounter firearms equipped with FRT-15 and WOT triggers and the general public who may not understand what they possess," *id.* ¶¶ 39-40.

*Second*, Plaintiffs are incorrect in suggesting that ATF itself does not believe these weapons are uniquely dangerous because Defendants have represented that they have no current intention of enforcing the classification decision against the Individual Plaintiffs in this case, and because they have historically focused their enforcement against large manufacturer and sellers. Opp'n at 5. As explained in the Saier Declaration, these enforcement priorities represent ATF's attempts to direct its limited resources at the most dangerous FRT-related activities. ATF is a "very small Federal agency" with only 2,600 Special Agents nationwide and a primary mission of investigating violent firearms offenders and firearms trafficking. *Id.* ¶ 25. ATF therefore must triage its enforcement activities related to FRT-15s and WOTs and has thus determined that the best use of its constrained resources is targeting those who meet certain risk factors, including those believed to be sellers or traffickers of these devices

4

and those with criminal histories that pose heightened dangers, *id.* ¶¶ 24, 28. So, while ATF could make non-enforcement representations to Individual Plaintiffs who do not appear to meet ATF's risk factors, ATF has no way of knowing whether the potentially thousands of unidentified members of Associational Plaintiffs, or the unknown, downstream customers of such members, are similarly "lower" risk. If the Preliminary Injunction remains in effect, these unknown persons and entities will have unprecedented access to FRT-15s and WOTs, and ATF will have no ability to identify or track their manufacturing, transfers, or purchases of these devices.

*Third*, Plaintiffs' suggestion that ATF could, if successful in this litigation, simply track down these devices and unknown owners by "ask[ing] those suspected owners if they have transferred or sold any FRTs and, if so, contact the person who purportedly acquired the FRT," Opp'n at 8, misunderstands the difficulties associated with retrievals. As an initial matter, many of these original owners are not known to ATF because there is no recordkeeping requirement. But even if the sellers were somehow identifiable, many will not know who the downstream purchasers are absent identity verification or tracking requirements, and others will simply refuse to share any information with ATF. These weapons will, at least in some circumstances, never be retrieved. Nor is Plaintiffs' suggestion an administratively feasible means of law enforcement. ATF does not have the manpower to identify and question the thousands of people in various FRT-15 and WOT chains-of-custody. *See id.* ¶¶ 24-25 (describing that even before the Court's Order "ATF has expended thousands of man hours on . . . retrieval efforts nationwide" and that ATF's resources are constrained). Rather, such a scenario would further strain ATF's limited resources and divert attention from ATF's core mission of addressing violent crime. *Id.* ¶ 25.

Finally, Plaintiffs' claims that FRT acquisitions by prohibited persons or criminals are not concerning because ATF could prosecute those individuals for other crimes misapprehends the risks presented by allowing the Preliminary Injunction to remain in effect. These dangerous individuals

may not be on ATF's radar until after they engage in a crime using an FRT-15 or WOT, at which point the damage is done. By creating a situation where these individuals can readily acquire machinegun conversion devices, *see id.* at ¶¶ 30, 36 (describing how the Preliminary Injunction is expected to increase manufacturing by entities who transfer these weapons to prohibited persons without background checks), the Preliminary Injunction will increase the chances that these weapons are used by dangerous persons to commit dangerous crimes.

ATF has clearly articulated irreparable harms that will increasingly present to the Government and public if the Court's Order remains in effect during Defendants' appeal. The Court should adopt the simplest, safest, and most efficient solution here and temporarily stay the Preliminary Injunction to avoid these irreparable harms in the first instance.

### 2. Plaintiffs Are Not Substantially Injured by a Stay.

As Defendants have explained, Plaintiffs have not shown any likelihood of ongoing or imminent harm, as is required to obtain preliminary injunctive relief, *see Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008), and in any event, any harm to Plaintiffs does not outweigh the harms to the Government created by allowing the unfettered manufacture and transfer of forced reset triggers like the FRT-15 and WOT, *see* ECF No. 64-2, at 6–7. Plaintiffs argue that the classification of FRTs as machineguns denies them "constitutional protected freedoms," Opp'n at 11, but nowhere have Plaintiffs asserted a constitutional right to own these devices, instead only arguing that the statutory prohibition on machineguns does not apply. And Plaintiffs again assert that their delay in seeking emergency relief can be excused due to a deprivation of "constitutionally protected freedoms," *id.* at

12 (alteration omitted), despite no constitutional issues being raised. Under these circumstances, a temporary stay of the injunction pending appeal will not cause any substantial injury to Plaintiffs.[1]

### 3. Defendants Are Likely to Succeed on the Merits of their Appeal.

Defendants are likely to succeed on the merits of the appeal because, as another federal court has already found, "it is highly likely . . . that the FRT-15 satisfies the statutory definition of a machinegun." *Rare Breed Triggers, LLC*, 2023 WL 5689770, at *15. Plaintiffs do not dispute that ATF has classified devices of this sort as machineguns since 1975. Plaintiffs continue to claim that this longstanding practice, as well as the *Rare Breed Triggers* decision from the only other federal court to examine FRTs, should be displaced entirely by *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), which addressed different devices (non-mechanical bump stocks). But there is no dispute of fact that non-mechanical bump stocks function differently from FRTs, as (again) another federal court already found. *See Rare Breed Triggers, LLC*, 2023 WL 5689770, at *15. Plaintiffs' claim that the plurality's opinion in *Cargill* "unambiguously defined what 'single function of the trigger' means" and is "controlling Fifth Circuit precedent" on the classification of FRTs, Opp'n at 3, is therefore wrong on the facts.

It is also wrong on the law. Even if the devices addressed in *Cargill* were comparable to the FRTs at issue here, *Cargill* was a fractured decision in which the aspects of the opinion on which Plaintiff relies to "unambiguously define[] . . . 'single function of the trigger'" failed to obtain a majority of the Fifth Circuit. The only portion of that opinion that garnered a majority was its application of the rule of lenity "to interpret the statute against imposing criminal liability." *Cargill*, 57 F.4th at 451; *see id.* at 449 n.*. That holding did not purport to "unambiguously define what 'single function of the

---

[1] Plaintiffs assert that Defendants have violated the Preliminary Injunction by contacting members of National Association for Gun Rights or Texas Gun Rights. ECF No. 69 at 10. Defendants have not taken any enforcement activity against known members of these groups, and Defendants respectfully refer the Court to their Notice of Compliance, ECF No. 57, for an explanation of steps taken to comply with the Preliminary Injunction.

trigger means.'"

In any event, Plaintiffs make no effort to reconcile their position with the *Cargill* plurality's unambiguous statement that its reasoning "would not apply" to mechanical bump stocks like the Akins Accelerator. *Id.* at 462 n.8. The plurality reached that conclusion even though—as Plaintiffs do not dispute—the trigger on a weapon equipped with an Akins Accelerator still must release the hammer for every shot fired. *Id.* at 454; *see Akins v. United States*, 312 F. App'x 198 (11th Cir. 2009) (per curiam) (affirming ATF determination that an Akins Accelerator is a machinegun). Thus, even the *Cargill* plurality's "analysis of the distinctions between various firearm-modification devices . . . provides further grounds to find that the FRT-15 is a machinegun." *Rare Breed Triggers, LLC*, 2023 WL 5689770, at *23. Defendants have thus established a strong showing of likelihood of success.

### 4. At a Minimum, the Court Should Stay the Preliminary Injunction in Part.

1. The Court should stay the parts of the Preliminary Injunction Order that enjoin criminal enforcement proceedings. Plaintiffs continue to insist that those facing a credible threat of prosecution do not need to await criminal proceedings to seek relief. Opp'n at 13. But Plaintiffs ignore that this body of law applies only to a "narrow exception" of cases: those "in which the very act of filing an indictment may chill constitutional rights." *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 187 (3d Cir. 2006). Indeed, every single case Plaintiff cites involved constitutional claims that were brought to vindicate constitutional rights. *See* ECF No. 39 at 20-21. Plaintiffs bring no such constitutional claims here. *See* Compl. ¶¶ 65-72.

Nor does the APA expand the equitable powers of district courts to enjoin enforcement of federal criminal law beyond those limited circumstances in which a plaintiff seeks to vindicate constitutional rights through pre-enforcement review. To the contrary, the APA expressly states that it does not affect "the power or duty of the court to dismiss any action or deny relief on any other

appropriate legal or equitable ground." 5 U.S.C. § 702.[2]

    2. The Court should also stay the parts of the Preliminary Injunction Order that enjoin government enforcement efforts against the manufacturing and sale of FRTs like the FRT-15 and WOT. In response, Plaintiffs note that some Plaintiffs and their members wish to acquire more FRTs, and Plaintiffs and their members include sellers. But Plaintiffs have not identified any sellers covered by the Court's injunction who are party to this suit and have standing. *See* ECF No. 39 at 13 & n.7 (Defs' Opp'n to PI) (explaining Plaintiffs and their members have only articulated harms related to *possession* of FRT-15s and WOTs); ECF No. 62 at 30 (Pls' Mot. for Summary Judgment) (identifying Rare Breed Trigger parties, who are not covered by the Preliminary Injunction, as members of NAGR). And, as described in Defendants' opening brief, ECF No. 64 at 11, a narrower injunction that only covers possession will protect Plaintiffs' articulated interests in possessing devices like the FRT-15 and WOT while mitigating many of the significant and irreversible harms presented by legalization of undocumented and untraceable manufacturing, sales, and transfers of potentially thousands of FRT-15s and WOTs. Even if Plaintiffs were to prevail on the merits, the delay of a few months that such a partial stay would impose on individuals who wish to acquire certain FRTs is a trivial equity in comparison to the Government's interest in preventing the spread of devices that replicate a machinegun's rate of fire.

    This logic also supports a stay as to the portions of the injunction that extend beyond Individual Plaintiffs. While any harms of acquisition by Individual Plaintiffs, a limited set of known individuals who appear not to present any particular risk factors, may be more readily mitigated, this

---

[2] Plaintiffs note that "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Opp'n at 14. That misses the point entirely: criminal enforcement proceedings are a separate agency action that has not yet occurred, meaning there is nothing to "set aside." For this same reason, Plaintiffs are not "suffering a legal wrong," *id.*, because of future criminal proceedings. And if they were, they are "entitled to judicial review thereof," *id.*, in those very ensuing criminal proceedings.

is not the case for the thousands of unknown members of the Associational Plaintiffs and their downstream customers. Indeed, Plaintiffs themselves may not ever learn the identities of downstream customers, and Plaintiffs therefore cannot assure the Court that those unknown individuals are law-abiding, safe wielders of such FRT devices. Accordingly, a stay of the portions of the injunction that extend beyond Individual Plaintiffs is necessary to avoid the safety and retrieval difficulties ATF identified.

## CONCLUSION

For all these reasons, the Court should stay the Preliminary Injunction pending the Fifth Circuit's resolution of Defendants' appeal or, at a minimum, stay the Preliminary Injunction insofar as it enjoins criminal proceedings and affords relief beyond named Plaintiffs and for conduct beyond mere possession of FRTs classified as machineguns.

DATED: November 13, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEX HAAS
Branch Director

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ *Laura B. Bakst*
LAURA B. BAKST
MICHAEL P. CLENDENEN
ALEXANDER W. RESAR
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone:   (202) 514-3183
E-mail:   laura.b.bakst@usdoj.gov

*Counsel for Defendants*

**Certificate of Service**

On November 13, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Laura B. Bakst*