# VOLUME 5

Still images on the right of the FRT-15 pulled from FRT Full Video animation on Rare Breed Triggers web-site. Note that image on the left within green box depicts a standard M16-type machinegun trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

765040-23-0011
2023-724-ALC
Page 30

Case 4:23-cv-00880-O   Document 77-5   Filed 12/01/23   Page 2 of 51   PageID 2981

## M16-TYPE MACHINEGUN



## FRT-15



With pressure still maintained from the original continuous function (pull) of the trigger, the hammer remains in a cocked position, still retained by the automatic sear. The action spring drives the bolt carrier group forward. As the bolt carrier group moves forward, the lugs of the bolt pick up a cartridge from the magazine and feed it into the chamber. As the bolt locking lugs enter the barrel extension, the ejector is compressed against the left side of the cartridge head, and the extractor snaps into the extractor groove on the cartridge. At this time, the "trip" surface on the M16-type bolt carrier interacts with the automatic sear (releasing the automatic sear from the automatic sear shelf of the hammer) to effect automatic fire. The remainder of the feeding cycle remains similar.

With pressure still continuously maintained from the original continuous function (pull) of the trigger. At this time, the trigger is still being held reward but is _momentarily_ kept in the forward position into which it was automatically placed by the self-acting or self-regulating mechanism until the "locking bar" is struck by the "trip" surface on the M16-type bolt carrier that was designed to interact with the automatic sear to effect automatic fire in "machinegun" variants of this operating system and serves no purpose in semiautomatic AR15-type firearms. The remainder of the feeding cycle remains similar. The action spring drives the bolt carrier group forward. As the bolt carrier group moves forward, the lugs of the bolt pick up a cartridge from the magazine and feed it into the chamber. As the bolt locking lugs enter the barrel extension, the ejector is compressed against the left side of the cartridge head, and the extractor snaps into the extractor groove on the cartridge.

ATF0270



(12) **United States Patent**

Rounds

(10) **Patent No.:** **US 10,514,223 B1**

(45) **Date of Patent:** **Dec. 24, 2019**

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **Wolf Tactical LLC**, Buda, TX (US)

(72) Inventor: **Jeffrey Cooper Rounds**, Buda, TX (US)

(73) Assignee: **Wolf Tactical LLC**, Buda, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/143,624**

(22) Filed: **Sep. 27, 2018**

**Related U.S. Application Data**

(60) Provisional application No. 62/565,247, filed on Sep. 29, 2017.

(51) **Int. Cl.**
| | |
|---|---|
| *F41A 19/43* | (2006.01) |
| *F41A 19/14* | (2006.01) |
| *F41A 19/10* | (2006.01) |
| *F41A 19/12* | (2006.01) |
| *F41A 17/82* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *F41A 19/43* (2013.01); *F41A 19/10* (2013.01); *F41A 19/12* (2013.01); *F41A 19/14* (2013.01); *F41A 17/82* (2013.01)

(58) **Field of Classification Search**
CPC .......... F41A 19/10; F41A 19/12; F41A 19/14; F41A 19/43; F41A 17/82
USPC ............ 89/136, 139; 42/69.01, 69.02, 69.03
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,704,153 A * 1/1998 Kaminski ............ F41A 17/063
42/117

| | | | |
|---|---|---|---|
| 6,101,918 | A | 8/2000 | Akins |
| 6,722,072 | B1 | 4/2004 | McCormick |
| 7,162,824 | B1 | 1/2007 | McCormick |
| 7,213,359 | B2 | 5/2007 | Beretta |
| 7,293,385 | B2 | 11/2007 | McCormick |
| 7,398,723 | B1 | 7/2008 | Blakley |

(Continued)

FOREIGN PATENT DOCUMENTS

TW          409847 U      10/2000

*Primary Examiner* — Bret Hayes

(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57) **ABSTRACT**

A trigger mechanism for use in a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled. The trigger mechanism includes a hammer, a trigger member, and a locking bar. The hammer has a sear notch and is mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions. The trigger member has a sear and is mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions. The trigger member has a surface positioned to be contacted by hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position. The locking bar is pivotally mounted in a frame and spring biased toward a first position in which it mechanically blocks the trigger member from moving to the release position, and is movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**7 Claims, 4 Drawing Sheets**



ATF0279

**US 10,514,223 B1**

Page 2

(56)               **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,127,658 | B1 | 3/2012 | Cottle |
| 8,820,211 | B1 | 9/2014 | Hawbaker |
| 9,021,732 | B2 | 5/2015 | Johnson |
| 9,513,076 | B2 * | 12/2016 | Kolev ...................... F41A 3/12 |
| 9,568,264 | B2 | 2/2017 | Graves |
| 9,816,772 | B2 | 11/2017 | Graves |
| 9,939,221 | B2 | 4/2018 | Graves |
| 2007/0199435 | A1 * | 8/2007 | Hochstrate ................ F41A 3/66 |
| | | | 89/191.02 |
| 2016/0010933 | A1 | 1/2016 | Bonner |
| 2016/0102933 | A1 | 4/2016 | Graves |
| 2017/0219307 | A1 * | 8/2017 | Foster .................... F41A 19/06 |
| 2018/0066911 | A1 | 3/2018 | Graves |
| 2018/0087860 | A1 * | 3/2018 | Sullivan ................. F41A 17/46 |

* cited by examiner



**FIG. 1**



**FIG. 2**



FIG. 3

FWD



FIG. 4

ATF0283



**FIG. 5**

US 10,514,223 B1

**1**

## FIREARM TRIGGER MECHANISM

### RELATED APPLICATIONS

This application claims priority to U.S. Provisional Patent Application No. 62/565,247 filed Sep. 29, 2017, and incorporates the same herein by reference.

### TECHNICAL FIELD

This invention relates to a firearm trigger mechanism. More particularly, it relates to a semiautomatic trigger that is mechanically reset by movement of the hammer when it is reset by the bolt carrier.

### BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunitions propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Other devices have been offered that facilitate the bump fire process. One is shown in U.S. Pat. No. 6,101,918, issued Aug. 15, 2000, to William Akins for a Method and Apparatus for Accelerating the Cyclic Firing Rate of a Semiautomatic Firearm. This device, sold for some time as the Akins Accelerator™, allowed the receiver and action of the firearm to move longitudinally relative to the butt stock and used a spring to assist forward return movement. Other devices, such as that shown in U.S. Pat. No. 8,127,658, issued Mar. 6, 2012, and other patents owned by Slide Fire Solutions provide a replacement stock and handgrip assembly that facilitates bump firing, but without spring assistance.

**2**

Other solutions to increase the rate of semiautomatic fire include pull/release trigger mechanisms. These devices cause one round to be fired when the trigger is pulled and a second round to be fired when the trigger is released. Such a device is shown in U.S. Pat. No. 8,820,211, issued Sep. 2, 2014, entitled Selectable Dual Mode Trigger for Semiautomatic Firearms. A device like this is offered by FosTecH Outdoors, LLC as the ECHO TRIGGER™. Another device, offered by Digital Trigger Technologies, LLC under the name DigiTrigger™, provides a dual mode trigger in which the pull/release operating function is achieved electronically.

The above-described devices either require practice to use reliably, are complex, and/or are expensive to manufacture and install.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and U.S. Pat. No. 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. This invention, however, does not provide a "drop-in" solution for existing popular firearm platforms, like the AR15, AK47 variants, or the Ruger 10/22™. To adapt this invention to an AR-pattern firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

### SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. In the disclosed embodiments, the normal resetting of the hammer, as the bolt or bolt carrier is cycled, causes the trigger to be forcibly reset by contact between the hammer and a surface of the trigger member. Once reset, movement of the trigger is blocked by a locking bar and cannot be pulled until the bolt has returned to battery, thus preventing "hammer follow" behind the bolt or bolt carrier.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

### BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures; wherein:

FIG. 1 is an isometric view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention;

FIG. 2 is a partially cut-away view thereof;

FIG. 3 is a longitudinal section view showing the module of the embodiment installed in a typical AR15-pattern lower receiver in a cocked and ready to fire status with the bolt and bolt carrier in an in-battery position;

FIG. 4 is a similar view in which the trigger has been pulled and the hammer has fallen against a firing pin; and

FIG. 5 is a similar view showing the bolt carrier in a retracted position, forcing the hammer and trigger into a reset status.

ATF0285

US 10,514,223 B1

**3**

DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced without one or more of the specific details or with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments.

Referring first to FIGS. **1** and **2**, therein is shown at **10** a "drop-in" trigger module adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatics firearm platforms, such as the Ruger 10/22™ or AK-pattern variants.

The module **10** includes a frame or housing **12** that may be sized and shaped to fit within the internal fire control mechanism pocket of an AR-pattern lower receiver. It includes first and second pairs of aligned openings **14**, **16** that are located to receive transverse pins (**40**, **36**, respectively, shown in FIGS. **3-5**) used in a standard AR-pattern trigger mechanism as pivot axes for the hammer and trigger member, respectively. The housing **12** includes left and right sidewalls **20**, **22**, which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls **20**, **22** may be interconnected at the bottom of the housing **12** at the front by a crossmember **24**.

A hammer **18** of ordinary (MIL-SPEC) AR-pattern shape and construction may be used. The illustrated hammer may be standard in all respects and biased by a typical AR-pattern hammer spring (not shown).

A modified trigger member **26** may be sized to fit between the sidewalls **20**, **22** of the housing **12** and may include a trigger blade portion **28** that extends downwardly. The trigger blade portion **28** is the part of the trigger member **26** contacted by a user's finger to actuate the trigger mechanism. The trigger blade portion **28** may be curved (shown) or straight, as desired. The trigger member **26** may pivot on a transverse pin **36** (not shown in FIGS. **1** and **2**) that extends through aligned openings **16** in the sidewalls **20**, **22** of the housing **12**. The same pin **36** is aligned and positioned within aligned openings **47** of a lower receiver **50** to assemble the module **10** into a fire control mechanism pocket **49** of the lower receiver **50**, as shown in FIGS. **3-5**, for example. The modified trigger member **26** may have integral first and second contact surfaces **30**, **32**. Some part of the trigger member **26** includes contact surfaces for interaction with the hammer **18** and locking bar **62**. For

**4**

example, the trigger member **26** can include first and second upwardly extended rear contact surfaces **30**, **32**. The first contact surface **30** is positioned to interact, for example, with a tail portion **44** of the hammer **18** that extends rearwardly from a head part **42** of the hammer **18**. The second contact surface **32** is positioned to interact with a locking bar **62**. The contact surfaces may be integral to a specially formed trigger body or may be a separate insert (shown) that is made to closely fit and mate with a standard AR-pattern trigger member, held in place by the trigger pin **36**, with no lost motion between the parts.

The hammer **18** may include bosses **34** coaxial with a transverse pivot pin opening **38** that receives an assembly/pivot pin **40** (not shown in FIGS. **1** and **2**) through the first set of aligned openings **14** in the housing **12** (and through openings **51** in the firearm receiver, to position the trigger module **10** within the fire control mechanism pocket **49** of the lower receiver **50**, as shown in FIGS. **3-5**). The bosses **34** may fit between the sidewalls **20**, **22** of the housing **12** to laterally position the hammer **18**, or can be received in the openings **14** (if enlarged) so that the hammer **18** stays assembled with the module **10** when the hammer's pivot pin is removed and/or when the module **10** is not installed in a firearm receiver. The hammer **18** includes a head portion **42** and a tail portion **44**. The hammer **18** also includes a sear catch **46** that engages the sear **48** on the trigger member **26**, when cocked. The trigger and hammer pins **36**, **40** provide pivot axes at locations (openings **47**, **51**, shown in FIGS. **3-5**, for example) standard for an AR-pattern fire control mechanism. Although FIGS. **3-5** are a longitudinal section view and only show one of the aligned openings **47**, **51**, it is understood that a typical AR15-pattern lower receiver **50** includes second, corresponding and aligned openings **47**, **51** in the half of the receiver **50** not shown).

Referring now also to FIG. **3**, the trigger module **10** is shown installed in the fire control mechanism pocket **49** of an AR-pattern lower receiver **50**. Other lower receiver parts not important to the present invention are well-known in the art and are omitted from all figures for clarity. As is well-known in the art, the bolt carrier assembly **52** (or blow-back bolt) would be carried by an upper receiver (not shown) and engage the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The hammer **18** is shown in a cocked position and a bolt carrier assembly **52** is shown in an in-battery position. The sear **48** engages the sear catch **46** of the hammer **18**.

The bolt carrier assembly **52** used with the embodiments of this invention can be an ordinary (mil-spec) M16-pattern bolt carrier assembly, whether operated by direct impingement or a gas piston system, that has a bottom cut position to engage an auto sear in a fully automatic configuration. The bottom cut creates an engagement surface **54** in a tail portion **56** of the bolt carrier body **58**. This is distinct from a modified AR15 bolt carrier that is further cut-away so that engagement with an auto sear is impossible. The semiautomatic AR-pattern safety selector switch **60** may also be standard (MIL-SPEC) in all respects.

The trigger module of the present invention includes a trigger locking bar **62** carried on a frame **66** for pivotal movement on a transverse pivot pin **68**. The frame **66** may be part of the module housing **12**, if configured as a "drop-in" unit. An upper end of the locking bar **62** extends above the upper edge of the housing **12** and lower receiver **50** to be engaged by the engagement surface **54** of the bolt

ATF0286

US 10,514,223 B1

| 5 | | 6 |

carrier body **58** when the bolt carrier assembly **52** is at or near its in-battery position (as shown in FIG. **3**). Contact between the engagement surface **54** and upper end of the locking bar **62** causes the locking bar **62** to pivot into a first position (FIG. **3**) against a biasing spring **70** and allows pivotal movement of the trigger member **26**. If desired, the locking bar **62** may include a rearward extension **64** that serves as a means to limit the extent to which it can pivot toward the blocking position.

Referring now also to FIG. **4**, when the safety selector **60** is in the "fire" position (as shown in all figures), finger pressure pulling rearward against the trigger blade portion **28** causes the trigger member **26** to rotate on the pivot pin **36**, as indicated by arrows. This rotation causes the sear **48** to disengage from the sear catch **46** of the hammer **18**. This release allows the hammer **18** to rotate by spring force (hammer spring omitted for clarity) into contact with the firing pin **72**. Any contact between the rear portion of the trigger member **26** and front surface of the locking bar **62** will simply cause the locking bar **62** to rotate out of the way, as illustrated in FIG. **4**.

Referring now to FIG. **5**, discharging an ammunition cartridge (not shown) causes the action to cycle by moving the bolt carrier assembly **52** rearwardly, as illustrated. The same effect occurs when the action is cycled manually. As in an ordinary AR15-pattern configuration, a lower surface **74** of the bolt carrier body **58** pushes rearwardly against the head portion **42** of the hammer **18**, forcing it to pivot on the hammer pivot/assembly pin **40** against its spring (not shown) toward a reset position. As the rearward movement of the bolt carrier body **58** and pivotal movement of the hammer **18** continues, mechanical interference or contact between a rear surface **74** of the hammer **18** (such as on the tail portion **44**) and a contact surface **30** of the trigger member **26** forces the trigger to pivot (arrows in FIG. **5**) toward and to its reset position. At the same time, as the trigger member **26** is reset, the biasing spring **70** moves the lower end of the locking bar **62** into a second position (FIG. **5**) in which it blocks pivotal movement of the trigger **26**, including by finger pressure applied (or reapplied) to the trigger blade **28**. Thus, as the bolt carrier assembly **52** returns forward, the trigger member **26** is held in its reset position by the locking bar **62** where the hammer sear catch **46** will engage with the sear **48** carried on the trigger member **26** to reset the fire control mechanism. The trigger member **26** cannot be pulled to release the sear/hammer engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly **52** and firing pin **72** as the bolt carrier assembly **52** is returning to battery. A trigger return spring (not shown) of the type used in a standard AR-pattern trigger mechanism may be unnecessary in this case, because the trigger member **26** is forced to return by the hammer **18**, but may be used, if desired.

When the bolt carrier assembly **52** has reached (or nearly reached) its closed, in-battery position (shown in FIG. **3**), the engagement surface **54** of the bolt carrier tail portion **56** contacts and forwardly displaces the upper end of the locking bar **62**, disengaging the second contact surface **32** of the trigger member **26**, allowing the trigger **26** to be pulled a second time. The distance of travel during which there is no interference between the locking bar **62** and second contact surface **32** of the trigger member **26**, allowing the trigger member **26** to be manually displaced, may be about from about 0.10 to 0.31 inch. This prevents early release of the hammer **18** and contact of the hammer against the firing pin **72** before the bolt is completely locked and in-battery.

Force applied by the user's trigger finger against the trigger blade portion **28** is incapable of overcoming the mechanical interference and force of the hammer **18** against the contact surface **30** of the trigger member **26**. However, the trigger can immediately be pulled again—only by application of an external force—as soon as the locking bar **62** has been rotated against the spring **70** and out of blocking engagement with the trigger member **26**, as the bolt carrier assembly **52** approaches or reaches its in-battery position. This allows the highest possible standard rate of fire, without risk of hammer-follow, for the semiautomatic action of the firearm.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

**1**. For a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a hammer having a sear notch and mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions;

a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in a frame and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**2**. The trigger mechanism of claim **1**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

**3**. The trigger mechanism of claim **1**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

**4**. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins;

a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between set and released positions;

a trigger member having a sear and mounted in the housing to pivot on a transverse axis between set and

ATF0287

US 10,514,223 B1

7

8

released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in the housing and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position in which the trigger member can be moved by an external force to the released position.

**5**. The trigger mechanism of claim **4**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

**6**. The trigger mechanism of claim **4**, wherein the housing's transversely aligned pairs of openings for receiving hammer and trigger assembly pins are aligned with the assembly pin openings in the fire control mechanism pocket of the receiver.

**7**. The trigger mechanism of claim **4**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

\* \* \* \* \*

ATF0288

U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Tampa Field Division*

Tampa, Florida  33602–3945

www.atf.gov

767000:AF
3310

**JUL 2 6 2021**

Mr. Kevin Maxwell
Rare Breed Trigger, LLC
733 W. Colonial Drive
Orlando, FL  32804

Dear Mr. Maxwell:

This is in reference to the Rare Breed Triggers, model FRT-15, manufactured and marketed by your company. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) examined this trigger and determined it to be a machinegun as defined in the National Firearms Act (NFA).

The NFA defines a firearm to include, in relevant part, "a machinegun." 26 United States Code (U.S.C.) § 5845(a)(6). A machinegun is defined under section 5845(b) as –

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

*Italics Added*.

As the Rare Breed Triggers FRT-15 is a machinegun under the NFA, it is subject to the registration, transfer, taxation, and possession restrictions applicable to these regulated weapons, which include criminal penalties relating to the illegal transfer and possession of said weapons. *See* 26 U.S.C., Chapter 53; *see also* 26 U.S.C. § 5871 (any person who violates or fails to comply with the provisions of the NFA shall be fined $10,000 per violation and is subject to imprisonment for a term of up to ten years).  Additionally, machineguns are also subject to the Gun Control Act of 1968, as amended (GCA), *see* 18 U.S.C. § 921(a)(23), and are subject to prohibitions regarding the possession, transfer, and transport of such items as set forth in 18 U.S.C. §§ 922(o) and 922(a)(4).

Mr. Kevin Maxwell
Rare Breed Trigger

The manufacture and sale of a machinegun is subject to significant legal restrictions and compliance under the GCA and the NFA. The NFA requires that the manufacturer register each firearm manufactured in the National Firearms Registration and Transfer Record. *See* 26 U.S.C. § 5841; 27 C.F.R. § 479.101. Any firearm manufactured and/or transferred in violation of the NFA, and/or subject to the NFA, and possessed by a person to whom it is not registered, is a violation of the NFA and subject to seizure and forfeiture. *See* 26 U.S.C. §§ 5861, 5872.

ATF has concluded the Rare Breed Triggers, model FRT-15, is a combination of parts designed and intended for use in converting a weapon into a machinegun, hence, the FRT-15 has been classified as a "machinegun" as defined by the NFA and GCA. ATF's examination found the Rare Breed Triggers, model FRT-15, allows a firearm to expel more than one shot, without manual reloading, with a single, continuous pull of the trigger. Because the FRT-15 is properly classified as a "machinegun" you must immediately take the following actions:

1. **Cease and desist all manufacture and transfer of the Rare Breed Trigger FRT-15.**

2. **Contact ATF within 5 days of receipt of this letter to develop a plan for addressing those machineguns already distributed.**

The NFA levies a $200 tax on each firearm made and an additional $200 tax on each firearm transferred. *See* 26 U.S.C. §§ 5811, 5821. Rare Breed Triggers may be liable for a $200 making tax and a $200 transfer tax on each FRT-15 made and transferred.

For public safety reasons, your cooperation in this matter is essential. Your failure to take the above steps may result in (1) law enforcement action by ATF, including a referral of this matter to the United States Attorney's Office for criminal prosecution; (2) tax assessment and collection; and/or (3) seizure and forfeiture of the firearms and property involved in violations of Federal law.

If you have any questions, and to discuss the plan referenced above, please contact Special Agent in Charge, Tampa Field Division, Craig Saier at 813-202-7300.

Sincerely,

Craig Saier
Special Agent in Charge
Tampa Field Division



# The Law Office of
# Kevin C. Maxwell

**ATTORNEY**
**KEVIN C. MAXWELL**
KEVINCMAXWELL@GMAIL.COM

**LEGAL ASS**
**LINNETTE M.**
KEVINMAXWELL

*MaxLawOrlando.com*

November 2, 2021

Craig.saier@atf.gov
Mr. Craig Saier
Special Agent in Charge
Tampa Field Division
U. S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives
400 N. Tampa Street, suite 2100
Tampa, Florida 33602

Re: Rare Breed Triggers, FRT-15

Dear Special Agent in Charge Saier

As you are aware, I represent Rare Breed Triggers, LLC ("RBT"). During the legal proceedings, case number 6:21-cv-1245, it was pled by your counsel, the reason RBT could not submit anything to be introduced into the administrative record and thereby considered or reconsidered as the case may be, by the ATF, was because suit had been filed.

As I am sure you are also aware, the above case was dismissed without prejudice last week on the Court's own motion. Rather than re-file, and given the Court was scheduled to hear and rule on a motion to remand the matter to the ATF for further consideration anyway, I have taken this opportunity, on behalf of my client, to provide the ATF, through your office, all of the information/evidence which needs to be added to the administrative record and thereby considered or reconsidered by the ATF FATD/FTISB/FTCB regarding the correct classification of the FRT-15 as a semi-automatic trigger assembly.

Accordingly, please find enclosed or attached the following items:

1) Opinion Letter of Attorney Kevin McCann, dated July 31, 2020
2) Opinion Letter of Daniel O'Kelly, dated August 6, 2020
3) Opinion Letter of Rick Vasquez, dated February 24, 2021
4) Opinion Letter of Brian Luettke, dated May 4, 2021
5) Legal Opinion of Attorney McCann, dated 8/27/21, regarding ATF 7/15/21 Tech exam
6) Opinion of Brian Luettke, dated 8/26/21, regarding ATF 7/15/21 Tech exam
7) Rebuttal Statement of Daniel O'Kelly, dated 8/26/21, regarding ATF 7/15/21 Tech exam
8) Opinion Letter of Rick Vasquez, dated 8/26/21, regarding ATF 7/15/21 Tech exam

255 Primera Blvd. Ste 160, Lake Mary Florida 32746
Telephone: (407) 480-2179
kevincmaxwell@gmail.com

9)   Video of FRT in cutaway receiver.
10) Video of FRT vs. Full auto
11) Video of FRT vs Giessele Trigger
12) Video of FRT zip tie test                    See enclosed Thumb Drive
13) Video of Jerry Miculek vs FRT
14) Video of FRT animation
15) Video of the Fostec Echo 2 trigger
16) Video of the Franklin Binary Gen 3 vs. Full auto

Should you have any questions or need additional information, please feel free to contact my office.

Sincerely,

/s/ Kevin Maxwell
Kevin C. Maxwell, Esquire



*Law Office of Kevin P. McCann*
*137 S. Courtenay Pkwy, Ste 830*
*Merritt Island, Florida 32952*

*Telephone: (321) 222-3270*
*Fax: (321) 978-0302*

July 31, 2020

Kevin Maxwell, Esq.
The Law Office of Kevin C. Maxwell
733 West Colonial Drive
Orlando, Florida 32804

      RE:    Legal Opinion of Firearm Trigger Mechanism
              United States Patent 10,514,223

Dear Mr. Maxwell:

Per your request, this letter serves as my legal opinion regarding the legality of a Firearm Trigger Mechanism ("FTM"), United States Patent Number 10,514,223 ("Patent"). You requested my legal opinion based on my current firearms-related legal practice, as well as my former twenty-five (25) year career and experiences as a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in which I routinely determined the legality of numerous firearms and firearm parts.

I reviewed the Patent and I observed a video simulation regarding the functionality of the FTM. On June 13, 2020, I observed the nomenclature and operation of a prototype of the FTM at an outdoor firing range. I reviewed the July 30, 2020 FTM expert technical report of Daniel O'Kelly, International Firearm Specialist Academy, and I reviewed applicable statutes, case law, and prior ATF opinions for similar devices.

The Patent for the FTM states, "*The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms... In the disclosed embodiments, the normal resetting of the hammer, as the bolt or bolt carrier is cycled, causes the trigger to forcibly reset by contact between the hammer and a surface of the trigger member. Once reset, movement of the trigger is blocked by a locking bar and cannot be pulled until the bolt has been returned to battery, thus preventing "hammer follow" behind the bolt or bolt carrier.*"

The mechanics and operation of the FTM, as described in the Patent, was visually presented in a video simulation of the device, which I observed and opined supports the mechanics and operation of the FTM as described in the Patent.

Mr. O'Kelly, a firearms technology expert, conducted a technical examination of the FTM and prepared the above-mentioned expert technical report, which I reviewed and opined supports the mechanics and operation of the FTM as described in the Patent.

ATF0293

Kevin Maxwell, Esq.
Legal Opinion
Page 2 of 2

The National Firearms Act ("NFA"), at Title 26, USC, §5845(b), provides the definition of a machinegun as follows: "*The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*"

The critical element in the definition of a machinegun is, "… *by a single function of the trigger.*" Thus, if a firearm fires more than one shot by a single function of the trigger, then the firearm is classified by statute as a "*machinegun*". In contrast, if a firearm fires only one shot by a single function of the trigger, then the firearm is not classified as a "*machinegun*".

The Gun Control Act ("GCA"), at Title 18, USC, § 921(a)(28), provides the definition of a semiautomatic rifle as follows: "*The term "semiautomatic rifle" means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.*"

Based on my review of the Patent and video simulation, my observance of the nomenclature and functionality of the FTM, my review of Mr. O'Kelly's expert opinion report, my review of applicable statutes and case law, my review of prior ATF opinion letters, and my knowledge and experience, I conclude that a rifle equipped with the FTM is not a "*machinegun*" as it does not fire more than one shot by a single function of the trigger. I further conclude that a rifle equipped with the FTM utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and fires only one shot with each separate pull of the trigger, and is thus a "*semiautomatic rifle*".

As a device that delivers only semiautomatic firing when equipped and utilized within a rifle, I conclude and opine that the FTM is a legal device not subject to the provisions of the NFA. Please let me know if you have any questions or require any additional information.

Very truly yours,

*Kevin McCann*

Kevin McCann, Esq.

ATF0294



**International Firearm Specialist Academy**
**PO Box 338 Lake Dallas, TX 75605**
**Email: Info@GunLearn.com**

August 6, 2020

Kevin Maxwell, esq.
Rarebreed Triggers
Geneva, Florida

Dear Mr. Maxwell,

This letter serves to explain the results of our recent examination and testing of your "Rare Breed, LLC FRT trigger system", which you recently submitted to us.

Before I explain my findings, it is necessary for me to clarify a few issues as they relate to firearm technology. First, allow me to differentiate between the term semi-automatic and fully-automatic (machinegun). As you know, Title 26 of the U.S Code defines a machinegun (fully-automatic) in subsection 5845(b) as:

*The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.*

It is important to note that by contrast, a semi-automatic is any firearm which shoots only one shot "automatically" by a single function of the trigger. The practical difference between fully-automatic and semi-automatic is referred to as the "cyclic rate of fire" (i.e. the number of shots which can be fired within a minute). This number is merely a ratio. Since few firearms have the capacity to hold a full minute's worth of ammunition, that number is determined by multiplying the number of shots which can be fired in a faction of a minute. For example, if a firearm can fire 12 shots in 10 seconds, its cyclic rate of fire is 72 rpm (rounds per minute).

Also, many devices have been invented in recent years which increase a semi-automatic firearms cyclic rate of fire. Bump-stocks and other bump-fire devices are some of them. Despite the fact

p.2
Kevin Maxwell, esq.
August 6, 2020

that the U.S. Government recently reversed themselves by re-defining their years-long position on the word "automatically" as used in the definition of a machinegun, please note that bump-fire devices, including bump-fire stocks do nothing "automatically", and firearms equipped with them require a separate trigger pull and release to fire each shot.

Please also note that all firearms have a "cycle of operation" which must be completed between the firing of one shot and the firing of a subsequent shot. There are eight steps which must occur during the cycle of operation (i.e. firing, unlocking, extraction, ejection, cocking, feeding, chambering, locking), and the order in which they occur depends upon the type of mechanical operation which the firearm employs (bolt-action, lever-action, break-action, pump-action, revolving action, self-loading, etc...).

Considering that an AR15-type firearm is a self-loading type of mechanical action (i.e. it uses the energy generated by a fired cartridge to reload its own chamber for a subsequent shot), the eight steps of the cycle of operation all occur extremely quickly (i.e. within less than 1/5 second). Therefore, a second shot may be fired by the shooter within 1/5 of a second after the first. Therefore, the cyclic rate of fire of a semiautomatic firearm is only limited by the physical dexterity of the operator of it. While many shooters may not have the physical dexterity to react each 1/5 second, the Rare Breed, LLC FRT trigger system allows a shooter to keep pressure on the trigger in anticipation of the end of a cycle of operation. Although the shooter may in fact hold pressure against the trigger during the cycle of operation, the trigger is not moving nor performing any "function" and is in fact locked in its non-firing position. Please note that "pressure" is not addressed in the definition of a machinegun, nor is the word "pull". The word "function" is the key word in the definition, and "function" is defined at Dictionary.com as;

*"to perform a specified action or activity; work; operate: to have or exercise a function; serve:"*
https://www.dictionary.com/browse/function

It is imperative that it be recognized that in the Rare Breed, LLC FRT trigger system, keeping pressure on the trigger serves no function. It is akin to leaning on a locked door, and then falling through it once unlocked, rather than waiting for the unlocking and then pushing it open.

In the case of a machinegun, it isn't the fact that the shooter holds continuous pressure against the trigger, it's the fact that he "functions" the trigger by pulling it to the rear only once and holding it there, and multiple shots result from this "single function of the trigger".

ATF0296

p.3
Kevin Maxwell, esq.
August 6, 2020

The advantage of the Rare Breed, LLC FRT trigger system is that when a shooter holds pressure against the locked trigger during the cycle of operation, he is able to pull (function) it again immediately after the cycle of operation ends, and avoid the normally much slower reaction time needed when using a traditional trigger. A traditional trigger relies on the shooter to hear the report and feel recoil while reacting to them, and then make the decision to release and re-pull the trigger, and then do so, all of which serve to slow reaction time and as a result, reduce the cyclic rate of fire.

The fact is, that a semiautomatic firearm, such as the AR15-type firearm, takes only a fraction of a second to cycle from one shot to another. There are videos on the internet of professional shooters firing 5 shots from an AR15 within one second. Regardless of whether the ability to fire that quickly semi-automatically is perceived as acceptable by ATF, the mechanical operation of a firearm equipped with an "Rare Breed, LLC FRT" trigger system is still done semi-automatically as defined in federal law. While it is true that a shooter may fire successive shots quickly by keeping pressure on the trigger of a firearm equipped with an "Rare Breed, LLC FRT" trigger system, the shooter must nevertheless make a subsequent movement of the trigger to the rear for each shot fired. The only thing which keeping continuous pressure on the trigger does, is to allow the shooter to be ready to make his next trigger movement immediately after the cycle of operation is complete.

We note that the only thing which happens "automatically" in the Rare Breed, LLC FRT trigger system is the return of the trigger to the set position when it is impinged upon by the hammer. It is also noteworthy that previous ATF rulings since 2009 concerning other devices for use in firing an AR15-type firearm more rapidly, such as the "fire-on-release" (i.e. Franklin Armory's "binary" trigger) type of mechanisms, have defined a single function of the trigger as a "single movement of the trigger". In fact the Franklin Armory Binary trigger system allows 2 shots to be fired with each pull-release of the trigger, yet ATF has opined that these are acceptable and not within the definition of a machinegun. The Rare Breed, LLC FRT trigger system in fact, requires two separate movements of the trigger (rearward and forward) for each single shot fired.

The Rare Breed, LLC FRT trigger system is a self-contained body which fits into the firing-control cavity of an AR15-type firearm. The body utilizes the conventional trigger pivot pin and hammer pivot pin to be held into place. The body houses a trigger, trigger-return spring, hammer, hammer-return spring, and a proprietary "locking bar".

ATF0297

p.4
Kevin Maxwell, esq.
August 6, 2020

The "Rare Breed, LLC FRT" trigger system was examined as installed into a Spikes Tactical model SR15 rifle, serial #SKU0092, chambered in 5.56 x 45mm caliber. My examination revealed that the Rare Breed, LLC FRT trigger is designed such that upon firing a shot, as the bolt-carrier moves to the rear it cocks the hammer as normal. However, the hammer in turn forces the reset of the trigger to its original position. Upon doing so, a locking-bar locks the trigger into the reset position, making it physically impossible to move the trigger rearward during the remainder of the cycle of operation. I note that whereas a traditional semiautomatic AR15-type trigger must consciously be released by the shooter in order for it to reset, the "Rare Breed, LLC FRT" type of trigger system forces the reset of the trigger and makes it impossible for the shooter to hold the trigger to the rear. This actually prevents the fully-automatic firing which could result in the case of parts malfunction, and therefore makes an AR15 equipped with a Rare Breed, LLC FRT" trigger system less susceptible to fully-automatic firing than a conventional AR15.

This is accomplished as follows. The bolt-carrier group already having completed the extraction and ejection of a fired cartridge case, begins moving forward under the energy of the buffer-spring. As the bolt goes back into battery, having fed and chambered the next cartridge into the chamber, the lower-tail of the bolt carrier impacts the top of the locking block, causing it to pivot out of engagement with the trigger. Only then, once the next cartridge has been chambered and the breech is locked, is the shooter able to again pull the trigger to fire a follow-up shot. Upon pulling the trigger to fire another shot, the above -described procedural cycle begins again.

The testing of the submitted rifle was done on June 13, 2020, at an outdoor range in Geneva, Florida, in the form of a live-fire session, using factory-loaded ammunition.

While in the "Safe" position, the rifle was found to be incapable of firing as the result of a trigger-pull. While in the "Fire" or "semiautomatic" position, the rifle was found to operate as a semi-automatic firearm as originally designed, firing only one shot for every pull of the trigger. During the rapid firing of full 30 rd. magazines, which were fired as rapidly as possible, there were no instances of "hammer-follow".

At no time did the firearm fire more than one shot per function of the trigger, no matter how quickly in succession the trigger was pulled and released.

In summary, the "Rare Breed, LLC FRT" trigger system did not perform in any way which would make it or a firearm in which it is properly installed, subject to the National Firearms Act. It is also my professional opinion that the "Rare Breed, LLC FRT" trigger system for AR-type

p.5
Kevin Maxwell, esq.
August 6, 2020


firearms as submitted, is not a firearm under the purview of the Gun Control Act, nor under the
National Firearms Act.

I trust that my findings have been helpful.
Respectfully,

Daniel O'Kelly
Director


*Daniel G. O'Kelly*

ATF0299

February 24, 2021

**VIA E-MAIL ONLY**
**kevincmaxwell@gmail.com**

Kevin C. Maxwell, Esquire
Law Offices of Kevin C. Maxwell
733 West Colonial Drive
Orlando, Florida 32804

Subject: Rare Breed FRT-15

Dear Kevin:

My consulting firm, Rick Vasquez Firearms, LLC was asked to provide an opinion concerning the classification of Rare Breed Triggers model FRT-15 trigger. As part of my research and analysis, I have reviewed a Rare Breed Trigger installed in a firearm, along with the video on the operating principles. I additionally reviewed previous ATF Firearms Technology Branch rulings on machineguns and rate of fire increasing triggers and utilized my extensive experience in firearms technology classification related matters. This experience includes, among other things, over two decades in the United States Marine Corps, work as a firearms instructor, and fifteen years with the Bureau of Alcohol, Tobacco and Firearms, including time as the acting chief of ATF's Firearms Technology Branch – the branch of ATF charged with rendering firearms classification decisions.

As a consultant, I have worked with numerous federal firearm licensees with regard to ATF regulatory compliance and related matters, including a number of firearm manufacturers. Accordingly, and while my analysis and opinions are set forth in additional detail below, it is my opinion that the Rare Breed Triggers FRT-15 trigger is a legal semi-automatic trigger and does not constitute a machinegun pursuant to the National Firearms Act.

## I.   LEGAL DEFINITIONS AND BACKGROUND:

Under 18 U.S.C. § 921(a)(3), the Gun Control Act of 1968 ("GCA") defines the term "firearm" to include "any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive … [and] … the frame or receiver of any such weapon…" Moreover, under 26 U.S.C. § 5845(b), the National Firearms Act of 1934 ("NFA") defines "machinegun" to include "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically <u>more than one shot</u>, without manual reloading, <u>by a single function of the trigger</u>. This term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." (emphasis added). Thus, the question presently under consideration is whether the Rare Breed Triggers FRT-15 falls within the definition of "machinegun" under the NFA.

ATF0300

RICK VASQUEZ FIREARMS, LLC
February 17, 2021
Page 2 of 3

## II.    APPLICATION AND ANALYSIS:

As a preliminary matter, it has long been ATF's position (dating back to the late 2000) that semi-automatic rifles that did not use electronics, springs or hydraulics to reset the trigger were not machineguns. The FRT-15 has a redesigned trigger, hammer, and a locking bar that functions as a disconnector. This system forces the trigger to mechanically reset and allows the shooter to pull the trigger in a rapid movement.

The FRT-15 is designed to fire in the following manner:

- With the firearm loaded and placed in the fire position.
- The shooter pulls the trigger, and it disengages from the hammer.
- The hammer engages, the hammer in turn striking the primer of the round in the chamber and the firearm fires.
- During the extraction and ejection phase of the cycle of operation, the hammer is cocked from inertia of the bolt carrier group (BCG) traveling back from gas pressure. Simultaneously as the hammer is cocked, the hammer forces a reset of the trigger..
- When the trigger is reset,  the locking bar swings forward and engages the trigger, mechanically locking it in the cocked or ready to fire position. This action can be felt by the pushing of the trigger finger forward..
- As the BCG gets to its final forward position, the locking bar is disengaged by the bolt allowing the previously locked trigger to be pulled for the follow-up shot.

This cycle of operation is nothing other than the FRT pushing the trigger and trigger finger forward allowing the shooter to pull the trigger rapidly.  The shooter can simply pull and release the trigger for a standard rate of fire.  Accordingly, since ATF interprets the term "single <u>function</u> of the trigger" in the NFA definition of machinegun to mean a single <u>movement</u> of the trigger. Each "pull" of a trigger constitutes a single movement.

The FRT-15 trigger is specifically designed to fire a single shot on each movement of the trigger.  My evaluation which included a thorough evaluation of the parts, operating principle, and a test fire, of the FRT-15 in an AR15 type rifle, verified that it fired only when the trigger is pulled. The reset function of the trigger pushes the trigger finger back to the fire position allowing the shooter to shoot rapid semi-automatic fire.

RICK VASQUEZ FIREARMS, LLC
February 17, 2021
Page 3 of 3




Rare Breed Triggers FRT - Action
from RARE BREED TRIGGERS

https://www.rarebreedtriggers.com

1/5

## III.    CONCLUSION:

The FRT trigger system is a self-contained trigger assembly with a redesigned hammer, trigger, and locking bar (disconnector). The FRT trigger system does not have an automatic sear nor does it operate by electronics, springs, or hydraulics, therefore, is not a "machinegun". Additionally, there is no verifiable history of ATF opinions to support this trigger being classified as a machinegun, both in general and specifically pertaining to the underlying design.

Please contact me with any questions or concerns that you may have or should you require any clarification of me opinion. This letter and the opinions contained therein are intended solely for your law firm and your client and are not to relied upon by any other individual or entity for any purposes.

Very truly yours,

Rick Vasquez

ATF0302



**Firearms Training and Interstate Nexus Consulting, LLC**
**5557 28th Street SE Ste 205**
**Grand Rapids, MI 49512**

May 4, 2021

Kevin C. Maxwell, Esquire
Law Offices of Kevin C. Maxwell
733 West Colonial Drive
Orlando, Florida 32804

Dear Mr. Maxwell,

My firearms consulting company, Firearms Training and Interstate Nexus Consulting, LLC was asked to provide an opinion on the classification of the Rare Breed Triggers FRT-15 and whether or not it is a machinegun as defined in Title 26 U.S.C. § 5845(b). I recently retired from the Bureau of Alcohol, Tobacco, Firearms, and Explosives after 22 years as a special agent, (29 years total law enforcement). My career at ATF included being an instructor at ATF's National Academy teaching the GCA and NFA firearms identification block of instruction to new employees attending either the Special Agent Basic Training or the Industry Operations Investigator Basic Training academy courses. I was also an ATF Firearms Instructor and attended numerous firearms armorer training classes. In my last position at ATF I was a Supervisory Special Agent and the Chief of the Advanced Firearms and Interstate Nexus Branch, a branch within the Firearms and Ammunition Technology Division (FATD).

The pertinent authority under consideration for this evaluation is the Gun Control Act of 1968 (GCA) and the National Firearms Act (NFA) of 1934 and the definitions contained in them.

The Gun Control Act in Title 18 U.S.C. § 921(a)(3)(A) defines the term **"firearm"** (in part) as *"any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive"*. Additionally, the Gun Control Act in Title 18 U.S.C. § 921(a)(28) defines the term **semiautomatic rifle** as *"any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge and chamber the next round, and which required a separate pull of the trigger to fire each cartridge."*

1

The National Firearms Act in Title 26 U.S.C. §5845(b) defines the term **"machinegun"** as *"any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."*

On March 30, 2021, I examined and test fired two Spike's Tactical AR-15 style rifles which both had Rare Breed Triggers FRT-15 installed in them. The test firing was conducted using factory MAGTECH ammunition at a range in Florida. Both firearms functioned as designed and as semiautomatic rifles. I also examined the components of the FRT-15, which is a self-contained trigger unit consisting of three major parts identified as a locking bar, hammer, and trigger.

I have reviewed the Firearm Trigger Mechanism's Patent Number US10,514,223, previous ATF (FTB & FATD) classification letters, an animation showing the semiautomatic function of the FRT-15 trigger during the cycle of operation, other opinion letters, and federal court opinions.

I have also read the March 25, 2021 Sixth Circuit Court of Appeals ruling in *Gun Owners of Am., Inc., et al. v. Garland, et al.* No. 21a0070 (CA6 Mar. 25, 2021). Although that case involved "Bump Stocks", I think what the court ruled is applicable to the Rare Breed Triggers FRT-15, because it emphasized and applied the actual definition of a machinegun in Title 26 U.S.C. § 5845(b) and rejected ATF's newly made up machinegun definition. The Court ruled "And because we find a single function of the trigger applies to the mechanical process of the trigger, we further hold a bump stock cannot be classified as a machine gun because a bump stock does not enable a semiautomatic firearm to fire more than one shot each time the trigger is pulled".

Due to the design of the FRT-15, the locking bar does not allow it to function as a "hammer follow" machinegun. Rather, during the cycle of operation the bolt carrier cocks the hammer and resets the trigger. The locking bar pivots forward locking the trigger in place until the bolt carrier comes back forward to the locking position and the locking bar is unlocked. The FRT-15 trigger can now be pulled. The FRT-15 allows for very fast semiautomatic trigger pulls due to the quick resetting trigger.

The Rare Breed Triggers FRT-15 is designed and functions as a semiautomatic trigger. The FRT-15 does not enable a semiautomatic firearm to fire more than one shot each time the trigger is pulled. Therefore, it is my opinion, Rare Breed Triggers FRT-15 is not a firearm or a machinegun, and is a legal semiautomatic trigger.

Sincerely,

Brian Luettke
Resident Agent/Owner FTINC, LLC

2



*Law Office of Kevin P. McCann*
*137 S. Courtenay Pkwy, Ste 830*
*Merritt Island, Florida 32952*

*Telephone: (321) 222-3270*
*Fax: (321) 978-0302*

August 27, 2021

Kevin Maxwell, Esq.
Law Office of Kevin C. Maxwell
733 West Colonial Dr.
Orlando, FL 32804

> RE:   Legal Opinion of ATF Report of Technical Examination, dated 7/15/2021
>        Classification of Rare Breed Triggers, model FRT-15

Dear Mr. Maxwell:

Per your request, this letter serves as my legal opinion regarding the ATF Report of Technical Examination of Rare Breed Trigger's forced reset trigger device, model FRT-15, dated July 15, 2021. As a result of ATF's examination of the FRT-15, ATF concluded that the FRT-15 device is a combination of parts, designed and intended, for use in converting a weapon (AR-15 type) into a machinegun, and therefore it is a "machinegun" as defined by the National Firearms Act ("NFA") of 1934 and the Gun Control Act ("GCA") of 1968.

ATF's Report of Technical Examination does not persuade me to alter my original legal opinion that the FRT-15 is not a "*machinegun*" since it does not fire more than one shot with a single function of the trigger.

In support of ATF's classification of the FRT-15 as a machinegun, ATF relied on the NFA, the GCA, 27 CFR § 479.11, *Staples v. United States*, 511 U.S. 600 (1994), *Atkins* [sic] *v. United States*, 312 F. App'x 197 (11th Cir. 2009), *Freedom Ordnance Mfg., Inc. v. Brandon*, 2018 U.S. Dist. LEXIS 243000 (S.D. Ind. 2018), and *United States v. Fleischli*, 305 F. 3d 643 (7th Cir. 2002).

In 1934, the definition of a machinegun was statutorily established by the NFA, which had remained as follows since that time: "*Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*"

On December 26, 2018, under pressure from President Donald Trump to ban bump-stock firearm devices, without direction or act of Congress, ATF arbitrarily revised the long-standing statutory definition of a machinegun by adding two (2) sentences at the end of the above definition to read as follows, "*For purposes of this definition, the term "automatically" as it modifies "shoots, is*

Kevin Maxwell, Esq.
Legal Opinion
Page 2 of 3

*designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machinegun" includes a bump-stock-type device, i.e., a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*" (see 83 FR 66554, 27 CFR § 478.11, and 27 CFR § 479.11)

In ATF's Report of Technical Examination, ATF provides that, "Federal courts have long held that automatically means that the weapon 'fires repeatedly with a single pull of the trigger.' *Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994). 'That is, once its trigger is depressed, the weapon will automatically continue to fire until the trigger is released or the ammunition is exhausted.' Id.". As provided by the FRT-15 patent and video simulation, as well as by the examinations by firearm technical experts Daniel O'Kelly, Richard Vasquez, and Brian Luettke, the trigger does release with each function of the trigger, and firearms equipped with the FRT-15 do not fire more than one (1) round with a single function of the trigger. Thus, the FRT-15 does not satisfy the definition of a machinegun as provided in *Staples* and cited in the ATF Technical Examination Report.

In ATF's Report of Technical Examination, ATF provides that, "Federal regulation 27 CFR § 479.11, states that 'single function of the trigger' means a single pull of the trigger and analogous motions." As stated above, without direction or act of Congress, ATF arbitrarily rewrote the long-standing laws regarding machineguns and the definition of a machinegun, which include this language that in 2018 ATF itself codified in 27 CFR § 479.11. Although ATF is afforded deference to interpret, enforce, and provide regulations regarding Congressionally established laws, credibility is lost when ATF rewrites the laws and revises the definition of a machinegun, now classifying and reclassifying long-standing non-machinegun devices as machineguns. Furthermore, there currently exists numerous meritorious challenges across the nation against ATF regarding its arbitrary revision of federal statutes and its arbitrary classifications and reclassifications of long-standing non-machinegun devices into machineguns. Thus, citing its own language to support its classification of the FRT-15 is unreliable.

In ATF's Report of Technical Examination, ATF provides that, "In *Freedom Ordnance* case, the United States District Court of Indiana confirmed that ATF was not arbitrary and capricious in the classification of an 'electronic reset assist device' as a machinegun even though the firearm's trigger reset before each shot by pushing the shooter's finger forward." ATF's Report of Technical Examination continues by providing, "In these cases (*Freedom Ordnance, Akins,* and *Fleischli* cases), a firearm is a machinegun when an internal mechanism or operation automatically forces the individual's finger forward instead of requiring that the shooter release the trigger." The opinion of the *Freedom Ordnance* case (3:16-cv-00243-RYL-MPB) is provided by and within the Entry on Cross-Motions for Summary Judgment (Document 34) in which Judge Richard L. Young, United States District Court, Southern District of Indiana, denied Freedom Ordnance's Motion for Summary Judgment and granted ATF's Motion for Summary Judgment. However, despite ATF's assertions in its Report of Technical Examination as provided above, Judge Young did not state anything in his opinion

Kevin Maxwell, Esq.
Legal Opinion
Page 3 of 3

about the firearm's trigger resetting before each shot by pushing the shooter's finger forward. Furthermore, none of the opinions in the *Freedom Ordnance*, *Akins*, and *Fleischli* cases provide that a firearm is a machinegun when an internal mechanism or operation automatically forces the individual's finger forward instead of requiring that the shooter release the trigger. ATF's Report of Technical Examination has misquoted these cases by asserting that a firearm is a machinegun if a mechanism forces the shooter's finger forward. These cases do not provide support for this assertion.

A device that increases the fire of a semiautomatic firearm by providing more rapid but continued semiautomatic mechanics of the firearm is not a machinegun. Semiautomatic firearms may also be manually manipulated to increase the rate of fire without any device added to the firearm through bump-firing. A semiautomatic firearm may be fired rapidly when the shooter provides forward pressure of the firearm with opposite rearward pressure of the trigger. Bump-firing occurs when the shooter's trigger finger is held in a stationary position while the shooter's support hand pushes forward on the firearm. The firearm's trigger is pushed into the shooter's finger as opposed to the normal process in which the finger presses the trigger. The pressure must be enough to pull the firearm forward and engage the trigger, but not so much that the recoil of the firearm isn't strong enough to move the firearm temporarily rearward removing the trigger from the finger. In a sense, the firearm is repeatedly recoiling away from the stationary trigger finger while the support hand is returning it forward for the trigger to be pulled again. Although bump-firing results in rapid firing, it does not make the firearm a machinegun. This is because the firearm's trigger is being pulled once for every shot fired. Should ATF's revision of the definition of a machinegun stand, then semiautomatic firearms must be reclassified as machineguns since they can operate by bump-fire rapid shooting in the same manner as ATF is trying to prohibit.

As mentioned above, ATF rewrote the statutory definition of a machinegun to include bump-stocks and other devices that increases the rate of fire of semiautomatic firearms in an attempt to arbitrarily make long-standing legal devices now illegal. ATF's intent to protect the public from a potentially dangerous item is understandable; however, ATF's current process of redefining machineguns and rewriting the laws is improper and contrary to the Constitution in which only Congress is tasked with establishing and modifying laws. The checks and balance system serves to prevent the Government from acting unconstitutionally, and the judiciary must review ATF's current arbitrary actions of rewriting long-standing laws and then reversing their enforcement efforts in manners inconsistent with its own history of enforcing laws and classifying firearms.

Very truly yours,

*Kevin McCann*

Kevin McCann, Esq.



**Firearms Training and Interstate Nexus Consulting, LLC**
**5557 28th Street SE Ste 205**
**Grand Rapids, MI 49512**

August 26, 2021

Kevin C. Maxwell, Esquire
Law Offices of Kevin C. Maxwell
255 Primera Blvd. Suite 160
Lake Mary, FL 32746

Dear Mr. Maxwell,

This report is a rebuttal to the ATF - Firearms and Ammunition Technology Division's (FATD) report identified as FTCB #2021-595-DAS dated 7-15-2021. After reading the FATD report, I have many questions regarding the apparent biased evaluation process, testing methodology, and overall lack of thoroughness that was used to evaluate Rare Breed Triggers FRT-15.

It appears Firearms Enforcement Officer (FEO) David Smith may have had a predetermined conclusion he was going to classify the Rare Breed Triggers FRT-15 as a machinegun from the very beginning of his evaluation. For example, on Page 2 under the heading "Findings" and subsequent heading "Exhibit 1", FEO Smith begins his initial description of the FRT-15 trigger and states "Exhibit 1 is a Rare Breed Triggers, model FRT-15...I observed that the Exhibit has no serial number in accordance with 26 U.S.C. § 5842." At the very beginning of FEO Smith's report and before he conducted any apparent evaluation or test firing of the FRT-15 trigger, he had already identified the FRT-15 as a machinegun within the purview of the National Firearms Act (NFA) of 1934 by claiming the trigger unit did not have a serial number "in accordance with 26 U.S.C. § 5842". A true unbiased initial description of the FRT-15 would have been sufficient to state it does not have a serial number and save the possible conclusion and NFA firearm marking requirements for the conclusion section of the report.

FEO Smith was accurate when on Page 3 he referenced the FRT-15 and stated "My examination determined Exhibit 1 does not function by "hammer follow"." However, he

1

felt it was necessary to describe other hammer follow machineguns as well as a machinegun that utilized an electronic switch (i.e. a minigun), all having nothing to do with how the FRT-15 semi-automatic trigger functions.

On Page 4 of FEO Smith's report, he states "Below is a description of how the Rare Breed Trigger, FRT-15 device operates with attached diagrams found on the Rare Breed Trigger website". FEO Smith used a description of the FRT-15 that was hard to follow due to the selected words and grammar. For instance, he wrote on Page 4 "As the bolt carrier moves to the rear, the hammer is driven into the top of the trigger forcing it forward. The bolt carrier then strikes the locking bar moving, [*sic*] it to lock the trigger in the forward position...As the bolt carrier continues to move forward, it strikes the rear surface of the locking bar releasing the trigger". A more descriptive sentence would have included stating the locking bar releases the trigger from its locked position, because it's important and accurate to identify the trigger is locked in position after each round of ammunition is fired and requires a separate function (a pull to the rear) for each round.

It is unclear whether or not FEO Smith actually held the FRT-15 trigger unit in his hands and simulated the function of it operating. If he did hold the FRT-15, he should have described that when the hammer is cocked and the trigger is reset in its forward position, the trigger is locked in position by the locking bar and cannot function until the cycle of operation is complete and the bolt carrier moves forward and releases the locking bar, which now allows the trigger to be pulled. This would have accurately described and demonstrated how the FRT-15 functions as a semi-automatic trigger.

FEO Smith wrote his report in the first-person point of view and when he actually does something like test firing, he wrote "I test-fired Exhibit 1". Did FEO Smith actually conduct a cycle of operation of the FRT-15 trigger unit while holding it? I did not see him writing about this in first-person in his report. I cannot imagine a person conducting a thorough evaluation of the FRT-15 and not simulate (while holding it) how it functions. With the hammer cocked, did he try to pull the trigger without any forward pressure on the locking bar and then with forward pressure on the locking bar? If he did not do it, he probably should have and I think this would have been an important process assisting him with making an unbiased opinion and would have demonstrated the semi-automatic function and the locking and unlocking of the FRT-15 trigger during the cycle of operation.

On Page 5, FEO Smith writes about his test-fire of the FRT-15. He writes "Finnaly [*sic*], I inserted a five-round ammunition load...pulled the trigger and held it to the rear...fired five (5) rounds automatically by a single pull/function of the trigger". I found this test firing statement inconsistent with what was written on Page 4 of his report regarding the actual function of the FRT-15. Is FEO Smith saying that during his test firing he was able to override the semi-automatic function, to include the locking bar of the FRT-15? Or is it probable the FRT-15 functioned as a semi-automatic trigger faster than his capability to realize he was in fact pulling the trigger after each round?

Furthermore, I did not see any reference that FEO Smith's FRT-15 test firing was video recorded with him pulling the trigger. On Rare Breed Triggers' website, they have a video

2

showing a shooter pulling the trigger for each round that is fired. Again, if FEO Smith did have a video recording showing him pulling the trigger for each round that he shot, it would have greatly aided him in making a better-informed decision on the classification of the FRT-15 as a semi-automatic trigger.

On Monday, August 16, 2021, I was sent two videos of FEO Smith test firing an AR-15 rifle equipped with an FRT-15 trigger. I do not know when this test firing took place as there is no date mentioned during the video. During this test fire, FEO Smith used a plastic zip tie as an apparatus to assist with pulling the trigger. Due to the angle of the camera and distance to the firearm, all it shows is the rifle firing. Again, if the evaluation of the FRT-15 was thorough, a more complete test would have involved having a video recording device set up to show the actual function of the trigger during the test firing. Rare Breed Triggers website shows this, why can't ATF show it?

Regarding the topic of FEO Smith using a zip tie in order to test fire the FRT-15, I find it interesting ATF would use the zip tie test on a semi-automatic trigger. On June 25, 2007 ATF issued a letter clarifying a previous letter which classified a shoestring as a machinegun. In the June 25, 2007 letter, ATF's Firearms Technology Branch (FTB) stated "when the string is added to a semiautomatic firearm as you proposed in order to increase the cycling rate of that rifle, the result is a firearm that fires automatically and consequently would be classified as a machinegun". So FEO Smith attempted to increase the cycling rate of the semi-automatic FRT-15 trigger to the cycling rate of a machinegun? According the June 25, 2007 letter, it seems the person who adds the "string" or in this case the zip tie is the person attempting to make a machinegun.

In conclusion, I think FEO Smith could have done a more complete and thorough evaluation of FRT-15 trigger. He glossed over the locking function of the trigger after each time the trigger is pulled and by doing so, his report left out the key factors as to why the FRT-15 is and should be classified as a semi-automatic trigger. Additionally, there was no video showing the function of the trigger while it is being used in a firearm. This would have shown (in part) the trigger being pulled to the rear, it resetting forward, and a subsequent pull of the trigger to the rear in order for the next round of ammunition to be fired.

Sincerely,

Brian Luettke
Resident Agent/Owner FTINC, LLC

ATF0310

**Rebuttal statement of Daniel G. O'Kelly**

In ATF's Report of Technical Examination (UI #163080-21-0006) to Special Agent Michael T. Nuttall, I first noticed that they cite 28 CFR 0.130, adding that the Attorney General provides ATF with the authority to investigate, administer, and enforce the laws related to firearms. And pursuant to that, the Firearms and Ammunition Technical Division (FATD) "provides expert technical support" on firearms and ammunition to federal, state, and local law enforcement. However, shortly thereafter FATD "determines" that the item at issue is a machinegun, rather than merely offering their expert opinion as such. I find it disturbing that they offer their opinion as a determination because this "determination" is outside the scope of their authority. Any such determination is only within the authority of a court. Also, if FATD is going to offer "expert technical support", then that support should be in the form of expert technical opinions and should be based on facts and their ability to clearly interpret the elements called for in a definition within the U.S Code. However, they go on throughout the remainder of the report making "determinations" as though they are fact, while using vague and unclear terminology, often evading the pivotal point of the definition. They do so while making statements which are not only untrue but at times physically impossible. In their "Findings" on page 2, FATD cites the fact that "FTISB previously examine (sic) a "forced reset trigger" from (name redacted) (holder of U.S. Patent 10514223) and determined it to be a combination of parts, designed and intended for converting a weapon into a machinegun; and therefore a machinegun as defined in the GCA and NFA ... (bold added)"

This citation is also obviously a leap in logic which is being offered as "support" for their later-stated opinion that the Rarebreed FRT is a "machinegun". The reason that I find this disturbing is the fact that ATF's FTISB, previously known as "FTB" has commonly reversed themselves months or even years later as to their opinions of other items as firearms under the purview of the NFA, and then back again in some cases[1]. In this respect, how can logic dictate that item B should be classified as something because item A previously was, since item A can later be re-classified as something else? Also, I find it disturbing that ATF takes so much liberty with the use of the words "classify" and "classification" as they refer to a device or item. While it is the Court which is the finder of fact, ATF serves to give opinions as to which definition or "class", if any, an item falls according to the definitions in the CFR and the U.S. Code. They are supposed to do this according to their training and experience by applying the required elements contained in a given definition, and by further taking notice of the adjectives and adverbs found in said definition which further qualify a given element(s). However, the "classification" of an item as to whether it satisfies a given definition is an act which can be performed by anyone with enough command of English to read the definition in detail and comprehend its nuances, along with enough knowledge of the mechanical features of the item in question. This is a feat easily done by may laypersons and especially by those in the firearm industry. However, due to the lack of one or both of

---

[1] On 11/26/12 ATF's FTB letter to Alex Bosco (903050:MMK, 3311/2013-0172) stated that a forearm brace does not alter the classification of the firearm and would not be subject to the NFA, although the intentional shouldering of the brace would. Then on 3/5/14, ATF's FTB letter to Sergeant Joe Bradley (903050:AG 3311/301737), stated that even the intentional shouldering of a brace-equipped firearm would not violate the NFA. Then on 10/28/14, ATF's FTB letter to Eric Lemoine (907010:MCP, 3311/302492) again stated that should a person shoulder a brace as a stock, that it would be "classified" as a firearm within the NFA. Then on 3/21/17, ATF's FTB letter to Mark Barnes, Esq. (90000:GM 5000), stated that shouldering a forearm brace is "not necessarily a violation". Then on 6/10/21 ATF filed an NPRM in the Federal Register, proposing to make braces fall within the NFA.

1

ATF0311

these abilities, individuals and companies have acquiesced to ATF for decades, asking them to make such "determinations" or "classifications" for them. In years of being a paid Consultant for a number of licensed firearm manufacturers, I have repeatedly seen FATD take great advantage of the opportunity to get away with "classifying" or "ruling" items to be something that it does not satisfy the definition of. They are often completely subjective in their findings. This has clearly been the result of the latitude that FATD has been afforded by those with insufficient knowledge to apply the item to the definition themselves. Countless times FATD has taken advantage of the opportunity to call something as they prefer it be classified when either no one knew better, or was afraid to challenge them, or could not afford to due to because ATF has numerous Attorneys on salary who can bankrupt a challenger who would need to pay enormous legal fees. Too often, FATD also says that they determine something to be an NFA firearm based on elements which do not even appear in said definition[2].

Further in ATF's "Findings" in the second paragraph on page 3, they make a statement that the item covered in U.S. Patent 10514223 does not function by "hammer-follow". I find this issue disturbing as it is being offered as a "red herring". Even firearms which do experience "hammer-follow"[3] merely jam in most cases. Although a firearm which does fire more than one shot with a single function of the trigger due to hammer-follow would qualify as a machinegun, hammer-follow itself is not illegal.

At the end of the fourth paragraph on page 3 ATF incorrectly quotes the definition of a machinegun in their favor by saying that "Machinegun classifications are based on ... whether the device converts a weapon to shoot automatically." Here they have conveniently left out the phrase of the definition which adds," ... by a single function of the trigger". This is especially disturbing because the missing phrase is the key difference between what ATF alleges that the FRT does and what it in fact does. That is, fire fewer than one shot per function of the trigger.

In the fifth paragraph on page 3, ATF erroneously explains the meaning of the word "automatically" as it is defined in 27 CFR 479.11. Mr. Curtis states that "automatically" "means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger". As true as that may be, it has no application to the FRT. The FRT requires two separate functions of the trigger to fire each shot. Despite the fact that the FRT automatically assists the resetting of the trigger to the ready position, the FRT still requires a second manual and intentional function of the trigger, on the part of the shooter, to fire each shot. The FRT does not shoot automatically. He only thing that it does automatically is to reset its trigger to the ready position. In order for an item to qualify as a machinegun within the specified definition it must satisfy all of the several qualifiers in the definition. For example, the adverb "automatically", describes how the weapon must shoot. The adjectival phrase "more than one shot" describes what it must shoot. And further, the weapon must do these qualified things "without manual reloading". Finally, it must do all of the aforementioned actions "by a single function of the trigger". ATF Chief Counsel's Office has repeatedly

---

[2] FATD letter to Standard Manufacturing re the DP12 being a Destructive Device because it weighs eleven pounds.
[3] Hammer follow is a condition which may occur in a malfunctioning semiautomatic firearm, wherein the hammer can fail to remain in the cocked position during cocking, and then ride the bolt forward. In some cases, this can cause chain-firing and result in the gun becoming a machinegun as defined in 26 USC 5845. In most cases it only results in a jammed firearm which must be cleared before firing a subsequent shot.

2

determined that "a single function of a trigger means a single movement of a trigger.[4]" The below email was addressed to me as well as to hundreds of other ATF personnel at the time.

*From: Galbraith, A.*
*Sent: Friday, March 20, 2009 8:51 AM*
*To: Turner, R.; TPD-NEXUS*
*Subject: A system that fired upon release of the trigger also.*
*All,*

*FTB looked at the original device back in the day. As long as the gun only fires one shot on the pull and one on the release, it is NOT a machinegun. The ATF-counsel-approved interpretation of "single function of the trigger" is a single movement of the trigger, making systems like this OK.*
*A. Galbraith*

*Firearms Enforcement Officer*
*Firearms Technology Branch*
*244 Needy Road, Suite 1600*
*Martinsburg, WV 25405*

Since that time, Franklin Armory has developed and marketed their BFS Binary Triggers©. A Binary Trigger© is an ATF-approved trigger system which allows a firearm to fire one shot upon the pull function of the trigger, and another shot upon the release function of the trigger. FATD has considered this to be a legal and semiautomatic device since approximately 2015. Extremely fast follow up shots can be fired with a Binary Trigger©, which only requires one function of the trigger per shot fired, however ATF has an issue with the FRT which requires two functions of the trigger per shot fired. I find it very arbitrary that ATF has a problem with a device which requires twice the trigger functions per shot as one which they consider perfectly legal, let alone the fact that the FRT does not satisfy the definition.

In his examination report, Mr. Smith references a letter, regarding a different trigger, from Mr. Curtis. In his letter Mr. Curtis cites Staples vs. United States by pointlessly saying that "…once it's trigger is depressed the weapon will automatically continue to fire until it's trigger is released or the ammunition is exhausted." Here he is playing with the various connotations of the word "pressed". At risk of being redundant, upon "functioning" the trigger of an FRT by moving it rearward from the ready position to the fire position, the weapon only fires one shot. To fire a second shot, the shooter must wait for the FRT to force the trigger forward into the ready position. Only then can the shooter fire another shot by again pulling (functioning) the trigger to the rear, causing it to release the hammer. As a result of the design of the FRT, two separate functions of the trigger must occur for each shot fired. This is double the number of functions required for legal semiautomatic firing[5]. Mr. Curtis, in his *Staples* quote, attempts to use the word "depressed" as though it means "functioned". I notice throughout the ATF Report that

---

[4] See email from ATF FEO Adam Galbraith on 3/20/09 at 8:51am to Richard Turner and all ATF-trained Interstate Nexus Agents (TPD-Nexus).
[5] Compare to a machinegun, which fires two or more shots for each time the trigger performs the single function of releasing the hammer. Further, compare it to the Binary© type of legal semiautomatic triggers which fire a shot upon functioning the trigger to the rear, and fire another shot by functioning the trigger forward to the ready position.

3

the words "pressure", "pull", and "depressed" are used as though they are synonymous with "function". They are not. Function is defined as *"an activity or purpose natural to or intended for a person or thing. Verb: Work or operate in a proper or particular way[6]."*

With an FRT, the shooter may exert constant "pressure" against the trigger, although the trigger cannot be "pulled" (moved) to the rear again until after each time it is forced forward by the hammer, at which point it can be "functioned" again by intentionally moving it to the rear with the finger. Constant pressure on a trigger does nothing. It is akin to leaning against a locked door until someone unlocks the door from the other side, which then allows the door to be pushed open by the weight leaning against it. It is only then that the weight of the person who is leaning against it functions the door to the open position. Upon the person falling through the then open door, the door is again forced closed, and locked by a mechanical apparatus (e.g. FRT's locking bar). During this time, another person leans against the door waiting for it to be unlocked so that their weight allows them to fall through it once unlocked.

Mr. Smith then cites the Freedom Ordnance 3:16-cv-00243-RLY-MPB case, stating that " ... a firearm is a machinegun when an internal mechanism or operation automatically forces the individuals finger forward instead of requiring that the shooter release the trigger." Again, there is nothing in the National Firearms Act to support this. The definition of a machinegun makes no such claim. This is yet another example of FATD's decades long practice of insisting that items fall within definitions which they clearly do not satisfy the elements of[7]. The word "automatically" is used in the definition to describe how the gun must shoot. That is, <u>with a single function of the trigger.</u> The FRT's trigger's return to the reset and forward position is forced by the FRT's hammer, but this movement (function) is still a "release". The definition says nothing about requiring the shooter to "release" or to remove their finger from the trigger.

At the top of page 4, Smith erroneously states that "If a device is designed to assist in preventing the hammer from positively resetting or which utilizes a spring, electric motor or non-manual source of energy which assists in the automatic resetting of the hammer and causes the firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, such an item or device would be classified as a combination of parts designed and intended, for use in converting a weapon into a machinegun; ... " Firstly, this verbiage is not found in any definition of a machinegun within the U.S. Code. It is merely another example of FATD writing their opinion to suit a situation. Additionally, the FRT does none of these things. It does not "assist in preventing the hammer from resetting". In the FRT the hammer positively resets and re-engages with the trigger after each shot. Secondly, every semiautomatic firearm ever made utilizes a "non-manual source of energy which assists in the automatic resetting of the hammer". That is the energy generated by burning gunpowder to drive

---

[6] Google.

[7] From 1968 to 2021 ATF insisted that a part of 60% of new firearms on the market have a part which qualifies as a firearm "frame or receiver" as defined in 27 CFR 478.11. However, based on my testimony in the Lycurgan, Jiminez, Roh, and Rowold/Robison cases, Attorney General Loretta Lynch notified Speaker of the House Paul Ryan in 2015 that ATF needed to correct the issue. ATF took no action. In 2018 Judge Seina, and in 2020 Judge Carr, ruled that ATF was wrong. In June of 2021 ATF finally filed a New Proposed Rulemaking in the Federal Register to change the definition of a "frame receiver" to include the previously referred to parts. The process is ongoing.

4

the bolt or breechblock[8] to the rear, which in turn causes the reset of the hammer by its reengagement with the trigger[9]. This is a non-manual source of energy, so if FATD's above position were to be given merit, then every semiautomatic firearm in the U.S. would be deemed a machinegun.  Further, the phrase "and causes a firearm to shoot automatically more than one shot" precludes the FRT from FATD's position because it does not shoot more than one shot per function of the trigger.

On page 4, 8th paragraph, Mr. Smith states that "This differs from a cycle of eoprations (sic) in a typical AR-type semiautomatic firearm in which the shooter must release and pull the trigger to fire a second projectile". His statement here is misleading, because in a typical AR-type firearm, the shooter does not have to release the trigger to allow the trigger to reset. The trigger resets due to the fact that it is under spring pressure to return to the forward position. In fact, the trigger-return spring in a typical AR-type firearm performs the same function as the FRT hammer. It returns the trigger to the forward/reset position. The only difference between the way the typical system works vs. the FRT is the amount of force with which the trigger is forced forward. The shooter must only lessen the pressure that he/she is exerting against the trigger in a typical AR-type firearm to allow the spring to do its job. The finger is never required to break contact with the trigger. In an FRT the hammer performs the movement (function) of returning the trigger to the forward position without the need for the shooter to break contact with the trigger.

Mr. Smith continues by saying that "… a firearm assembled with the FRT requires no such release and subsequent pull by the shooter to fire a second projectile. … the shooter may fire a second projectile merely by maintaining the initial trigger pull and allowing the self-acting internal mechanism to complete its automatic cycle of operation". Although Mr. Smith is correct that an FRT equipped firearm doesn't require a "release" (break in contact from the finger) with the trigger to fire a subsequent shot, it does require the trigger to <u>function</u> by moving back to the reset position before firing another shot. However, he is incorrect by stating that the "shooter may fire second projectile by maintaining the initial trigger pull." This is physically impossible, due to the forced return (function) of the trigger to the reset position by the steel hammer, and then by the locking bar which holds it locked into that position until the cycle of firing that shot is complete. In this instance ATF again takes liberty in blurring the lines between "pull", "pressure", and "function". The truth is, that a shooter of an FRT may maintain pressure on the trigger throughout the firing of a string of several shots, but even then, the trigger functions to release the hammer and then functions to reset the hammer/trigger for each shot fired. Of course, the shooter must consciously cause one of these functions to occur for each shot.

 The most disturbing statement in Mr. Smith's' entire report is on page 5 in the second paragraph. He describes his test-firing of the FRT, stating that he "…fired two rounds automatically with a single pull/function of the trigger" and that he repeated this an additional time. The reason that I say this statement is so disturbing is because his claim is physically impossible. Unless he was test-firing some other device, this could not have occurred. As I've previously stated, every time an FRT-equipped firearm fires a shot, the trigger is forced to return to the forward reset position where it began before

---

[8] Depending on it's design, every firearm utilizes either a bolt or breechblock to support the rear of a cartridge upon firing. This support prevents pressure from moving rearward until after the bullet exits the barrel and prevents injury to the shooter.
[9] Some semiautomatic firearms utilize a striker instead of a hammer. A striker is a spring-loaded firing-pin which is released from the cocked position by the sear upon a function of the trigger.

5

firing. Resultingly, during a string of rapidly fired shots, the shooter will physically feel his finger moving rearward and forward once each, for each shot fired. This movement is approximately .13 inch both fore and aft. It is imperative to note here that firearms are precise machines which rely on extremely close tolerances in order to function, and to do so safely. There is no measurable "play" or "stretch" in an operable firearm. The trigger of an FRT must make this movement both aft and then again forward for each shot fired. Therefore, I'm at a loss as to how Mr. Curtis can make this impossible claim. As such, Mr. Smith should reconsider this statement before testifying to it under oath. In the next paragraph, he claims to have fired 5 shots "by a single function of the trigger". This is again impossible as the trigger would have made the above-described movements (functions 2 time for each  shot fired).

I note that this is the first time that ATF acknowledges the "pull" of a trigger as a function. This is a double-edged sword however, because Mr. Smith, and FATD in general, is noticeably liberal in their usage of the various connotations of this word "pull" as it suits their collective aim. I offer that a person can "pull" or add "constant pressure" on the knob of a locked door without causing a "function" to occur, whereas one can also "pull" or add "constant pressure" on the same door when not locked and effect the "function" of opening or closing the door in the process. Likewise, a person can or add "pressure" onto the steps of an escalator by stepping onto it. Yet the escalator continues to perform the "function" of moving the person up or down the incline by working against that pressure. There is a huge difference between "pull", "pressure" and "function", which is exactly why writers of the definition chose to use "function" as the definitive issue concerning what a trigger must do.

In referencing a prior examination of a different trigger, On page (46) Mr. Curtis states in the last sentence on the page that "... a single constant rearward *pull* will cause the firearm to fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." (italics added) Here is yet another misleading statement which is poorly worded, in an effort to support FATD's position. Not to mention the fact this is not an examination of the FRT-15. The accurate way to have stated this would be "a single rearward movement will cause the trigger to function twice for each shot fired, by repeatedly functioning the release of the hammer, and then functioning to reengage the hammer with the trigger." In summary, ATF regularly confuses the issue by saying "pressure" where it is immaterial because "function" is the issue. At other times ATF uses the word or "pull" despite the fact that they are referring to a pressure which is causing no function.

Again referencing a examination of a trigger which is not the FRT-15, On page (50), Mr. Curtis states in the second paragraph that "...after firing several cartridges the sear failed to retain the hammer which simply followed the bolt forward leaving a substantial firing-pin mark on the primer of the chambered cartridge without firing the cartridge." Here I fail to see the point, as this merely resulted in a stoppage, commonly known as a "jammed gun". This is hardly a violation of the U.S. Code or a public safety issue. It would only be of consequence if the gun had fired multiple shots as a result.

Again referencing a examination of a trigger which is not the FRT-15, On page (51) Mr. Curtis describes a test-firing sequence wherein ATF modifies the gun by attaching a zip-tie around the trigger. This is a laughable demonstration because it has nothing to do with ATF's erroneous assertion that the FRT fires more than one shot by a single function of the trigger. Zip-ties have nothing to do with the FRT. If a person were to modify a firearm from its original legal design by redesigning it as a machinegun as defined in 26 USC, then the criminal violation would have been committed by the modifying individual. This "test" also gives no acknowledgement to the fact that a plastic zip-tie has some degree of elasticity

6

and that the installation of one as depicted still allows the firing to occur as a semiautomatic, with one shot being fired with at least one function of the trigger occurring each time. Further, if such a modified firearm were received from the field by FTSIB for determination, they would "classify the zip-tie as the machinegun, as they have other items in the past, such as shoestrings, pieces of a coat hanger, etc... In such cases their determination is that the item has been redesigned as an item solely intended for use in converting a weapon into a machinegun, under the third definition of a machinegun in 26 USC 5845(b). In fact, any, and every semiautomatic firearm can be modified to fire fully-automatically. However, this doesn't make every semiautomatic a machinegun.

Again referencing an examination of a trigger which is not the FRT-15, On page (52), Mr. Curtis states in paragraph 2 that " ... ATF has long held that a single function of the trigger is a "single pull" or alternatively, a single release of a trigger." Here FATD's statement fully supports my earlier point about Binary Triggers©. The ATF stated position clearly supports that either a function of the trigger to the rear for each shot fired is legal, or alternatively, a single function of the trigger is alone sufficient for the FRT to be recognized as a legal semiautomatic. Therefore, the FRT could ironically fire two shots for each pull and return of the trigger, regardless of the fact that it is mechanically returned to the reset position, and still be legal. Yet FATD erroneously argues otherwise.

Again referencing a examination of a trigger which is not the FRT-15, In paragraph 4 of page (52), Mr. Curtis begins by citing that "Federal courts have noted that automatically means the weapon "fires repeatedly with a single pull of the trigger"". Still, he blurs the issue with the use the word "pull". No firearm fires by merely adding pressure to a trigger without that trigger actually moving a distance. So, "pull" certainly does not mean "add pressure without movement". Clearly, the federal courts have intended the word "pull" to mean a movement which causes a function therefore we see the word "function" in the definition. Once again, the FRT fires one shot per rearward movement/function of the trigger.

Again referencing a examination of a trigger which is not the FRT-15, At the start of paragraph 5 on page (52), Mr. Curtis falsely states "FTISB testing indicated that continuous rearward pressure after the initial pull of the trigger initiates a "firing sequence" which discharges multiple rounds with a single function of the trigger." I can only shake my head at such an outlandish claim. The facts are that maintaining rearward pressure on the trigger after the initial pull of the trigger, initiates the repetition of a cycle wherein the firing of one shot occurs with each time the trigger is functioned aft and then functioned forward.

Finally in referencing a examination of a trigger which is not the FRT-15,, on page (53) in paragraph 2, Mr. Curtis says that "A device designed to prevent the hammer from positively resetting could cause a firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, and would also be classified as a combination of parts designed and intended, solely and exclusively, for use in converting a weapon into a machinegun;..." I'm at a loss to see his point here as he again attempts to use technical descriptions and definitions which have zero applicability here. The hammer in an FRT absolutely makes a positive reset by interlocking with the trigger after each shot fired. Further, how does he propose to call something illegal by virtue of what it "could do"? Obviously, a baseball bat "could" be used as a deadly weapon, but until or unless it is that doesn't make them illegal. Even further, an FRT fires one shot per two trigger functions, let alone one per trigger function

7

(i.e. Binary Triggers©), let alone more than one shot per trigger function (i.e. machineguns). Lastly, since an FRT <u>does not</u> convert a firearm into a machine gun, it is not designed and intended for that purpose.

I reserve the right to amend my report.

Daniel O'Kelly

8/26/21

Date

8

ATF0318

August 26, 2021

**VIA E-MAIL ONLY**
**kevincmaxwell@gmail.com**

Kevin C. Maxwell, Esquire
Law Offices of Kevin C. Maxwell
733 West Colonial Drive
Orlando, Florida 32804

Subject: Rare Breed FRT-15 Rebuttal

Dear Kevin:

My consulting firm, Rick Vasquez Firearms, LLC was asked to provide an opinion concerning the classification of Rare Breed Triggers model FRT-15 trigger by ATF as a machinegun. This classification is found in FTCB# 2021-595-DAS 317066 in which ATF FTISB has classified the FRT-15 as a machinegun.

As part of my research and analysis, I have reviewed a Rare Breed Trigger installed in a firearm, along with an animated video on the operating principles. Provided to me for review were videos demonstrating how the FRT-15 works side by side of a Giessele trigger of the same design that ATF classified as a non-machinegun. While an employee of ATF and as the Acting Branch Chief of the Firearms Technology Branch I wrote opinions and classifications on machineguns, to include the Akins Accelerator. I additionally reviewed previous ATF Firearms Technology Branch rulings on machineguns and rate of fire increasing triggers and utilized my extensive experience in firearms technology classification related matters.

## I.    LEGAL DEFINITIONS AND BACKGROUND:

Under 18 U.S.C. § 921(a)(3), the Gun Control Act of 1968 ("GCA") defines the term "firearm" to include "any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive ... [and] ... the frame or receiver of any such weapon..." Moreover, under 26 U.S.C. § 5845(b), the National Firearms Act of 1934 ("NFA") defines "machinegun" to include "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. This term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." (emphasis added). Thus, the question presently under consideration is whether the Rare Breed Triggers FRT-15 falls within the definition of "machinegun" under the NFA.

## II.    APPLICATION AND ANALYSIS:

As a preliminary matter, it has long been ATF's position (dating back to the late 2000) that semi-automatic rifles that did not use electronics, springs, or hydraulics to reset the trigger were not

RICK VASQUEZ FIREARMS, LLC
August 26, 2021, Page 2 of 3

machineguns. The FRT-15 has a redesigned trigger, hammer, and a locking bar that functions as a disconnector. This system forces the trigger to mechanically reset and allows the shooter to pull the trigger in a rapid movement.

The FTISB report provided is very heavy on statutes and previous case law but light on explaining the Rare Breed trigger. For example, this trigger is not electric or an electrically fired minigun as one of the cited cases, nor does it have hydraulics or spring as cited in the Akins case. The pertinent information is the description of the method of operation. The FTISB description of operation is cited and clarified

FTCB# 2021-595-DAS 217066 "Below is a description of how the Rare Breed Trigger, FRT-15 device operates with attached diagrams found on the Rare Breed Trigger website.

First, the FRT-15 device must be installed into an AR 15-type weapon which includes a H3 weight buffer and M 16-type bolt carrier. These components are necessary because the specific design of the FRT-15 requires these to function as designed.

The picture on page 4 of the attached, shows the position of the hammer (orange), trigger (red), and locking bar (green) in the FRT-15 device once the weapon is charged and the selector is placed in the fire position. In this configuration, the hammer is held in place with its sear surface against the front of the trigger.

When the trigger is pulled (rearward pressure applied to the trigger), the hammer is released and strikes the firing pin, igniting the cartridge primer, and starting the cycle of operations (See attachment page 5 picture 7).

As the bolt carrier moves to the rear, the hammer is driven into the top of the trigger forcing it forward. The bolt carrier then strikes the locking bar moving, it to lock the trigger in the forward position (See attachment page 6 picture 8).

As the bolt carrier moves forward, the trigger is held in the forward position by the locking bar and the hammer engages the sear surface on the front of the trigger (See attachment page 7 picture 9). As the bolt carrier continues to move forward, it strikes the rear surface of the locking bar releasing the trigger. If the shooter maintains constant rearward pressure to the trigger, that single constant pull will continue the cycle of operation and fire a subsequent projectile. (See attachment page 8, 9 picture 1 0, 1 1). This differs from a cycle of operations in a typical AR-type semiautomatic firearm in which a shooter must release and pull the trigger to fire a second projectile. As stated, a firearm assembled with the FRT-15 requires no such release and subsequent pull by the shooter to fire a second projectile. Instead, the shooter may fire a second projectile merely by maintaining the initial trigger pull and allowing the self-acting internal

RICK VASQUEZ FIREARMS, LLC
August 26, 2021, Page 3 of 3

mechanism to complete its automatic cycle of operation."

The areas from the FTISB report in red are critical missteps by FTISB whether purposeful or not; we do not know. When the bolt comes to the rear, it cocks the hammer, which forces the trigger to reset in the forward position allowing the trigger finger to travel forward, and the blocking bar (disconnector is engaged) captures the trigger. At this time the hammer is still engaged. As the bolt carrier goes forward, it trips the blocking bar leaving the trigger and front of the hammer engaged. The blocking bar does not work as an automatic sear trip. If the shooter applies continued rearward pressure on the trigger, it will fire again with a single function of the trigger. If the shooter applies too much pressure, the cycle of operation is interrupted.

If the shooter releases the trigger, it ceases firing. This is no different than the Giessele Trigger (that ATF has approved) demonstrated in the video provided. The mechanics of the trigger components are the same. The video demonstrates how each trigger is pushed forward, pushing the shooters finger forward and then the trigger finger pulls the trigger causing the firearm to fire one shot. The FRT-15 trigger works simply as a rapid reset device allowing for rapid firing. This is not automatic firing as ATF has previously explained.





Rare Breed Triggers FRT - Action
RARE BREED TRIGGERS

https://www.rarebreedtriggers.com

## III.   CONCLUSION:

The trigger works simply as a rapid reset device allow for rapid firing. This is not automatic firing as ATF has previously explained. The mechanics allow for a rapid reset and pulling of the trigger. The videos provided and missteps in the FTISB report clearly demonstrate that FTISB either deliberately attempted to mislead and obfuscate, or simply does not perform historical research and comparisons when making opinions. My previous opinion not only still

RICK VASQUEZ FIREARMS, LLC
August 26, 2021, Page 4 of 3

stands but is more strongly confirmed. The FRT trigger system is a self- contained trigger
assembly with a redesigned hammer, trigger, and locking bar (disconnector).
The FRT trigger system does not have an automatic sear, nor does it operate by electronics,
springs, or hydraulics, therefore, is not a "machinegun". Additionally, there is no verifiable
history of ATF opinions to support this trigger being classified as a machinegun, both in general
and specifically pertaining to the underlying design.

Please contact me with any questions or concerns that you may have or should you require any
clarification of me opinion. This letter and the opinions contained therein are intended solely for
your law firm and your client and are not to relied upon by any other individual or entity for any
purposes.

                              Very truly yours,

                              Rick Vasquez

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Denver Field Division*

www.atf.gov

January 12, 2022

3rd Gen Machine Inc
1435 North 200 W
Logan, UT 84341

Dear Evan Michael Jones and Jonathon William Robinson:

This is in reference to the Rare Breed Triggers FRT-15 manufactured, distributed, or sold by your company. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) examined this trigger and determined it to be a machinegun as defined in the National Firearms Act (NFA) and the Gun Control Act (GCA).  Please be aware that ATF is currently conducting a criminal investigation into these triggers, and you are now on notice that any information you have regarding these triggers, and any triggers you currently possess, could be considered evidence in this investigation and destruction or disposal of this evidence could be viewed as obstruction.

The GCA defines the term "machinegun" as "the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))." 18 U.S.C. 921(a)(23).  The NFA defines the term "machinegun" under section 5845(b) as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,* and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. 5845(b). *Italics added.*

Because the Rare Breed Triggers FRT-15 is a machinegun under the NFA, it is subject to the registration, transfer, taxation, and possession restrictions applicable to these regulated weapons, which include criminal penalties relating to the illegal transfer and possession of said weapons. *See* 26 U.S.C., Chapter 53; *see also* 26 U.S.C. § 5871 (any person who violates or fails to comply with the provisions of the NFA may be fined up to $10,000 per violation and is subject to imprisonment for a term of up to ten years). Additionally, the Rare Breed Triggers FRT-15 is subject to the prohibitions regarding the possession, transfer, and transport of machineguns under the GCA as set forth in 18 U.S.C. §§ 922(o) and 922(a)(4).

ATF0323

The manufacture and sale of a machinegun is subject to significant legal restrictions and compliance under the GCA and the NFA. The NFA requires that the manufacturer register each firearm manufactured in the National Firearms Registration and Transfer Record. *See* 26 U.S.C. § 5841; 27 C.F.R. § 479.101. Any firearm manufactured and/or transferred in violation of the NFA, and/or subject to the NFA, and possessed by a person to whom it is not registered, is a violation of the NFA and subject to seizure and forfeiture. *See* 26 U.S.C. §§ 5861, 5872.

ATF has concluded that the Rare Breed Triggers FRT-15 is a combination of parts designed and intended for use in converting a weapon into a machine gun, hence, the FRT-15 has been classified as a "machinegun" as defined by the NFA and GCA. ATF's examination found the Rare Breed Triggers FRT-15 allows a firearm to expel more than one shot, without manual reloading, with a single, continuous pull of the trigger. Because the FRT-15 is properly classified as a "machinegun" you must immediately take the following actions:

1. **Cease and desist all manufacture and transfer of the Rare Breed Triggers FRT-15.**
2. **Immediately surrender any Rare Breed Triggers FRT-15 currently in your possession to ATF.  You will be notified shortly of the basis for the seizure, and you may file a claim once you receive this notice. If your claim is denied, you may contest this forfeiture in federal court and your surrender of these triggers will not be deemed a waiver of your rights to contest this forfeiture.**
3. **Contact ATF within 5 days of receipt of this letter to develop a plan for addressing those machineguns already distributed.**

The NFA levies a $200 tax on each firearm made and an additional $200 tax on each firearm transferred. *See* 26 U.S.C. §§ 5811, 5821.  3rd Gen. Machine Inc. may be liable for a $200 making tax and a $200 transfer tax on each Rare Breed Trigger FRT-15 made and transferred.

For public safety reasons, your cooperation in this matter is essential. Your failure to take the above steps may result in (1) law enforcement action by ATF, including a referral of this matter to the United States Attorney's Office for criminal prosecution; (2) tax assessment and collection; and/or (3) seizure and forfeiture of the firearms and property involved in violations of Federal law.

If you have any questions, and to discuss the plan referenced above, please contact Special Agent in Charge, Denver Field Division, David S. Booth at (303) 575-7600.

Sincerely,


David S. Booth
Special Agent in Charge
Denver Field Division

ATF0324

Acknowledgment of Service

Served on the _____day of _____, 2022, by _____, Special Agent,

Bureau of Alcohol, Tobacco, Firearms and Explosives at _____.

I hereby acknowledge receipt of this notice:

_____ _____
Signature                                                    Date

ATF0325



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives
*Office of Enforcement Programs and Services*
*Office of Field Operations*

Washington, DC 20226
www.atf.gov

March 22, 2022

## OPEN LETTER TO ALL FEDERAL FIREARMS LICENSEES

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) recently examined devices commonly known as "forced reset triggers" (FRTs) and has determined that some of them are "firearms" and "machineguns" as defined in the National Firearms Act (NFA), and "machineguns" as defined in the Gun Control Act (GCA).

These particular FRTs are being marketed as replacement triggers for AR-type firearms. Unlike traditional triggers and binary triggers (sometimes referred to generally as "FRTs"), the subject FRTs do not require shooters to pull and then subsequently release the trigger to fire a second shot. Instead, these FRTs utilize the firing cycle to eliminate the need for the shooter to release the trigger before a second shot is fired. By contrast, some after-market triggers have similar components but also incorporate a disconnector or similar feature to ensure that the trigger must be released before a second shot may be fired and may not be machineguns.

Both the NFA and GCA regulate machineguns. "Machinegun" is defined under 26 U.S.C. § 5845(b) and 18 U.S.C. § 921(a)(23) as—

> Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, *or combination of parts designed and intended, for use in converting a weapon into a machinegun,* and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. (Emphasis added.)

ATF's examination found that some FRT devices allow a firearm to automatically expel more than one shot with a single, continuous pull of the trigger. For this reason, ATF has concluded that FRTs that function in this way are a combination of parts designed and intended for use in converting a weapon into a machinegun, and hence, ATF has classified these devices as a "machinegun" as defined by the NFA and GCA.

Accordingly, ATF's position is that any FRT that allows a firearm to automatically expel more than one shot with a single, continuous pull of the trigger is a "machinegun", and is accordingly subject to the GCA prohibitions regarding the possession, transfer, and transport of machineguns

**OPEN LETTER TO ALL FEDERAL FIREARMS LICENSEES** (cont.)

under 18 U.S.C. §§ 922(o) and 922(a)(4).  They are also subject to registration, transfer, taxation, and possession restrictions under the NFA. *See* 26 U.S.C. §§ 5841, 5861; 27 CFR 479.101.

Under 26 U.S.C. § 5871, any person who violates or fails to comply with the provisions of the NFA may be fined up to $10,000 per violation and is subject to imprisonment for a term of up to ten years.  Further, pursuant to 26 U.S.C. § 5872, any machinegun possessed or transferred in violation of the NFA is subject to seizure and forfeiture.  Under 18 U.S.C. § 924(a)(2), any person who violates § 922(o) may be sent to prison for up to 10 years and fined up to $250,000 per person or $500,000 per organization.

Based on ATF's determination that the FRTs that function as described above are "machineguns" under the NFA and GCA, ATF intends to take appropriate remedial action with respect to sellers and possessors of these devices.  Current possessors of these devices are encouraged to contact ATF for further guidance on how they may divest possession.  If you are uncertain whether the device you possess is a machinegun as defined by the GCA and NFA, please contact your local ATF Field Office.  You may consult the local ATF Office's webpage for office contact information.

Assistant Director
Enforcement Programs and Services

Assistant Director
Field Operations