# VOLUME 10



U. S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Correspondence Approval and Clearance**

903050:MRC
3311/2006-1060

**BY HAND DELIVERY**



Dear

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) recently received a request from an individual to examine a device referred to as an "Akins Accelerator." Because your company is manufacturing and distributing the device, we are contacting you to advise you of the results of our examination and classification.

The National Firearms Act (NFA), Title 26 United States Code (U.S.C.) Chapter 53, defines the term "firearm" to include a machinegun. Section 5845(b) of the NFA defines the term "machinegun" as follows:

> ...any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

Machineguns are also regulated under the Gun Control Act of 1968 (GCA), 18 U.S.C. Chapter 44, which defines the term in the same way as in the NFA. 18 U.S.C. § 921(a)(23). Pursuant to 18 U.S.C. § 922(o), machineguns manufactured on or after May 19, 1986, may only be manufactured for and distributed to Federal, State, and local government agencies for official use.

The Firearms Technology Branch (FTB) examination of the submitted item indicates that the Akins Accelerator is an accessory that is designed and intended to accelerate the rate of fire for Ruger 10/22 semiautomatic firearms. The Akins Accelerator device, which is patented, consists of the following metal block components (also see enclosed photos):

| Code | Initiator 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer | Reviewer | Reviewer | Reviewer |
|------|------------------|-----------------|-----------------|-----------------|----------|----------|----------|----------|
| Surname | | | | | | | | |
| Date | | | | | | | | |

ATF EF 3312. 3A
Revised May 2004

U. S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Correspondence Approval and Clearance**

- Block 1: A metal block that replaces the original manufacturer's V-Block of the 10/22 rifle. The replacement block has two rods attached that are approximately ¼ inch in diameter and approximately 6 inches in length.
- Block 2: A metal block that is approximately 3 inches long, 1-3/8 inches wide, and ¾ of an inch high that has been machined to allow the two guide rods to pass through.  Block 2 serves as a support for the guide rods and as an attachment to the stock.

As received, the Akins Accelerator utilizes the following parts and features to facilitate assembly:

- Assembly of Block 1 to Block 2: These blocks are assembled using ¼ inch rods, metal washers, rubber and metal bushings, two collars with set screws, one coiled spring, C-clamps, and a split ring.
- Apertures for Attachment of Stock: Block 2 is drilled and tapped for two 10-24 NC screws.  These threaded holes allow the attachment of the Akins device with Ruger 10/22 barreled receiver to the composite stock that is a component part of the Akins device.

The composite stock is designed for a Ruger 10/22 barrel and receiver.  This stock permits the entire firearm (receiver and all its firing components) to recoil a short distance within the stock when fired. Rearward pressure on the trigger causes the firearm to discharge, and as the firearm moves rearward in the composite stock, the shooter's trigger finger contacts the stock.  The trigger mechanically resets, and the accelerator, which has a coiled spring located forward of the firearm receiver, is compressed.  Energy from this accelerator spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the trigger to contact the shooter's trigger finger, so long as the shooter maintains finger pressure against the stock, making the weapon fire again.  The Akins device assembled with a Ruger 10/22 is advertised to fire approximately 650 rounds per minute.

For testing purposes, FTB personnel installed a semiautomatic Ruger 10/22 rifle from the National Firearms Collection into the stock, with the Akins device attached.  Live-fire testing of the Akins Accelerator demonstrated that a single pull of the trigger initiates an automatic firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted.

In order to be regulated as a "machinegun" under Section 5845(b), conversion parts must be designed and intended to convert a weapon into a machinegun, i.e., a weapon that shoots automatically more than one shot, without manual reloading, by a **single function of the trigger**. Legislative history for the National Firearms Act indicates that the drafters equated "single function of the trigger" with "single pull of the trigger." National Firearms Act:  Hearings Before the Comm.. on Ways and Means, House of Representatives, Second Session on H.R. 9066, 73rd Cong., at 40 (1934).  Accordingly, it is the position of this agency that conversion parts that are designed and intended to convert a weapon into a machinegun, that is, one that will

| Code | Initiator 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer | Reviewer | Reviewer |
|---|---|---|---|---|---|---|---|
| Surname | | | | | | | |
| Date | | | | | | | |

ATF 0648 3A
Revised May 2004

**U. S. Department of Justice**
-3-
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Correspondence Approval and Clearance**

shoot more than one shot, without manual reloading, by a single pull of the trigger, are regulated as machineguns under the National Firearms Act and the Gun Control Act.

We note that by letters dated November 17, 2003, and January 29, 2004, we previously advised you that we were unable to test-fire a prototype of the Akins device that you sent in for examination. However, both letters state that the theory of operation is clear, and because the device is not a part or parts designed and intended for use in converting a weapon into a machinegun, it is not a machinegun as defined under the National Firearms Act. The previous classification was based on a prototype that fractured when this office attempted to test fire it. Nonetheless, the theory of operation of the prototype and the Akins Accelerator is the same. To the extent the determination in this letter is inconsistent with the letters dated November 17, 2003, and January 29, 2004, they are hereby overruled.

Manufacture and distribution of the Akins Accelerator device must comply with all provisions of the NFA and the GCA. Accordingly, any devices you currently possess must be registered in accordance with 26 U.S.C. § 5822 and regulations in Part 27 Code of Federal Regulations (C.F.R). § 479.103. If you do not wish to register the devices, they should immediately be abandoned to the nearest ATF Office. You may contact the Portland field office at ███████ to arrange for abandonment of the weapons. Pursuant to 18 U.S.C. § 922(o), the devices may only be manufactured for and distributed to Federal, State, and local law enforcement agencies. In addition, the devices must be marked in accordance with 18 U.S.C. § 923(i), 26 U.S.C. § 5842, 27 C.F.R. § 478.92, and 27 C.F.R. § 479.102. If you have questions about any of these provisions of law, please contact Acting Assistant Chief ███████ in the Firearms Programs Division a ███████

Sincerely yours,

Richard Vasquez
Assistant Chief, Firearms Technology Branch

cc: SAC, Seattle Field Division
DIO, Seattle Field Division
Division Counsel, Seattle
Assistant Chief Counsel, San Francisco

Enclosures

| Code | Initiator 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer | Reviewer | Reviewer |
|---|---|---|---|---|---|---|---|
| Surname | | | | | | | |
| Date | | | | | | | |

ATF 0649 3A
Revised May 2004

**18 U.S.C. 922(o):  Transfer or possession of machinegun**
**26 U.S.C. 5845(b):  Definition of machinegun**
**18 U.S.C. 921(a)(23):  Definition of machinegun**

*The definition of machinegun in the National Firearms Act and the Gun Control Act includes a part or parts that are designed and intended for use in converting a weapon into a machinegun. This language includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted.*

**ATF Rul. 2006-2**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has been asked by several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm. These devices, when attached to a firearm, result in the firearm discharging more than one shot with a single function of the trigger. ATF has been asked whether these devices fall within the definition of machinegun under the National Firearms Act (NFA) and Gun Control Act of 1968 (GCA). As explained herein, these devices, once activated by a single pull of the trigger, initiate an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted. Accordingly, these devices are properly classified as a part *"designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun"* and therefore machineguns under the NFA and GCA.

The National Firearms Act (NFA), 26 U.S.C. Chapter 53, defines the term "firearm" to include a machinegun. Section 5845(b) of the NFA defines "machinegun" as *"any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."* The Gun Control Act of 1968 (GCA), 18 U.S.C. Chapter 44, defines machinegun identically to the NFA. 18 U.S.C. 921(a)(23). Pursuant to 18 U.S.C. 922(o), machineguns manufactured on or after May 19, 1986, may only be

- 2 -

transferred to or possessed by Federal, State, and local government agencies for official use.

ATF has examined several firearms accessory devices that are designed and intended to accelerate the rate of fire for semiautomatic firearms. One such device consists of the following components: two metal blocks; the first block replaces the original manufacturer's V-Block of a Ruger 10/22 rifle and has attached two rods approximately ¼ inch in diameter and approximately 6 inches in length; the second block, approximately 3 inches long, 1 ⅜ inches wide, and ¾ inch high, has been machined to allow the two guide rods of the first block to pass through. The second block supports the guide rods and attaches to the stock. Using ¼ inch rods, metal washers, rubber and metal bushings, two collars with set screws, one coiled spring, C-clamps, and a split ring, the two blocks are assembled together with the composite stock. As attached to the firearm, the device permits the entire firearm (receiver and all its firing components) to recoil a short distance within the stock when fired. A shooter pulls the trigger which causes the firearm to discharge. As the firearm moves rearward in the composite stock, the shooter's trigger finger contacts the stock. The trigger mechanically resets, and the device, which has a coiled spring located forward of the firearm receiver, is compressed. Energy from this spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the trigger to contact the shooter's trigger finger. Provided the shooter maintains finger pressure against the stock, the weapon will fire repeatedly until the ammunition is exhausted or the finger is removed. The assembled device is advertised to fire approximately 650 rounds per minute. Live-fire testing of this device demonstrated that a single pull of the trigger initiates an automatic firing cycle which continues until the finger is released or the ammunition supply is exhausted.

As noted above, a part or parts designed and intended to convert a weapon into a machinegun, *i.e.*, a weapon that will shoot automatically more than one shot, without manual reloading, by a single function of the trigger, is a machinegun under the NFA and GCA. ATF has determined that the device constitutes a machinegun under the NFA and GCA. This determination is consistent with the legislative history of the National Firearms Act in which the drafters equated "single function of the trigger" with "single pull of the trigger." *See, e.g., National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066*, 73rd Cong., at 40 (1934). Accordingly, conversion parts that, when installed in a semiautomatic rifle, result in a weapon that shoots more than one shot, without manual reloading, by a single pull of the trigger, are a machinegun as defined in the National Firearms Act and the Gun Control Act.

*Held*, a device (consisting of a block replacing the original manufacturer's V-Block of a Ruger 10/22 rifle with two attached rods approximately ¼ inch in diameter and approximately 6 inches in length; a second block, approximately 3 inches long, 1 ⅜ inches wide, and ¾ inch high, machined to allow the two guide rods of the first block to pass through; the second block supporting the guide rods and attached to the stock; using ¼ inch rods; metal washers; rubber and metal bushings; two collars with set screws; one coiled spring; C-clamps; a split ring; the two blocks assembled together with the

composite stock) that is designed to attach to a firearm and, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted, is a machinegun under the National Firearms Act, 26 U.S.C. 5845(b), and the Gun Control Act, 18 U.S.C. 921(a)(23).

*Held further*, manufacture and distribution of any device described in this ruling must comply with all provisions of the NFA and the GCA, including 18 U.S.C. 922(o).

To the extent that previous ATF rulings are inconsistent with this determination, they are hereby overruled.


Date approved:  December 13, 2006


Michael J. Sullivan
Acting Director



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Martinsburg, WV   25401
www.atf.gov

903050:RV
3311/2007-261

**JAN 1 6 2007**



Dear ▮▮▮▮▮▮

Previously, you submitted a design and prototype to the Firearms Technology Branch (FTB),
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), for classification. We responded
on August 23, 2005, stating that the prototype that you submitted was not a machinegun as
defined in 26 U.S.C. § 5845(b).

On December 13, 2006, ATF issued Ruling 2006-2, a copy of which is enclosed for your
convenience. In light of this new ruling, the classification that we issued on August 23, 2005,
may no longer be valid. We are therefore requesting that you resubmit your device for a further
evaluation. As this device may be reclassified as a machinegun, we urge you not to transfer this
or any similar devices before we have had an opportunity to reexamine it.

Should you have any questions, please do not hesitate to contact us.

Sincerely yours,

Richard Vasquez
Deputy Chief, Firearms Technology Branch

Enclosure

ATF 0653

**18 U.S.C. 922(o):  Transfer or possession of machinegun**
**26 U.S.C. 5845(b):  Definition of machinegun**
**18 U.S.C. 921(a)(23):  Definition of machinegun**

*The definition of machinegun in the National Firearms Act and the Gun Control Act includes a part or parts that are designed and intended for use in converting a weapon into a machinegun.  This language includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted.*

**ATF Rul. 2006-2**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has been asked by several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm.  These devices, when attached to a firearm, result in the firearm discharging more than one shot with a single function of the trigger.  ATF has been asked whether these devices fall within the definition of machinegun under the National Firearms Act (NFA) and Gun Control Act of 1968 (GCA).  As explained herein, these devices, once activated by a single pull of the trigger, initiate an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted.  Accordingly, these devices are properly classified as a part *"designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun"* and therefore machineguns under the NFA and GCA.

The National Firearms Act (NFA), 26 U.S.C. Chapter 53, defines the term "firearm" to include a machinegun.  Section 5845(b) of the NFA defines "machinegun" as *"any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."*  The Gun Control Act of 1968 (GCA), 18 U.S.C. Chapter 44, defines machinegun identically to the NFA.  18 U.S.C. 921(a)(23).  Pursuant to 18 U.S.C. 922(o), machineguns manufactured on or after May 19, 1986, may only be

transferred to or possessed by Federal, State, and local government agencies for official use.

ATF has examined several firearms accessory devices that are designed and intended to accelerate the rate of fire for semiautomatic firearms. One such device consists of the following components: two metal blocks; the first block replaces the original manufacturer's V-Block of a Ruger 10/22 rifle and has attached two rods approximately ¼ inch in diameter and approximately 6 inches in length; the second block, approximately 3 inches long, 1 ⅜ inches wide, and ¾ inch high, has been machined to allow the two guide rods of the first block to pass through. The second block supports the guide rods and attaches to the stock. Using ¼ inch rods, metal washers, rubber and metal bushings, two collars with set screws, one coiled spring, C-clamps, and a split ring, the two blocks are assembled together with the composite stock. As attached to the firearm, the device permits the entire firearm (receiver and all its firing components) to recoil a short distance within the stock when fired. A shooter pulls the trigger which causes the firearm to discharge. As the firearm moves rearward in the composite stock, the shooter's trigger finger contacts the stock. The trigger mechanically resets, and the device, which has a coiled spring located forward of the firearm receiver, is compressed. Energy from this spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the trigger to contact the shooter's trigger finger. Provided the shooter maintains finger pressure against the stock, the weapon will fire repeatedly until the ammunition is exhausted or the finger is removed. The assembled device is advertised to fire approximately 650 rounds per minute. Live-fire testing of this device demonstrated that a single pull of the trigger initiates an automatic firing cycle which continues until the finger is released or the ammunition supply is exhausted.

As noted above, a part or parts designed and intended to convert a weapon into a machinegun, *i.e.*, a weapon that will shoot automatically more than one shot, without manual reloading, by a single function of the trigger, is a machinegun under the NFA and GCA. ATF has determined that the device constitutes a machinegun under the NFA and GCA. This determination is consistent with the legislative history of the National Firearms Act in which the drafters equated "single function of the trigger" with "single pull of the trigger." *See, e.g., National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066*, 73rd Cong., at 40 (1934). Accordingly, conversion parts that, when installed in a semiautomatic rifle, result in a weapon that shoots more than one shot, without manual reloading, by a single pull of the trigger, are a machinegun as defined in the National Firearms Act and the Gun Control Act.

*Held*, a device (consisting of a block replacing the original manufacturer's V-Block of a Ruger 10/22 rifle with two attached rods approximately ¼ inch in diameter and approximately 6 inches in length; a second block, approximately 3 inches long, 1 ⅜ inches wide, and ¾ inch high, machined to allow the two guide rods of the first block to pass through; the second block supporting the guide rods and attached to the stock; using ¼ inch rods; metal washers; rubber and metal bushings; two collars with set screws; one coiled spring; C-clamps; a split ring; the two blocks assembled together with the

composite stock) that is designed to attach to a firearm and, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted, is a machinegun under the National Firearms Act, 26 U.S.C. 5845(b), and the Gun Control Act, 18 U.S.C. 921(a)(23).

*Held further*, manufacture and distribution of any device described in this ruling must comply with all provisions of the NFA and the GCA, including 18 U.S.C. 922(o).

To the extent that previous ATF rulings are inconsistent with this determination, they are hereby overruled.


Date approved: December 13, 2006



Michael J. Sullivan
Director

ATF 0656



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Martinsburg, West Virginia 25405   903050:RV
www.atf.gov                        3311/2007-328

**OCT 19 2009**



Dear ▉▉▉▉▉ :

This is in reply to your correspondence to the Firearms Technology Branch (FTB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), requesting classification of a device you have submitted. You refer to this device as an ▉▉▉▉▉ ." Our Branch had previously evaluated a non-functioning prototype of this device and, based upon a theory of its operation, rendered a determination that the item was not a machinegun (refer to #3311/2005-517). Subsequently, ATF issued Ruling 2006-2 and notified you of a potential change to the classification of your submission. We urged you not to transfer the item or a similar device until ATF had an opportunity to re-examine your submission (refer to #3311/2007-261). We apologize for the delay in responding to your inquiry.

The ▉▉▉▉ is a mechanical device that is made to accept a semiautomatic version of an M1919 (or copy) firearm (hereinafter, "M1919"). You have also indicated that this device will be made to accept semiautomatic variants of the AK47. The ▉▉▉▉ purpose is to allow the M1919 or other adaptable firearms to fire more than one shot, without manual reloading, by a single function of the trigger.

As background, the National Firearms Act (NFA), 26 U.S.C. § 5845(a), defines "firearm" to include "**(6)** a machinegun"; in turn, 26 U.S.C. § 5845(b), defines a "machinegun" as follows:

> ...*any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*

In Ruling 2006-2, ATF classified a device that utilized several conversion parts added to a Ruger® 10/22 receiver. After the addition of parts, a single pull of the trigger initiated an automatic firing cycle that continued until the finger was released, the firearm malfunctioned, or the ammunition supply was exhausted. Therefore, the device was classified as a machinegun

under the National Firearms Act, 26 U.S.C. § 5845(b) and the Gun Control Act of 1968, 18 U.S.C. § 921(a)(23).

Our re-examination of a functioning ▊▊▊▊ indicates that the device is an accessory that is designed and intended to accelerate the rate of fire for an M1919 or other adaptable, semiautomatic firearms.   Your submitted ▊▊▊▊ is for the M1919.  The ▊▊▊ device, which is patented, consists of the following components and features:

- Cradle assembly, approximately 18 inches in length x 4 inches in width.
- There are two 1-inch square steel sections running parallel to each other.  These rods are connected by weld at either ends
- The rear of the device is flat with an elliptically-shaped hole approximately 1-1/2 inches in diameter.   It has two wooden handles on each side.
- There is an upper and lower section of the rear attachment connected by Allen head screws.  Mounted to this section is a spring-loaded "trigger" with a hook on the end.  The hook connects the device to the trigger of a host weapon.
- On top of the two 1-inch square rods is a square, metal block with an approximately ½-inch hole drilled through it.  The purpose of this section is to mount the device and the firearm to the traversing and elevation (T&E) mechanism.
- Between the rear section (which is the handle) and the mounting block, are two springs approximately 2-3/4 inches in length with metal rods through the length.  These metal rods are attached to a 1-inch square aluminum block with an approximate ¼-inch hole drilled through it.
- The front section that connects the two parallel bars together has a mounting hole for attachment to an M1919 pintle assembly.

Included with the device are three accessories: (1) a sleeve, approximately 3/8-inch long, with an approximately ¼-inch hole through the center with aluminum retaining bushings; (2) a metal rod approximately 1/2 inch in diameter x 4-3/8 inches in length; and (3) a metal rod approximately ¼ inch diameter x 6 inches in length. For additional, descriptive information, please refer to the enclosed photos.

The firearm is mounted inside of the cradle assembly in the following manner:

- The 3/8-inch sleeve goes through the mounting holes for the T&E mechanism on the bottom plate of the host M1919 firearm.
- The ½-inch diameter rod is inserted into the front of the receiver and replaces the pintle mounting bolt.
- The firearm is then inserted into the cradle.
- When the firearm is inserted into the cradle, the ¼ inch rod is inserted through the cradle into the sleeve in the T&E mounting holes.
- There are cutouts inside the parallel bars.  The cutouts slide over the ½-inch rod that is mounted in the pintle mounting holes.

██████████

When the M1919 is fired, the cradle permits the entire M1919 firearm (the receiver and all its firing components) to recoil a short distance within the cradle assembly. Downward pressure on the ████ trigger, which works on a pivot, pulls the trigger of the host firearm. This causes the weapon to discharge and, as the firearm moves rearward in the cradle assembly, the M1919 trigger is reset. Energy from the action spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the ████ "trigger" to automatically pull the trigger of the M1919. As the M1919 travels forward, the "trigger" for the ████ is still held forward and, as the firearm reaches its forward point of travel, the M1919 trigger is automatically pulled, keeping the firing sequence active until either the finger is released, the weapon malfunctions, or the ammunition supply is exhausted.

For testing purposes, FTB personnel installed a semiautomatic M1919 firearm from the National Firearms Collection into the ████ cradle assembly. Live-fire testing of the device confirmed that finger pressure applied to the ████ "trigger" initiates a firing cycle, which continues until the trigger is released, the weapon malfunctions, or the ammunition supply is exhausted.

Based on this evaluation, provisions of Federal law cited herein, and ATF Ruling 2006-2, FTB concludes that the ████ device, being a combination of parts designed and intended for use in converting a weapon into a machinegun, is a "machinegun" as defined in the NFA at 26 U.S.C. § 5845(b) and the Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(23).

Since the firearm is a machinegun it is subject to regulation and restriction of manufacture, transportation, delivery, receipt, transfer and/or possession under the NFA, GCA, and applicable regulations Most notably, 18 U.S.C. § 922(o), and 27 CFR § 479.105 provide restrictions on the transfer or possession of a machinegun manufactured after May 19, 1986. In order for FTB to return this item, you must provide documentation that authorizes you to manufacture and/or possess the firearm. For instance, you may possess the proper Federal firearms license (FFL) from the ATF National Licensing Center, Martinsburg, West Virginia, and make an appropriate Special Occupational Tax (SOT) payment to the NFA Branch also located in Martinsburg, West Virginia.

If you already have the proper FFL and SOT, you must comply with regulations related to the documentation of manufactured firearms such as, among other things, filing an ATF Form 2 within close of the next business day and identification under 27 CFR §§ 478.92 and 479.102. Since you were not aware of the firearm's classification, ATF will authorize you to submit the Form 2 by close of the next business day following your receipt of this classification. Alternatively, you may file an ATF Form 1 and otherwise comply with the NFA, GCA and applicable regulations under Parts 478 and 479 of Title 27 of the Code of Federal Regulations by evidencing that the manufacture, transportation, delivery, receipt, transfer and/or possession of the firearm would not be in violation of local, State or Federal law.

If you or other interested persons are unable to comply with the law this firearm cannot be returned since its possession would be unlawful. You, and any other person with an interest in

█████████████

the firearm, may abandon all interest in the firearm to ATF. Alternatively, ATF may initiate forfeiture proceedings against the firearm pursuant to 26 U.S.C. § 5872. You should immediately, but no later than 30 calendar days from the date of receipt of this classification, provide written proof of compliance with the law or notice ATF in writing of your intent to abandon all interest in the firearm.

We thank you for your inquiry and trust that the foregoing has been responsive.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosures



Rear of ████ showing trigger spade

-5-



Bottom of device showing:
- Action springs
- ¼ inch rod through action spring blocks
- ½ inch diameter mounting rod

ATF 0661



Bottom of ███████ showing the hook that connects the trigger of the M1919 to the ████.

ATF 0662



Bushing for mounting the ▮▮▮▮
onto an M1919.

ATF 0663



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_____

*Martinsburg, WV  25405*

www.atf.gov

907020:MRC
3311/302558

**APR 1 3 2015**



Dear

This refers to your recent correspondence and submission of a physical sample along with a power point to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch (FTISB), Martinsburg, West Virginia.  Specifically, you ask FTISB to evaluate your prototype design and determine its classification under Federal law.

The Gun Control Act of 1968 (GCA), 18 U.S.C. Section 921(a)(3), defines the term "firearm" as follows: "…(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device.  Such term does not include an antique firearm."

Additionally, the National Firearms Act (NFA), 26 U.S.C. Section 5845(b), defines "machinegun" as—

"…any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

You have submitted to FTISB a prototype AR-style rifle with newly designed fire control components that you describe as a "positive reset trigger." In your submission you identify the following fire control components:

- Gun support/gun stock
- Secondary trigger
- Secondary trigger link
- Pivot toggle
- Shuttle link
- Shuttle

The internal components comprising your prototype design are shown here:



You provided the prototype shown here:



The internal components are shown here as they would exist inside the prototype.



The cycle of operation of your prototype is shown below.





After the trigger is pulled, a projectile is expelled and the firearm barrel and receiver recoil, moving each backward (step 1, below). The shuttle, also attached to the barrel, moves backward in concert (step 2). The backward movement of the shuttle pushes the shuttle link and the top end of the pivot

toggle (step 3). The pivot toggle rotates, pushing the secondary trigger link forward (step 5). Finally, the secondary trigger is pushed forward, moving the trigger finger forward as well. Each of these steps happens automatically as a result of the recoil energy generated from firing a projectile.



In step 6 above, the forward movement of the secondary trigger pushes the finger forward countering the constant rearward pressure applied by the shooter. The 10/22 trigger moves forward as well.



In the normal operation of the 10/22, the trigger would move forward only when the shooter releases the trigger. However, the prototype design utilizes recoil energy to move the trigger finger. In this way, the shooter can maintain constant pressure through a single pull of the trigger.

Once the recoil energy has dissipated, the shooter's constant rearward pressure pushes the secondary trigger backward (step 1, below). In turn, this moves the secondary trigger link (step 2), rotates the pivot toggle (step 3), and pushes the shuttle link and shuttle forward (step 4). The shuttle moves the receiver and barrel forward.



Constant rearward finger pressure tilts the
pivot toggle, pushing the receiver forward

At this point the 10/22 receiver is capable of firing a second projectile (see below). The constant
rearward pressure applied by the shooter's trigger finger fires the subsequent projectile, and the
process repeats itself until the shooter finally releases the rearward pressure.



Pivot toggle

Constant rearward finger pressure (a single
pull or function) causes the device to
move and that finger pressure fires a
second projectile

As stated above, the NFA defines machinegun, in relevant part, as "any weapon which
shoots…automatically more than one shot, without manual reloading, by a single function of the
trigger." ATF has long held that a "single function of the trigger" is a single "pull" or, alternatively, a
single "release" of the trigger. Therefore, a firearm that fires a single projectile upon a pull of the
trigger, and fires a single projectile upon the release of that trigger would not be classified as a
"machinegun" under Federal law.

Upon review, we find that your prototype permits a shooter to fire automatically, more than one shot,
without manual reloading, by a single function of the trigger. Your design utilizes recoil energy to
move the shooter's finger and permits the firearm to reset. However, your prototype actually utilizes
the single pull of the trigger to accomplish this. In this way, the prototype design uses a single

function of the trigger to operate the design and causes an otherwise semiautomatic firearm to fire more than a single projectile automatically.

ATF has long held that a single function of the trigger results from a single action by the shooter to initiate the firing sequence, whether it is a push or a pull movement.

Based on our evaluation and provisions of Federal law cited above, FTISB concludes that the prototype design is a combination of parts designed and intended for use in converting a weapon into a machinegun.  It is therefore a "machinegun" as defined in the above-cited § 5845(b).

We thank you for your inquiry and trust that the foregoing has been responsive.

Sincerely yours,

Max M. Kingery
Acting Chief, Firearms Technology Industry Services Branch

## SCOTT L. BRAUM & ASSOCIATES, LTD.

Attorneys at Law
812 East Franklin Street
Suite C
Dayton, Ohio 45459
937-396-0089

WRITER'S EMAIL
trr@braumlaw.com

WRITER'S FACSIMILE
937-396-1046

November 3, 2017

VIA ELECTRONIC MAIL AND
FEDERAL EXPRESS NEXT DAY

Michael R. Curtis
Chief, FTISB
United Stated Department of Justice
Bureau of Alcohol Tobacco Firearms and Explosives
244 Needy Road
Martinsburg, WV 25401

      Re:     907010:WJS
             3311/305601
             Response to July 21, 2017 Classification Letter

Dear Mr. Curtis:

      As you know, our firm represents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and we, along with our technical advisor, have reviewed your letter of July 21, 2017 classifying ▮▮▮▮▮▮▮ Electronic Reset Assist Device (ERAD) AR trigger system which was modified and submitted to conform with the concerns raised in FTISB's October 27, 2016 classification ruling in 907010: WJS 3311/304847. With regard to the present classification, FTISB has raised new concerns that could have been but were not raised with regard to the prior classification. The new concerns, however, are based on factual conclusions that are demonstrably erroneous. It appears as though FTISB is applying standards other than the letter of the law to accomplish some purpose other than simply applying the letter of the law. Whether FTISD -- or anyone else -- <u>wants</u> the ERAD to be treated as a machinegun is inapposite to the question of whether the ERAD <u>actually is</u> a machinegun as that term is defined by the law. In the end, the definition set forth under the law is the only definition that matters. The purpose of this letter is to address the factual errors in your July 21, 2017 letter and to request reconsideration of FTISB's ruling.

      The only proper question for FTISB to decide is whether ▮▮▮▮▮▮▮ ERAD device enables a firearm to fire more than one round with "a single function of the trigger" -- a phrase that ATF itself has both defined and applied. If the ERAD enables a firearm to fire more than one round per a single function of the trigger, then it is a "machinegun." If it does not, then the ERAD is not a "machinegun," and FTISB's should reverse its July 21, 2017 classification decision.

SCOTT L. BRAUM AND ASSOCIATES, LTD
November 3, 2017
Page 2

Here, in view of the law and ATF's own long-standing definitions, FTISB's classification letter marks an arbitrary and inexplicable departure from the clear language of the law and decades of consistent application of it. Because the ERAD does not enable a firearm to fire more than one round per single function of the trigger, it is not a machinegun.[1]

## I.     A Device Is Not A Machinegun Unless It Enables A Firearm To Fire More Than One Round Per "Single Function Of The Trigger."

"A machinegun is a weapon that fires 'automatically more than one shot, without manual reloading, by a single function of the trigger.'" *See, Akins v. United States,* 312 Fed. Apx. 197, 200 (11th Cir. 2009); *citing* 26 U.S.C. § 5845(b). Moreover, a machinegun is also any "combination of parts designed and intended for use in converting a weapon into a machinegun." *See,* 26 U.S.C. 5845(b).

## II.     "Single Function Of The Trigger" Is Well-Defined And Objectively Provable.

"Single function of the trigger" is clearly defined and objectively provable, relating entirely to the actual functioning of a firearm's mechanisms. For instance, ATF and courts have observed that, at the very least, the pulling of a trigger from its forward position to its backward position constitutes a "function." *See, e.g., Staples v. United States,* 511 U.S. 600 (1994). ATF has further clarified the meaning of "single function of the trigger" by holding that both the pulling of the trigger and the release of the trigger are separate functions such that a firearm may discharge one round upon the trigger's pull and a separate round upon the trigger's release without being classified a machinegun. *See,* e.g., Appendix D (Two-Stage Trigger Letter). Recent application of such with regard to binary/two-stage triggers did not require a novel interpretation, but rather was the application of a decades-old interpretation of "single function of a trigger" to mean "single movement of a trigger" such that the resetting is a second function. *See,* Appendix E: ATF Memorandum September 28, 1989 ("Firearms Technology Branch interprets the phrase "single function of the trigger" to mean a single movement of the trigger, whether that movement is the pull of the trigger or the release of the trigger.")(emphasis in original). A "function" of the trigger for purposes of the analysis is a forward or rearward movement of the trigger – each being a separate function.

Determinative of whether the ERAD is a machinegun is whether it enables a firearm to fire more than one round per single movement of the trigger: nothing more, nothing less.

---

[1]     For FTISB's consideration, ▮▮▮▮ encloses the affidavits of Richard Vasquez and ▮▮▮▮ describing the operation of the original ERAD from which the current ERAD under review is derived. *See,* Appendix A (Vasquez Affidavit) and Appendix B (▮▮▮ Affidavit). The only difference between the two devices is that the current ERAD was modified so that the shooter's finger impacts the firearm's trigger directly and the ERAD does not touch the firearm's trigger at any time. ▮▮▮▮ further encloses and incorporates herein in full its Supplemental Video on the flash drive provided. *See,* Appendix C (Supplemental Video).

SCOTT L. BRAUM AND ASSOCIATES, LTD
November 3, 2017
Page 3

**A.    A Firearm's Overall Rate Of Fire Is Unrelated To The Question Of Whether It Is A Machinegun.**

How many rounds per minute a firearm may be made to fire or whether that number exceeds some imagined maximum is irrelevant to ATF's classification.   Rather, the only determinative factor is how many rounds a firearm may be made to fire per "single function of the trigger."

ATF has classified numerous items that enable firearms to shoot at a faster rate than a firearm equipped with the ERAD as non-machineguns. In fact, both the TacCon trigger and the ████████, devices that assist with trigger reset and are not classified as machineguns by ATF, advertise a 600+ rounds per minute rate of fire. The reason why the TacCon trigger and ██ were classified as non-machineguns despite the rates of fire that they enable a firearm operator to achieve is because the only question that matters is how many rounds they fire per single function of the trigger.  This same standard should be applied to the ERAD.

**B.    Use Of Continual Pressure With A Trigger Reset Device Does Not Make A Firearm A Machinegun.**

Use of continual pressure with a trigger reset device does not make a firearm a machinegun. Notably, other devices that enable a shooter to obtain a higher rate of speed than the ERAD require the application of constant pressure as well and have rightly been deemed not to be machineguns because the firearms' triggers still function. One ATF ruling specifically acknowledges that a firearm is not necessarily a machinegun simply because continuous pressure may be used to initiate and maintain a firing sequence, as long the trigger functions once per shot:

> [A]s a shot is fired, an intermediate amount of pressure is applied to the handguard with the support hand, and the receiver assembly will recoil rearward far enough to allow the trigger to mechanically reset. Continued intermediate pressure applied to the handguard will push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired. … each shot being fired by a single function of the trigger.

*See,* Appendix F (emphasis added).  That continuous pressure is applied to the forend of a gun with the non-trigger hand utilizing recoil to assist in resetting is a distinction without a difference and a factor of no legal consequence.[2]

---

[2]    Notably, contrary to FTISB's contention, a bump fire device does not require continued intermediate pressure with the non-shooting hand in order to operate and increase a firearm's rate of fire. *See,* Ex. C.

SCOTT L. BRAUM AND ASSOCIATES, LTD
November 3, 2017
Page 4

Just as with other devices already declared to be a non-machinegun, the ERAD enables a shooter to initiate a series of trigger pulls by applying continued pressure yet still requiring a forward movement (function) firearm's trigger to accomplish trigger reset in order to fire a subsequent round on a subsequent rearward movement (function).  The only distinction -- that bump fire and other devices use gas/recoil energy to facilitate the trigger reset while the ERAD uses electrical energy to facilitate the trigger reset -- has no bearing on the only, ultimate question: whether the ERAD enables a firearm to shoot more than one round per single function of the trigger.  Just as with the bump fire and other devices, each shot with the ERAD requires a subsequent trigger pull following an assisted reset to fire a subsequent round.

When the ERAD is employed and depressed such that the firearm's trigger is pulled, the firearm will fire only one shot unless the ERAD overcomes the force of the shooter's trigger finger to allow the trigger to reset so that it may be pulled a second time.[3]  No evidence suggests that -- with the ERAD attached to a firearm -- a pull of the trigger will discharge more than one round unless first the forward force of the ERAD against the trigger finger is sufficient to cause a forward movement of distance sufficient to permit an actual resetting (a/k/a a second function of the trigger per ATF's definition) thus enabling a second shot with a human-powered rearward pull.

## III.   FTISB'S CLASSIFICATION IS ARBITRARY AND CONTRARY TO LAW.

### A.   The Evidence Demonstrates Clearly How The ERAD Operates.

The video already provided by ████████ with regard to this submission illustrates carefully and precisely what the ERAD does and what it does not do and is vital to FTISB's proper analysis:

| Time | EVIDENCE |
|---|---|
| 2:00 – 2:30 | The ERAD cannot apply any rearward pressure. |
| 2:30 – 2:51 | The ERAD only pushes itself and the shooter's finger away from the trigger. |
| 4:00 – 5:00 | The ERAD forces the shooter's finger forward and provides no non-human force to assist in subsequent pulls of the trigger. |
| 7:00 – 11:45 | The ERAD is directly comparable to the ████ stock which ATF has declared not to be a machinegun.  Both the ████ e stock and the ERAD enable a user to initiate a firing sequence by application of constant force which, when combined with opposing energy (cartridge energy for the ████ stock as opposed to electric energy for the ERAD) facilitates the rapid resetting of the trigger so that a subsequent function of the trigger |

---

[3]     ████ has tested what occurs when the ERAD is employed, the firearm's trigger is pulled, and the shooter resists the reset motion of the ERAD.  Not surprisingly, the firearm shoots one round and does not shoot another round until the shooter allows the trigger to reset and pulls the trigger a subsequent time.

SCOTT L. BRAUM AND ASSOCIATES, LTD
November 3, 2017
Page 5

| | |
|---|---|
| | may initiate the firing of a subsequent round. |
| 11:45 – 11:50 | Full-Speed Demo. of ▮▮▮▮ device classified as a non-machinegun. |
| 11:50 – 11:55 | Full-Speed Demo. of ERAD classified by ATF as a machinegun. |
| 11:56 – 12:24 | Slow-Motion Demo. of ▮▮▮▮ device classified as a non-machinegun. |
| 12:25 – 12:53 | Slow-Motion Demo. of ERAD classified by ATF as a machinegun. Video demonstrates the firearm's trigger as well as the ERAD device being pulled by human power to fire a single round, whereupon the ERAD device fully extends, allowing the firearm's trigger to reset (two functions of the trigger) before human power is used to pull the firearm's trigger again (third function of the trigger) in order to discharge a second round. |
| 12:54 – 13:20 | Slow-Motion Close-Up Demo. of ▮▮▮▮ device classified as a non-machinegun. The shooter applies constant pressure on the forend of the firearm and constant rearward pressure on the finger rest. |
| 13:21 – 13:45 | Slow-Motion Close-Up Demo. of ERAD classified by ATF as machinegun. |
| 13:56 – 14:14 | Controlled single shot firing with the ERAD activated. |

This video evidence shows a device that does nothing but use battery power to push the shooter's finger forward to allow the trigger to reset so that the shooter can use human power to pull the trigger. A firearm with the ERAD attached fires a round upon trigger pull (first function), resets when the trigger finger and the reset bar move into the forward position (second function), and requires human energy to fire a subsequent round upon a subsequent trigger pull (third function). Unlike the prior version of the ERAD where the shooter's finger never touches the firearm's trigger, here the ERAD never touches the firearm's trigger, which naturally resets and requires a subsequent pull to fire a subsequent round.

### B.   The Processes At Work In A "Bump Fire" Or "Slide Fire" Device Are Virtually Indistinguishable From The Processes At Work In The ERAD.

In differentiating the ERAD from approved bump fire devices, FTISB made the erroneous conclusion that it is somehow forward pressure on the handguard that facilitates trigger reset and proper functioning of the bump fire device:

> If sufficient pressure is not applied to the handguard with the support hand, the rifle can only be fired in a conventional semiautomatic manner with the firing hand. Forward pressure, supplied by the shooter, is necessary to perform "bump fire" since the reciprocation of the receive assembly is necessary to reset the trigger, and fire subsequent rounds.

*See,* 7/21/17 Letter, pg. 2. This factual conclusion, which was the key point of differentiation between approved bump fire devices and ▮▮▮▮ ERAD, is demonstrably inaccurate as set

SCOTT L. BRAUM AND ASSOCIATES, LTD
November 3, 2017
Page 6

forth in the supplemental video provided on the flash drive accompanying this letter.  While
Freedom incorporates the entire content its supplemental video into its response -- it carefully
addresses each matter raised by FTISB in its classification letter -- the video starting at 3:15
specifically addresses and debunks the notion that a second, non-shooting hand is necessary to
operate a bump fire device.

Both the ERAD and bump fire devices enable a user to experience an increased rate of
fire, with ERAD rates of fire actually being lower than the rates of fire that bump fire devices
that ATF has declared not to be machineguns.[4]  Both ERAD and bump fire devices enable the
shooter to initiate a firing sequence through application of continuous pressure.  Both the ERAD
and bump fire devices use non-human force (the ERAD uses electric energy while bump fire
devices use gas/recoil energy) to expedite trigger reset putting the user in a position to again pull
the firearm's trigger.  As neither the ERAD nor bump fire devices enable a firearm to discharge
more than one round per single function of the trigger, neither is a machinegun as that term is
defined under the law.

## C.      The Processes At Work In A Tac-Con 3MR Device Are Virtually Indistinguishable From The Processes At Work In The ERAD.

The 3MR trigger is, just that, a trigger. The 3MR trigger uses non-human energy from the
fired cartridge to mechanically force the shooter's finger forward following each shot. This, of
course, is precisely what the ERAD does except by use of battery power instead of the power of
the fired cartridge.  This force "allows the trigger to reset rapidly." So rapidly, in fact, that the
Tac-Con 3MR is advertised to enable shooters to fire 600+ rounds per minute.

The mechanisms that operate to press a user's trigger finger forward in the 3MR are
internal, with the obvious exception of the trigger itself.  Notably, so are the mechanisms that
operate to press the ERAD user's trigger finger forward, with the obvious exception of the reset
bar. Although the 3MR does not run on a motor and the ERAD does, there is nothing in the law
to suggest that this distinction is relevant, because it is not.  Like a user of the 3MR trigger that
FTISB has rightly declared not to be a machinegun, a user of the ERAD can operate a firearm
either with constant rearward pressure for multiple shots or without constant rearward pressure
for single shots. The 3MR and the ERAD both employ non-human force upon the user's trigger
finger to move (function) the trigger forward a sufficient distance to allow the trigger to reset.
The 3MR and the ERAD both are incapable of aiding rearward pull and therefore require human
force to again function the trigger to accomplish a subsequent firing.  The only differences are
that the 3MR can accomplish reset faster than the ERAD and they use different types of power to
assist reset -- neither of which are relevant factors for a machinegun classification.

---

[4]      While the level of skill necessary to be able to obtain rapid-fire results with a bump fire device is as
irrelevant as the rate of fire, a Google search of "first time bump fire" yields numerous videos refuting
ATF's unsupported claim. *See,* e.g., https://www.youtube.com/watch?v=TI3occOYH7g.

SCOTT L. BRAUM AND ASSOCIATES, LTD
November 3, 2017
Page 7

**CONCLUSION:**

There is no evidence in the record before FTISB sufficient to conclude that the ERAD enables a firearm to shoot more than one round per single function of the trigger: it does not. Rather, just as with previously-approved trigger reset devices, the ERAD uses a non-human energy source to separate the shooter's trigger finger from the trigger in order for the trigger to then naturally reset. As a matter of law, whether that energy source is gas/recoil energy or electric/batter energy does not matter. Whether a shooter is able to function a firearm with the use of constant rearward (in the case of the 3MR trigger and the ERAD) or forward (in the case of bump fire devices) pressure does not matter. What matters is whether, with the ERAD attached, a firearm's trigger resets and must be pulled again before a subsequent round is fired. That is all that matters.

Because a semi-automatic firearm with the ERAD attached still fires only one round per single function of the trigger, the ERAD is not properly classified as a machinegun. ███████ requests that FTISB include this letter and it's appendices into its administrative record on the ERAD classification, reconsider its July 21, 2017 ruling in light of such, and reverse its prior classification and properly declare the modified ERAD not to be a machinegun.

Very truly yours,

Timothy R. Rudd

Enclosure (Flash Drive)

cc:     Scott L. Braum (w/o appendices)
        ███████████████████ (w/o appendices)
        Rick Vasquez (w/o appendices)

TRR:sdh

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV 25405*

www.atf.gov

907010: WJS
3311/305601

**JUL 2 1 2017**



Dear ███████

This is in reference to your recent submission and accompanying correspondence and supplemental video to, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch (FTISB) which is accompanied by an AR-type firearm, with a battery powered, motorized pistol grip-type E-RAD device attached which is similar to a device FTISB has previously evaluated (FTISB letters 304248 and 304847).

As you know, the National Firearms Act (NFA), 26 U.S.C. § 5845(b), defines the term **"machinegun"** as—

...any weapon which shoots, is designed to shoot, or can be readily restored to shoot, *automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*

As specified in the GCA, 18 U.S.C. § 921(a)(23), the term **"machinegun"** has *"the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))."*

The submitted device is identified as an "E-RAD". As a part of this description you note that the submitted device has been *"specifically modified from the prior submission to address FTISB's concerns and ensure that the design is fully in line with all points of*

*bump technology which ATF has already approved"*. You further state that the recent sample incorporates design features that ensures that, *"no part of the ERAD comes in contact with the trigger of any firearm at any time, and only the operator's finger comes into contact with the firearm's trigger when the E-RAD is in use"*. As a part of your correspondence, you state the E-RAD is *"not a machinegun"* which achieves a rate of fire of 400-450 rounds per minutes.

For your information, generally, a bump-fire type device operates when attached to an un-modified semiautomatic, AR-type firearm in the following manner:

When operated, a shooter must apply forward pressure to the forward handguard/fore-end of the AR-type rifle with the support hand. This brings the receiver assembly forward to a point at which the trigger can be pulled by the firing hand, which remains stationary. If sufficient forward pressure is not applied to the handguard with the support hand, the rifle can only be fired in a conventional semiautomatic manner with the firing hand. Forward pressure, *supplied by the shooter*, is necessary to perform "bump fire" since the reciprocation of the receiver assembly is necessary to reset the trigger, and fire subsequent rounds.

The FTISB examination of "bump-fire" type devices indicate that if, as a shot is fired and the shooter provides a sufficient amount of pressure to the handguard/gripping surface to counter the recoil, an AR-type rifle assembly will come forward until the trigger re-contacts the shooter's stationary firing-hand trigger finger, allowing a subsequent shot to be fired.

In this manner, the shooter pulls the upper assembly forward to fire each shot, such that the firearm cannot shoot automatically more than one shot, without manual reloading, by a single function of the trigger." The analysis as to whether a shooter releases the trigger and consciously pulls the trigger a second time is unnecessary in such cases because the firearm is not functioning "automatically." Our examination of the submitted E-RAD device, found the submitted device did not function in this manner. In fact, the E-RAD device utilized an electric motor in place of a shooter's positive input.

The sample examined by FTISB personnel, attached to Windham Weaponry Model WW-15, serial number WW171280, consists of a plastic or polymer "grip" attached to the host AR-type receiver by a metal cap screw.



The grip is assembled utilizing six machine cap screws. A metal button was observed just below the trigger guard of the host weapon. This metal button, when depressed, initiates function of the battery-powered motor contained within the E-RAD grip.



An additional metal component was observed as a part of the E-RAD grip. For the purpose of this examination, this component will be identified as the E-RAD **trigger shoe**, which rests below and reciprocates around the AR-type trigger and is driven by the battery–powered motor.



FTISB also noted a metal spring resting behind the trigger shoe along with a plastic, spring-activated button which comes into contact with the trigger being pulled. This plastic trigger has two red wires attached and further connected to the bottom of the accompanying motor.  FTISB personnel found that this plastic button, with or without the silver portion attached, assists the initiation and termination function of the battery-powered motor during the functioning of the E-RAD grip.

For the purpose of this examination, the AR-type trigger will be identified as the **"trigger" because it initiates the firing of the host firearm when the E-RAD is installed**.

FTISB disassembled the E-RAD device to observe the internal components and dimensions. The submitted grip assembly incorporated the following design features or characteristics (see enclosed photographs):

- Electric Motor.
- Trigger Shoe.
- Battery powered, camming metal lobe designed to interact with trigger shoe.
- (2) 9-Volt Batteries.
- Right and Left Grip Panels.

ATF 0680



FTISB personnel noted the Windham Weaponry, Model WW-15 AR-type firearm, serial number **WW171280** incorporates <u>un-modified</u> semiautomatic configured fire-control components with no modifications made to the frame or receiver to permit machinegun function.  A field function test of the aforementioned firearm found the host firearm functions as designed, as a semiautomatic rifle.

As a part of this examination, FTISB personnel test-fired the E-RAD utilizing commercially available Hornady and Winchester brands of .223 Remington caliber ammunition and an accompanying compatible magazine. The Windham Weaponry, Model WW-15, AR-type firearm, serial number WW171280 was fired by FTISB personnel as received.

During this test-fire portion of the examination, our Branch observed machinegun function six times. FTISB found the depression or pull of the grip button *alone*, does not initiate the firing sequence because it merely initiates the electric motor.  Consequently this does not permit the host firearm to expel a projectile by the action of an explosive. However, test-firing of this device demonstrated that after the grip button engages the electric motor, the E-RAD allows the firearm to operate automatically more than one shot, with a single function of the trigger. This initiates an automatic firing cycle that continues until the operator's finger is released or the ammunition supply is exhausted.

We note first that upon closer examination of the device interacting with the semiautomatic fire-control components, FTISB personnel did not observe "hammer-follow"—a process in which the hammer is not retained by the disconnector after firing and it moves forward, by itself, and strikes the firing pin once a new round is chambered. Our Branch found that after the initial pull of the trigger, the host firearm does not incorporate "hammer follow" function because it briefly utilizes the firearm's disconnector or trigger resetting feature.

To fire as designed, the E-RAD grip button is depressed <u>and</u> constant pressure is applied to the trigger. The hammer is released from the trigger sear surface, travels forward and strikes the firing-pin, thus expelling a projectile by the action of an explosive.  The

hammer and trigger sear surface are shown here on a semi-automatic AR-15, for reference.



Then, once the hammer is pushed to the rear when the rifle recoils, the hammer is *briefly* retained by the disconnector until the motorized camming metal lobe rotates and *pushes* the trigger shoe forward, subsequently forcing the operator's trigger finger forward. This is a vital difference between the E-RAD and typical semiautomatic operation. In semi-automatic operation, a shooter must release the trigger to "reset" the firearm for a subsequent shot. The E-RAD functioning negates this need and performs this function, forcing the finger to move forward and subsequently releases the hammer, allowing it to again be retained by the trigger sear surface for a subsequent shot to be fired. A second shot is then fired because the shooter has retained a single, constant pull that again releases the hammer once the camming lobe stops pushing forward. This process is shown here.







In this way, the firing sequence is initiated by a pull of the trigger and trigger shoe and perpetuated *automatically* by the reciprocating, battery-powered metal lobe that allows firing of multiple rounds as long as the shooter maintains a constant, single pull on that trigger.

We found that during the aforementioned testing, if the trigger was *pulled and released* deliberately, *with or without* the grip button engaged, a single shot could be fired for each single pull of the trigger. However, just as with other machineguns, the firing of a single projectile is accomplished only through a conscious and deliberate *release* of the trigger once a round is fired. Failure to release the trigger results in the firing of more than one round, as described above.

Therefore, we again note an important fact concerning the design of the E-RAD. In a firearm *without* the E-RAD installed, the hammer resets only when the shooter actually, consciously releases pressure on the trigger, thereby allowing the disconnector to release the hammer so that it may again be retained by the trigger sear surface. In firearms *with*

the E-RAD installed, the functioning differs at this point. In the E-RAD, the motor acts to reset the hammer _automatically._ This automatic functioning, made possible by the electric motor, is a significant difference from actual bump-fire devices utilizing a shooter's manual power, as described above.

Indeed, the E-RAD is specifically designed, with the use of an electric motor, to move the shooter's finger and allow the hammer to reset and engage the trigger sear surface. However, through this process, _the shooter has never released the trigger itself, instead applying a single, constant pull_. When the camming metal lobe cams such that forward pressure is released, the shooter's constant pull again releases the hammer and causes a second round to fire.

A single pull of the trigger by the shooter therefore starts a firing sequence in which _semiautomatic_ operation is made _automatic by an electric motor_. ATF has long held that a single pull of the trigger is the same as a "single function" of the trigger. Similarly, a single release of the trigger is a single function of the trigger. In this way, certain "binary" triggers increase the rate of fire but are not machineguns because they fire only a single shot when the trigger is pulled, and a single shot when the trigger is released.

As a result of the subject test weapon, with installed **E-RAD device,** firing automatically more than one shot, without manual reloading by a single function of the trigger, the submitted E-RAD device (attached to the submitted Windham Weaponry, Model WW-15 AR-type firearm, serial number WW171280) is classified as _a combination of parts_ designed and intended, for use in converting a weapon into a machine gun,  and is thus a "**machinegun**" as defined in 26 U.S.C. § 5845(b) and 18 U.S.C. § 921 (a) (23). Please be aware that the manufacture and distribution of the device described in this correspondence must comply with all provisions of the NFA and GCA, including 18 U.S.C. § 922(o).

The submitted E-RAD device is designed to utilize a battery-powered electric motor which automatically continues the firing sequence and causes a firearm to shoot automatically by the _automatic_ resetting of the firearm hammer utilizing an electric motor. With constant pressure or a single pull of the firearm trigger while the ERAD device is engaged, the host AR-type firearm shoots _automatically_ more than one shot, without manual reloading, by a single function of the trigger. Such an item or device is classified as a combination of parts designed and intended, solely and exclusively, for use in converting a weapon into a machinegun; thus a "machinegun" as defined in 26 U.S.C. § 5845(b).

Please be aware,  if a device is designed to assist in preventing the hammer from positively resetting or which utilizes _a spring, electric motor or non-manual source of energy which assists in the automatic resetting of the hammer and causes a firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger_, such an item or device would be classified as a combination of parts designed and intended, solely and exclusively, for use in converting a weapon into a machinegun; thus a "machinegun" as defined in 26 U.S.C. § 5845(b).

ATF 0684

Further, the incorporation of a positive disconnecting or trigger resetting feature alone, does not preclude or remove such a weapon or device from the definition of a "machinegun" as defined in NFA, 26 U.S.C. § 5845(b). Also, the absence of "hammer-follow" in an AR-type firearm, does not exclude such a firearm from being classified as a machinegun. FTISB machinegun classifications are based on the evaluation of the item as submitted and whether the item converts a weapon to shoot automatically, regardless of how reliably it shoots automatically more than one shot, without manual reloading, by a single function of the trigger.

FTISB finds that the host AR-type rifle, Windham Weaponry AR-type receiver (serial number WW171280), not having any modifications made which would cause it to fire automatically, or incorporating the frame or receiver of a machinegun; is not a "machinegun" as defined in 26 U.S.C. § 5845(b).

The host Windham Weaponry rifle will be returned via the accompanying prepaid UPS return label. Please advise our Branch within 60 days of receipt of this letter regarding the disposition of subject ERAD devices. The submitted E-RAD device, which is classified as a "machinegun" as defined in 26 U.S.C. § 5845(b), cannot be returned to unless you are a licensed firearms manufacturer who has paid the Special Occupational Tax (SOT).

We trust the foregoing has been responsive to your current evaluation request.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

ATF 0685