**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

NATIONAL ASSOCIATION FOR GUN
RIGHTS, INC., *et al.*,

               Plaintiffs,

     v.

MERRICK GARLAND, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
OF THE UNITED STATES, *et al.*,

             Defendants.

Case No. 4:23-cv-00830-O

**DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

SUMMARY ........................................................................................................................1

BACKGROUND .................................................................................................................2

STANDARD OF REVIEW ..................................................................................................7

ARGUMENT......................................................................................................................8

    I.    Plaintiffs Lack Standing...........................................................................................8

        A.  Plaintiffs Do Not Have Standing to Assert a Pre-Enforcement Challenge.................8

        B.  Associational Plaintiffs Lack Standing for Further Reasons. .......................................10

        C.  Plaintiffs Do Not Have Standing to Challenge ATF's Classification Decisions
            Related to FRTs for Conduct Beyond mere Possession. ...............................................12

    II.   FRTs Are Machineguns Under Federal Law......................................................................14

    III.  Any Relief Awarded Should Be Limited in Type and Scope. ............................................19

        A.  If Plaintiffs Prevail on the Merits, They Are Entitled Only to Declaratory
            Relief...................................................................................................................19

        B.  Plaintiffs Have Not Carried Their Burden to Obtain a Permanent Injunction
            Even If Such Relief Were Available....................................................................20

            1.    Plaintiffs Have Not Established Irreparable Injury. ...............................20

            2.    The Equities and Public Interest Do Not Favor a Permanent
                Injunction. ...............................................................................................22

        C.  Even If a Permanent Injunction Does Issue, Its Scope Should Be Limited. ..............23

            1.    A Permanent Injunction Should Not Extend Beyond the
                Individual Plaintiffs. ...............................................................................23

            2.    Permanent Injunctive Relief Should Be Geographically
                 Limited. ...................................................................................................24

            3.    Permanent Injunctive Relief Should Protect Only Possession
                 of FRTs. ...................................................................................................27

            4.    A Permanent Injunction Should Not Extend to Criminal
                 Prosecutions. ............................................................................................28

CONCLUSION......................................................................................................................30

i

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ...........................................................................................27

*Ackerman v. Int'l Longshoremen's & Warehousemen's Union,*
  187 F.2d 860 (9th Cir. 1951) ..............................................................................28

*Akins v. United States,*
  312 F. App'x 198 (11th Cir. 2009) ................................................................ 15, 18

*Aposhian v. Barr,*
  958 F.3d 969 (10th Cir. 2020);
  *en banc granted but previous order reinstated,* 989 F.3d 890 (10th. Cir. 2021) ..............................................22

*Arizona v. Biden,*
  40 F.4th 375, 397 (6th Cir. 2022) .......................................................................24

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
  627 F.3d 547 (5th Cir. 2010) ..............................................................................10

*Babbitt v. United Farm Workers Nat. Union,*
  442 U.S. 289 (1979) ............................................................................................29

*Baldwin Metals Co. v. Donovan,*
  642 F.2d 768 (5th Cir. 1981) ..............................................................................20

*Bevis v. City of Naperville,*
  --- F. Supp. 3d ----, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ................ 21, 22

*Blue Ocean Inst. v. Gutierrez,*
  585 F. Supp. 2d 36 (D.D.C. 2008) ........................................................................7

*Blum v. Holder,*
  744 F.3d 790 (1st Cir. 2014)..................................................................................9

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ..............................................................................26

*Camp v. Pitts,*
  411 U.S. 138 (1973)................................................................................................7

*Cargill v. Garland,*
  57 F.4th  (5th Cir. 2023);
  *cert. granted,* No. 22-976, 2023 WL 7266996 (U.S. Nov. 3, 2023)................................*passim*

*Christoforu v. United States,*
   842 F. Supp. 1453 (S.D. Fla. 1994), *aff'd*, 61 F.3d 31 (11th Cir. 1995)................................22

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................................................ 8, 9

*Comm. on Judiciary of U.S. House of Representatives v. Miers,*
   542 F.3d 909 (D.C. Cir. 2008) ..........................................................................20

*Davis v. Fed. Election Comm'n,*
   554 U.S. 724 (2008) .................................................................................. 13, 24

*Deaver v. Seymour,*
   822 F.2d 66 (D.C. Cir. 1987);
   *application for stay denied, Deaver v. United States*, 483 U.S. 1301, 1303 (1987).......................29

*Deaver v. United States,*
   483 U.S. 1301 (1987) .......................................................................................29

*Dep't of Homeland Sec. v. New York,*
   140 S. Ct. 599 (2020) ................................................................................ 24, 25

*Dombrowski v. Pfister,*
   380 U.S. 479 (1965) .......................................................................................29

*Douglas v. City of Jeannette (Pennsylvania),*
   319 U.S. 157 (1943) .......................................................................................28

*Energy Mgmt. Corp. v. City of Shreveport,*
   397 F.3d 297 (5th Cir. 2005) .............................................................................11

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388, 391 (2006) .................................................................................20

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) .........................................................................................7

*Fontenot v. McCraw,*
   777 F.3d 741 (5th Cir. 2015) ...................................................................... 12, 24

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
   129 F.3d 826 (5th Cir. 1997) .............................................................................12

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ............................................................................... 21, 23

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
   45 F.4th 306 (D.C. Cir. 2022) ....................................................................................26

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
   968 F.3d 454 (5th Cir. 2020) .......................................................................................7

*Hunt v. Wash. St. Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ............................................................................................ 10, 12

*Hynes v. Grimes Packing Co.,*
   337 U.S. 86 (1949) ......................................................................................................29

*La. ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.,*
   70 F.4th 872 (5th Cir. 2023) ............................................................................... 10, 13

*League of United Latin Am. Citizens v. Abbott,*
   604 F. Supp. 3d 463 (W.D. Tex. 2022) ......................................................................11

*Lewis v. Casey,*
   518 U.S. 343 (1996) ............................................................................................ 24, 27

*Louisiana v. Becerra,*
   20 F.4th 260 (5th Cir. 2021) .......................................................................................24

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 ....................................................................................................... 11, 14

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ............................................................................................ 22, 23

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
   602 F.3d 687 (5th Cir. 2010) .......................................................................................7

*N.A.A.C.P. v. City of Kyle,*
   626 F.3d 233 (5th Cir. 2010) .....................................................................................11

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) .......................................................................................22

*Nat'l Coal. for Men v. Selective Serv. Sys.,*
   Case No. CV H-16-3362, 2019 WL 1902693 (S.D. Tex. Apr. 29, 2019) ..............20

*Nat'l Rifle Ass'n of Am. v. Magaw,*
   132 F.3d 272 (6th Cir. 1997) .....................................................................................29

*Nken v. Holder,*
   556 U.S. 418 (2009) ....................................................................................................22

*Parker v. Dist. of Columbia.*,
    478 F.3d 370 (D.C. Cir. 2007);
    *aff'd sub nom. Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................................9

*Parks v. Hinojosa*,
    Case No. 4:21-CV-00111-O, 2021 WL 1720219 (N.D. Tex. Apr. 30, 2021);
    *reconsideration denied*, No. 4:21-CV-00111-O, 2021 WL 2783989 (N.D. Tex. July 2, 2021) .............20

*Pederson v. Louisiana State Univ.*,
    213 F.3d 858 (5th Cir. 2000) ...................................................................................................11

*Rare Breed Triggers, LLC v. Garland,*
    Case No. 6:21-CV-1245, 2021 WL 4750081 (M.D. Fla. Oct. 12, 2021)........................................25

*Rare Breed Triggers, LLC v. Garland,*
    Case No. 6:21-CV-1245-CEM-GJK, 2021 WL 7543623 (M.D. Fla. Aug. 5, 2021) .........................28

*Republic Nat'l Bank of Miami v. United States*,
    506 U.S. 80 (1992).................................................................................................................20

*Rizzo v. Goode*,
    423 U.S. 362 (1976)...............................................................................................................20

*Save Power Ltd. v. Syntek Fin. Corp.*,
    121 F.3d 947 (5th Cir. 1997)...................................................................................................30

*Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms, & Explosives*,
    Case No. 3:21-CV-0116-B, 2023 WL 4304760 (N.D. Tex. June 30, 2023) ....................................24

*Sierra Club v. Peterson*,
    185 F.3d 349 (5th Cir. 1999), *on reh'g*, 228 F.3d 559 (5th Cir. 2000) .......................................7

*Sierra Club v. U.S. Dep't of Interior*,
    990 F.3d 909 (5th Cir. 2021)......................................................................................................7

*Staples v. United States*,
    511 U.S. 600 (1994)...............................................................................................................15

*Steffel v. Thompson*,
    415 U.S. 452 (1974)...............................................................................................................29

*Stolt-Nielsen, S.A. v. United States*,
    442 F.3d 177 (3d Cir. 2006)....................................................................................................29

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)...............................................................................................................11

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ..................................................................................8, 9, 13, 29

*Texas v. EPA,*
  389 F. Supp. 3d 497 (S.D. Tex. 2019) ......................................................................7

*Town of Chester v. Laroe Ests., Inc.,*
  581 U.S. 433 (2017) ........................................................................................8, 13, 24

*Truax v. Raich,*
  239 U.S. 33 (1915) ........................................................................................................29

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018) ........................................................................................24, 25, 27

*Trump v. United States,*
  Case No. 22-13005, 2022 WL 4366684 (11th Cir. Sept. 21, 2022) .....................28

*United States v. Camp,*
  343 F.3d 743 (5th Cir. 2003) .....................................................................................17

*United States v. Cox,*
  342 F.2d 167 (5th Cir. 1965) .....................................................................................28

*United States v. Johnson,*
  632 F.3d 912 (5th Cir. 2011) .......................................................................................7

*United States v. Jokel,*
  969 F.2d 132 (5th Cir. 1992) .................................................................................14, 17

*United States v. Nixon,*
  418 U.S. 683 (1974) ...............................................................................................28, 30

*United States v. Olofson,*
  563 F.3d 652 (7th Cir. 2009) .................................................................................15, 17

*United States v. Rare Breed Triggers, LLC,*
  --- F. Supp. 3d ----, 2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023) ...................*passim*

*United States v. Salerno,*
  481 U.S. 739 (1987) ....................................................................................................23

*United States v. Texas,*
  599 U.S. 670 (2003) ....................................................................................................27

*W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24,*
  751 F.2d 721 (5th Cir. 1985) .................................................................................26, 30

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................................................ 22, 26

*Winter v. Nat, Res. Def. Council, Inc.*,
    555 U.S. 7, 129 S. Ct. 365 (2008) .................................................................... 20, 22

*Younger v. Harris*,
    401 U.S. 37 (1971) ............................................................................................ 21, 22

*Zimmerman v. City of Austin, Texas*,
    881 F.3d 378 (5th Cir. 2018) .................................................................................. 8

## Statutes

5 U.S.C. § 702 .............................................................................................................. 30

5 U.S.C. § 706 .......................................................................................................... 7, 27

5 U.S.C. § 706(2) ......................................................................................................... 27

18 U.S.C. § 921 ........................................................................................................ 1, 14

18 U.S.C. § 922 .......................................................................................... 1, 2 , 23, 28

26 U.S.C. § 5845 ...................................................................................................*passim*

26 U.S.C. § 6103 ............................................................................................................ 4

## Rules

Fed. R. Civ. P. 5 .......................................................................................................... 32

Fed. R. Civ. P. 41 ........................................................................................................ 21

Fed. R. Civ. P. 56 .......................................................................................................... 7

## SUMMARY

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has for decades classified certain "forced reset trigger" devices ("FRTs") as machineguns under the under the National Firearms Act of 1934 ("NFA"). *See* 18 U.S.C. § 921(a)(24); 26 U.S.C. § 5845(b). Plaintiffs in this case include two firearms rights groups (the "Associational Plaintiffs") and three individuals (the "Individual Plaintiffs") who own, owned, and/or would like to own one or more FRTs. Plaintiffs seek broad, universal relief enjoining enforcement of federal law against anyone concerning FRTs.

For several reasons, the Court should deny Plaintiffs' motion for summary judgment and grant summary judgment in favor of the government. First, Plaintiffs cannot establish standing. They have not demonstrated a credible threat of enforcement sufficient to establish pre-enforcement standing as to any Plaintiff. Nor have they established that any Plaintiff, or member thereof, has a concrete interest beyond mere possession sufficient to confer standing to challenge enforcement related to the transfer, sale, or manufacturing of devices like the FRT-15 and WOT.

Second, the statutory definition of "machinegun," as interpreted by the Fifth Circuit, includes FRTs that function like the FRT-15 and WOT. A machinegun is a weapon capable of "shoot[ing] automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). FRTs do just that. When the trigger of an FRT-equipped firearm is pulled and subject to constant rearward pressure, the firearm continues to fire without any further manual input, exactly like that of fully automatic weapons. In this way, firearms equipped with FRTs, which are mechanical triggers, are unlike the firearms equipped with non-mechanical bump stocks at issue in *Cargill v. Garland*, 57 F.4th 453 (5th Cir. 2023) (en banc), *pet. for cert. granted*, No. 22-976 (U.S. Nov. 3, 2023), which require additional manual input to continue to fire after the trigger is pulled. Instead, FRTs are most analogous to the mechanical bump stocks that the *Cargill* plurality recognized to be machineguns. *Id.* at 462 n.8. Just as with those devices, the trigger on an FRT moves and releases the hammer for each shot fired. But because that process happens automatically in both FRTs and mechanical bump stocks after the shooter pulls the trigger once to activate the firing sequence, both types of devices are properly classified as machineguns.

Finally, if the court grants judgment, it should be limited to declaratory relief holding FRTs are not machineguns, as such relief adequately addresses the harms Plaintiffs have demonstrated. Plaintiffs seek an improper and overbroad permanent injunction, and they have failed to carry their burden to establish such relief should issue in the absence of irreparable harm and equities that favor a permanent injunction. And in no way should the Court accept Plaintiffs' invitation to enjoin hypothetical federal prosecutions, as such an injunction would violate the clear mandates of equity between the branches of government and among the federal courts. Accordingly, even if the Court were to grant injunctive relief, that relief should be limited to civil proceedings involving the Individual Plaintiffs' possession of FRTs in the Northern District of Texas.

## BACKGROUND

Machineguns have long been regulated under the NFA. Since passage of the Firearm Owners Protection Act of 1986, the sale of new machineguns to members of the public has been prohibited. *See* 18 U.S.C. § 922(o). Congress defined a machinegun as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 922(a)(4), (b)(4) (incorporating this definition into the criminal statute).

FRTs are devices that replace the factory trigger in a semiautomatic rifle to increase the weapon's rate of fire. On most semiautomatic rifles, pulling the trigger releases the hammer from the weapon's "sear," causing the hammer to swing and strike the firing pin, which is housed inside the rifle's "bolt carrier." ATF FRT-15 Classification Report, April 27, 2023 (Administrative Record ("AR") at 261-262). The firing pin strikes the bullet cartridge, which in turn causes ignition of the gunpowder and the bullet to fire. AR262. The gases from this explosion are channeled to force the rifle's bolt carrier rearward. AR263. On an ordinary AR-15 type semiautomatic rifle, the bolt carrier

2

depresses the hammer, eventually forcing it into a position where it is retained by the "disconnector." AR264-266. The bolt carrier then travels forward to its original position, aligning the firing pin to shoot another round. AR268. The disconnector holds the hammer in place until the shooter releases the trigger, at which point the hammer again comes to rest on the weapon's sear and the shooter may fire another shot by a subsequent pull on the trigger. AR269-271.

A weapon equipped with an FRT functions differently, as it has no disconnector. AR247. Instead, the rearward travel of the bolt carrier presses the hammer directly onto the trigger. AR265. By acting upon the hammer in this way, the bolt carrier also pushes down on the trigger itself, causing it to push the shooter's finger forward. AR266. The trigger also engages a component called the "locking bar," which prevents the trigger from releasing the hammer while the bolt carrier is still traveling (releasing the hammer too early could result in a malfunction, like a failure to fire or a dangerous "out-of-battery detonation" of the ammunition). AR266-267, AR245. As the bolt carrier travels forward, it strikes the locking bar, thus releasing the trigger and firing another shot. AR245. In short, then, an FRT resets the trigger of a firearm automatically and mechanically in a way that pushes the shooters' finger forward after firing every round, allowing for multiple rounds to be fired with a continued rearward pull of the trigger.

ATF first classified a device that functioned in a similar manner as a machinegun in 1975, AR498-502, AR506, and it reached the same conclusion with materially similar devices in 1994, 2004, 2005, 2006, and 2017 before addressing the specific devices at issue in this suit beginning in 2018. *See* AR534, AR552, AR576, AR610, AR667. ATF classified the FRT-15, manufactured by Rare Breed Triggers, LLC, as a machinegun in 2021 and again in 2023. *See* AR107, AR232. ATF also classified the Wide Open Trigger ("WOT"), which operates the same as the FRT-15, as a machine in 2021 and 2023. *See* AR173, AR188.

On or about August 4, 2017, Company A,[1] through Rick Vasquez Firearms LLC, submitted its AR1 trigger system to ATF for evaluation as a trigger-finger reset device. *See* ATF AR1 Classification Report, August 28, 2018 (AR81); National Firearms Act (NFA) Handbook, § 7.2.4 (revised 2009), https://www.atf.gov/firearms/docs/undefined/atf-national-firearms-act-handbook-chapter-7/download [https://perma.cc/DE74-3YZF] ("[A] firearms manufacturer is well advised to seek an ATF classification before going to the trouble and expense of producing [a device]."). The AR1 was covered by United States Patent Number 9,568,264 (the "'264 patent"). ATF FRT-15 Classification Report, July 15, 2021 (AR148).

By letter dated August 28, 2018, ATF's Firearms Technology Industry Services Branch ("FTISB") classified the AR1 trigger as a machinegun under 26 U.S.C. § 5845(b). AR147-159. FTISB noted that the "shooter maintains a constant rearward pull on the trigger and the internal mechanism automatically forces the individual's finger/trigger forward instead of requiring that the shooter release the trigger" and this "single constant rearward pull will cause the firearm to fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." AR151-152. In order "to demonstrate the sample fired more than one shot, without manual reloading, with a single function of the trigger, rather than firing a single shot with each function of the trigger," a zip-tie "was installed around the rear of the grip and the front of the sample's trigger," the zip-tie was gradually tightened "until the trigger was retracted just enough to release the hammer" and "retained in a fixed position," and the "weapon cycled and fired five cartridges automatically <u>without the trigger being released</u>." AR157. This test was repeated several times with the same result. In summary, FTISB found the AR1 trigger is a device "designed to assist in preventing the hammer from positively resetting (requiring that the shooter release the trigger in order to fire the next round) and causes a firearm to

---

[1] The identity of the company that submitted the 2017 evaluation has been redacted as taxpayer return information subject to the disclosure limitations in the Internal Revenue Code, 26 U.S.C. § 6103. The NFA is located in the Internal Revenue Code, Chapter 53, and machineguns are defined as "firearms" within the NFA, 26 U.S.C. § 5845(a)(6). This brief uses the pseudonym "Company A" in place of the company's real name.

shoot automatically more than one shot, without manual reloading, by a single function of the trigger."
AR159. Company A did not take further action on FTISB's classification.

On December 24, 2019, United States Patent Number 10,514,223 B1 (the "'223 patent") was
issued to Company A for a "Firearm Trigger Mechanism" (the device that would later be marketed by
Rare Breed Triggers, LLC as the FRT-15). AR137. The patent application indicates that the FRT-15
functions largely the same as the AR1 claimed in the '264 patent by the same company, but that the
FRT-15 provides a "'drop-in' solution for existing firearm platforms." AR144. In the Abstract of the
patent, the FRT-15 is described as follows:

> The trigger member has a surface positioned to be contacted by hammer when the
> hammer is displaced by cycling of the bolt carrier, the contact causing the trigger
> member to be forced to the set position. The locking bar is pivotally mounted in a
> frame and spring biased toward a first position in which it mechanically blocks the
> trigger member from moving to the release position and is movable against the spring
> bias to a second position when contacted by the bolt carrier reaching a substantially
> in-battery position, allowing the trigger member to be moved by an external force to the
> release position.

AR137. The description states that:

> the trigger member forces the trigger to pivot . . . toward and to its reset position. At
> the same time, as the trigger member is reset, the biasing spring moves the lower end
> of the locking bar into a second position . . . in which it blocks pivotal movement of
> the trigger, including by finger pressure applied (or reapplied) to the trigger blade.

AR144. The language "including by finger pressure applied (or reapplied) to the trigger blade" suggests
that while a shooter may pull the trigger, release it, and pull again, it is not necessary for the firearm
to shoot more than one shot as long as pressure remains "applied." Neither Company A nor any other
entity sought ATF classification for the FRT-15.

In June 2021, ATF's Firearms Technology Criminal Branch examined an FRT-15. AR107.
The examination revealed that the FRT-15 was a combination of parts, designed and intended for use
in converting a weapon into a machinegun, and as such was a machinegun as defined in 26 U.S.C.
§ 5845(b). AR111.

The examination report noted that the device was marked with "Rare Breed Triggers U.S. Pat.
10514223," AR108, *i.e.*, this device was a "drop-in" version of the AR1 device previously submitted

5

by Company A for classification. The report noted that FTISB had previously classified Company A's AR1 device as a machinegun. AR108. In discussing the device's operation, the report noted that the trigger is forced forward and held in its forward position by the locking bar, and as the "bolt carrier continues to move forward, it strikes the rear surface of the locking bar releasing the trigger." AR110. Importantly,

> [i]f the shooter maintains constant rearward pressure to the trigger, that single constant pull will continue the cycle of operation and fire a subsequent projectile . . . . This differs from a cycle of o[pe]rations in a typical AR-type semiautomatic firearm in which the shooter must release and pull the trigger to a second projectile. As stated, a firearm assembled with the FRT-15 requires no such release and subsequent pull by the shooter to fire a second projectile. Instead, the shooter may fire a second projectile merely by maintaining the initial trigger pull and allowing the self-acting internal mechanism to complete its automatic cycle of operation.

AR110. To further explain that a separate pull-release-pull of the trigger is not necessary for a semi-automatic weapon with such a device installed to keep firing, the report included an attachment of the AR1 classification showing the repeated fire when the trigger was zip-tied. AR157. In April 2023, ATF conducted another evaluation of the FRT-15 and reached the same conclusion that the FRT-15 met the statutory definition of a machinegun. AR232.

On January 19, 2023, the government brought a civil action against Rare Breed Triggers, LLC and its officers in the Eastern District of New York. The government alleged that Rare Breed Triggers, LLC and its officers conspired to use deceitful means to evade and obstruct the lawful jurisdiction of ATF to regulate and confiscate a device that the agency has determined to be a machinegun, and repeatedly misled customers that the FRT-15 was legal. That Court has issued a Preliminary Injunction against Rare Breed Triggers, LLC from manufacturing or distributing FRT-15s. *See generally United States v. Rare Breed Triggers, LLC*, --- F. Supp. 3d ----, 2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023).

Plaintiffs brought this action in August 2023. Plaintiffs include three individuals who own, owned, and/or would like to own one or more FRTs and two Associational Plaintiffs. Plaintiffs sought a Temporary Restraining Order and a Preliminary Injunction, both of which the Court granted. ECF Nos. 36, 53. Plaintiffs have now moved for summary judgment.

**STANDARD OF REVIEW**

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "In the context of a challenge under the [Administrative Procedure Act ("APA")], '[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.'" *Texas v. EPA*, 389 F. Supp. 3d 497, 503 (S.D. Tex. 2019) (quoting *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008)); *see, e.g., Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 459–60 (5th Cir. 2020). When reviewing agency action under the APA, a court may set aside agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)). This standard is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (citing *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010)).

In reviewing a final agency action under the APA, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "The focal point for judicial review" of an administrative agency's action "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). A court must "apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citation omitted). As such, review is limited to the administrative record that existed before the agency at the time of the decision. *See, e.g., id.* (explaining that a court's "factfinding capacity" is "typically unnecessary to judicial review" in an APA case). The Court is empowered "to conduct *de novo* inquiry into an agency's action" only "in rare circumstances," *Sierra Club v. Peterson*, 185 F.3d 349, 369 (5th Cir. 1999) (quoting *Fla. Power & Light Co.*, 470 U.S. at 744), *on reh'g*, 228 F.3d 559 (5th Cir. 2000), none of which has been raised by Plaintiffs in this case. To the extent Plaintiffs rely on materials outside the administrative record—including those presented at the preliminary injunction hearing—in support of the merits of their claims, the Court should decline to consider such materials.

7

# ARGUMENT[2]

## I.   Plaintiffs Lack Standing.

Plaintiffs have failed to establish standing. They have not demonstrated a credible threat of enforcement against otherwise-law-abiding FRT owners, as they claim to be. This is even more true of Associational Plaintiffs, who have not demonstrated that any member at the time of filing suit had received even a warning from ATF or that the entities themselves are bona fide membership organizations empowered to seek relief on behalf of their members. Moreover, to the extent Plaintiffs seek to challenge FRT-related enforcement related to transferring, selling, or manufacturing devices like FRT-15s and WOTs, they fail to establish that any Plaintiff, or member thereof, has a concrete interest beyond mere possession sufficient to confer standing. *See Town of Chester v. Laroe Ests., Inc.,* 581 U.S. 433, 439 (2017) ("[P]laintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (citation omitted)).

### A.   Plaintiffs Do Not Have Standing to Assert a Pre-Enforcement Challenge.

To seek pre-enforcement review, Plaintiffs must establish "a credible threat of prosecution," *Zimmerman v. City of Austin, Texas*, 881 F.3d 378, 391 (5th Cir. 2018) (citations omitted), that is "sufficiently imminent," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). A "theory of *future* injury [must not be] too speculative to satisfy the well-established requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 401 (2013) (quotation omitted).

Plaintiffs have not established a credible threat of enforcement that is "sufficiently imminent," *Susan B. Anthony List*, 573 U.S. at 159. At most, Plaintiffs and their members have identified warning letters and related contact from ATF officials. But these mere warnings and requests that individuals *voluntarily* surrender their FRTs do not establish a credible threat of enforcement. Indeed, in the two

---

[2] Defendants recognize that the Court has already decided, as a preliminary matter, certain of the arguments contained herein. Defendants respectfully contend that these issues merit alternative conclusions at the summary judgment stage, where the Court has the benefit of the full administrative record and additional elapsed time demonstrating ATF's FRT-related enforcement practices. Defendants also seek to preserve these arguments for purposes of appellate review.

plus years since the classification decisions were issued and the four months since filing suit, Plaintiffs have identified not a single Plaintiff or member thereof who claims to have actually suffered any civil or criminal action based on their ownership of a FRT, including those who received ATF warnings. In fact, Plaintiff Carey alleges that he received a warning letter about his FRT possession nearly a year before filing the Complaint, Compl. ¶ 8, but has nevertheless faced no civil or criminal enforcement action. Under such circumstances, there is no basis to believe enforcement is "imminent," *id.*, let alone "certainly impending," *Clapper,* 568 U.S. at 401.

Nor can Plaintiffs show that any other ATF action against non-parties establishes a credible threat against Plaintiffs here. While history of past enforcement for similar conduct is evidence of a credible threat, such history must be in a sufficiently similar context to create more than a generalized threat of prosecution. *See Susan B. Anthony List*, 573 U.S. at 164 ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." (citation omitted)); *Blum v. Holder*, 744 F.3d 790, 798 (1st Cir. 2014) ("In assessing the risk of prosecution as to particular facts, weight must be given to the lack of a history of enforcement of the challenged statute to like facts . . . ."); *Parker v. Dist. of Columbia.*, 478 F.3d 370, 374 (D.C. Cir. 2007), *aff'd sub nom. Dist. of Columbia v. Heller,* 554 U.S. 570 (2008) (general threat of prosecution insufficient to show imminent injury to support Article III standing). That is not the case here.

Defendants have repeatedly explained that ATF's enforcement priorities have been focused on large-scale manufacturers and sellers of FRTs and those with criminal histories, not individual owners like Plaintiffs and their members, *see* Compl. ¶¶ 4, 5-10, 14-16, 19-20. That is reflected in the government's actions against Rare Breed Triggers, a major manufacturer charged with fraudulent conduct, *cf.* ECF No. 19 at 9 (making assertions about government desire to seize triggers from Rare Breed Triggers, LLC), as well as in the enforcement actions Plaintiffs identified in other districts against individuals not party to this suit. Plaintiffs have maintained that they "are law-abiding citizens," ECF No. 33 at 9 (Pls.' Reply in Supp. of Mot. for TRO); *see also* ECF No. 47 at 30 (Pls.' Reply in Supp. of Mot. for PI), and that NAGR "only seeks to vindicate the rights of its members who are lawfully able to possess firearms," ECF No. 22 at 16 (Pls.' Mot. for PI). ATF, meanwhile, prioritizes

9

enforcement activities against those with criminal histories, *see* ECF No. 64-1 ¶ 24 (Saier Decl.), as is evident in the three prosecutions Plaintiffs identified. The Defendants in those cases were charged with multiple gun-related felonies beyond just FRT-possession,[3] and thus suggest nothing about the risk of enforcement against otherwise law-abiding FRT owners. *See La. ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.,* 70 F.4th 872, 878 (5th Cir. 2023) ("[P]laintiff . . . bears the burden of establishing standing.").[4]

In short, Plaintiffs have failed to explain how these actions create any specter of enforcement against Plaintiffs whose interests are allegedly in small-scale possession. *See* Compl. ¶¶ 4, 5-10, 14-16, 19-20; *Rare Breed Triggers, LLC*, 2023 WL 5689770, at *1 (finding "Defendants fraudulently induced their customers to buy a product that is illegal to possess").

**B.  Associational Plaintiffs Lack Standing for Further Reasons.**

In addition to the reasons described, Associational Plaintiffs lack standing because they have not identified a member who had standing at the time of suit and because they have not established that they are bona fide membership organizations empowered to seek relief on behalf of their members.

To "bring suit on behalf of its members," an association must demonstrate that "its members would otherwise have standing to sue in their own right." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). This requires the association to "identify 'a specific member' to assert standing on

---

[3] *See United States v. Bruggeman*, No. 2:22-cr-185, ECF No. 33 (Second Superseding Indictment) (S.D. Tex. Nov. 9, 2022) (counts two through four charging defendant with possession of unregistered firearm silencers); *United States v. Augusto*, No. 3:22-cr-30025, ECF No. 19 (Superseding Indictment) (D. Mass. Sept. 1, 2022) (count one charging defendant with "thirty-eight 'switch-type'" Glock machinegun conversion devices; counts two through seven charging defendant with unregistered firearms and firearms silencers); *United States v. Berrios-Aquino*, No. 3-22-cr-473, ECF No. 42 (Superseding Indictment) (D.P.R. Apr. 20, 2023) (count one charging defendant with possession of a machinegun distinct from machineguns modified with FRTs charged in count two).

[4] The seizures Plaintiffs previously identified are similarly insufficient. For example, the first seizure Plaintiffs identified, *see* ECF No. 47-1 at 70 (highlighting seizure in Middle District of Georgia), apparently involved not a small-scale owner but an operator of an online firearms store. *See* Bill Carswell LLC, https://billcarswellfirearms.com/ (last visited Dec. 1, 2023).

10

his behalf." *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 483 (W.D. Tex. 2022); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (observing that plaintiffs must "identify members who have suffered the requisite harm"). In other words, that member must themself have an injury that is "concrete []or imminent" to confer standing. *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan*, 504 U.S. at 560).

Plaintiffs argue that the Associational Plaintiffs have standing because (1) the Individual Plaintiffs, who claim to be members, have standing, and (2) because unidentified members were contacted by ATF with warnings even after the preliminary injunction issued. *See* ECF No. 62 at 9 (Pls.' MSJ Br.). For the reasons described *supra* 8-10, namely ATF's representations regarding its lack of intentions to take enforcement actions against Individual Plaintiffs and the lack of *any* identified enforcement actions against any otherwise law-abiding individuals, no member of an Associational Plaintiff faces a credible threat of enforcement.

But even if mere warnings could establish a credible threat of enforcement, Plaintiffs have not identified a member who received a warning at the relevant time. "Standing is determined as of the time that suit is filed." *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 n.3 (5th Cir. 2005) (citing *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000)). While Plaintiffs supplied declarations from alleged members who received ATF warnings, virtually all of those alleged warnings were undated or post-dated the filing of the complaint. Moreover, Plaintiffs do not indicate when the individuals they claim received warnings became members of the Associational Plaintiffs or whether they were members at the time of suit. For example, the Individual Plaintiffs did not claim to be members of the Associational Plaintiffs until they submitted supplemental declarations dated to late-September 2023. *See* ECF 62-1 at 472-74. For this reason too, Plaintiffs have not met their burden of establishing that an Associational Plaintiff member faced a credible threat of enforcement at the time of suit.[5]

_____

[5] Defendants strongly disagree with Plaintiffs' suggestions that they have not complied with the Court's Preliminary Injunction. *See* ECF 62 at 9, 21 (Pls.' MSJ Br.). As Defendants informed Plaintiffs' counsel and explained in their Notice of Compliance, Plaintiffs' refusal to identify their members to

In addition, even if the Associational Plaintiffs here have identified some members with standing to sue in their own right, the organizations lack standing because they have failed to demonstrate that they are bona fide membership organizations empowered to seek relief on behalf of their members. They have not identified any "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor have they explained how their members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (quotation omitted); *see Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344-45 (1977). Any individual may apparently join these organizations by making donations through their websites, and neither organization lists voting rights or other powers of control as benefits of membership, instead emphasizing newsletters or other alerts and perks such as hats or bags.[6] Here, the Associational Plaintiffs are purporting to litigate not on behalf of specific "identified members" but instead on behalf of hundreds of thousands or more unidentified members who do not control the organization or this litigation and many of whom may not even know about the litigation. In these circumstances, an organizational plaintiff may not purport to litigate on behalf of such unidentified members, including presumably binding those members to any final judgment, without additional evidence establishing that those members in fact direct or control the organization. *See Friends of the Earth*, 197 F.3d at 829.

### C. Plaintiffs Do Not Have Standing to Challenge ATF's Classification Decisions Related to FRTs for Conduct Beyond mere Possession.

Even if "Plaintiffs face a credible threat of . . . prosecution for prior and current ownership of FRTs," PI Order at 13-14, Plaintiffs have failed to demonstrate standing to challenge enforcement against the sale, transfer, or manufacturing of FRTs. "Standing is not dispensed in gross," *Fontenot v.*

---

Defendants makes it impossible for ATF to determine, prior to a contacting an FRT-owner, whether that individual is a member of an Associational Plaintiff and covered by the Preliminary Injunction. *See* ECF No. 57 ¶¶ 7-8 (Notice of Compliance). ATF has, nevertheless, implemented reasonable procedures to ensure that it is complying with the Preliminary Injunction and to cease any activities against those subject to its protections once learning of their membership and coverage. *See id.* ¶¶ 2-5, 9.

[6] *See* Join-National Association for Gun Rights, https://nationalgunrights.org/join/ (last visited Nov. 30, 2023); Join | Texas Gun Rights, https://txgunrights.org/join/ (last visited Nov. 30, 2023).

*McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (citation omitted), and Plaintiffs "must demonstrate standing for each claim [they] seeks to press and for each form of relief that is sought," *Town of Chester*, 581 U.S. at 439 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Plaintiffs, despite repeated opportunities to do so, have not demonstrated any threat of enforcement for FRT-related conduct beyond mere possession.

As private owners and associations whose members are private owners, Plaintiffs are not likely to face any risk of enforcement for FRT-related conduct beyond mere possession. Plaintiffs' own summary judgment motion tethers its associational standing argument to "[e]ach individual plaintiff [who] either currently possesses or previously possessed an FRT and each would like to purchase additional FRTs in the future." Pls.' MSJ Br. at 8-9. So too did this Court's Preliminary Injunction Order rest on individual possession. *See* ECF No. 53 at 14 (finding "each Individual Plaintiff's prior or current possession of FRTs gives rise to a credible threat of civil or criminal prosecution that establishes standing to sue in their own right" as well as for purposes of associational standing). Furthermore, while Plaintiffs have submitted numerous declarations in this action, including from other purported Associational Plaintiff members, no declarant identifies any enforcement action or warnings received related to anything other than FRT possession. At most, a single declaration submitted by Individual Plaintiff James Wheeler references an interest in the sale of FRTs as a partial owner of a business that owns and sells FRTs. However, that business is not a party to this lawsuit, and Plaintiff Wheeler provides no evidence about its identity, corporate form, or ownership structure to suggest that he has standing to assert any injury on its behalf. *See* Compl. ¶¶ 14-16; Compl. Ex. 2 ¶¶ 8, 9 (ECF No. 13-2); *La. ex rel. La. Dep't of Wildlife*, 70 F.4th at 878 ("[P]laintiff . . . bears the burden of establishing standing.").

Plaintiffs' only argument on this front has been the attenuated claim that Plaintiffs' ability "to buy additional forced reset triggers is severely undermined if manufacturers and sellers still face a credible threat of enforcement for selling FRTs to Plaintiffs." ECF No. 47 at 30-31. As an initial matter, Plaintiffs do not claim that such alleged harms would create any "credible threat of prosecution" against *them* for purposes of pre-enforcement standing. *Susan B. Anthony List*, 573 U.S.

at 159. But putting that aside, these harms premised on a series of unmaterialized possibilities—that Plaintiffs *might* seek to purchase an FRT from a manufacturer or seller who *might* be chilled from the sale because ATF *might* take some enforcement action against them—are far too "speculative" to establish an injury that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560. In fact, that several Plaintiffs and their members have apparently been able to acquire FRTs notwithstanding ATF's unequivocal and years'-long determination that devices like FRT-15s and WOTs are illegal machineguns undermines these alleged indirect harms. For this reason, the Court should determine that, at a minimum, Plaintiffs lack standing to seek relief beyond enforcement related to FRT possession.

## II.     FRTs Are Machineguns Under Federal Law.

The statutory definition of a machinegun requires that the weapon "shoot[] automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(a)(24). The Fifth Circuit and other courts have explained that the relevant function of a trigger is to initiate the firing sequence. *See, e.g., United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (*per curiam*). Thus, a weapon is a machinegun if the shooter can initiate the firing sequence once—such as by pulling the trigger—and the weapon will then fire "automatically more than one shot." FRTs meet this definition of a machinegun because there is no dispute of fact that when a shooter replaces the standard trigger on an AR15-type rifle with a FRT, the weapon will fire repeatedly and automatically from a single continuous pull of the trigger.

For this reason, ATF has classified devices that operate on this principle as machineguns for nearly fifty years. ATF first classified a device of this type as a machinegun in 1975, AR498-502, AR506, and it reached the same conclusion with materially similar devices in 1994, 2004, 2005, 2006, and 2017 before addressing the specific devices at issue in this suit beginning in 2018. *See* AR534, AR552, AR576, AR610, AR667, AR81. And these classifications are fully consistent with judicial precedent. In summarizing the scope of the provision, the Supreme Court has explained that the definition encompasses at least a weapon where "once its trigger is depressed, the weapon will

14

automatically continue to fire until its trigger is released or the ammunition is exhausted." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).[7] As the Eleventh Circuit explained, "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly." *Akins v. United States*, 312 F. App'x 198, 201 (11th Cir. 2009) (per curiam); *see also United States v. Olofson*, 563 F.3d 652, 658-59 (7th Cir. 2009) (holding that a weapon modified to allow a shooter to "exhaust[] a twenty-round magazine with one continuous depression of the trigger" was a machinegun).

Nor is there any dispute of fact that FRT-equipped weapons automatically fire multiple rounds after the trigger has performed the relevant single function by initiating the firing sequence. ATF found across multiple classifications of multiple FRTs that a single constant rearward pull of the trigger causes the trigger to initiate the firing sequence, which results in FRT-equipped firearms shooting automatically more than one shot. *See* AR112; ATF Wide Open Trigger Classification Report, Oct. 20, 2021 (AR178-179), AR256. In other words, after a FRT is depressed, the firearm will "fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." AR152. Accordingly, a FRT is a machinegun, as the only other federal court to consider the question has found "highly likely." *Rare Breed Triggers, LLC*, 2023 WL 5689770, at *15 ("[T]he Government . . . is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun.").

Indeed, ATF Firearms Enforcement Officer (FEO) Anthony Ciravolo conducted a test, examination, and classification analysis of the Rare Breed Triggers model FRT-15 on April 20, 2023. AR232. The FRT-15 is a type of "drop-in" FRT designed to replace the trigger of a standard AR15-type firearm to "increase the rate" of fire. AR285. As the patent inscribed on the FRT-15 explains,

---

[7] The legislative history confirms this understanding. The then-president of the National Rifle Association testified that "[t]he distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition," and that any weapon "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun." *National Firearms Act: Hearings Before the House Comm. on Ways and Means on H.R. 9066*, 73d Cong 40 (1934) (statement of Karl T. Frederick, President, National Rifle Association of America) (AR371).

"[s]ometimes this is simply for entertainment and the feeling of shooting a machinegun." AR285. Ciravolo's classification report explains that the FRT-15 accomplishes this increase in rate of fire by eliminating the disconnector, which is a small metal part in semi-automatic triggers that catches the hammer after it fires and disconnects it from the firing sequence so that the weapon will not fire a second shot automatically. *Id.* at 14; *see also Rare Breed Triggers*, 2023 WL 5689770, at *5-6.[8] Accordingly, the classification report concluded that the FRT-15 is a machine gun under 26 U.S.C. § 5845(b). AR247.

Multiple firing tests performed during that analysis demonstrated that a semi-automatic firearm equipped with the FRT-15 fired multiple rounds automatically with a single depression of the trigger. AR246. A semi-automatic firearm equipped with the FRT-15 and loaded with a two-round ammunition fired both rounds with a single, constant depression of the trigger across all three tests. *Id.* The same occurred with a five-round ammunition load, also across three different tests. *Id.*

These results replicated those obtained after testing by ATF FEO David A. Smith on June 7, 2021. AR111. FEO Smith's analysis also concluded the FRT-15 was a machinegun. *Id.* Specifically, Smith assessed a firearm equipped with an FRT-15 and multiple-round ammunition loads, and found the firearm fired *all* available rounds "automatically by a single pull/function of the trigger" on each of four tests. AR111.

Function tests conducted on other, similar non-Rare Breed FRTs also showed that such devices transform semi-automatic firearms into machineguns. ATF FEO Anthony Ciravolo conducted an examination, test, and classification analysis on an AR Triggers Wide Open Trigger ("WOT") FRT. AR195. He found that the WOT FRT fired all available rounds "automatically by a single function (pull) of the trigger" across four different tests in which multiple-round ammunition loads were inserted into the firearm's magazine. AR195. And Plaintiffs concede that the WOT "operates on the same mechanical principles as the Rare Breed FRT-15." Compl. ¶ 44.

---

[8] The FRT-15 is extremely effective at increasing rate of fire to that of a machinegun. Without any limitation on the amount of ammunition, a semi-automatic AR15-type rifle equipped with an FRT-15 would fire at an average rate of 840.8 rounds per minute. AR247. By comparison, the average rate of fire for a M16-type, M4 machinegun is 870.4 rounds per minute. *Id.*

The zip-tie test ATF conducted on a model AR1 FRT also demonstrates that firearms equipped with FRTs are machineguns because they fire automatically with a single constant depression of the trigger. In this test, a zip-tie was installed around the rear of the grip and the front of the FRT, and that zip-tie was gradually tightened until the trigger was retracted just enough to release the hammer. AR157. A ten round-ammunition load was placed into the firearm's magazine, and once the first cartridge was chambered, the weapon "fired *five cartridges automatically* without the trigger being released." *Id.* (emphasis added). Michael Curtis, the Chief of the Firearms Technology Industry Services Branch, repeated this test multiple times to demonstrate that the FRT fired more than one shot with a single function of the trigger. *Id.* With each test, the firearm fired from three to ten cartridges (out of ten available) before a malfunction was encountered or the ammunition load expended. *Id.* The same zip-tie test was conducted on an FRT-15-equipped firearm with the same results. *See* ECF No. 41-1, Declaration of Daniel Hoffman ("Hoffman Decl.") ¶ 4.

Plaintiffs claim that none of these assessments are relevant because the trigger moves and releases the hammer each time an FRT-equipped firearm releases a round. Pls. MSJ Br. at 16-17. But neither movement nor the release of the hammer equate to function. The Fifth Circuit has repeatedly explained that "a trigger is just the 'mechanism . . . used to initiate the firing sequence.'" *Cargill v. Garland*, 57 F.4th 447, 462 (5th Cir. 2023) (plurality op.), *cert. granted*, No. 22-976, 2023 WL 7266996 (U.S. Nov. 3, 2023) (quoting *Jokel*, 969 F.2d at 135). *See also United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) (explaining that *Jokel*, 969 F.2d at 135, "defined a trigger . . . as any 'mechanism . . . used to initiate the firing sequence'"). Accordingly, the relevant function of the trigger for purposes of classifying firearms under Section 5845(b) is the initiation of the firing sequence—so long as the firing sequence need only be initiated once for a firearm to automatically shoot multiple rounds, that firearm is a machinegun. *See Olofson*, 563 F.3d at 658 (explaining that under the statute an automatic firing sequence is "set in motion by a single function of the trigger"). Indeed, a plurality of the Fifth Circuit in *Cargill* recognized exactly this in explaining that the Akins Accelerator—a device that used a spring to channel the recoil energy of each shot to repeatedly force the trigger against the shooter's stationary finger—is a machinegun. With that device, the plurality explained, "a shooter . . . need only

17

pull the trigger once to activate the firing sequence," and the device "maintained the [firing sequence] of its own accord." 57 F.4th at 462 n.8. Thus, even though the trigger on a firearm equipped with an Akins Accelerator still releases the hammer each time a shot is fired, the plurality emphasized that its "decision . . . would not apply to an Akins Accelerator." *Id.*; *accord Akins*, 197 F. App'x at 201 (upholding ATF's classification of the Akins Accelerator as a machinegun and explaining that the statute covers "any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly").

Thus, the plurality decision in *Cargill*, 57 F.4th 447, further confirms that ATF correctly classified FRTs as machineguns. In *Cargill*, the Fifth Circuit considered "whether a semi-automatic rifle equipped with a non-mechanical bump stock fires more than one shot each time the trigger 'acts.'" 57 F.4th at 459. A plurality of the Court answered that question in the negative because a non-mechanical bump stock requires the shooter to provide additional manual input after the initial pull of the trigger to maintain a rapid firing sequence. *Id.* at 463. Thus, "[b]ump firing does not maintain if all a shooter does is initially pull the trigger. Rather, to continue the firing after the shooter pulls the trigger, he or she must maintain manual, forward pressure on the barrel and manual, backward pressure on the trigger ledge." *Id.* There is no dispute of fact that this holding does not directly control here because a bump stock "is a completely different device from the FRT-15 or any other forced reset trigger," as Plaintiffs' purported expert concedes. *See* ECF No. 19 at 25.

But the logic and scope of the *Cargill* plurality makes clear that FRTs are machineguns. As discussed, the plurality explained that its analysis did not apply to mechanical bump stocks such as the Akins Accelerator. The plurality explained that that its concerns regarding the application of the term "single function of the trigger" to non-mechanical bump stocks "would not apply to the Akins Accelerator" because "a shooter using an Akins Accelerator need only pull the trigger once to activate the firing sequence" and the device then "maintained the bump fire of its own accord," *Cargill*, 57 F.4th at 462 n.8, with no need "to maintain pressure on the barrel and trigger ledge in order to maintain this firing sequence," *id.* at 454. The same is true of the devices here: the shooter need only "pull the trigger once to activate the firing sequence" which the device then "maintain[s] . . . of its own accord."

18

*Id.* at 462 n.8; *see Rare Breed Triggers, LLC*, 2023 WL 5689770, at *23 (explaining that the Cargill plurality "provides further grounds to find that the FRT-15 is a machinegun").

Accordingly, Plaintiffs' contention that the *Cargill* plurality defined function as release of the hammer cannot be squared with the fact that the plurality expressly carved out mechanical bump stocks from the scope of its opinion while recognizing that the triggers on mechanical bump stocks perform the same mechanical function as any normal trigger by releasing the hammer prior to each shot. As the *Cargill* plurality recognized, for every shot from a weapon equipped with an Akins Accelerator, the spring action of the device must force the weapon's trigger against the shooter's finger to release the hammer. *Cargill*, 57 F.4th at 454. But such a weapon is still a machinegun because it maintains fire automatically once the firing sequence has been initiated. *Id.* at 462 n.8. Thus, the central point is that after the initial function of the trigger caused by the shooter's pull, the device operates automatically to produce repeated fire.

Indeed, the other federal court to have examined the relevance of *Cargill* to FRTs reached this very conclusion, explaining that "[t]he FRT-15 is a mechanical device that automatically 'resets' the trigger to repeat the firing cycle until the shooter releases the trigger shoe." *Rare Breed Triggers, LLC*, 2023 WL5689770, at *23; *id.* at *24 ("Unlike non-mechanical bump stocks, FRT-15s allow for rapid, automatic firing 'if all a shooter does is initially pull the trigger,' and the firing cycle will continue until that pressure is released." (quoting *Cargill*, 57 F.4th at 454)). With FRTs, "the act of pulling and holding the trigger is one function, and that function produces more than one shot," *Cargill*, 57 F.4th at 463, and such devices therefore fall squarely within even the *Cargill* plurality's understanding of the statutory definition of machinegun.

## III.   Any Relief Awarded Should Be Limited in Type and Scope.

### A.   If Plaintiffs Prevail on the Merits, They Are Entitled Only to Declaratory Relief.

If the Court concludes that Plaintiffs have prevailed on the merits, it should issue a declaratory judgment limited to the parties in this action holding that FRTs are not machineguns, rather than issue a permanent injunction. "[I]t has long been held that an injunction is 'to be used sparingly, and only

in a clear and plain case,'" particularly where, as in this case, "a plaintiff seeks to enjoin the activity of a government agency." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976); *see also Parks v. Hinojosa*, No. 4:21-CV-00111-O, 2021 WL 1720219, at *3 (N.D. Tex. Apr. 30, 2021), *reconsideration denied*, No. 4:21-CV-00111-O, 2021 WL 2783989 (N.D. Tex. July 2, 2021) (same). Indeed, a permanent injunction should not issue as a matter of law where a declaratory judgment can afford complete relief. *See Baldwin Metals Co. v. Donovan*, 642 F.2d 768, 775 n.17 (5th Cir. 1981) ("An inadequate remedy at law and an irreparable injury should exist before a court grants injunctive relief."). And that is the case here. *See Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) ("[W]e have long presumed that officials of the Executive Branch will adhere to the law as declared by the court. As a result, the declaratory judgment is the functional equivalent of an injunction."); *cf. Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 98 (1992) (White, J., concurring) (explaining declaratory relief sufficient because government officials can be "expect[ed]" to "satisfy their obligations").

### B.  Plaintiffs Have Not Carried Their Burden to Obtain a Permanent Injunction Even If Such Relief Were Available.

Even if injunctive relief were available, and it is not because a declaratory judgment affords Plaintiffs complete relief, Plaintiffs fail to establish that the relevant factors favor such a remedy. An injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat, Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365 (2008); *see also Nat'l Coal. for Men v. Selective Serv. Sys.*, No. CV H-16-3362, 2019 WL 1902693, at *1 (S.D. Tex. Apr. 29, 2019). Accordingly, a permanent injunction requires not only success on the merits, but also a demonstration that (1) the movant has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) an equity remedy is warranted after balancing the hardships; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### 1.  Plaintiffs Have Not Established Irreparable Injury.

Plaintiffs have failed to demonstrate that they have suffered an irreparable injury requiring permanent injunctive relief. They seek to disrupt the status quo in which FRTs have been classified as

20

machineguns for years by requesting broad relief against *any* enforcement of ATF's classification of FRTs as machineguns, even as to individuals who are not a party to this case and future purchases of these devices. ATF classified the FRT-15 as a machinegun in July 2021, over *two years* before this lawsuit was brought. *See* ECF No. 13-6. And similar devices have received the same classification since the 1970s. *See* Saier Decl. ¶ 12, ECF No. 64-1. And, as explained above, *see supra* 8-10, the record is devoid of any evidence of enforcement action against a small-scale owner of a FRT device who is otherwise law-abiding.

Furthermore, "[c]ertain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Younger v. Harris*, 401 U.S. 37, 46 (1971). Thus, the hypothetical consequences of a hypothetical criminal prosecution do not create irreparable harm. Likewise, there is no irreparable harm from a hypothetical seizure of Plaintiffs' property. Any seized property could be returned via a forfeiture action or some other proceeding (*e.g.*, a motion under Federal Rule of Criminal Procedure 41(g)), so the loss of property would not be irreparable. *See Bevis v. City of Naperville,* --- F. Supp. 3d ----, 2023 WL 2077392, at \*17 (N.D. Ill. Feb. 17, 2023) (finding no irreparable harm demonstrated by ban on assault weapons and high-capacity magazines because "the financial burden and loss of access to effective firearms would be minimal"). Any claim of compliance costs is therefore misplaced, particularly as to *new* purchases of FRTs.

In any event, even if the Plaintiffs could establish irreparable injury, it would be insufficient to justify the broad injunction sought. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Plaintiffs have not shown that individuals who are not parties to this lawsuit will suffer irreparable harm absent an injunction, even assuming that Plaintiffs have standing to raise claims on their behalf. Moreover, the proposed injunction would apply not only to current owners of FRTs, but anyone who seeks to

21

obtain new FRTs in the future, and Plaintiffs have not shown how an inability to purchase new FRTs constitutes irreparable harm.

### 2.   The Equities and Public Interest Do Not Favor a Permanent Injunction.

The two final prongs of the injunction analysis—assessing the balance of harms and weighing the public interest—"merge" when "the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). As explained *supra* 20-22, Plaintiffs' asserted injuries are hypothetical, and, if any enforcement action were against them, they would have an opportunity to challenge it. *See Christoforu v. United States*, 842 F. Supp. 1453, 1456 (S.D. Fla. 1994), *aff'd*, 61 F.3d 31 (11th Cir. 1995); *see also Younger*, 401 U.S. at 46 (recognizing that the cost of criminal prosecution to the accused party is not an "irreparable" injury). On the other hand, issuing a wide-ranging injunction presents serious public safety risks. *See N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) (acknowledging "substantial, indeed compelling, governmental interests in public safety and crime prevention.").

Plaintiffs seek a broad sweeping injunction that would cripple the government's ability to take virtually any enforcement action with regard to a FRT device anywhere in the United States. The public safety would undoubtedly be jeopardized by removing restrictions on the manufacturing, sale, and possession of these deadly devices. *See Aposhian v. Barr*, 958 F.3d 969, 991 (10th Cir. 2020) (holding that "the public has a strong interest in banning the possession and transfer of machine guns" based on "the safety of the public in general," "the safety of law enforcement officers," and the safety of "first responders"), *en banc granted but previous order reinstated*, 989 F.3d 890 (10th. Cir. 2021); *Bevis*, 2023 WL 2077392, at *17 (N.D. Ill. Feb. 17, 2023) (finding "compelling[]" that firearm law "protect[s] public safety by removing particularly dangerous weapons from circulation"). Similarly, the government has a strong and continuing interest in being able to enforce its laws restricting the possession and sale of machineguns where the circumstances warrant action in the government's law enforcement discretion. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) ("primary concern of every

government" is "the safety and indeed the lives of its citizens"). A broad injunction would undermine ATF's ability to respond in real time to serious future threats implicating FRTs.[9]

It cannot be disputed that firearms equipped with FRT devices like the FRT-15 and WOT are extremely dangerous. An AR-type firearm equipped with an FRT-15 can fire at a rate comparable to an M16 machinegun—roughly 800 to 900 rounds per minute, irrespective of the shooter's skill—and often in an indiscriminate and uncontrolled fashion. *See* Saier Decl. ¶¶ 11, 39, ECF No. 64-1. While crimes involving these types of FRTs are likely underreported, ATF has encountered these devices in numerous criminal settings. *Id.* ¶¶ 33-35. There is further evidence that FRT-15s are being distributed by manufacturers and third-party sellers to countless individuals prohibited from receiving or possessing firearms under 18 U.S.C. § 922(g). *Id.* ¶ 36. Even absent malintent, these devices present a unique risk of injury. Because they look like normal triggers, individuals and law enforcement may unknowingly acquire or recover a firearm that has an FRT-15 or WOT type device installed, presenting safety concerns to users who may not expect or be able to handle a weapon with a rapid rate of automatic fire. *Id.* ¶¶ 39-40.

### C.  Even If a Permanent Injunction Does Issue, Its Scope Should Be Limited.

If the Court issues a permanent injunctive, the injunctive relief granted must be no broader than necessary to remedy any demonstrated irreparable harms of the Plaintiffs in this case. *Gill*, 138 S. Ct. at 1934; *Madsen*, 512 U.S. at 765. Here, these principles require that the Court limit relief in the following respects.

#### 1.  A Permanent Injunction Should Not Extend Beyond the Individual Plaintiffs.

Any relief granted should only apply to the Individual Plaintiffs, as Associational Plaintiffs fail to demonstrate standing, *see supra* 10–12. Plaintiffs "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester.*, 581 U.S. at 439 (quoting *Davis v.*

---

[9] That the government has generally enforced the statute against the largest manufacturers and sellers of these deadly devices does not mean that it considers individual owners to pose no threats. Rather, it reflects ATF's allocation of its limited resources to target the most dangerous FRT-related activities. *See generally* ECF No. 64-1 ¶¶ 24-25, 28 (Saier Decl.).

*Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)); *see also Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) ("[S]tanding is not dispensed in gross.") (quoting *Lewis*, 518 U.S. at 358 n.6). Their failure to do so as to the Associational Plaintiffs precludes the broader relief sought as to the Associational Plaintiffs, even if this Court finds that the Individual Plaintiffs have standing. Moreover, even if the Associational Plaintiffs could satisfy Article III's requirements to sue on behalf of their hundreds of thousands of members, equitable principles would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment. Such a restriction on relief would promote longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional. *Cf. Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits).

### 2. Permanent Injunctive Relief Should Be Geographically Limited.

In the alternative, if the Court believes that injunctive relief is necessary to remedy harms suffered by Plaintiffs beyond the Individual Plaintiffs, its relief should be limited to the Northern District of Texas. "Both the Fifth Circuit and the Supreme Court have suggested that nationwide injunctions are, at best, reserved for extraordinary circumstances." *Second Amend. Found. v. Bureau of Alcohol Tobacco, Firearms, & Explosives*, No. 3:21-CV-0116-B, 2023 WL 4304760, at *3 (N.D. Tex. June 30, 2023) (citing *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (staying nationwide injunction of COVID-19 vaccination mandates as "an issue of great significance" that "will benefit from the airing of competing views in our sister circuits." (citation omitted)) and *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions)); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (suggesting universal injunctions are inconsistent with "limits on equity and judicial power"). As Justices Gorsuch, joined by Justice Thomas, explained, "[b]ecause plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *Dep't of Homeland Sec*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This creates risks of "conflicting nationwide injunctions," with "asymmetric" stakes where "a single

successful challenge is enough to stay the challenged rule across the country." *Id.*; *see also Trump*, 138 S. Ct. at 2425 (Thomas, J., concurring) (Universal relief "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.").

This case presents the exact circumstances that militate against nationwide relief. The Eastern District of New York is presently considering the exact question before this Court, and recently determined that FRT-15s are highly likely illegal machineguns, including under the *Cargill* plurality's reasoning. *See Rare Breed Triggers, LLC*, 2023 WL 5689770, at *15, *49-50 (issuing preliminary injunction against Rare Breed Triggers). Similarly, a federal court in Florida earlier declined to enjoin ATF from enforcing its decision that the FRT-15 is a machinegun. *See Rare Breed Triggers, LLC v. Garland,* No. 6:21-CV-1245, 2021 WL 4750081, at *3 (M.D. Fla. Oct. 12, 2021). Granting relief beyond the scope of this district would result in conflicting rulings and condone the "gamesmanship and chaos" Justices Gorsuch and Thomas warned against, *Dep't of Homeland Sec.*, 140 S. Ct. at 601 (Gorsuch, J., concurring).

Indeed, the *Cargill* plurality noted in similar circumstances that broad relief was not necessarily appropriate even at final judgment, acknowledging disagreement among the circuits about the application of the statute to non-mechanical bump stocks. *See Cargill*, 57 F.4th at 472 (observing that "it may be the case that a more limited remedy [than vacatur] is appropriate in these circumstances"). That same respect for coordinate courts counsels against broad relief here. This Court should follow the Fifth Circuit's mandate "to avoid rulings which may trench upon the authority of sister courts," *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985), and decline to issue such broad relief.

Plaintiffs argue that the Court should issue an injunction that applies to *every* owner or potential owner of a FRT, regardless of whether they are a Plaintiff or member of an Associational Plaintiff, on the ground that Defendants have, by Plaintiffs' account, violated the Preliminary Injunction by contacting members of National Association for Gun Rights or Texas Gun Rights. Pls.' MSJ Br. at 26–27. Defendants have not taken any enforcement activity against known members of these groups,

and Defendants respectfully refer the Court to their Notice of Compliance, ECF No. 57, for an explanation of steps taken to comply with the Preliminary Injunction.

Plaintiffs also argue that the federal judiciary would not benefit from allowing the issues presented in this case to percolate through different courts because the issue presented here is one of statutory interpretation. Pls.' MSJ Br. at 27–28. Universal relief "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts [and] encouraging forum shopping." *Trump*, 138 S. Ct. at 2425 (Thomas, J., concurring). The preference for allowing legal questions to percolate through the courts does not exclude questions of statutory interpretation. To the contrary, this is precisely the sort of issue that would benefit from consideration by different courts, as indicated by the grant of certiorari in the *Cargill* case that created a circuit split over whether bump stocks are machineguns. *See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 319 (D.C. Cir. 2022) (holding that bump stocks are machineguns).

Plaintiffs' decision to bring an APA claim does not necessitate a nationwide remedy. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (vacating nationwide scope of injunction in facial challenge under the APA). A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and the APA's general instruction that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), is insufficient to mandate such a departure. The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967). Accordingly, the Court should construe the "set aside" language in Section 706(2) as applying only to the named Plaintiffs, especially as no federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter, *see Trump*, 138 S. Ct. at 2426 (2018) (Thomas, J., concurring). And at least three Supreme Court Justices recently indicated their understanding that the APA does not require, or perhaps even permit, universal vacatur of agency actions. *See United States v. Texas*, 599 U.S. 670, 695 (2003) (Gorsuch, J., concurring in the judgment) (joined by Justices Thomas and Barrett). This Court

should follow Justice Gorsuch's *Texas* concurrence and decline to issue vacatur, or at least limit the scope of vacatur.

### 3. Permanent Injunctive Relief Should Protect Only Possession of FRTs.

Because any injunctive relief that issues must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established," *Lewis v. Casey*, 518 U.S. 343, 357 (1996), Plaintiffs cannot obtain a permanent injunction that protects more than possession of FRTs. Plaintiffs provide no evidence that any purported harm they have or may suffer would be remedied by several categories of requested injunctive relief. As private owners and associations whose members are private owners, no Plaintiff has adduced any evidence that they have or likely will face any risk of: (1) "civil proceedings" for "selling[] or manufacturing forced reset triggers," ECF No. 60 at Req. 3(b); (2) "criminal prosecutions for representing to the public or potential buyers and sellers that forced reset triggers are not machineguns," *id.* at Req. 3(c); (3) "civil actions for representing to the public or potential buyers and sellers that forced reset triggers are not machineguns," *id.* at Req. 3(d); and (4) interference with their "exchange of FRTs," *id.* at Req. 3(i). For this reason alone, these categories of hypothetical government actions should be excluded from any relief the Court may grant. *See Lewis*, 518 U.S. at 357 ("[D]emonstrated harm from one particular inadequacy in government administration" does not provide "authoriz[ation] to remedy *all* inadequacies in that administration.").

Similarly, Plaintiffs provide no explanation of how they will be harmed absent "[a]n order directing Defendants to mail remedial notices" stating that FRTs are not machineguns. ECF No. 60 at Req. 4. Plaintiffs apparently seek to have ATF issue such "remedial notices" to persons who are not a party to this lawsuit and are not members of Associational Plaintiffs, *see* Pls.' MSJ Br. at 28–30, since Plaintiffs themselves will already be aware of the outcome of this litigation. Plaintiffs lack standing to assert a claim on behalf of non-parties, and in any event have not explained what harm will be caused to the non-parties absent such an order.[10]

---

[10] The Court should also limit any relief by excluding individuals prohibited from possessing firearms under 18 U.S.C. § 922(g), as with the Preliminary Injunction. *See* ECF No. 53, at 45.

### 4. A Permanent Injunction Should Not Extend to Criminal Prosecutions.

"It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions." *Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 163 (1943). Binding on this Court is the Fifth's Circuit's warning that "as an incident of the constitutional separation of powers, . . . courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions." *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965); *see also United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case[.]"); *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *9 (11th Cir. Sept. 21, 2022) ("It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions."); *Ackerman v. Int'l Longshoremen's & Warehousemen's Union*, 187 F.2d 860, 868 (9th Cir. 1951) ("That equity will stay its hand in respect to criminal proceedings, always when they are pending, and ordinarily when they are threatened, is a rule of wide and general application under our legal system.") (collecting authorities)). Courts have repeatedly applied these principles, including in a challenge to the classifications here at issue, to decline to enjoin future prosecutions sought in ancillary civil proceedings. *See, e.g.*, *Rare Breed Triggers, LLC v. Garland*, No. 6:21-CV-1245-CEM-GJK, 2021 WL 7543623, at *2 (M.D. Fla. Aug. 5, 2021) (recognizing that "[m]any district courts have utilized the *Younger* framework to conclude that it is improper for a federal court to enjoin a federal criminal prosecution absent circumstances that do not exist here" and declining to "enjoin law enforcement action by the ATF leading to the potential criminal prosecution of [Rare Breed Triggers] Plaintiffs"); *Deaver v. Seymour*, 822 F.2d 66, 69-71 (D.C. Cir. 1987) (finding that "[p]rospective defendants cannot, by bringing ancillary equitable proceedings, circumvent federal criminal procedure" and thus upholding denial of injunction against indictment), *application for stay denied*, *Deaver v. United States*, 483 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers) ("There will be time enough for applicant to present his constitutional claim to the appellate courts if and when he is convicted of the charges against him.").

While this Court held otherwise at the Preliminary Injunction stage, each case that it, and Plaintiffs in their summary judgment brief, cited dealt with claims to vindicate *constitutional* rights. *See,*

*e.g.*, *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("When contesting the *constitutionality* of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his *constitutional* rights.'" (emphases added) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 276 (6th Cir. 1997) (addressing "pre-enforcement challenge to the *constitutionality* of Title XI of the Violent Crime Control and Law Enforcement Act of 1994" (emphasis added)); *Susan B. Anthony List*, 573 U.S. at 154-55 (adjudicating *constitutional* challenge to statute criminalizing certain false statements which were to be investigated by the Ohio Elections Commission *after* "[t]he District Court stayed the action under *Younger v. Harris* . . . pending completion of the [Ohio Election Commission] proceedings."). This is not a coincidence. "There is an exception to this general rule [against jurisdiction] in order to avoid a chilling effect on constitutional rights." *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 183 (3d Cir. 2006), *as amended* (May 16, 2006) (citing *Dombrowski v. Pfister*, 380 U.S. 479, 486–87 (1965); *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 98–99 (1949); *Truax v. Raich*, 239 U.S. 33, 38–39 (1915)). Because Plaintiffs here do not bring a constitutional challenge, *see* Compl. ¶¶ 65-72, this exception does not apply; there is no basis to deviate from the longstanding equitable rule against preemptive injunctions of criminal prosecutions in ancillary civil proceedings.

Plaintiffs further argue that the APA, the statute under which their complaint is brought, generally permits pre-enforcement review, including of criminal proceedings. Plaintiffs disregard the concluding sentence of 5 U.S.C. § 702, which makes clear that nothing in the APA expands the Court's jurisdiction beyond ordinary limitations. *See id.* ("Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."). If ultimately prosecuted, Plaintiffs are fully able to challenge the legality of the classification decision in that criminal prosecution, as the Rare Breed Triggers parties did in the Eastern District of New York. But in the interim, Defendants respectfully maintain that this Court may not interfere with "the Executive Branch['s] exclusive

authority and absolute discretion to decide whether to prosecute a case," *Nixon*, 418 U.S. at 693, and deprive sister courts of the opportunity to decide these issues in the first instance, particularly in districts where applicable law conflicts with *Cargill* and FRT-15s and WOTs are deemed machineguns, *see W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985) (courts should "avoid rulings which may trench upon the authority of sister courts").

Finally, Plaintiffs' request for an injunction protecting Lawrence DeMonico, Kevin Maxwell, Rare Breed Triggers, LLC, and Rare Breed Firearms, LLC from criminal prosecution is inappropriate. *See* Pls.' MSJ Br. at 30–32. Even aside from the points just mentioned, Plaintiffs' request regarding these four non-parties is particularly improper because these entities, referred to by Plaintiffs as the "Rare Breed Parties," are subject to civil litigation regarding the status of the FRT-15 as a machinegun in the Eastern District of New York, which predates this suit. Indeed, had the Rare Breed Parties been listed as Plaintiffs in this lawsuit, this Court likely would have dismissed the case under the first-to-file rule, *see, e.g.*, *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997), given the overlapping issues and parties. But Plaintiffs did not even indicate that the Rare Breed Parties were members of an Associational Plaintiff in their Complaint or in any of the briefing on the Motion for Preliminary Injunction, instead raising this fact for the first time in their Motion for Summary Judgment. The Rare Breed Parties should not be able to benefit from an injunction by being members of an Associational Plaintiff that they could not have obtained if they were named parties themselves.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' cross-motion for summary judgment and deny Plaintiffs' Motion for Summary Judgment. In the event the Court grants Plaintiffs' motion for summary judgment, it should issue only a declaratory judgment. In the event the Court grants Plaintiffs' request for permanent injunction, any injunctive relief should be limited.

DATED: December 1, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEX HAAS
Branch Director

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ *Alexander W. Resar*
MICHAEL P. CLENDENEN
LAURA B. BAKST
ALEXANDER W. RESAR
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone:  (202) 616-8188
E-mail:  alexander.w.resar@usdoj.gov

*Counsel for Defendants*

31

**<u>Certificate of Service</u>**

On December 1, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/  Alexander W. Resar*