**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:23-cv-00830-O |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

### PLAINTIFFS' COMBINED BRIEF IN RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

   I.    The Record on Review is Not Limited to Defendants' Administrative Record ............ 2

   II.   Plaintiffs Have Standing ........................................................................................... 7

       A.    The Individual Plaintiffs Face a Credible Threat of Enforcement .................... 7

       B.    Associational Plaintiffs Have Standing ........................................................... 9

       C.    Plaintiffs' Have Standing to Challenge ATF's Classification Decisions
           Related to FRTs for Conduct Beyond Mere Possession ................................. 12

   III.  FRTs are Not Machineguns ...................................................................................... 13

       A.    FRTs Do Not Meet the Statutory Definition of Machinegun ......................... 13

       B.    If the Statute is Ambiguous, the Rule of Lenity Applies ................................ 18

   IV.  Injunctive Relief is Available and Should be Granted ............................................... 20

       A.    Plaintiffs Have Established Irreparable Injury ................................................ 21

       B.    The Balance of Equities and Public Interest Favor a Permanent Injunction.... 23

       C.    The Scope of the Permanent Injunction Should Not be Limited to the
           Individual Plaintiffs ...................................................................................... 25

       D.    The Permanent Injunction Should Not Be Geographically Limited ............... 26

       E.    The Permanent Injunction Must Be Broader than Just Possession of FRTs.... 27

       F.    The Permanent Injunction Can and Must Extend to Criminal Prosecutions ... 28

       G.    Injunctive Relief for the Rare Breed Parties ................................................... 30

   V.   Scope of Issues in Reply Brief ................................................................................. 31

CONCLUSION ..................................................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967) .................................................................................. 29

*Abramski v. United States*,
  573 U.S. 169 (2014) ..................................................................................... 7

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022)....................................................................... 25

*Bevis v. City of Naperville, Illinois*,
  657 F. Supp. 3d 1052 (N.D. Ill. 2023) ...................................................... 10

*Canal Auth. V. Callaway*,
  489 F.2d 567 (5th Cir. 1974)....................................................................... 22

*Cargill v. Barr*,
  502 F.Supp.3d 1163 (W.D. Tex. 2020) ........................................................ 7

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) ................................................. 6, 16, 19, 26

*City of Dallas v. Hall*,
  Case Nos. 3:07-CV-0060-P, 3:07-CV-0213-P, 2007 WL 3257188 (N.D. Tex. Oct. 29, 2007) . 6

*Data Marketing Partnership, LP v. United States Department of Labor*,
  45 F.4th 846 (5th Cir. 2022).......................................................................... 26

*Davis Mts. Trans-Pecos Heritage Ass'n v. United States Air Force*,
  249 F. Supp. 2d 763 (N.D. Tex. 2003), *vacated sub nom. on other grounds*, *Davis Mts. Trans-Pecos Heritage Ass'n. v. Fed. Aviation Admin*., 116 Fed. App'x 3 (5th Cir. 2004).................... 5

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
  762 F.2d 464 (5th Cir. 1985)......................................................................... 22

*Fed. Election Comm'n v. Cruz*,
  142 S.Ct. 1638 (2022) ................................................................................. 29

*Franciscan All. Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022)............................................................................ 8

*Friends of the Earth, Inc. v. Chevron Chemical Company*,
  129 F.3d 826 (5th Cir. 1997)......................................................................... 11

*Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Engineers*,
  No. 3:13-CV-126, 2015 WL 1883522 (S.D. Tex. Apr. 20, 2015) ......................................... 4, 5

ii

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) ........................................................................................... 23, 24

*Medina County Environmental Action v. Surface Transportation Board*,
    602 F.3d 687 (5th Cir. 2010) ......................................................................................... 4

*Mock v. Garland*,
    No. 4:23-cv-00095-O, 2023 WL 6457920 (N.D. Tex. Oct. 2, 2023) .......................... 8

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ..................................................................................................... 21

*Nat'l Assoc. for Gun Rights v. Grisham*,
    No. 1:23-cv-00771-DHU-LF, 2023 WL 5951940 (D.N.M. Sept. 13, 2023) ........... 10

*National Association for Gun Rights v. Garland*,
    Case No. 23-11138 at (5th Cir. Nov. 30, 2023) ....................................................... 13

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ............................................................................ 23, 24

*NFIB v. Perez*,
    No. 5:16-CV-066-C, 2016 WL 3766121 (N.D. Tex. June 27, 2016) ......................... 5

*O.A. v. Trump*,
    404 F.Supp.3d 109 (D.D.C. 2019) ..................................................................... 21, 29

*OnPath Federal Credit Union v. United States Department of Treasury, Community Development Financial Institutions Fund*,
    73 F.4th 291 (5th Cir. 2023) ......................................................................................... 4

*Shaughnessy v. Pedreiro*,
    349 U.S. 48 (1955) ...................................................................................................... 29

*Stolt-Nielsen, S.A. v. United States*,
    442 F.3d 177 (3d Cir. 2006) ....................................................................................... 28

*Students for Fair Admission, Inc. v. University of Texas at Austin*,
    37 F.4th 1078 (5th Cir. 2022) .............................................................................. 10, 11

*Students for Fair Admission, Inc. v. University of Texas at Austin*,
    Case No. 1:20-CV-763-RP, 2021 WL 3145667 (W.D. Tex. Jul. 26, 2021) ........... 11

*Texas Gun Rights, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
    No. 4:23-cv-00578-O, 2023 WL 8352316 (N.D. Tex. Oct. 4, 2023) ................ 10, 11

*Texas v. Biden*,
    Case No. 2:21-cv-067-Z, 2021 WL 4552547 (N.D. Tex. Jul. 19, 2021) ................ 3, 5

iii

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ...................................................................... 22

*Texas v. United States Department of Homeland Security*,
Case No. 6:23-cv-00007, 2023 WL 2842760 (S.D. Tex. Apr. 7, 2023) ................................ 3, 6

*United States v. Apel*,
571 U.S. 359 (2014) ...................................................................... 7

*United States v. Rare Breed Triggers, LLC*,
No. 23-cv-369 (NRM) (RML) (E.D.N.Y.) ...................................................... 13, 27

*Vanderstok, et al. v. Garland, et al.*,
625 F. Supp.3d 570 (N.D. Tex. 2022) ........................................................ 22

*Wages and White Lion Investments, L.L.C. v. United States*,
16 F.4th 1130 (5th Cir. 2021) ................................................................ 22

*Zimmerman v. City of Austin, Texas*,
881 F.3d 378 (5th Cir. 2018) .............................................................. 7, 9

**Statutes**

18 U.S.C. § 922(o) ...................................................................... 12

5 U.S.C. § 702 ...................................................................... 29, 30

**Other Authorities**

James Madison, The Federalist No. 47 (Jan. 30, 1788) ............................................ 30

## INTRODUCTION

Defendants' Combined Memorandum in Support of Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 81) ("Combined Motion") is nothing more than a thinly veiled rehash of the same arguments this Court has already rejected three times. Defendants even acknowledge as much, stating "Defendants recognize that the court has already decided, as a preliminary matter, certain of the arguments contained herein." Combined Motion at 8 n.2. Defendants provide no valid reasons for this Court to change course and identify no material error in this Court's earlier rulings.

Plaintiffs have set forth a set of four operative facts:

- The Bureau of Alcohol, Tobacco, Firearms, and Explosives has made a final determination to classify forced reset triggers as "machineguns" (e.g., Pls.' App'x 112-177; Pls.' App'x 179-193; Pls.' App'x 197-253; Pls.' App'x 195-196; Pls.' App'x 498-499 ¶ 42; Pls.' App'x 274-275, Prelim. Inj. Hr'g. Tr. 105:24-106:4);

- For each and every round fired, the trigger moves forward into its reset state and is depressed to release the hammer from its sear surface (Pls.' App'x 67; Pls.' App'x 529-532, Prelim. Inj. Hr'g. Tr. 21:16-22:17, 109:11-18, 111:7-16);

- The trigger in a firearm equipped with a forced reset trigger must reset after every round that is fired (Pls.' App'x 67-68; Pls' App'x 532-533, Prelim. Inj. Hr'g. Tr. 111:17-112:24); and

- If the shooter attempts to overcome the reset and holds the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction (Pls.' App'x 533, Prelim. Inj. Hr'g. Tr. 113:10-21).

In addition, the only force that moves the trigger rearward comes from the user's finger. Pls' App'x 532, Prelim. Inj. Hr'g. Tr. 111:10-12. Defendants do not dispute these facts. These facts are dispositive of this case because they establish that the trigger in a firearm equipped with a Forced Reset Trigger ("FRT") must "function" for each round fired.

In response, Defendants do not specifically identify *any* material facts that support their motion for summary judgment. Instead, they rely on (a) procedural arguments that have been

repeatedly rejected by this Court and (b) circular, conclusory statements.  This does not carry Defendants' burden on summary judgment.

The individual Plaintiffs have standing because they face a credible threat of prosecution and economic compliance costs.  The associational Plaintiffs have standing because at least one member of each association has standing.  Based upon the undisputed material facts identified above, FRTs do not meet the definition of a "machinegun" under Fifth Circuit case law.  Finally, the scope of the proposed permanent injunction is appropriate.  Injunctive relief is necessary to prevent circumvention of any declaratory order, circumvention that Defendants' own words and deeds confirm will occur if not enjoined.  Injunctive relief must be broad enough to protect the named Plaintiffs in this case, including the members of the associational Plaintiffs, and should comport with the basic principle that vacatur is the appropriate remedy for an unlawful agency action.  Relief must also protect the manufacture, sale, and transfer of FRTs, both as a matter of basic consistency—if FRTs are not machineguns, there is no basis to restrict their manufacture, sale, or transfer—and as a necessary precondition to FRT ownership.  Finally, it makes no sense to exclude criminal prosecutions from the scope of a permanent injunction, effectively leaving Defendants free to pursue criminal prosecutions against law abiding citizens for offenses that are not crimes.

Accordingly, Defendants' Combined Motion should be denied, and summary judgment entered in favor of Plaintiffs.

## ARGUMENT

## I.  The Record on Review is Not Limited to Defendants' Administrative Record

Defendants claim that the record for review in this Court should be limited to the administrative record before the agency at the time of its decision.  Combined Motion at 15.  This

contention is immaterial.  Defendants do not dispute the key facts, listed above, that establish FRTs do not satisfy the statutory definition of a "machinegun."

Limiting review to just the administrative record before the agency at the time of decision is inappropriate in this case because of the nature of the claims presented and the fact that Plaintiffs—and indeed the public at large—had no role in producing or contributing to the agency's record.  Instead, Defendant's purported limitation is little more than a thinly veiled backdoor effort to incorporate *Chevron*-style deference that should be rejected.

To illustrate why, imagine that, instead of machineguns, Defendants were classifying fruits. Imagine further that Defendants decided to evaluate an orange and in doing so, on their own and with no public input, determined that the orange is really a potato.  Under Defendants' view of the world, there would be no mechanism for challenging Defendants' classification, even though it is plainly wrong, because there is nothing in the administrative record that says differently.  This is not and cannot be correct.

As a preliminary matter, Defendants have not moved to strike any of the materials cited by Plaintiffs or included in their appendix supporting their Motion for Summary Judgment.  Thus, this issue is not properly before this Court.

Even if it were, Defendants' contention is meritless. Courts in this district have held that the record requirement does not apply to claims that could be brought apart from the Administrative Procedure Act.  *See Texas v. Biden*, Case No. 2:21-cv-067-Z, 2021 WL 4552547, at *4-6 (N.D. Tex. Jul. 19, 2021); *see also Texas v. United States Department of Homeland Security*, Case No. 6:23-cv-00007, 2023 WL 2842760, at *3 (S.D. Tex. Apr. 7, 2023) (citing *Texas* and "permit[ing] extra-record discovery on the Plaintiff States' ultra vires claim.")  *Texas* held that even when brought as an APA claim, a statutory claim that an agency has acted *ultra vires* "does

not arise within the APA context and [is] therefore not bound by the statutorily created record rule." *Id*. at 6.  In so holding, the court reasoned that because plaintiffs would have a longstanding equitable claim in suits "alleging a federal official acted *ultra vires* of statutorily delegated authority," such claims do not fall within the APA record rule. *Id*. at *5.

The nature of the claims at issue in this case do not lend themselves to limiting review to the preexisting administrative record.  This is not a case alleging that the agency improperly disregarded information in the formulation of its policy or that its final action was not a logical outgrowth of a preexisting administrative process.  In either of those examples, the preexisting administrative record is crucial, because it shows what the agency knew and when.  Rather, this claim alleges that Defendants do not have statutory authority to do what they have done.  This claim does not depend on any information before the agency at the time of its decision and falls squarely into the sort of *ultra vires* claim that could be brought outside of the APA framework. Accordingly, the APA record rule does not apply to Plaintiffs' claim.

Moreover, even if the record rule applied, the Fifth Circuit has recognized three situations where supplementation of the record is appropriate: "(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision;" "(2) the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors;" or "(3) the agency failed to explain administrative action so as to frustrate judicial review."  *OnPath Federal Credit Union v. United States Department of Treasury, Community Development Financial Institutions Fund*, 73 F.4th 291, 299 (5th Cir. 2023) (citing *Medina County Environmental Action v. Surface Transportation Board*, 602 F.3d 687, 706 (5th Cir. 2010)); *see also Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Engineers*, No. 3:13-CV-126, 2015 WL 1883522, at *3 (S.D. Tex. Apr. 20, 2015) (noting that, while *Medina*

arose in the context of a "motion to supplement," "regardless of the labels used, *Medina* dealt with what is traditionally considered a request to add 'extra-record' evidence, not an attempt to supplement with evidence that the agency considered but failed to include in the judicial record.").

In practice:

> District courts in this circuit routinely allow extrarecord evidence to be introduced under the following '*Davis Mountain*' circumstances: 1. When agency action is not adequately explained in the record before the court; 2. *When the agency failed to consider factors which are relevant to its final decision;* 3. When an agency considered evidence which it failed to include in the record; 4. *When a case is so complex that a court needs more evidence to enable it to understand the issues clearly;* 5. *In cases where evidence arising after the agency action shows whether the decision was correct or not*; 6. In cases where agencies are sued for a failure to take action; 7. In cases arising under NEPA; and 8. In cases where relief is at issue, especially at the preliminary injunction stage.

*Texas*, 2021 WL 4552547 at *2 (citing *NFIB v. Perez*, No. 5:16-CV-066-C, 2016 WL 3766121, at *23 (N.D. Tex. June 27, 2016) (quoting *Davis Mts. Trans-Pecos Heritage Ass'n v. United States Air Force*, 249 F. Supp. 2d 763, 776 (N.D. Tex. 2003) (citation omitted), *vacated sub nom. on other grounds*, *Davis Mts. Trans-Pecos Heritage Ass'n. v. Fed. Aviation Admin.*, 116 Fed. App'x 3 (5th Cir. 2004))) (emphasis added).  These factors generally accord with the three factors identified by the circuit court. *Id*. ("Courts within the Fifth Circuit have concluded that '[m]ost, and perhaps all, of the eight *Davis Mountains* exceptions fit within the three broader categories in *Medina*' and 'it does not seem that there will often be a significant practical distinction between the eight exceptions listed in *Davis Mountains* and the three listed in *Medina*.'" (quoting *NFIB*, at *23 n.9)); *see also Gulf Coast Rod Reel & Gun Club, Inc.* 2015 WL 1883522, at *3 ("[*Medina* was not] a sea change in in this circuit's law on extra-record evidence.").

The evidence produced by Plaintiffs fits comfortably into the *Davis Mountain/Medina* exceptions.

First, it reflects "factors that are relevant to the agency's final decision" that the agency failed to consider. "Whether an agency considered all relevant factors 'can sometimes only be determined by looking outside the record to see what the agency may have ignored.'" *Texas v. Department of Homeland Security*, 2023 WL 2842760, at *3 (quoting *City of Dallas v. Hall*, Case Nos. 3:07-CV-0060-P, 3:07-CV-0213-P, 2007 WL 3257188, at *4 (N.D. Tex. Oct. 29, 2007)). Plaintiffs did not request Defendants' determinations regarding FRTs. There was no public comment period during which Plaintiffs, or anyone else, could weigh in and correct errors in the agency's administrative process. Rather, Defendants determined that FRTs are "machineguns" based entirely on their own and on a record of their own making. Thus, additional information reflects documentation that is adverse to the agency's determination and was "deliberately or negligently excluded." Furthermore, the testimony of both sides' experts concerning how FRTs work is "evidence arising after the agency action [that] shows whether the decision was correct or not."

Finally, any information outside of the agency's administrative record is properly considered "background information" regarding the functioning of the FRT that is necessary for this Court to evaluate complex and competing claims regarding how FRTs operate.

Upon closer examination, what Defendants are effectively driving at is importing *Chevron*-style deference through the back door of supporting materials. By seeking to artificially constrain the record before this Court, Defendants are demanding that this Court defer to Defendants' factual and legal determinations—determinations made with no opportunity for input or challenge from the public. But as the Fifth Circuit has recognized, "when 'the Government interprets a criminal statute too broadly . . . or too narrowly . . . a court has an obligation to correct its error.'" *Cargill v. Garland*, 57 F.4th 447, 467 (5th Cir. 2023) (en banc) (quoting *Abramski v. United States*, 573

6

U.S. 169, 191 (2014)).   Indeed, "criminal laws are for the courts, not for the Government, to construe."  *Id*.  As a result, "the Supreme Court has 'never held that the Government's reading of a criminal statute is entitled to any deference.'"  *Id*. (quoting *United States v. Apel*, 571 U.S. 359, 369 (2014)).   Meeting the court's duty "to correct" the government's error in criminal law is irreconcilable with the government's effort to limit the record on review.[1]

## II.  Plaintiffs Have Standing

### A.  The Individual Plaintiffs Face a Credible Threat of Enforcement

In granting Plaintiffs' Motion for Preliminary Injunction, this Court stated "[n]othing in Defendant's renewed standing challenge contradicts the operative facts the Court relied upon while granting the TRO."  Order (ECF No. 53) at 10; *see also* Order & Op. on Pls. Mot. For TRO (ECF 36) at 7-9.  The third time is not the charm; Defendants *still* have not contradicted the operative facts that this Court relied on in assessing standing and *still* continue to press overly cramped arguments that, if adopted, would effectively eliminate pre-enforcement challenges.

As this Court previously found, "[t]here is no dispute that the Individual Plaintiffs 'intend to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute."  Order (ECF No. 53) at 12 (quoting *Zimmerman v. City of Austin, Texas*, 881 F.3d 378, 391 (5th Cir. 2018)).   "By bringing this action, the Individual Plaintiffs place themselves in potential jeopardy due to acknowledging their possession of FRTs."  *Id*. (quoting *Mock v. Garland*,

---

[1] Tellingly, Defendants have been willing to go beyond the administrative record when it benefits their case.  For example, several of the same institutional defendants presented expert testimony at trial that is, by definition, beyond the administrative record to support their case in *Cargill*.  *See Cargill v. Barr*, 502 F.Supp.3d 1163, 1175-77 (W.D. Tex. 2020) ("At trial, Defendants called David A. Smith, a Firearms Enforcement Officer with ATF's Firearms and Technology Division ('FATD') in Martinsburg, West Virginia, to testify 'as an expert in the field of firearms mechanics and operations.'").

No. 4:23-cv-00095-O, 2023 WL 6457920, at *8 (N.D. Tex. Oct. 2, 2023)).  Thus, Plaintiffs face a credible threat of enforcement sufficient to establish standing.

In response, Defendants claim that the "ATF's enforcement priorities have been focused on large-scale manufactures and sellers of FRTs and those with criminal histories, not individual owners like Plaintiffs and their members."  Combined Motion at 9.  First, this is false.  Defendants' own filings aver that "the FRT-15 and WOT are subject to active retrieval efforts" that "are directed towards approximately 8,849 unique purchasers"—*i.e.*, individual owners.  Declaration of Special Agent Craig Saier (ECF 64-1) at 8-9; *see also* Order (ECF No. 73) at 6 ("Defendants contend that complying with the preliminary injunction pending appeal will make it harder for them to seize FRTs from otherwise law-abiding citizens." (citing Defs.' Mem. in Support of Mot. to Stay Prelim. Inj. Pending Appeal 5 (ECF No. 64-2))).  Defendants claim these seizures are "voluntary," Combined Motion at 8, but that completely disregards the context.  Defendants are not merely politely asking FRT owners to surrender their property.  Defendants are effectively making FRT owners an "offer they can't refuse" by sending armed agents to their homes and threatening criminal prosecutions if they do not comply—a process this Court has already referred to as "coercive[]" and an "enforcement activity."  *See* Order (ECF 73) at 12 (referring to this process as an "enforcement activity" and observing that the threat of prosecution is "used coercively to confiscate property without filing charges.")

Second, Defendants' claim about their "enforcement priorities" are immaterial. "Defendants' refusal to disavow prosecuting the Individual Plaintiffs during the pendency of this case [is] the exact type of 'prosecutorial indecision' that the Fifth Circuit has 'repeatedly held' as more than enough to 'have standing.'"  Order (ECF 73) at 13 (quoting *Franciscan All. Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022).  And make no mistake, a present statement of

Defendants' "enforcement priorities" is no different than a statement about Defendants' "current" plans," which could change . . . at any time." *Id*. 10.

As this Court has already repeatedly determined, the Individual Plaintiffs have standing. Defendants' renewed attack on this finding is meritless.

### B.  Associational Plaintiffs Have Standing

The associational Plaintiffs have several individuals who were members at the time the Complaint was filed who either own or wish to own FRTs.  For example, Plaintiff Wheeler has been a member of the National Association for Gun Rights since before the complaint in this matter was filed. *See* Pls.' Reply App'x 7 (Flugaur Declaration).  Since Plaintiff Wheeler has standing, there is at least one National Association for Gun Rights member who has standing to support this action.  In addition, the National Association for Gun Rights conducted a poll of a subset of its members on July 26, 2023.  In response to this poll, 55 National Association for Gun Rights Members self-reported that they own FRTs.  *Id*. The National Association for Gun Rights has members with standing to challenge this action.

Defendants suggest that this is not enough; that associational Plaintiffs' members must also have "received a warning letter at the relevant time."  Combined Motion at 11.  This misstates the law.  In order to have standing, a member of the associational Plaintiffs must merely "intend to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Zimmerman*, 881 F.3d at 391.  Merely possessing or seeking to possess an FRT qualifies. Each member of the associational Plaintiffs does not have to have received a personalized warning letter in order for there to be a credible threat of enforcement, particularly against the backdrop of Defendants' aggressive "retrieval" efforts.

9

Defendants next suggest that the associational Plaintiffs do not have "members." But Defendants again get the facts and the law wrong. The National Association for Gun Rights and Texas Gun Rights are both traditional voluntary membership organizations. The National Association for Gun Rights' bylaws establish preset criteria for two classes of members, voting members and supporting members. Supporting members are people who either make a financial contribution above a certain level to the National Association for Gun Rights or have certain specified relationships with the organization and/or affiliated groups. *See* Pls.' Reply App'x 7-8 (Flugaur Declaration); *see also generally Students for Fair Admission, Inc. v. University of Texas at Austin*, 37 F.4th 1078, 1085 (5th Cir. 2022) (finding an organization was a traditional membership organization where the organization "complied with its bylaws in creating members."). Supporting members have the ability to influence the policy of the organization by voting on policy referendums put forward by the Board of Directors. *Id*. Moreover, the National Association for Gun Right's ability to bring lawsuits on behalf of its members is well recognized, both in this Court and others throughout the country. *See e.g., Texas Gun Rights, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 4:23-cv-00578-O, 2023 WL 8352316, at *2 (N.D. Tex. Oct. 4, 2023) (finding the National Association for Gun Rights and Texas Gun Rights have associational standing to bring suit on behalf of their members); *Nat'l Assoc. for Gun Rights v. Grisham*, No. 1:23-cv-00771-DHU-LF, 2023 WL 5951940, at *2 (D.N.M. Sept. 13, 2023) (describing NAGR as an organizational plaintiff bringing suit on behalf of its members); *Bevis v. City of Naperville, Illinois*, 657 F. Supp. 3d 1052, 1061 (N.D. Ill. 2023) (finding associational standing).

Texas Gun Rights has a similar membership structure, explicitly set forth and adopted in a resolution by the corporation's Board of Directors, which specifies that supporting members are

persons who either make a financial contribution above a certain level, support certain Texas Gun Rights activities, or have certain specified relationships with the organization and/or affiliated groups. *See* Pls.' Reply App'x 9-10 (McNutt Declaration. This similarly sets forth criteria for becoming a supporting member and provides for supporting members to provide policy input through certain referenda. *Id*. Moreover, Texas Gun Rights' corporate certificate of formation explicitly acknowledges that the corporation has members. *Id*. This Court has also previously recognized that Texas Gun Rights has the ability to bring lawsuits on behalf of its members. *See Texas Gun Rights, Inc.*, 2023 WL 8352316 at *2.

Since both National Association for Gun Rights and Texas Gun Rights have predetermined membership structures set forth in their bylaws and corporate resolution, respectively, they are traditional membership organizations. This makes Defendants' reference to *Friends of the Earth, Inc. v. Chevron Chemical Company¸* 129 F.3d 826 (5th Cir. 1997) and its analysis of "indicia of membership" inapposite. *See Students for Fair Admission*, 37 F.4th at 1085. As the Fifth Circuit found, "*Friends of the Earth* is inapposite" when "[i]t is undisputed that [the associational plaintiffs] complied with [their] bylaws in creating [their] members. As the district court explained, '[plaintiff's] bylaws state that it will have members, whereas in *Friends of the Earth* the plaintiff's bylaws provided that its board of directors would set membership requirements— which they never did.'" *Students for Fair Admission*, 37 F.4th at 1085 (quoting *Students for Fair Admission, Inc. v. University of Texas at Austin*, Case No. 1:20-CV-763-RP, 2021 WL 3145667, at *6 (W.D. Tex. Jul. 26, 2021)).[2] Unlike the plaintiff in *Friends of the Earth*, the National

---

[2] Even if it were not, the Associational Plaintiffs also have several "indicia of membership," including a clearly identified and defined membership structure and a procedure for members to influence organizational policy through referenda. *See* Pls.' Reply App'x 7-8 (Flugaur Declaration); Pls.' Reply App'x 9-10 (McNutt Declaration).

Association for Gun Rights' bylaws provide membership criteria, which they have followed, while Texas Gun Rights' board of directors set explicit membership criteria through a board resolution, which they have followed.  They are valid membership organizations that do not also need to satisfy the "indicia of membership" test.

### C.  Plaintiffs' Have Standing to Challenge ATF's Classification Decisions Related to FRTs for Conduct Beyond Mere Possession

Defendants' claim that Plaintiffs lack standing to challenge decisions related to FRTs for conduct beyond possession are nonsensical.  The same statute that criminalizes the "possession" of "machineguns" also prohibits their "transfer."  *See* 18 U.S.C. § 922(o).  If Defendants claim that FRTs are "machineguns" not in accordance with law for purposes of possession is wrong, it is also wrong for purposes of the transfer or sale of FRTs.  There is no principled basis for drawing the distinction Defendants seek.  Vacatur of Defendants' erroneous actions *requires* invalidating the prohibition on both possession and transfer of FRTs.

With respect to Defendants' specific standing claims, as the Fifth Circuit recognized, "Plaintiffs must be able to acquire FRTs in order to use them."  Emergency Stay at 7.  Thus, the manufacture, sale, and transfer of FRTs is a necessary precondition for the possession of FRTs by individuals who do not already own them. In addition, Plaintiffs have indicated that they would like to sell FRTs.  *See* Pls.' App'x 1-2 (Wheeler Declaration). Contrary to Defendants' claim, associational plaintiffs do not consist solely of private owners.  Combined Motion at 13. They also include small business owners and companies that are or would like to be engaged in the sale and manufacture of FRTs.  *See* Pls.' Reply App'x 7-8 (Flugaur Declaration) (confirming that Plaintiff Wheeler was a National Association for Gun Rights member before the Complaint was filed in this matter); *see also* Pls.' App'x 1 (Wheeler Declaration) (stating that Plaintiff Wheeler is the

50% owner of a small business selling firearms and ammunition and that he intends to buy and sell FRTs but for Defendants' erroneous classification)..

Anyone who "transfers" an FRT faces a credible threat of prosecution.  Defendants have specifically stated that their "enforcement priorities" are "focused on . . . sellers of FRTs." Combined Motion at 9.  This is not an idle threat: Defendants have pursued legal actions against companies involved in the sale of FRTs, including bringing a civil fraud action against Rare Breed Triggers.  *See United States v. Rare Breed Triggers, LLC,* No. 23-cv-369 (NRM) (RML) (E.D.N.Y.).  Defendants cannot have it both ways: they cannot claim that individual Plaintiffs are safe because they focus their enforcement resources on "sellers," then claim Plaintiffs lack standing to challenge the *ultra vires* prohibition on selling FRTs.  Their effort to draw such a distinction is disingenuous and should be rejected.

## III. FRTs are Not Machineguns

### A.  FRTs Do Not Meet the Statutory Definition of Machinegun

This Court has already found three times, in different procedural postures, that FRTs do not meet the statutory definition of machinegun.  This finding was bolstered by the Fifth Circuit, which found "the *Cargill* plurality's interpretation of the statutory definition of 'machinegun' is . . . persuasive" and "favors Plaintiffs, not Defendants," as does "*Cargill's* rule-of-lenity analysis." Order, *National Association for Gun Rights v. Garland*, Case No. 23-11138 at 4-5 (5th Cir. Nov. 30, 2023) (ECF No. 51-2) ("Emergency Stay").  There is nothing in Defendants' Combined Motion that changes this conclusion.

Defendants do not and cannot dispute three key facts identified in Plaintiffs' Motion for Summary Judgment:

- For each and every round fired, the trigger moves forward into its reset state and is depressed to release the hammer from its sear surface (Pls.' App'x 67; Pls.' App'x 529-532, Prelim. Inj. Hr'g. Tr. 21:16-22:17, 109:11-18, 111:7-16);

- The trigger in a firearm equipped with a forced reset trigger must reset after every round that is fired (Pls.' App'x 67-68; Pls' App'x 532-533, Prelim. Inj. Hr'g. Tr. 111:17-112:24); and

- If the shooter attempts to overcome the reset and holds the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction (Pls.' App'x 533, Prelim. Inj. Hr'g. Tr. 113:10-21).

In addition, the only force that moves the trigger rearward comes from the user's finger. Pls' App'x 532, Prelim. Inj. Hr'g. Tr. 111:10-12. These facts resolve this case. As the Fifth Circuit recently noted, "[u]nder the *Cargill* plurality's reasoning, then, that the FRT trigger must reset means that the weapon does not shoot by a '*single* function of the trigger' and thus is not a machinegun." Emergency Stay Order at 5. The Fifth Circuit went on to state "Defendants do not grapple with these undisputed factual findings by the district court to argue otherwise." *Id*. They still do not.

Defendants do not offer a definition of "single function of the trigger" that is consistent with the law in this circuit, nor do they offer a set of operative facts that satisfy the definition. Instead, Defendants present a hodgepodge of legal conclusions masquerading as factual claims.

For example, Defendants claim "there is no dispute of fact that when a shooter replaces the standard trigger on an AR 15-type rifle with a FRT, the weapon will fire repeatedly and automatically from a single continuous pull of the trigger." Combined Motion at 14. In addition to being stunningly dishonest—there plainly *is* a dispute over this conclusion labeled as "fact," indeed, the crux of Plaintiffs' challenge is that this claim is not true—this statement is nothing more than a recitation of the legal definition of a machinegun. It is not in any way an analysis of the facts that underpin Defendants' (erroneous) conclusion.

Similarly, Defendants misleadingly claim "[n]or is there any dispute of fact that FRT-equipped weapons automatically fire multiple rounds after the trigger has performed the relevant single function by initiating the firing sequence."  Combined Motion at 15.  This conclusory claim is emphatically disputed. The trigger resets after each round is fired, ending one firing sequence and beginning another.  Thus, FRTs do not "automatically fire multiple rounds" after a single function of the trigger.  Defendants' claim implicitly focuses on the movement of the trigger finger as the relevant determining factor for evaluating a "firing sequence," rather than the mechanics of the trigger itself.  This focus is wrong under the reasoning of the *Cargill* plurality.  *Cargill*, 57 F.4th at 460 ("The statutory definition of machinegun utilizes a grammatical construction that ties the definition to the movement of the trigger itself, and not the movement of a trigger finger."). In any event, the user's finger moves each time the FRT trigger functions.

Next, Defendants attempt to rely on their now-infamous zip tie test.  Combined Motion at 17.  This Court already rejected this test, stating:

> In a machinegun, the trigger must be held in its rearmost position for the gun to fire automatically. The machinegun's trigger does not reset in between each shot. *But in an FRT-equipped firearm, the trigger must still reset in between each shot—even when depressed in a rearward state by the zip tie.* Defendants' zip tie does not appear to hold the FRT trigger still in its most rearward position. *If it did, the weapon would malfunction and not fire subsequent shots. Instead, the elasticity in the zip tie allows for sufficient movement to allow for a trigger reset.* All this test establishes is that the trigger need not move to its most rearward position. It can still reset from sufficient rearward pressure and forward movement propelled by the stretched zip tie. In other words, the zip tie test does not demonstrate that a single function of the trigger does not occur for each shot since the trigger's operative function is the reset of the hammer—not how the user or a zip tip pulls the trigger. The zip tie test is irrelevant to the statutory definition provided by Congress and as interpreted by *Cargill*.

Opinion and Order (ECF No. 53) at 28-29 (emphasis added).  As a result, the Fifth Circuit concluded on a motion for an emergency stay "[u]nder the *Cargill* plurality's reasoning, then, that the FRT trigger must reset means that the weapon does not shoot by a '*single* function of the

15

trigger' and thus is not a machinegun." Emergency Stay at 5. Defendants have provided *no* reason to conclude this Court was wrong before.

Defendants go on to engage in another stunning lack of candor with this Court by yet again mischaracterizing the Fifth Circuit's discussion of the Akins Accelerator, claiming "a plurality of the Fifth Circuit in *Cargill* recognized [that the relevant function of the trigger is the initiation of the firing sequence] in explaining that the Akins Accelerator . . . is a machinegun," Combined Motion at 17, and claiming "[a] plurality of the Court" concluded non-mechanical bump stocks are machine guns "because a non-mechanical bump stock requires the shooter to provide additional manual input after the initial pull of the trigger to maintain a rapid firing sequence." Combined Motion at 18. But neither the Fifth Circuit nor a plurality thereof did any such thing.

As this Court previously observed, *Cargill* "merely recognized that the only issue before it was whether non-mechanical bump stocks were machineguns, and that the outcome may differ for a mechanical bump stock depending on how it worked." Order (ECF 53) at 25; *see Cargill*, 57 F.4th at 462 ("[T]he case *might* well be different if we were considered a semiautomatic weapon equipped with a mechanical bump stock…. But we are not considering that case." (emphasis added)). A panel of the Fifth Circuit recently confirmed this reading, stating "*Cargill* said, in dicta, [that mechanical bumpstocks] *might* be machineguns." Emergency Stay at 6. This is not the definitive statement Defendants claim it to be.

Moreover, the Fifth Circuit's reasoning for even this conditional statement is inapposite to Defendants' claims. The reason that the classification of mechanical bump stocks may differ from the classification of non-mechanical bump stocks is because the *legal trigger* may be different. To wit, this Court stated "[i]t could be the case that *a switch activating a mechanical bump* stock would be the legal trigger." *Cargill*, 57 F.4th at 462 (emphasis added). The potential distinction

is *not* how what Defendants call the "trigger shoe" interacts with the shooter's finger; it's whether the "trigger shoe" is actually the operative trigger.  And it says nothing about a traditional trigger that resets after each shot is fired.

Defendants likely have focused on the function of mechanical bump stocks because it is not clear that the Fifth Circuit's cursory analysis of the law to mechanical bump stocks accurately reflects how they operate.  This is understandable since the issue of mechanical bump stocks was not before the court in *Cargill*¸ and the court did not rule on it.  Nevertheless, even if this Court were to embark on a new comparison of the FRTs and mechanical bump stocks—a comparison that is neither necessary nor appropriate—it would show key differences that distinguish FRTs.

Bump stocks use the firearm's recoil force to allow the trigger to reset automatically, but it is only an *external* force provided by the user that causes the subsequent *function* (i.e., actuation or "pulling") of the trigger. Thus, the *Cargill* plurality found that a firearm equipped with a non-mechanical bump stock only fires one round automatically per single function of the trigger.

"Mechanical" bump stocks, such as the referenced Akins Accelerator, include an internal spring to assist the *actuation* (functioning)—*not the reset*—of the trigger. In theory, it was argued, these devices did not require an external force by the user to *actuate* the trigger repeatedly *i.e.,* cause the trigger automatically to function repeatedly. But non-mechanical bump stocks lack this internal spring. An external force supplied by the user is required to cause actuation of the trigger. This is what distinguished "mechanical" bump stocks from "nonmechanical" bump stocks.

Like bump stocks, FRTs use the cycling of the firearm's action to assist or force the trigger to *reset*. Like non-mechanical bump stocks (and unlike mechanical bump stocks), FRTs do not include any internal spring or other internal means to assist *actuation* of the trigger. An external force must be applied by the user to cause the trigger to function (actuate the trigger) each time a

17

shot is fired. The only force that moves the trigger rearward in an FRT comes from the user's finger. Pls' App'x 532, Prelim. Inj. Hr'g. Tr. 111:10-12. In the Defendants' contrived zip-tie demonstration, the addition of the zip tie *added* a spring—an external force—that did this. The spring force of the zip-tie *actuates* the trigger. Absent the added zip-tie modification, an FRT (like a nonmechanical bump stock) requires an external force to be applied by the user to cause the trigger to function each time a shot is fired.

FRTs are not mechanical bump stocks. Defendants' comparison is inapt.

**B. If the Statute is Ambiguous, the Rule of Lenity Applies**

Defendants have argued that the statutory interpretation recited in *Cargill* and advocated by Plaintiffs is that of a *plurality* (eight of sixteen judges) of the en banc Court of Appeals and not a *majority*. However, the *majority* (twelve of sixteen judges) of the Fifth Circuit agreed that if the statute does not unambiguously compel that interpretation, then the rule of lenity applies and the statute must be construed in Plaintiffs' favor.[3] The plurality stated:

> Nor can we say that the statutory definition *unambiguously* supports the Government's interpretation. As noted above, we conclude that it unambiguously does not. But even if we are wrong, the statute is at least ambiguous in this regard.

---

[3] The Circuit explained:

> Of the sixteen members of our court, thirteen of us agree that an act of Congress is required to prohibit bump stocks, and that we therefore must reverse. Twelve members (CHIEF JUDGE RICHMAN and JUDGES JONES, SMITH, STEWART, ELROD, SOUTHWICK, HAYNES, WILLETT, HO, DUNCAN, ENGELHARDT, and WILSON) reverse on lenity grounds. Eight members (JUDGES JONES, SMITH, ELROD, WILLETT, DUNCAN, ENGELHARDT, OLDHAM, and WILSON) reverse on the ground that federal law unambiguously fails to cover non-mechanical bump stocks.

> CHIEF JUDGE RICHMAN, JUDGE STEWART, and JUDGE SOUTHWICK concur in the judgment and join in Part V, as does JUDGE Ho, who also writes separately. JUDGE OLDHAM concurs in the judgment and joins in Parts I-IV.A. JUDGE HAYNES only concurs in the judgment and writes separately.

*Id*. at 448, n*.

And if the statute is ambiguous, Congress must cure that ambiguity, not the federal
courts.

*Cargill*, 57 F.4th at 451 (emphasis original). The rule of lenity prevents the possibility whereby
Congress passes an ambiguous criminal statute, only to be interpreted later by a federal agency.
*Id*. at 470. Twelve members of the Circuit found the statute was "at least" ambiguous and must be
construed against the Government.

Defendants make no effort to address *Cargill*'s rule of lenity holding.  As the Fifth Circuit
explained, "[i]f the statutory definition of machinegun is indeed ambiguous—not unambiguous,
as the *Cargill* plurality concluded—then the rule of lenity means that ambiguity should be resolved
in Plaintiffs' favor."  Emergency Stay at 5-6.  Plaintiffs believe that the *Cargill* plurality was
correct and, as a consequence, that the statute unambiguously does not apply to FRTs.  If this
conclusion is wrong, then the statute is ambiguous.  This ambiguity is highlighted by the constantly
shifting definitions employed by Defendants, including multiple different definitions just in the
course of this litigation.  For example, Defendants have claimed "single function of the trigger"
means:

- A "single pull of the trigger and analogous motions," 27 C.F.R. § 479.11;

- The application of "constant rearward pressure;"[4]

- A "continuous pull,"[5]

- A "constant rearward pull" or "single function of the trigger means single pull of the
  trigger;"[6] and

---

[4] Pls.' App'x 112-177, ATF's FRT Report, July 15, 2021; Pls.' App'x 179-193, ATF's WOT
Report, October 21, 2021.
[5] Pls.' App'x 112-177, ATF's FRT Report, July 15, 2021.
[6] Pls.' App'x 197-253, ATF's FRT Report, April 27, 2023, at 5; Pls.' App'x 299, Prelim. Inj. Hr'g.
Tr. 162:1-4, *United States v. Rare Breed Triggers, LLC*, et al., No. 23-cv-369 (NRM) (RML), 2023
WL 5689770 (E.D.N.Y. Aug. 1, 2023).

- The "initiation of the firing sequence" plus "constant rearward pressure."[7]

The utter inability of Defendants to proffer a consistent definition of "single function of the trigger" that supports their preferred outcome means that the term is *at worst* ambiguous. As *Cargill* counsels, in the face of such ambiguity, the rule of lenity tips the scales in favor of Plaintiffs. Accordingly, Defendants' Combined Motion must fail.

## IV. Injunctive Relief is Available and Should be Granted

Injunctive relief is appropriate and, indeed, required in this case because Defendants in no uncertain terms tell this Court that, in the absence of an injunction, the ATF will not abide by a Court determination that FRTs are not machineguns and intend to continue confiscating property and bringing criminal charges under their statutory interpretation—even after this Court holds it to be unlawful. For example, Defendants state "[a] broad injunction would undermine ATF's ability to respond in real time to serious future threats implicating FRTs." Combined Motion at 23. Similarly, Defendants claim "Plaintiffs seek a broad sweeping injunction that would cripple the government's ability to take virtually any enforcement action with regard to a FRT device anywhere in the United States." *Id.* at 22. The obvious implication of these statements is that Defendants will continue to pursue enforcement actions against FRT owners, manufactures, and sellers in the absence of an injunction and will take any actions that are not specifically enjoined, regardless of any declaratory ruling that FRTs are *not* machineguns and are *legal*.

These concerns are heightened by Defendants' constantly shifting justifications for their regulatory posture. Defendants have advanced at least six different regulatory interpretations to justify their criminalization of FRTs.[8] If the Court vacates one or all of these impermissible

---

[7] Pls.' App'x 278, Prelim. Inj. Hr'g. Tr. 130:10-17.

[8] *See* 27 CFR § 479.11 (Defining "function of the trigger" as a "single pull of the trigger and analogous motions."); Pls.' App'x 112-177, ATF's FRT Report, July 15, 2021 ("continuous pull");

interpretations, there is every reason to worry Defendants will simply proffer yet another specious formulation. Thus, with Defendants having untethered themselves from the ATF's own regulations, vacatur through declaratory ruling alone would be ineffective to provide relief from the ATF's everchanging, but nevertheless improper, statutory interpretation and unlawful actions. Accordingly, a permanent injunction is appropriate and needed.

These concerns are heightened by Defendants' repeated violations of the preliminary injunction. Since the preliminary injunction was issued, Defendants have contacted at least fifteen members of the associational plaintiffs, seeking to compel them to surrender their actual or alleged FRTs on threat of prosecution. *See* Pls.' Reply App'x 7-8 (Flugaur Declaration). There is every reason to believe this conduct will continue unless there is a broad permanent injunction in place to put a stop to it. Here, granting an injunction would "have [a] meaningful practical effect independent of its vacatur." *O.A. v. Trump*, 404 F.Supp.3d 109, 153-54 (D.D.C. 2019) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).

### A. Plaintiffs Have Established Irreparable Injury

Defendants have disputed Plaintiffs' injury four times, at four different stages in this litigation. They have lost every time. There is nothing in their Combined Motion that suggests, let alone compels, an alternative conclusion now.

"[C]omplying with [an agency order] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Wages and White Lion Investments, L.L.C.*

---

Pls.' App'x 179-193, ATF's WOT Report, October 21, 2021 ("constant rearward pressure"); Pls.' App'x 197-253, ATF's FRT Report, April 27, 2023, at 5; Pls.' App'x 299, Prelim. Inj. Hr'g. Tr. 162:1-4, *United States v. Rare Breed Triggers, LLC*, et al., No. 23-cv-369 (NRM) (RML), 2023 WL 5689770 (E.D.N.Y. Aug. 1, 2023) ("constant rearward pull" or "single function of the trigger means single pull of the trigger"); Pls.' App'x 278, Prelim. Inj. Hr'g. Tr. 130:10-17 ("initiation of the firing sequence" plus "constant rearward pressure.").

*v. United States*, 16 F.4th 1130, 1142 (5th Cir. 2021) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016))); *see also VanDerStok, et al. v. Garland, et al.*, 625 F. Supp.3d 570, 584 (N.D. Tex. 2022) (quoting *Texas*). Accordingly, "Federal courts have long recognized that, 'when the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (quoting *Canal Auth. V. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974)))

First, Plaintiffs continue to face a credible threat of prosecution. *See generally* Order (ECF 53) at 32-34. Even after the issuance of a TRO and preliminary injunction, and the denial of a stay pending appeal by both this Court and the Fifth Circuit, Defendants are *still* continuing their aggressive campaign of enforcement against individual FRT owners. Indeed, Defendants have contacted at least fifteen associational plaintiff members since the preliminary injunction was issued. *See* Pls.' Reply App'x 7-8 (Flugaur Declaration). Thus, Plaintiffs continue to the credible threat of civil enforcement and criminal prosecution. This is a more than *de minimis* irreparable harm.

Second, Plaintiffs continue to face economic compliance costs. As the Court previously found, Plaintiffs face irreparable economic compliance costs "stem[ming] from the Hobson's choice Plaintiffs still face: continue to exercise ownership and constitutionally protected freedoms while risking federal prosecution *or* forfeit those freedoms to avoid civil and criminal consequences." Pls.' App'x 99, Opinion and Order at 34. Likewise, Plaintiffs are still concerned with the harm derived from the loss of use and enjoyment of their property, even for a limited period of time. While Defendants claim "[a]ny seized property could be returned via forfeiture

action or some other proceeding," they ignore that there would not and cannot be compensation for the loss of enjoyment of the property to the illegal seizure.

Finally, Defendants claim that there is not sufficient irreparable harm to support the breadth of the proposed injunction. Combined Motion at 21-22. This continues to "ignore[] that Plaintiffs must be able to acquire FRTs in order to use them." Emergency Stay at 7. Plaintiffs will be irreparably harmed in the absence of a permanent injunction.

### B. The Balance of Equities and Public Interest Favor a Permanent Injunction

Defendants claim "Plaintiffs seek a broad sweeping injunction that would cripple the government's ability to take virtually any enforcement action with regard to a FRT device anywhere in the United States." Combined Motion at 22. This misunderstands the posture of this case and speaks to a disturbing willingness by Defendants to bend and outright ignore the law. A permanent injunction will only issue if Plaintiffs prevail on the merits of their claim. For the reasons set out above and in Plaintiffs' Motion for Summary Judgment, they should: FRTs are not machineguns. If FRTs are not machineguns, ***then the government has no basis to take any enforcement action with regard to them—anywhere, against anyone.*** Justice Blackmun made a similar observation in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), writing in dissent but apparently expressing the view of all nine Justices on the question.

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.

*Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting). As understood by the D.C. Circuit in *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998), this view was

shared by the three Justices who joined Justice Blackmun's dissent, and by the majority, which observed that a final agency action may "be challenged under the APA by a person adversely affected—and the entire [agency program], insofar as the content of that particular action is concerned, would thereby be affected." *Lujan*. at 890, n.2; *see also Nat'l Mining Ass'n*, 145 F.3d at 1409 (citing same). Defendants' argument—that they should be allowed to continue to seize property and prosecute people for possessing items that are not illegal—is dystopian.

Nevertheless, Defendants continue to press forward with "unadorned, conclusory assertions that FRTs are a threat to public safety." Emergency Stay at 7. These concerns continue to be premised on the claim that FRTs are machineguns—a claim that is "tethered entirely to the merits" of this case. Order (ECF 73) at 6-7. As this Court has previously noted, should the Court conclude (as it must) that FRTs are not machineguns, "that machineguns are a threat to public safety is a *non sequitur*." Order (ECF 53) at 39.

When not premised on the conclusion that FRTs are machineguns, Defendants focus on the rate of fire. Combined Motion at 23. But as this Court previously found, "this fact is irrelevant to any consideration of the potential harm posed . . . because the statutory definition of machinegun . . . does not define a machinegun based on this attribute." Order (ECF 73) at 11. While "[r]ate of fire may be Defendants' *preferred* way of defining machineguns[,]…until Congress changes the statutory definition, any contentions regarding rate of fire have no bearing on the Court's analysis." *Id*. at 12.

On the other side of the ledger, this "Court has already found—twice, in slightly different contexts—that Plaintiffs face a substantial risk of irreparable harm if Defendants are not enjoined from engaging in enforcement activities." Order (ECF No. 73) at 12. To wit, "[n]ot only do Plaintiffs face a credible threat of prosecution (including when used coercively to confiscate

property without filing charges), Plaintiffs also face the loss of the use and enjoyment of their property as a result of Defendants' 'active retrieval' efforts." *Id.* (citations omitted).  The balance of equities between conclusory statements and the continued enforcement of an illegal interpretation on one hand, and the threat of prosecution and loss of tangible property on the other, favors Plaintiffs. *See also* Emergency Stay at 7 ("Suffice it to say that we agree that, absent a preliminary injunction, Plaintiffs face a credible threat of civil or criminal prosecution for what is likely a lawful activity and the Defendants have not offered more than unadorned, conclusory assertions that FRTs are a threat to public safety.").

### C.  The Scope of the Permanent Injunction Should Not be Limited to the Individual Plaintiffs

For the reasons set forth above and in Plaintiffs' filings, the associational Plaintiffs have standing.  They are full parties to this litigation, and they are entitled to the protections that come with being a prevailing party in this litigation.  Defendants have offered no compelling reason to treat associational plaintiffs as second-class parties.  Instead, Defendants rely on a mere two conclusory statements, supported solely by a citation to an out-of-circuit concurring opinion. *See* Combined Motion at 32.  Worse, the out-of-circuit concurrence cited by Defendants is inapposite to this point, as it concerns a nationwide injunction; it does not contemplate excluding *actual parties to a case* from the scope of relief. *See Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring).   As the Fifth Circuit said, "[t]he associational plaintiffs have standing to sue, and Defendants offer no reason why we should engage in such indiscriminate line-drawing."  Emergency Stay at 7.  They still do not.  Defendants' efforts to cleave off the associational plaintiffs should be rejected.

**D.  The Permanent Injunction Should Not Be Geographically Limited**

Defendants seek to limit any permanent injunction to just the Northern District of Texas. This is insufficient to protect the rights of even the *individual, named plaintiffs*, two of whom reside outside the Northern District of Texas, let alone the rights of members of the associational Plaintiffs, who reside across the country.  Providing relief to the parties before this Court requires an injunction that extends beyond the confines of the Northern District of Texas.

As the Fifth Circuit has observed, "vacatur of an agency action is the default rule in this Circuit."  *Cargill*, 57 F.4th at 472; *see also Data Marketing Partnership, LP v. United States Department of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy" for an agency action that is otherwise not in accordance with law.).  Vacating Defendants' unlawful classification means vacating it everywhere, not just in the Northern District of Texas.  And enforcing that vacatur requires a similarly geographically broad and comprehensive injunction.

Moreover, Defendants' own conduct has made it plain that Defendants will not respect a more limited injunction.  Defendants claim they "have not taken any enforcement activity against known members" of the associational Plaintiffs.  Combined Motion at 25.  But this is at best misleading and at worst a knowing lie to the Court.  Defendants have contacted at least fifteen members of the National Association for Gun Rights and demanded that they surrender their FRTs or risk prosecution, in apparent violation of the preliminary injunction.  *See* Pls.' Reply App'x 7-8 (Flugaur Declaration). As this Court has recognized, *this is "enforcement activity*."  *See* Order (ECF No. 73) at 12 (referring to Defendants' "active retrieval" efforts as "enforcement activity.").  It is readily apparent that Defendants will take a mile for every inch of wiggle room given in this

matter, to the detriment of law abiding FRT owners. Thus, the permanent injunction in this case must be geographically broad.

### E.  The Permanent Injunction Must Be Broader than Just Possession of FRTs

As the Fifth Circuit noted, "a narrower preliminary injunction that protects just possession—not manufacture, distribution, or transfer—ignores that Plaintiffs must be able to acquire FRTs in order to use them." Emergency Stay at 7. The same is true for a permanent injunction.

As described above, *see supra* section II, Plaintiffs have standing to pursue broader relief. Defendants claim that concerns about criminal or civil enforcement actions for manufacturing, selling, or transferring FRTs are "hypothetical." Combined Motion at 35. But their own words belie this claim. Indeed, Defendants claim that their "enforcement priorities" are "focused" specifically on "sellers of FRTs." Combined Motion at 17. Similarly, they have brought an actual civil enforcement action against a seller and manufacturer of FRTs, Rare Breed Triggers, under a civil fraud statute based on the allegation that telling prospective buyers FRTs are not machineguns is fraud. *See United States v. Rare Breed Triggers, LLC,* No. 23-cv-369 (NRM) (RML) (E.D.N.Y.). Thus, concerns that Defendants would subject others to the same treatment are far from hypothetical; they are grounded in Defendants' own words and deeds.

Next, Defendants challenge the need to issue remedial notices stating FRTs are not machineguns. Combined Motion at 35. As Defendants themselves acknowledged, they have been engaged in an aggressive campaign of "active retrieval," including by sending actual or suspected FRT owners "warning letters" threatening them with criminal prosecution if they do not surrender their FRTs. As this Court acknowledged, this process is used to "coercively confiscate property without filing charges." Order (ECF 73) at 12. As long as those letters are inaccurate and stand

uncorrected, there is a serious risk that FRT owners will believe they continue to be subject to the Hobson's Choice of surrendering their FRT or risking criminal prosecution.  In short, Defendants spread this misinformation; their misinformation has consequences, including coercing individuals to surrender their property based on false pretenses; therefore, Defendants have an obligation to correct their record.

### F.  The Permanent Injunction Can and Must Extend to Criminal Prosecutions

Defendants claim that equitable relief to enjoin criminal enforcement can only be granted in response to a constitutional claim to vindicate constitutional rights. Combined Motion at 37. Defendants raised this same claim at the preliminary injunction stage.  ECF. No. 39 (Opposition to Plaintiff's Motion for Preliminary Injunction) at 20.   It was rejected then.  Order (ECF No. 53) at 15-20.  Defendants do not and cannot offer a good reason for why this Court was wrong before.

Once again, Defendants offer little to support their bold proposition, citing only a single case, *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177 (3d Cir. 2006). While *Stolt-Nielsen* has some broad language arguably consistent with Defendants' thesis, the facts of the case render it inapposite. In *Stolt-Nielsen*, the plaintiff sued to enforce a conditional leniency agreement with the government that the government purported to revoke as a consequence of plaintiff's behavior. As this Court observed, *Stolt-Nelson* concerned "a fundamentally individualized determination rather than a review of a generally applicable administrative action.  This distinction is key."  Order (ECF No. 53) at 17.

Moreover, Defendants' position would yield absurd results. Defendants do not and could not challenge the Court's authority to enter a declaratory judgment ruling finding that FRTs are not machineguns and may not be prohibited by administrative fiat. Instead, Defendants argue that, even if that is true, Defendants should still be allowed to arrest and prosecute people for possessing

them. This is a recipe for blatant Due Process violations. The executive branch cannot arrest and prosecute people for things that are not crimes, and it does not violate the separation of powers for the Court to say as much. *See generally Franciscan Alliance*, 47 F.4th at 378 ("[A]n agency 'literally has no power to act…unless and until Congress authorizes it to do so by statute.'" (quoting *Fed. Election Comm'n v. Cruz*, 142 S.Ct. 1638, 1649 (2022))). In prior cases where injunctive relief was denied in favor of vacatur only, the courts noted that "Defendants have represented that they will abide by the Court's order." *See O.A. v. Trump*, 404 at 153-54. Here, the government is saying *exactly the opposite*. The best evidence of the need for injunctive relief is Defendants' own brief. The Defendants provide the strongest possible evidence why vacatur is inadequate and an injunction is necessary: in the absence of an injunction, the Government will not abide by this (or any) court's determination if they do not like it.

Finally, yet again, Defendants reject the Court's prior citation to the APA, claiming that the APA's general provisions permitting challenges to criminal proceedings is superseded by section 702, which, in Defendants' characterization, "makes clear that nothing in the APA expands the Court's jurisdiction beyond ordinary limitations." Combined Motion at 37. But Defendants' bold statement would create an exception that swallows the rule and runs counter to the text and purpose of the APA itself.

"[T]he Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)). The APA itself refers to "mandatory or injunctive decree[s]" issued thereunder. 5 U.S.C. § 702. The import of this text is that injunctive relief is available under the APA. Moreover, the entire purpose of section 702 is to ensure that "[a] person suffering a legal wrong because of agency action" is able to obtain an appropriate remedy.

5 U.S.C. § 702. This purpose would be eviscerated if it turns out that section 702 conferred no right to obtain meaningful relief through the courts when wronged by agency action.

In Federalist 47, James Madison warned "[t]he accumulation of all powers, legislative, executive and judiciary, in the same hands…may justly be pronounced the very definition of tyranny." James Madison, The Federalist No. 47 (Jan. 30, 1788). The crux of this case is that the executive branch has improperly usurped legislative authority by enacting criminal prohibitions that are beyond the scope of its legislatively granted authority. Now, Defendants seek to arrogate unto themselves the judicial authority as well by placing their actions beyond the reach of pre-enforcement judicial review. This is not and cannot be correct.

### G. Injunctive Relief for the Rare Breed Parties

This case is in Texas because one of the individual Plaintiffs resides in the Northern District of Texas, Texas Gun Rights is based in Texas, and many National Association for Gun Rights members reside in Texas.

Defendants claim that Plaintiffs' raised the membership status of the Rare Breed Parties "for the first time in their Motion for Summary Judgment." Combined Motion at 38. This is deeply misleading. The Rare Breed Parties were specifically discussed at the preliminary injunction hearing, Pls.' Reply App'x 1-6, Prelim. Inj. Hr'g. Tr. 20:16-21:3, 35:1-5, 39:15-19 , and were specifically addressed in this Court's preliminary injunction order. Order (ECF 53) at 43-44.

Defendants chose not to bring a criminal action against the Rare Breed Parties for possessing, manufacturing, or transferring machineguns. Instead, they chose to bring only a case based on civil fraud allegations. As such, it is possible to fashion a remedy that provides the Rare Breed Parties a similar level of protection as any other National Association for Gun Rights

member without intruding on the authority of the New York court.  To be clear, the Rare Breed Parties are not asking this Court to interfere with the claims pending before the New York court. But there is no reason why the fact that the government chose to bring civil fraud claims against them in New York should require that they alone be subject to, for instance, the threat of baseless criminal prosecution for possession of FRTs.  For this Court to protect them against those sorts of threats would not trench upon the New York court's jurisdiction.

## V.  Scope of Issues in Reply Brief

Defendants chose to combine their opposition to Plaintiffs' Motion with their cross-motion. For expediency, Plaintiffs have likewise combined their principal brief in opposition to the cross-motion with their reply brief on Plaintiffs' summary judgment motion. Defendants' cross-motion for summary judgment did not seek any injunctive relief, so their reply brief cannot properly include any argument on the issue of injunctive relief. Defendants' reply brief must be limited to their cross-motion issues, which do not include any aspect of injunctive relief and this Court should decline to consider any portion of Defendants' reply brief that seeks to serve as an unauthorized sur-reply.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted and Defendants' Cross-Motion for Summary Judgment should be denied.

Date: December 22, 2023

Respectfully submitted,

/s/ Benjamin Sley
Benjamin Sley (TX Bar No. 18500300)
Whitney A. Davis (TX Bar No. 24084843)
EGGLESTON KING DAVIS, LLP
102 Houston Avenue, Suite 300
Weatherford, TX 76086
Telephone: (703) 748-2266
whit@ekdlaw.com
ben@ekdlaw.com

Jonathan M. Shaw (VA Bar No. 98497)
Gary M. Lawkowski (VA Bar No. 82329)
David A. Warrington (VA Bar No. 72293)
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: (703) 748-2266
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
glawkowski@dhillonlaw.com
dwarrington@dhillonlaw.com

Glenn Bellamy (OH Bar No. 0070321)
WOOD HERRON & EVANS LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Telephone: 513-707-0243
gbellamy@whe-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this action.

Date: December 22, 2023

By: /s/ Benjamin Sley

Benjamin Sley