# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION FOR** | § | |
| **GUN RIGHTS, INC.,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | Civil Action No. 4:23-cv-00830-O |
| | § | |
| **MERRICK GARLAND,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION & ORDER

Pending before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 60) and Amended Brief in Support (ECF No. 62), filed on November 3, 2023; Defendants' Cross-Motion for Summary Judgment (ECF No. 79), Response in Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 80), and Combined Memorandum in Support of Cross-Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 81), filed on December 1, 2023; Plaintiffs' Response to Defendants' Cross-Motion for Summary Judgment (ECF No. 83), Combined Brief in Response to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment (ECF No. 84), and Appendix (ECF No. 85), filed on December 22, 2023; Defendants' Reply Brief in Further Support of Cross-Motion for Summary Judgment (ECF No. 87), filed on January 12, 2024; Plaintiffs' Notice of Supplemental Authority (ECF No. 97), filed on June 18, 2024; Plaintiffs' Notice of Non-Compliance (ECF No. 98), filed on June 20, 2024; and Defendants' Response to Plaintiffs' Notice of Non-Compliance (ECF No. 99), filed on June 24, 2024.

Having considered the above-referenced filings and applicable law, the Court concludes that Defendants engaged in unlawful agency action taken in excess of their authority. Therefore,

the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 60) and **DENIES** Defendants' Cross-Motion for Summary Judgment (ECF No. 79).

## I.     BACKGROUND[1]

The United States Congress delegated authority to the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") to regulate firearms in interstate commerce. In a 2018 regulation, the ATF clarified its definition of "machinegun." 27 C.F.R. § 479.11 (2018). In the years that followed, the ATF classified certain types of firearms as machineguns pursuant to its clarified definition. *See, e.g.*, 83 Fed. Reg. 66514 (bump stocks). As a result, it became illegal to possess or transfer these prohibited firearms. Alleging incongruence between the statutory definition of "machinegun" and the ATF's interpretation, Plaintiffs filed this suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to challenge the legality of the ATF's classification of firearms under the broadened definition.

### A.  Forced Reset Triggers

One of the prohibited firearms is a forced reset trigger ("FRT"). An FRT is an assembly that allows the trigger of a semi-automatic weapon to reset quicker than it otherwise would using the standard trigger-return spring. Due to the swift trigger reset, a firearm equipped with an FRT enables the user to fire at a faster rate than with a traditional trigger.

Reviewing the basic mechanism of a firearm is necessary to understand how an FRT works. The basic function of any trigger is to release the hammer. This occurs when the trigger is pulled back to the point that a "trigger sear" releases the hammer from its retained position. Once released by the trigger, the hammer pivots to contact the firing pin. Once contacted, the firing pin

---

[1] Unless otherwise indicated, all facts are taken from the Court's October 7, 2023 Opinion & Order that granted a preliminary injunction. *See* Op. & Order on Pls.' Mot. for Prelim. Inj., ECF No. 53. There is no indication in the summary judgment record—or at any stage in this litigation—that the parties disagree as to the relevant facts.

then strikes a chambered ammunition cartridge or "round," causing gunpowder in the cartridge to combust. The combustion effect propels the cartridge's bullet out of the barrel of the firearm. Once fired, a standard semi-automatic trigger returns to its "reset" state—ready-to-fire or "set" position—by allowing the firearm to function once again due to starting the mechanism anew. In other words, the firearm only functions again upon the reset of the trigger to release the hammer.

An FRT is a device that forcibly returns the trigger to its reset state. In the commercialized FRT designs at issue in this litigation, the trigger is forcibly reset by the hammer when the bolt carrier cycles to the rear. A "locking bar" mechanically locks the trigger in its reset state, preventing the user from moving the trigger rearward to function by releasing the hammer, until the bolt has returned to the in-battery position and the firearm is safe to fire. When firing multiple shots using an FRT, the trigger must still reset after each round is fired and must separately function to release the hammer by moving far enough to the rear in order to fire the next round.

### B. Statutory Background

The National Firearms Act of 1934 ("NFA") regulates certain firearms in interstate commerce. 26 U.S.C. §§ 5801 *et seq.* At the time of its proposal, the NFA "was known to many as the 'the Anti-Machine Gun Bill.'" *Cargill v. Garland*, 57 F.4th 447, 450 (5th Cir. 2023) (en banc), *aff'd sub nom.*, 602 U.S. 406 (2024). Among other things, the NFA criminalized the possession or transfer of certain unregistered firearms while also prohibiting the registration of firearms otherwise banned by law. 26 U.S.C. §§ 5812(a), 5861. In the decades following its enactment, Congress passed the Gun Control Act of 1968 (the "GCA"), which criminalized the possession of firearms for certain classes of people. 18 U.S.C. § 921 *et. seq.* The GCA was amended in 1986 by the Hughes Amendment to the 1986 Firearm Owners Protection Act—

colloquially referred to as "the machinegun ban"—in order to prohibit the possession or transfer of machineguns. 18 U.S.C. § 922(o). With limited exceptions,[2] it is a federal felony today to possess or transfer a machinegun. *Id.* This offense is punishable by up to ten years in federal prison for first-time offenders. 18 U.S.C. § 924(a)(2).

According to the NFA and GCA, a "machinegun" is statutorily defined as

[a]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine-gun [sic], and any combination of parts from which a machine-gun [sic] can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (providing the original statutory definition of "machinegun"); 18 U.S.C. § 921(a)(24) (incorporating the NFA's definition of "machinegun" into the GCA). In other words, a machinegun is a "rifle capable of automatic fire" due to "firing more than one round per trigger-action." *Cargill*, 57 F.4th at 452. Firearms incapable of automatic fire per trigger-action are thus not machineguns. *Id.*

### C. Regulatory Background

For decades, the ATF's regulations mirrored the federal statutory definition of "machinegun." *Compare* 27 C.F.R. §§ 478.11, 479.11 (2017) *with* 26 U.S.C. § 5845(b). This statutory parity was disrupted in 2018 when the ATF broadened the meaning of machinegun by re-interpreting the statutory definition to add the following language:

For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term

---

[2] These exceptions are limited to government actors, as well as machineguns in existence and registered prior to May 19, 1986—the effective date of the statute. 18 U.S.C. § 922(o)(2)(A)–(B).

"machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

27 C.F.R § 479.11 (2018).

Three years after the ATF broadened its interpretation of the statutory definition, agency subdivisions issued reports applying the revised definition of "machinegun" to FRTs. For instance, the Firearms Technology Criminal Branch ("FTCB") issued a Technical Examination Report on July 15, 2021, which purportedly classified the FRT-15—a version of the FRT—as a machinegun. The FTCB issued a similar report several months later on October 21, 2021 regarding the Wide Open Trigger ("WOT") version of the FRT. Both the WOT and the FRT-15 operate on the same mechanical principles. At the beginning of the next year, the FTCB issued its "Open Letter to All Federal Firearms Licensees" (the "Open Letter") on March 22, 2022. The Open Letter advised that the ATF "recently examined devices commonly known as 'forced reset triggers' (FRTs)" and "determined that *some* of them are 'firearms' and 'machineguns' as defined in the [GCA]." Most important for this case, the Open Letter further explained that "ATF's examination found that *some* FRT devices allow a firearm to automatically expel more than one shot with a single, continuous pull of the trigger" and that "any FRT that allows a firearm to automatically expel more than one shot with a single, continuous pull of the trigger is a 'machinegun.'" One month later, the ATF's Firearms and Ammunition Technology Division ("FATD") issued yet another report on the FRT-15 trigger.

The ATF's application of its revised definition is not merely contained to agency reports. In fact, the ATF and other government actors have actively pursued civil and criminal enforcement actions against manufacturers, sellers, and owners of FRTs. Specifically, the

5

Department of Justice ("DOJ") has brought several criminal prosecutions against individuals for possessing FRTs—including at least one individual located in the State of Texas.[3] The DOJ has also initiated civil proceedings against at least one company and two individuals for manufacturing and selling FRTs.[4] More proceedings seem inevitable given that the ATF sent cease-and-desist letters regarding possession of FRTs as recently as October 2023 and even seized FRTs as recently as September 2023.[5]

### D. Parties

Plaintiffs comprise of both individuals and organizations. Plaintiffs Patrick Carey, Travis Speegle, and James "J.R." Wheeler are three individual citizens located in the Texas–Louisiana area (the "Individual Plaintiffs"). Each Individual Plaintiff has owned, currently owns, and/or plans to own FRTs in the future. Plaintiffs also include two organizations—National Association for Gun Rights, Inc. ("NAGR") and Texas Gun Rights, Inc. ("TGR")—with thousands of members in the Northern District of Texas (the "Organizational Plaintiffs").

Plaintiff Carey owned two FRTs prior to receiving a warning notice from the ATF on August 22, 2022. The warning notice informed Plaintiff Carey that "ATF has information that you have acquired one or more [FRTs]," that "[t]hese items have been classified as machineguns

---

[3] *See, e.g.*, Second Superseding Indictment at Count One, *United States v. Bruggeman*, 2:22-cr-185 (S.D. Tex. Nov. 9, 2022) (charging defendant with "knowingly posess[ing] a machinegun, that is, six (6) Rare Breed Triggers FRT-15"); Indictment at Count Two, *United States v. Berrios-Aquino*, 3:22-cr-473 (D.P.R. Apr. 20, 2023) (charging defendant with possession of a machinegun for having a Rare Breed FRT-15 trigger); Superseding Indictment at Count One, *United States. v. Augusto*, 3:22-cr-30025 (D. Mass. Sept. 1, 2022) (charging defendant with possession of a machinegun in part for having three Rare Breed FRT-15 forced reset triggers and one Tommy Triggers FRT-15-3 MD forced reset trigger).

[4] *See, e.g.*, Compl., *United States v. Rare Breed Triggers, LLC, et al.*, No. 1:23-cv-00369-NRM-RML (E.D.N.Y. Jan. 19, 2023) (ECF No. 1) (seeking injunctive relief to enjoin a commercial entity and related individuals from marketing FRT-15s as lawful weapons despite the ATF's contrary interpretation that FRTs are machineguns).

[5] *See, e.g.*, Pls.' App. 301–03, ECF No. 62-1 (declaration of Lee Boerschig with attached ATF correspondence); *id.* at 397, 399, 326–27, 330, 391, 393 (ATF Official Notification posted on November 1, 2023 (stating ATF seized FRTs/WOTs on August 31, 2021, September 19, 26, 27, 2023, October 3, 4, 11, 13, 16, 19, 20, 24 2023)).

that were unlawfully manufactured," that "[p]ossession of these devices is a violation of law due to their illegal manufacture," and that "*the unlawful receipt and possession of any of these devices is a felony violation of Federal law*." Due to the direct threat of civil and criminal enforcement, Plaintiff Carey surrendered his two FRTs to ATF agents. Plaintiff Wheeler personally owns one FRT and has a 50% ownership stake in a small firearms and ammunition business that owns two additional FRTs. Plaintiff Speegle personally owns ten FRTs. Both Plaintiffs Wheeler and Speegle wish to maintain possession of their FRTs, but fear they are at risk of civil and criminal prosecution for continued possession. The Individual Plaintiffs' prior or current conduct—possession or transfer of FRTs—is subject to enforcement on account of the ATF's broadened definition of machinegun.

In addition to the Individual Plaintiffs, other members of the Organizational Plaintiffs are also subject to enforcement under the ATF's broadened definition of machinegun. Formed in 2000, NAGR is a Virginia non-profit organization with its headquarters in Loveland, Colorado.[6] NAGR's purpose is to "preserve and defend the Second Amendment rights of gun owners."[7] It represents over 3,000 members in the Northern District of Texas alone.[8] Certain members of NAGR either already own FRTs or wish to acquire them but for the challenged ATF definition.[9] Since this case was filed, additional members of the Organizational Plaintiffs have reported receiving warning letters or other contact from the ATF regarding their FRTs.[10] Most notably, large Texas entities such as Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, and their

---

[6] Pls.' Compl. 2, ECF No. 1.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] Pls.' Notice of Non-Compliance, ECF No. 98; Pls.' Reply in Support of Mot. for Prelim. Inj. 20, ECF No. 47 (describing declarations of Ryan Flugaur, Chris McNutt, and John Kordenbrock); *see also* Pls.' Reply App. 94, ECF No. 48 (Declaration of Ryan Flugaur); *id.* at 85–93, 95–98, 101–04 (Declarations of other NAGR Members).

respective officers, Lawrence DeMonico and Kevin Maxwell (the "Rare Breed Parties"), are also members of NAGR.[11]

Similarly, TGR is another non-profit corporation representing unnamed members in this lawsuit.[12] Its mission is "to protect the Second Amendment rights of its members, including protecting the liberty of individuals to defend themselves, their families, and their property without having to first ask government for permission."[13] Headquartered in Hudson Oaks, Texas, TGR represents over 14,000 members residing in the Northern District of Texas alone.[14] Among these members are those who own FRTs or wish to acquire them but for the challenged ATF definition.[15]

Fearing civil and criminal prosecution, Plaintiffs sue various government officers and entities—the Attorney General of the United States, the DOJ, the ATF, and the Director of the ATF (collectively, the "Defendants")—over the ATF's newly broadened definition and implementation of the machinegun regulation. In the instant action, Plaintiffs bring an APA challenge to the validity of Defendants' interpretation of the "machinegun" definition. According to Plaintiffs, this definition is unlawful because "Defendants' interpretation of the law and their specific actions to threaten and potentially initiate enforcement actions against Plaintiffs are thus arbitrary, capricious, and otherwise contrary to law."[16] To prevent unlawful agency action against them going forward, Plaintiffs seek declaratory judgment that Defendants' interpretation is unlawful and permanent injunctive relief to prevent Defendants from enforcing or otherwise

---

[11] Pl.'s Am. Mem. in Support of Mot. for Summ. J. 30–31, ECF No. 62.
[12] Pls.' Compl. 2–3, ECF No. 1.
[13] *Id.*
[14] *Id.*
[15] *Id.* at 3.
[16] *Id.* at 14.

implementing the novel definition.[17] And to remedy past harms, Plaintiffs also seek an order requiring the return of all FRTs seized by and surrendered to Defendants or, if destroyed, requiring compensation for the value of the lost property.[18]

### E.  Eastern District of New York's Preliminary Injunction

Shortly after this case was filed, a federal district court in the Eastern District of New York (the "E.D.N.Y. Court") granted a preliminary injunction in favor of Defendants in a similar lawsuit involving the ATF's definition as applied to FRTs (the "E.D.N.Y. Lawsuit" and "E.D.N.Y. Decision"). *United States v. Rare Breed Triggers, LLC*, No. 1:23-cv-00369-NRM-RML, 2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023), *appeal filed*, No. 23-7276 (2d. Cir. Oct. 5, 2023). The E.D.N.Y. Lawsuit enjoined the Rare Breed Parties—along with their agents, officers, and employees—from "engaging in any sales of [various FRTs] and other machinegun conversion devices." *Id.* at *50. That injunction remains pending on appeal.

### F.  Procedural History

On August 30, 2023, this Court granted a temporary restraining order ("TRO") to the Individual Plaintiffs only.[19] Finding that the ATF's expanded definition of "machinegun" is likely unlawful, the TRO enjoined Defendants from implementing or enforcing, in any civil or criminal manner, the definition against the Individual Plaintiffs.[20] The TRO was narrow in scope, limiting temporary injunctive relief to the Individual Plaintiffs.[21] Due to agreed extensions, the TRO remained in place through October 7, 2023.[22]

---

[17] *Id.* at 15.
[18] *Id.*
[19] Aug. 30, 2024 Op. & Order on Pls.' Mot. for TRO, ECF No. 36.
[20] *Id.* at 27.
[21] *Id.* at 25.
[22] *See* Joint Mot. for Extension of Time 1–2, ECF No. 37 ("[T]he parties stipulate, under Federal Rule of Civil Procedure 65(b)(2), that the temporary restraining order shall apply until the earlier of September 30, 2023, or until such time that the Court rules on Plaintiffs' Motion for Preliminary Injunction."); Joint

On October 2, 2023, the Court conducted an evidentiary hearing to determine whether the TRO should extend throughout the life of the case.[23] As with the E.D.N.Y. Lawsuit, each party was permitted an expert witness to testify about the mechanics of FRTs.[24] Notably, the hearing made clear that there are no factual disputes regarding how FRTs work.[25] Instead, the hearing confirmed that the parties' dispute centers entirely on a legal question: whether FRTs qualify as machineguns under the statutory definition. Plaintiffs' expert, Daniel O'Kelly, testified that FRTs *do not* exhibit the attributes of a machinegun, as described by the statute. Defendants' expert, Anthony Ciravolo, testified that FRTs *do* exhibit those attributes. This live testimony mirrored the positions these same experts proffered during the two-day hearing in the E.D.N.Y. Lawsuit.[26] After hearing live testimony and reviewing the briefing, the Court granted Plaintiffs' Motion for Preliminary Injunction on October 7, 2024.[27]

Defendants appealed thirty days later pursuant to 28 U.S.C. § 1292(a)(1).[28] Simultaneous to filing an interlocutory appeal, Defendants moved for a stay of the preliminary injunction

---

Mot. to Reschedule Hr'g 1–2, ECF No. 43 ("The parties stipulate, under Federal Rule of Civil Procedure 65(b)(2), that the temporary restraining order shall apply until the earlier of October 7, 2023, or until such time that the Court rules on Plaintiffs' Motion for Preliminary Injunction."). The Court granted both motions. Aug. 31, 2023 Order, ECF No. 37; Sept. 14, 2023 Order, ECF No. 43.

[23] *See* Electronic Minute Entry, ECF No. 51 (describing the Court's hearing held on October 2, 2023). Just like the E.D.N.Y. Lawsuit, this Court heard expert testimony regarding how FRTs function. *See* Defs.' Resp. in Opp. to Mot. for Prelim. Inj. 24, ECF No. 39 (referencing the evidentiary hearing held in the E.D.N.Y. Lawsuit); *see also United States v. Rare Breed Triggers, LLC*, No. 1:23-cv-00369-NRM-RML, 2023 WL 5689770, at *8 (E.D.N.Y. Sept. 5, 2023) (referencing the evidentiary hearing held on August 1–2, 2023).

[24] Sept. 29, 2023 Order, ECF No. 50 (setting time limits and scope of expert testimony).

[25] *See* Tr. of Oct. 2, 2023 Hr'g 133, ECF No. 56 ("I think we agree on the way that [these] guns work. I think the disagreement is on how the statute is applied."). Even without the arguments and evidence from October 2, 2023 hearing, Defendants' briefing at every stage of this litigation makes clear that they agree to the basic facts of how the FRT device operates.

[26] *See generally* Tr. of Aug. 2, 2023 Hr'g, *United States v. Rare Breed Triggers, LLC*, No. 1:23-cv-00369-NRM-RML (E.D.N.Y. Jan. 19, 2023) (ECF No. 140).

[27] Oct. 7, 2024 Op. & Order on Pls.' Mot. for Prelim. Inj. 1, ECF No. 53.

[28] Defs.' Notice of Appeal, ECF No. 63.

pending the appeal.[29] To meet Defendants' request for a ruling within ten days, the Court ordered expedited briefing.[30] Finding that Defendants failed to show that the circumstances justified a stay of the preliminary injunction, the Court declined to do so.[31] The next day, Defendants asked the Fifth Circuit to enter an emergency stay until such time that the panel could evaluate the merits of the preliminary injunction.[32] The Fifth Circuit denied this request.[33]

Between the issuance of the preliminary injunction on October 7, 2023 and the Fifth Circuit deciding not to stay that relief on November 30, 2023, the Supreme Court granted certiorari in *Garland v. Cargill*. No. 22-976, 144 S. Ct. 374 (Nov. 3, 2023) (mem.). The same day, Plaintiffs sought summary judgment in this case.[34] Defendants similarly moved for summary judgment approximately one month later.[35] Although briefing on the cross-motions for summary judgment closed on January 12, 2024, the Court waited to consider these motions until after the Supreme Court's guidance in *Cargill* given that it would directly inform the merits of this case. The Supreme Court rendered its decision in *Cargill* on June 14, 2024, affirming the en banc Fifth Circuit.[36] *Garland v. Cargill*, 602 U.S. 406 (2024). As such, the cross-motions for summary judgment are ripe for consideration.

---

[29] Defs.' Mot. to Stay Prelim. Inj., ECF No. 64.
[30] Nov. 6, 2024 Order, ECF No. 66.
[31] Nov. 16, 2024 Order 13, ECF No. 73.
[32] Defs.' Emergency Mot. for Stay Pending Appeal, *Nat'l Assoc. for Gun Rights, Inc.. v. Garland*, No. 23-11138 (5th Cir. Nov. 17, 2023).
[33] Nov. 30, 2023 Order 7, *Nat'l Assoc. for Gun Rights, Inc. v. Garland*, No. 23-11138 (5th Cir. Nov. 30, 2023).
[34] Pls.' Mot. for Summ. J., ECF No. 60.
[35] Defs.' Cross-Mot. for Summ. J., ECF No. 79.
[36] Pls.' Notice of Suppl. Authority, ECF No. 97.

## II.      THRESHOLD ISSUES[37]

Defendants renew many of the same threshold issues raised at earlier stages in this litigation: standing and the veracity of pre-enforcement challenges.[38] This time, Defendants also emphasize that standing should be cabined just to possession and nothing more.[39] Before turning to the merits of the ATF's decision to classify FRTs as machineguns, the Court first addresses these threshold issues.

### A. Individual Standing

Nothing in Defendants' third attempt to challenge standing contradicts the operative facts the Court relied upon when granting the TRO and the preliminary injunction.[40] Yet Defendants once again argue that the Plaintiffs lack standing because there is no credible threat of prosecution.[41] Throughout this lawsuit, Defendants have repeatedly refused to disavow prosecuting the Individual Plaintiffs and instead attempted to assuage concerns by stating there are no current plans to prosecute.[42] Even if true, this phrasing reveals the implicit threat that the Plaintiffs fear: the Defendants could change their *current* plans at any time by deciding to prosecute. That is why, as the Fifth Circuit makes clear, standing exists here. *See Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (emphasizing that "plaintiffs have standing in the face of similar prosecutorial indecision," including when an agency "has not to

---

[37] The threshold issues at this stage mirror those earlier in the litigation. Therefore, the Court's continues to stand on its prior analysis. *See* Oct. 7, 2024 Op. & Order on Pls.' Mot. for Prelim. Inj., ECF No. 53.

[38] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 8–14, ECF No. 81.

[39] *Id.* at 12–14.

[40] *See* Op. & Order on Pls.' Mot. for TRO 7–9, ECF No. 36 (finding that the Individual Plaintiffs successfully established standing); Op. & Order on Pls.' Mot. for Prelim. Inj., ECF No. 53 (same).

[41] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 8–14, ECF No. 81.

[42] Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 5, ECF No. 87 (stating that "ATF has been faithful to its representations that it has no *current intention* to take action against Individual Plaintiffs" (emphasis added)).

date evaluated" whether it will pursue enforcement); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018) (explaining that standing in pre-enforcement challenges requires a showing "of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute . . . as well as credible threat of prosecution").

Defendants disagree that they have engaged in indecision comparable to the government in *Franciscan Alliance*.[43] In that case, the government "repeatedly refused to disavow enforcement [of the rule at issue] against" the plaintiff and further represented that it had "'not to date evaluated' whether it will enforce [it] against [Plaintiffs]," effectively "conced[ing] that it may." *Franciscan All.*, 47 F.4th at 376. But this is precisely the same course that Defendants have followed in this case. No amount of unequivocal statements regarding "lack of intentions to take enforcement actions against Individual Plaintiffs" can change the fact that Defendants have twice refused—and *continue* their refusal—to disavow prosecution against these Plaintiffs given their lingering silence at the summary judgment stage.[44] And whether or not Defendants have taken "enforcement actions against any otherwise law-abiding individuals" likewise does not show that Defendants have determined their position.[45] All that Defendants have determined to do is recycle their empty guarantee today to those who may become subject to enforcement tomorrow. This "guarantee" falls short of a disavowal of enforcement, which demonstrates that Defendants "concede[] that [they] may" and have not sufficiently "determined [their] position" such that a credible threat of enforcement would no longer exist. *Franciscan All.*, 47 F.4th at

---

[43] *See* Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 11, ECF No. 81 (noting the "ATF's representations regarding its lack of intentions to take enforcement actions against Individual Plaintiffs").

[44] *Id.* at 9, 11.

[45] *Id.* at 11; *see also id.* at 9 ("Defendants have repeatedly explained that ATF's enforcement priorities have been focused on large-scale manufacturers and sellers of FRTs and those with criminal histories, not individual owners like Plaintiffs and their members.").

376. To the contrary, credible threats of enforcement continue to loom over Plaintiffs such that there is standing to sue.[46]

Applying Fifth Circuit precedent here, the Individual Plaintiffs successfully satisfy standing requirements. There is no dispute that the Individual Plaintiffs "inten[d] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Zimmerman*, 881 F.3d at 391. Each Individual Plaintiff currently possesses—or previously possessed—a newly proscribed FRT. What is disputed is whether engaging in the newly proscribed FRT ownership carries "a credible threat of prosecution." *Id.* Defendants liken the Plaintiffs' concern to no more "than a generalized threat of prosecution" that cannot support pre-enforcement relief, particularly because the ATF has no current "intentions to take enforcement actions against the Individual Plaintiffs."[47] The Court disagrees and instead finds that a sufficiently credible threat exists to establish standing.

By bringing this action, the Individual Plaintiffs place themselves in potential jeopardy due to acknowledging their possession of FRTs. *See Mock v. Garland*, No. 4:23-cv-00095-O, 2023 WL 6457920, at *8 (N.D. Tex. Oct. 2, 2023) (noting that the plaintiffs, by bringing their lawsuit, necessarily provided sensitive information to the ATF regarding their regulatory noncompliance and facilitating potential future prosecution based on that information). Despite Defendants' rejection of this reality based on the claim that law-abiding FRT owners have not been subject to prosecution,[48] this misunderstands the enforcement concern. To date, Plaintiff Carey has experienced armed ATF agents arriving at his home to warn that he could face

---

[46] Notably, it seems that the Fifth Circuit finds the government's refusal to fully disavow enforcement during litigation instructive. *See* Request for Supplemental Briefing at 1, *VanDerStok v. Garland*, No. 23-10718 (requesting the government answer whether it "intend[s] to enforce ATF's Final Rule pending appeal with respect to the parties in this case?").

[47] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 9, 11, ECF No. 81.

[48] Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 4, ECF No. 87.

prosecution by not surrendering his FRTs and by purchasing additional FRTs in the future.[49] Plaintiffs also cite to examples of enforcement activity, seizures, and search warrants carried out against other individual owners of FRTs, including new examples since the filing of this lawsuit.[50] Certain individuals have even faced prosecution.[51] These enforcement activities—even if not formal prosecution based only on FRT possession by otherwise law-abiding citizens—continues to breathe life into the Individual Plaintiffs' fears. At the end of the day, Defendants' classification decision treats FRTs as machineguns, which means that the ATF could turn its attention to law-abiding citizens at any moment. The factual record bears this out. As recently as June 20, 2024, Plaintiffs notified the Court of Defendants' continued contact with law-abiding FRT owners.[52]

Based on this record, Defendants certainly appear to be "chomping at the bit" to seize FRTs.[53] Further evidence of this is Defendants' refusal to disavow prosecuting the Individual Plaintiffs during the pendency of this case—the exact type of "prosecutorial indecision" that the Fifth Circuit has "repeatedly held" as more than enough to "have standing." *Franciscan All.*, 47 F.4th at 376. Given this flurry of recent enforcement activity—stemming from the same interpretation of the law that proscribes Plaintiffs' conduct here—and Defendants refusal to guarantee that no action will be taken against the Individual Plaintiffs pending disposition of this action, there is more than a specter of enforcement sufficient to confer standing. More to the point, the Court has now reached this conclusion *three* times. Even if Defendants' contention that

---

[49] Pls.' Am. Mem. in Support of Mot. for Summ. J. 12, ECF No. 62.
[50] Pls.' Compl. 11, ECF No. 1; Pls.' Am. Mem. in Support of Mot. for Summ. J. 9, ECF No. 62; Pls.' App. 294, ECF No. 62-1 (declaration of Ryan Flugaur); *see also* Pls.' Reply in Support of Mot. for Prelim. Inj. 20, ECF No. 47 (declarations of Ryan Flugaur, Chris McNutt, and John Kordenbrock). *id.* at 85–93, 95–98, 101–04 (declarations of other NAGR Members).
[51] Plaintiffs previously referenced earlier in this litigation the ATF's Official Notification showing multiple seizures of FRTs. Pls.' Reply App. 66, ECF No. 34.
[52] Pls.' Notice of Non-Compliance, ECF No. 98.
[53] Decl. of Michael Columbo, Pls.' Br. App. 9, ECF No. 62-1.

it "has been faithful to its representations that it has no current intention to take action against Individual Plaintiffs"[54] is true, this does not overcome the fact that a credible specter of enforcement hangs in the balance. The threat is not "imaginary or wholly speculative." *Susan B. Anthony*, 573 U.S. at 160. And even if Defendants' faithful adhere to its representations somehow lessen the threat today, those representations do not overcome the most important consideration for the standing inquiry: this threatened harm was present at the time this lawsuit was filed. *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 301 n.3 (5th Cir. 2005) ("Standing is determined as of the time that suit is filed.") (citation omitted)).

Consequently, the Court finds—just as it did on two previous occasions—that the Individual Plaintiffs face a credible threat of civil or criminal prosecution for prior and current ownership of FRTs. This constitutes more than a *de minimis* harm to confer standing.

### B. Associational Standing[55]

The Court must also determine whether there is associational standing. When an organization seeks relief on behalf of its members, it must establish associational standing. *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Defendants argue that the Organizational Plaintiffs fail to do so.[56] The associational standing doctrine permits a traditional membership organization "to invoke the court's [injunctive or declaratory] remedial powers on behalf of its members." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). To establish associational

---

[54] Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 5, ECF No. 87.

[55] Justice Thomas recently suggested that the Constitution may impose some limits on associational standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 398–99 (2024) (Thomas, J., concurring) ("Associational standing, however, is simply another form of third-party standing. And, the Court has never explained or justified either doctrine's expansion of Article III standing. In an appropriate case, we should explain just how the Constitution permits associational standing."). Having reviewed the concerns articulated by Justice Thomas, the Court is satisfied that this case does not involve an attenuated connection between the Individual Plaintiffs and Organizational Plaintiffs. And the Organizational Plaintiffs have "arguably faced an injury of [their] own." *Id.* at 404.

[56] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 10–12, ECF No. 81.

standing, the organization must satisfy a three-prong *Hunt* test by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt*, 432 U.S. at 343). Finally, the Fifth Circuit has explained that, "[w]here the policy remains non-moribund, . . . the policy causes self-censorship among those who are subject to it" shows that "there is standing." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37 (5th Cir. 2020).

Here, the Organizational Plaintiffs satisfy the three-prong *Hunt* test. First, NAGR and TGR both seek relief on behalf of their members.[57] Among these members are the Individual Plaintiffs, who have standing to sue for the reasons stated above.[58] Moreover, additional members of the Organizational Plaintiffs have received warning letters for their possession of FRTs, including a member within the Northern District of Texas.[59] And other unnamed members desired to purchase and own an FRT but for the ATF's classification of FRTs as illegal machineguns.[60] It is well established that a plaintiff does not need to "expose himself to liability before bringing suit." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). "The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *Id.* at 129. Thus, each Individual Plaintiff's prior or current possession of FRTs gives rise to a credible threat of civil or criminal prosecution that establishes "standing to sue in their own right," satisfying prong one of

---

[57] Pls.' Compl. 2–4, ECF No. 1.

[58] As another example, Plaintiff Wheeler has standing since he either owned or wished to own FRTs at the time the Complaint was filed. Pls.' Reply App. 7, ECF No. 85 (Flugaur Declaration) (identifying Plaintiff Wheeler as an example of an NAGR member with standing).

[59] Pls.' Compl. 3, ECF No. 1.

[60] Pls.' Reply App. 9, ECF No. 85 (McNutt Declaration).

the *Hunt* test. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (recognizing the need to identify a member with standing for the "association to have standing to bring suit on behalf of its members" (cleaned up)).

Second, NAGR and TGR share similar organizational purposes that are clearly germane to this lawsuit challenging Defendants' asserted authority to classify and regulate FRTs as machineguns. NAGR's mission is "to preserve and defend the Second Amendment rights of gun owners."[61] Likewise, TGR's mission is "to protect the Second Amendment rights of its members, including protecting the liberty of individuals to defend themselves, their families, and their property without having to first ask government for permission and to push back on firearms-related licensing requirements."[62] And, third, because NAGR and TGR seek relief that is universal in character—vacatur and permanent injunctive relief—there is no need for all of their individual members to participate in the lawsuit.

Notwithstanding the Organizational Plaintiffs satisfying the *Hunt* test, Defendants once again challenge associational standing. This attempt falls flat for a third time. For starters, Defendants seek to impose more stringent standing requirements on the Organizational Plaintiffs. According to Defendants, Plaintiffs' members must have "received a warning letter at the relevant time" to have standing to sue.[63] But this misstates the law. To establish standing, a member of an Organizational Plaintiff must simply "intend to engage in a course of conduct arguably affected with a constitutional interest, but proscribed." *Zimmerman*, 881 F.3d at 391. Merely possessing or seeking to possess an FRT qualifies. Especially against the backdrop of the ATF's aggressive retrieval efforts, the absence of a personalized warning letter does not

---

[61] Pls.' Compl. 2, ECF No. 1.
[62] *Id.* at 2–3.
[63] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 11, ECF No. 81.

undermine the credible threat of enforcement facing Plaintiffs. Indeed, the record shows that ATF's enforcement policy "remains non-moribund" and is "caus[ing] self-censorship among those who are subject to it," the Court is satisfied that "there is standing." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37 (5th Cir. 2020).

Defendants also contest that the Organizational Plaintiffs are "bona fide membership organizations empowered to seek relief on behalf of their members."[64] Again, Defendants get the law wrong. An association has standing when it has "traditional members," or, alternatively, exhibits "indicia of membership." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (citing *Hunt*, 432 U.S. at 344–45). Here, the Organizational Plaintiffs are traditional voluntary membership organizations.[65] NAGR's bylaws contain preset criteria for a bipartite membership structure comprised of voting and supporting members.[66] NAGR's supporting members are those who either make a financial contribution above a certain amount or have specified relationships with the organization.[67] These members are able to influence the policy direction of NAGR by voting on policy referendums put forward by the Board of Directors.[68] Likewise, TGR exhibits a comparable membership structure of voting and supporting members.[69] TGR's supporting members are similar to those in NAGR, as stated in the March 2023 Resolution of the Board of Directors of TGR, which means they also provide policy

---

[64] *Id.* at 12.
[65] Plaintiffs submitted declarations discussing the membership structure of each Organizational Plaintiff. While this responsive information satisfies the Court that Defendants' newest effort to challenge associational is unavailing, Defendants nevertheless point to an out-of-circuit case that found the submission of affidavits insufficient to provide insight regarding membership. Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 6, ECF No. 87 (citing *Viasat, Inc. v. FCC*, 47 F.4th 769, 782 (D.C. Cir. 2022)). In *Viasat*, the D.C. Circuit took issue with the affidavits only providing a "bare assertion of membership." 47 F.4th at 782. Even if this Court found *Viasat* persuasive, it nevertheless finds that such a characterization does not apply to the declarations in this case.
[66] Pls.' Reply App. 7–8, ECF No. 85 (Flugaur Declaration).
[67] *Id.* at 7–8.
[68] *Id.* at 8.
[69] Pls.' Reply App. 9, ECF No. 85 (McNutt Declaration).

input through certain referenda.[70] Because the Organizational Plaintiffs have predetermined membership structures set forth in either their guiding documents and Defendants do not otherwise dispute compliance with those guiding documents, the Court finds that NAGR and TGR are traditional voluntary membership organizations.[71]

Given these attributes, another factor to consider is how other courts have treated these particular organizations. *See Students for Fair Admissions, Inc.*, 37 F.4th at 1085 (considering both the organization's guiding documents and whether "every other court to consider the issue . . . [is] in agreement"). Applying the same approach as the Fifth Circuit here, it is noteworthy that other courts, including this one, previously found associational standing for these particular organizations. *See, e.g.*, *Nat'l Assoc. for Gun Rights v. Grisham*, No. 1:23-cv-00771-DHU-LF, 2023 WL 5951940, at *2 (D.N.M. Sept. 13, 2023) (describing NAGR as an organizational plaintiff bringing suit on behalf of its members); *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1061 (N.D. Ill. 2023) (finding NAGR has associational standing); *Texas Gun Rights, Inc. v. ATF*, No. 4:23-cv-00578-O, 2023 WL 8352316, at *2 (N.D. Tex. Oct. 4, 2023) (finding NAGR and TGR have associational standing).

Therefore, having assuaged this Court of their ability to represent members along with satisfying all three prongs of the *Hunt* test, the Court once again finds that the Organizational

---

[70] *Id.* at 9–10.

[71] Given this determination and because Defendants present no contrary evidence that the Organizational Plaintiffs "violated [their] own bylaws," the Court does not engage in an alternative analysis of whether or not the Organizational Plaintiffs otherwise exhibit "indicia of membership." *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1085 (5th Cir. 2022) (determining it unnecessary to conduct an indicia-of-membership analysis); *see also Friends of the Earth, Inc. v. Chevron Chem, Co.*, 129 F.3d 826, 827, 829 (5th Cir. 1997) (conducting an indicia-of-membership analysis after determining that the organization violated its own bylaws by merely treating "those who gave a donation" as its "members"). Even if the Court were to conduct the indicia-of-membership analysis, Plaintiffs would satisfy its requirements based on evidence that, among other things, members finance activities and "voluntarily associated themselves with [the organization]." *Friends of the Earth, Inc.*, 129 F.3d at 829.

Plaintiffs demonstrate associational standing. Accordingly, the Organizational Plaintiffs may pursue relief on behalf of their members.

### C.  Conduct Beyond Possession

Defendants also challenge standing as to any conduct beyond mere possession.[72] This is nonsensical. While "[s]tanding is not dispensed in gross," *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (citation omitted), and Plaintiffs "must demonstrate standing for each claim [they] seek[] to press," *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 430 (2017) (citation omitted), the Court finds no principled basis for distinguishing possession from manufacturing and selling. That is because possession of FRTs requires a fully functioning FRT market. Put differently, the manufacture, sale, and transfer of FRTs is a necessary precondition for possession by Plaintiffs who do not already own—but would own—FRTs without the ATF's classification decision. The Fifth Circuit already recognized as much *in this case*.[73] Without FRT manufacturers and sellers—both existing and would-be entities—the ability of Plaintiffs to possess FRTs is severely undermined. And this likely explains why the GCA criminalizes both "possession" *and* "transfer" of machineguns because these conduct categories are the two halves that form the whole. *See* 18 U.S.C. § 922(o) ("[I]t shall be unlawful for any person to transfer or possess a machinegun."). Thus, even if the Court previously focused most of its attention on individual possession at the TRO and preliminary injunction stages and even if the Organizational Plaintiffs lack any manufacturers or sellers within their membership,[74] this does

---

[72] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 12–14, ECF No. 81.

[73] *See* Nov. 30, 2023 Order 7, *Nat'l Assoc. for Gun Rights, Inc. v. Garland*, No. 23-11138 (5th Cir. Nov. 30, 2023) ("Plaintiffs must be able to acquire FRTs in order to use them.").

[74] Defendants contend that Plaintiffs "state, for the first time, that the Rare Breed Parties in the E.D.N.Y. Lawsuit are members of NAGR . . . at the summary judgment stage." Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 8, ECF No. 87. The Court disagrees. Plaintiffs plead in the Complaint under the section entitled, "Plaintiffs Face a Credible Threat of Enforcement," the search warrant executed

not change the reality that manufacturing and selling FRTs are part and parcel of broader FRT possession.[75]

Moreover, Defendants attempt to paint a picture that sellers are not implicated in this lawsuit by characterizing Plaintiffs "as private owners and associations whose members are private owners."[76] This is incorrect. Certain Plaintiffs (or their members) already manufacture or sell FRTs, such as Rare Breed Triggers, and others would like to do so, such as Plaintiff Wheeler.[77] Taking as true Defendants' representation that "enforcement priorities have been focused on large-scale manufacturers and sellers of FRTs,"[78] it follows that there is an even *more* credible threat to manufacturers sellers of FRTs. Indeed, Defendants have already taken legal action against one such entity, Rare Breed Triggers, for manufacturing and selling FRTs.[79] Defendants cannot have it both ways: on the one hand, claiming individual FRT owners are not

---

against the Rare Breed Parties as an example of enforcement "against one or more Plaintiffs." Pls.' Compl. 12, ECF No. 1. The Complaint is also full of references to the FRT-15 manufactured and sold by Rare Breed Triggers, along with the legal action taken against this commercial member. *Id.* at 3, 10, 11, 12. Even if Defendants are correct that Plaintiffs did not sufficiently identify the Rare Breed Parties as NAGR members in the Complaint, there simply is no obligation to do so. The Organizational Plaintiffs need not disclose at the time of filing each and every member by name. To impose such a requirement would completely erase associational standing. Unless and until the Supreme Court modifies associational standing, the Court will not accept Defendants' implicit invitation to deviate from prevailing doctrine.

[75] *See* Oct. 7, 2024 Op. & Order on Pls.' Mot. for Prelim. Inj. 14, ECF No. 53 (finding that "each Individual Plaintiff's prior or current possession of FRTs gives rise to a credible threat of civil or criminal prosecution that establishes standing to sue in their own right" as well as for purposes of associational standing).

[76] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 13, ECF No. 81.

[77] *See, e.g.*, Pls.' App. 1–2, ECF No. 62-1 (Wheeler declaration) (indicating a personal desire and intent to sell FRTs as the co-owner of a small business selling other firearms and ammunition).

[78] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 9, ECF No. 81.

[79] *See* Compl., *Rare Breed Triggers, LLC, et al.*, No. 1:23-cv-00369-NRM-RML (E.D.N.Y. Jan. 19, 2023) (ECF No. 1) (seeking injunctive relief to enjoin a commercial entity and related individuals from marketing FRT-15s as lawful weapons despite the ATF's contrary interpretation that FRTs are machineguns).

in danger for mere possession due to the ATF's focus on "sellers," and, on the other hand, claiming that selling is "far too 'speculative' to establish an injury."[80]

Therefore, the Court finds that standing exists for conduct beyond mere possession. Plaintiffs (or their members) already engage in the manufacturing and selling of FRTs and others would do so but for the ATF's classification decision.

### D.  Pre-Enforcement Challenges

Once again, Defendants call into question the veracity of pre-enforcement judicial review of laws carrying criminal penalties.[81] Defendants have suggested throughout this lawsuit that allowing pre-enforcement review in this case would "ride roughshod across constitutional limitations on the judiciary's equitable powers to enjoin hypothetical future law enforcement action."[82] As the Court previously explained, the basic contours of Defendants' pre-enforcement contentions are true.[83] But it still remains that separation of powers does not preclude pre-enforcement judicial review of laws carrying criminal penalties. *See Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (emphasizing that a plaintiff facing "a credible threat of prosecution . . . should not be required to await and undergo a criminal prosecution as the sole means of seeking relief") (internal quotation marks omitted)); *see also Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) ("Although in regard to criminal statutes, courts are wary of . . . intervening prior to prosecution and foreshortening the prosecutor's action, courts have allowed pre-enforcement review of a statute with criminal penalties.").

---

[80] *Compare* Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 9, ECF No. 81 *with id.* at 14 (quoting *Lujan*, 504 U.S. at 560).
[81] *Id.* at 8–10.
[82] Defs.' Resp. in Opp. to Pls. Mot. for Prelim. Inj. 21, ECF No. 39.
[83] Aug. 30, 2024 Op. & Order on Pls.' Mot. for TRO 9, ECF No. 36.

To begin, Defendants still do not retract from their previous averments that certain safeguards weigh in favor of no pre-enforcement intervention by the judicial branch.[84] "This runs afoul of multiple Supreme Court decisions. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("When an individual is subject to such a threat [of enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."). And that is to say nothing of the potential harm that such insulation from pre-enforcement judicial review would likely cause individuals subject to prosecution. Without access to courts to bring pre-enforcement challenges, vulnerable citizens may surrender the ability to promptly challenge unlawful executive branch actions. This cannot be.

Defendants concede that a narrow exception exists for "vindcat[ing] *constitutional* rights" alone.[85] But Defendants offer little support for this bold proposition. One of the cases Defendants cite in an effort to shore up their position is *Stolt-Nielsen v. United States*, 442 F.3d 177 (3d Cir. 2006), *as amended* (May 16, 2006).[86] According to the Third Circuit in *Stolt-Nielsen*, the district court lacked the authority to enjoin executive branch officials from filing an indictment because the plaintiffs had access to a federal forum post-indictment. *Id.* at 187. The Third Circuit only recognized the narrow exception for chilled constitutional rights. *Id.* To be sure, *Stolt-Nielsen* contains broad language consistent with Defendants' position that pre-enforcement review of future enforcement is only available where constitutional rights are at stake. But a comparison

---

[84] *See generally* Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 8–10, ECF No. 81.

[85] *Id.* at 28.

[86] *Id.* at 29.

with the issue in this case renders that language unpersuasive. In *Stolt-Nielsen*, the plaintiff sued to enforce a conditional leniency agreement that the government purported to revoke as a consequence of plaintiff's behavior. *Id.* at 179–80. This was a fundamentally individualized determination rather than a review of a generally applicable administrative action. And this distinction is key. The stakes for Plaintiffs are of a comparable gravity to situations in which constitutional rights are violated: unlawful executive action that leadings to the deprivation of a liberty interest.

Furthermore, the APA does not prohibit pre-enforcement judicial review. Under the APA, federal courts have the authority to review challenges to agency actions on a pre-enforcement basis.[87] To be sure, Defendants are correct that this authorization does not expand the Court's jurisdictional beyond tradition limitations.[88] *See* 5 U.S.C. § 702 ("Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."). But permissible challenges nevertheless include an endless variety of agency actions that are "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Notably, judicial review of agency actions that may be "contrary to constitutional right, power, privilege, or immunity . . . [or] in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(B)–(C), is cumulative under the arbitrary-and-capriciousness standard, which "governs review of *all* proceedings that are subject to challenge under the APA." *Menkes v. DHS*, 637 F.3d 319, 330 (D.C. Cir. 2011) (citing *Consumers Union of U.S., Inc. v. FTC*, 801

---

[87] *See generally* Kathryn Kimball Mizelle, *To Vacate or Not to Vacate: Some (Still) Unanswered Questions in the APA Vacatur Debate*, 38 HARV. J.L. & PUB. POL'Y PER CURIAM 1, 12–13 (2022) (discussing vacatur on a pre-enforcement basis).

[88] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. 29, ECF No. 81.

F.2d 417, 422 (D.C. Cir. 1986)). Thus, "[i]n *all* cases" of judicial review under § 706, "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) (citing 5 U.S.C. § 706(2)(A)–(D)) (emphasis added). This is also consistent with the Supreme Court's emphasis that the APA's "'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140–41 (1967) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)).

Even so, Defendants reject this broad statutory authorization of judicial review for a third time, suggesting that the APA's general conferral of authority to review certain agency actions and to grant interim relief has no bearing on whether the injunctive relief sought here is available.[89] Once again, this bold statement lacks any direct support. Not only that, Defendants' interpretation also runs counter to the text of the APA itself. The APA's text refers to "mandatory or injunctive decree[s]" issued thereunder. 5 U.S.C. § 702. The import of this text is that injunctive relief is available under the APA without any express limitation precluding the availability of such relief on a pre-enforcement basis. Moreover, the text of § 702 makes clear that "[a] person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action" is "entitled to judicial review thereof." *Id.* And the APA expressly provides that criminal proceedings are *included* in such review. *Id.* § 703. This ability to obtain an appropriate remedy is not contingent on the person being subject to existing enforcement. To the contrary, the APA recognizes judicial authority to "issue all necessary and appropriate

---

[89] *Id.* at 29–30.

process . . . to preserve status or rights" from "irreparable injury" caused by agency action.[90] *Id.* § 705. Indeed, the APA's explicit textual entitlement would be undermined by an interpretation that § 702 confers no right to obtain meaningful equitable relief on a pre-enforcement basis when wronged by agency action. Provided that the claim is justiciable, the APA's broad entitlement to judicial review is not limited in the way Defendants portray.

Based on the text, the APA empowers courts with specific authority to "hold unlawful and set aside agency action, findings, and conclusions found to be" unlawful without subjecting that authority only to post-enforcement situations. *Id.* § 706. This is the only reading of the text that gives "a 'hospitable' interpretation" to the APA's "'generous review provisions.'" *Abbott Lab'ys*, 387 U.S. at 140 (quoting *Shaughnessy*, 349 U.S. at 51). It also tracks with the important purpose the APA serves. *See Franciscan All.*, 47 F.4th at 378 ("[A]n agency 'literally has no power to act . . . unless and until Congress authorizes it to do so by statute.'" (quoting *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1649 (2022)).

James Madison warned that "[t]he accumulation of all powers, legislative, executive and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed. 1961). The crux of this case is that the executive branch has improperly usurped legislative authority by enacting criminal prohibitions that are beyond the scope of its legislatively granted authority. Now, Defendants seek to arrogate unto themselves the judicial authority as well by placing their actions beyond the reach of pre-enforcement judicial review. This is not and cannot be.

To be sure, the constitutional check of judicial review is an essential component of separation-of-powers principles to oblige another branch to control itself. *See* THE FEDERALIST

---

[90] *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012–17 (2018) (explaining that, although the power of judicial review is not akin to an executive veto, the APA expressly grants courts additional authority to review agency action).

No. 78, at 380 (Alexander Hamilton) (Dover ed., 2014) ("There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void."). And this remains just as important today as it was at the Founding. Not only would Defendants have this Court ignore decades of Supreme Court precedent and the APA's plain textual authorization of judicial review, they would also have this Court twist the foundational value of separation of powers into something it is not. The Court declines this invitation for the second time. Instead, the Court finds that it possesses both constitutional and statutory authority to review pre-enforcement challenges to agency action with criminal consequences and it does so here.

*       *       *       *       *

Accordingly, finding no bar to the authority to afford equitable relief to Plaintiffs, the Court proceeds with its analysis of the merits.

## III.   LEGAL STANDARDS

### A.  Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[A] material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotations omitted). "[T]he substantive law will identify which facts are material[,]" and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

A party seeking summary judgment must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must then set forth specific facts showing that there is a genuine issue for trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968). "If reasonable minds could differ as to the import of the evidence," then the court should deny the motion. *Anderson*, 477 U.S. at 250. Here, the questions before the Court are of a purely legal nature and contain no fact disputes.

### B.  The APA

The APA "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (quoting 5 U.S.C. § 702). Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record. *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). Upon review of agency action, the APA requires the district court to "hold unlawful and set aside agency action" found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). Once a court determines the contested agency action falls short of the APA's substantive or procedural requirements, the reviewing court "shall" set aside the unlawful agency action. *Id.*; *Data Mktg. P'ship v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022).

29

Among other procedural requirements, the APA requires agencies to provide "legislative" rules (*i.e.*, substantive regulations) for public notice and comment, 5 U.S.C. § 553(b), and to ensure that the final version of such a rule is a "logical outgrowth" of the agency's initial regulatory proposal. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021). The APA's arbitrary and capricious standard requires that agency action be both "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This means that agencies must not "rel[y] on factors which Congress has not intended it to consider" or "entirely fail[] to consider an important aspect of the problem" when issuing regulations. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The APA instructs courts to "hold unlawful and set aside agency action . . . found to be . . . "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Likewise, this same instruction applies to other agency action, including that which is "in excess of statutory jurisdiction, authority, or limitations." *Id.* § 706(2)(C). Judicial review of agency actions "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(B)–(C), are cumulative under the arbitrary and capriciousness standard, which "governs review of *all* proceedings that are subject to challenge under the APA." *Menkes v. DHS*, 637 F.3d 319, 330 (D.C. Cir. 2011) (citing *Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986)). Thus, "[i]n *all* cases" of judicial review under Section 706, "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, *or* constitutional requirements." *Citizens to*

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) (citing 5 U.S.C. § 706(2)(A)–(D)) (emphases added).

In APA cases challenging agency action, summary judgment "serves as the mechanism for deciding" whether the action "is supported by the administrative record and otherwise consistent with the APA standard of review." *Gadhave v. Thompson*, 2023 WL 6931334, at *1 (N.D. Tex. Oct. 19, 2023) (citation omitted). The agency resolves "factual issues to arrive at a decision that is supported by the administrative record," and the district court applies the APA standards of review to determine whether, as a matter of law, "the evidence in the administrative record permitted the agency to make the decision it did." *Yogi Metals Grp. Inc. v. Garland*, 567 F. Supp. 3d 793, 797–98 (S.D. Tex. 2021), *aff'd*, 38 F.4th 455 (5th Cir. 2022) (citation omitted). Such cases generally involve pure questions of law, with the district court functionally operating as an appellate tribunal over the agency. *MRC Energy Co. v. U.S. Citizenship & Immigr. Servs.*, No. 3:19-cv-2003-K, 2021 WL 1209188, at *3 (N.D. Tex. Mar. 31, 2021).

## IV.   ANALYSIS[91]

Plaintiffs contend that the ATF's broadened view of the machinegun definition as applied to FRTs is an unlawful expansion of the agency's authority.[92] Plaintiffs are correct. Because there is no genuine dispute regarding material facts and statutory interpretation is a question of law, the Court concludes that the ATF exceeded its statutory authority by expanding definition of machinegun and subsequently classifying FRTs as machineguns.

### A.  Administrative Record

---

[91] The Court's discussion of facts concerning the basic mechanical operation of FRTs is drawn from (1) the administrative record, (2) the pleadings, and (3) the October 2, 2023 hearing.

[92] Pls.' Compl. 15, ECF No. 1.

In reviewing a final agency action under the APA, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "The focal point for judicial review" of an administrative agency's action "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). A court must "apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citation omitted). As such, review is limited to the administrative record that existed before the agency at the time of the decision. *See, e.g., id.* (explaining that a court's "factfinding capacity" is "typically unnecessary to judicial review" in an APA case). Only "in rare circumstances" is a court empowered "to conduct de novo inquiry into an agency's action." *Sierra Club v. Peterson*, 185 F.3d 349, 369 (5th Cir. 1999) (quoting *Fla. Power & Light Co.*, 470 U.S. at 744), *vacated on other grounds on reh'g*, 228 F.3d 559 (5th Cir. 2000).

Defendants argue that "the Court should decline to consider . . . materials outside the administrative record—including those presented at the preliminary injunction hearing—in support of the merits of [Plaintiffs'] claims."[93] Plaintiffs respond that limiting review in this way is inappropriate for a variety of response. One of those reason is that at least one exception to the general record requirement applies given the nature of the claims presented and the fact that Plaintiffs, along with the entire public at large, played no role whatsoever in producing or contributing to the administrative record.[94] The Court agrees with Plaintiffs.

---

[93] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 7, ECF No. 81.
[94] Pls.' Combined Br. in Resp. to Defs.' Cross-Mot. for Summ. J & Reply in Support of Mot. for Summ. J. 3, ECF No. 84.

Courts in the Fifth Circuit routinely allow supplementation of the administrative record when certain circumstances are present: (1) when the agency action is not adequately explained in the record, (2) when the agency failed to consider factors which are relevant to its final decision, (3) when an agency considered evidence which it failed to include in the record, (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly, (5) where evidence arising after the agency action shows whether the decision was correct or not, (6) where agencies are sued for a failure to take action, (7) when a case arises under the National Environmental Policy Act, or (8) where relief is at issue. *Davis Mts. Trans-Pecos Heritage Ass'n v. U.S. Air Force*, 249 F. Supp. 2d 763, 776 (N.D. Tex. 2003) (citation omitted), *vacated sub nom. on other grounds*, *Davis Mts. Trans-Pecos Heritage Ass'n v. FAA*, 116 F. App'x 3 (5th Cir. 2004).[95] The extra-record evidence at issue in this case fits comfortably in more than one of these categories—namely, scenarios (2), (4), and (5).

The second and fifth circumstances are closely related. In the second scenario, a court may consider relevant factors that the agency did not take into account when making its final decision. "Whether an agency considered all relevant factors 'can sometimes only be determined by looking outside the record to see what the agency may have ignored.'" *Texas v. U.S. Dep't of Homeland Sec.*, No. 6:23-cv-00007, 2023 WL 2842760, at *3 (S.D. Tex. Apr. 7, 2023) (quoting *City of Dall. v. Hall*, Case Nos. 3:07-CV-0060-P, 3:07-CV-0213-P, 2007 WL 3257188, at *4 (N.D. Tex. Oct. 29, 2007)). That is the case here. There was no public comment period during

---

[95] These eight circumstances fit within the three broad categories outlined by the Fifth Circuit: "(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, . . . (2) the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors, or (3) the agency failed to explain administrative action so as to frustrate judicial review." *Medina Cnty. Envir. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). *Medina* was not "a sea change in this circuit's law on extra-record evidence." *Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Engineers*, No. 3:13-cv-126, 2015 WL 1883522, at *3 (S.D. Tex. Apr. 20, 2015).

which Plaintiffs, or anyone else, could weigh in and correct errors in the agency's administrative process as it relates to FRT operation. Rather, Defendants classified FRTs as "machineguns" based entirely on their own analysis and on a record of their own making. The extra-record information reflects documentation that is adverse to the agency's determination and reveals "factors which are relevant to [the ATF's] final decision." *Davis Mts. Trans-Pecos Heritage Ass'n*, 249 F. Supp. 2d at 776. Likewise, in the fifth scenario, testimony from each side's expert concerning how FRTs operate supplies "evidence arising after the agency action [that] shows whether the decision was correct or not." *Id.* Both of these concerns raise questions as to whether "the agency deliberately or negligently excluded [evidence] that may have been adverse to its decision." *Medina*, 602 F.3d at 706.

Even if neither of the above circumstances applies in this case, information outside of the administrative record that provides "background information" regarding the functioning of an FRT is proper to consider. *Davis Mts. Trans-Pecos Heritage Ass'n*, 249 F. Supp. 2d at 776. To be sure, the mechanical operation of an FRT is an issue sufficiently "complex that a court needs more evidence to enable it to understand the issues clearly" and how these particular devices operate. *Id.* Defendants argue that reliance on any extra-record evidence regarding "the functionality of FRTs and whether those devices are properly deemed 'machineguns' . . . goes to key issues on the merits . . . and cannot be considered mere 'background information.'"[96] But just as the E.D.N.Y. Court deemed expert testimony necessary to understand how FRTs function before it could make a ruling, this Court similarly requested expert testimony at the preliminary

---

[96] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 4, ECF No. 81.

injunction hearing.[97] All questions of law—here, the straightforward application of *Cargill*—are not based on extra-record evidence.

Finally, the record rule does not apply to the Court's review of certain issues separate from the merits. For instance, consideration of extra-record evidence is appropriate to evaluate standing. *Texas v. U.S. Dep't of Homeland Sec.*, No. 6:23-cv-00007, 2023 WL 2842760, at *2 (S.D. Tex. Apr. 7, 2023) (Tipton, J.). This makes good sense given the importance of ascertaining whether a plaintiff has standing to proceed before deciding the merits. Likewise, "the record rule also does not limit the evidence this Court can consider when determining the propriety of injunctive relief." *Texas v. Biden*, 2:21-cv-00067-Z, 2021 WL 4552547, at *3 (N.D. Tex. July 19, 2021). The reason for this exception is because "'injunctive relief is generally not raised in the administrative proceedings below and, consequently, there usually will be no administrative record developed on these issues.'" *Id.* (quoting *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d. 360, 369 n.7 (D.D.C. 2017)). It is for this very reason the Court previously considered extra-record evidence at the TRO and preliminary injunction stages notwithstanding Defendants' objections.[98]

Upon closer examination, Defendants' record-rule arguments are little more than a thinly veiled backdoor effort to import *Chevron*-style deference into this case. True, Defendants have "never claimed that *Chevron* deference applies in this case" directly.[99] But by limiting review to the administrative record, the functional result is the equivalent of *Chevron* deference. Following

---

[97] *See* Defs.' Resp. in Opp. to Mot. for Prelim. Inj. 24, ECF No. 39 (referencing the evidentiary hearing held in the E.D.N.Y. Lawsuit)

[98] *See, e.g.*, *id.* at 4 n.2, ECF No. 39 ("Defendants do not concede . . . the propriety of Plaintiffs' reliance on evidence outside the administrative record to contest the merits.").

[99] *Id.* at 4. Until recently, *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.* required courts to bestow significant deference to an administering agency's interpretation of a statute, even if the court would read that statute differently. 467 U.S. 837, 843 (1984); *see also Loper Bright Enters.*, 144 S. Ct. at 2270 ("*Chevron* has proved to be fundamentally misguided.").

the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, a court may not

defer to an agency's interpretation of the law—even an ambiguous law—given the APA's

requirement that "court must exercise independent judgment." 144 S. Ct. 2244, 2262 (2024). To

allow such an artificially constrained review of the record here, this Court would functionally

defer to Defendants' factual and legal determinations, which were made without any opportunity

for input or challenge from Plaintiffs and the broader public. This is particularly problematic

when the agency's interpretation of the NFA and GCA could result in criminal penalties.

Plaintiffs aptly illustrate why this is so:

> [I]magine that, instead of machineguns, Defendants were classifying fruits.
> Imagine further that Defendants decided to evaluate an orange and in doing so, on
> their own and with no public input, determined that the orange is really a potato.
> Under Defendants' view of the world, there would be no mechanism for
> challenging Defendants' classification, even though it is plainly wrong, because
> there is nothing in the administrative record that says differently.[100]

This is not and cannot be correct. If it were, one need not exert much energy to imagine the

abuses that could result.

Finally, even if this Court is incorrect to consider materials outside of the administrative

record, the record-rule conclusion reached in this opinion does not change. That is because

Defendants' briefing does not appear to dispute the key facts: (1) the ATF made a final

determination to classify FRTs as "machineguns,"[101] (2) the trigger moves forward into its reset

state and is depressed to release the hammer from its sear surface for every round fired,[102] (3) the

---

[100] Pls.' Combined Br. in Resp. to Defs.' Cross-Mot. for Summary J. 3, ECF No. 84.

[101] Defendants do not appear to contest this fact at all. *See generally* Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 11, ECF No. 87 (repeatedly referring to the ATF's "classification decision" of FRTs as machineguns without once arguing this is not final agency action).

[102] *Id.* at 11 (describing the administrative record and acknowledging that "the purported 'forced reset' push[es] the trigger forward." (quoting ATF FRT-15 Classification Report, Apr. 27, 2023 (AR246)); *see also* Pls.' App. 67, 529–32, ECF No. 62-1 (noting the trigger moves forward into its reset state and depresses to release the hammer from its sear surface for each round fired).

trigger in an FRT-equipped firearm must reset after every round fired,[103] and (4) a shooter who attempts to prevent the reset by holding the trigger in a fully depressed position will cause the weapon to malfunction.[104] These facts can be drawn from the administrative record alone and demonstrate that an FRT-equipped firearm must function for each and every round fired.[105] The live testimony during the preliminary confirmed the lack of any such dispute regarding the material facts.

---

[103] Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 10, ECF No. 87 (claiming that "movement does not equate to function" despite "the fact that the trigger shoe on an FRT-equipped firearm automatically moves back and forth (i.e., resets)"); *id.* at 11 (acknowledging "the fact that the trigger forcibly resets and thus moves back and forth when subject to a single continuous pull of the trigger"); *see also* Pls.' App. 67–68, 532–33, ECF No. 62-1 (noting the trigger in an FRT-equipped firearm must reset after every round that is fired).

[104] Defendants do not appear to contest this fact at all. If anything, Defendants' suggest agreement. *See* Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 11, ECF No. 87 (stating that an FRT-equipped weapon will "continue[] to fire until the finger is removed from the trigger, the weapon malfunctions, or the ammunition is exhausted" (ATF FRT-15 Classification Report, Apr. 27, 2023 (AR246)); *see also* Pls.' App. 533, ECF No. 62-1 (noting that the weapon will malfunction if the shooter attempts to overcome the reset by holding the trigger in a fully depressed position).

[105] Because the Court determines that it may properly consider extra-record evidence in this case given that the circumstances fall within at least one of the previously recognized exceptions, the Court need not reach Plaintiff's additional arguments regarding the *ultra vires* exception. Pls.' Combined Br. in Resp. to Defs.' Cross-Mot. for Summ. J & Reply in Support of Mot. for Summ. J. 3–4, ECF No. 84. Nor does the Court need to reconcile whether Plaintiff should have filed a motion to supplement the administrative record, as Defendants suggest. Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 2–3, ECF No. 87. Or whether Defendants should have filed a motion to strike, as Plaintiffs suggest. Pls.' Combined Br. in Resp. to Defs.' Cross-Mot. for Summ. J & Reply in Support of Mot. for Summ. J. 3, ECF No. 84. Neither party cites a case that requires either party to take some *affirmative* step with respect to this issue. And the Court was unable to locate such a case from its own research. Therefore, this issue rests within the sound discretion of the Court whether to permit the extra-record evidence or to disregard it.

### B. Statutory Interpretation in *Cargill*[106]

The Court does not begin its statutory analysis on a blank slate. Rather, the Court's analysis is informed by the reasoning employed by a plurality of judges in the Fifth Circuit concerning the exact statutory language at issue here. *Cargill*, 57 F.4th at 458–64. Critically, this plurality's statutory interpretation was recently affirmed by the Supreme Court. *Cargill*, 602 U.S. at 410. As the Supreme Court agreed, a weapon that qualifies as a machinegun under § 5845(b) of the NFA must be capable of (1) firing multiple rounds by a single function of the trigger and (2) do so automatically. *Id.* at 415. In other words, the NFA unambiguously defines a machinegun as a weapon that fires automatically once the *trigger* performs a single function. *Id.* at 410–11, 415. The statutory text grammatically links the definition to the movement of the trigger. *See id.* at 422 ("The statutory definition instead hinges on how many shots discharge when the shooter engages the trigger."). *Cargill* underscores that the definition is solely concerned with the mechanical operation of the trigger rather than the actions of the user. *Id.* As a result, which firearms qualify as machineguns turns entirely on the movement of the trigger itself rather than the trigger finger. *Id.* (emphasizing that "§ 5845(b) does not define a machinegun based on what type of human input engages the trigger"). Based on this, *Cargill*

---

[106] *Cargill* also discussed the relevance of deference under *Chevron*. 57 F.4th at 456–57. The Court recognizes that the ATF does not receive interpretive deference under *Chevron* following *Loper Bright*. 144 S. Ct. at 2273 ("*Chevron* is overruled."). And even if *Loper Bright* left open any application of *Chevron*-style or similar deference, the Court has previously explained at earlier stages of this litigation how such deference would not apply here. For instance, the Step Zero command that interpretive rules—which the ATF's broadened machinegun definition appears to be—are not eligible for *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 232 (2001). Even assuming otherwise, *Chevron* deference would still not apply for at least two reasons. First, the Court has found the statutory definition to be unambiguous. *See, e.g.*, *Western Refining Southwest, Inc. v. FERC*, 636 F.3d 719, 727 (5th Cir. 2011) ("[If] the statute's text is unambiguous, we need not proceed to Step Two of *Chevron*."). Additionally, "[t]he Supreme Court has never held that the Government's reading of a criminal statute is entitled to any deference." *Cargill*, 57 F.4th at 466–67 (cleaned up).

rejected the ATF's regulatory interpretation of "machinegun" because it exceeded the agency's statutory authority in violation of the APA. *Id.* at 415.

*Cargill* emphatically rejected the ATF's interpretation of machinegun set forth in § 479.11. As *Cargill* explained, the ATF's expanded definition was aimed at criminalizing the manufacture, sale, and possession of bump stocks following the tragic Las Vegas shooting. *Id.* at 412. Similar to FRTs, a bump stock is an accessory that attaches to a semi-automatic weapon to increase the rate of fire. *Id.* at 411–12. By harnessing the firearm's natural recoil to quickly reengage the trigger, a skilled shooter utilizing this "bump firing" technique can rapidly fire multiple rounds. *Id.* Yet despite this increase in firing speed, *Cargill* determined that bump stocks are not machineguns because the device does not meet both elements of the statutory definition: (1) capable of firing multiple rounds by a single function of the trigger and (2) operate automatically. *Id.* at 415.

As the Supreme Court's statutory interpretation makes clear, a "single function of the trigger" means what it says: a single function of the *trigger*. It does not mean a single pull by the shooter or some analogous motion. *Id.* at 421–22. In fact, the word "pull" is not found anywhere in the statutory definition. The only place "pull" exists is in the ATF's broadened regulatory definition interpreting the statute. *See* 27 C.F.R § 479.11 (2018) ("'[S]ingle function of the trigger' means a single pull of the trigger[.]"). But according to *Cargill*, the statutory definition unambiguously turns on the movement of the trigger and not a trigger finger. *Cargill*, 602 U.S. at 422. Indeed, the statute does not say "by a single *pull* of the trigger." Nor does it say "by single function of the trigger *finger*." Rather, the best reading of the statutory definition is that after the shooter initiates the trigger's relevant function by some action—such as pulling the trigger or some other action by the user—it is the follow-on action of the trigger acting out its mechanical

purpose that informs the operative "function." Based on this reasoning, accepting Defendants' suggestion that "function" is synonymous with "pull" would impermissibly read words into the statute.[107] To do so would directly contradict the statutory definition and *Cargill*'s holding.

"Function" and "pull" are *not* synonymous. The former is based on a mechanical perspective whereas the latter is based on the shooter's perspective. *Cf. Cargill*, 602 U.S. at 416 ("The phrase 'function of the trigger' thus refers to the mode of action by which the trigger activates the firing mechanism."). Even if Defendants are correct to interpret "single function of the trigger" as referring to "single pull of the trigger," they must still satisfy the second definitional requirement: "automatically." 26 U.S.C. § 5845(b). Importantly, the statutory definition does not endorse an isolated reading of this second requirement. Rather, "the phrase 'by a single function of the trigger' modifies the adverb 'automatically.'" *Cargill*, 57 F.4th at 463. That is because "automatically" is understood as limited by the "single function of the

---

[107] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 14–15, ECF No. 81 (citing *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994)). Although *Staples* uses the same terms as Defendants—"release" and "pull" of the trigger—in a footnote discussing the characteristics of a machinegun, the Court determines that the holding in *Staples* is not applicable to these facts. First, *Staples* involved a different context than the one before this Court. *Staples*, 511 U.S. at 602 n.1. The Supreme Court addressed the government's burden of proof regarding a *mens rea* question about an individual's knowledge that he possessed an unregistered machinegun. *Id.* at 604–05. Not only was a specific semi-automatic accessory like an FRT or bump stock not before the Court, but the footnote in *Staples* only unpacks the meanings of "automatic" and "fully automatic." *Id.* at 602, 602 n.1. That is because the statutory definition at issue in the instant case was not before the *Staples* Court, making an analysis of *both* required statutory elements—(1) automatic and (2) single function of the trigger—unnecessary. The Supreme Court did not—and did not need to—address how "single function of the trigger" modifies "automatically" in order to answer the question before it. However, this question regarding the interplay of the two required elements was directly addressed in *Cargill*. Therefore, the footnote containing the terms "release" and "pull" in *Staples* does not constitute a binding holding of the Supreme Court. *See Webster v. Fall*, 266 U.S. 507, 511 (1924) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *see also District of Columbia v. Heller*, 554 U.S. 570, 625 n.25 (2008) (refusing to follow statement in previous decision characterized as "dictum" because "the point was not at issue and was not argued"); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed [it], we are free to address the issue on the merits.").

trigger" clause. *Id.* On its own, "automatically" simply means that firing "maintain[s] if all a shooter does it initially pull the trigger." *Id.* This alone is insufficient to qualify as a machinegun.

Moreover, Defendants read too much into mechanical versus non-mechanical bump stocks. In Defendants' view, the Fifth Circuit suggested the outcome depends on whether the device is a mechanical bump stock that only required the shooter to pull the trigger once to activate the firing sequence and thereafter maintain bump fire on its own accord.[108] This is an inaccurate reading of the Fifth Circuit's opinion. The Fifth Circuit merely recognized that the only issue before it was whether non-mechanical bump stocks were machineguns, and that the outcome may differ for a mechanical bump stock depending on how it worked. *Id.* at 462 ("[T]he case *might* well be different if we were considering a semiautomatic weapon equipped with a mechanical bump stock." (emphasis added)). While "[i]t could be the case that a switch activating a mechanical bump stock would be the legal trigger," the Fifth Circuit acknowledged that it was "not considering that case." *Id.* Likewise, the Supreme Court treated mechanical bumps stocks in the same manner since they were "not at issue" in the case. *Cargill*, 602 U.S. at 411 n.1. Certainly, other cases involved firearm devices that functionally replaced the traditional trigger and converted the weapon into a machinegun. *Cargill*, 57 F.4th at 453, 462 (referencing a switch-operated mechanical bump stock and a switch-operated electric motor add-on). That a "trigger activator" pushes the trigger towards its reset position does not mean it becomes the new trigger. *Id.* at 462 (citing *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003)).

### C. Application of *Cargill* to FRTs

Applying the guidance from both *Cargill* decisions here, FRTs do not fire multiple rounds with a single function of the trigger and, thus, do not qualify as machineguns. For each

---

[108] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 14–19, ECF No. 81.

and every round fired, the trigger moves forward into its reset state and is depressed to release the hammer from its sear surface. Because the operative mechanical function of the trigger is to release the hammer, that the trigger of an FRT-equipped firearm functions for each shot fired disqualifies it as a machinegun under the current statutory definition. Moreover, if all the shooter does is initially pull the trigger, the FRT-equipped firearm will only fire one round. And if the shooter attempts to reset and hold the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction.

By continuing to characterize a "single function of the trigger" as a "single constant rearward pull of the trigger," Defendants transform the required statutory focus away from the objective trigger mechanics to the subjective actions of the gun user instead.[109] This is incorrect and is the same rewriting of the statute Defendants already attempted—and failed—to do with bump stocks. *Cargill*, 602 U.S. at 428–29; *see also id.* at 429 (Alito, J., concurring) (recognizing that "the statutory text is clear, and we must follow it"). For purposes of statutory interpretation, it matters not what human input is required to activate the trigger. All that matters is whether more than one shot is fired each time the trigger functions. As *Cargill* explained, courts cannot look to the shooter's actions in deciding whether FRTs are machineguns. *Id.* at 422–23 (majority op.). Indeed, the "notion that the definition turns on the actions of an unnamed shooter is inconsistent with both the [definition's] grammatical and statutory contexts." *Cargill*, 57 F.4th at 461.

In light of the Supreme Court's decision, the critical consideration is how the trigger mechanically functions. *Cargill*, 602 U.S. at 412; *see also id.* at 436 (Sotomayor, J., dissenting) (characterizing the majority opinion as employing a "reading [that] fixates on a firearm's internal

---

[109] *Id.* at 15.

mechanics while ignoring the human act on the trigger"). That function is the "follow-on action where the trigger acts out its mechanical design or purposes" *after* the shooter has initiated it by some action. *Cargill*, 57 F.4th at 460. *Cargill* leaves no doubt that this required "action" is in relation to the function of the trigger itself, which is defined purely mechanically under the statute rather than an action taken by the user. *Id.* at 461 ("Congress did not use words describing the shooter's perspective of the weapon's rate of fire. . . . Instead, it made up an entirely new phrase—by single function of the trigger—that specifically pertains to the mechanics of a firearm."). Whether prudent or not, "Congress defined the term 'machinegun' by reference to the trigger's mechanics." *Id.* In a hammer-fired gun like those an FRT enhances, the trigger's function is to release the hammer as part of a "simple mechanical process." *Id.* at 459. By disengaging the hammer from the sear, the trigger in FRTs still initiates the "process" that "happens every single time one bullet is fired." *Id.*

This mechanically-grounded definition is consistent with prior Fifth Circuit precedent. *See, e.g.*, *United States v. Jokel*, 969 F.2d 132, 134 (5th Cir. 1992) (concluding that the role of the trigger is "the part of the action of a firearm moved by the finger *to release the hammer* . . . in firing") (emphasis added)). Defendants attempt to characterize *Jokel* as describing the trigger's relevant function as "initiat[ing] the firing sequence" is misplaced.[110] To be sure, the initial trigger pull sets off a sequence that enables a weapon to continue firing without additional physical manipulation. *Cargill*, 602 U.S. at 422. But, as *Cargill* makes clear, "Congress did not write a statutory definition . . . keyed to when a firing sequence begins and ends." *Id.* at 423. Instead, the statutory definition hinges on the trigger's operative mechanical function: the release

---

[110] *Id.* at 14.

43

and reset of the hammer as part of certain functions in the firing sequence that must recur before each round is fired. *Id.*

Defendants agree that the trigger in an FRT-equipped firearm releases the hammer for every shot.[111] By contrast, the auto sear in a fully automatic gun takes over to retain and release the hammer for all subsequent shots so that its trigger functions only once in a string of automatic fire. *See Cargill*, 57 F.4th at 454 (contrasting the auto sear of a "fully automatic gun" with a bump stock). An FRT-equipped firearm contains a locking bar that prevents a subsequent trigger function until the weapon is safe to fire again. But this is not the same as an auto sear. Unlike an auto sear, the locking bar still prevents firing until it is safe to do so again after unlocking the trigger. Because the FRT's locking bar does not alter the basic mechanical process where the trigger moves for every shot fired, this distinguishes an FRT from a fully automatic weapon with an auto sear. Whether that movement occurs by the shooter "apply[ing] forward pressure to the weapon's forebody in order to maintain the shooting mechanism" for bump stocks, *id.* at 454, or by the hammer maintaining the shooting mechanism for FRTs, the fact remains that the trigger resets the hammer each time before the next shot can be fired. *Cargill* explains that this is a separate function of the trigger. *Id.* at 459. Like bump stocks, FRTs do not enable a weapon to automatically fire multiple rounds with a single function of the trigger itself. To wit, even the name for the device makes this clear: a *forced* reset trigger rather than an *automatic* reset trigger.

---

[111] *Id.* at 1 ("[T]he trigger on an FRT moves and releases the hammer for each shot fired."); *see also* Defs.' Resp. in Opp. to Mot. for Prelim. Inj. 9, ECF No. 39 ("[T]he FRT uses the firing sequence to automatically reset itself along with the locking bar to lock and then automatically time the re-release of the hammer so that as soon as the bolt locks into battery the next round will automatically be fired."). Moreover, the parties confirmed at the October 2, 2023 hearing that there is no disagreement as to how FRTs function. *See* Tr. of Oct. 2, 2023 Hr'g 13, ECF No. 56 ("I think we agree on the way that [these] guns work. I think the disagreement is on how the statute is applied.").

This determination still remains true for Defendants' video of the zip-tie test, which purports to show that FRTs fire with "a single constant depression of the trigger."[112] In a machinegun, the trigger must be held in its rearmost position for the gun to fire automatically. The machinegun's trigger does not reset in between each shot. But in an FRT-equipped firearm, the trigger *must* still reset in between each shot—even when depressed in a rearward state by the zip tie. Defendants' zip tie does not appear to hold the FRT trigger still in its most rearward position. If it did, the weapon would malfunction and not fire subsequent shots. Instead, the elasticity in the zip tie allows for sufficient movement to allow for a trigger reset. All this test establishes is that the trigger need not move to its most rearward position. It can still reset from sufficient rearward pressure and forward movement propelled by the stretched zip tie. In other words, the zip tie test fails to demonstrate that a single function of the trigger does not otherwise occur for each shot since the trigger's operative function is the reset of the hammer—not how the user or a zip tip pulls the trigger. The zip tie test is irrelevant to the statutory definition provided by Congress and as interpreted by *Cargill*.

Even without the aid of expert testimony during the October 2, 2023 hearing—which revealed that there are no relevant fact issues regarding the mechanics of FRTs—Defendants' efforts to distinguish *Cargill* are unavailing. Similar to the government in *Cargill*, the Defendants here cannot overcome the plain reading of the statutory language. When the ATF revised its interpretation of machinegun to define a "single function of the trigger" as the same thing as "a single pull of the trigger and analogous motion," its definition conflicted with the definition provided by the controlling statutes. 27 C.F.R. § 479.11 (2018). And where an agency regulation contradicts the statute, not only is that regulation arbitrary and capricious, but the

---

[112] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 17, ECF No. 81.

statute governs. Because of this contradiction, the ATF's broadened definition of machinegun—and subsequent classification of FRTs—is unlawful.

Furthermore, unlike a switch-activated device that takes over as the legal trigger of the weapon, FRTs do not alter the basic operation the trigger: the trigger must still move sufficiently rearward for each shot based on external manual input from the shooter. This, in turn, activates the trigger's function—releasing and resetting the hammer—which occurs before each subsequent shot and is not set in motion by a switch. Unlike Defendants' comparison to the Akins Accelerator and electronic motor devices,[113] triggers in FRT-equipped firearms perform the same mechanical function as any normal trigger by releasing the hammer prior to each shot. While the Akins Accelerator may not have "any trigger other than the rifle trigger pulled by the shooter," as Defendants contend,[114] that misunderstands what mechanically occurs. The Akins device contains an internal spring that alters the *actuation* of the trigger rather than resetting of the trigger.[115] This is critical because the actuation is what causes the automatic function. FRTs do not include any internal spring or other means to assist actuation of the trigger. With FRTs, an external force must be applied by the user to cause the trigger to function (or actuate) each time a shot is fired. The only force that moves the trigger rearward in an FRT comes from the user's finger.[116] What, then, would be comparable to the Akins Accelerator? One example is the zip-tie demonstration in which the zip tie added external force akin to a spring. Without a similar zip-tie modification, an FRT, like a nonmechanical bump stock, still requires an external force to be applied by the user to cause the trigger to function each time a shot is fired.

---

[113] *Id.* at 17–19; Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 11–13, ECF No. 87.
[114] Defs.' Reply Br. in Further Support of Cross-Mot. for Summ. J. 13, ECF No. 87.
[115] Pls.' Am. Mem. in Support of Mot. for Summ. J. 17, ECF No. 62.
[116] *Id.* at 17–18 (citing Tr. of Oct. 2, 2023 Hr'g. at 111, ECF No. 56).

The closest Defendants come to analogizing FRTs to machineguns is by pointing to two similarities that FRTs and machineguns share: (1) the comparable rates of fire and (2) the absence of a disconnector.[117] But these arguments are foreclosed by the statutory definition and *Cargill*. The statutory definition does not define machineguns "according to how quickly they fire." *Cargill*, 57 F.4th at 464. Nor does it identify the absence of a disconnector as the dispositive characteristic. *See id.* at 460 (declining to "read words into the statute"). Instead, a weapon need only be capable of firing automatically once the trigger itself performs a single function to qualify as a machinegun under the statute. *Id.* at 460, 465. If Congress wants to amend the statutory definition in the future to define machineguns based on rate of fire or absence of a disconnector, it knows how to do so. Until such time, a comparable—and even identical—rate of fire and absence of a disconnector have no bearing on whether a firearm is a machinegun. Therefore, these comparators do not alter the Court's determination that FRTs are not machineguns.[118]

*   *   *   *   *

Because the *Cargill* decisions from the en banc Fifth Circuit and the Supreme Court are squarely dispositive of the issue in this case, the Court concludes that ATF's regulation is not in accord with the statutory definition of "machinegun." By redefining the statutory definition, the ATF exceeded the scope of its authority. Upon determining that an agency's action is unlawful, that "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory,

---

[117] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 16, 16 n.8, ECF No. 81.

[118] The Court's determination is based on its finding that the relevant statutory language is *not* ambiguous. If it were ambiguous, the rule of lenity would surely apply for the same reasons agreed to by a majority of the en banc *Cargill* panel. 57 F.4th at 469; *see also Cargill*, 602 U.S. at 414 (noting that "the [Fifth Circuit] majority concluded that the rule of lenity required resolving that ambiguity in Cargill's favor").

procedural, *or* constitutional requirements." *Citizens to Preserve Overton Park*, 401 U.S. at 413–14 (1971) (citing 5 U.S.C. § 706(2)(A)–(D)).

## V.   REMEDIES[119]

Having found in favor of Plaintiffs on the merits, the Court must finally consider the proper remedy. To alleviate the harms and injuries suffered as a result of Defendants' actions, Plaintiffs request that this Court (1) set aside (or vacate) as unlawful ATF's unlawful classification of FRTs as machineguns, (2) declare unlawful ATF's determination that FRTs are "machineguns," and (3) permanently enjoin Defendants from implementing or enforcing against the parties in this lawsuit, in any civil or criminal manner described below, any regulation that based on the determination that FRTs are "machineguns."[120]

### A.   Vacatur

Plaintiffs are entitled to a vacatur of Defendants' classification of FRTs as machineguns. The proper remedy upon determining that an agency has exceeded its authority is vacatur of the unlawful agency action. 5 U.S.C. § 706(2). While in some cases a court may remand a rule or decision to the agency to cure procedural defects, the Fifth Circuit considers vacatur the "default rule" for agency action otherwise found to be unlawful. *Data Mktg. P'ship*, 45 F.4th at 859–60 (describing vacatur as the default remedy under 5 U.S.C. § 706(2)); *accord Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 n.29 (5th Cir. 2022) (concluding that "[v]acatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation") (emphasis added)). The D.C. Circuit agrees. *See United Steel v. Mine Safety & Health Admin.*, 925 F.3d

---

[119] Even if the Supreme Court alters associational standing doctrine, these remedies would still be appropriate to award based on the Individual Plaintiffs' standing.

[120] Pls.' Compl. 15–16, ECF No. 1; Pls.' Am. Mem. in Support of Mot. for Summ. J. 32, ECF No. 62. Although Plaintiffs do not use the word "vacate," their Complaint nonetheless seeks relief under 5 U.S.C. § 706's set aside or vacatur clause. *See id.* at 15 (requesting the Court to "hold[] unlawful and set[] aside ATF's action" pursuant to "5 U.S.C. § 706"). Pls.' Compl. 15, ECF No. 1.

1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action. . . . In rare cases, however, we do not vacate the action but instead remand for the agency to correct its errors."). And, recently, Justice Kavanaugh endorsed vacatur as the appropriate remedy in APA cases despite its universal scope. *Corner Post, Inc. v. Bd. of Governors*, No. 22-1008., 2024 WL 3237691, at *15 (July 1, 2024) (Kavanaugh, J., concurring) (criticizing the "far-reaching argument that the APA does not allow vacatur . . . but instead permits a court only to enjoin . . . a rule against the plaintiff" alone because that position "would revolutionize long-settled administrative law" and "shut[] the door on entire classes of everyday administrative law cases"). The propriety of vacatur-without-remand "turns on two factors: (1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Id.* (cleaned up). Applying these factors here, the Court cannot envision how the ATF could satisfactorily salvage its classification of FRTs as machineguns on remand.

### 1. Seriousness of Deficiencies and Ability to Provide Justification on Remand.

Regarding the first vacatur-versus-remand factor, Defendants will not be able to justify its decision to create law that Congress did not pass and that the Supreme Court did not allow. Broadly speaking, remand to the agency "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (citing *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)). Under this factor, remand without vacatur is proper only where the agency failed "adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule." *Tex. Med. Ass'n*, 2023 WL 4977746, at *13 (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)). That is not what occurred with the agency action here. Likewise, the

49

complete "[f]ailure to provide the required notice and to invite public comment is a fundamental flaw that normally requires vacatur of the rule." *Wheeler*, 955 F.3d at 85; *see also Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013) (noting that "the court typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) ("[A]n agency that bypassed required notice and comment rulemaking obviously could not ordinarily keep in place a regulation while it completed that fundamental procedural prerequisite.").

These severe deficiencies do not warrant remand. *Texas v. United States* (*DACA*), 50 F.4th 498, 529 (5th Cir. 2022) (concluding that there was "no possibility that [the agency] could obviate the[] conflicts on remand" because the challenge document had "severe . . . deficiencies" and "fundamental substantive defects" that "contradict[ed] significant portions of the [enabling statute]"). The same holds here. Not only is the classification of FRTs as machineguns contrary to law, the ATF will not be able to substantiate its classification decision on remand because there is no possibility that it could correct the fundamental substantive errors.

## 2. Disruptive Consequences

As to the second factor—disruptiveness—Defendants may not rely on the "uncertainty that typically attends vacatur of any rule." *Wheeler*, 955 F.3d at 85 (rejecting agency's disruption argument). "[T]he threat of disruptive consequences cannot save a rule when its fundamental flaws 'foreclose [the agency] from promulgating the same standards on remand.'" *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quoting *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261–62 (D.C. Cir. 2007)). No amount of asserted disruptiveness can save the classification of FRTs as machineguns here.

Not only does the classification of FRTs as machineguns suffer from severe deficiencies that cannot be corrected on remand, but a vacatur that simply reinstates the longstanding status

quo prior to 2018 would not cause disruptive consequences. Vacatur is, thus, appropriate given the Court's conclusion that Defendants have engaged in unlawful agency action. An illegitimate agency action is void *ab initio* that cannot be remanded as there is nothing for the agency to justify. Moreover, vacating this unlawful assertion of Defendants' authority would be minimally disruptive because vacatur simply "establish[es] the status quo" that existed prior to the agency action. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) ("[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action.").

If the opposite remedy—remand to the agency—were the default, it would "create[] a risk that an agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remand would also "invite[] agency indifference." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."). And "[b]ecause vacatur is the default remedy . . . defendants bear the burden to prove that vacatur is unnecessary." *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 6:23-cv-59-JDK, 2023 WL 4977746, at *13 (E.D. Tex. Aug. 3, 2023) (citation omitted). Defendants have not done so here. Thus, applying the default remedy, the Court **VACATES** the ATF's classification of FRTs as machineguns.

### 3. Scope of Vacatur

"Vacatur is inherently universal."[121] There may be circumstances that justify a court fashioning a more limited vacatur. *Cf. VanDerStok v. Garland*, 86 F. 4th 179, 196–97 (5th Cir. 2023) (remanding in part for consideration of narrowing the vacatur to only cover certain provisions of the final rule rather than the entire rule), *cert. granted*, No. 23-852, 2024 WL 1706014 (U.S. 2024). But a more limited vacatur cannot logically be limited just to the parties in the lawsuit. By its very nature, a vacatur is universal in scope because it "erase[s] [an unlawful regulation] from the books." *United States v. Texas*, 599 U.S. 670, 696 (2023) (Gorsuch, J., concurring in the judgment). Erasure cannot be limited to only one party when the agency action no longer exists. *See Data Mktg. P'ship*, 45 F.4th at 859 (explaining that vacatur "retroactively undoes or expunges a past [agency] action") (citation omitted)); *see also Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (2024) (Jones, J.) (concluding "that the scope of preliminary relief or ultimate relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action").

Defendants contend that "the Court should construe the 'set aside' language in Section 706(2) as applying only to the named Plaintiffs."[122] But this misunderstands the remedial nature of a vacatur. "Vacatur operates on the legal status of a rule, causing the rule to lose binding force" whereas injunctions are party-specific.[123] Put simply, the only option is to wholly set aside the final agency action. Only the scope of the vacatur lends itself to limitation as to some or all

---

[121] John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 YALE J. ON REGUL. 119, 120 (2023).
[122] Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 26, ECF No. 81.
[123] Harrison, *supra* note 80, at 119–20.

provisions of a Final Rule, for example, but the scope logically cannot be limited to specific parties.

Avoiding the pitfalls that accompany remand-without-vacatur and finding no statutory authorization to limit vacatur to specific parties, the Court **VACATES** Defendants' unlawful classification of FRTs as "machineguns." Such a classification is contrary to law and was done in a manner beyond the scope of its legitimate statutory authority to promulgate it in the first place. Vacatur of the ATF's unlawful action—classification of FRTs as machineguns—achieves the same effect here as a nationwide injunction. At its core, vacatur is inherently universal in character like a nationwide injunction. *Data Mktg. P'ship*, 45 F.4th at 859. But "'[u]nlike an injunction, which merely blocks enforcement, vacatur unwinds the challenged agency action.'" *Id.* That is why the statutorily authorized vacatur is viewed as a less drastic remedy. *Id*; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) ("If a less drastic remedy (such as a partial or complete vacatur of [the agency's] deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").

### B.  Declaratory Relief

Plaintiffs are also entitled to declaratory relief in this case. Under the Declaratory Judgment Act, a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 220l(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* The Declaratory Judgment Act is "an enabling Act, which confers . . . discretion on courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (citation omitted). Moreover, the APA expressly

contemplates declaratory relief: "The form of proceeding for judicial review . . . includ[es] actions for declaratory judgments or writs of prohibitory or mandatory injunction[.]" 5 U.S.C. § 703. And "[t]he existence of another adequate remedy [such as a vacatur or injunction] does not preclude a declaratory judgment that is otherwise appropriate." FED. R. CIV. P. 57.

Plaintiffs successfully established that the ATF's classification of FRTs as machineguns is unlawful agency action. As a result, the Court finds that Plaintiffs are entitled to a declaration delineating the rights and legal relations among themselves and Defendants. Although the Court vacated the ATF's classification, a declaration is forward-looking in nature and provides prospective relief. Finding it necessary in this case to also award forward-looking declaratory relief, the Court **DECLARES** unlawful the ATF's determination that FRTs are "machineguns."

### C.  Permanent Injunctive Relief

Finally, Plaintiffs are entitled to permanent injunctive relief. A permanent injunction is proper when a plaintiff prevails on the merits, there is no adequate remedy at law for the plaintiff's otherwise irreparable injury, the balance of the harms favors the plaintiff, and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs satisfy each of these elements.

As extensively explained earlier in this opinion, Plaintiffs satisfy the first requirement because they succeed on the merits of their claim that the classification of FRTs as machineguns is contrary to law. Regarding the remaining injunction factors, the Court stands on its prior analysis from the preliminary injunction stage.[124] The record reveals no meaningful changes that undermine the Court's previous findings that Plaintiffs are suffering, and will continue to suffer, irreparable harm due to credible threats of enforcement, compliance costs,

---

[124] *See* Oct. 7, 2024 Op. & Order on Pls.' Mot. for Prelim. Inj. 31–37, ECF No. 53 (discussing the irreparable harm Plaintiffs will face).

and the chilling of constitutional and ownership rights. Likewise, the balance of the equities and the public interest factors remain in Plaintiffs' favor.[125] Even in their third bite at the apple, Defendants still have not identified any concrete injuries to counterbalance the real harms facing Plaintiffs. And there is no public interest in unlawful and unconstitutional government action. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021). Accordingly, having considered the arguments, evidence, and law, the Court holds that the relevant factors weigh in favor of entering a permanent injunction.

Because Plaintiffs carry their burden as to each of the permanent injunction factors, the Court next addresses the scope of the injunction. When ordering equitable relief, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). The scope of injunctive relief is "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction "should be crafted to provide 'complete relief to the plaintiffs.'" *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (quoting *Yamasaki*, 442 U.S. at 702). At the same time, the injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (cleaned up). And it must be tailored to "redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (citation omitted). Under "certain circumstances," however, the demand for "complete" relief may necessitate that injunctive redress benefit many claimants of a common legal right in order to prevent "more confusion." *Mock*, 75 F.4th at 587 (citation omitted). But even when a nationwide injunction is appropriate under the circumstances,[126] a less

---

[125] *See id.* at 37–41 (discussing the lack of countervailing interests to Defendants and the public).

[126] The Court is especially mindful of the Supreme Court's concerns regarding nationwide injunctions. *See, e.g.*, *California v. Texas*, 593 U.S. 659, 672 (2021) (explaining that a valid Article III remedy generally must "'operate with respect to specific parties'" rather than "in the abstract") (quoting *Murphy*

drastic remedy—vacatur—may ameliorate future-looking concerns. Therefore, despite the Court finding no indication that issuing a nationwide injunction *in this case* would conflict with the historical limits on its equitable powers, the Court determines that an injunction focused on enforcement and implementation remains necessary to wholly redress Plaintiffs' injuries. Here, vacatur and declaratory relief are not enough without the additional protection that flows from the clarity of permanent injunctive relief, such as avoiding circumvention of any declaration[127] and preventing confusion in the absence of specifically enjoined actions should Defendants later attempt to promulgate a new interpretation of "machinegun" capturing FRTs in violation of the statutory text.[128]

Therefore, in keeping with these obligations, the Court tailors the scope of the injunction with careful attention to completely redress the violation established and to also avoid upsetting the competing interests. Thus, the Court **ENJOINS** Defendants from the following actions against any person or entity:

---

[127] *v. NCAA*, 584 U.S. 453, 489 (2018) (Thomas, J., concurring)); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599–601 (2020) (mem.) (Gorsuch, J., concurring) (lamenting the "serious questions about the scope of courts' equitable powers under Article III" caused by "trial courts ordering relief that transcends the cases before them" by "direct[ing] how the defendant must act toward persons who are not parties to the case"); *Trump v. Hawaii*, 585 U.S. 667, 713–14 (2018) (Thomas, J. concurring) (conveying "skeptic[ism] that district courts have the authority to enter universal injunctions" without "authority . . . from a statute or the Constitution").

[127] Defendants' statement that "[a] broad injunction would undermine ATF's ability to respond in real time to serious future threats implicating FRTs" suggests a dogged intent to continue confiscation and enforcement practices despite this Court's ruling. Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 23, ECF No. 81; *see also id* at 22 ("[A] broad sweeping injunction . . . would cripple the government's ability to take virtually any enforcement action with regard to a FRT device anywhere in the United States.").

[128] So far, Defendants have advanced multiple interpretations of "machinegun" to capture FRTs. *See, e.g.*, 27 CFR § 479.11 ("single pull of the trigger and analogous motions"); *see also* Pls.' App. 112–77, ECF No. 62-1 ("continuous pull"); Tr. of Oct. 2, 2023 Hr'g. at 130, ECF No. 56 ("initiation of the firing sequence"); Defs.' Combined Mem. in Support of Cross-Mot. for Summ. J. & Resp. in Opp. to Pls.' Mot. for Summ. J. 1, ECF No. 81 ("constant rearward pressure").

(a)    Initiating or pursuing criminal prosecutions for possession of FRTs;

(b)    Initiating or pursuing civil proceedings for possessing, selling, or manufacturing FRTs based on the claim that FRTs are machineguns;

(c)    Initiating or pursuing criminal prosecutions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

(d)    Initiating or pursuing civil actions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

(e)    Sending "Notice Letters" or other similar communications stating that FRTs are machineguns;

(f)    Requesting "voluntarily" surrender of FRTs to the government based on the claim that FRTs are machineguns;

(g)    Destroying any previously surrendered or seized FRTs; and

(h)    Otherwise interfering in the possession, sale, manufacture, transfer, or exchange of FRTs based on the claim that FRTs are machineguns.

When determining the geographic scope of an injunction, the relevant considerations are similar to those in the analysis for the public-interest factor to justify an injunction in the first place. *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-cv-00278-P, 2024 WL 965299, at *46–*47 (N.D. Tex. Mar. 5, 2024). Those considerations include the avoidance of unconstitutional laws or government action, government efficiency, administrability of remedies, and public confidence in the judiciary. *Id.* Having carefully considered those circumstances here, the Court declines the invitation to extend the scope of the permanent injunction nationwide given that the statutorily authorized vacatur already supplies comparable universal relief. This determination is the result of diligent adherence to recent Supreme Court and Fifth Circuit guidance regarding appropriate remedies, along with an evaluation of the public-interest considerations that may warrant nationwide relief in select cases.[129]

---

[129] The first consideration—avoidance of an unconstitutional law or government action—favors a nationwide injunction. Likewise, the efficiency and administrability concerns that underlie the second and third factors also weigh in favor of a nationwide relief given the continued problems navigating the

Despite the Court finding no indication that issuing a nationwide injunction *in this case* would conflict with the historical limits on its equitable powers, the less drastic remedy—vacatur—sufficiently redresses Plaintiffs' concerns. However, the Court finds it appropriate to still issue party-specific relief to Plaintiffs to ensure that no harm from enforcement or implementation—be it through rulemaking or otherwise—continues going forward. Just as recently as June 20, 2024, Plaintiffs notified the Court of Defendants' continued contact with FRT owners.[130] Defendants respond that they cannot possibly know who is covered by the preliminary injunction "*before* ATF is aware of the person's membership status with an [Organizational] Plaintiff."[131] In other words, Defendants explain that they "have no means of knowing, prior to receiving a notice from Plaintiff, that they have contacted an individual or entity covered by the Preliminary Injunction."[132] Without questioning efforts to comply with the preliminary injunction, the Court fully recognizes administrability difficulties may cause improper contact with a member of an Organizational Plaintiff.[133] Vacatur of the ATF's unlawful action—classification of FRTs as machineguns—should prevent any such harms. But to the extent it does not, the Court also enters injunctive relief focused on enforcement and implementation of the unlawful classification.

---

preliminary injunction. And, finally, as to the remaining factor, the Supreme Court has made clear just how difficult it is to overcome the presumption that a nationwide injunction is "consistent with the historical limits on equity and judicial power." *Trump v. Hawaii*, 585 U.S. at 720 (Thomas, J. concurring).

[130] Pls.' Notice of Non-Compliance, ECF No. 98.

[131] Defs.' Resp. to Pls.' Notice of Non-Compliance 2 n.1, ECF No. 99.

[132] *Id.*

[133] *Id.* at 3 (admitting that the ATF "received a similar notification regarding a different NAGR member . . . and confused the second notification as regarding the same individual," which caused the ATF to "not relay the second notification down the chain of command to the ATF agent" and resulted in the "inadvertent error" of "the ATF agent sen[ding] a short follow-up email to the alleged member . . . without knowing that the individual was allegedly covered by the Preliminary Injunction").

Accordingly, the Court's injunction extends only to the plaintiffs in this lawsuit to protect them from civil or criminal enforcement of the challenged agency action to the extent not already covered by the vacatur. Parties beyond this lawsuit are *not* covered. And this injunction does not cover any pending criminal cases since that would interfere with another court. Crucially, this Court's award of permanent injunctive relief also does not offer any person blanket immunity from prosecution for all firearm-related offenses. Defendants may still prosecute violations of otherwise lawful provisions of the NFA and GCA, as well as other lawful firearms regulations. This relief should alleviate demonstrable injuries without unnecessarily burdening Defendants.

Finally, respect for coordinate courts also guides the scope of the relief awarded here. *See W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985) (holding that district courts should "avoid rulings which may trench upon the authority of sister courts"). Although this Court reaches a different conclusion than the E.D.N.Y. Decision, Fifth Circuit precedent is clear regarding overlapping decisions from coordinate courts. As it relates to the Rare Breed Parties or any of their agents, officers, and employees,[134] the Court further narrows its permanent injunction by carving out the Rare Breed Parties despite membership in an Organizational Plaintiff. But unlike the preliminary injunction, the Court only carves out the Rare Breed Parties to the extent that the permanent injunction conflicts with the E.D.N.Y Lawsuit's civil scope. The E.D.N.Y. Lawsuit does *not* include any claims that the Rare Breed Parties engaged in criminal conduct.[135] Therefore, while recognizing that inclusion of the Rare Breed Parties in the civil aspects of the permanent injunction would likely conflict with the E.D.N.Y. Lawsuit, the Court also finds that protection from criminal prosecution would not.

---

[134] These individuals include Lawrence DeMonico and Kevin Maxwell. Pls.' Am. Mem. in Support of Mot. for Summ. J. 30, ECF No. 62.

[135] *See* Compl. at 33–38, *Rare Breed Triggers, LLC*, No. 1:23-cv-00369-NRM-RML (E.D.N.Y. Jan. 19, 2023) (ECF No. 1) (seeking injunctive relief to prevent conspiracy to defraud, mail fraud, wire fraud, conspiracy to commit mail fraud, and conspiracy to commit wire fraud).

Accordingly, the Court **ENJOINS** Defendants from pursuing criminal actions against the Rare Breed Parties based on the classification that FRTs are "machineguns." Besides this narrow carve out, other manufacturers or sellers may continue to fully manufacture, sell, exchange, transfer, and/or market FRTs under this permanent injunction without facing civil or criminal consequences from Defendants.

With these limitations in place, the Court finds that the aforementioned relief appropriately narrows the scope of this extraordinary remedy without overly burdening Defendants and without trenching upon the E.D.N.Y. Decision. Accordingly, this injunction covers the Individual Plaintiffs and their families, the Organizational Plaintiffs and their members, and the downstream customers of any commercial member of an Organizational Plaintiff. Furthermore, this injunctive relief shall not extend to any individual prohibited from possessing firearms under 18 U.S.C. § 922(g). For those parties covered by this injunction, the relief shall take effect immediately and remain in effect pending the final disposition of this lawsuit. *See* 5 U.S.C. § 705.

## VI.   CONCLUSION

There is no denying the tragic nature of the Las Vegas shooting that motivated the Final Rule. But no matter how terrible the circumstances, there is never a situation that justifies *a court* altering statutory text that was democratically enacted by those who are politically accountable. That responsibility belongs exclusively to Congress. The Constitution assigns such legislative choices to the appropriate *elected* officials—not *life-tenured judges* and *unelected bureaucrats*. Rather than respect this intentional feature of our democratic system, Defendants chose to advance an policy agenda wholly divorced from the NFA's statutory text. Thus, to allow Defendants' unlawful action to stand would be to functionally rewrite the NFA. That is not how

our democratic system functions. Indeed, "it is never [a court's] job to rewrite . . . statutory text." *Henson v. Santander Consumer USA Inc.*, 582 U. S. 79, 89 (2017). As Chief Justice John Marshall put it, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (1 Cranch). Nothing more. This remains true even when shocking events may underscore the need for legislative change. And even when this prudent constraint produces undesirable results, one must remember that circumventing the democratic process to effectuate desired change undermines the animating policy goals upon which our system rests. A democratic path to change already exists.

By jumping the gun, Defendants robbed Congress of the ability to capitalize on political support to alter the statutory language following the Las Vegas shooting. Indeed, multiple bills on *this exact issue* were pending in Congress when Defendants decided to act.[136] None of these bills were given the chance to become law. As is often the case, public attention waned, taking with it the momentum for legislative action.[137] But this result is even more pernicious than the mere inability to enact legislative change. Each time an agency circumvents the legislative process it chips away at the most prudent reason for the separation of powers—that is, ensuring unelected and unaccountable individuals do not make the law. This reason alone compels the Court's decision today.

For the foregoing reasons and with the above admonitions in mind, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 60) and **DENIES** Defendants' Cross-

---

[136] *E.g.*, S. 1916, 115th Cong., 1st Sess., § 2 (2017); H.R. 3947, 115th Cong., 1st Sess. (2017); H.R. 3999, 115th Cong., 1st Sess. (2017).

[137] Indeed, recent proposals directed at firearms with rates of fire similar to a machinegun appear to have stalled without the robust political support that existed shortly after the Las Vegas shooting. *E.g.*, H.R. 396, 118th Cong., 1st Sess. (2023); S. 1909, 118th Cong., 1st Sess. (2023); H.R. 5427, 117th Cong., 1st Sess. (2021).

Motion for Summary Judgment (ECF No. 79). Specifically, the Court **ORDERS** the following relief:

1. The Court **VACATES** Defendants' unlawful classification of FRTs as "machineguns."

2. The Court **DECLARES** unlawful Defendants' determination that FRTs are "machineguns."

3. The Court **ENJOINS** Defendants—along with their respective officers, agents, servants, and employees—from implementing or enforcing against the parties in this lawsuit, in any civil or criminal manner described below, the ATF's expanded definition of "machinegun" to FRTs that this Court has determined is unlawful:

   (a) Initiating or pursuing criminal prosecutions for possession of FRTs;

   (b) Initiating or pursuing civil proceedings for possessing, selling, or manufacturing FRTs based on the claim that FRTs are machineguns;

   (c) Initiating or pursuing criminal prosecutions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

   (d) Initiating or pursuing civil actions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

   (e) Sending "Notice Letters" or other similar communications stating that FRTs are machineguns;

   (f) Seizing or requesting "voluntarily" surrender of FRTs to the government based on the claim that FRTs are machineguns;

   (g) Destroying any previously surrendered or seized FRTs; and

   (h) Otherwise interfering in the possession, sale, manufacture, transfer, or exchange of FRTs based on the claim that FRTs are machineguns.

4. This scope of this injunction covers the Individual Plaintiffs and their families, the Organizational Plaintiffs and their members, and the downstream customers of any

commercial member of an Organizational Plaintiff to the extent that it does not interfere with other courts, such as the E.D.N.Y. Lawsuit's civil jurisdiction over the Rare Breed Parties and other pending criminal cases against individuals already subject to prosecution.

5.  The Court further **ENJOINS** Defendants from pursuing criminal proceedings or criminal enforcement actions against the Rare Breed Parties on the grounds that FRTs are "machineguns."

6.  The Court **ORDERS** Defendants to return to all parties, including manufacturers, distributors, resellers, and individuals, all FRTs and FRT components confiscated or seized pursuant to their unlawful classification within **thirty (30) days** of this decision.

7.  The Court **ORDERS** Defendants to mail remedial notices correcting their prior mailing campaign that "warned" suspected FRT owners that possession of FRTs and FRT components was purportedly illegal.

Every year, our country commemorates the revolution waged against a tyrannical executive. To safeguard against future tyranny, our founding documents designed a system that prevents undue concentrations of power in order to protect important rights and to ensure that a legislative consensus is reached before enacting laws on the most important issues in society. Such foresight is especially prudent in cases like this one. Indeed, while this case may seem focused on firearms, it represents so much more. It is emblematic of a devastating problem that increasingly rears its head in federal courts: rampant evasion of the democratic process. Few issues more acutely underscore this problem than the present case. Our nation would do well to

remember the very reasons and spirit that inspired our democratic system of governance in the first place.

**SO ORDERED** this **23rd day** of **July, 2024**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**