**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

NATIONAL ASSOCIATION FOR GUN
RIGHTS, INC., *et al.*,

                Plaintiffs,

     v.

MERRICK GARLAND, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
OF THE UNITED STATES, *et al.*,

              Defendants.

Case No. 4:23-cv-00830-O

**DECLARATION OF MATTHEW P. VARISCO**

1.    I am the Assistant Director for the Office of Field Operations within the Bureau of Alcohol,

Tobacco, Firearms, and Explosives ("ATF"), United States Department of Justice ("DOJ").  I

have been in this position since March 2024.  Prior to my current position, I was the Assistant

Director for the Office of Enforcement Programs and Services (Regulatory Operations), the

Special Agent in Charge of the Philadelphia Field Division, and I have served as an ATF

Special Agent for over 23 years.

2.    In my current senior executive position, I direct policy, conduct planning, and oversee all ATF

criminal investigations and regulatory oversight for ATF's 25 field divisions.

3.    I am authorized to provide this Declaration on ATF's behalf and am providing it in support of

Defendants' Motion for a Stay.   This declaration is based on my personal knowledge and

belief, my training and experience, as well as information conveyed to me by ATF personnel in

the course of my official duties.

**Return of FRT-15s and WOTs**

4.  The Court's final order requires that ATF "return to all parties, including manufacturers, distributors, resellers, and individuals, all FRTs and FRT components confiscated or seized pursuant to their unlawful classification within **thirty (30) days** of this decision."  Doc. 101 at 2.  "Parties" here appears to include not only the named plaintiffs but also all members of the associational plaintiffs in this case.  Plaintiff organizations have never provided comprehensive information identifying their members, and the vast majority of their members are unknown to ATF.  When ATF's counsel in this case asked plaintiffs to identify members to whom ATF would be required to return devices, they were informed that plaintiffs do not have that information.  Plaintiffs' counsel proposed that ATF provide to them a comprehensive list of those from whom it confiscated or seized FRTs or FRT components to facilitate their return.  Such request is infeasible for several reasons, including because it could require ATF to turn over law enforcement records about third parties unrelated to Plaintiffs, risk compromising ongoing investigations, and implicate other statutes and regulations.

5.  ATF does not know—and has no way of independently determining—which former possessors, sellers and manufacturers who had their devices seized or confiscated are members of the plaintiff organizations.  Even if a member self-identifies to ATF and requests return, ATF does not have information sufficient to independently verify whether an individual or entity asserting membership in a plaintiff organization is, in fact, a member.  Nor can ATF independently determine whether any such individual or entity was a member at the time this suit was filed or at the time final judgment was entered.  ATF cannot practically comply with an injunction without information about to whom it owes compliance duties.

6.  Compliance with the 30-day timeline likely would be practically infeasible even if ATF knew to whom it was required to return devices.  Plaintiffs' suit specifically identifies the FRT-15 and

WOT as the devices at issue.  ATF has approximately 11,884 FRT-15s and WOTs in its possession.  These fall within several categories, including but not limited to: (i) FRT-15s and WOTs that were seized pursuant to search warrants, other judicial process, or warrant exceptions as part of a criminal investigation into the possession or distribution of the devices by a manufacturer or distributor ("Distributor Investigations"); (ii) FRT-15s and WOTs that were subject to national retrieval efforts from possessors in connection with one of several criminal investigations ("Possessor Retrievals"); (iii) FRT-15s and WOTs that were seized pursuant to search warrants or judicial process as part of an investigation into other criminal conduct (e.g., firearms trafficking, narcotics trafficking, felon-in-possession), where the subject of the investigation was also in possession of one or more of the devices ("Collateral Seizures"). The return of FRT-15s and WOTs to covered individuals and entities would be a complicated undertaking.  For one thing, while the court's order requires return only of devices purportedly seized "pursuant to [ATF's] unlawful classification," Doc. 101 at 2, for each return, ATF would need to determine whether the seizure took place pursuant to a search warrant or other authorized process before returning the device(s).

7.   The largest group of FRT-15s and WOTs in ATF custody are those falling in the Distributor Investigations category.  This includes FRT-15s and WOTs from the Rare Breed parties that are in ATF's possession as a result of matters under the jurisdiction of other Federal courts. Similarly, with respect to the Collateral Seizures, these seizures are generally under the jurisdiction of other courts, and involve individuals who have been charged with crimes, have been convicted of crimes, have charges pending, or who remain under active criminal investigation.  Further, in some instances, the possession itself may the subject of a criminal charge and the FRT-15 or WOT would be evidence before those courts.

8. The Possessor Retrievals accounts for several hundred FRT-15s and WOTs sold by the Rare Breed parties, Big Daddy Unlimited (BDU) and Wide Open Enterprises ("WOE") (the maker of the WOT), or resellers who acquired FRT-15s and WOTs from the Rare Breed Parties, BDU/WOE, or other sources.  As explained in the Declaration of Craig Saier filed earlier in this case, retrieval efforts are prioritized based on multiple factors including criminal history and association with known or suspected criminal activity.  Each of these retrievals are laborious and time consuming and pose inherent risks to law enforcement; the same would be true of an effort to return devices.

9. Upon identification of a covered individual or entity, ATF would need to determine whether the owner's FRT-15 or WOT is in ATF custody, and whether the device was seized pursuant to warrant or other judicial authorization.  Upon confirmation of coverage by the Order, ATF personnel would be required to make contact with each individual or entity. ATF may not have current contact information for each of these individuals.  The most likely information ATF would have would be a mailing address, which may not be up to date.  ATF would attempt to first contact these individuals by mail or phone, however in-person contact may be required.  For reasons discussed below, in person contact presents additional possible challenges.

10. ATF personnel would also need to conduct new background checks on each of the individuals and/or entities to determine whether anything has changed with respect to their criminal histories (e.g., a recent indictment or conviction).

11. Upon completion of appropriate records checks, if the intended recipient is not otherwise prohibited from possessing firearms, ATF personnel would need to make arrangements with the recipient to return the subject devices(s).  However, ATF has no ability to require any such individuals or entities to engage with ATF, to be responsive to ATF efforts to contact those

4

individuals or entities, or to ultimately accept a return of a seized FRT-15 or WOT (this may be particularly the case where the individuals may be subject to other state or local laws prohibiting the possession of the device).

12. In situations in which ATF is able to successfully contact a non-prohibited individual or entity, and there is a desire to have the device returned, the actual physical return of the device would ultimately involve an in-person return of the property.  An in-person transfer is necessary to enable ATF personnel to verify the individual's identity, to ensure that the correct individual receives the device, and to execute property transfer documents which would be retained by ATF as proof of the return.  The return of these devices will be time consuming and subject to the availability of funds.

13. The return process is further complicated by several factors.  First, the FRT-15s and WOTs in ATF custody are not maintained in a central location, but rather are stored in evidence in individual ATF field offices.  ATF Special Agents throughout the country would be responsible for effecting returns.  This tasking would be in addition to their ongoing criminal investigations and support of criminal prosecutions, other court obligations, and training requirements, among other responsibilities.  Finally, while ATF has a relatively small national footprint, retrievals have occurred in many states, from individuals who may be geographically distant from the nearest ATF office.  In such instances, appropriate advance arrangements would need to be made to ensure that the availability of both ATF personnel and the recipient. Further, in-person returns may require coordination with additional ATF personnel, or outside law enforcement agencies for both officer safety and to ensure appropriate documentation of return.

14. Additionally, ATF and the Department of Justice would also need to assess whether any anticipated recipients are agents, officers, employees, or any other persons or entities in active

concert or participation with the Rare Breed parties, and therefore subject to the injunction in the Eastern District of New York, and the carve out for the Rare Breed parties contemplated by the Court's order.

15.   Accordingly, even if ATF immediately received the names of Plaintiffs' members from whom ATF has confiscated or seized FRT devices, it is not feasible to 1) identify those individuals and entities and match them to devices in ATF's possession, 2) determine that they are not otherwise a prohibited person and that return of their device would not interfere with another court's jurisdiction, 3) contact them at a current address or phone number, and 4) effectuate the return of these devices to them within 30 days (i.e., by August 22, 2024).  ATF cannot ensure that it will be able to make contact with such members (*e.g.* due to undeliverable mail, outdated contact information, ignored communications, etc.) or that such members will want to retrieve their devices.  Further, possession or sale of the FRT-15 and WOT may be unlawful under state law where those members reside or conduct business, which also complicates ATF's ability to effectuate a return.

16.   Moreover, as discussed in the declaration of Craig Saier, once devices are in the hands of the public, they would require significant time and resources to recover if a court ultimately concludes that these devices are machineguns—if they can be recovered at all.  Saier Decl. para. 22-31.

**Compliance With the Permanent Injunction**

17.   Separate and apart from the aspect of the order requiring return of devices in ATF's possession, the court's order bars the defendants from taking a variety of actions with respect to "the Individual Plaintiffs and their families, the Organizational Plaintiffs and their members, and the downstream customers of any commercial member of an Organizational Plaintiff to the extent it does not interfere with other courts."  Doc. 101 at 2.

18.  As discussed above, ATF has no ability to identify "members" of "the Organizational

Plaintiffs" to whom this injunction applies or to verify their membership at the appropriate

time.

19.  In addition, because ATF does not know the "commercial member[s]" of the associational

plaintiffs, ATF has no ability to identify the "downstream customers" of such members to

whom the injunction applies.  And even if ATF were aware of the "commercial member[s]" of

the associational plaintiffs, it is not clear how ATF would be aware of those members'

"downstream customers" to whom the injunction also applies.

**Public Safety Concerns**

20.  As discussed in the declaration of Craig Saier, these devices also pose a significant public safety

risk.  Saier Decl. para. 32-43.  A semiautomatic firearm equipped with a forced reset trigger

enables the firearm to shoot 800 to 900 rounds per minute, regardless of the shooter's skill,

training or stamina.  As that declaration explained, the FRT-15 and WOT have been

distributed to convicted felons and have been recovered in connection with serious criminal

conduct.  These devices are distributed without record keeping or background checks and are

now available through many uncontrolled and unregulated sources for a fraction of the cost of

legal machineguns.

21.  To provide additional information, from January of 2021 through July 25, 2024, the ATF

Firearms and Ammunition Technology Division has conducted approximately eighty criminal

examinations of the devices at issue in this case as a part of criminal cases. A total of 143

devices have been classified as a part of these cases.

22.  The FRT-15, WOT, and other self-described "forced reset trigger" devices continue to be

recovered by ATF in connection with criminal investigations after issuance of the court's

preliminary injunction.  These have included investigations into the illicit distribution of

narcotics, firearms trafficking, the possession of firearms by prohibited individuals, and the distribution of firearms to such individuals.  As discussed in the declaration of Craig Saier, the recovery of these devices by law enforcement is likely underreported because law enforcement may not be cognizant of their installation in a recovered firearm, and because their recovery would not ordinarily be captured during the firearms tracing process.  Saier Decl. para. 33.

23.    Further, while Plaintiffs' suit specifically identifies the FRT-15 and WOT as the devices at issue, the industry term "forced reset trigger" or "FRT" is broadly used in the Order. This may create confusion among industry members and the public.  For instance, there are self-described "forced reset triggers" that operate on different mechanical principles than the FRT-15 and WOT and can be 3D printed at home.  The expansion of 3D printing to these types of devices creates significant public safety concerns.  ATF is aware of websites that provide 3D printing downloads to print devices described or advertised as "forced reset triggers" which would make these devices available to any member of the public with a 3D printer.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 1, 2024.

By: _____
      Matthew P. Varisco
      Assistant Director, OFO