**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| | ) | Case No. 4:23-cv-00830-O |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| MERRICK GARLAND, | ) | |
| IN HIS OFFICIAL CAPACITY AS | ) | |
| ATTORNEY GENERAL | ) | |
| OF THE UNITED STATES, ET AL, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STAY JUDGMENT PENDING APPEAL

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................ 1

LEGAL STANDARD....................................................................................................... 2

ARGUMENT .................................................................................................................... 2

    I.    FRTs Are Not Machineguns ................................................................................ 3

    II.    Defendants Can Easily Comply with the Prospective Injunctive Relief ............ 7

        a.    Compliance with the Order to Return Devices to the Parties Within 30 Days is
Feasible .................................................................................................................... 8

        b.    Sending Remedial Notices Is Neither Overbroad Nor Does It Create a Risk of
Substantial Confusion............................................................................................. 12

        c.    The Court's Relief is Not Overbroad with Respect to Prospective Criminal
Prosecutions............................................................................................................ 13

    III.    There is No Irreparable Harm to Defendants Nor Does the Public Interest Favor A
Stay ........................................................................................................................ 15

    IV.    Plaintiffs Will Be Harmed By Any Stay.................................................... 20

    V.    Conclusion .................................................................................................... 20

i

## TABLE OF AUTHORITIES

**Cases**

*Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157 (1943) ............................................. 15

*Freedom from Religion Foundation, Inc. v. Mack*, 4 F.4th 306 (5th Cir. 2021) ......................... 19

*Garland v. Cargill*, 602 U.S. 406 (2024) ................................................................. 1, 3, 4, 5, 6, 7

*Gill v. Whitford*, 585 U.S. 48 (2018) ........................................................................................ 8

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) .......................................................... 8

*National Association for Gun Rights v. Garland*, No. 23-11138
   (5th Cir. Nov. 30, 2023) ................................................................................... 2, 3, 7, 16

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................ 2, 3

*Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362 (5th Cir. 2023) ..................................... 2

*Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177 (3d Cir. 2006), *as amended* (May 16, 2006) . 13

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) .................................................................... 7

*United States v. Rare Breed Triggers, LLC*, 690 F.Supp.3d 51 (E.D.N.Y. 2023) ....................... 11

**Statutes**

5 U.S.C. § 702 ................................................................................................................ 14

5 U.S.C. § 703 ................................................................................................................ 14

**Other Authorities**

Brief for Petitioners, *Garland v. Cargill*, 602 U.S. 406 (2024) (No. 22-976), 2023 WL 8836097 7

## INTRODUCTION

Defendants continue to deny the fundamental fact of this case: forced reset triggers ("FRTs") do *not* meet the statutory definition and are *not* machineguns.

Because Defendants refuse to accept this basic fact, they continue to trot out the same tired and failed arguments. Indeed, Defendants' Motion to Stay Judgment Pending Appeal (ECF No. 104) and Memorandum in Support thereof (ECF No. 105) ("Motion") are nothing more than a rehash of the same arguments they have already made six times: (1) in their opposition to Plaintiff's Motion for Temporary Restraining Order, (2) in their opposition to Plaintiff's Motion for Preliminary Injunction, (3) in their Motion to Stay the Preliminary Injunction, (4) in their Emergency Appeal of the Motion to Stay the Preliminary Injunction, (5) in their Motion for Summary Judgment, and (6) in their Opposition to Plaintiff's Motion for Summary Judgment. This Court has already rejected these arguments five times, and the Fifth Circuit has rejected them once. Nothing that has happened since has strengthened those arguments; they have only grown weaker following the Supreme Court's decision in *Garland v. Cargill*, 602 U.S. 406 (2024).

Defendants are *still* unlikely to succeed on the merits of their position. Rather, *Cargill* only underscores that this Court applied the appropriate legal standard in holding that FRTs are not machineguns. The balance of harms *still* favors protecting Plaintiffs from being arrested and prosecuted pursuant to an illegal enforcement theory, particularly when Defendants *still* cannot articulate any specific harm associated with FRTs as distinct from firearm ownership generally. And there is *still* no public interest in enforcing an illegal interpretation of law.

Defendants' Motion must fail.

1

## LEGAL STANDARD

As the Fifth Circuit recently reiterated, "[a] stay pending appeal is 'extraordinary relief' for which defendants bear a 'heavy burden.'" *National Association for Gun Rights v. Garland*, No. 23-11138 at *3 (5th Cir. Nov. 30, 2023) (unpublished order) (quoting *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023)). "A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular case." *Id.* (quoting *Plaquemines Parish*, 84 F.4th at 373); *see also Nken v. Holder*, 556 U.S. 418, 433 (2009) (same). "In considering whether to exercise its discretion, a court must consider four factors[:] . . . '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Plaquemines Parish*, 84 F.4th at 373 (quoting *Nken*, 556 U.S. at 434). Of these, "[t]he first two factors . . . are the most critical." *Nken*, 556 U.S. at 434.

## ARGUMENT

Defendants do not and cannot satisfy their "heavy burden." This Court has ruled against Defendants on all four *Nken* factors five times already. Defendants' arguments have only become weaker now that the Supreme Court has ruled in *Cargill*, affirming the judgment of the Fifth Circuit plurality, and this Court has ruled that Plaintiffs *have* succeeded on the merits.

Contrary to Defendants' contention, they are not likely to succeed on the merits. FRTs are not machineguns under the law Congress has written and the Supreme Court has interpreted.

Contrary to their protestations, Defendants are eminently capable of complying with the Court's injunctive relief. The supposed difficulties Defendants claim to be encountering are

entirely the result of their own willful refusal to accept the judgment of the Court that FRTs are not machineguns and their obstinate foot-dragging as they fail to do even the absolute bare minimum to satisfy the terms of the injunction.

Defendants fare no better in claiming irreparable harm or a public interest in a stay. This Court has already evaluated the substance of Defendants' claims several times and found them lacking. Defendants will not be irreparably harmed by the injunction.

By contrast, Plaintiffs would be injured by a stay. Defendants' Motion makes clear that they fully intend to pursue "recovery" and "enforcement" actions against anyone they believe is not covered by this Court's injunction, notwithstanding this Court's declaration that FRTs are not machineguns and vacatur of Defendants' unlawful classifications. Given this contemptuous enforcement posture, any stay would once again expose Plaintiffs and those who associate with them to uncertainty and potential enforcement actions as Defendants continue to refuse to accept their defeat on the merits of this case.

This Court can and should deny Defendants' Motion.

## I.    FRTs Are Not Machineguns

Likely success on the merits is one of the "most critical" factors in assessing a motion to stay. *National Association for Gun Rights*, No. 23-11138 at *6 (quoting *Nken*, 556 U.S. at 434). Defendants lost on the merits of this case and present no strong argument that the Court erred. Rather, contrary to Defendants' argument, *Cargill confirms*—not refutes—this Court's holding that FRTs are not machineguns.

*Cargill* is clear: it is the physical movement of the trigger that matters, not the movement of the trigger finger, or pull of the trigger. *Cargill*, 602 U.S. at 422. *Cargill* found "the phrase 'function of the trigger' . . . refers to the mode of action by which the trigger activates the firing

mechanism," which, on weapons with a curved metal lever as a trigger, "means the physical trigger movement required to shoot the firearm." *Id.* at 416. The statute "does not define a machinegun based on what type of human input engages the trigger—whether it be a pull, bump, or something else[,] [n]or does it define a machinegun based on whether a shooter has assistance in engaging the trigger." *Id.* at 422. Thus, in a semi-automatic weapon, "[f]or each shot, the shooter must engage the trigger to allow it to reset. Any additional shot fired after one cycle is the result of a separate and distinct 'function of the trigger.'" *Id.* at 421.

This Court found four facts—and each was undisputed in the record:

- For each and every round fired, the trigger on a weapon equipped with an FRT moves forward into its reset state and is depressed to release the hammer from its sear surface. ECF 100 at 41-42.

- The trigger in a firearm equipped with a FRT must reset after every round that is fired. *Id*.

- If all a shooter does is initially pull the trigger, a firearm equipped with an FRT will only fire one shot. *Id*.

- If the shooter attempts to overcome the reset and holds the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction. *Id*.

These facts track *Cargill*'s reasoning. For each shot, the trigger itself must move. For each shot, the trigger must reset. It does not move back and forth on its own. The shooter must engage with the trigger. If the shooter takes their finger off the trigger, the gun will not fire. If the shooter holds the trigger in its most rearward position, the gun will malfunction and will not fire.

Like a bump stock, an FRT does not transform a semi-automatic gun into a machinegun. It "merely reduces the amount of time that elapses between separate 'functions' of the trigger." *Cargill*, 602 U.S. at 421. As with a bump stock, "[a] shooter must also actively maintain just the

4

right amount" of pressure on the trigger: too much pressure, the gun will malfunction, too little, it will not fire a second shot. *See id.* at 424.

Defendants focus on the term "engage" and hope this Court will not notice they have created a new definition of this word from whole cloth. Motion at 11-12. Rather than accept the ineluctable consequences of *Cargill*, Defendants seek to reintroduce "pull" of the trigger through the back door by effectively redefining "engage" to mean a conscious pull. But their use of the term "engage" is inconsistent with *Cargill*. *Cargill* states that the shooter "engages the trigger by moving it backwards." (with reference to the lower arrow in Fig. 2).



*Cargill*, 602 U.S. at 418. In other words, as used in *Cargill*, to "engage" the trigger is to actuate it. It is not synonymous with a conscious pull of the trigger.

Nor could it be. *Cargill* acknowledges that "a shooter manually bump firing a semiautomatic rifle can achieve continuous fire by holding his trigger finger stationary and maintaining forward pressure with his nontrigger hand." *Id.* at 423. It does not matter that the trigger finger does not move. It does not matter that the pressure from the nontrigger hand—the force that actuates the trigger each time–is "maintained." Under *Cargill,* a firearm with a bumpstock is not a machinegun because the *trigger* still moves forward and backward for each and every shot, resetting in between. It is undisputed that this is how weapons equipped with FRTs work as well.

Again disregarding *Cargill*, Defendants also seek to smuggle back in their discredited argument that the "function of the trigger" is to initiate a "firing sequence" by redefining "firing cycle" as synonymous with "firing sequence."

Defendants claim with respect to FRTs that "while this Court defined function of the trigger as only the first step in the firing cycle . . . the Supreme Court instead considered the initiation of the entire firing cycle as the 'function of the trigger,'" and "[w]ith a firearm equipped with an FRT-15 or WOT . . . the trigger need only activate the firing mechanism one time to initiate a firing cycle in which the weapon will continue to fire automatically until the trigger is disengaged[.]" Motion at 12-13. This is nothing more than definitional three-card monte, with Defendants seeking to substitute "firing cycle" for their explicitly rejected argument that "function of the trigger" means initiating a "firing sequence."

"Firing cycle" is a well-understood term. As described in *Cargill*:

When the shooter engages the trigger by moving it backward . . . the square point of the trigger pivots downward and out of the notch securing the hammer. [] This movement releases the spring-loaded hammer, allowing it to swing forward. [] At the top of the hammer's rotation, it strikes the firing pin, causing the weapon to fire a single shot. [] The firearm then ejects the spent cartridge from the chamber and loads a new one in its place. . . . The mechanism that performs this task swings the hammer backward at the same time. [] As the hammer swings backward, it latches onto the disconnector. . . . This latching . . . prevents the hammer from swinging forward again after a new cartridge is loaded into the chamber. [] The disconnector will hold the hammer in that position for as long as the shooter holds the trigger back, thus preventing the firearm from firing another shot.[] [] Finally, when the shooter takes pressure off the trigger and allows it to move forward . . . , the hammer slips off the disconnector just as the square point of the trigger rises into the notch on the hammer . . . . The trigger mechanism is thereby reset to the original position . . . . A semiautomatic rifle must complete this cycle for each shot fired.[]

*Cargill*, 602 U.S. at 418-421 (citations and footnotes omitted). This is not how Defendants use the term in their Motion. Instead, they appear to view the "firing cycle" as a continuous action on the part of the shooter, regardless of whether the trigger moves or resets in between each shot.

6

This is the same argument the government presented under the label "firing sequence" in *Cargill*. For example, the government argued "A bump stock allows a shooter to initiate a multi-shot bump-firing sequence with a single motion: either pulling the trigger or sliding the rifle forward in order to press the trigger against the stationary trigger finger. Once that bump-firing sequence begins, the weapon continues to shoot hundreds of rounds per minute without further manipulation of the trigger by the shooter." Brief for Petitioners at 15, *Garland v. Cargill*, 602 U.S. 406 (2024) (No. 22-976), 2023 WL 8836097, at *15.

*Cargill* explicitly and emphatically rejected this argument, stating "Congress did not write a statutory definition of 'machinegun' keyed to when a firing sequence begins and ends." *Cargill*, 602 U.S. at 423. Indeed, the Court held that ATF's argument "resists the natural implication of its reasoning, insisting that the bumping motion is a 'function of the trigger' only when it initiates, but not when it continues, a firing sequence." *Id*. The same may be said of the ATF's position in this case: it treats a shooter's rearward pressure on the trigger as a "function of the trigger" for the first shot but disregards it for each additional shot. This is not a "firing cycle." It is the same "firing sequence" argument the government made—and the Supreme Court rejected—in *Cargill*.

As the Fifth Circuit found when this case was at the preliminary injunction stage, "Defendants' 'case on the merits is sufficiently weak to justify denying a stay on that basis alone.'" *National Association for Gun Rights*, No. 23-11138 at *6 (quoting *Texas v. United States*, 40 F.4th 205, 215 (5th Cir. 2022) (per curiam)). As it was then, so it is now. But even more so in the wake of *Cargill* and this Court's summary judgment decision, Defendants' Motion must fail.

## II.    Defendants Can Easily Comply with the Prospective Injunctive Relief

Defendants can easily comply with all of the prospective injunctive provisions: simply stop attempting to enforce their illegal classification of FRTs, including through sending false warning

notices. Indeed, this appears to be the outcome the Court anticipated when it vacated Defendants' *ultra vires* classification decisions. *See* ECF 100 at 58 ("Vacatur of the ATF's unlawful action—classification of FRTs as machineguns—should prevent [improper contact with a member of an Organizational Plaintiff]."). Thus, contrary to Defendant's framing, there is no question they can "feasibly comply with the prospective injunctive relief." Motion at 8.

What Defendants have difficulty doing is finding ways to evade this Court's order by narrowing its scope to the smallest group of people possible. This is a consequence of Defendants' own choices, not the Court's order. Far from meeting their "heavy burden" to justify the "extraordinary relief" of a stay pending appeal, Defendants have reaffirmed that the injunction is indispensable.

### a. Compliance with the Order to Return Devices to the Parties Within 30 Days is Feasible

Defendants' concerns with returning FRTs to Plaintiffs and their members is a problem of Defendants' own making. This Court determined that FRTs *are not illegal* under the statute. *See* ECF 100 at 54 ("the Court DECLARES unlawful the ATF's determination that FRTs are 'machineguns."); *see also supra* at 3. Accordingly, Defendants do not have—and have never had—a valid basis to confiscate or seize *any* FRT from any American based on their *ultra vires* claim that FRTs are machineguns. Under the logic of the Court's opinion, *all* of Defendants' seizures were illegal, and Defendants should return *all* of them.

Because an "injunction 'should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs[,]" ECF 100 at 55 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994), the Court's mandate to return FRTs is limited to the parties before the Court. This mandate is necessary to "redress the plaintiff[s'] particular injury." ECF 100 at 55 (quoting *Gill v. Whitford*, 585 U.S. 48, 73 (2018)). Plaintiffs were deprived of their

property under color of an illegal interpretation. Their property must be returned if they are to be made whole. Moreover, given that Plaintiffs have already met their burden in this case by showing that FRTs are *not* illegal, Defendants should not be permitted to shift the burden to Plaintiffs to prove to Defendants' satisfaction that they are entitled to have their property returned. It should never have been taken in the first place.

Of course, just like any other legal object, Defendants could and can still seize FRTs when they are used in another crime. By analogy, baseball bats are legal. If a baseball bat is used in a crime, it may be seized as evidence. What cannot happen, and what has effectively happened in this case, is Defendants cannot walk into the Texas Rangers locker room or a little league dugout and abscond with all of the bats on threat of federal prosecution and then, after the owners win relief from this Court, require them to jump through further hoops to get their illegally seized property returned. Notwithstanding Defendants' feigned ignorance, the Varisco Declaration plainly recognizes this distinction, referring to "FRT-15s and WOTs that were seized pursuant to search warrants or judicial process as part of an investigation into other criminal conduct" as "collateral seizures." Varisco Declaration at ¶¶ 6-7.

The problem is not that Defendants *can't* comply with the Court's order. It is that they do not want to. To the extent Defendants are having issues complying with this mandate, it is only because they are seeking to give it the narrowest possible effect. To wit, Defendants claim that "ATF does not know the identities of the Organizational Plaintiffs' claimed members . . . let alone which of those members is entitled to return of their FRT devices." Motion at 6. While Defendants are only *required* to return FRTs to certain individuals, there is nothing preventing them from being overinclusive. Thus, the problem is not that Defendants *can't* comply with the Court's mandate, it is that they are claiming trouble doing the bare minimum and *only* the bare minimum.

9

This is entirely a problem of Defendants' own making.

Even if it were not, Plaintiffs have proposed a practical solution to Defendants' concerns. On July 26, Plaintiffs suggested that Defendants provide Plaintiffs with a list of from whom they have confiscated or seized FRTs or FRT components. *See* Pls.' App. at 2–3. In general, this information is already made public through seizure notices. *See* Pls.' App. at 5–232. Moreover, it is unlikely to compromise existing investigations, given that individuals presumably know that Defendants showed up at their homes or businesses and took their property. Nevertheless, Defendants rejected this reasonable proposal, claiming "disclosure of this information could compromise ongoing investigations and/or implicate the restrictions in the Privacy Act, 5 U.S.C. § 552a." *See* Pls.' App. at 2. Tellingly, when Plaintiffs' counsel demonstrated that these proffered excuses made no sense, Defendants neither responded nor included Plaintiffs' counsel's response with their filing. *See* Pls.' App. 1.  Instead, they conjure up a host of new supposed problems that they never raised during the meet-and-confer process. For that reason alone, this Court should disregard them.

Even if this Court considers these new issues, however, it should reject them. Defendants claim it is difficult to return FRTs within 30 days because they seized so many of them (11,884) and scattered them around the country. Motion at 7. This cannot be squared with Defendants' prior representations to this Court that Plaintiffs did not have a real fear of enforcement actions or that their enforcement actions were limited to a handful of manufacturers. *See* ECF 87 at 9-10. Defendants also claim it will be difficult for them to comply because they may have trouble locating "some portion of Plaintiffs' members." Motion at 7. These concerns are raised too soon and seek the wrong remedy.

They are raised too soon because, at this point, they are purely speculative. Defendants

have thrown up their hands rather than comply with the Court's order. Thus, they have no evidence that they will not be able to return the appropriate FRTs if they were to actually try. And there is reason to believe that they will be able to locate many of their owners. For example, Defendants managed to find addresses for suspected owners to send threatening notices and make house calls seeking to "retrieve" FRTs. There is no reason they cannot return their wrongfully collected property by exercising the same diligence.

They also seek the wrong remedy. To the extent that the 30-day deadline imposes practical difficulties on Defendants, they may move to modify the order. They did not. Instead, they argue that because it is hard to do in 30 days or less, they should be relieved from doing it *at all*. This is not correct.

Finally, in the Varisco Declaration (though not in their brief), Defendants claim "ATF and the Department of Justice would also need to assess whether any anticipated recipients are agents, officers, employees, or any other persons or entities in active concert or participation with the Rare Breed parties, and therefore subject to the injunction in the Eastern District of New York, and the carve out for the Rare Breed parties contemplated by the Court's order." Varisco Decl. at ¶ 14. This is a red herring that misreads the order of this Court and that of the Eastern District of New York. The Eastern District of New York did not order the seizure of the Rare Breed parties' triggers. Rather, it is a fraud action predicated on allegations that they misled commercial consumers. Consistent with this scope, the EDNY injunction only restricts the parties from "engaging in any *sales* of the FRT-15, the Wide-Open Trigger, forced reset triggers, and other machinegun conversion devices until and unless otherwise ordered by th[e] Court" and requires them to preserve business records. *See United States v. Rare Breed Triggers, LLC*, 690 F.Supp.3d 51, 123 (E.D.N.Y. 2023) (emphasis added). Nothing in the New York case prevents the Rare Breed

11

parties from *possessing* FRTs. Thus, Defendants can return unlawfully seized FRTs to the Rare Breed parties without impacting the New York injunction, as long as the Rare Breed parties do not sell them while the injunction remains in place. Yet again, Defendants are inventing imaginary issues to avoid the consequences of their own illegal actions.

Defendants' issues with the Court's return order are just a byproduct of their intransigence. They are self-created problems that fall well short of meeting Defendants' "heavy burden" justifying "extraordinary relief." To the extent there are any actual practical challenges, Defendants should seek to modify the deadlines in this Court's Order as appropriate, rather than seeking to deny Plaintiffs' full relief from Defendants' illegal conduct.

### b. Sending Remedial Notices Is Neither Overbroad Nor Does It Create a Risk of Substantial Confusion

Defendants are entirely responsible for the purported "confusion" alleged to be caused by remedial notices. Defendants sent out thousands of threatening notices claiming FRTs were machineguns. This Court (correctly) concluded they are not. Thus, Defendants' action was unlawful. If a private party had botched the law as badly as Defendants and sent notices to consumers, they would likely find themselves in the crosshairs for mail or wire fraud.[1] The least Defendants can (and must) do is correct their own error.

In this context, Defendants' concern about compliance with state law is misplaced. Defendants' initial incorrect notices focused on *federal* law. Presumably, remedial notices would also focus on *federal* law.

Defendants engaged in a widespread campaign of misinformation to discourage American citizens from exercising their constitutional right to bear arms in a manner Defendants do not like.

---

[1] Indeed, this is the crux of the allegations against the Rare Breed parties in New York: that they allegedly did not properly warn consumers that Defendants could (unlawfully) consider FRTs to be machineguns.

No statute or congressional directive required the ATF to undertake its direct notification campaign. It was undertaken to chill legal behavior by discouraging possession, sale, or manufacture of FRTs under the false pretense that they were illegal machineguns. Thus, requiring corrective notification *to the same recipients* of the ATF's targeted mailing campaign in the same manner is appropriate and is neither overly broad nor does it create an undue risk of confusion.

### c. The Court's Relief is Not Overbroad with Respect to Prospective Criminal Prosecutions

Defendants rehash the same arguments regarding criminal prosecutions that were raised at the temporary restraining order stage, the preliminary injunction stage, and summary judgment stage of this case. They were all rejected by this Court four times. *See* ECF 36 at 9-12; ECF 53 at 17-20; ECF 73 at 8-9; ECF 100 at 23-28. They were also rejected by the Fifth Circuit, which concluded "Defendants' other arguments, including that pre-enforcement judicial review violates separation of powers, are also unpersuasive, as the district court already explained." *National Association for Gun Rights*, No. 23-11138 at *7. Nothing has changed. This Court should once again reject Defendants' contentions.

Yet again, Defendants claim that pre-enforcement injunction of criminal proceedings can only apply to "constitutional rights." Motion at 14. This Court directly addressed this precise argument. At summary judgment, it found "Defendants offer little support for this bold proposition." ECF 100 at 24. They offer nothing more now. They rely on the same case, *Stolt-Neilsen, S.A. v. United States*, 442 F.3d 177 (3d Cir. 2006), *as amended* (May 16, 2006), that this Court examined in its summary judgment opinion. This Court rejected Defendants' argument, holding that *Stolt-Neilsen* involved "a fundamentally individualized determination rather than a review of a generally applicable administrative action. And this distinction is key. The stakes for Plaintiffs are of a comparative gravity to situations in which constitutional rights are violated:

13

unlawful executive action that lead[s] to the deprivation of a liberty interest." ECF 100 at 25.

To be sure, Defendants claim that the court failed to "explain how the 'liberty interest' at issue is any different from that at play any time a criminal prosecution is threatened based on a purportedly erroneous interpretation of a statute." Motion at 14. This attempt to shift the burden to the Court fails on its own merits. Defendants bear the "heavy burden" of showing why they are likely to succeed. They cannot simply accuse the Court of not explaining its ruling to their satisfaction. And on this point, Defendants fall well short. Defendants' focus misses the point. As this Court has stated twice, the "key distinction" is that *Stolt-Nielsen* involved a "fundamentally individualized determination" while this case concerns "a generally applicable administrative action." ECF 100 at 25; ECF 53 at 17. Defendants do not and cannot address this "key distinction." Nor do they explain why this Court would be bound by an opinion of the Third Circuit, even if it were an apposite one.

Finally, Defendants yet again claim that the Administrative Procedure Act does not permit this Court to enjoin criminal prosecutions. But again, Defendants have raised this argument before. And, yet again, this Court has rejected it four times now. *See* ECF 36 at 10; ECF 53 at 17-20; ECF 73 at 8-9; ECF 100 at 25-28. The text of the APA "refers to 'mandatory or injunctive decree[s]' issued thereunder," which "makes clear that '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action' is 'entitled to judicial review thereof,'" and "expressly provides that criminal proceedings are *included* in such review." ECF 100 at 26; *see also* 5 U.S.C. §§ 702, 703.

At summary judgment, this Court found Defendants' "bold statement lacks any direct support" and "runs counter to the text of the APA itself." ECF 100 at 26. Defendants' cursory paragraph adds nothing to their argument. Indeed, the *only* case cited by Defendants, *Douglas v.*

*City of Jeannette (Pennsylvania)*, 319 U.S. 157 (1943), not only does not analyze the scope of the Administrative Procedure Act, but it also was decided three years before the APA was even passed.

Defendants bear a "heavy burden" to show a "strong" likelihood of success. This Court has heard and rejected Defendants arguments—many of them repeatedly. Nothing has changed. Defendants were wrong then, and they are wrong now. Thus, they do not and cannot meet their burden for a stay pending appeal.

### III.   There is No Irreparable Harm to Defendants Nor Does the Public Interest Favor A Stay

Both this Court and the Fifth Circuit previously rejected Defendants' claims that they would be irreparably harmed. Again, nothing has changed. Defendants trot out the same arguments that were rightly rejected twice before. The third time is not and cannot be the charm.

Yet again, Defendants' claim of irreparable harm fails to grapple with the fundamental reality that, as this Court declared, FRTs are not illegal under the statute Congress wrote. For example, Defendants claim "[t]he *unlawful* manufacture, importation, and distribution of FRT-15 and WOT devices has been substantial" and refer to the market for FRTs as "illicit." Motion at 16 (emphasis added). But this process is *not* inherently unlawful or illicit; rather, it is "Defendants' determination that FRTs are 'machineguns'" and corresponding enforcement actions that are unlawful. ECF 100 at 62.

Defendants' other arguments are fatally infected with this same deficiency. Defendants claim that "[t]he Court's Order will make it nearly impossible to recover FRT-15s and WOTs acquired while the Order is in effect if ATF prevails in this litigation." Motion at 16. The Fifth Circuit rejected this argument at the preliminary injunction stage, stating "Defendants argue that they will suffer irreparable harm because the injunction will make it harder for them to seize FRTs—but this assumes (wrongly, in our view) that FRTs are illegal." *National Association for*

*Gun Rights*, No. 23-11138 at *6.

Likewise, this Court thoroughly rejected this same argument at the preliminary injunction stage, reasoning:

> Not only does this presume FRTs are illegal machineguns (meaning that this articulation of harm is tethered entirely to the merits), but this harm also does not rise to the level of irreparability. Should Defendants prevail on the merits, they would simply restart their retrieval efforts anew. There is nothing in the record actually showing that Defendants will be completely unable to later contact individuals suspected of transferring or selling FRTs during the [] injunction and trace the movement of those FRTs based on that information. All Defendants have shown is that these retrieval efforts will be more challenging.[] When paired with the Court's determination that such confiscation of law-abiding citizens' FRTs is likely unlawful, this plea that the injunction interferes with Defendants' ability to seize FRTs merits no sympathy.

ECF 73 at 6-7. It still does not. Indeed, the portions of the Varisco Declaration cited by Defendants for this point largely refer to the Saier Declaration, which was the very same document the Court previously found unconvincing. *See* Varisco Declaration ¶¶ 20, 22 (citing the Saier Declaration); *see also* Motion at 17 (citing Saier Declaration). To the extent that Defendants add anything new, it is a speculative reference to 3D printing. *See* Varisco Declaration ¶ 23. Neither the change in declarants nor speculation about 3D printing are close to enough to establish irreparable harm, particularly in light of the Court's ruling on the merits.

Next, Defendants claim that some of the people who acquire FRTs following this Court's Order "will be prohibited persons or otherwise not covered by the Order's injunctive relief. But . . . ATF will have limited capability to interdict the acquisitions." Motion at 17.

First and foremost, this completely misunderstands the legal status of FRTs. Under the Court's Order, FRTs are legal, regardless of whether someone is "covered by the Order's injunctive relief." Yet again, Defendants are plainly stating an intent to ignore the Court's declaratory ruling and vacatur to continue their unlawful crusade against law abiding gun owners.

This again highlights the importance of injunctive relief in this case—Defendants are clearly not deterred or persuaded by their loss on the merits.

Second, this Court already addressed Defendants' concerns regarding prohibited persons in its order denying a stay of the preliminary injunction. The Court stated: "[T]he Court is not persuaded that Defendants should be allowed to restrict the rights of law-abiding citizens simply because some criminal somewhere might break the law. The Court cannot grant the extraordinary remedy of a stay pending appeal based on what a prohibited person *might* do." ECF 73 at 7 (emphasis in original). It still cannot. And ought not.

The Court went on to observe "[e]ven more fundamental is the fact that FRTs only work with a preexisting firearm, which, by definition, prohibited persons cannot legally possess. If Defendants are concerned with prohibited persons acquiring FRTs, they already possess the authority to arrest that person now, with or without the preliminary injunction." *Id*. This was true then, and it remains true now. *Prohibited persons* are still prohibited from possessing firearms, regardless of whether or not they have an FRT. Defendants' ability to prevent prohibited persons from acquiring firearms is completely independent of the legal status of FRTs.

Defendants claim "[i]t cannot be disputed that firearms equipped with devices like the FRT-15 and WOT are extremely dangerous" because "[a]n AR-type firearm equipped with an FRT-15 can fire at a rate comparable to an M16 machinegun—roughly 800 to 900 rounds per minute, irrespective of the shooter's skill—and often in an indiscriminate and uncontrolled fashion." Motion at 15.

First, the statement that it "cannot be disputed" that these firearms are "extremely dangerous" is a knowing falsehood. As Plaintiffs said in their response to Defendants' Motion to Stay the preliminary injunction, "Contrary to Defendants' arrogant assertion, it *can be* and *is*

disputed whether firearms equipped with FRTs are more dangerous than any other firearm. Moreover, Defendants' argument is fundamentally a *non sequitur*. If they believe FRTs are uniquely dangerous and should be banned, they (or their supporters) can lobby Congress to pass a law banning them. They cannot arrogate that legislative power to themselves in the absence of statutory authority." ECF 69 at 7 n.2.

Second, as this Court previously found, the fact that the "FRT's rate of fire is similar to how quickly a machinegun fires" is "irrelevant to any consideration of the potential harm posed" because "the statutory definition of machinegun—as emphasized by *Cargill*—does not define a machinegun based on this attribute." ECF 73 at 11. "Rate of fire may be Defendants' *preferred* way of defining machineguns. But until Congress changes the statutory definition, any contentions regarding rate of fire have no bearing on the Court's analysis." *Id*. at 12.

Next, Defendants claim "[w]hile crimes involving these types of FRTs are likely underreported, ATF has encountered these devices in numerous criminal settings." Motion at 15. Defendants made this same argument in response to the Court's preliminary injunction order. This Court found that "this is not a causal argument. Nor is it evidence that FRTs are uniquely dangerous or more likely to be involved in criminal activity than any other firearm or firearm accessory." ECF 73 at 10. These causal deficiencies "become even more apparent when Defendants admit that their 'criminal enforcement proceedings pertaining to FRT-15s and WOTs have mainly targeted those individuals charged with multiple other gun-related felonies'" because "'if the only targets of Defendants' enforcement actions are against those who violate other gun laws, then the prohibition on FRTs does nothing to protect the public.'[] And it follows, then, 'that FRT ownership is neither a necessary nor sufficient condition for protecting public safety.'" ECF 73 at 10-11 (quoting ECF 53 at 39).

Finally, Defendants add a new argument: "[b]ecause [FRTs] look like normal triggers, individuals and law enforcement may unknowingly acquire or recover a firearm that has an FRT-15 or WOT type device installed, presenting safety concerns to users who may not expect or be able to handle a weapon with a rapid rate of automatic fire." Motion at 15-16. First, as with Defendants' other arguments, this statement begs the question by assuming FRTs enable "automatic" fire. As this Court found, they do not. Second, this contention is wholly speculative. It presumes that users—including trained law enforcement officers, such as ATF agents who claim to be firearms experts—will disregard basic firearms safety principles and hurt themselves or others by recklessly firing a weapon they have not examined and with which they are not familiar. Defendants present no evidence this has occurred, nor do they present evidence as to how or why such incidents would be attributable to the FRT, rather than the negligent user.

Defendants have put forth a weak showing of irreparable harm that both this Court and the Fifth Circuit already rejected at the preliminary injunction stage. Even if they had not, it would still not justify a stay of this Court's Order. As the Fifth Circuit has emphasized, "any injury to [the enjoined party] is outweighed by [a] strong likelihood of success on the merits" by plaintiffs. *Freedom from Religion Foundation, Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021). As demonstrated above, particularly in light of the *Cargill* decision, Plaintiffs—not Defendants— have a strong likelihood of success on the merits of any appeal of this case. That alone is sufficient to outweigh any harm to Defendants in this case.

Even if it were not, as this Court previously found, "[t]here is no evidence suggesting that FRTs in the hands of law-abiding citizens will disserve the public interest." ECF 73 at 11. Defendants have not met their "heavy burden." Accordingly, their Motion for Stay should be denied.

IV.     **Plaintiffs Will Be Harmed By Any Stay**

On the other side of the ledger, Plaintiffs will be harmed by any stay of this Court's Order. Plaintiffs prevailed on the merits and obtained both declaratory and injunctive relief. Nevertheless, Defendants have evidenced a clear intent to ignore this Court's declaratory ruling and vacatur.

The plain implication of Defendants' arguments concerning the difficulty of identifying the individuals protected by the injunction is that Defendants intend to ignore the Court's declaratory judgment and vacatur and continue their aggressive enforcement campaign against anyone who falls outside the scope of the Court's injunction. Defendants also repeatedly allude to inter-circuit non-acquiescence. *See, e.g.* Motion at 10 ("[FRTs] are, according to another federal court, likely machineguns. . . . Sending a remedial notice to individuals not protected by the Court's injunction or declaratory judgment, and who may reside in jurisdictions that will ultimately disagree with this Court's determination, could leave them with the misimpression that possessing, selling, or manufacturing FRT-15s and WOTs is without legal risk.").

Defendants are functionally telling this Court that they intend to disregard this Court's Order wherever they plausibly can, including by continuing their aggressive "recovery" efforts and formal enforcement proceedings. Thus, injunctive relief is absolutely necessary to provide full relief to Plaintiffs—including members of the organizational plaintiffs. Anything else reinstates the sword of Damocles of federal enforcement over the heads of all those currently protected by the Court's Order.

V.      **Conclusion**

For the foregoing reasons, Defendants' Motion for Stay of Judgment should be denied.

Date: August 7, 2024                          Respectfully submitted,

                                             /s/Gary M. Lawkowski
                                             Gary M. Lawkowski (VA Bar No. 82329)*
                                             Jonathan M. Shaw (VA Bar No. 98497)*
                                             David A. Warrington (VA Bar No. 72293)*
                                             DHILLON LAW GROUP, INC.
                                             2121 Eisenhower Avenue, Suite 608
                                             Alexandria, VA 22314
                                             Telephone: (703) 748-2266
                                             Facsimile: (415) 520-6593
                                             glawkowski@dhillonlaw.com
                                             jshaw@dhillonlaw.com
                                             dwarrington@dhillonlaw.com


                                             Whitney A. Davis (TX Bar No. 24084843)
                                             Julian E. Whitley
                                             EGGLESTON KING DAVIS, LLP
                                             102 Houston Avenue, Suite 300
                                             Weatherford, TX 76086
                                             Telephone: (703) 748-2266
                                             whit@ekdlaw.com
                                             jwhitley@bwwlaw.com


                                             Glenn Bellamy (OH Bar No. 0070321)*
                                             WOOD HERRON & EVANS LLP
                                             600 Vine Street, Suite 2800
                                             Cincinnati, OH 45202
                                             Telephone: 513-707-0243
                                             gbellamy@whe-law.com

                                             *Pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this action.

Date: August 7, 2024

By: /s/ Gary M. Lawkowski
Gary M. Lawkowski

22