## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| Plaintiffs, | ) | Case No. 4:23-cv-00830-O |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) ) | |
| Defendants. | ) ) | |

### DECLARATION OF EDGAR ACOSTA II

I, Edgar Acosta II, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2.     As a NAGR member, and after becoming aware of the Court's July 23, 2024, order granting summary judgment to Plaintiffs in this matter, I contacted ATF to retrieve the forced reset trigger ("FRT") the ATF confiscated from me. The ATF refused to return my FRT, as more specifically described below.

3.     I am a United States citizen who is legally permitted to own firearms.

4.     In or about March 2024, ATF visited my house to demand that I surrender my FRT, a wide open trigger ("WOT").

5.     Although I was not home at the time, I eventually spoke with the ATF agent Jeremy Schmidt and agreed to, and did, surrender the WOT.

6.     Following the entry of the Court's order on July 23, 2024, I emailed the ATF requesting the return of my WOT.

1

7.      The ATF refused, responded that it was "unaware" of this Court's final judgment, and that it would not return any FRTs until after the United States Supreme Court ruled. Attached as **Exhibit A** is a copy of the email communication with the ATF.

8.      I continue to seek the return of my WOT.


<u>**VERIFICATION**</u>

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 26, 2024

Edgar Acosta II

EXHIBIT A

**From: Schmidt, Jeremy P. (ATF)** <Jeremy.Schmidt@atf.gov>
Date: Wed, Jul 31, 2024, 11:30 AM
Subject: RE: [EXTERNAL] Regarding my wot
To: Edgar Acosta <eacosta668@gmail.com>

Mr. Acosta,

I am unaware of any Judgment stating the triggers are now reclassified by the United States Supreme Court.

Are you referring to the supplemental brief filed on July 12, 2024, in the 5th Circuit Court by the National Association for Gun Rights, Incorporated?

If so, this was a brief for an appeal, not a judgment.

If the Supreme Court rules in favor of returning the triggers, I will personally hand deliver them back to you.

At this time I am unable to return the items to you.

**Jeremy Schmidt**

**ATF Special Agent/CES**

**P.O. Box 1278**

**Bismarck, ND  58502**

**From:** Edgar Acosta <eacosta668@gmail.com>
**Sent:** Wednesday, July 31, 2024 7:27 AM
**To:** Schmidt, Jeremy P. (ATF) <Jeremy.Schmidt@atf.gov>
**Subject:** [EXTERNAL] Regarding my wot

Hello Jeremy this is Edgar from tioga I had surrendered my wot triggers to you several months ago I saw judgement came out in my favor and would like my items returned thank you

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:23-cv-00830-O |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF RYAN J. FLUGAUR

I, Ryan J. Flugaur, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2.      I am employed as the vice president of Plaintiff National Association for Gun Rights, Inc ("NAGR"). I am familiar with NAGR's records.

3.      I can confirm that the following persons and entity are members of NAGR:

  a.  Brian Trapp

  b.  Edgar Acosta II

  c.  Lawrence DeMonico

  d.  Chris Thompson

  e.  Rare Breed Firearms, LLC

5

## <u>VERIFICATION</u>

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 13, 2024

Ryan J. Flugaur

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | Case No. 4:23-cv-00830-O |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF CHRIS THOMPSON

I, Chris Thompson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.       I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2.       As a NAGR member, and after becoming aware of the Court's July 23, 2024, order granting summary judgment to Plaintiffs in this matter, I contacted ATF to retrieve the forced reset trigger ("FRT") the ATF confiscated from me. The ATF refused to return my FRT, as more specifically described below.

3.       I am a United States citizen who is legally permitted to own firearms.

4.       On or about February 22, 2023, ATF agent Sarah Choi visited my house to demand that I surrender my FRT, a Wide Open Trigger ("WOT"), which I did.

5.       On or around August 6, 2024, after the Court's July 23 order granting Plaintiffs summary judgment, I contacted ATF agent Sarah Choi requesting the return of my WOT.

6.       Agent Choi was unsure how to handle the request and told me that she would have someone else contact me.

7.      On August 20, 2024, I received a call from ATF agent Kevin Marsh. He requested proof of NAGR membership as a first step toward the return of my WOT.

8.      I provided proof of membership and, on August 23, 2024, spoke with agent Marsh again.

9.      Now agent Marsh told me my NAGR membership did not qualify under the Court's July 23, 2024, summary judgment order because I became a NAGR member in October 2023, after the Complaint in this matter was filed.

10.      Agent Marsh further told me I would not be receiving my WOT anytime soon, if at all.

11.      I later emailed agent Marsh requesting the return of my WOT. Agent Marsh responded that "it is anticipated that when returns are made[,] those who were members of the plaintiff organization at the time suit was filed will be first in line for returns," and that [t]here are no plans to adjust that schedule based on independent requests." Attached as **Exhibit A** is a copy of the email communication.

12.      I continue to seek the return of my WOT.

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September _13_ , 2024

Chris Thompson

8

EXHIBIT A

**From: Marsh, Kevin B. (ATF)** <Kevin.Marsh@atf.gov>
Date: Fri, Sep 13, 2024, 9:18 AM
Subject: RE: [EXTERNAL] Chris Thompson - Forced Reset Trigger (FRT) - NAGR Membership verification
To: Chris Thompson <g.chris.thompson@gmail.com>


I have nothing new to report since we last talked.  As I explained then, it is anticipated that when returns are made those who were members of the plaintiff organization at the time suit was filed will be first in line for returns.  There are no plans to adjust that schedule based on independent requests.



Kevin B. Marsh

Division Counsel

Detroit Field Division

Bureau of Alcohol, Tobacco, Firearms and Explosives

Cell: (313) 719-8557



This message, including any attachment(s), is/are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by replying to this message and destroy all copies of the original message.



**From:** Chris Thompson <g.chris.thompson@gmail.com>
**Sent:** Wednesday, September 11, 2024 3:36 PM
**To:** Marsh, Kevin B. (ATF) <Kevin.Marsh@atf.gov>
**Subject:** Re: [EXTERNAL] Chris Thompson - Forced Reset Trigger (FRT) - NAGR Membership verification


Kevin I've been in touch with NAGR and was advised to follow up again and request my trigger be returned. So, as a verifiable NAGR Member, this is my request - Please have my

trigger returned to me. Please respond by letting me know if this request will be granted or denied, thank you.

On Fri, Aug 23, 2024, 1:29 PM Chris Thompson <g.chris.thompson@gmail.com> wrote:

Hey Kevin, I wasn't a member prior to the date on the welcome letter.

On Fri, Aug 23, 2024, 12:19 PM Marsh, Kevin B. (ATF) <Kevin.Marsh@atf.gov> wrote:

Thank you for sending this. We have one more question for you, which is when your membership began. The letter you sent seems to suggest that you joined in November 2023. Would you please let me know if you were a member before that, and if so, could you please send me something that shows the date you joined? Thank you for your patience as we work through these issues.

Kevin

Kevin B. Marsh

Division Counsel

Detroit Field Division

Bureau of Alcohol, Tobacco, Firearms and Explosives

Cell: (313) 719-8557

This message, including any attachment(s), is/are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by replying to this message and destroy all copies of the original message.

EXHIBIT A

**From:** Chris Thompson <g.chris.thompson@gmail.com>
**Sent:** Wednesday, August 21, 2024 2:25 PM
**To:** Marsh, Kevin B. (ATF) <Kevin.Marsh@atf.gov>
**Subject:** [EXTERNAL] Chris Thompson - Forced Reset Trigger (FRT) - NAGR Membership verification


Kevin, attached is my welcome letter and membership card (front/back).


It looks like there was a development yesterday in which the ATF's request for motion for a Stay was denied, so it appears the agency is still compelled to return my trigger per my specific request per court order.


Please let me know the next steps, thank you! ~Chris

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| Plaintiffs, | ) | Case No. 4:23-cv-00830-O |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF BRIAN TRAPP

I, Brian Trapp, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2.      As a NAGR member, and after becoming aware of the Court's July 23, 2024, order granting summary judgment to Plaintiffs in this matter, I contacted ATF to retrieve the forced reset trigger ("FRT") the ATF confiscated from me. The ATF refused to return my FRT, as more specifically described below.

3.      I am a United States citizen who is legally permitted to own firearms.

4.      On or about August 17, 2021, ATF agent Lucas Keck visited my place of work to demand that I surrender my FRT. I surrendered it as I was told to do.

5.      Following the entry of the Court's order on July 23, 2024, I attempted to contact ATF agent Lucas Keck but was unable to do so.

6.      I thereafter called the Tulsa Oklahoma ATF Field Office to request the return of my FRT, but received no response.

7.    Following this Court's August 20, 2024, Order denying the ATF's request for a stay, I again contacted the ATF, this time speaking with ATF agent Ashley Stevens.

8.    Agent Stevens informed me that "per higher ups," the order requiring the ATF to return FRTs to members of the organizational Plaintiffs only applies in the Northern District of Texas. I am a resident of Oklahoma.

9.    The ATF did not request additional paperwork or verification from me, but instead simply refused to return my FRT

10.    I continue to seek the return of my FRT.

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September __12__, 2024

_____

Brian Trapp

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:23-cv-00830-O |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF LAWRENCE DEMONICO

I, Lawrence DeMonico, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2.      As the Court is aware, I am an NAGR member.

3.      I am the owner of Rare Breed Firearms, LLC ("RBF"), which is also an NAGR member, and which is located at 22503 West Highway 71, Spicewood, Texas 78669.

4.      By application dated March 1, 2024, on behalf of RBF, I applied for a federal firearms license ("FFL").

5.      On May 20, 2024, the ATF denied the FFL application. ATF gave three reasons, all of which were based on FRTs being machineguns. Attached as **Exhibit A** is a copy of the ATF's Notice to Deny Application for License.

6.      Within 15 days of the ATF's May 20 denial, I exercised my right to request a hearing, which was scheduled for September 18, 2024.

7.      After the hearing was scheduled, the Court issued its July 23, 2024, order granting Plaintiffs' summary judgment.

8.    After the Court's July 23, 2024, final order, through counsel on August 16, 2024, I submitted a request to the ATF to reconsider the FFL denial. Attached as **Exhibit B** is a copy of the August 16, 2024, supplemental filing seeking reconsideration. This request was made to save the time and resources that a hearing will require.

9.    Hearing no response from the ATF, through counsel on August 21, 2024, I followed up with ATF and directed ATF to the August 16 reconsideration request.

10.    Hearing no response from the ATF, through counsel on September 4, 2024, I followed up with ATF and directed ATF to the August 16 reconsideration request.

11.    ATF finally responded on September 6, 2024, stating that it had received the August 16, 2024, supplemental filing seeking reconsideration, and that the "administrative hearing in this matter will proceed as scheduled on September 18, 2024." Attached as **Exhibit C** is a copy of the reconsideration denial.

12.    Attached as **Exhibit D** is a copy of the transcript of the September 18, 2024, FFL Hearing.

13.    Attached as **Exhibit E** is a copy of the email communication between Darwin Boslaw and Adam Elggren (July 18 – Sep. 10, 2024), without attachment.

14.    Attached as **Exhibit F** is a copy of Seized Asset Claim Form (Oct. 11, 2023).

15.    Attached as **Exhibit G** is a copy of the DOJ's Claim Acknowledgement (Oct. 19, 2023).

16.    Attached as **Exhibit H** is a copy of Letter from Kevin C. Maxwell, Esq. to U.S. Department of Justice seeking return of seized assets (Sept. 17, 2024).

**<u>VERIFICATION</u>**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 26 2024

Lawrence DeMonico

15

Exhibit A

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Notice to Deny Application for License

---

☑ In the matter of application for license as a/an   Manufacturer of Firearms Other Than Destructive Devices _____, filed by:
or
☐ In the matter of application for renewal of license number _____ as a/an
_____, filed by:

Name and Address of Applicant *(Show number, street, city, State and ZIP Code)*

Rare Breed Firearms, LLC
22503 West Highway 71
Spicewood, Texas 78669

---

**Notice Is Hereby Given That:**

The application described above may be denied because the applicant does not qualify for licensing under the provisions of 18 U.S.C. § 923(d), as set forth in the pages attached and made a part of this form. Pursuant to 18 U.S.C. § 923(f)(2), you may file a request for a hearing to review the denial of your application. This request must be received, in duplicate, by the Director of Industry Operations (DIO), Bureau of Alcohol, Tobacco, Firearms and Explosives, located at   5825 North Sam Houston Parkway West, Suite 300, Houston, Texas 77086 _____, within 15 days of your receipt of this notice.

Where a timely request for hearing is made, and the application described above is for renewal of a currently valid license, you may continue to operate under your present license pending the outcome of the hearing. The hearing will be held as provided in 27 CFR Part 478.

If a timely request for a hearing is not received, the application shall be disapproved, and a copy so marked will be returned to the applicant.

☑ Please see included brochure

| Date | Name and Title of Bureau of Alcohol, Tobacco, Firearms and Explosives Official | Signature |
|------|------|------|
| 05/20/2024 | Tanarra James, Director, Industry Operations | *Tanarra James* |

I certify that on the date shown below I served this notice on the person identified below by:

☑ Certified mail to the address shown below.
Tracking Number:   7019 0160 0001 0722 8152 _____     **Or**

☐ Delivering a copy of the notice to the address shown below.

| Date Notice Served | Title of Person Serving Notice | Signature of Person Serving Notice |
|------|------|------|
| | Executive Assistant | |

Print Name and Title of Person Served | Signature of Person Served *(if applicable)*

Address Where Notice Served
15511 Highway 71 West, Suite 110-444, Bee Cave, Texas 78738

Rare Breed Firearms, LLC
5-74-453-07-PA-14130

ATF E-Form 5300.43 (4498)
Page 2

Pursuant to the provisions of 18 U.S.C. § 923(d) and 27 C.F.R. § 478.71, notice is hereby given that the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") intends to deny the Application for a Federal Firearms License submitted by Rare Breed Firearms, LLC, ("Applicant"). Specifically, the Director, Industry Operations, United States Department of Justice, ATF, Houston Field Division, has reason to believe Applicant does not meet the criteria for licensing set forth in the Gun Control Act of 1968, as amended, 18 U.S.C. Chapter 44, and the regulations issued thereunder, 27 C.F.R. Part 478 (collectively "GCA"), as described below.

In an Application for Federal Firearms License, ATF Form 7 (5310.12)/7CR (5310.16) dated March 1, 2024, received by ATF on March 15, 2024, Applicant applied for a Federal firearms license as a Manufacturer of Firearms Other than Destructive Devices. The Application listed Lawrence DeMonico as Applicant's President and sole Responsible Person.

Applicant and its President and sole responsible person, Lawrence DeMonico, willfully violated the provisions of the GCA and/or regulations listed thereunder, and therefore does not meet the criteria for licensing pursuant to 18 U.S.C. § 923(d)(1)(C) and 27 C.F.R. § 478.47(b)(3).

1.      Lawrence DeMonico, individually and with others, between on or about December 2020 and the present, possessed and/or transferred machineguns, specifically the Rare Breed Triggers FRT-15 ("FRT-15") and the Wide Open Trigger ("WOT") machinegun conversion device, in willful violation of 18 U.S.C. § 922(o).

2.      Lawrence DeMonico, between on or about April 15, 2023, and April 16, 2023, transported machineguns in interstate commerce, specifically the FRT-15, from Utah to New Mexico, without being a licensed importer, manufacturer, dealer, or collector, in willful violation of 18 U.S.C. § 922(a)(4).

3.      Applicant aided and abetted Rare Breed Triggers, LLC; Lawrence DeMonico; and others, to possess and/or transfer machineguns, specifically the FRT-15, in willful violation of 18 U.S.C. §§ 2 and 922(o).

See *United States v. Rare Breed Triggers*, LLC, 669 F.Supp.3d 169 (E.D.N.Y. 2023); *United States v. Rare Breed Triggers*, LLC, No. 23-CV-369 (NRM)(RML), 2023 U.S. Dist. LEXIS 156379, 2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023). Copies Attached.

## EXPLANATION OF THE HEARING PROCESS



The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has decided to deny your original or renewal application for a Federal firearms license, or to revoke, suspend and/or impose a civil fine on your existing license.

As stated on the enclosed Notice of Denial, Revocation, Suspension and/or Fine, you have the right to request a hearing. This brochure provides general guidance to assist you in making a decision on requesting a hearing, and to appropriately prepare for a hearing should you request one.

### Background
27 C.F.R. §§ 478.71 – 478.73

The Gun Control Act of 1968 (GCA) and its implementing regulations specify certain licensing requirements for those intending to engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition.

The GCA authorizes ATF to deny a license application when an inspection reveals the applicant is not qualified to receive or continue to hold the license. ATF may revoke a license when a licensee willfully violates the GCA or its implementing regulations.

For purposes of the regulatory provisions of the GCA, a "willful" violation occurs when the licensee knew of his or her legal obligations and either purposefully disregarded or was plainly indifferent to those requirements. ATF is not required to prove a licensee intended to violate the law.

Under limited circumstances, ATF may revoke or suspend a license and/or impose a civil fine against a licensee who knowingly violates certain provisions of the GCA.

### Hearing Request and Representation
27 C.F.R. §§ 478.74 and 478.76

You have the right to request a hearing. If you wish to do so, you must file a request, in writing, with the Director, Industry Operations (DIO) within 15 days after the receipt of the enclosed Notice.

An applicant or licensee may be represented at the hearing by an attorney, certified public accountant or other person recognized to practice before ATF as provided in 31 C.F.R. Part 8.

### Pre-Hearing Resolution
27 C.F.R. §§ 478.72 and 478.74

You may submit an offer to settle or other proposed resolution prior to the hearing. If you wish to present your offer in person, you must request to do so within the same 15 days as allotted for a hearing. A request for a pre-hearing resolution should be made in writing to the DIO. ATF is not obligated to grant requests for in-person meetings or proposals for resolution.

You may also submit offers of potential resolution to the DIO after the hearing, but before a final decision is rendered; however, the DIO will not entertain settlement offers at the hearing.

**1**

EXPLANATION OF THE HEARING PROCESS

## Hearing Overview
27 C.F.R. §§ 478.72, 478.74, 478.76, 478.77

Upon receipt of a timely request and after consultation with you, ATF will set the date, time and place of the hearing. You will then receive formal notification via certified mail, return receipt request. Please be advised that ATF may reschedule a hearing for good cause, as determined by the DIO.

The DIO will preside over the hearing. The purpose of the hearing is to allow both parties to present, in an orderly manner, all relevant evidence and arguments regarding the proposed licensing action.

The hearing itself is informal in nature which means that formal courtroom procedures, including sworn testimony and rules of evidence are not followed. During the hearing, you will have the opportunity to submit facts and arguments for review and consideration. An ATF-hired court reporter will be present to transcribe the hearing. The resulting transcript, along with the exhibits presented at the hearing, constitute the official record of the hearing. You may order a copy of the transcript at your own expense. Video recording of the hearing is not permitted.

An ATF attorney will present evidence in support of the licensing action. The ATF industry operations investigator(s) who conducted your inspection and/or other ATF employees who have relevant information concerning your case may testify.

At the conclusion of the government's presentation, you will have the opportunity to respond. You should state your case as clearly and factually as possible. Your presentation should focus on the violation(s) described in the Notice you received. You may also bring other witnesses who are able to speak to the violation(s) cited in the Notice. Both you and the government have

the right to question all witnesses. Please note that all persons attending the hearing must bring a valid form of state or federal government issued identification (e.g., driver's license or passport) for entry.

In addition to oral testimony, you may also present written documentation. Regardless of its form, all evidence presented at the hearing must be relevant. Relevant evidence is evidence that tends to prove or disprove an issue at the hearing, such as whether the alleged violation occurred as stated in the Notice.

*NOTE:* **It is a violation of law to possess or cause to be present a firearm or other dangerous weapon in a Federal facility. 18 U.S.C. § 930(a). Violation of this law will result in termination of hearing proceedings and a referral to law enforcement.**

## After the Hearing
27 C.F.R. §§ 478.72, 478.74, 478.78

Following completion of the hearing, the court reporter will prepare a transcript of the hearing. After reviewing the transcript and all evidence submitted at the hearing, the DIO will make the final licensing decision for ATF.

Should the DIO determine that the allegation(s) contained in the Notice are substantiated, he or she may issue a Final Notice of Denial, Revocation, Suspension and/or Fine of Firearms License, which ATF would send to you via certified mail, return receipt requested.

You may appeal the DIO's final decision to the appropriate Federal district court within 60 days for de novo judicial review.

If you have any questions concerning the hearing, please contact the DIO for the ATF division in which you are located.

2

U.S. v. RARE BREED TRIGGERS, LLC    **169**
Cite as 669 F.Supp.3d 169 (E.D.N.Y. 2023)

*See Novio v. New York Acad. of Art*, 286
F. Supp. 3d 566, 583 n.9 (S.D.N.Y. 2017)
(applying NYCHRL in the educational set-
ting). Under current NYCHRL caselaw,
Plaintiff need only show that she was
treated "less well" than other students on
account of her gender to show that she
was deprived of a public accommodation.
*See id.* at 583 ("Under [§ 8–107(4)(a)], a
plaintiff need not demonstrate that the
treatment was 'severe or pervasive' . . .
[but] need only show that she has been
treated 'less well' than other [students]
because of a protected characteristic.").
Arguably, the standard in place at the time
could have relied on the more restrictive
"severe or pervasive" test from federal
caselaw. *See Williams v. New York City
Hous. Auth.*, 61 A.D.3d 62, 872 N.Y.S.2d
27, 36-39 (1st Dep't 2009) (discussing the
prior "view of the City HRL as simply
mimicking its federal and State counter-
parts" in application of the federal "severe
or pervasive" test for actionable sexual
harassment; and adopting the "less well"
test for HRL liability). But this question is
academic for the purposes of this motion;
sexual assault by a teacher of a student
certainly constitutes "severe or pervasive"
treatment on account of gender. Accord-
ingly, there are disputed material facts
that preclude summary judgment.

## IV. CONCLUSION

For the foregoing reasons, NYC DOE's
motion for summary judgment is GRANT-
ED on Plaintiff's claims under NYSHRL;
accordingly, those claims are DIS-
MISSED. Plaintiff's claim against NYC
DOE for negligence for Defendant Walt-
zer's alleged sexual assault of Plaintiff is
DISMISSED based on the Court's prior
judgment. NYC DOE's motion for sum-
mary judgment on Plaintiff's claims under
NYC HRL is DENIED.

Trial will be held on Plaintiff's sexual
assault and IIED claims against Waltzer,
and on Plaintiff's NYCHRL claim against
Waltzer and NYC DOE.

**SO ORDERED.**



UNITED STATES of America,
Plaintiff,

v.

RARE BREED TRIGGERS, LLC; Rare
Breed Firearms, LLC; Lawrence De-
Monico; and Kevin Maxwell, Defen-
dants.

23-cv-369 (NRM) (RML)

United States District Court,
E.D. New York.

Signed April 18, 2023

**Background:** United States brought ac-
tion against trigger manufacturer, its affili-
ate, and their principals to enjoin mail and
wire fraud scheme concerning sale of trig-
ger allegedly used to convert legal rifles
into illegal machine guns. Defendants
moved to transfer venue.

**Holdings:** The District Court, Nina R.
Morrison, J., held that:

(1) defendants were subject to personal
jurisdiction in Western District of Tex-
as;

(2) Western District of Texas was proper
venue; but

(3) transfer of venue was not warranted.

Motion denied.

**170**           **669 FEDERAL SUPPLEMENT, 3d SERIES**

**1. Federal Courts ⟷2931**

In evaluating motion to transfer venue, court must determine whether action could have been brought in proposed transferee forum as original matter and, if so, whether transfer is appropriate. 28 U.S.C.A. § 1404(a).

**2. Federal Courts ⟷2905, 2906**

To determine whether transfer of venue is appropriate, court may consider host of equitable factors, including: (1) convenience of witnesses; (2) convenience of parties; (3) location of relevant documents and relative ease of access to sources of proof; (4) locus of operative facts; (5) availability of process to compel attendance of unwilling witnesses; (6) parties' relative means; (7) comparative familiarity of each district with governing law; (8) weight accorded to plaintiff's choice of forum; and (9) judicial economy and interests of justice. 28 U.S.C.A. § 1404(a).

**3. Federal Courts ⟷2906**

As general matter, plaintiff's choice of forum generally is entitled considerable weight in ruling on motion to transfer venue, particularly when plaintiff is resident of forum district, and should not be disturbed unless balance of several factors is strongly in defendant's favor. 28 U.S.C.A. § 1404(a).

**4. Injunction ⟷1504**

Trigger manufacturer, its affiliate, and their principals were subject to personal jurisdiction in Western District of Texas in United States' action to enjoin mail and wire fraud scheme concerning sale of trigger allegedly used to convert legal rifles into illegal machine guns; manufacturer operated out of Western District of Texas, and affiliate was Texas limited liability company that operated in Texas.

**5. Injunction ⟷1504**

Western District of Texas was proper venue for United States' action against trigger manufacturer, its affiliate, and their principals to enjoin mail and wire fraud scheme concerning sale of trigger allegedly used to convert legal rifles into illegal machine guns, where manufacturer operated out of Western District of Texas. 28 U.S.C.A. § 1391(b)(2).

**6. Injunction ⟷1504**

Statute authorizing United States to bring action to enjoin certain frauds "in any Federal court" confers venue in every district court in country. 18 U.S.C.A. § 1345.

**7. Constitutional Law ⟷3964**

Due process requires non-resident defendant to have minimum contacts with relevant sovereign before that sovereign can subject defendant to personal jurisdiction in its courts. U.S. Const. Amend. 14.

**8. Injunction ⟷1504**

Transfer of venue from Eastern District of New York to Western District of Texas was not warranted in United States' action against trigger manufacturer, its affiliate, and their principals to enjoin mail and wire fraud scheme concerning sale of trigger allegedly used to convert legal rifles into illegal machine guns, even though manufacturer operated out of Western District of Texas, and witnesses and documents were in Texas; witnesses for both sides would come from New York, Florida, Michigan, Texas, Utah, Virginia, and West Virginia, there was no indication that documents would be bulky or difficult to transfer electronically, there were no potential witnesses who would fall outside New York court's subpoena power, and defendants had brought suits in jurisdictions outside of Texas. 28 U.S.C.A. § 1404(a).

U.S. v. RARE BREED TRIGGERS, LLC    **171**
Cite as 669 F.Supp.3d 169 (E.D.N.Y. 2023)

**9. Federal Courts** ⟜2905

Access to documents and other proof is not persuasive factor in favor of transfer of venue without proof that documents are particularly bulky or difficult to transport, or proof that it is somehow greater imposition for defendant to bring its evidence to forum state than for plaintiff to bring its evidence to forum state. 28 U.S.C.A. § 1404(a).

**10. Federal Courts** ⟜2811

No litigant has right to have interpretation of one federal court rather than that of another determine his case.

———

Joseph Anthony Marutollo, Michael S. Blume, U.S. Attorney's Office, Brooklyn, NY, Paulina Stamatelos, DOJ-USAO, Brooklyn, NY, for Plaintiff.

Caleb Kruckenberg, Pro Hac Vice, Jonathan Morgan Houghton, Steve Simpson, Pro Hac Vice, Pacific Legal Foundation, Arlington, VA, for Defendants.

## MEMORANDUM & ORDER

NINA R. MORRISON, United States District Judge

Pending before the Court is Defendants' motion to transfer venue to the Western District of Texas. The Court has considered the parties' briefs on Defendants' motion to transfer, as well as, when relevant, the parties' briefs on Defendants' motion to dismiss for lack of personal jurisdiction and statements made at oral argument on that motion on March 17, 2023. For the reasons outlined herein, Defendants' motion to transfer this action to the Western District of Texas is DENIED.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Rare Breed Triggers LLC ("RBT") is a corporate entity which was formed in Florida in April 2020, re-incorporated in North Dakota, and currently operates out of Texas. ECF No. 23 at 1; ECF No. 23-1 ¶ 5; ECF No. 39 ¶¶ 3-11.[1] Defendant Lawrence DeMonico, who lives in Texas, serves as RBT's president, and Defendant Kevin Maxwell, who lives in Florida, is RBT's owner. ECF No. 23 at 1-2; ECF No. 23-1 ¶ 6; ECF No. 39 ¶¶ 1, 12. Defendant DeMonico is also the president of defendant Rare Breed Firearms ("RBF"). ECF No. 25-3 at 6.

RBT's flagship product is the FRT-15, a "forced reset trigger" that gun owners can install on AR-15-style rifles to replace the gun's original trigger. ECF No. 25-1 ¶¶ 4, 6. RBT also sells the Wide Open Trigger ("WOT"), a mechanism very similar to the FRT-15 which RBT acquired in a patent dispute against Big Daddy Enterprises, a company which formerly served as RBT's exclusive distributer of the FRT-15 and which launched the WOT in an apparent attempt to compete with its one-time business ally.[2] ECF No. 1, Ex. R at 1; ECF

---

1. The facts relevant to Defendants' motion for a change of venue are largely undisputed and are taken from the Government's complaint and attached exhibits, as well as the parties' other briefs and exhibits submitted before this Court to date. Any disputes as to material facts are noted herein. Certain exhibits attached to the Government's complaint were too voluminous for the Government to submit to the Court electronically and are available to the Court only in hard copy. *See* ECF No. 7

Text Entry. Therefore, some exhibits that are referenced by letter (i.e., "Exhibit Q") rather than number are not available to view on ECF as of the time of this writing.

2. Because the FRT-15 and the WOT are very similar devices, the Court will, for ease of reference, refer only to "FRT-15s" in this opinion.

**172**          **669 FEDERAL SUPPLEMENT, 3d SERIES**

No. 25-1 ¶¶ 12-13, 16-19, 23. The Government alleges that, since selling its first FRT-15 in December 2020, RBT has made roughly $30 million in revenue from both retail sales to individual gun owners and wholesale sales to third-party distributors. ECF No. 7 ¶ 85. According to defendant Maxwell, RBT sells 1,000 to 3,000 FRT-15s every week when the product is in stock. ECF No. 1, Ex. Q ¶ 11. In addition, Defendants have brought multiple lawsuits in various federal district courts since 2021 in an attempt to protect RBT's exclusive patent over the FRT-15 design. ECF No. 24 at 24 n.17.

Although the parties disagree over how the FRT-15 should be legally categorized, all parties agree that, once installed, the FRT-15 increases the speed at which a gun can fire successive rounds. ECF No. 1 ¶ 6; ECF No. 25-1 ¶ 5. Defendants describe the FRT-15 as a "fun and entertaining" device that allows gun owners to rapidly " 'plink[ ]' targets at a shooting range." ECF 25-1 ¶ 5. Plaintiff United States ("the Government"), however, describes the FRT-15 as a device that converts legal rifles into illegal machineguns and dramatically increases the lethality of these weapons once installed. ECF No. 1 ¶¶ 3, 6, 87. The Bureau of Alcohol, Tobacco, and Firearms ("ATF") classified the FRT-15 as a "machinegun" on July 15, 2021, ECF No. 1, Ex. F, and reaffirmed its conclusion on October 20, 2021.[3] ECF No. 1, Ex. M. The ATF similarly classified the WOT as a "machinegun" on October 21, 2021. ECF No. 1, Ex. P.

In the wake of these classifications, the Government served Defendants with a series of letters ordering them to cease and desist from manufacturing and selling FRT-15s. *See* ECF No. 1, Exs. L; N.

Defendants, believing the ATF's classification of the FRT-15 as a machinegun to be legally erroneous, sued the ATF in the United States District Court for the Middle District of Florida. *See Rare Breed Triggers, LLC v. Garland*, No. 21-cv-1245, 2021 WL 4750081 (M.D. Fla. Oct. 12, 2021). That Court denied Defendants' request for a preliminary injunction and thereafter dismissed the case. *Id.*

Defendants disagree with the Government's classification of the FRT-15—so much so, according to the Government, that Defendants have repeatedly told their customers that the FRT-15 is *not* a machinegun, and that purchasers of an FRT-15 need not be concerned about the legality of possessing one. For example, the Government alleges that, as of January 17, 2023, Defendants informed their customers on the RBT website that " 'in spite of what you may have heard, seen, or understood,' the FRT-15 'is not a machinegun' " under relevant law, ECF No. 1 ¶ 168; that ATF's cease-and-desist letters have "zero relevance to anyone that may have purchased and currently possesses an FRT-15," *id.* ¶ 172; that ATF lacks the authority to "address FRTs that are currently in circulation," *id.* ¶ 174; and that customers should still purchase Defendants' products because Defendants will in turn use that revenue to fund litigation against ATF, *see id.* ¶ 178. The Government further alleges that Defendants took a series of steps to evade detection of their FRT-15 sales by the United States, for example by labeling their packages with the false company name "Red Beard Treasures," rather than "Rare Breed Triggers," in an alleged attempt to conceal the packages' contents from the United States Postal Service. *Id.* ¶ 182.

---

3.  The Government argues that because the National Firearms Act's definition of a "machinegun" includes any device that can "convert[ ] a weapon into a machinegun," the FRT-15 is itself a machinegun. ECF No. 1 ¶¶ 38-40.

U.S. v. RARE BREED TRIGGERS, LLC    **173**
Cite as 669 F.Supp.3d 169 (E.D.N.Y. 2023)

On January 19, 2023, the Government filed an *ex parte* motion with this Court seeking a temporary restraining order and preliminary injunction under 18 U.S.C. § 1345 and Rule 65(b) of the Federal Rules of Civil Procedure. *See* ECF No. 5-1. The Government argued that Defendants' statements regarding the legality of the FRT-15 had induced, or would imminently induce, gun owners to purchase FRT-15s under the false impression that possession of this product was legal, thereby enriching Defendants while exposing their customers to the risk of criminal liability and fines. ECF No. 5 at 5, 8, 12, 17, 28-34. By way of example, the Government averred that multiple people who had purchased FRT-15s voluntarily divested when they learned that it was illegal to own one. *Id.* at 17. For this reason, the Government argued, there was probable cause [4] to believe that Defendants were engaging or would imminently engage in mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, and conspiracy to commit mail and wire fraud under 18 U.S.C. § 1349. ECF No. 5-1 ¶¶ 2-5, 8. The Government further argued that Defendants' repeated attempts to evade Government detection and regulation constituted fraud against the United States under 18 U.S.C. § 371, and warranted the rare step of an *ex parte* TRO to prevent Defendants from destroying the records of their alleged fraud and causing other irreparable harm. *Id.* ¶¶ 1, 8-vii.

After holding an expedited oral argument on January 24, 2023, this Court granted the Government's motion in part and denied it in part. *See* ECF No. 11. The Court concluded that Defendants' statements and activities created significant risk that legal gun owners have paid or would pay for an FRT-15 which they could not legally own.[5] *Id.* ¶ 9. Although the

---

4. Because 18 U.S.C. § 1345 is not frequently invoked, there exists some ambiguity as to whether the Government must demonstrate that there is "probable cause" to believe that a defendant is committing fraud or must instead prove "by a preponderance of the evidence" that the defendant is committing fraud. *See, e.g., United States v. Legro,* 284 F. App'x 143, 145 (5th Cir. 2008) (describing this ambiguity in 18 U.S.C. § 1345). Because the Court concluded at the TRO hearing on January 24, 2023 that the Government had met its burden under either standard, ECF No. 14 at 8, it declined to reach the question of which standard applied, although it used the phrase "probable cause" in its temporary restraining order. ECF No. 11 ¶¶ 1-6.

In the future, a court facing a closer call may find it necessary to closely engage with this question on a TRO posture. Because 18 U.S.C. § 1345 is a "hybrid" statute, providing a civil cause of action to enjoin criminal activity, it is not entirely clear which standard should apply. On the one hand, an *ex parte* application for a temporary restraining order bears some procedural similarities to a search warrant application, and in that context the probable cause standard applies. On the other hand, preponderance of the evidence is the default standard of proof for most civil ac-

tions, and in light of the broad authority already given to the Government under 18 U.S.C. § 1345, there is certainly cause to question whether Congress intended for the Government to have the authority to, say, shut down a defendant's entire business based on *ex parte* allegations of fraud proven under such a low standard. That is especially so in light of caselaw that holds that irreparable injury is presumed for purposes of Rule 65(b) of the Federal Rules of Civil Procedure if the statutory conditions of 18 U.S.C. § 1345 are met. *See, e.g., United States v. Palumbo,* 448 F. Supp. 3d 257, 261 (E.D.N.Y. 2020).

5. Although the Court reached this conclusion on a TRO posture, Defendants argue in part that the FRT-15 is in fact *not* a machinegun under relevant statutes and regulations, and that Defendants' statements about their products do not constitute fraud. The Court has not reached the merits of these claims, and it has scheduled a hearing on the Government's motion for a preliminary injunction for May 31 and June 1, 2023. In the meantime, while merits discovery and briefing are pending, Defendants have consented to an extension of this Court's temporary restraining order until June 30, 2023, or until the Court rules on the

RBT website listed the FRT-15 as "sold out" on the date that the Court issued the temporary restraining order, a host of factors alleged by the Government in its motion and the exhibits submitted along with its motion supported the inference that Defendants' alleged fraud and the related harms asserted by the Government could quickly resume once the FRT-15 was back in stock. These included the facts that Defendants maintained a waitlist to inform their customers when the FRT-15 was once again available for purchase, ECF No. 14 at 3-4, that defendant Maxwell stated that RBT sold 1,000 to 3,000 FRT-15s per week, ECF No. 1, Ex. Q ¶ 11, and that RBT's website assured customers that it would re-stock the FRT-15 in a matter of "days," ECF No. 11 ¶ 9. The Court therefore issued an order temporarily prohibiting Defendants from selling forced reset triggers and requiring Defendants to preserve any and all documents related to the manufacture and sale of Defendants' force reset triggers. *Id.* ¶ 10. The Court denied the Government's request, however, to generally enjoin Defendants from engaging in mail fraud, wire fraud, and conspiracy, since such a vague "obey the law" injunction would not adequately put Defendants on notice of the specific activities in which they may not engage. ECF No. 14 at 19-20, 52. The Court scheduled a preliminary injunction hearing for February 2, 2023, at 2:30 p.m. EST. ECF No. 11 at 5.

On February 1, 2023, Defendants, through counsel, entered an appearance before this Court. *See* ECF No. 15. At the parties' joint request, the Court converted the February 2, 2023 preliminary injunction hearing into a status conference, *see* ECF Order dated February 1, 2023, at which Defendants informed the Court that they intended to file a motion to dismiss this action for lack of personal jurisdiction,

and that they consented to an extension of the TRO while that motion remained pending. ECF Minute Entry and Order dated February 3, 2023. The Court set an expedited briefing schedule for Defendants' motion to dismiss. *Id.*

The Court also ordered jurisdictional discovery. *Id.* On February 9, 2023, Defendants filed a motion to quash the Government's subpoena of Defendants' records with J.P. Morgan Chase ("Chase"). *See* ECF No. 17. The Court heard argument on Defendants' motion on February 14, 2023. At that conference and in its response brief to Defendants' motion, the Government argued that Defendants' communications with Chase may bear on the question of personal jurisdiction, since Chase is headquartered in New York and processes all wire transfers through New York. ECF No. 18 at 1-2; ECF No. 22 at 12-13. The Government also argued that Defendants used their Chase account to receive wire transfers from third-party distributors who went on to sell FRT-15s throughout the country, and information about those distributors' sales may also bear on the question of personal jurisdiction in New York. ECF No. 22 at 9, 13-14. Defendants argued that, if this Court concludes that it has personal jurisdiction over defendant RBT, it would logically also have personal jurisdiction over individual defendants Maxwell and DeMonico, so it was not necessary for the Government to receive discovery that relates solely to the individual defendants' relationship with Chase. *Id.* at 23-24. In light of Defendants' concession, the Court granted Defendants' motion to quash in part and denied in part, keeping the Government's subpoena largely intact but quashing the subpoena with respect to any Chase records that related solely to the individual defendants and not

Government's motion for a preliminary in-

junction, whichever is sooner.

U.S. v. RARE BREED TRIGGERS, LLC **175**
Cite as 669 F.Supp.3d 169 (E.D.N.Y. 2023)

to defendant RBT. ECF Minute Entry and Order dated February 15, 2023.

The parties completed briefing on Defendants' motion to dismiss for lack of personal jurisdiction on March 2, 2023. On March 7, 2023, the Government moved for expedited merits discovery, which included a request for Defendants' customer list. *See* ECF No. 30. Defendants opposed this motion, arguing that merits discovery was premature while the question of whether this Court has jurisdiction remained pending, and that in any event Defendants' customer list would, at most, be relevant only to the scope of the Court's injunctive relief if it grants the Government's motion for a preliminary injunction, not to the merits of the preliminary injunction itself. *See* ECF No. 31. The Court agreed with Defendants and denied the Government's motion for merits discovery, with leave to renew. ECF Minute Entry and Order dated March 9, 2023.

The Court heard oral argument on Defendants' motion to dismiss for lack of personal jurisdiction on March 17, 2023. In its briefs and at oral argument, the Government asserted two principal theories of personal jurisdiction. First, the Government argued that 18 U.S.C. § 1345 implicitly authorizes nationwide service of process and allows the Government to bring suit in this Court regardless of the defendants' contacts with the Eastern District of New York because it expressly permits the Government to seek an anti-fraud injunction "in any Federal court." ECF No. 24 at 9-10. Under the Government's interpretation of § 1345, personal jurisdiction would exist in this Court as a statutory matter under Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure, and personal jurisdiction would exist as a constitutional matter because Defendants easily have minimum contacts with the United States, which is the relevant sovereign for the Court's due process analysis when nationwide service of process is authorized by a federal statute. *Id.* at 9-13. The parties cited no judicial opinion—and the Court has found none—that has ever interpreted the phrase "in any Federal court" in 18 U.S.C. § 1345, making the Government's first theory of personal jurisdiction a question of first impression in this Court.

In the alternative, the Government argued that statutory personal jurisdiction exists under either or both of two different prongs of the New York long-arm statute. First, the Government asserted that Defendants have "transacted business" in New York under N.Y. C.P.L.R. § 302(a)(1) because the wire transfers that they received from third-party distributors to their bank account in Florida were processed by Chase through its New York headquarters, a fact which Defendants have known for years. *Id.* at 13-17. Second, the Government argued under N.Y. C.P.L.R. § 302(a)(3) that Defendants have committed "tortious conduct without the state" that has had effects within the state because the ATF has recovered FRT-15s in New York which—though the Government had no evidence at that time that these devices or any of their component parts were purchased directly from Defendants—customers were induced into buying through Defendants' fraudulent statements on their website and elsewhere. *Id.* at 17-20. The Government further argued that either theory of personal jurisdiction under the New York long-arm statute would also satisfy due process, because the requisite minimum contacts with New York existed and because due process would not otherwise be violated by requiring Defendants to litigate their case in the Eastern District of New York. *Id.* at 20-25.

Defendants opposed each of the Government's theories of personal jurisdiction. First, Defendants argued that the phrase

"in any Federal court" in 18 U.S.C. § 1345 cannot implicitly authorize nationwide service of process, since the Supreme Court has held that if Congress wishes to authorize nationwide service of process in a statute, it must do so explicitly. ECF No. 23 at 12-13; ECF No. 29 at 4-6. Second, Defendants argued that their contacts with New York do not satisfy either prong of the New York long-arm statute. First, Defendants asserted that they never "transacted business" in New York through the use of their Chase account or otherwise: Defendants opened their Chase account through a branch in Florida; none of the third-party dealers from whom Defendants received wire transfers lived in New York; the fact that Chase happens to process wire transfers through its New York headquarters is essentially coincidental; and even if these transfers processed through New York constituted "transacting business" under the long-arm statute, they would not constitute minimum contacts with New York for purposes of due process. ECF No. 23 at 14-20; ECF No. 29 at 6-11. Second, Defendants argued that the record does not support the inference that Defendants' allegedly fraudulent statements had any reasonably foreseeable effects within the state, since any customers who purchased an FRT-15 in New York did so through third-party vendors, not directly from Defendants. ECF No. 23 at 21-22; ECF No. 29 at 11-13.

Throughout briefing and at the Court's March 17th oral argument, Defendants consistently represented that they never made any sales in any way related to the FRT-15 devices to customers in New York. First, they asserted that RBT's website and internal sales processes were set up in a manner that excluded customers with New York shipping or billing addresses from purchasing an FRT-15. ECF No. 23 at 4; ECF No. 23-1 ¶ 13. Defendants similarly argued that they never sold FRT-15s

to third-party vendors who stated any specific intention to sell in New York, and that they were unaware of any specific instance in which a third-party vendor did sell FRT-15s to customers in New York. ECF No. 23 at 17; ECF No. 23-1 ¶ 17; ECF No. 29 at 3, 11, 12, 14; ECF No. 29-1 ¶ 9. Defendants further averred that defendant RBF, whom the Government described at RBT's "sister company," ECF No. 1 ¶ 22, has even less to do with this action because it "wasn't . . . involved in sales of the FRT-15 or WOT" at all. ECF No. 23 at 30. Rather, although RBF is also run by defendant DeMonico, Defendants asserted that RBF is a separate design company that "licenses its designs to third party firearm manufacturers." ECF No. 23 at 2; ECF No. 23-1 ¶ 4. Its direct sales to customers, Defendants then argued, consist only of "swag" such as "stickers and t-shirts," and although it "produces designs for parts of an AR-15 rifle known as 'lower receivers[,]' [i]t does not manufacture or sell these parts." ECF No. 23-1 ¶ 4; ECF No. 29-1 ¶ 6. For that reason, although RBF did send packages into New York, these packages "likely" would have contained "t-shirts and hats." ECF No. 29 at 15; ECF No. 29-1 ¶ 7.

During oral argument, Defendants also clarified that they contested personal jurisdiction only in those few states in which Defendant RBT did not sell directly to any retail or wholesale customers, such as New York. Indeed, Defendants stated that they "would readily agree that the United States has personal jurisdiction" over this action "for any of those states where [RBT's] customers or dealers were located."

On March 22, 2023, the Court informed the parties that it was inclined to *sua sponte* transfer this action to another forum as a matter of judicial efficiency. ECF No. 36 at 1. The Court did not rule on

Defendants' motion to dismiss for lack of personal jurisdiction. *Id.* at 3. However, in light of Defendants' acknowledgement that personal jurisdiction would exist in nearly every other federal judicial district in the country, the Court alerted the parties to its preliminary view that transfer would likely relieve both the parties and the courts from what could be extensive litigation (in both this Court and potentially the appellate courts) over the Government's two relatively novel theories of personal jurisdiction. *Id.* at 1-2. Given that both the Government and Defendants shared a compelling interest in an expeditious (and final) resolution of the merits, transfer of venue appeared, at that time, to be in the long-term interests of all concerned. *Id.* The Court therefore issued an Order to Show Cause as to why venue should not be transferred and invited supplemental briefing from the parties on the question of which venue(s) would be appropriate if the matter were indeed transferred. *Id.* at 3.

The parties submitted their initial round of supplemental letter briefs on March 29, 2023. *See* ECF No. 38; ECF No. 39; ECF No. 40. Defendants argued that dismissal of the action was more appropriate than transfer, ECF No. 38 at 2, but that, if the Court were inclined to transfer the action, the most appropriate forum was the Western District of Texas, with the Middle District of Florida and the District of North Dakota as "permissible" alternative venues. *Id.* at 1, 2. The Government argued that this action should remain in the Eastern District of New York, but that the Court should select the District of Connecticut if it elected to transfer venue. ECF No. 40 at 1, 8.[6]

In its submission, however, the Government also offered additional evidence obtained during a renewed investigation to support its position that personal jurisdiction over all Defendants exists in New York. Specifically, the Government filed a new affidavit summarizing information it had only recently obtained from the United States Postal Service ("USPS") and through interviews with Defendants' customers identified through those postal records. *See* ECF No. 40-1. The Government informed the Court that, after contacting USPS for its records related to packages that Defendants have sent to New York, ATF agents interviewed the packages' addressees, several of whom reportedly stated that they purchased FRT-15s or FRT-15 parts in New York directly from Defendants RBT and RBF. *Id.* ¶¶ 5-22, 36. Some of these customers stated that it was necessary to purchase certain replacement parts for the FRT-15 because "reviews online" suggested that those parts "were susceptible to breaking." *Id.* ¶ 36.

On March 31, 2023, Defendants responded to the Government's submission, arguing that they may wish to contest the Government's factual assertions at an evidentiary hearing, but that in any event transfer of this action to the Western District of Texas was most appropriate. ECF No. 42 at 1, 5. The next day, the Government submitted additional evidence that Defendants have sold FRT-15 parts directly into New York—including, most notably, a screen shot of a receipt emailed from defendant RBF to a customer in Collins, New York for several products including an "FRT-15 Locking Bar Spring." ECF No. 43-1 at 9. This information, the Government argued, not only provided strong

---

6.  In response to the Court's Order to Show Cause, the State of New York also entered an appearance as an interested party and filed a letter in support of the Government's argument that this action should not be transferred. *See* ECF No. 41. The City of New York later filed a similar letter. *See* ECF No. 46.

evidence that Defendants were—contrary to their earlier representations—selling products related to the pending FRT-15 fraud claims directly to New York customers, but also provided new support for the Government's contention that sales of the FRT-15s to New Yorkers by RBT's third-party dealers were readily foreseeable and/or known to Defendants, since those customers had interfaced directly with RBT to service those devices. ECF No. 43 at 1-3.

After receiving the Government's submissions, the Court held a status conference on April 4, 2023. Defendants informed the Court that they had no reason at that time to dispute the accuracy of the Government's submissions, at least with respect to Defendants' shipment of replacement FRT-15 parts to customers in New York. ECF No. 45 at 5. The Court informed defense counsel that, while it was aware that they had accepted this case on short notice and under the pressure of a temporary restraining order, this admission seemed to contradict many of the factual assertions that Defendants used to support their motion to dismiss for lack of personal jurisdiction: not only did this in-

formation appear to prove that defendant RBF sold more than just t-shirts and hats, but it also provided compelling grounds for the Court to find that all of the Defendants did in fact know that third-party vendors were selling FRT-15s into New York, and Defendants were supporting those sales by shipping replacement parts to those customers.[7] *Id.* at 4, 6-7. Defense counsel told the Court that they would confer with their clients as to whether they wished to proceed with their motion to dismiss for lack of personal jurisdiction in light of this new evidence. *Id.* at 9. Later that day, Defendants voluntarily withdrew their motion. ECF No. 44 at 1. However, Defendants moved the Court in the alternative to transfer this action to the Western District of Texas for the reasons they stated in their response to the Court's Order to Show Cause. *Id.*

### Legal Standard

[1]    A district court may, "[f]or the convenience of the parties and witnesses, in the interest of justice," transfer a civil action "to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).[8] District courts in this

---

**7.** The Court also notes that, in a deposition during RBT's patent dispute with Big Daddy Enterprises, defendant DeMonico was asked to list those states in which RBT does not sell the FRT-15, and he did not name New York. ECF No. 1, Ex. I at 29-30. At oral argument on Defendants' motion to dismiss, both parties considered this to likely be a "slip of the tongue," in light of the then-undisputed fact that Defendants never sold their products directly to customers in New York—but whether that remains the case in light of the Government's new submissions is unclear. Further, at that same deposition, defendant DeMonico volunteered that Defendants "have dealers that choose to sell in those states" where RBT does not sell directly, which would have included New York. *Id.* at 30. The inferences as to Defendants' knowledge of third-party sales to New York that the Government asked the Court to

draw from this statement at oral argument certainly carry additional weight in light of the present record.

**8.** Although transfer of venue is in some cases addressed under 28 U.S.C. § 1406(a) and 28 U.S.C. § 1631, those statutes do not provide the appropriate framework here. 28 U.S.C. § 1406(a) authorizes transfer of an action when venue is improper in the transferor court. However, as this opinion makes clear, venue is proper in the Eastern District of New York pursuant to 18 U.S.C. § 1345, and, in any event, neither party has argued that this Court lacks venue. *See Orb Factory Ltd. v. Design Science Toys, Ltd.,* 6 F. Supp. 2d 203, 207 (S.D.N.Y. 1998) ("Given that [the defendant] failed to interpose a timely objection to venue in that it did not file a motion under Rule 12(b) ... any objection has been waived. Once objections to venue are waived, any

U.S. v. RARE BREED TRIGGERS, LLC    **179**

Cite as 669 F.Supp.3d 169 (E.D.N.Y. 2023)

circuit "appl[y] a two-part test to motions to transfer venue under § 1404(a)." *Smart Skins LLC v. Microsoft Corp.*, 14-cv-10149, 2015 WL 1499843, at *4 (S.D.N.Y. Mar. 27, 2015). "First, the court must determine whether the action could have been brought in the proposed transferee forum" as an original matter. *Megna v. Biocomp Laboratories Inc.*, 220 F. Supp. 3d 496, 497 (S.D.N.Y. 2016). This analysis requires the court to determine that both personal jurisdiction and venue would lie in the transferee district. *Giuliani, S.p.A. v. Vickers, Inc.*, 997 F. Supp. 501, 502 (S.D.N.Y. 1998) ("[T]he court may transfer pursuant to § 1404(a) only if the transferee forum is one where, at the time the suit was brought, the defendants were subject to jurisdiction and venue was proper."); *AEC One Stop Group, Inc. v. CD Listening Bar, Inc.*, 326 F. Supp. 2d 525, 528-29 (S.D.N.Y. 2004) (concluding in transfer analysis that defendant residents of California would be "subject to jurisdiction" in the Central District of California and that venue in that district was appropriate under special venue statute 28 U.S.C. § 1400(a)).

[2,3]    Second, "if the action could have been filed in the proposed transferee district, the court must then determine whether transfer is appropriate." *Megna*, 220 F. Supp. 3d at 497 (S.D.N.Y. 2016). To that end, the court may consider a host of equitable factors, including "(1) convenience of witnesses; (2) convenience of the parties; (3) location of relevant documents and the relative ease of access to sources of proof; (4) the locus of the operative facts; (5) the availability of process to compel the attendance of unwilling witnesses;

(6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) judicial economy and the interests of justice." *Id.* at 498 (quoting *Frame v. Whole Foods Market, Inc.*, 06-cv-7058, 2007 WL 2815613, at *4 (S.D.N.Y. Sept. 24, 2007)). However, these factors are "non-exclusive," *Bank of America, N.A. v. Wilmington Trust FSB*, 943 F. Supp. 2d 417, 426 (S.D.N.Y. 2013), and the "relative weight of each factor depends on the particular circumstances of the case," *Smart Skins LLC*, 2015 WL 1499843, at *4. *See also In re Northwest Airlines Corp.*, 384 B.R. 51, 60 (S.D.N.Y. 2008) ("The decision to transfer venue is within the discretion of the court based on an individualized, case-by-case consideration of convenience and fairness." (citation and quotation marks omitted)). Finally, as a general matter, "[a] plaintiff's choice of forum generally is entitled considerable weight—particularly when the plaintiff is a resident of the forum district—and should not be disturbed unless the balance of several factors is strongly in favor of defendant." *Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 376 (S.D.N.Y. 2006).

### Application

Defendants' motion to transfer venue requires the Court to answer three questions: (1) whether personal jurisdiction exists in the Western District of Texas; (2) whether venue exists in that district; and (3) whether Defendants have demonstrat-

---

defect in venue is cured, and the benefits of a § 1406(a) transfer for lack of venue are no longer available." (citation omitted)). 28 U.S.C. § 1631 authorizes transfer to cure a "want of jurisdiction," but Defendants have at this point withdrawn their motion to dismiss for lack of personal jurisdiction. Moreover,

guidance from the Second Circuit suggests that 28 U.S.C. § 1631 "authorizes transfers only to cure lack of subject matter jurisdiction," not to cure a lack of personal jurisdiction. *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 179 n.9 (2d Cir. 2000).

ed that the relevant equitable factors warrant the requested transfer. *See, e.g., Megna,* 220 F. Supp. 3d at 497 (discussing equitable factors).

#### i. Personal Jurisdiction in the Transferee District

[4]   The Court readily concludes (and the Government has not disputed) that personal jurisdiction over this action exists in the Western District of Texas. Defendant RBT "currently[ ] operates out of Austin" in the Western District of Texas, ECF No. 38 at 2, which subjects it to general jurisdiction in that district. *See Daimler AG v. Bauman,* 571 U.S. 117, 137, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014) (concluding that for entity defendants "the place of incorporation and principal place of business are paradigm bases for general jurisdiction"); *Monbo v. Nathan,* 18-cv-5930, 623 F.Supp.3d 56, 136–37 (E.D.N.Y. Aug. 26, 2022) (applying *Daimler* to defendant incorporated as a limited liability company). Defendant RBF "is a Texas limited liability company that operates in Texas," ECF No. 38 at 2, and would therefore also be subject to personal jurisdiction in the Western District of Texas for the same reason. And Defendants conceded during the Defendants' February 14, 2023 status conference that a court with personal jurisdiction over defendant RBT would also have personal jurisdiction over individual defendants Maxwell and DeMonico.[9] Personal jurisdiction over this action, therefore, would exist in the Western District of Texas.

#### ii. Venue in the Transferee District

[5]   For similar reasons, venue over this action would also exist in the Western District of Texas. The fact that RBT operates from Austin, Texas would alone confer venue in the Western District of Texas, since a "substantial part of the events . . . giving rise to" this action took place in that district. 28 U.S.C. § 1391(b)(2). *See Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 357 (2d Cir. 2005) ("[F]or venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question." (emphasis in original)).

[6]   In addition—although the Court need not reach this question in light of the applicability of 28 U.S.C. § 1391(b)(2)—18 U.S.C. § 1345 likely also provides separate statutory basis for venue in the Western District of Texas. While 28 U.S.C. § 1391 provides the "[g]eneral" venue provisions for civil actions, venue may be "otherwise provided" in a different statute. 28 U.S.C. § 1391(a). Indeed, "special venue statutes are scattered throughout the United States Code," 14D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 3814 n.1 (4th ed. 2023), and many of them offer plaintiffs venue options that are broader than the venue provisions codified in 28 U.S.C. § 1391(b).

By its plain terms, 18 U.S.C. § 1345 authorizes the United States to bring an action to enjoin certain frauds "in any Federal court." In its response to Defendants' motion to dismiss for lack of personal jurisdiction, the Government urged the Court to interpret this phrase as implicitly

---

9.  Notwithstanding this representation from Defendants, numerous other connections to Texas would likely subject both individual defendants to personal jurisdiction there. First, defendant DeMonico lives in Austin. ECF No. 39 ¶ 7. Second, Defendants do not dispute that RBT (for which defendant DeMonico is

president and defendant Maxwell is the owner, ECF No. 23 at 1-2), has engaged in high-volume direct sales of FRT-15 devices nationwide in all but a handful of states, and that Texas is not on the list of states that RBT intended to and/or has ever excluded from those sales.

authorizing nationwide service of process, thereby conferring personal jurisdiction in this court as a statutory matter under Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure. This interpretation is questionable at best, however, in light of the Supreme Court's decision in *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987), decided just three years before Congress added the phrase "in any Federal court" to 18 U.S.C. § 1345. In that case, the Court concluded that "Congress knows how to authorize nationwide service of process when it wants to provide for it," and that a failure to do so in a statute demonstrates that "such authorization was not [Congress's] intention." *Omni Capital*, 484 U.S. at 106, 108 S.Ct. 404. *See also PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (noting that a court cannot look to a federal statute as a statutory basis for the exercise of personal jurisdiction "if the federal statute does not *specifically* provide for national service of process" (citation omitted) (emphasis added)). Indeed, insofar as this Court is aware, statutes which other courts have interpreted as authorizing nationwide service of process typically use the words "serve" or "process." *See, e.g.*, 18 U.S.C. § 1965(b); 31 U.S.C. § 3732(a); 15 U.S.C. § 22.

While the Government argued that any other interpretation would render the phrase "in any Federal court" meaningless, that is not so if the phrase confers venue. Although a grant of venue in "any federal court" is broad, it is not without precedent among other venue-conferring statutes. The Truth-in-Lending Act, for example, confers venue "in any United States district court, or in any other court of competent jurisdiction." 15 U.S.C. § 1640(e). Similarly, the Employee Retirement Income Security Act ("ERISA") confers venue not only in the district "where

the plan is administered" and the district "where the breach took place," but also in any district in which the defendant "resides or may be found," which is generally coextensive with those districts in which the defendant is subject to personal jurisdiction under a minimum contacts analysis—a broad grant of venue indeed. 29 U.S.C. § 1132(e)(2); *Seitz v. Bd. of Trs. of the Pension Plan of the N.Y. State Teamsters Conf. Pension and Ret. Fund*, 953 F. Supp. 100, 102 (S.D.N.Y. 1997) (citing *Varsic v. United States Dist. Court*, 607 F.2d 245, 248-49 (9th Cir. 1979)); *Paulson v. Guardian Life Ins. Co. of Am.*, 614 F. Supp. 3d 1, 7 (S.D.N.Y. 2022) ("[W]hen enacting ERISA, Congress purposefully made the venue provision broad."). Special venue statutes also regularly seek to maximize convenience to the plaintiff, rather than the defendant: The Anti-Terrorism Act, for example, confers venue in, among other districts, "any district where any plaintiff resides." 18 U.S.C. § 2334(a).

In support of its argument that 18 U.S.C. § 1345 authorizes nationwide service of process, the Government highlights the legislative history of the statute, pointing to a 1990 amendment that changed the phrase "in a district court" to "in any Federal court." ECF No. 24 at 10. This too, however, supports the inference that this phrase does not authorize service of process, but instead confers venue. There exist many "federal" courts that are not "district" courts. Article I bankruptcy courts, for example, are "federal" courts but not "district" courts, and the expansion of 18 U.S.C. § 1345 could be read to permit the United States to seek an anti-fraud injunction in a bankruptcy proceeding, assuming other jurisdictional prerequisites are met. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 307, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (noting that "[t]he jurisdiction of the bankruptcy courts, like that of other

federal courts, is grounded in, and limited by, statute," and concluding that bankruptcy courts, as a general matter, have the authority to issue injunctions within the scope of that jurisdiction). This expansion of 18 U.S.C. § 1345 also likely encompasses Article IV territorial courts, which are "federal" courts but are frequently not considered "district" courts for statutory interpretation purposes. *See Nguyen v. United States*, 539 U.S. 69, 76, 123 S.Ct. 2130, 156 L.Ed.2d 64 (2003) (concluding that the phrase "district court" in a statute did not include "Article IV territorial courts, even when their jurisdiction is similar to that of a United States District Court created under Article III" (quoting *Mookini v. United States*, 303 U.S. 201, 205, 58 S.Ct. 543, 82 L.Ed. 748 (1938))); *Summers v. United States*, 231 U.S. 92, 101-102, 34 S.Ct. 38, 58 L.Ed. 137 (1913) ("[T]he courts of the Territories may have such jurisdiction of cases arising under the Constitution and laws of the United States as is vested in the circuit and district courts, but this does not make them circuit and district courts of the United States.").

[7]  Finally, to the extent the phrase "in any Federal court" is ambiguous, the doctrine of constitutional avoidance cautions the Court to read the phrase as conferring venue rather than authorizing nationwide service of process. *See United States v. Magassouba*, 544 F.3d 387, 404 (2d Cir. 2008) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, a court should construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." (citation and internal quotation marks omitted)). Due process requires a defendant to have minimum contacts with the relevant sovereign before that sovereign can subject the defendant to personal jurisdiction in its courts. *Walden v. Fiore*,

571 U.S. 277, 284, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014). When a federal court sits in federal question jurisdiction pursuant to a statute that authorizes nationwide service of process, however, many courts have analyzed the defendant's contacts with the United States as a whole, rather than his contacts with the state in which the court sits. *In re Libor-Based Financial Instruments Antitrust Litigation*, 11-MDL-2262, 2015 WL 4634541, at *18 (S.D.N.Y. 2015); *see also Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998) ("The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered."). In addition, in any action brought under 18 U.S.C. § 1345, the plaintiff that hales a defendant into its forum of choice will, by definition, always be the United States Government.

If 18 U.S.C. § 1345 implicitly authorizes nationwide service of process, vast changes to the traditional constitutional bounds of personal jurisdiction might well result. Under the Government's proposed interpretation, the United States could, say, bring an injunctive action in the United States District Court for the District of Alaska to shut down the operations of a local medical clinic, publishing entity, or other small business in New York whose alleged fraud was exclusively confined to New York and who had zero contacts with Alaska whatsoever. And the Government in a far-away state could also, as it did here, obtain an *ex parte* TRO shutting down some or all of the defendants' operations before they have any opportunity to be heard on the merits. Indeed, at oral argument on Defendants' motion to dismiss, the Government conceded that the statute would give it the authority to do exactly that, since any such defendant would have minimum contacts with the United States as a whole. While

## U.S. v. RARE BREED TRIGGERS, LLC    **183**
Cite as 669 F.Supp.3d 169 (E.D.N.Y. 2023)

an out-of-state defendant in such a case could theoretically defeat jurisdiction despite a finding of minimum contacts by arguing that an exercise of personal jurisdiction would not comport with notions of fair play and substantial justice, this is a very high hurdle once a court concludes that the defendant has minimum contacts with the sovereign. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) ("Where a plaintiff makes the threshold showing of the minimum contacts required ... a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." (citation and internal quotations marks omitted)). Indeed, some courts have even held that, under a national contacts analysis, "minimum contacts with the United States automatically satisfy due process." *Brounmand v. Joseph*, 522 F. Supp. 3d 8, 20-21 (S.D.N.Y. 2021) (collecting cases). And even defendants with meritorious due process claims would incur considerable time, effort, and expense to litigate a motion to dismiss in a district where they have no prior contacts whatsoever.

If Congress wishes to modify such foundational principles of personal jurisdiction, it must, at the very least, do it explicitly. *See Omni Capital*, 484 U.S. at 104-05, 108 S.Ct. 404. Indeed, some courts and commentators have questioned whether Congress's authority to establish a federal statutory basis for personal jurisdiction is as plenary as the Government argues in this case, given the vast due process implications that result. *See Willingway Hosp., Inc. v. Blue Cross & Blue Shield of Ohio*, 870 F. Supp. 1102, 1106 (S.D. Ga. 1994) ("If due process is to have any application at all in federal cases—and the Fifth Amendment requires that it does—it seems impossible that Congress could empower a plaintiff to force a defendant to litigate any claim, no matter how trifling,

in whatever forum the plaintiff chooses, regardless of the burden on the defendant."); 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1068.1 (4th ed. 2023).

The Court therefore concludes that the phrase "in any Federal court" in 18 U.S.C. § 1345 likely does not authorize nationwide service of process, but instead is properly read as a provision conferring venue. For that reason, the Western District of Texas—like every district court in the country—would have venue over this action for purposes of this Court's 28 U.S.C. § 1404(a) transfer analysis.

### iii. Equitable Factors

[8] Although the Western District of Texas is a legally sufficient forum, very few of the equitable factors outlined in *Megna* and related cases support a transfer of this action from the Eastern District of New York to the Western District of Texas. *Cf. EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 347-48 (E.D.N.Y. 2012) ("The parties do not dispute that this action could have been brought in the [transferee court]. Instead, the parties focus on whether transfer would promote the interests of justice and the convenience of the parties.").

First, neither the convenience of the witnesses nor the convenience of the parties supports a transfer to the Western District of Texas. In their motion to transfer venue, Defendants argue only that one witness, and one individual defendant, live in that district: defendant DeMonico. *See* ECF No. 39. The Government, on the other hand, asserts that while it is possible that multiple witnesses may live in Texas, anticipated witnesses for both sides will also come from New York, Florida, Michigan, Texas, Utah, Virginia, and West Virginia. ECF No. 40 at 6. Indeed, it is not clear that the Western District of Texas

would be more convenient than the Eastern District of New York even for *every defendant*, since defendant Maxwell lives in Florida and is not involved in the daily affairs of RBT in Texas. ECF No. 39 ¶ 13. These factors therefore counsel the Court against transferring this action.

[9] Second, it is true that, in light of RBT and RBF's status as Texas LLCs, the "locus of operative facts" may exist in the Western District of Texas, and "relevant documents" and other evidence may exist there as well (though Florida and North Dakota are other possibilities). However, "access to documents and other proof is not a persuasive factor in favor of transfer without proof that documents are particularly bulky or difficult to transport, or proof that it is somehow a greater imposition for defendant to bring its evidence to New York than for plaintiff to bring its evidence to" Texas. *Const. Reinsurance Corp. v. Stonewall Ins. Co.*, 872 F. Supp. 1247, 1251 (S.D.N.Y. 1995) (quoting *Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, 810 F. Supp. 486, 500 (S.D.N.Y. 1992)). And of course, the foregoing cases weighing the burdens of "transport[ing]" documents were decided nearly three decades ago, before the process of creating, preserving, and transferring documents electronically with rapid speed and at minimal cost became not the exception but the general rule in modern civil litigation. *See United States v. Stamps*, 18-cv-1106, 2018 WL 6031155, at *3 (E.D.N.Y. Nov. 16, 2018) (concluding that this factor is now less important to a court's transfer analysis "[g]iven that almost all discovery today is sent and received electronically"). Defendants do not argue in their motion that evidence that exists in the Western District of Texas would be bulky or difficult to transfer electronically; however, some of the Government's *own* records may pose at least some undue burden on the Government and potentially the transferee court if venue were transferred to Texas. *See* ECF No. 7 Text Entry (noting that many exhibits were "voluminous" and therefore were filed with the Court "in hard copy"). Thus, although the "locus of operative facts" factor perhaps favors transfer of this action to the Western District of Texas, the "location of relevant documents" factor does not.

Third, Defendants point to no potential witnesses who would fall outside this Court's subpoena power (other than, perhaps, experts retained by both parties who would appear without need for a subpoena). *See generally* ECF No. 38; ECF No. 42. This factor, therefore, counsels against transfer.

Fourth, Defendants argue that the relative means of the parties supports transfer, since Defendants have "not generated any significant income since" this Court's imposition of a temporary restraining order and Defendants' consent to extend that order, whereas the United States "maintains offices, staff, and regularly litigates" in the Western District of Texas. ECF No. 38 at 3. Although it is true that the United States is a well-resourced adversary, Defendants are far from impoverished: indeed, the Government has alleged, and Defendants have not disputed, that RBT alone has made roughly $30 million from the sale of the FRT-15 in less than three years. ECF No. 7 ¶ 85. Defendants' position is further undermined by the fact that Defendants have brought FRT-15-related lawsuits of their own in jurisdictions outside the Western District of Texas, including in the Northern District of Ohio and the Northern District of Oklahoma. ECF No. 24 at 24 n.17. To the extent that this factor favors Defendants, the tilt is very slight.

[10] Fifth, this action will turn exclusively on questions of federal law as codi-

fied in 18 U.S.C. § 1345, the federal criminal provisions incorporated into that statute by reference, and certain federal firearm statutes and regulations. The Western District of Texas is no more familiar with federal law than the Eastern District of New York. Indeed, "no litigant has a right to have the interpretation of one federal court rather than that of another determine his case." *H. L. Green Co. v. MacMahon*, 312 F.2d 650, 652 (2d Cir. 1962). This factor, therefore, counsels against transfer.

Sixth, there are many reasons for this Court to give significant weight to the Government's choice of forum. As a default matter, "a plaintiff's choice of forum is presumptively entitled to substantial deference." *Gross v. British Broadcasting Corp.*, 386 F.3d 224, 230 (2d Cir. 2004). In addition, Congress expressed its intention to give the Government broad leeway to pick its forum by authorizing it to seek anti-fraud injunctions "in any Federal court." 18 U.S.C. § 1345. *Cf. Tritt v. Automatic Data Processing, Inc. Long Term Disability Plan Adm'r*, 06-cv-2065, 2008 WL 2228841, at *2 (D. Conn. May 27, 2008) (concluding that the court must give "significant deference" to plaintiff's choice of forum "because Congress purposefully enacted a broad venue provision for ERISA cases"). And while it is true that the United States Government, unlike many private plaintiffs, does not "reside" in the Eastern District of New York, it is clear from the submissions to date that the United States Attorney for the Eastern District of New York and his staff devoted considerable time and resources over many months to investigating, researching, and preparing this complex and first-of-its kind civil fraud action against these well-resourced Defendants, which this Court finds to be an additional factor weighing in favor of plaintiff's chosen forum. This fac-

tor, therefore, strongly counsels the Court against transferring the action.

Finally, on the current posture, judicial economy counsels the Court against transferring this action to another district. Defendants' motion to transfer is not the parties' first motion in this action. Indeed, the Court has presided over the Government's motion for a temporary restraining order, Defendants' motion to dismiss for lack of personal jurisdiction, and two motions related to discovery. The Court has held oral argument on each of those motions, one of which lasted for over three hours. The Court has also scheduled a preliminary injunction hearing to take place just six weeks from now. Although transfer may have promoted judicial economy if the Court received Defendants' transfer motion earlier in these proceedings, this Court has now become very familiar with many of the underlying facts and legal issues in this case. It makes little sense to transfer this action to another district in which a new judge must either postpone the parties' preliminary injunction hearing or familiarize herself with the record on a highly expedited timetable. The federal judiciary's limited resources, therefore, are best preserved by keeping the action in this Court.

### Conclusion

For the reasons outlined above, Defendants have failed to demonstrate that the balance of relevant equitable factors warrants disturbing the Government's choice of forum. Defendants' motion to transfer venue is denied.

SO ORDERED.



**2023 WL 5689770**
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

UNITED STATES of America, Plaintiff,
v.
RARE BREED TRIGGERS, LLC;
Rare Breed Firearms, LLC; Lawrence
DeMonico; and Kevin Maxwell, Defendants.

23-cv-369 (NRM) (RML)
|
Signed September 5, 2023

**Synopsis**
**Background:** United States brought action under the Fraud Injunction Act against manufacturer of replacement triggers for firearms, its affiliate, and their executives, alleging that defendants engaged in mail fraud, wire fraud, and conspiracy to defraud the United States by selling replacement triggers that could be used to convert legal rifles into illegal machineguns. After the District Court, Nina R. Morrison, J., 2023 WL 504992, granted the government's motion for a temporary restraining order barring defendants from selling their triggers, the government moved for a preliminary injunction.

**Holdings:** The District Court, Nina R. Morrison, J., held that:

[1] government was likely to succeed in proving that manufacturer's triggers satisfied the statutory definition of an illegal machinegun;

[2] the "function" of manufacturer's trigger, for purposes of statute defining a "machinegun," was to initiate a weapon's firing by means of a single pull;

[3] government was highly likely to succeed in proving that manufacturer acted with fraudulent intent, as required for government to show the scienter element of mail and wire fraud;

[4] government was highly likely to succeed in proving that manufacturer's misrepresentations and omissions about its triggers were material, as required for government to show materiality element of mail and wire fraud;

[5] government was highly likely to succeed in proving that manufacturer's executives engaged in a conspiracy to defraud the United States;

[6] irreparable harm was likely to befall both government and manufacturer's customers absent a preliminary injunction;

[7] the balance of hardships tipped decidedly in government's favor; but

[8] government was not entitled to an injunction requiring manufacturer to allow customers to return certain triggers in return for cash payments.

Motion granted.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (54)

**[1]**   **Injunction**   Extraordinary or unusual nature of remedy

A preliminary injunction is an extraordinary remedy never awarded as of right.

**[2]**   **Injunction**   Grounds in general; multiple factors

A party seeking a preliminary injunction must show irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

**[3]**   **Injunction**   Public interest considerations

A party moving for a preliminary injunction must demonstrate that the public interest would not be disserved by the issuance of an injunction.

**[4]**   **Injunction**   Purpose or function in general
**Injunction**   Equitable considerations in general

The purpose of the interim equitable relief of a preliminary injunction is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward.

**[5]    Injunction** ⟜ Findings and conclusions

On a preliminary-injunction motion, a court must state the findings and conclusions that support its decision, and those findings and conclusions may include an assessment of the witnesses' credibility when necessary to resolve a contested issue of fact. Fed. R. Civ. P. 52(a)(2).

**[6]    Injunction** ⟜ Weapons and explosives

Government demonstrated, for purposes of obtaining a preliminary injunction barring manufacturer of replacement triggers for rifles from selling those triggers, that it was highly likely to succeed in proving that manufacturer's triggers satisfied the statutory definition of an illegal machinegun in action under the Fraud Injunction Act against manufacturer alleging claims for mail fraud, wire fraud, and conspiracy to defraud the United States based on manufacturer's sale of its triggers; a firearm equipped with manufacturer's trigger would repeatedly and automatically fire multiple rounds as long as the shooter simply maintained continuous rearward pressure on the trigger shoe.

18 U.S.C.A. §§ 371, 1341, 1343, 1345, 1349; 26 U.S.C.A. § 5845(b).

**[7]    Internal Revenue** ⟜ Firearms and destructive devices

A weapon is a "machinegun" as defined under federal law if the weapon is capable of firing repeatedly with a single pull of the trigger. 26 U.S.C.A. § 5845(b).

**[8]    Courts** ⟜ Dicta

**Courts** ⟜ Supreme Court decisions

Interpretations of law from an appellate court —particularly the United States Supreme Court —even if technically dicta, are entitled to be given persuasive weight by a district court in the absence of other, binding interpretations of the same law.

**[9]    Statutes** ⟜ Undefined terms

Unless a statute defines a term, or the statute otherwise indicates that a term should be given special meaning, a court typically interprets the statute applying the ordinary, contemporary, common meaning of the words used; the court may also employ other traditional tools of statutory construction after considering the statute's text, including examining the statute's purpose as reflected in its legislative history.

**[10]    Internal Revenue** ⟜ Firearms and destructive devices

The word "trigger" as used in the federal definition of a machinegun, as a weapon that can shoot multiple rounds "by a single function of the trigger," means the part of the weapon's firing mechanism that, although it releases the hammer, does so only for the broader purpose of firing the weapon, and only when moved by the finger; "trigger" does not refer narrowly to the internal part of the firing mechanism that releases the hammer. 26 U.S.C.A. § 5845(b).

**[11]    Internal Revenue** ⟜ Firearms and destructive devices

For a firearm to operate "automatically," and thus to come within federal law's definition of a machinegun, it simply needs to fire repeatedly until the shooter releases the trigger; the fact that the trigger might move slightly against the pressure from the shooter's finger before release is irrelevant. 26 U.S.C.A. § 5845(b).

**[12]    Internal Revenue** ⟜ Firearms and destructive devices

For purposes of federal statute defining a "machinegun" as a weapon that can automatically shoot multiple rounds "by a single function of the trigger," the "function" of manufacturer's replacement trigger for semi-automatic rifles was to initiate the weapon's firing by means of a single pull; this function was not changed by the fact that manufacturer's trigger rapidly pushed against the shooter's finger over the course of automatic firing. 26 U.S.C.A. § 5845(b).

1 Case that cites this headnote

[13]    **Statutes**  Liberal or strict construction; rule of lenity

The rule of lenity applies when there is a grievous ambiguity or uncertainty in the language and structure of a statute.

[14]    **Statutes**  Liberal or strict construction; rule of lenity

A statute does not become ambiguous, as required for application of the rule of lenity, merely because it has been applied in situations not expressly anticipated by Congress.

[15]    **Statutes**  Liberal or strict construction; rule of lenity

A word in a statute does not become ambiguous for purposes of the rule of lenity simply because a defendant proposes a different possible meaning to the court.

[16]    **Fraud**  Nature and Elements of Offense

The essential elements of a mail- or wire-fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wire to further the scheme. 18 U.S.C.A. §§ 1341, 1343.

[17]    **Fraud**  Nature and Elements of Offense

For the government to meet its burden in a civil action for mail or wire fraud, the government must prove (1) the existence of a scheme to defraud, (2) the requisite scienter (or fraudulent intent) on the part of the defendant, and (3) the materiality of the defendant's misrepresentations. 18 U.S.C.A. §§ 1341, 1343.

[18]    **Fraud**  False Pretenses or Representations

In the context of mail and wire fraud, the words "to defraud" commonly refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching. 18 U.S.C.A. §§ 1341, 1343.

[19]    **Fraud**  Injury and causation

To establish mail or wire fraud, it need not be shown that the intended victim of the fraud was actually harmed; it is enough to show that the defendant contemplated doing actual harm, that is, something more than merely deceiving the victim. 18 U.S.C.A. §§ 1341, 1343.

[20]    **Fraud**  Knowledge and Intent; Foreseeability

To demonstrate a violation of the mail- or wire-fraud statutes, the government must demonstrate that the defendant acted with the requisite fraudulent intent, meaning that the defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim. 18 U.S.C.A. §§ 1341, 1343.

[21]    **Fraud**  Knowledge and Intent; Foreseeability

Acts done by a defendant inadvertently, mistakenly, or in good faith do not satisfy the requirement of the mail- and wire-fraud statutes

Case 4:24-cv-00698-O Document 158-2 Filed 11/27/24    Page 40 of 169    PageID 4696
United States v. Chao Tung Wu, Not Reported in F.Supp.2d (2013)
2023 WL 5689770

that the defendant act with fraudulent intent.
🏴 18 U.S.C.A. §§ 1341, 🏴 1343.

**[22]    Fraud** 👈 Knowledge and intent; foreseeability

Direct proof of a defendant's fraudulent intent is not necessary to establish that the defendant committed mail or wire fraud; rather, the requisite fraudulent intent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim with the knowledge that the statements were false. 🏴 18 U.S.C.A. §§ 1341, 🏴 1343.

**[23]    Fraud** 👈 Presumptions and burden of proof

When it is clear that a defendant's scheme, viewed broadly, is necessarily going to injure, it can be presumed, for purposes of an action for mail or wire fraud against the defendant, that the defendant had the requisite intent to defraud. 🏴 18 U.S.C.A. §§ 1341, 🏴 1343.

**[24]    Injunction** 👈 Weapons and explosives

Government demonstrated, for purposes of obtaining a preliminary injunction barring manufacturer of replacement triggers for rifles from selling those triggers, that it was highly likely to succeed in proving that manufacturer acted with the requisite fraudulent intent in selling its triggers, as required to show the scienter element of claims for mail fraud and wire fraud in government's action against manufacturer under the Fraud Injunction Act, where there was compelling evidence that manufacturer knowingly sold its customers a trigger that was very likely illegal and thus worthless, and that manufacturer intentionally misled customers by telling them that the triggers were not illegal even though manufacturer knew that they were almost certainly illegal. 🏴 18 U.S.C.A. §§ 1341, 🏴 1343, 🏴 1345; 🏴 26 U.S.C.A. § 5845(b).

**[25]    Fraud** 👈 False Pretenses or Representations

The mail- and wire-fraud statutes do not criminalize every deceitful act, however trivial; rather, to be liable for mail or wire fraud, a defendant must have engaged in a deceptive course of conduct by making material misrepresentations. 🏴 18 U.S.C.A. §§ 1341, 🏴 1343.

**[26]    Fraud** 👈 False Pretenses or Representations

A misrepresentation is "material," as required to support a claim of mail or wire fraud based on the misrepresentation, if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it is addressed. 🏴 18 U.S.C.A. §§ 1341, 🏴 1343.

**[27]    Fraud** 👈 Value or character of goods

When a mail- or wire-fraud scheme involves the solicitation of a purchase, for a defendant's misrepresentations to a customer to be material, as required for liability under the mail- and wire-fraud statutes, the misrepresentations must generally concern the quality, adequacy, or price of the goods to be sold, or otherwise concern the nature of the bargain. 🏴 18 U.S.C.A. §§ 1341, 🏴 1343.

**[28]    Fraud** 👈 Injury and causation

For a misrepresentation by a defendant to a customer to support the defendant's liability for mail or wire fraud in a scheme involving the solicitation of a purchase, the harm contemplated as a result of the misrepresentation must affect the very nature of the bargain itself; such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representation and the actual benefits which the defendant delivered, or

intended to deliver. 🏳18 U.S.C.A. §§ 1341, 🏳1343.

---

**[29]    Fraud 👈 Injury and causation**

Misrepresentations amounting only to deceit in connection with a defendant's solicitation of a purchase are insufficient to maintain a mail- or wire-fraud prosecution against the defendant where the victims received exactly what they paid for and there was no discrepancy between benefits reasonably anticipated from the purchase and actual benefits received. 🏳18 U.S.C.A. §§ 1341, 🏳1343.

---

**[30]    Fraud 👈 False Pretenses or Representations**

**Fraud 👈 Omissions and concealment**

A scheme to defraud that violates the mail- and wire-fraud statutes may turn on either an affirmative misrepresentation or omissions of material information that the defendant has a duty to disclose. 🏳18 U.S.C.A. §§ 1341, 🏳1343.

---

**[31]    Fraud 👈 Omissions and concealment**

A defendant who has no duty to affirmatively disclose information to another may develop such a duty, for purposes of the mail- and wire-fraud statutes, where the defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading. 🏳18 U.S.C.A. §§ 1341, 🏳1343.

---

**[32]    Fraud 👈 Omissions and concealment**

Under the mail- and wire-fraud statutes, it is just as unlawful to speak half-truths, or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, as it is to make affirmative misrepresentations. 🏳18 U.S.C.A. §§ 1341, 🏳1343.

---

**[33]    Injunction 👈 Weapons and explosives**

Government showed, for purposes of obtaining a preliminary injunction barring manufacturer of replacement triggers for rifles from selling those triggers, that it was highly likely to succeed in proving that manufacturer's misrepresentations and omissions to customers about the triggers were material, as required for government to prevail on mail- fraud and wire-fraud claims in action against manufacturer under the Fraud Injunction Act, where the triggers' legality was material to transactions with customers, customers often asked about the triggers' legality, manufacturer reassured customers that the triggers were legal despite having information showing otherwise, and manufacturer had a no-refund policy to avoid paying customers back when they found out the triggers were illegal. 🏳18 U.S.C.A. §§ 1341, 🏳1343, 🏳1345; 🏳26 U.S.C.A. § 5845(b).

---

**[34]    Fraud 👈 Value or character of goods**

For purposes of the materiality requirement for a defendant's statements in an action for mail or wire fraud arising from the defendant's sale of a product, misrepresentations about the product's legality are material, because the implicit legality of the product being sold is central to nearly every bargain. 🏳18 U.S.C.A. §§ 1341, 🏳1343.

---

**[35]    Fraud 👈 Scheme to Defraud**

A "scheme to defraud," for purposes of the mail- and wire-fraud statutes, can be described as a plan to deprive person of something of value by trick, deceit, chicane, or overreaching. 🏳18 U.S.C.A. §§ 1341, 🏳1343.

---

**[36]    Fraud 👈 Scheme to Defraud**

A "scheme to defraud," for purposes of the mail- and wire-fraud statutes, is characterized by a departure from community standards of fair play

and candid dealings. 🏴18 U.S.C.A. §§ 1341, 🏴1343.

**[37]  Fraud** 🔑 Scheme to defraud
The Government can establish the existence of a scheme to defraud, for purposes of the mail- and wire-fraud statutes, through circumstantial evidence. 🏴18 U.S.C.A. §§ 1341, 🏴1343.

**[38]  Injunction** 🔑 Weapons and explosives
Assuming scheme-to-defraud element of a mail- or wire-fraud claim was separate from the scienter and materiality requirements for such a claim, government showed, for purposes of obtaining a preliminary injunction barring manufacturer of replacement triggers for rifles from selling those triggers, that it was highly likely to succeed in proving that manufacturer engaged in a scheme to defraud by selling its triggers, where there was compelling evidence that manufacturer knowingly sold its customers a trigger that was very likely illegal and thus worthless, that manufacturer intentionally misled customers by telling them that the triggers were not illegal even though manufacturer knew that they were almost certainly illegal, and that the triggers' legality mattered to customers. 🏴18 U.S.C.A. §§ 1341, 🏴1343, 🏴1345; 🏴26 U.S.C.A. § 5845(b).

**[39]  Conspiracy** 🔑 Fraud against government in general
Whereas other antifraud statutes, such as those prohibiting mail and wire fraud, define "frauds" only as acts which deprive victims of money or property, the term "defraud" as used in the federal statute criminalizing a conspiracy to defraud the United States is interpreted much more broadly, because that statute is designed to protect the integrity of the United States and its agencies generally, not just the United States'

financial interests. 18 U.S.C.A. §§ 371, 🏴1341, 🏴1343.

**[40]  Conspiracy** 🔑 Fraud against government in general
Even if the federal government is not subjected to property or pecuniary loss by a defendant's fraud, the defendant can engage in a prohibited conspiracy to defraud the United States if the defendant conspires to interfere with or obstruct one of the United States' lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest. 18 U.S.C.A. § 371.

**[41]  Conspiracy** 🔑 Fraud against government in general
To prove a conspiracy to defraud the United States, the government must demonstrate (1) that the defendant entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy. 18 U.S.C.A. § 371.

**[42]  Conspiracy** 🔑 Fraud against government in general
The impairment or obstruction of a governmental function contemplated by the statute criminalizing a conspiracy to defraud the United States need not involve the violation of a separate statute. 18 U.S.C.A. § 371.

**[43]  Injunction** 🔑 Weapons and explosives
Government showed, for purposes of obtaining a preliminary injunction barring manufacturer of replacement triggers for rifles from selling those triggers, that it was highly likely to succeed in proving that manufacturer's executives engaged in a conspiracy to defraud the United States by conspiring to prevent the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) from carrying out its lawful functions, including its function of confiscating illegal

machineguns, where manufacturer used false return addresses when sending triggers to customers, manufacturer destroyed sales records after learning that ATF was investigating its sales, and one executive traveled to a supplier to collect a pallet of triggers despite knowing that ATF intended to seize them pursuant to a warrant. 18 U.S.C.A. § 371; 26 U.S.C.A. § 5845(b).

---

**[44]    Conspiracy**  ⟜  Form of agreement; express or implied agreement

**Conspiracy**  ⟜  Fraud against government in general

A conspiracy, including a conspiracy to defraud the United States, need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct. 18 U.S.C.A. § 371.

---

**[45]    Conspiracy**  ⟜  Direct or Circumstantial Evidence

**Conspiracy**  ⟜  Fraud against government in general

Circumstantial evidence alone can be sufficient to find the existence of a conspiratorial agreement such as a conspiracy to defraud the United States. 18 U.S.C.A. § 371.

---

**[46]    Search, Seizure, and Arrest**  ⟜  Permissible subjects of warrants

The fact that a search warrant aimed at seizing evidence from a suspect involves property belonging to that individual does not make the warrant invalid, nor does it make interference with that warrant any less obstructionist.

---

**[47]    Injunction**  ⟜  Irreparable injury

A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.

---

**[48]    Injunction**  ⟜  Irreparable injury

To demonstrate the existence of irreparable harm for purposes of a motion for a preliminary injunction, a plaintiff must show that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.

---

**[49]    Injunction**  ⟜  Irreparable injury

**Injunction**  ⟜  Recovery of damages

To demonstrate the existence of irreparable harm for purposes of a motion for a preliminary injunction, the plaintiff must show an alleged harm that is continuing, that cannot be adequately redressed by final relief on the merits, and for which money damages cannot provide adequate compensation.

---

**[50]    Injunction**  ⟜  Weapons and explosives

Government showed, for purposes of obtaining under the Fraud Injunction Act a preliminary injunction barring manufacturer of replacement triggers for rifles from selling those triggers, that irreparable harm would befall both government and manufacturer's customers in the absence of a preliminary injunction, where, if triggers satisfied the statutory definition of a machinegun, as was likely, their continued illegal sale would constitute per se harm to government and public, government would have to expend resources to collect triggers, and any customers who purchased triggers would not only suffer a monetary loss from buying a worthless product, but could also face legal repercussions, including a risk of future criminal prosecution, for possessing illegal machineguns. 18 U.S.C.A. §§ 922(g)(1), 922(o)(1), 924(c)(1)(B)(ii), 1345; 26 U.S.C.A. §§ 5845(b), 5871.

---

**[51]    Injunction**  ⟜  Weapons and explosives

The balance of hardships tipped decidedly in the government's favor with respect to its motion, in action under the Fraud Injunction Act, for a preliminary injunction barring manufacturer of replacement triggers for rifles from selling those triggers, which the government was likely to show were illegal because they met the statutory definition of a machinegun, even though manufacturer and customers would suffer some hardships if the triggers were ultimately determined to be legal, where if no injunction were issued and the government ultimately prevailed, thousands of illegal machineguns could be added to the existing stockpile scattered throughout the country, and the government would have to use its limited resources to track them down. 🖻18 U.S.C.A. § 1345; 🖻26 U.S.C.A. § 5845(b).

[52] **Injunction** 🖙 Weapons and explosives

Assuming that the government failed to show that it was likely to succeed on the merits of its claims for mail and wire fraud and conspiracy to defraud the United States in action under the Fraud Injunction Act against manufacturer of replacement triggers for rifles that the government alleged met the statutory definition of an illegal machinegun, a preliminary injunction barring manufacturer from selling triggers was still warranted, because there was at least a serious question as to the legality of the triggers, and the equities tipped decidedly in the government's favor. 🖻18 U.S.C.A. §§ 1341, 🖻1343, 🖻1345; 🖻26 U.S.C.A. § 5845(b).

[53] **Injunction** 🖙 Public interest considerations

When a court orders injunctive relief, it should ensure that the injunction does not cause harm to the public interest.

[54] **Injunction** 🖙 Weapons and explosives

Government was not entitled, in action under the Fraud Injunction Act and for mail and wire fraud against manufacturer of firearm triggers, to a preliminary injunction requiring manufacturer of firearm triggers to allow customers to return certain triggers in return for cash payments, since such a refund program would constitute final, not preliminary, relief given that manufacturer would be unable, if it ultimately prevailed, to recover money it issued in refunds to customers. 🖻18 U.S.C.A. §§ 1341, 🖻1343, 🖻1345.

**Attorneys and Law Firms**

David Allen Cooper, Joseph Anthony Marutollo, Michael S. Blume, United States Attorney's Office, Brooklyn, NY, Paulina Stamatelos, DOJ-USAO, Brooklyn, NY, for Plaintiff.

Caleb Kruckenberg, Pro Hac Vice, Jonathan Morgan Houghton, Steve Simpson, Pro Hac Vice, Pacific Legal Foundation, Arlington, VA, David Warrington, Pro Hac Vice, Alexandria, VA, Jacob Roth, Pro Hac Vice, Dhillon Law Group, West Palm Beach, FL, Josiah Contarino, Dhillon Law Group Inc., Newark, NJ, Michael A. Columbo, Pro Hac Vice, Dhillon Law Group, Inc. Political Law, San Francisco, CA, for Defendants.

## MEMORANDUM & ORDER

NINA R. MORRISON, United States District Judge:

*1 Now pending before this Court is the United States of America's motion for a preliminary injunction against Defendants Rare Breed Triggers LLC, Rare Breed Firearms LLC, Lawrence DeMonico, and Kevin Maxwell. The Court has considered the parties' pre-hearing briefs; the evidence presented during a two-day preliminary injunction hearing held on August 1 and 2, 2023; the parties' post-hearing proposed findings of fact submitted on August 13, 2023; the statements made at oral argument held on August 15, 2023; and the parties' supplemental briefs submitted on August 18, August 23, August 28, and August 31, 2023.

On the present record, the Court concludes that the Government is likely to succeed on the merits of its claims. The evidence before this Court establishes that since December 2020, Defendants have sold approximately 100,000 illegal machinegun conversion devices (known as

"FRT-15" triggers) throughout the United States, taking in $39 million dollars from their customers in under two years. Defendants fraudulently induced their customers to buy a product that is illegal to possess—falsely representing that the FRT-15s was "absolutely" legal, while withholding material information in their possession that revealed otherwise. In the process, Defendants placed tens of thousands of their customers at risk of criminal prosecution and the loss of their right to own firearms. And even after Defendants were notified by federal officials that they were engaged in the sales of illegal firearms, they used deceptive means to continue to sell thousands of FRT-15s and obstruct law enforcement's legitimate efforts to track and recover these devices.

For the reasons outlined herein, the United States of America's motion for a preliminary injunction is GRANTED.

## PROCEDURAL HISTORY

Defendant Rare Breed Triggers ("RBT") is a limited liability company incorporated in North Dakota and operated out of Austin, Texas by its president, Defendant Lawrence DeMonico. *See* Preliminary Injunction Hearing Transcript ("Tr.") 421:6–21, 517:4–8; ECF No. 124-1 at 12:11–16, 106:21–107:1. Though previously co-owned by four managing members, RBT is currently owned exclusively by Defendant Kevin Maxwell, who also serves as the company's general counsel. Tr. 420:3–421:18, 529:20–22; ECF No. 124-3 at 61:15–19; Defs. Ex. A. DeMonico is also the president of a design company, Defendant Rare Breed Firearms ("RBF"). Tr. 468:20–469:11, 485:17–18.

RBT's flagship product is a device called the FRT-15, a "forced-reset trigger" that gun owners can install on an AR-15-style rifle to accelerate the weapon's rate of fire. [1] In the present action, the parties primarily dispute whether or not the FRT-15 is a device which can convert a semi-automatic weapon into a "machinegun" as defined under federal law. *See* 26 U.S.C. § 5845(b). Defendants contend that the FRT-15, though capable of making a weapon fire successive rounds extremely rapidly, is a perfectly legal semi-automatic trigger. The United States of America ("the Government"), on the other hand, contends that the FRT-15 is an illegal machinegun conversion device which Defendants, despite having received a cease-and-desist letter from the Bureau of Alcohol, Tobacco and Firearms ("ATF") on July 27, 2021 informing them to that effect, have continued to sell.

*2 On January 19, 2023, the Government brought the present action against Defendants seeking an *ex parte* temporary restraining order and a preliminary injunction under 18 U.S.C. § 1345, a statute known as the Fraud Injunction Act. *See* ECF No. 1 ¶ 18. The Fraud Injunction Act authorizes the Government to bring an action to enjoin a suspected criminal fraud scheme in order "to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." 18 U.S.C. § 1345(b).

In short, the Government alleges that Defendants have conspired to use deceitful means to evade and obstruct the lawful jurisdiction of the ATF to regulate and confiscate a device that the agency has determined to be a machinegun, constituting a conspiracy to defraud the United States under 18 U.S.C. § 371. ECF No. 1 ¶¶ 195–99. The Government further alleges that Defendants have repeatedly misled their customers to believe that the FRT-15 is a legal, semi-automatic trigger, despite the ATF's formal classification of the FRT-15 as a machinegun and Defendants' knowledge that the ATF and the courts have classified similar devices as machineguns, which constitutes mail fraud, wire fraud, and conspiracy to commit mail and wire fraud under 18 U.S.C. §§ 1341, 1343, and 1349. ECF No. 1 ¶¶ 200–215.

After the Court heard argument on the Government's motion for an *ex parte* temporary restraining order on January 24, 2023, it granted the Government's motion in part and denied it in part and directed the Government to serve a copy of the order on Defendants, which the Government did on January 27, 2023. *See* ECF No. 11.

On February 1, 2023, Defendants appeared through counsel. *See* ECF No. 15. On consent of both parties, the Court adjourned the preliminary injunction hearing scheduled on February 2, 2023, *see* Order dated February 1, 2023, extended the temporary restraining order, and set a briefing schedule for Defendants' anticipated motion to dismiss this action for lack of personal jurisdiction. Minute Entry dated February 3, 2023; *see* ECF No. 15 ¶¶ 5–10, ECF No. 16 at 1.

The parties fully briefed Defendants' motion to dismiss for lack of personal jurisdiction by March 2, 2023, and the Court held oral argument on the motion on March 17, 2023. *See* ECF Nos. 23, 24, 29; Minute Entry dated March 17, 2023. Because RBT has a nearly national presence in the firearm accessories

market, Defendants "readily agree[d]" at oral argument that personal jurisdiction existed in "any of those states where[ ] [RBT's] customers [or] dealers are located." March 17, 2023 Oral Argument Tr. 50:5–7. However, Defendants asserted that they had specifically built the RBT website to prohibit any customer with a New York billing or shipping address from purchasing an FRT-15, with similar prohibitions on sales to customers in a handful of other states and territories. *See* ECF No. 23-1 ¶ 13. Defendants also submitted affidavits, including from former RBT co-owner Cole Leleux, stating that, although Defendants did sell the FRT-15 through third-party distributors, they never sold an FRT-15 to a distributor that stated an intention to sell in New York. ECF No. 23-1 ¶ 14, ECF No. 29-1 ¶ 9. Defendants further argued that Defendant RBF should be dismissed from this action because it simply had no connection with the FRT-15: although it is also run by DeMonico, Defendants represented to the Court that RBF is a design company that sells "swag" like t-shirts and hats, not firearms. ECF No. 23 at 29–30; ECF No. 29 at 14–15. Thus, although RBF indeed delivered packages to customers in New York, Defendants maintained that those packages had nothing to do with the FRT-15.

**\*3** The Government conceded that, as far as it could tell, Defendants had never directly sold an FRT-15 to a customer in New York. However, the Government nonetheless asserted two theories of personal jurisdiction in this Court. First, the Government argued that 18 U.S.C. § 1345, despite not mentioning service of process, implicitly authorizes nationwide service of process by permitting the Government to bring an anti-fraud injunctive action in "any federal court," thus conferring personal jurisdiction over Defendants in this court pursuant to Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure. ECF No. 24 at 14–18. Second, the Government argued that Defendants have sufficient contacts with the state of New York to satisfy both the statutory and constitutional requirements for a New York court to exercise personal jurisdiction over them because (1) Defendants, while in Florida, opened up a bank account with J.P. Morgan Chase, which is incorporated in New York and processed Defendants' wire transfers through its New York headquarters, and (2) gun owners have purchased FRT-15s through RBT's third-party distributors, and the ATF has recovered FRT-15s in New York. ECF No. 24 at 18–30.

On March 22, 2023, the Court entered an order directing the parties to show cause as to why this action should not be transferred to one of the numerous districts in which Defendants had conceded that there would be no dispute

as to personal jurisdiction. *See* ECF No. 36. On March 29, 2023, Defendants responded to the Court's order and asserted that dismissal, rather than transfer, was warranted, but argued that the Western District of Texas, the Middle District of Florida, and the District of North Dakota were "appropriate" venues. ECF No. 38 at 2. Two hours later, the Government filed its response, informing the Court that it had conducted an investigation in coordination with the ATF in the preceding week and discovered that, in fact, Defendants *had* sold FRT-15 parts directly to customers in New York. ECF No. 40. In support of its letter, the Government filed an affidavit summarizing the conversations that ATF agents had with some of Defendants' New York customers. *See* ECF No. 40-1.

Defendants initially denied the Government's allegations and requested an evidentiary hearing to contest them. *See* ECF No. 42 at 5. The Government then filed additional evidence of Defendants' commercial ties to New York, including a screenshot of a receipt emailed from Rare Breed Firearms to a customer in Collins, New York for an "FRT-15 locking bar." ECF No. 43-1 at 9. Shortly thereafter, Defendants withdrew their motion to dismiss for lack of personal jurisdiction, asking the Court to instead construe their letter in response to the Court's Order to Show Cause as a motion to transfer venue to the Western District of Texas. ECF No. 44. The Court so construed Defendants' letter and denied Defendants' motion to transfer. *See* ECF No. 48 at 1.

On May 1, 2023, Defendants' attorneys filed a motion to withdraw as counsel. ECF No. 51. The Court granted the motion after an *ex parte* hearing, and partially stayed the action to facilitate Defendants' search for new representation. *See* Minute Entries dated May 4, 2023.

Defendants' new counsel filed notices of appearance on May 24, 2023. ECF No. 57. On May 26, 2023, the Court granted Defendants' request for another adjournment of the preliminary injunction hearing and extended the temporary restraining order with Defendants' consent. *See* Minute Entry dated May 26, 2023. The Court also granted Defendants leave to file a sur-reply through new counsel on the Government's motion for a preliminary injunction to supplement the merits briefs that Defendants' prior counsel filed before withdrawing, which Defendants submitted on June 16, 2023. *See* ECF No. 70. The parties completed discovery and filed fully briefed motions *in limine* by July 27, 2023.

The Court held a preliminary injunction hearing on August 1 and 2, 2023, and the parties submitted proposed findings of fact on August 13, 2023. ECF Nos. 126, 127. After holding oral argument on August 15, 2023, the Court directed the parties to file letter briefs as to the scope of an injunction that the Court could issue if it granted the Government's motion, as well as to other outstanding legal issues. Minute Entry dated August 15, 2023. The parties submitted supplemental briefs on August 18, August 23, August 28, and August 31, 2023.

### SUMMARY OF THE FACTS

#### I. The Functionality of Semi-Automatic Firearms, Automatic Firearms, and the FRT-15

**\*4**    Although the Government's legal claims (and Defendants' defenses to those claims) involve allegations of fraud in Defendants' marketing and sale of the FRT-15, those claims are closely related to foundational question of whether the FRT-15 is—or is not—an illegal machinegun as that term is defined by federal statute. To that end, at the preliminary injunction hearing, the Court heard live testimony from three expert witnesses about the mechanics of the FRT-15, whose testimony was accompanied by an array of demonstrative evidence.

The Government offered expert testimony from Anthony Ciravolo, a current ATF firearms enforcement officer who has performed approximately 300 firearms classifications in his time at the ATF and whom the Court qualified as an expert without objection from Defendants. Tr. 20:17–22:19; 27:6–17. Defendants, for their part, offered expert testimony from former ATF agents Daniel O'Kelly and Brian Luettke, whom the Court also qualified as expert witnesses in the field of firearms without objection from the Government, despite the fact that neither witness had participated in the process of "classification" in their time at the ATF—that is, neither of Defendants' testifying experts, while at ATF, had ever been charged with the task of determining whether or not a device should be formally classified as an illegal machinegun. Tr. 257:24–259:6, 264:2–11, 385:25–386:10, 392:2–18. Defendants also presented expert testimony by declaration from Rick Vasquez, a former ATF agent who did conduct such classifications while still at the agency, *see* ECF No. 120-1, and Kevin McCann, a former ATF agent who did not. *See* ECF No. 107-5.

Importantly, although the parties disagree as to whether the FRT-15 satisfies the legal definition of a machinegun,

the parties do agree on how the FRT-15 works as a technical matter, as compared to standard semi-automatic and automatic triggers. *See* August 15, 2023 Oral Argument Transcript ("O.A. Tr.") 15:23–17:22. As discussed *infra*, the parties' experts expressed some differing views on how the FRT-15 is either similar to or different from certain other trigger devices that the ATF has variously categorized as (legal) semi-automatic or (illegal) automatic triggers. But for purposes of understanding the fundamentals of the FRT-15's operations, the Court relies upon the testimony of all three experts who testified at the hearing, without need to resolve any conflicts among them.

#### A. Legal, Semi-Automatic Weapons

When a standard semi-automatic weapon such as an AR-15 is in the ready-to-fire position, the trigger holds the gun's "hammer" in place by means of each piece's "sear surface." Tr. 33:14–34:1. When the shooter initiates the weapon's firing sequence by pulling the "trigger shoe"—that is, the curved metal portion of the trigger that is visible to the shooter— the trigger releases the hammer. Tr. 34:2–13. The hammer then strikes the firing pin, which causes a shot to be fired. Tr. 34:14–18, 269:16–17. The force of that shot pushes the bolt carrier of the weapon rearwards, which forces the hammer rearwards as well. Tr. 35:11–25, 269:16–19. The bolt then hits a spring and travels forwards again into battery as an additional round is chambered automatically from the magazine. Tr. 37:2–4, 41:20–25, 42:9–14. In the meantime, a disconnector, which is connected on a shared pivot to the trigger that is still being held rearward by the shooter's finger, retains the hammer, thus preventing the hammer from falling forward again. Tr. 35:5–7, 36:10–15, 81:18–82:18, 269:19– 270:3.

**\*5**   At this point, if the shooter simply maintains constant rearward pressure on the trigger, the gun will not fire a second time, because the hammer remains captured by the disconnector. Tr. 36:22–37:1, 46:13–18. Rather, the shooter must reset the trigger and hammer by releasing at least some of the pressure on the trigger shoe. Tr. 45:14–18, 279:9–14, 279:25–280:6. Once she does, the trigger will move forward, the disconnector will pivot and release the hammer, and the hammer will drop back into its original position and be retained again by the trigger, rendering the gun ready fire. Tr. 45:22–25, 269:20–22. If the shooter pulls the trigger again, the sequence will repeat. Tr. 46:1–2, 269:20–22, 270:19–21.

#### B. Illegal, Fully Automatic Weapons

In an automatic firearm such as an M-16-style rifle—a weapon which all parties agree satisfies the federal statutory definition of a machinegun and is illegal for private citizens to possess—the process begins in the same way. [2] In the ready to fire position, the trigger retains the hammer. Tr. 50:1–8. Once the shooter pulls the trigger shoe back, the trigger releases the hammer, which strikes the firing pin, causing a shot to be fired. Tr. 51:2–11; 58:15–18. The rearward force of the bolt carrier then pushes the hammer backwards again. Tr. 52:4–10. However, unlike in an AR-15, an M-16 in automatic mode has a depressed disconnector, which prevents the disconnector from capturing the hammer after it strikes the firing pin. Tr. 54:4–13; 55:10–16. Without a mechanism to constrain the movement of the hammer at this moment, the hammer could quickly fall forward again as the bolt moves forward, striking the firing pin and repeating the firing process. But if the hammer were, at this instant, permitted to fall forward immediately by the forward momentum of the bolt, it could strike the firing pin before the bullet from the magazine has been properly chambered, resulting in a malfunction. Tr. 56:12–18. To prevent this, the hammer is momentarily held in place as the bolt moves rearwards and forwards by means of a mechanism called an "auto-sear"—a device feature that is not present in legal, semi-automatic weapons. Tr. 53:16–20, 271:7–13, 271:24–272:1. The auto sear "times" the device to make sure that a bullet is in the chamber by the time the hammer strikes the firing pin again. Tr. 80:10–19; 81:5–8. As the bolt moves rearward after a shot is fired, the auto sear pivots counterclockwise, [3] and the bottom of the auto sear retains the hammer by way of each piece's sear surface. Tr. 52:4–53:20; 53:23–54:3; 54:14–55:3, 271:19–23. These pieces will remain locked in place until the bolt moves sufficiently forward again and the "trip surface" of the bolt pushes the top portion of the auto sear forward, pivoting the auto sear clockwise and releasing the hammer. Tr. 55:17–56:11, 271:19–23, 273:11–19. At the same instant, a round is fully chambered, and the weapon is safe to fire. Tr. 56:22–25; 80:23–81:4. The hammer then strikes the firing pin, a shot is fired, the process repeats, and a cycle of fire begins. Tr. 57:1–8.

At no point in an automatic weapon's firing cycle does the trigger ever re-engage the hammer. Tr. 272:4–6, 275:7–10. Rather, as long as the shooter maintains rearward pressure on the trigger shoe, the trigger will remain out of the way of the hammer and the firing cycle will continue—*i.e.*, as long as the shooter's finger is holding the trigger shoe rearward, the firearm will rapidly shoot multiple rounds of ammunition. Tr. 57:9–14; 59:25–60:6; 60:19–25, 273:25–274:7. However,

once the shooter releases the trigger shoe, the internal portion of the trigger will move forward and capture the hammer again, stopping the firing process. Tr. 272:6–11, 275:11–20. If the shooter then pulls the trigger a second time, the automatic firing process will repeat itself.

### C. The FRT-15

*6 In a firearm outfitted with an FRT-15, the firing process again begins in the same way. In the ready to fire position, the trigger is engaged with the hammer. Tr. 64:3–8, 169:9–16, 283:13–21. When the shooter pulls the trigger shoe, the trigger releases the hammer, and the hammer strikes the firing pin, causing a shot to be fired. Tr. 64:9–12, 71:20–23, 169:17–22, 283:21–23. However—unlike a trigger in a standard semi-automatic weapon—the FRT-15 has no disconnector. Tr. 144:23–145:3. Rather, as the bolt carrier moves rearward after a shot is fired, the force of the bolt pushes the hammer *into* the top of the trigger, rapidly forcing the trigger forward again against the rearward pressure of the shooter's finger on the trigger shoe. Tr. 66:12–21, 283:20–284:1. [4] Once the bolt carrier then moves sufficiently forward again, the trigger will re-engage with the hammer by way of each piece's sear surface, returning the trigger and the hammer to their configuration in the ready-to-fire position. Tr. 68:15–22, 169:23–170:3.

Without a mechanism to constrain the movement of the trigger at this moment, the trigger would immediately release the hammer, which would strike the firing pin again and repeat the firing process. If the trigger were to do so, however, it could strike the firing pin before the bullet from the magazine has been properly chambered, resulting in a malfunction. Tr. 69:16–25, 77:22–78:8. To prevent this, after a shot is fired, the FRT-15 trigger is momentarily held in place as the bolt moves rearwards and forwards; that is achieved by means of a mechanism not present in an AR-15 or M-16, called a "locking bar." Tr. 76:18–23. The locking bar "times" the device to make sure that a bullet is in the chamber by the time the trigger is free to release the hammer again. [5] Tr. 79:12–20, 81:5–11, 188:16–189:3, 284:1–5, 324:3–10. As the rearward force of the bolt forces the trigger forward, the locking bar pivots counterclockwise, and the bottom of the locking bar captures the top rear of the trigger by way of each piece's sear surface. Tr. 67:3–10, 69:3–20, 283:24–284:5. These pieces remain held in place, regardless of the shooter's rearward pressure on the trigger shoe, until the bolt moves sufficiently forward and the "trip surface" on the bolt pushes the top portion of the locking bar forward,

pivoting the locking bar clockwise and freeing the trigger to move. Tr. 70:4–10, 281:23–282:4. At the same instant, a round is fully chambered, and the weapon is safe to fire. Tr. 78:22–79:5, 284:6–7. At this moment, as long as the shooter has simply maintained rearward pressure on the trigger, the trigger releases the hammer, the hammer strikes the firing pin, and a cycle of fire begins. Tr. 70:11–17, 73:21–74:9, 171:18–172:3, 282:6–16.

Like the trigger on a standard semi-automatic weapon, the internal portion of the trigger on an AR-15 outfitted with an FRT-15 releases the hammer with each successive shot. Tr. 172:4–15, 178:7–12, 277:12–16. Like a machinegun, however, the shooter need only pull the FRT-15 trigger once and maintain rearward pressure for the gun to rapidly fire multiple rounds, requiring no additional input from the shooter. Tr. 70:20–24, 74:11–16, 280:25–281:8. In a cycle of fire, the FRT-15, like a standard machinegun, fires each shot in one-tenth to one-fourteenth of a second. Tr. 61:21–22, 87:16–21. This functionality enables even a novice shooter using an FRT-15 to fire multiple rounds of ammunition in a fraction of a second. Tr. 345:15–19.

## II. The History of the FRT-15 and the Incorporation of Rare Breed Triggers

**\*7** The FRT-15 was invented by non-defendant Jeffrey Cooper Rounds, who received a patent for the device (referred to by the parties as "the '223 patent") on December 24, 2019. Tr. 488:16–17, 535:1–13; ECF No. 120-2 ¶ 3; Govt. Ex. 77 at 1. Prior to obtaining the '223 patent, Rounds had patented another device that was, in key respects, the same trigger mechanism, referred to in this litigation as the "AR-1." *See, e.g.*, Govt. Ex. 134 at 21.

On or about August 4, 2017, Rounds submitted the AR-1 to the ATF for classification: that is, Rounds sought the agency's formal, written opinion as to whether the device was a legal semi-automatic trigger or an illegal machinegun. Govt. Ex. 134 at 26. Although the ATF's classification process is not a mandatory prerequisite to selling a trigger, the parties agree that inventors often submit such devices for classification with the ATF prior to selling the device commercially to receive the agency's assurance that the device is legal. *See, e.g.*, Govt. Ex. 11 at 7:27–29. Rounds submitted the AR-1 to the ATF through his company Wolf Tactical with the help of a private consultant, Rick Vasquez. Govt. Ex. 134 at 13, 19. Vasquez had previously worked in the ATF division that performed such classifications; after leaving the agency, he formed a private consulting firm, Rick Vasquez Firearms

LLC. Tr. 115:17–23; ECF No. 120-1 ¶¶ 1–3; Govt. Ex. 134 at 13, 21. Defendants would later retain Vasquez as a paid expert in their efforts to market the commercial embodiment of the '223 patent: the FRT-15. *See, e.g.*, ECF No. 120-1 ¶ 9.

On August 28, 2018, the ATF informed Rounds and Vasquez that it had indeed classified the AR-1 as a machinegun. Govt. Ex. 134 at 1, 12–13; Defs. Ex. S at 41, 52–53. The ATF explained that "[a] device with a trigger that is mechanically forced forward during a cycle of operation or firing sequence, which results in more than one round being fired with a 'single function of the trigger,' is a machinegun." Govt. Ex. 134 at 12; Defs. Ex. S at 52. The ATF explained that it had determined that the AR-1 operated this way by performing a "zip tie test" on the device: an agent had secured the trigger of a weapon outfitted with an AR-1 in its rearward position with a thin plastic cable, and, after the agent manually released the bolt carrier on the rifle, the weapon proceeded to fire multiple rounds with no additional human input. Govt. Ex. 134 at 11–12; Defs. Ex. S at 51–52. The ATF informed Rounds and Vasquez that, because its examination had revealed that a shooter only needed to exert "continuous rearward pressure" on the trigger to be able to fire multiple rounds automatically, the FRT-15 was, in fact, a machinegun. Govt. Ex. 134 at 12; Defs. Ex. S at 52.

In a separate set of findings, the ATF "[a]dditionally" informed Rounds that, when the ATF tested the device, "the hammer was found to have followed the bolt into battery as it chambered a cartridge" in a malfunction called "hammer follow." In the ATF's view, a device that facilitates hammer follow "would also be classified as ... a machinegun." Govt. Ex. 134 at 13; Defs. Ex. S at 53; *see also* Tr. 114:11–21.

Over the course of developing the AR-1 in 2017, Rounds discussed the invention with DeMonico and Leleux. Tr. 428:16–429:3, 488:16–25, 562:6–17; ECF No. 120-2, ¶¶ 13–14, ECF No. 124-1 at 114:10–20. DeMonico and Leleux expressed their doubts to Rounds about the commercial viability of such a product because the installation of the AR-1 on an AR-15 would require clumsy modified parts, rendering it unfriendly to the average consumer. Tr. 489:3–6, 536:5–15, 563:13–564:17; ECF No. 120-2 ¶ 14; ECF No. 124-1 at 114:21–115:3, ECF No. 124-3 at 23:5–21. Consistent with DeMonico and Leleux's feedback, Rounds designed a new trigger that required far less sophistication to install while awaiting the ATF's classification of the AR-1. ECF No. 124-3 at 23:17–24. On September 29, 2017, Rounds filed a provisional application for what would become the '223

patent—a patent which Defendants would go on to purchase from Rounds and sell to consumers under the name "FRT-15." Tr. 492:16–18; ECF No. 120-2 ¶ 3.

**\*8** Unlike the AR-1, the FRT-15 was designed as a "drop in" trigger, allowing a user to easily replace an AR-15's original trigger with an FRT-15 trigger without complicated installation. Tr. 112:25–113:2; ECF No. 124-3 at 23:21–24. The addition of a locking bar also fixed the AR-1's problem with hammer follow. Tr. 536:21–537:19.

Otherwise, however, the FRT-15 is functionally indistinguishable from the AR-1 with respect to its internal firing mechanism. Just as in an AR-1-equipped firearm, a firearm equipped with an FRT-15 trigger permits the weapon's bolt carrier to force the trigger forward back into the shooter's finger and thus facilitate rapid fire of multiple rounds as long as the shooter simply maintains pressure on the trigger shoe. Tr. 110:11–18. The designs do, however, have two internal differences that change the way that this effect is achieved. First, in the AR-1 trigger, the bolt carrier forces the trigger forward through direct contact, whereas, in the FRT-15, the bolt carrier forces the trigger forward indirectly by first putting force on the hammer, which in turn forces the trigger forward. Tr. 107:17–24, 112:17–23; ECF No. 120-2 ¶ 4, ECF No. 124-3 at 86:5–12. Second, the AR-1 and the FRT-15 use different timing mechanisms. Tr. 113:7–9. The AR-1 implements a modified bolt carrier that includes a cut-out slot for the top of the trigger; when the bolt moves rearward and forces the trigger forward after the weapon fires a shot, the trigger, which protrudes into the bolt carrier, cannot be pulled back until the bolt clears the cut-out, which is also the instant when a bullet has been properly chambered and the weapon is safe to fire again. Tr. 109:10–110:18, 113:10–12. The FRT-15, on the other hand, includes the addition of the locking bar, which briefly holds the trigger in place while the mechanism resets and a bullet is chambered, and releases the trigger when a bullet has been chambered and the weapon is safe to fire again. ECF No. 120-2 ¶ 5; ECF No. 124-3 at 86:19–22.

Both the AR-1 and the FRT-15 allow a shooter to rapidly fire multiple rounds by simply maintaining pressure on the trigger shoe, because the rearward force of the bolt carrier automatically pushes the trigger shoe back into the shooter's finger. Tr. 111:6–11; 112:4–10, 113:14–114:1. And that feature—the capacity to repeatedly and automatically fire multiple rounds with the application of "continuous rearward pressure" on the trigger shoe—was why the ATF classified

the AR-1 as a machinegun. *See* Govt. Ex. 134 at 12–13; Defs. Ex. S at 52–53; *see also* Govt. Ex. 1 at 5 (ATF concluding that the FRT-15 is a machinegun because it can fire multiple rounds with "one continuous pull of the trigger.").

When DeMonico and Leleux learned that Rounds planned to sell the '223 patent, they became interested in the trigger's commercial potential. Tr. 537:20–538:1; ECF No. 124-1 at 136:1–2. At the preliminary injunction hearing, DeMonico claimed that, prior to acquiring the '223 patent and launching sales of its commercial embodiment (the FRT-15), he had no knowledge that the ATF had classified the AR-1 as a machinegun; according to DeMonico, he "did not have any real knowledge of [the] AR-1," and its history was "something that [Rounds] just didn't talk to me about." Tr. 494:7–495:2; *see also* Tr. 430:8–16, 490:4–14; ECF No. 124-1 at 134:25–135:10. Leleux testified that he "d[id no]t think" that, prior to purchasing the '223 patent, he and Defendants had seen a copy of the ATF's AR-1 classification letter, which all parties to this litigation agree was a non-public report. Tr. 578:22–579:1, O.A. Tr. 48:10–49:7.

**\*9** Importantly, however, Leleux acknowledged both at the preliminary injunction hearing and during his deposition that Rounds had verbally told Leleux and DeMonico that the ATF had classified the AR-1 as a machinegun, Tr. 539:19–23, 577:25–578:21, that Leleux and DeMonico knew that "one of" the issues that the ATF had with the AR-1 was the device's potential for hammer follow (which Rounds fixed in the '223 patent), ECF No. 124-2 at 23:24–24:2; *see also* Tr. 536:20–537:11, 565:13–566:11, and that Rounds wanted to "dump" the '223 patent, rather than market the device himself, because he knew that the ATF had problems with the AR-1 and would "give him a hard time" with the '223 patent as well. ECF No. 124-3 at 30:11–24; *see also* Tr. 566:21–567:7; ECF No. 124-1 at 134:10–135:18.

Shortly before purchasing the '223 patent, DeMonico, Leleux, and non-defendant Michael Register reached out to Maxwell, seeking his advice about the legality of the device because of his expertise in firearms law. Tr. 542:7–12, 588:5–11; ECF No. 124-3 at 43:6–22. The partners came to an agreement whereby Maxwell would forego his usual hourly fee and render his legal services for free in exchange for an ownership stake in the company that the parties would form to sell the commercial embodiment of the '223 patent. Tr. 588:12–18. The partners therefore filed articles of organization for "Rare Breed Triggers" on May 4, 2020, [6] *see* Tr. 588:25–589:3; Govt. Ex. 47, and RBT purchased the

rights to the '223 patent from Rounds by written contract for $10,000 on May 7, 2020.[7] Tr. 420:7–421:5, 492:19–24, 539:4–8; Govt. Ex. 77 at 1. At the same time, DeMonico and Rounds also entered into an oral agreement in which Rounds would receive a $25 royalty for each trigger sold. Tr. 492:25–493:9, 539:8–12; ECF No. 120-2 ¶ 16; ECF No. 124-1 at 131:25–132:9. Defendants commercially dubbed Rounds's patent the "FRT-15." Tr. 492:16–18. To date, Defendants have paid Rounds $2.4 million in royalties for sales of the FRT-15. Tr. 569:12–14.

Unlike Rounds had done with the AR-1, the partners made a "group decision" that they would not submit the FRT-15 to the ATF for classification. Tr. 425:17–24, 543:17–19. DeMonico, Maxwell, and Leleux testified that they came to this decision because they had reason to believe that the ATF's classification letters were unreliable, and that the agency has "a history of just changing [its] mind" in the classification of other devices. Tr. 425:25–427:9, 543:17–544:1, 590:11–19; ECF No. 124-3 at 92:14–17. Leleux also testified that because the ATF's classification process can take a long time, RBT was concerned that another manufacturer would beat them to market with a similar product, which had happened to Leleux in the past. ECF No. 124-3 at 91:20–92:11.

Rather than seek the formal opinion of the ATF, the parties hired four former ATF agents to provide them with private assessments of the FRT-15's legal status: Kevin McCann, Daniel O'Kelly, Brian Luettke, and Rick Vasquez.[8] Tr. 430:19–431:5, 543:3–5. Each expert wrote Defendants a letter stating that, in his opinion, the FRT-15 was not a machinegun. See Tr. 439:7–9; ECF No. 120-1 at 10–12 (Vasquez); Defs. Ex. Y at 27–28; (Luettke); Z at 2–3 (McCann), A1 at 41–45 (O'Kelly). Each expert recited in his letter that the statutory definition of a machinegun is a weapon which fires "automatically ... by a single function of the trigger," which, in their opinion, the FRT-15 does not do.

*10  Even at the time that Defendants received these expert opinions, however, they were not without qualification. Most notably, although O'Kelly gave Defendants a written opinion that the FRT-15 was not a machinegun, he also told them privately, "I guarantee you ... do not be surprised if ATF calls it one", Tr. 370:1-2, because "then you're gonna have to fight it." Tr. 370:14–15.

Defendants began selling the FRT-15 at a price of $380 in early December 2020. Tr. 493:12–13. In none of their marketing materials or responses to customers' inquiries

about the product's legal status did Defendants disclose the fact that ATF had classified the AR-1 as a machinegun. Nor did they share with the public the fact that the ATF had reached this determination for reasons that fully describe the FRT-15's mechanics: because "a single constant rearward pull will cause the firearm to fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." Govt. Ex. 134 at 6; Defs. Ex. S at 46.

Within weeks of offering the FRT-15 for sale to the public, on January 8, 2021, Defendants received an email from a firearms developer with the subject line "Potential Legal Issue with Rare Breed FRT-15 Trigger system." Govt. Ex. 102 at 1. The developer opened his email by writing, "This is a warning given to you with the best of intentions to protect you." Govt. Ex. 102 at 1. The developer went on to explain that in 2006 he had submitted a very similar device to the ATF—one which, he explained, "had the same forced reset function as your Rare Breed FRT-15 system"—and the ATF had classified it as a machinegun. Govt. Ex. 102 at 1. The inventor then warned Defendants that the FRT-15, similarly, qualified as a machinegun rather than a semi-automatic trigger:

> Your probable question at this point might be "Why would our trigger be determined to be a machine-gun? That would be based on the [ATF] test. For a firearm to be a semi-automatic, the tester will cycle the action to cock the firearm. The trigger will be pulled to release the hammer/striker. When the trigger is pulled it will be held back in the fire position. With the trigger held back under pressure, the action will be cycled. The trigger will then be released. After release, the trigger will be pulled with the expectation the hammer/striker will then fall, showing the function of the disconnector. Your system will immediately drop the hammer when the bolt closes, showing no disconnect and not dropping the hammer when the trigger is pulled again.

Govt. Ex. 102 at 2. The developer closed his email by telling Defendants, "I hope this information is useful and helps keep you *and your customers* out of trouble." Govt. Ex. 102 at 2 (emphasis supplied).

The device referenced in the January 8, 2021 "Potential Legal Issue" email had been designed and submitted to the ATF for classification by a company called Hunter Kinetic Innovations ("HKI"). See Govt. Ex. 33 at 1. When the ATF classified HKI's trigger as a machinegun on April 27, 2006, the agency cited the fact that—as with the FRT-15—"as long as rearward pressure is applied to the trigger ... the firearm continues to fire until the firing finger is removed." Govt.

Ex. 33 at 2. On January 18, 2021—ten days after receiving the email from HKI's principal warning of a potential legal issue with the FRT-15—Defendants retained Rick Vasquez as a consulting expert. *See* June 23, 2023 Status Conference Transcript 3:9–15. Vasquez, while an agent at the ATF, participated in the agency review process that had classified HKI's trigger as a machinegun. Tr. 140:9–143:5; Govt. Ex. 33 at 5.

**\*11** Despite these numerous warnings, DeMonico maintained in this proceeding that at the time Defendants launched the FRT-15, he had "[a]bsolutely" no reason to believe that the device was a machinegun. Tr. 432:16–18. Indeed, Defendants repeatedly made these representations to their customers. On December 2, 2020, Maxwell published a video on RBT's website in which he introduced himself as RBT's general counsel, and, while sitting in a suit in front of a bookshelf lined with law books, told customers, "Let me be abundantly clear. In my legal opinion, the Rare Breed Triggers FRT is a perfectly legal semi-automatic drop-in trigger." Defs. Ex. A. Maxwell further stressed in the video that, in reaching these conclusions, he sought the opinions of "two former ATF employees," whom he called "two of the most significant subject matter experts in the industry." Defs. Ex. A. Of the two former ATF agents that Maxwell had consulted at the time he published this video, he informed the viewer that "one literally wrote the book on technical branch training" at the ATF, and "the other is a recently retired supervisor senior agent-in-charge who is now a practicing attorney." Defs. Ex. A.

DeMonico published similar videos on the RBT website unequivocally representing to prospective customers that the FRT-15 was legal. *See, e.g.*, Defs. Exs. B, D. In fact, in one such video published on January 23, 2021, DeMonico interviewed O'Kelly and, after repeatedly emphasizing that O'Kelly was a former ATF agent who had testified numerous times in court as an expert witness, asked him, "Here is the million-dollar question: is the FRT a machinegun?" Defs. Ex. D. O'Kelly—who had privately warned Defendants of the serious risk that the ATF *would* classify the FRT-15 as a machinegun—responded, "Absolutely not." Defs. Ex. D.

When RBT first launched the FRT-15, Defendants received "hundreds if not thousands of questions from customers asking about [its] legality." Defs. Ex. D; *see also* ECF No. 124-1 at 191:24–192:5. In response, Defendants consistently assured their customers by email that their product was "absolutely positively" legal. *See, e.g.*, Govt. Ex. 128 at 1; *see*

*also* Tr. 478:22–479:7. DeMonico often used the same form language when responding to this type of inquiry: "Have we created something innovative? Yes! Have we done anything illegal? No!" *See, e.g.*, Govt. Exs. 103 at 1, 104 at 1; Defs. Ex. I1 at 1. Moreover, in the event that customers specifically asked whether Defendants had first sought the ATF's opinion before bringing the FRT-15 to market—and whether they might be able to have a copy of that opinion letter for their protection, should they be stopped by authorities—Defendants responded that they had not participated in the ATF's classification process, but stressed that they had instead consulted former ATF agents who had uniformly determined that the product was "legal." Tr. 440:22–441:3, 483:3–9, 487:2–19; *see generally* Defs. Ex. I1 (cataloguing many such examples).

RBT, which made roughly $39 million in revenue from sales of the FRT-15 in just two years, ECF No. 105-1 at 2, had a "no refund" policy. Tr. 446:16–24; ECF No. 124-3 at 88:24–89:4; Govt. Ex. 39 at 9; Defs. Ex. R3 at 2–3. DeMonico and Leleux clarified that, notwithstanding the company's formal policy, RBT had in fact issued refunds to certain customers on a case-by-case basis over the years—for example, when a customer purchased two devices but only wanted to keep one. Tr. 446:25–447:17; ECF No. 124-3 at 89:4–22. In his deposition, however, DeMonico explained the reason behind the policy: RBT adopted it because "the last thing we wanted to deal with was, you know, a landslide of customers wanting a refund because, you know, the ATF changed their mind on something." ECF No. 124-1 at 57:18–21.

### III. The ATF's Cease-and-Desist Letter

The ATF soon caught wind of the FRT-15. *See* Tr. 235:15–22; Defs. Ex. Y2 at 4. As internal email discussions at the agency reveal, the agents were for several months unable to secure an FRT-15 for testing and classification because RBT sold out of FRT-15s almost instantly every time the product was back in stock. Defs. Ex. U3 at 1. On June 4, 2021, however, the Firearms Technology Criminal Branch of the ATF finally received an FRT-15 for classification. Govt. Ex. 1 at 1; Defs. Ex. S at 1. In a report signed on July 15, 2021, the ATF concluded—consistent with the aim of Rounds's redesign—that the FRT-15 "does not function by 'hammer follow.' " Govt. Ex. 1 at 3, 6; Defs. Ex. S at 3, 6. However, the ATF classified the FRT-15 as a machinegun for the same reason it had so classified the AR-1: because "one continuous pull of the trigger allows" a firearm equipped with an FRT-15 "to shoot more than one shot." Govt. Ex. 1 at 5; Defs. Ex. S at 5. [9]

**\*12** On July 27, 2021, the ATF served Defendants with a cease-and-desist letter, ordering Defendants to stop "all manufacture and transfer" of FRT-15s and to "[c]ontact ATF ... to develop a plan for addressing those machineguns already distributed." Govt. Ex. 2 at 1–2; Defs. Ex. C1 at 1–2; *see also* Tr. 216:1–4. [10] Craig Saier, who at the time was Special Agent in Charge of the ATF's Tampa Field Division, personally served the ATF's cease-and-desist letter on Maxwell. Tr. 209:18–21, 214:11–19. DeMonico claimed at the preliminary injunction hearing that Defendants "were all pretty surprised to receive" the cease-and-desist. Tr. 448:9–11. But at the meeting in which Saier provided the letter to Maxwell, Maxwell told Saier that he "expected this letter." Tr. 217:8. In fact, Maxwell added, he had already drafted the complaint that RBT planned to file against the ATF in court, and had been waiting for the ATF's cease-and-desist to so file. Tr: 217:8–10; *see also* Defs. Ex. V3 at 2.

After the ATF issued its cease-and-desist, Defendants immediately went on offense. Less than a week after being served with the ATF's notice, on August 3, 2021, Defendants filed suit in the United States District Court for the Middle District of Florida, seeking a legal declaration that the agency's classification was erroneous and an order enjoining the ATF from interfering with Defendants' sales of the FRT-15. *See* Defs. Ex. Z1 at 1, 17. Defendants also—both directly and through a public relations firm they hired for this purpose—launched a media campaign to publicize the fact that RBT had sued the ATF. Tr. 450:16–451:20, 548:5–17; ECF No. 107-4 ¶¶ 3–5; *see generally* Govt. Exs. 11, 13, 18; Defs. Ex. G3.

On August 19, 2021, DeMonico issued a public statement by video. Tr. 450:16–20; *see also* Govt. Exs. 12, 13. In it, DeMonico informed his customers that the ATF had issued a cease-and-desist letter after classifying the FRT-15 as a machinegun, but that the cease-and-desist "has zero relevance" to any RBT customers who had already purchased an FRT-15. Govt. Ex. 13 at 2:2–17, 5:7–16. DeMonico also again stressed to his customers that the ATF's classification was wrong in light of the contrary opinions of Defendants' four experts, who were all former ATF agents. Govt. Ex. 13 at 3:9–4:21. In interviews, DeMonico also asserted that he was the only person with the "balls" to sell the FRT-15, and that "when shit hit[ ] the fan" he wasn't going to "run" or "hide." Govt. Ex. 18 at 4:6–18.

But Defendants' much-hyped lawsuit was short-lived. The federal district judge presiding over the suit promptly denied RBT's request for a temporary restraining order (on August 5, 2021) and, after a hearing, denied RBT's motion for a preliminary injunction on October 12, 2021. *See Rare Breed Triggers, LLC v. Garland*, 21-cv-1245, 2021 WL 4750081, at \*1 n.2, \*3 (M.D. Fla. Oct. 12, 2021). The Court then dismissed the action altogether on October 28, 2021, when the parties failed to file a case management report. *See* Defs. Ex. B2 at 1–2. Although the dismissal order informed Defendants that they "may seek reconsideration" of the dismissal if they were not at fault for the apparent noncompliance with the Court's procedures, Defs. Ex. B2 at 2 n.1, they did not do so.

On November 2, 2021, Defendants submitted additional materials to the ATF—including their experts' opinion letters—and requested that the agency reconsider the FRT-15's classification. Tr. 250:12–16, 252:3–7; Defs. Ex. X1 at 1–2. Saier informed Maxwell that he would forward his reconsideration application to the ATF's Firearms Ammunition and Technology Division. At the same time, he reiterated the ATF's position to Maxwell and again directed RBT to (1) stop selling the FRT-15 and (2) contact the ATF about a process for identifying and retrieving FRT-15s that RBT had already sold. Tr. 220:7–23, 249:24–250:10, 598:19–599:8; Govt Exs. 5 at 1–2, 35 at 1–2; Defs. Ex. D1 at 1–2. Six weeks later, Maxwell sent a follow-up letter to the ATF inquiring about the status of Defendants' reconsideration request. Defs. Ex. Y1 at 1. He received no response, and Defendants continued to sell and actively market the sale of FRT-15s. Tr. 453:14–15.

**\*13** On January 12, 2022, the ATF served a cease-and-desist letter on 3rd Gen Machine, the company that manufactured and fulfilled orders for RBT. ECF No. 105-5 ¶ 2–3, 5; ECF No. 120-3 ¶ 2; Govt. Ex. 37 at 1–2; Defs. Ex. E1 at 1–2; *see also* Tr. 453:17–454:6, 504:22–505:8, 533:11–12. Upon receiving the ATF's cease-and-desist, Jonathan Robinson, then-General Manager of 3rd Gen, asked Defendants about the legality of the FRT-15. ECF No. 105-5 ¶¶ 5–6. Defendants assured him that they were "involved in litigation with the ATF," and that the judge "had shut the case down, in favor of RBT, because the ATF had not allowed RBT to submit documents to it concerning the FRT-15." ECF No. 105-5 ¶ 7. This was untrue: Defendants were not, at that time, "involved" in any litigation, in any court, challenging the ATF's classification of the FRT-15 as a machinegun. Nor was the case resolved (or "shut down") in RBT's "favor"—it had been dismissed on procedural grounds, and RBT had done

nothing to refile it, in Florida or elsewhere. But 3rd Gen apparently relied on those representations and continued to produce the FRT-15. *See* ECF No. 105-5 ¶ 8.

On March 22, 2022, the ATF published an open letter to all gun owners who may have purchased an FRT-15, informing them that the ATF had classified the FRT-15 as a machinegun, that "ATF intends to take appropriate remedial action with respect to sellers and possessors of these devices," and that purchasers are encouraged to voluntarily divest themselves of FRT-15s. Govt. Ex. 38 at 1–2; Defs. Ex. G1 at 1–2; *see also* Tr. 245:20–23.

On March 26, 2022, the ATF executed a search of 3rd Gen Machine's premises, pursuant to a warrant issued by Magistrate Judge Jared C. Bennett of the United States District Court for the District of Utah. ECF No. 117-1 ¶ 2, ECF No. 120-3 ¶¶ 1, 3. Judge Bennett's warrant authorized the ATF to seize, *inter alia*, "[a]ll ... FRT-15 machineguns" in 3rd Gen's facilities. ECF No. 120-3 at 7. The ATF indeed seized the FRT-15s and component parts in 3rd Gen's possession, as well as 3rd Gen's computers. Tr. 506:23–507:1; ECF No. 120-3 ¶ 4. Soon thereafter, however, Defendants learned that, despite the ATF's search, a pallet of FRT-15s remained at 3rd Gen. Tr. 457:22–458:7; ECF No. 105-5 ¶ 10; ECF No. 120-3 ¶ 5–6. [11] On March 30, 2022, Maxwell requested by email that 3rd Gen send the pallet of FRT-15s to RBT, to which 3rd Gen, through counsel, responded that it refused to obstruct the ATF, which planned to take possession of these devices as well. ECF No. 105-5 ¶ 12; ECF No. 124-1 at 175:21–176:1; Defs. Ex. A4 at 1–2. On April 14, 2022, however, DeMonico flew to Salt Lake City, drove to 3rd Gen, loaded the pallet of triggers into a U-Haul, and drove hundreds of miles to New Mexico before the ATF intercepted him and seized the triggers. Tr. 457:22–458:7, 459:6–461:12, 463:25–467:21, 508:4–13; ECF No. 105-5 ¶ 13–15; ECF No. 117-1 ¶¶ 5–6; ECF No. 124-1 at 179:15–182:10. [12]

On May 16, 2022, Defendants again filed suit against the ATF in the United States District Court for the District of North Dakota, where RBT had recently re-incorporated. *See* ECF No. 124-1 at 104:21–105:1; Defs. Ex. C2 at 1. The action was dismissed for lack of venue on November 5, 2022. Tr. 516:17–23. *See Rare Breed Triggers, LLC v. Garland*, 22-cv-85, ––– F.Supp.3d –––, –––, 2022 WL 17175089, at *7 (D.N.D. Nov. 4, 2022).

During this time, Defendants and their representatives fielded numerous email inquiries from their customers as to the legality of the FRT-15 and the potential consequences of purchasing one. For example, when customers expressed concerns that their purchase history would eventually become available to the ATF, Defendants regularly informed them that RBT had a "digital shredding" policy, pursuant to which customer data was automatically deleted after a certain period; Defendants assured their customers that this mitigated any risk that the ATF would be able to identify RBT's customers and seize their FRT-15s, informing them, "we can't turn over what we don't have." Govt. Ex. 107 at 1; *see also* ECF No. 124-2 at 85:14–18; Govt. Ex. 88 at 1; Defs. Ex. F, Q3 at 1.

**\*14** In or around November 2022, Defendants, who had previously mailed their triggers largely through the United Parcel Service ("UPS"), a private carrier, began shipping triggers through the United States Postal Service ("USPS"). *See, e.g.*, Tr. 444:22–445:1, 476:19–25. When mailing triggers using USPS—but only USPS—Defendants wrote on each package's "return" line fictitious company names that shared RBT's initials, such as "Red Barn Tools" or "Red Beard Treasures." Tr. 445:11–446:3, 476:9–477:6; Govt. Ex. 52 at 4.

After the ATF's issuance of the cease-and-desist letter, Defendants apparently no longer informed their customers that the FRT-15 was "absolutely legal," but instead used form language stating that it was "[thei]r position" that the FRT-15 was legal, and that Defendants were "currently in litigation" to challenge the ATF's classification. *See, e.g.*, Defs. Ex. H1 at 3. Yet Defendants sent emails to their customers that included such language even after their action in the Middle District of Florida was dismissed, and long before they commenced their action in the District of North Dakota seven months later. *See, e.g.*, Govt. Ex. 22 at 5. They also did so after their action in the District of North Dakota was dismissed. *See, e.g.*, Govt. Ex. 92 at 1; Defs. Ex. H1 at 3. Although RBT initially publicized the existence of (and their legal challenges to) the ATF's July 2021 cease-and-desist letter on its social media platforms and in media interviews, they omitted any reference to the ATF's classification of the FRT-15 as a machinegun on RBT's website, which was the only place that customers could actually purchase an FRT-15 from RBT. Tr. 483:11–484:13, 485:1–9.

After the ATF classified the FRT-15 as a machinegun, Defendants were "bombarded" with emails from concerned customers. ECF No. 124-2 at 81:23–83:7. When frustrated customers emailed Defendants demanding a refund—

explaining that they had no idea prior to purchase that the ATF had so classified the FRT-15—Defendants routinely repeated "[thei]r position" as to the legality of the FRT-15, reminded the customers that they had agreed to RBT's "no refund" policy at checkout, and warned the customer that any attempt to refund a purchase would be met with legal action. *See, e.g.*, Govt. Exs. 22 at 5–6, 80 at 5–6; Defs. Ex. K1 at 3.

## ANALYSIS

**[1]** **[2]** Rule 65(a) of the Federal Rules of Civil Procedure permits a district court to issue preliminary injunctive relief to a party while an action proceeds to a final decision. Fed. R. Civ. P. 65(a). A preliminary injunction, however, is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, ––– U.S. ––––, 138 S. Ct. 1942, 1943, 201 L.Ed.2d 398 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). Rather, a party seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).[13]

**\*15** **[3]** **[4]** **[5]** The moving party must also demonstrate that "the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quotation marks omitted); *Khan v. Addy's BBQ LLC*, 419 F. Supp. 3d 538, 552 (E.D.N.Y. 2019). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties ... but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580, 137 S.Ct. 2080, 198 L.Ed.2d 643 (2017) (per curiam) (citations omitted). On a preliminary injunction motion, "the court must ... state the findings and conclusions that support its" decision, Fed. R. Civ. P. 52(a)(2), which may include an assessment of the witnesses' credibility when necessary to resolve a contested issue of fact. *See, e.g.*, *Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 282 F. App'x 885, 889 n.2 (2d Cir. 2008).

The Fraud Injunction Act is a hybrid civil-criminal statute that authorizes the Government to seek injunctive relief in "any Federal court" upon a showing that a defendant is "violating or about to violate" certain federal criminal fraud statutes. 18 U.S.C. § 1345(a). The crimes covered by § 1345 include conspiracies to defraud the United States under 18 U.S.C. § 371, as well as mail fraud, wire fraud, and conspiracies to commit mail or wire fraud under 18 U.S.C. §§ 1341, 1343, and 1349. The statute requires the court to "proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." 18 U.S.C. § 1345(b). Actions brought under the Fraud Injunction Act are "governed by the Federal Rules of Civil Procedure." *Id.*

## I. Likelihood of Success on the Merits

### A. The FRT-15 Is Likely an Illegal Machinegun

**[6]** The Government's motion for a preliminary injunction—indeed, this entire action—depends in part on the threshold question of whether the FRT-15 is, in fact, an illegal machinegun. For instance, the Government alleges that Defendants knew that the FRT-15 was an illegal machinegun before they brought the device to market but failed to inform their customers of this fact prior to sale, constituting mail and wire fraud. The Government further alleges that Defendants have conspired to interfere with the ATF's attempts to track and confiscate illegal machineguns, which, the Government asserts, includes the FRT-15. Each of these arguments thus depends in part on whether the FRT-15 satisfies the statutory definition of a machinegun under federal law, and both parties agree that the Court must answer this threshold question in order to assess the Government's fraud claims. On the present record, the Court concludes that the Government has demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun.

The National Firearms Act of 1934 ("NFA") defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The NFA, when passed in 1934, did not criminalize the

manufacture or possession of machineguns, but instead subjected machineguns to a $200 per-unit tax. *See* National Firearms Act of 1934, Pub. L. No. 73-474, § 3(a), 48 Stat. 1236, 1237 (1934).

**\*16** In 1968, Congress passed the Gun Control Act ("GCA"), which, among other things, expanded the definition of "machinegun" to include parts that can convert a weapon into a machinegun, expanded federal regulation to other firearms such as rifles and sawed-off shotguns, and required entities that manufacture or sell covered firearms, including machineguns, to first obtain a federal firearms license. *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1215–23, 1231 (1968). The Firearms Owners' Protection Act of 1986 ("FOPA"), in turn, amended the GCA to outright prohibit the sale or possession of any machinegun that was manufactured after 1986. Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, § 102, 100 Stat. 451, 453 (1986). The FOPA incorporated by reference the definition of "machinegun" outlined in 28 U.S.C. § 5845(b). 18 U.S.C. § 921(a)(24). It is therefore currently illegal to possess or sell any weapon which fires multiples shots "automatically ... by a single function of the trigger." *See* 26 U.S.C. § 5845(b); 18 U.S.C. § 922(o)(1). [14]

In the present action, the parties offer contrary interpretations of the phrase "automatically ... by a single function of the trigger" in § 5845(b)'s definition of an illegal machinegun. The Government argues that a trigger's "function" is to initiate the firing sequence. *See, e.g.*, O.A. Tr. 25:21–26:2, 27:13–14. Once the trigger begins the firing sequence—typically by means of a shooter's pull on the trigger shoe—the trigger will then fire one round if the weapon is a semi-automatic, or multiple rounds if the weapon is an automatic.

As applied to any weapon with a standard pull trigger, therefore, the Government asserts that the word "function" in § 5845(b) is essentially synonymous with the word "pull," since the pull of the trigger begins the firing sequence. O.A. Tr. 25:21–26:2, 27:13–20. After the shooter's initial pull, a shooter firing a machinegun need only apply constant rearward pressure to the trigger with his or her finger to rapidly fire multiple rounds of ammunition. O.A. Tr. 12:12–13, 25:1–8. In the Government's view, because a weapon equipped with an FRT-15 is also capable of automatically firing multiple bullets with a single pull of the trigger—that is, the shooter need only maintain "constant rearward pressure"

on the trigger after an initial pull for the weapon to fire—it is an illegal machinegun. This is so, the Government argues, regardless of the fact that on the FRT-15, the trigger technically re-engages with the hammer before firing each shot and moves back and forth against the shooter's finger. O.A. Tr. 25:21–27:2.

Under the Government's proposed definition, the trigger on the FRT-15 only "functions" once to achieve multiple rounds of fire because once the shooter initiates the firing sequence by pulling the trigger, the weapon then fires automatically until the shooter releases the trigger or the ammunition is exhausted. OA. Tr. 27:3–10. Indeed, out-of-circuit caselaw interpreting the word "trigger" in § 5845(b) supports the Government's proposed interpretation of the phrase "single function of the trigger." *Cf. United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) ("The ordinary meaning [of] a trigger is a mechanism that is used to initiate the firing sequence."); *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002) ("We join our sister circuits in holding that a trigger is a mechanism used to initiate a firing sequence.").

Defendants' proposed definition of § 5845(b) is not a model of clarity. It appears, however, that Defendants have offered two alternate, but closely related, interpretations of the phrase "single function of the trigger." First, Defendants argue that the term "function" refers to the internal workings of the firearm as it loads and expels a projectile, *i.e.*, the role that the trigger plays in the mechanics of a weapon's firing cycle. Specifically, they argue that a trigger's function is to "release the hammer," which is the mechanism within a gun's firing apparatus which, when released, strikes the firing pin, causing a shot to be fired. *See, e.g.*, O.A. Tr. 24:9–10. On a semi-automatic weapon, the trigger must re-engage the hammer by way of each piece's "sear surface" before the process can repeat and the gun can fire an additional round. On a classic machinegun like the M-16, on the other hand, once the trigger shoe is pulled by the shooter's finger, the trigger only needs to release the hammer a single time before the automatic firing sequence begins: once it does so, the hammer strikes the firing pin, and the force of the initial shot begins a repetitive process between the hammer, the auto-sear, the bolt carrier, and the firing pin, allowing for automatic fire. For this reason, Defendants argue, any gun which fires only one bullet each time the trigger re-engages the hammer fires only one bullet per "function" of the trigger and is not a machinegun—even if, as a practical matter, the weapon is capable of rapidly firing bullets as long as the shooter pulls the trigger once

and maintains rearward pressure on the trigger shoe. In other words, Defendants assert that whether the shooter "pulls" the trigger multiple times to fire multiple rounds is irrelevant under § 5845(b). *See* O.A. Tr. 21:1–4, 23:15–17, 33:16–22.

**\*17** Defendants have also, at points in this litigation, conceded that, in light of Supreme Court caselaw, the word "function" in § 5845(b), as the Government contends, is synonymous with the word "pull," and that a weapon is therefore a machinegun as long as it fires multiple rounds with a single "pull" of the trigger. O.A. Tr. 20:17–24, 21:6–20. But Defendants argue that the FRT-15 nonetheless satisfies that definition. They argue that even though a shooter need only consciously pull the trigger shoe once and maintain constant pressure on the trigger with her finger in order for a weapon equipped with an FRT-15 to fire repeatedly, the trigger is in fact being "pulled" repeatedly and rapidly throughout that process. O.A. Tr. 20:9–16, 22:8–23:3. These "pulls" of the shooter's finger are imperceptible to someone watching an FRT-15 in action. However, at the preliminary injunction hearing, Defendants played a video of an FRT-15 at a rate approximately sixty-one times slower than real-time speed; in extreme slow motion, a viewer can see that the trigger shoe does move slightly back and forth against the shooter's finger with each shot in the firing cycle. [15] Defendants thus argue that, in the mechanical sense, when the shooter pulls the trigger and then simply maintains pressure on the trigger shoe, the trigger is "pulled" with each additional shot as it resets and re-engages with the hammer inside the weapon—even though the shooter consciously does no additional "pulling" and is instead maintaining pressure on the trigger shoe. O.A. Tr. 19:19–23, 23:4–11.

The Court concludes that the Government, and not the Defendants, provides the correct interpretation of § 5845(b) as applied to the FRT-15.

### 1. As Applied to Triggers Such As the FRT-15, the Word "Function" in § 5845(b) Is Synonymous with the Word "Pull"

The Court does not start its statutory analysis on a clean slate. Rather, the Court is guided by Supreme Court precedent in *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), which all but dooms Defendants'

first proposed interpretation of § 5845(b). In *Staples*, the Court considered a defendant's challenge to his criminal conviction for the illegal possession of an unregistered machinegun; although federal agents determined the weapon had been modified to fire automatically after test-firing it, the defendant contended that he was unaware that the weapon was capable of automatic fire, and that the Government should have been required to prove beyond a reasonable doubt that he knew the weapon had characteristics that made it a machinegun under federal law. *Id.* at 602, 114 S.Ct. 1793.

The Court reversed the defendant's conviction, concluding that the trial court had improperly instructed the jury as to the *mens rea* that the Government had to prove to secure a conviction for illegal possession of an unregistered machine gun. *Id.* at 602–604, 114 S.Ct. 1793. In its discussion of the federal prohibition on possession of such devices, the Court interpreted § 5845(b) as follows:

> The National Firearms Act ... defines a machinegun as "any weapon which shoots ... automatically more than one shot, without manual reloading, by a single function of the trigger," § 5845(b). Thus, any fully automatic weapon is a "firearm" within the meaning of the Act.... [T]he terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly *with a single pull of the trigger.* That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are "machineguns" within the meaning of the Act. We use the term "semiautomatic" to designate a weapon that fires *only one shot with each pull of the trigger.*

*Id.* at 602 & n.1, 114 S.Ct. 1793 (cleaned up) (emphasis added).

[7] *Staples* arguably renders this Court's analysis of § 5845(b) complete. District courts do not typically engage in independent exercises of statutory interpretation when presented with an appellate court's interpretation of the same statute. A weapon is a machinegun within the meaning of § 5845(b), therefore, if it is capable of "fir[ing] repeatedly with a single pull of the trigger." *Id.* Notably, Defendants conceded at oral argument on August 15, 2023 that this

"single pull of the trigger" interpretation of § 5845(b) in *Staples* is binding on this Court. O.A. Tr. 20:18–21:20.

Perhaps realizing the weight of this concession, Defendants then hastily withdrew it in a supplemental letter brief filed on August 23, 2023. ECF No. 130 at 1. They urge the Court to give *Staples* limited weight because, they argue, this portion of the Court's opinion was set forth in a footnote of the Court's opinion and is merely "dictum." ECF No. 130 at 1–2; *see also* Defs. Ex. U1 at 166:23–167:8. Other courts have offered similar suggestions. *See United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009) (concluding that "the *Staples* footnote was not "precedentially binding") [16]; *United States v. Alkazahg*, 81 M.J. 764, 780 (N-M. Ct. Crim. App. 2021) (concluding that the *Staples* "footnote is not the interpretation of a statute").

*18 [8] Defendants' arguments are unconvincing. First, interpretations of law from an appellate court—particularly the United States Supreme Court—even if technically dicta, are entitled to persuasive weight by a district court in the absence of other, binding interpretations of the same law. *Cf. Fischer v. CF & I Steel Corp.*, 657 F. Supp. 1195, 1201 (S.D.N.Y. 1987) ("[E]ven if the *Klinger* [v. *Baltimore & O. R. Co.*, 432 F.2d 506 (2nd Cir. 1970)] holding were dicta for the reasons urged by defendants, such a pronouncement would still serve as powerful guidance for lower courts in interpreting this rarely construed statute."). Second, to the extent that Defendants seek to diminish the weight of the *Staples* Court's explication of § 5845(b) because it appears in a footnote, that fact alone does not render it unpersuasive or unimpactful. *See, e.g.*, *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1934) (suggesting that courts employ a tiered system of scrutiny when assessing the constitutionality of a statute).

[9] Assuming that the interpretation of § 5845(b) set forth in *Staples* is not binding, however, then the Court must, as with any act of statutory interpretation, "start[ ] with the language of the statute itself." *United States v. Kinzler*, 55 F.3d 70, 72 (2d Cir. 1995); *see also Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012) ("As with any question of statutory interpretation, we begin with the text

of the statute to determine whether the language at issue has a plain and unambiguous meaning."). Unless a statute defines a term, or the statute otherwise indicates that a term should be given special meaning, a court typically interprets the statute "applying the ordinary, contemporary, common meaning of the words used." *Kinzler*, 55 F.3d at 72 (citation and quotation marks omitted). The court may also employ other "traditional tools of statutory construction" after considering the statute's text, including examining the statute's "purpose as reflected in its legislative history." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't. Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017) (citations omitted).

The Court starts its inquiry by considering the plain meaning of the terms "trigger" and "function." Modern dictionaries variously define the word "trigger" in the context of firearms to mean "a part of a gun that causes the gun to fire when pressed" [17] and "the part of the action moved by the finger to fire a gun." [18] These same sources define the word "function" as "the natural purpose [ ]of something," [19] "the action for which a ... thing is specially fitted or used or for which a thing exists." [20] These definitions strongly support the inference that the phrase "function of the trigger" is, as the Government asserts, synonymous with "pull of the trigger," since they describe a trigger as the external interface between the shooter and the firing mechanism that, when pulled, causes the gun to be fired. *See Cargill v. Garland*, 57 F.4th 447, 452 (5th Cir. 2023) ("The trigger is the interface between the gun's internal mechanism and the human finger.").

The Court also considers the definition of the word "trigger" in 1934, when the NFA was passed. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (concluding that the statute's year of enactment is "[t]he most relevant time for determining a statutory term's meaning"). In 1934, Webster's dictionary defined a trigger in a firearm as "the part of a lock moved by the finger to release the cock in firing." *Webster's New International Dictionary of the English Language* (2d ed. 1934). On the one hand, the definition could support a narrow reading that is consistent with Defendants' position, defining a trigger's function internally as part of the firing mechanism that "release[es] the [hammer]." On the other hand, the definition could support a broad reading of a trigger's function that is consistent with the Government's position, defining the trigger as the part of the firing mechanism that, true, releases

the hammer, but only for the broader purpose of "firing" the weapon, and only when "moved by the finger."

*19 [10] The Court concludes that, in the context of the NFA, the latter interpretation is the correct one. The Court appreciates that, as Defendants argue, the trigger on a firearm equipped with an FRT-15 does indeed release the firearm's hammer. Defendants presented two expert witnesses during the Court's preliminary injunction hearing to explain that "releasing the hammer" is the trigger's technical function within a gun's firing mechanism; the Government does not dispute that this is an accurate technical description of how the trigger interfaces with the other internal components of the weapon during the firing cycle. *See, e.g.*, O.A. Tr. 26:5–10. However, there is simply no indication in the NFA, or the statutes that adopted the meanings defined in the NFA, that Congress intended the phrase "single function of the trigger" to be given a technical meaning rather than its ordinary, common meaning. *See Kinzler*, 55 F.3d at 72. For precisely that reason, other courts have cited approvingly to *Staples*—defining a firearm as a machinegun if it can fire multiple rounds with a single "pull"—as offering a "commonsense" definition for what constitutes a machinegun, rather than one which depends on "hyper-technical adherence to literalism."

🚩*Fleischli*, 305 F.3d at 655. *See also* 🚩*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 30 (D.C. Cir. 2019) ("[A] quite common feature of weapons that indisputably qualify as machineguns is that they require both a single pull of the trigger and the application of constant and continuing pressure on the trigger after it is pulled." (emphasis omitted)). Federal appellate cases that pre-date 🚩*Staples* also reached the same conclusion. *See, e.g.*, 🚩🌀*United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) ("[I]t is undisputed that the shooter could, by fully pulling the trigger, and it only, at the point of maximum leverage, obtain automation with a single trigger function. We are satisfied the gun was a machinegun within the statutory definition.").[21]

This interpretation of the text is also fully grounded in the legislative history of the National Firearms Act. As the transcript of the hearing before the House Ways and Means Committee demonstrates, the first draft of the National Firearms Act defined a machinegun not with reference to the weapon's trigger but as "any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading." *National Firearms Act: Hearing on H.R. 9066 Before the H. Comm. on Ways and Means*, 73rd Cong. 1 (1934). However, then-president of the National Rifle

Association Karl Frederick testified before the committee on the first day of the hearing and, asserting that the working definition of a machinegun was "wholly inadequate and unsatisfactory," *id.* at 39, recommended what became the final definitional language of 🚩§ 5845(b). *Id.* at 40. The subsequent colloquy among Frederick and the members of the committee demonstrates that both the president of the NRA and the legislators at the hearing all considered the words "function" and "pull" to be interchangeable:

> MR. FREDERICK: The distinguishing feature of a machinegun is that *by a single pull of the trigger the gun continues to fire* as long as there is any ammunition in the belt or in the magazine. Other guns require a *separate pull of the trigger for every shot fired*, and such guns are not properly designated as machineguns. A gun, however, which is capable of firing more than one shot by *a single pull of the trigger, a single function of the trigger*, is properly regarded, in my opinion, as a machinegun.

> *20 MR. HILL: May l ask you a question there?

> MR. FREDERICK: Yes, sir.

> MR. HILL: Suppose your definition were adopted. Would it be practicable to manufacture a gun that would be classed either as an automatic or a semiautomatically operated gun, even with more than one function of the trigger, and still answer the purpose, in a large way, of a machinegun which requires only one function of the trigger?

> MR. FREDERICK: I do not think so. For purposes of example, you may look at the automatic pistol which is the standard weapon of the United States Army. That has an automatic discharge of the empty cartridge and a reloading principle which is operated by the force of the gas from the exploded cartridge. *But with a single pull of the trigger only one shot is fired. You must release the trigger and pull it again for the second shot to be fired. You can keep firing that as fast as you can pull your trigger: But that is not properly a machinegun* and in point of effectiveness any gun so operated will be very much less effective than one which pours out *a stream of bullets with a single pull* and as a perfect stream....

> MR. CHOCHRAN: Mr. Frederick, under your proposed definition, would the Colt automatic pistol be a machinegun?

MR. FREDERICK: No, sir. I do not think that in the eyes of any ballistic engineer it would be so regarded. I do not think it should be so regarded.

MR. COCHRAN: Does not the Colt automatic pistol continue to shoot *as long as you exert pressure upon the trigger?*

MR. FREDERICK: No, sir. It requires a *separate pull of the trigger* for every shot fired.

*Id.* at 40–41 (emphasis supplied). After Frederick's proposed language was adopted, Assistant Attorney General Joseph Keenan further discussed the meaning of the phrase "single function of the trigger" with legislators:

MR. HILL: One question relative to the definition of machineguns. There is a distinction between an auto-loading and automatic gun, I take it?

MR. KEENAN: I think so.

MR. HILL: *An automatic gun is one that fires without pulling the trigger more than once.* An auto-loading might not be an automatic. An auto-loading gun might not be an automatic gun; for instance, you have these small rifles, the .22-caliber rifles which are auto-loading, but *you have to pull the trigger each time to fire them. That is not a machinegun.*

MR. KEENAN: That is right.

MR. HILL: I know in these small rifles, when you fire by pulling the trigger they reload automatically, but they do not automatically fire again *unless you pull the trigger.*

MR. KEENAN: I appreciate the distinction.

MR. HILL: That is not a machinegun under this definition.

MR. KEENAN: No.

*Id.* at 97 (emphasis supplied).

After the committee changed the statutory definition of a machinegun to one fired automatically by a "single function of the trigger," the Senate Finance Committee and the House Ways and Means Committee both recommended that their respective chambers pass the bill. In summarizing the bill to the legislators, each committee noted that a "machinegun" in the bill was given its "usual definition" as "a weapon designed to shoot more than one shot without reloading and by a single

pull of the trigger." S. Rep. No. 73-1444, at 2 (1934); H.R. Rep. No. 73-1780, at 2 (1934).

**\*21** Moreover, Defendants' proposed technical definition of a trigger's "function"—defined solely as the part of the firing mechanism that releases the hammer—is simply so narrow that nearly any machinegun could be modestly redesigned to thwart Congress's ban on machineguns. *Cf. Kinzler*, 55 F.3d at 72 (noting that statutory interpretations that contradict legislative intent are disfavored); *In re Gusam Rest. Corp.*, 737 F.2d 274, 276 (2d Cir. 1984) (adopting an interpretation after concluding that it "does not contradict[ ]" the "congressional intent" of the statute). Suppose the Court adopted Defendants' interpretation of § 5845(b) and concluded that the "function" of a gun's trigger is solely to "release the hammer." A firearm would only be a machinegun, then, if it fired multiple bullets per single instance of the trigger releasing the hammer. A firearms manufacturer could well design a weapon identical to an M-16 machinegun except for the fact that the trigger engages not directly with the hammer, but with a widget which in turn releases the hammer and initiates automatic fire. Such a gun would be, for all practical purposes, a machinegun, since it would continue to automatically fire until the shooter releases his finger from the trigger—which then, instead of retaining the hammer directly, interfaces with the widget which in turn retains the hammer. Yet under Defendants' proposed interpretation of § 5845(b), such a weapon does not "function" when the shooter pulls the trigger, since the trigger never itself releases the hammer. Indeed, other courts have rejected similar attempts to circumvent the statute. *Oakes*, 564 F.2d at 388 (concluding that a gun with one trigger that, when pulled, activated a second trigger, which initiated automatic fire, was a machinegun); *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) (concluding that a weapon equipped with an electronic switch which, when pushed, caused the gun's factory-made trigger to fire repeatedly was a machinegun); *Fleischli*, 305 F.3d at 655–56 (same).

The Court therefore concludes in light of the above analysis that—as applied to a weapon with a standard pull trigger like the FRT-15—a firearm is a machinegun if it fires multiple rounds automatically with a single "pull" of the trigger. [22]

### 2. A Weapon Is a Machinegun If It Is Capable of Firing More Than One Round Per "Pull" of the Trigger Each Time the Shooter Pulls and Holds the Trigger Shoe

The Court turns, next, to Defendants' alternate argument that even if the interpretation of § 5845(b) in *Staples* ("single pull of the trigger") is binding on this Court, the FRT-15 is not a machinegun because it still requires separate "pulls" of the trigger to fire each shot. At post-hearing oral argument, Defendants conceded that the Supreme Court's interpretation of § 5845(b) in *Staples* is binding on this Court (before retracting that concession in a post-argument letter brief). Nonetheless, however, Defendants argue that the FRT-15 is legal even within the confines of that definition. O.A. Tr. 21:14–20, 22:21–23:3; ECF No. 130 at 1 (arguing that *Staples* "is consistent with our position in this case but it is not binding on this Court"). Although a shooter firing a weapon outfitted with an FRT-15 consciously pulls the trigger only one time and simply maintains pressure on the trigger shoe in order to fire the weapon repeatedly, the internal mechanics of the FRT-15 rapidly reset the trigger back to the ready-to-fire position over-and-over between each shot. Thus, Defendants argue, the FRT-15 requires *multiple* "pulls" to fire multiple shots if the Court considers the actual mechanics of the trigger, since the trigger shoe repeatedly moves (albeit only slightly) back and forth against the pressure of the shooter's finger, as the interior portion of the trigger repeatedly captures and releases the hammer with each firing cycle. O.A. Tr. 20:5–16.

There are several problems with Defendants' position. First, their proposed application of the term "single function" to the FRT-15 is implicitly rejected by *Staples*. In their sur-reply, Defendants cite *Staples* for the proposition that the Supreme Court, when interpreting § 5845(b), "did not refer to the pressure applied by the user's finger on the trigger, or the user's actions with regard to releasing the trigger." ECF No. 70 at 5. That is simply not so. Defendants' brief notably omits the first sentence of the *Staples* passage in question, defining an automatic weapon as one that "fires repeatedly *with a single pull of the trigger*." *Staples*, 511 U.S. at 603 n.1, 114 S.Ct. 1793 (emphasis added); *see* ECF No. 70 at 5. It is true that the Supreme Court did not literally say "with a single pull of the trigger *by the shooter*." But someone or something must be pulling the trigger in order for the weapon to fire. Defendants argue that "notably absent" from the language of § 5845(b) is "any reference to the weapon's user, his actions, or the actions of his trigger finger." ECF No. 70 at 4. In the strictest sense, that is true. Yet these words are implicit in the very concept of a "trigger." Indeed, even those courts that have interpreted § 5845(b) with a primary focus on the internal mechanics of the trigger's "function" recognize that "the trigger is the interface between the gun's internal mechanism *and the human finger*." *Cargill*, 57 F.4th at 452 (emphasis supplied).

**\*22  [11]**  The second problem with Defendants' position is that it cannot be reconciled with the complete statutory text of § 5845(b). Congress defined a machinegun as a weapon that fires "automatically" by a single function of the trigger. *See* 26 U.S.C. § 5845(b). Dictionaries currently define the word "automatic" when applied to firearms as describing a weapon which "is able to keep ... shooting continuously *for as long as the trigger is pressed*,"[23] and can "fir[e] repeatedly *until the trigger is released*."[24] Once again, Defendants' proposed definition of § 5845(b) contradicts the ordinary understanding of what it means for a firearm to operate automatically: it simply needs to fire repeatedly until the shooter releases the trigger. The fact that the trigger might move slightly against the pressure from the shooter's finger before release is irrelevant.

The definition of the word "automatic" in 1934 does not help Defendants, either. When Congress passed the NFA, Webster's Dictionary defined a device to be automatic if it had "a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation" or "perform[s] work formerly or usually done by hand." *Webster's New International Dictionary of the English Language supra.* The same dictionary also demonstrates that the phrase "automatic firearm" existed in the lexicon at that time. *Id.* Such definitions cannot support Defendants' proposed interpretation. When Congress passed the NFA in 1934, a machine was "automatic" precisely because, once activated, it acted of its own accord and replaced a task that was previously completed manually. This describes the FRT-15 exactly: if the shooter pulls the trigger one time, the repetitive mechanism in the FRT-15 is entirely self-executing until the shooter releases the trigger, notwithstanding the fact that the trigger mechanically pushes against the shooter's finger throughout the process. Such a device operates

"automatically" within the ordinary understanding of that word.[25]

### 3. The FRT-15 vs. Non-Mechanical Bump Stocks

Defendants urge the Court to follow the interpretive approach employed by two appellate courts to date in considering whether a different device—called a "non-mechanical bump stock"—falls within § 5845(b)'s definition of a machinegun. In particular, Defendants call this Court's attention to *Cargill v. Garland*, in which the Court of Appeals for the Fifth Circuit invalidated an amendment to 27 C.F.R. 411.79 defining a non-mechanical bump stock as a machinegun within the meaning of § 5845(b), 57 F.4th at 464.[26] In so holding, *Cargill* interpreted § 5845(b) as excluding such a device from its purview, concluding that § 5845(b) "ties the definition [of a machinegun] to the movement of the trigger itself, and not the movement of a trigger finger."[27] *Id.* at 460; *see also Alkazahg*, 81 M.J. 764.

***23** For all of Defendants' heavy reliance on *Cargill*, *see, e.g.*, ECF No. 50 at 3, 7–9, 21–23; ECF No. 70 at 3–5, that case does not ultimately support the result they seek when applied to the FRT-15's trigger function. Not only is *Cargill* distinguishable for a number of reasons, but its analysis of the distinctions between various firearm-modification devices in fact provides further grounds to find that the FRT-15 is a machinegun.

First, *Cargill* concerned an ATF regulation promulgated after notice-and-comment rulemaking that addressed the legality of "non-mechanical" bump stocks. *Id.* at 450–51. In short, when a gun owner shoots a weapon equipped with a non-mechanical bump stock and cradles the weapon with the proper technique, the gun is free to slide back and forth in the shooter's arms between shots. *Id.* at 453–54. As the gun comes forward, the trigger shoe re-engages with the shooter's stationary finger, thereby pulling the trigger and repeating the firing process. *Id.* A shooter operating a weapon equipped with such a device cannot simply pull the trigger and rapidly fire multiple rounds, however: rather, she must, with some skill, "maintain manual, forward pressure on the barrel and

manual, backward pressure on the trigger ledge" in order to do so. *Id.* at 463.

In *Cargill*, the Fifth Circuit invalidated an ATF regulation defining a non-mechanical bump stock as a machinegun within the meaning of § 5845(b). *Id.* at 464. In so holding, however, *Cargill* explicitly cabined its opinion to only those devices, and expressly distinguished them from "mechanical" devices that "automatically assist the shooter" in firing multiple rounds of ammunition:

> We note one important distinction. Some bump stocks—called mechanical bump stocks—are equipped with springs or **other internal mechanical devices that automatically assist the shooter** to engage in bump firing. For such a bump stock, the shooter does not have to maintain pressure on the barrel and trigger ledge in order to maintain this firing sequence. **Only non-mechanical bump stocks are at issue in this case.... The case might well be different if we were considering a semi-automatic weapon equipped with a *mechanical* bump stock.**

*Id.* at 454, 462 (italics in original, bold supplied).

Even if the *Cargill* analysis of § 5845(b) were correct, therefore, it would by its own terms simply not apply to the FRT-15. The FRT-15 is a *mechanical* device that automatically "resets" the trigger to repeat the firing cycle until the shooter releases the trigger shoe. And unlike the non-mechanical bump stock at issue in *Cargill*, the mechanical functionality of an FRT-15 means that even a novice shooter need only maintain finger pressure on the trigger shoe to achieve rapid sequential fire.

Second, *Cargill* cites to and reaffirms the Fifth Circuit's holding in *United States v. Camp*—a case which itself favors the Government's proposed interpretation of the word

"trigger" in § 5845(b) as applied here." 57 F.4th at 462. In Camp, the Fifth Circuit concluded that a weapon that was modified with an electric-powered device—one which, when switched on, caused the gun's factory-made trigger to fire in quick succession—was a machinegun, notwithstanding the fact that the gun's original trigger technically re-engaged with the weapon's hammer with each shot. 343 F.3d at 744–45. In so holding, Camp defined trigger function in § 5845(b) in terms virtually identical to those urged by the Government in this case: most notably, the Fifth Circuit reasoned that, unlike legal devices which "require a *user* to *separately pull the [trigger]* each time the weapon is fired," the firearm at issue in Camp "required only one *action*—pulling the switch [that the defendant] installed—to fire multiple shots" and was therefore a machinegun. *Id.* at 745 (emphasis supplied). Cargill reaffirmed Camp's conclusion that a trigger's function is to "initiate the firing sequence" on the weapon by means of a single user action, but it simply concluded that the logic of Camp, which involved a modified trigger mechanism, did not apply to bump stocks. Cargill, 57 F.4th at 462. Whereas in Camp, the defendant had replaced the weapon's standard trigger with a trigger that facilitated automatic fire, in Cargill, "no party [disputed] that the legally relevant trigger" to the question of whether a non-mechanical bump stock is a machine gun "is anything other than the traditional trigger" on a semi-automatic weapon." *Id.* The FRT-15 is much more akin to the trigger mechanism in Camp than to a non-mechanical bump stock: it replaces a semi-automatic rifle's standard trigger and allows for rapid sequential fire as long as the shooter simply pulls and holds the trigger. [28]

**\*24** Additionally, Cargill noted, as this Court does, that the phrase "single function of the trigger" in § 5845(b) specifically modifies the word "automatically." *Id.* at 460. Cargill defined the term "automatic" as "self-acting," and concluded that a semi-automatic rifle outfitted with a non-mechanical bump stock was not automatic because it still required simultaneous human input into both the "barrel" and "ledge" of the weapon to achieve automatic fire. *Id.* at 462–63. The Court therefore defined a non-mechanical bump

stock as a manual, rather than an automatic, device because "[b]ump firing does not maintain if all a shooter does is initially pull the trigger. Rather, to continue the firing after the shooter pulls the trigger, he or she must maintain manual, forward pressure on the barrel and manual, backward pressure on the trigger ledge." *Id.* at 463. That is decidedly not the case here. Unlike non-mechanical bump stocks, FRT-15s allow for rapid, automatic firing "if all a shooter does is initially pull the trigger," and the firing cycle will continue until that pressure is released. *Id.* at 454. [29]

Finally, Defendants call this Court's attention to a recent preliminary ruling applying Cargill in the Northern District of Texas. *See* Nat'l Ass'n for Gun Rights, Inc. v. Garland, No. 23-cv-830, 2023 WL 5610293, at \*1 (N.D. Tex. Aug. 30, 2023) ("NAGR"). The plaintiffs in NAGR are three individuals who own or state that they have plans to own FRT-15s, along with two institutional plaintiffs; they filed suit on August 9, 2023, seeking an order temporarily enjoining federal officials from enforcing any criminal or civil prohibitions of the FRT-15 against them personally. *Id.* at \*3. Shortly thereafter, on August 30, 2023, the district court granted the plaintiffs' motion for a temporary restraining order "to preserve the status quo" pending further proceedings. *Id.* at \*13. In so ruling, the NAGR Court found that plaintiffs had met their initial burden at the temporary restraining order stage of making out a prima facie case on the merits—*i.e.*, a "substantial likelihood" of success on their claim that the FRT-15 is not a machinegun under § 5845(b). *Id.* at \*7. The Court reasoned that this issue appeared to be controlled by Cargill. *Id.* at \*7–8. However, the Court noted that the parties' arguments regarding Cargill's application to the FRT-15 had not yet been fully briefed in the case's highly expedited posture, and that it would revisit the issue on the motion for a preliminary injunction after they had done so. *Id.* at \*8.

This Court has considered the Opinion and Order in NAGR and its preliminary assessment of the significance of Cargill as applied to the FRT-15. Recognizing that this Court's analysis is considerably aided by the extensive briefing, lay and expert testimony, and exhibits filed by both parties in this action over the last seven months concerning the history, mechanics, and comparative functionality of the

FRT-15, this Court respectfully disagrees that *Cargill*'s interpretation of § 5845(b) as applied to non-mechanical bump stocks requires the same result as to the FRT-15. Indeed, for the reasons stated *supra*, this Court concludes that much of the reasoning in *Cargill* warrants the opposite conclusion.

\* \* \*

**\*25**   **[12]**   In short, guidance from the Supreme Court, the plain meaning and purpose of the statute, and the interpretive methods applied by other federal appellate courts all support the inference that, for purposes of § 5845(b), the "function" of an FRT-15 trigger is to initiate the weapon's firing sequence by means of a single pull. There is no dispute that an FRT-15 fires automatically as long as the shooter holds pressure on the trigger, notwithstanding the fact that the trigger rapidly pushes against the shooter's finger over the course of automatic firing.

**[13]**   **[14]**   **[15]**   The Court need not, and does not, determine the meaning of § 5845(b) with respect to all replacement-trigger devices. But at least as applied to the FRT-15, this result is plainly consistent with caselaw interpreting this statute. As such, the Government is likely to succeed on the merits of its contention that the FRT-15 is an illegal machinegun.[30]

\* \* \*

The Court now turns to the civil claims brought by the Government against Defendants under 18 U.S.C. § 1345. These claims arise from what the Government contends were Defendants' fraudulent sales of what they knew were illegal machinegun-conversion devices, and their efforts to obstruct law enforcement's efforts to prevent further sales of the FRT-15 and recover those devices already in circulation.

### B. The Government is Likely to Succeed on the Merits of Its Claims that Defendants Have Committed Mail and Wire Fraud

**[16]**   18 U.S.C. § 1345 permits the Government to bring a civil action in federal court to enjoin ongoing criminal schemes or conspiracies to commit mail or wire fraud. *See,*

*e.g., United States v. Palumbo,* 448 F. Supp. 3d 257 (E.D.N.Y. 2020). The federal mail and wire fraud statutes respectively prohibit the use of the mails or wires to further "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343.[31] "The essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wire to further the scheme." *United States v. Shellef,* 507 F.3d 82, 107 (2d Cir. 2007) (citation and quotation marks omitted). *See also United States v. Schwartz,* 924 F.2d 410, 416 (2d Cir. 1991) ("Because the mail fraud and wire fraud statutes use the same relevant language, we analyze them the same way.").

**\*26**   The second and third elements of mail and wire fraud as outlined in *Shellef* are not at issue here. First, the FRT-15 costs $380 per unit, which gun owners paid directly to Defendants. Therefore, if Defendants' sale of the FRT-15 constituted a scheme to defraud, then money would indeed be its object, as Defendants have conceded. *See* O.A. Tr. 86:12–19.[32] Second, all parties also agree that Defendants used both the United States Postal Service as well as the wires—in the form of internet communications and financial transactions, for example—to sell the FRT-15. O.A. Tr. 86:1–10.

**[17]**   What remains for the Court to decide, therefore, is whether the Government has met its burden of demonstrating that Defendants likely engaged in a "scheme to defraud" their customers. To meet its burden, the Government must prove "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce,* 224 F.3d 158, 165 (2d Cir 2000) (citations omitted).

**[18]**   **[19]**   "In the context of mail and wire fraud, 'the words "to defraud" commonly refer to wrongdoing one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.' " *Id.* (quoting *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)). "It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim.

As a consequence, the deceit practices must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck." *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991).

In sum, to prevail on this claim in its motion for a preliminary injunction, the Government must establish that Defendants executed a scheme to induce their customers to purchase a product they knew was or would likely be illegal; that Defendants acted with requisite intent; and that Defendants' representations or omissions were material to their customers. The Court concludes that the Government has met its burden.

### 1. Scienter

**[20]** **[21]** To demonstrate a violation of the mail or wire fraud statutes, the Government must demonstrate that the defendant acted with the requisite fraudulent intent. *Pierce*, 224 F.3d at 165. Fraudulent intent, in turn, requires the Government to prove that "the defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim."[33] *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (citation omitted) (cleaned up). "It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim." *Schwartz*, 924 F.2d at 420. *See also United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) (noting that the Government "need not prove that the victims of the fraud were *actually* injured, but only that defendants *contemplated* some actual harm or injury to their victims" (quotation marks omitted) (emphasis in original)). On the other hand, acts done "inadvertently, mistakenly, or in good faith ... do not satisfy the requirements of the statute." *O'Malley v. New York City Transit Authority*, 896 F.2d 704, 706 (2d Cir. 1990).

**\*27** **[22]** **[23]** "[D]irect proof of defendant's fraudulent intent is not necessary. Intent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with the knowledge that the statements were false." *Guadagna*, 183 F.3d at 129. *See also United States v. RW Pro. Leasing Servs. Corp.*, 452 F. Supp. 2d 159, 173 (E.D.N.Y. 2006) ("To establish the requisite fraudulent intent, the government need only

produce circumstantial evidence in the form of inferences deduced from facts and situations."). "When it is clear that a scheme, viewed broadly, is necessarily going to injure, it can be presumed that the schemer had the requisite intent to defraud." *RW Pro. Leasing Servs. Corp.*, 452 F. Supp. 2d at 173 (citing *United States v. Chacko*, 169 F.3d 140, 148 (2d Cir. 1999)).

**[24]** The core of Defendants' response to the Government's mail and wire fraud allegations is their claim that they acted in good faith. It is undisputed that Defendants repeatedly told their customers the FRT-15 was legal. Maxwell, for example, published a video on the RBT website in a suit, in front of legal books, informing potential customers that the FRT-15 is not an illegal machinegun. *See* Defs. Ex. A. DeMonico posted similar videos to the RBT website, including one featuring O'Kelly who, presented to the viewer as an expert, assuaged potential customers that the FRT-15 is "absolutely not" a machinegun. *See* Defs. Ex. D. Defendants also fielded "hundreds if not thousands" of emails from customers about the FRT-15's legality, Defs. Ex. D, to which Defendants responded that the FRT-15 was "absolutely positively" legal. *See, e.g.*, Govt. Ex. 128 at 1. The question is whether Defendants knew that these representations were false.

Defendants DeMonico and Maxwell have repeatedly asserted that they believed in good faith that the FRT-15 was legal based on their own understanding of how the FRT-15 works and how § 5845(b) had been interpreted by the courts and ATF in analogous contexts. They cite the opinions they obtained from their retained "experts," all former ATF officials, to that effect, and maintain that they presented their customers with all the relevant information they needed prior to sale.

The record before this Court contains compelling evidence to the contrary. Indeed, it appears clear to the Court that Defendants—far from believing in good faith that the FRT-15 was legal—knowingly sold their customers a device that was very likely illegal and thereby worthless. Defendants reaped $39 million in sales of the FRT-15 in just two years. But these enormous profits came only after Defendants intentionally withheld material information in their possession bearing directly on the truth of their marketing claims about the FRT-15's legality.

United States v. Rare Breed Triggers, LLC, --- F.Supp.3d ---- (2023)
2023 WL 5689770

### a. Defendants Knew That the ATF Had Classified the AR-1 as a Machinegun and Would Therefore Classify the FRT-15 as a Machinegun as Well

One thing Defendants knew—but did not tell their customers—when they launched their FRT-15 sales campaign in 2020 was that its predecessor device, the AR-1, had been classified by the ATF as a machinegun. Certain aspects of the AR-1 were modified in its redesign. But the essential "forced-reset trigger" feature of the device, enabling automatic fire as long as the shooter maintains pressure on the trigger—which Defendants knew was the reason the ATF had classified it as an illegal machinegun—remained unchanged.

As discussed *supra*, Defendants purchased the '223 patent—the commercial embodiment of which became the FRT-15—from Jeffrey Cooper Rounds. *See* Govt. Ex. 77 at 1. Rounds had previously developed and submitted an earlier version of his device, the "AR-1," to the ATF for review and classification. *See generally* Govt. Ex. 134. In August 2018, the ATF informed Rounds and his consulting expert, Rick Vasquez, in writing that the AR-1 was indeed a machinegun. *See* Govt. Ex. 134 at 1, 12–13. The ATF specifically explained that the AR-1 was a machinegun because "testing indicated that continuous rearward pressure after the initial pull of the trigger initiates a 'firing sequence' which discharges multiple rounds with a single function of the trigger." Govt. Ex. 134 at 12.

**\*28** The ATF also advised Rounds that, "[a]dditionally," the AR-1's trigger induced hammer follow "on several occasions during the testing," and the ATF classifies devices that facilitate hammer-follow as machineguns. Govt. Ex. 134 at 13. The '223 patent eliminated the AR-1's problem with hammer follow and utilized a forced-reset mechanism that added a "locking bar," Tr. 536:21–537:19; ECF No. 120-2 ¶ 4–5, ECF No. 124-3 at 86:5–12, but nonetheless discharged multiple rounds as long as the shooter maintained continuous rearward pressure on the trigger. It was this design that Defendants purchased from Rounds on May 7, 2020. Govt. Ex. 77 at 1.

Having heard witness testimony about the AR-1's and the FRT-15's development and classification, and having reviewed declarations and documentary evidence as to these devices' history, the Court finds that (1) Defendants were aware of the AR-1's classification as a machinegun, (2) knew that the FRT had a functionally indistinguishable forced-

reset trigger that would all but certainly lead the ATF to the same conclusion regarding its illegality, but (3) concealed that information from their customers in marketing the FRT-15 for sale from December 2020 onwards.

Both DeMonico and Leleux testified that they had not seen the ATF's letter classifying the AR-1 as a machinegun before purchasing the '223 patent in May 2020. Tr. 578:22–579:1; ECF No. 124-1 at 124:8–10. The Court does not find these assertions credible. First, Defendants paid $10,000 for Rounds's patent, coupled with a $25-per-unit royalty. Govt. Ex. 77 at 1; ECF No. 120-2 ¶ 16. Since purchasing the patent and selling the FRT-15, Defendants have paid Rounds $2.4 million in royalties. Tr. 569:12–14. The parties agree that the ATF cannot itself publish letters sent to private individuals who participate in the voluntary classification process when the classification includes a finding that the submitted device is an illegal machinegun. O.A. Tr. 49:9–50:12. However, Rounds certainly had a copy, *see* Govt. Ex. 134 at 1, and he was free to share it with whomever he liked. *See* O.A. Tr. 50:8–12. Rounds would have had every reason to provide the ATF's letter classifying the AR-1 as an illegal machinegun to Defendants before finalizing the sale of the '223 patent to them. Indeed, had he withheld that crucial document, he could well have found himself on the receiving end of a claim that he had failed to disclose material information to DeMonico, Maxwell, and Leleux; whether or not Rounds had "fixed" the problems that led the ATF to so classify the AR-1, Defendants (and their future customers) were surely entitled to evaluate that critical issue for themselves when purchasing the '223 patent from Rounds.

Even more fundamentally, whether or not DeMonico and Leleux saw the actual AR-1 machinegun classification letter before bringing the FRT-15 to market, they certainly knew about it. During the preliminary injunction hearing, DeMonico claimed a lack of recollection as to whether Rounds ever told him that the ATF had classified the AR-1 as a machinegun. Tr. 494:7–495:2. But Leleux had a very clear recollection that he, DeMonico, and Rounds *did* have at least one conversation in which Rounds disclosed that the ATF had classified the AR-1 as a machinegun, and that that conversation took place at "the time we were buying" the '223 patent. Tr. 539:19–25; *see also* Tr. 535:14–536:19. In his deposition, Leleux similarly recalled that Rounds had informed Leleux and DeMonico that "one of the problems" that the ATF had with the AR-1 was its "potential for hammer follow," and that Rounds predicted that "the ATF would give him a hard time" with the '223 patent. ECF No. 124-3 at

30:11–18. Thus, Rounds did inform Defendants that the ATF had classified the AR-1 as a machinegun, and the Court does not credit what it construes as DeMonico's feigned lack of recollection on this critical point. Defendants' awareness of the ATF's recent classification of the AR-1 as a machinegun supports a finding that they made representations to their customers about the legality of the FRT-15 with fraudulent intent.

**\*29** Leleux also testified that, to the extent Defendants were aware of the ATF's classification of the AR-1, their representations to their customers as to the legality of the FRT-15 were nonetheless made in good faith. He claims they understood that the ATF's classification of the AR-1 was based on the device's potential for "hammer follow," which Rounds corrected in the '223 patent. *See, e.g.,* Tr. 539:19–25. In his deposition, DeMonico asserted that this was his limited understanding of the ATF's classification of the AR-1 as well. ECF No. 124-1 at 125:4–17. However, the Court finds this testimony not credible, for two reasons. First, the ATF's AR-1 classification letter specifically gives *two distinct* grounds for classifying the AR-1 as a machinegun: (1) that a weapon equipped with the AR-1 can fire multiple shots as long as a shooter holds "continuous rearward pressure" on the trigger, and (2) that the weapon had the potential for hammer follow. Govt. Ex. 134 at 12–13. Thus, if Defendants had seen this letter prior to purchasing the patent (which, as explained *supra*, the Court finds that they likely did) then they would have known that the '223 patent's correction of the AR-1's hammer follow issue *alone* would not have changed the ATF's classification of the '223 patent as a machinegun—since a '223 patent-style trigger can also, of course, fire multiple rounds as long as the shooter holds continuous rearward pressure on the trigger. Second, even if Leleux and DeMonico did not see a copy of the AR-1 classification letter before purchasing the '223 patent, Leleux said in his deposition that Rounds verbally told him and DeMonico that "*one* of the problems" that the ATF had with the AR-1 was the potential for hammer follow, ECF No. 124-3 at 30:11–16, and that even after Rounds did the redesign that resulted in the FRT-15, Rounds predicted to Defendants that that the ATF would still "give him a hard time." ECF No. 124-3 at 30:18. It strains credulity to think that Rounds would have discussed the "hammer follow" problem in detail with Defendants but would not have given similarly detailed disclosures as to the other reason that the ATF had expressly declared the AR-1 to be an illegal machinegun. This strongly supports the inference that Defendants knew at the moment they launched RBT that there was a significant likelihood that the FRT-15 was also

an illegal device and would be classified as such, because the forced-reset feature of the AR-1 remained a key element of the trigger after its redesign. Yet they nonetheless assured their customers, with no equivocation, that the trigger was "absolutely" legal. *See, e.g.,* Defs. Ex. D. [34]

Moreover, in January or February 2021, Defendants were contacted by Thomas Graves, Mr. Rounds's former business associate, who claimed that the FRT-15 infringed on Mr. Graves's share of a patent for the "Flex Fire" technology that Graves and Rounds allegedly developed together and which provided the mechanical concepts for the AR-1. Tr. 544:10–546:19; *see also* Govt. Ex. 134 at 21. After being contacted by Graves, Defendants say they received a copy of the ATF's AR-1 classification. Tr. 579:9–16; ECF 130 at 2. Therefore, within a few months of launching sales of the FRT-15, Defendants knew exactly why the ATF considered the AR-1 to be a machinegun: not simply because of its potential for hammer follow, but also because its "internal mechanism or operation automatically forces the individual's finger forward instead of requiring that the shooter release the trigger" and allows for automatic fire with "continuous rearward pressure after the initial pull of the trigger." Govt. Ex. 134 at 12. This description of the AR-1 also perfectly describes the functionality of the FRT-15. Yet Defendants continued to unequivocally represent to their customers that the FRT-15 was not a machinegun.

In sum, the Court finds that Defendants' knowledge of the AR-1—including not only the ATF's designation of that device as a machinegun but the *reasons* for that designation, and that the key feature leading to that classification remained functionally unchanged in the FRT-15—supports a finding that Defendants lied to their customers when they told them that the FRT-15 was "absolutely, positively" a legal trigger.

### b. Defendants Knew That Their "Expert" Opinion Letters Were Incomplete and Misleading, and They Did Not Rely on Them in Good Faith

Defendants further assert that their belief as to the legality of the FRT-15—and their statements to that effect to their customers—was in good faith, since they hired four "experts" formerly employed by the ATF to give independent opinions as to whether or not the FRT-15 was a machinegun within the meaning of § 5845(b), and all four advised Defendants that it was not. Defendants' reliance on these experts'

opinions is certainly relevant to Defendants' argument that they acted in good faith and without any intent to defraud their customers. *Cf. United States v. Novis*, 20-cr-335, 2023 WL 4746541, at *2 (E.D.N.Y. July 24, 2023) ("[A]dvice of counsel can be relevant to the jury's determination of whether the Defendants acted in good faith and lacked an intent to defraud."). However, on the current posture, the Government has presented evidence that amply supports the inference that "despite what [experts] told them," Defendants "knew that they were tricking and defrauding people." *Id.* at *13. Not only did Defendants have independent reason to know that their experts' opinions about the legality of the FRT-15 were likely incorrect, but at least one (and likely more than one) of these experts warned Defendants of this possibility himself.

**\*30** First, during the preliminary injunction hearing Daniel O'Kelly told the Court in response to its direct questioning that he had private conversations with Defendants not just about his own opinion on the FRT-15's legality, but how his former employer, the ATF, would likely classify the device. O'Kelly recalled that he told Defendants "I guarantee you, or I may have said, do not be surprised if ATF calls" the FRT-15 a machinegun. Tr. 370:1–3. Having seen O'Kelly's demeanor on the stand, it appears to the Court that in fact O'Kelly "guarantee[d]" to Defendants that the ATF would, if it got its hands on an FRT-15, classify it as a machinegun —but when O'Kelly realized the potential consequences of this admission for Defendants' claims of good faith, he hastily modified his testimony mid-sentence to offer a less damning ("don't be surprised") version of events. Yet however construed, O'Kelly's testimony demonstrates that— at the very least—one of Defendants' own experts had warned them that the ATF would likely classify the FRT-15 as an illegal machinegun. Not only did Defendants proceed to sell it despite O'Kelly's warning: they published an interview between DeMonico and O'Kelly on the RBT website in which O'Kelly told Defendants' customers that the FRT-15 was "absolutely not" illegal. Defs. Ex. D. And they continued to trumpet the "former ATF" credentials of their experts in that marketing video and other statements to their customers, even after the ATF issued its July 27, 2021 cease-and-desist. *See, e.g.*, Govt. Ex. 13 at 3:9–4:21.

Defendants' assertions that they relied in good faith on four independent and neutral expert assessments are further undercut by the fact that they apparently sent each new expert their previous experts' report(s) when they solicited their opinions as to the legality of the FRT-15. For example, Brian Luettke testified at the preliminary injunction hearing

that, before he conducted his examination of the FRT-15, Defendants had first sent him reports from "the other experts" which had concluded that the FRT-15 was not a machinegun. Tr. 390:4–13, 412:1–413:6. Kevin McCann, in his expert report, also reveals that he first read O'Kelly's report before classifying the device himself. Defs. Ex. Z at 2. These facts obviously undermine Defendants' claims that they sought neutral opinions from experts as to the legality of the FRT-15. Rather, on the current record, it appears much more likely to the Court that Defendants, at least once they had O'Kelly's report in hand, presented their experts with a question to which they signaled a commercially "correct" answer and at least one analytical route to that end.

The Court also finds it highly likely that Defendants were given other material information about the likelihood that the ATF would classify the FRT-15 as a machinegun by another one of their experts, Rick Vasquez, which they also did not disclose to their customers. After being retained as a paid consultant in January 2021, Vasquez provided Defendants with a letter stating that, in his view, the FRT-15 was not a machinegun, declaring that "there is no verifiable history of ATF opinions to support this trigger being classified as a machinegun, both in general and specifically pertaining to the underlying design." *See* ECF No. 120-1 at 10–13. Yet Vasquez was the very same ATF agent who, while still at the agency, had earlier classified at least one other very similar device that used forced-reset technology as a machinegun, and which Vasquez and his ATF colleagues classified as such for reasons that apply equally to the FRT-15. *See, e.g.*, Govt. Ex. 33 at 5–6 (showing that Vasquez was a signatory to the classification of a forced-reset-trigger device submitted by Hunter Kinetics Inventions capable of firing multiple shots with "one single pull of the trigger"). Defendants, in their opening statement, asserted that their experts had never before heard of the "continuous rearward pressure" standard applied in the ATF's classification, and Vasquez said by declaration that such a standard is irrelevant to the question of whether a device is a machinegun. Tr. 14:9–18; ECF No. 120-1 ¶ 13. Yet in the ATF's prior classification letters, at least one of which Vasquez formally endorsed while at the agency, the ATF classified such a device as a machinegun precisely because the weapon continues to fire "as long as rearward pressure is applied to the trigger." Govt. Exs. 33 at 6; *see also* Tr. 118:14–119:1, 127:16–128:2; Govt. Ex. 119 at 11–12.[35]

**\*31** Vasquez testified that he did not recall what role he played in so classifying this device while at the ATF, but that unspecified "political considerations" may have influenced

those classifications, and he surmised that he would not make the same determination now. ECF No. 120-1 ¶ 15–16. Yet such a caveat is beside the point: even if the Court were to credit Vasquez's claim that he disagreed with the ATF's classification of those device(s) but signed off on them anyway, his history with the ATF put him on notice that the ATF *would* likely consider the FRT-15 to be an illegal device. Further, the Court finds it highly unlikely that Vasquez was not aware of the ATF's classification of the HKI device classification at the time he gave Defendants his opinion letter, and that he did not advise them of that history. This is because Vasquez was retained by Defendants on January 18, 2021, *see* June 23, 2023 Status Conference Transcript 3:9–15—just ten days after HKI's principal wrote an unsolicited email to RBT, alerting them to HKI's prior classification and warning them of the serious risk of "trouble" for Defendants "and [their] customers," given the obvious parallels between HKI's and the FRT-15's trigger functionality. *See* Govt. Ex. 102 at 1–2. And even if Defendants (or Vasquez) somehow did not connect the proverbial dots between the two devices, the developer's email clearly put them on notice of a potentially serious legal problem with the FRT-15, just weeks after they put the device on the market to customers nationwide.

Vasquez also, while in private practice, submitted the AR-1 for classification to the ATF, and was copied on the ATF's letter to Rounds informing him of its determination that the AR-1 was a machinegun precisely because it could fire multiple rounds as long as the shooter maintained "continuous rearward pressure after the initial pull of the trigger." Govt. Ex. 134 at 12. In short, it is difficult to conceive that Vasquez did not disclose this information to Defendants and warn them about the likelihood that the ATF would reach the same conclusion on the FRT-15 when they retained him in 2021.

Finally, Leleux's prior experience with the ATF classification process significantly impeaches Defendants' claims that they bypassed that process with the FRT-15 in favor of privately-retained experts because they had good-faith concerns about delays or "inconsistency" on the ATF's part. During the preliminary injunction hearing, Leleux testified that his own firearms company Spike's Tactical had sought the ATF's approval of a different device before bringing it to market, and the ATF classified it as an illegal suppressor.[36] Tr. 556:6–557:7. In the wake of the ATF's classification, Spike's Tactical then decided (quite understandably) not to sell it at all. Tr. 557:6–8. At his deposition, Leleux was asked why RBT's founders chose not to seek ATF classification for the FRT-15.

He cited the ATF's previous classification of Spike's Tactical's silencer as illegal—and explained that their earlier decision to submit the silencer to the ATF led the Spike's Tactical partners "to miss out on huge opportunity to make a lot of money." ECF No. 124-3 at 92:5–11; *see also* Tr. 557:15–560:14.

The parties agree that the ATF's classification process is voluntary. A manufacturer can choose to forego the process and risk facing prosecution or civil liability if the device is later declared to be illegal. Yet Defendants' deliberate decision to bypass that process with the FRT-15, in light of Leleux's knowledge of the enormous financial consequences that the ATF classification process can have on a firearms business and its customers, indicates that Defendants declined to seek ATF classification of the FRT-15 and instead simply assure RBT's customers that the device was "legal" precisely because they knew that allowing ATF to examine their device *before* bringing it to market might kill their proverbial golden goose.

### c. Defendants Did Not Rely in Good Faith on the ATF's Past Classifications of Other Legal Triggers

Defendants further assert that they harbored a good faith belief in the legality of the FRT-15 because they were aware of similar trigger devices that the ATF had *not* classified as machineguns. In particular, Defendants repeatedly cite their knowledge of the ATF's classification of the Tac-Con 3MR trigger (the "3MR") as a legal device in 2013, *see* Defs. Ex. P. at 1–2, and what they contend are its similarities to the forced-reset functionality of the FRT-15. All three of the RBT co-founders who testified at the hearing specifically invoked their prior knowledge of the 3MR and its approval by ATF in this regard. *See* Tr. 436:5–6, 437:1–12 (DeMonico was "very familiar with the [Tac-Con] 3MR" and knew it was "legal and available" when he sold the FRT-15); *see also* Tr. 540:1–17, 541:6–9 (Leleux knew of 3MR, believed it to be "similar" to FRT-15, and did not believe the devices' differences made the FRT-15 a machinegun); *see also* Tr. 592:4–7 (Maxwell owned a 3MR and believed it to be "every bit as fast as my FRTs" yet the 3MR "hasn't gotten that kind of attention" from ATF).[37]

**\*32** Defendants also elicited live testimony from their expert Daniel O'Kelly on this point. O'Kelly opined that the ATF's description of the forced-reset feature of the 3MR in its classification letter "describes [the FRT] exactly," Tr. 306:7–307:19, and that he considers the FRT-15 to be an "apt comparison" to the 3MR when assessing whether

either device is a machinegun. Tr. 306:7–307:19, 355:12–356:4. O'Kelly went on to say that he "can't imagine" why someone familiar with the ATF's approval of the 3MR would not also believe that the FRT-15 was legal. Tr. 308:5–15. The Government's expert, Anthony Ciravolo, testified to the contrary. Ciravolo noted that the 3MR does include a forced-reset trigger function that "reduces the distance the trigger shoe itself has to travel" when pulled by the shooter, thereby enabling more rapid firing than a standard AR-15 trigger. Tr. 147:9–11, 149:9–12. But the 3MR (like the standard AR-15) has a "disconnector" that stops the firing cycle after each shot, and the cycle will not resume until the shooter manually releases pressure on the trigger shoe and pulls the trigger again. *See* Tr. 147:6–8, 148:6–9, 20–5. Ciravolo underscored this distinction—*i.e.,* that a shooter cannot fire additional rounds simply by holding "constant rearward pressure" on the 3MR's trigger—in his testimony supporting the Government's position as to why the ATF gave the 3MR a different classification than the FRT-15. Tr. 148:16–19, 149:18–150:2.

Defendants' claimed reliance on their knowledge of the 3MR when they took the FRT-15 to market provides no support for their good-faith defense. This is so for several reasons.

First, the Court finds that Ciravolo's comparison of the forced-reset functionality of the 3MR vs. the FRT-15, and his explanation for the ATF's different classifications of the two devices, was logical and credible; O'Kelly's contrary testimony was not. The differences between the 3MR and the FRT-15 for purposes of determining whether the device allows for automatic fire with a "single function of the trigger" are apparent and material. The 3MR trigger (like a standard AR-15 trigger) contains a disconnector that retains the hammer and thereby stops the firing cycle after a round is fired; only when the shooter consciously releases and pulls the trigger will the weapon fire again. Tr. 181:1–5, 183:25–184:13. The FRT-15 has no disconnector, and allows the weapon to automatically fire as long as the shooter holds continuous pressure on the trigger shoe. This credibly explains why the ATF classified the 3MR, but not the FRT-15, as a "legal product." Tr. 150:11–12.

The Court's credibility assessment is also grounded in a significant disparity between these two experts' knowledge and experience. At the ATF, Ciravolo is specifically charged with (among other things) classification of firearms and making official determinations as to whether such devices are machineguns under § 5485(b). Tr. 20:22–21:2, 21:15–22:9. O'Kelly, though he is a former ATF agent, has no such

experience. Although O'Kelly did prepare training manuals and curricula for other ATF agents on a range of topics relating to firearms, Tr. 259:23–260:13, his duties never included the classification of a device as a machinegun based on its mechanical operations. Tr. 337:1–339:8. Further, although O'Kelly has testified as an expert witness on various topics, his experience (and testimony) actually determining whether a firearm is a machinegun was limited to far more rudimentary "field" testing (*i.e.,* upon seizure of a device when executing a warrant), after which a suspected device would be sent to the unit in which other agents (like Ciravolo) examined and formally classified the device. Tr. 335:8–338:10. And unlike Ciravolo—who had test-fired and examined the internal mechanics of the 3MR, and brought one to the hearing to demonstrate its functionality, Tr. 145:18–147:8—the foundation for O'Kelly's opinion about the device's purported similarity to the FRT-15 was notably thin. O'Kelly has never fired a weapon equipped with a 3MR; has never physically examined a 3MR; and has never seen a video or even a diagram of the 3MR. Tr. 360:2–25. Instead, his knowledge of the 3MR came exclusively from ATF's classification letter and "[r]esearching the internet." Tr. 365:19–23. And he had no recollection of any sources he found or relied upon in this internet research. Tr. 366:10–13. For these and other reasons, Ciravolo's comparative analysis of the 3MR and FRT-15 is far more credible than O'Kelly's.[38]

**\*33** Also undermining Defendants' claim that they relied on the ATF's classification of the 3MR in concluding that the FRT-15 was "legal" is that *none* of their four retained experts did so. Defendants sent the ATF's 3MR classification letter to at least one former ATF expert, Brian Luettke, whose opinion they sought in March 2021. *See* Tr. 390:11–13. Luettke was previously unfamiliar with the 3MR, but considered and "research[ed]" the device after Maxwell alerted him to it. Tr. 412:21–413:6. Yet he made no mention of the 3MR in his subsequent opinion letter on the FRT-15's legality, even after noting that he had reviewed "previous ATF ... classification letters" before writing the letter. *See* Defs. Ex. Y at 28. Nor was there any mention of the 3MR in the opinion letters written by Defendants' other three experts in late 2020 and early 2021, even when they, too, wrote that they had considered prior ATF classification letters. *See* ECF No. 120-1 at 10–12 (Vasquez); Defs. Exs. Z at 2–3 (McCann), A1 at 41–45 (O'Kelly). Were the 3MR's forced-reset trigger truly as analogous to the FRT-15 as Defendants now claim, it seems reasonable to conclude that at least one—if not all—of the former ATF agents they retained to assess its legality would have said as much. That is particularly so since

United States v. Rare Breed Triggers, LLC, --- F.Supp.3d ---- (2023)
2023 WL 5689770

Maxwell made sure that at least one of these experts was well aware of the ATF's reasons for classifying the 3MR as a legal device. Tr. 410:16–18, 412:21–413:6.

#### d. Defendants Submitted a False Declaration to the Court Earlier in This Litigation

The Court has concerns about crediting Maxwell's and DeMonico's claims that they acted at all times in complete good faith when selling the FRT-15 for an additional reason: they filed with this Court what they had reason to know was a false witness declaration on a material issue.

The declaration in question was signed by RBT co-founder Cole Leleux and filed by Defendants in support of their (subsequently-withdrawn) motion to dismiss for lack of personal jurisdiction. Tr. 573:23–574:9. In the declaration, Leleux outlined his familiarity with RBT's sales history throughout the country, and provided factual support for Defendants' claim that RBT never engaged in any direct or indirect sales of the FRT-15 to New York customers. Leleux specifically represented to the Court that he knew of *no* instance in which a third-party vendor had sold any FRT-15s to customers in New York. Tr. 574:13–22. Yet emails later provided in discovery revealed that when personally responding to customer service inquiries in January 2021, Leleux told New York customers (under the pseudonym "Charles") that RBT did not sell the FRT-15 into New York directly, but that they *could* purchase the device instead from Big Daddy Enterprises, RBT's then-exclusive distributor —since Big Daddy, Leleux assured them, planned to sell FRT-15s in all fifty states. Tr. 570:14–575:6.

The Court agrees with the Government that Leleux likely knew that this portion of his declaration was false at the time he signed it. Current defense counsel characterized the statement as the likely product of Leleux's lack of recollection in early 2023 as to Big Daddy's practices. O.A. Tr. 108:18–109:3. Leleux did not directly claim as much, but explained that he was "trying to get through hundreds of emails" around the time he advised the New York customer about Big Daddy's sales practices. Tr. 572:24. Even if Leleux did not specifically recall sending emails to New York customers advising them that they could purchase FRT-15s from Big Daddy in 2021, it is unlikely that Leleux had completely forgotten about Big Daddy's sales practices—that is, selling FRT-15s to customers in the states that Defendants did not—when he signed a sworn declaration on this very topic in 2023.

It also appears all but certain to the Court that DeMonico and Maxwell were themselves fully aware of Big Daddy's distribution practices when they had their former counsel file the Leleux declaration on their behalf. Leleux speculated that Maxwell "probably had no idea" that Leleux was advising New York customers that they could purchase FRT-15s from third parties. Tr. 573:1. But that is a different issue than whether Maxwell and DeMonico knew that Big Daddy sold FRT-15s to customers in all fifty states. Notwithstanding the complex corporate structure through which the co-founders distributed their FRT-15 revenues, RBT was a tight-knit enterprise run by a small number of co-founders; each were heavily involved in decisions about sales, marketing, and third-party contractors (some of whom, including Big Daddy, became their adversaries in litigation). Maxwell was RBT's counsel, and it was his advice that helped lead the company to avoid direct sales to New York and a handful of other states. DeMonico himself directed a customer to purchase an FRT-15 from Big Daddy in California, where Defendants also did not do any direct business. *See* Govt. Ex. 97 at 1. The Court therefore readily concludes that Defendants were aware that Big Daddy sold FRT-15s to customers in New York.

**\*34**  At oral argument, Defendants argued that false statements in Leleux's declaration cannot be imputed to DeMonico and Maxwell. Yet Leleux submitted his false declaration in support of *their* motion to dismiss this action for lack of personal jurisdiction. The Court is troubled by the fact that Defendants DeMonico and Maxwell appear to have permitted a sworn declaration from one of their business partners to be filed by former counsel (who were at that time brand new to this litigation, working under extremely tight deadlines, and lacked any prior familiarity with RBT's business practices) containing demonstrably false factual assertions about the sales of FRT-15s—one that the Court had been prepared to credit, and which could have led to the improper dismissal of this action had the Government not garnered independent evidence of Defendants' sales in New York.

Defendants' likely knowledge of the Leleux declaration's falsity is not necessary to nor dispositive of this Court's analysis of whether they acted in "good faith" when they assured their customers that the FRT-15 was, in their view, a "perfectly legal" device. But it does give the Court further cause for concern about their overall credibility and veracity.

\* \* \*

In sum, the Court finds that the present record contains compelling evidence that Defendants intentionally misled their customers as to the legality of the FRT-15—that is, they knew that the FRT-15 was almost certainly an illegal product, yet they told their customers the opposite. The Court therefore concludes that the Government is likely to establish scienter at a final trial on the merits.

### 2. Materiality

[25]  [26] The mail and wire fraud statutes "do not criminalize every deceitful act, however trivial." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019). Rather, the defendant must have "engaged in a deceptive course of conduct by making *material* misrepresentations." *Id.* (citing *Neder v. United States*, 527 U.S. 1, 4, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). A misrepresentation is "material" if it has "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it is addressed." *Id.* (quoting *Neder v. United States*, 527 U.S. at 16, 119 S.Ct. 1827). On a basic level, the Court's materiality inquiry focuses on this question: "would the misrepresentation actually *matter* in a *meaningful* way to a rational decisionmaker?" *Id.* (emphasis in original). *See also United States v. DeFilippo*, 17-cr-585, 2018 WL 11211500, at *3 (S.D.N.Y. July 23, 2018) (applying these principles in the context of a wire fraud conviction).

[27]  [28]  [29] "Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *Shellef*, 507 F.3d at 108. When a fraud scheme involves the "solicitation of a purchase," the defendant's misrepresentations to his customers must generally concern the "quality, adequacy or price of the goods to be sold, or otherwise [concern] the nature of the bargain." *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970). "[T]he harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy between benefits reasonably

anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (citation and quotation marks omitted). On the other hand, "[m]isrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution" where the victims "received exactly what they paid for" and "there was no discrepancy between benefits 'reasonably anticipated' and actual benefits received." *Id.* at 98–99.

*35 [30]  [31]  [32] A scheme to defraud that violates the mail and wire fraud statutes may turn on either an affirmative misrepresentation or "omissions of material information that the defendant has a duty to disclose." *United States v. Autori*, 212 F.3d 105, 118 (2d Cir. 2000). A defendant who has no duty to affirmatively disclose information to another may develop such a duty where the defendant "makes partial or ambiguous statements that require further disclosure in order to avoid being misleading." *Id.* at 119; *see Remington Rand Corp. v. Amsterdam-Rotterdam Bank*, N.V., 68 F.3d 1478, 1484 (2d Cir. 1995) (same). Indeed, under the mail and wire fraud statutes, "it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *Autori*, 212 F.3d at 118 (quoting *United States v. Townley*, 665 F.2d 579, 585 (5th Cir. 1982)).

[33] The Court concludes on the present record that what Defendants told their customers about the legality of the FRT-15—or indeed, what they failed to tell them—was material.

#### a. A Product's Legality or Illegality Is Material to a Retail Transaction

[34] As a threshold matter, the implicit legality of the product being sold is central to nearly every bargain, as a person cannot generally have a property interest in an item that is illegal to possess, at least as against the Government. *Cf. Akins v. United States*, 82 Fed. Cl. 619, 623 (2008) (concluding that the ATF's classification of a device as a machinegun and its order that the device be turned over to the ATF was not a "taking" within the meaning of the Fifth Amendment); *United States v. Clymore*, 245 F.3d 1195, 1200 (10th Cir.

2001) (noting that a party has no property right in illegal drugs or the proceeds from selling illegal drugs) (citing 21 U.S.C. § 881(a)). The Court has no doubt that, had Defendants properly informed their customers that, for $380, they could receive an FRT-15 that was likely subject to eventual seizure by the ATF, with a corresponding risk of criminal prosecution, few, if any, customers would have purchased one. At the very least, Defendants' repeated assertions that the FRT-15 was legal—when they knew that there was at least a strong likelihood that that statement was not true—created a duty to disclose more information than they did. *Autori,* 212 F.3d at 118. Importantly, while Defendants were under no obligation to submit the FRT-15 to ATF for classification, they made a deliberate choice to repeatedly tout the "former ATF" credentials of their experts and the "due diligence" they conducted in their assurances to customers that the device was not a machinegun. *See, e.g.,* Govt. Exs. 13 at 3:7–4:19; 103 at 1. These statements heightened the materiality of the undisclosed information in their possession.

For example, Defendants repeatedly told their customers that the FRT-15 was "absolutely, positively" legal—yet never disclosed that the ATF had previously classified the AR-1 as a machinegun for reasons that also applied to the FRT-15. Defendants emphasized that they consulted four former ATF agents who assured them that the FRT-15 was legal—yet they did not disclose that at least one of those experts privately warned Defendants that the ATF would likely reach the opposite conclusion, and may have even "guarantee[d]" that outcome. Tr. 370:1–2. After the ATF issued its cease-and-desist, DeMonico published a video announcing the ATF's position—yet this information was not available on the RBT website, where customers could actually purchase the FRT-15. [39]

**\*36** Defendants also led their customers to believe that they were vigorously suing the ATF in court for a judgment that the FRT-15 was legal. However, the litigation history between Defendants and the ATF tells a different story. Defendants received the ATF's cease-and-desist letter on July 27, 2021, and quickly sued the ATF in the Middle District of Florida. *See* Defs. Ex. Z1. However, in Florida, after losing a motion for a temporary restraining order and then a motion for a preliminary injunction, Defendants essentially abandoned their lawsuit, which was dismissed without prejudice on October 28, 2021. Defs. Ex. B2 at 2. Defendants did not seek reconsideration of the dismissal, even though the Court's form order advised that if they were not at fault for noncompliance

with the local rule in question, they could do so. Defs. Ex. B2 at 2 n.1. Nor did they simply refile the action in Florida to quickly restart the litigation process. Instead, they waited seven months before bringing a similar suit in the District of North Dakota on May 16, 2022—and only after the ATF had finally seized their cache of FRT-15s from 3rd Gen at the end of March. *See* Defs. Ex. C2. That case, too, was dismissed —this time for lack of venue—on November 5, 2022. Tr. 516:17–23.

Throughout this period, Defendants repeatedly assuaged customers who sought refunds on the FRT-15 that Defendants were "currently in litigation" or "currently involved in the court process"—even when this was not so. *See, e.g.,* Govt. Exs. 22 at 5–6; 92 at 1; Defs. Ex. H1 at 3. One savvy customer who received this response in December 2021 replied, "[H]asn't the Rare Breed lawsuit against the ATF been dismissed?" Govt. Ex. 22 at 6. Not all of Defendants' customers, however, were this well-informed. When Defendants told one customer who had expressed concerns about the FRT-15's legality that RBT was "currently in litigation" on December 6, 2022—six weeks after their most recent lawsuit had been dismissed—the customer responded, "Thanks, keep fighting the battle worthwhile." Govt. Ex. 92 at 1.

DeMonico testified at the preliminary injunction hearing that all he has wanted since receiving the ATF's cease-and-desist letter was to have his "day in court." Tr. 463:20. It is clear that Defendants went on offense by filing suit immediately after the ATF served its cease-and-desist letter in July 2021—as was their right. But the litigation history raises a strong inference that this was nothing more than a way for Defendants to save face with their customers—and keep the profits rolling in for as long as possible—rather than a good-faith effort to obtain a court ruling on the FRT-15's legality.

### b. RBT's "No Refund" Policy

The above point is buttressed by the fact that RBT had an explicit "no refund" policy. During his direct examination, DeMonico testified that, despite RBT's "no refund" policy, he had in fact executed $431,000 worth of refunds. Tr. 447:5–6. The Court has no reason to doubt the veracity of this statement—though this sum would represent around only 1% of RBT's $39 million in sales. Even if this is true, however, the *reason* for RBT's policy, as DeMonico explained, revealed that Defendants knew that the legality of the FRT-15, even

as determined by the ATF, was very important to RBT's customers:

MS. STAMATELOS: Could you explain [RBT's "no refund"] policy?

MR. DEMONICO: .... In our experience—in my experience—the winds change and opinion changes at ATF like at the flip of a coin. So one day, the ATF is happy with something and the next day they're not. We've seen it countless times. We've seen it with bump stocks. We've seen it with frames and receivers. We've seen it with, you know, the Akins Accelerators—it's approved, it's not approved. [40] And the last thing we wanted to deal with was, you know, a landslide of customers wanting a refund because, you know, the ATF changed their mind on something.

ECF No. 124-1 at 56:3–57:21. Leleux testified to the same effect during his deposition. ECF No. 124-3 at 90:8–15. These statements clearly support a finding that Defendants' omissions as to the legality of the FRT-15 were material to customers' decisions whether to purchase one —and Defendants had fashioned their "no refund" policy specifically to avoid paying customers back when they found out that they had been misled.

**\*37** The Court need not speculate on this point in light of numerous emails that customers sent to the RBT customer service account, to which DeMonico had drafted standard replies. Tr. 478:4–11; ECF No. 124-1 at 192:1–5, ECF No. 124-2 at 79:8–16, 102:13–103:19. First, many customers emailed RBT inquiring as to the legal status of the FRT-15, especially after hearing about the ATF's cease-and-desist letter declaring the FRT-15 to be illegal. This fact, on its own, supports a finding that customers considered the legality of the FRT-15 to be central to their decision whether to purchase one. For example, Defendants received the following email from a customer on October 20, 2022:



Govt. Ex. 86 at 2 (highlight supplied). Defendants, through their customer service representative Jennifer Pierson, responded that it was "[o]ur position" that the FRT-15 is legal based on the opinion letters they received from former ATF agents and informed the customer that RBT was currently suing the ATF. Govt. Ex. 86 at 1–2. The customer, however, was not assuaged:

Govt. Ex. 86 at 1 (highlight supplied).

Other customers not only inquired into the legality of the FRT-15 but explicitly asked for a refund from RBT when they learned that the ATF had classified the FRT-15 as a machinegun. For example, Defendants received the following email from a frustrated customer on December 3, 2021, nearly six months after the ATF had issued its cease-and-desist letter and two months after the Middle District of Florida dismissed Defendants' declaratory action:

Order #76370


reported via email
a month ago (Fri, 3 Dec 2021 at 12:27 PM)
To: "Customer Service @rarebreedtriggers.com" <customerservice@rarebreedtriggers.com>

Hello,
I purchased an FRT-15 trigger on 11/30 with order #76370. Nowhere on your website does it say that the ATF has issued a cease and desist order for all sales of the FRT, deeming this component to be a fully automatic rifle, subject to NFA restrictions. The trigger I purchased from Rare Breed Triggers is scheduled to be delivered to me today, 12/3, but I can not install it or use it as I would then be in violation of Federal law. Please refund the full purchase price of $402.14 and let me know how you would like your trigger return shipped to you. Thank you for your help with this.

Sent with ProtonMail Secure Email

Govt. Ex. 22 at 5 (highlight supplied). Pierson responded to this customer on the same day, explaining again that it was "[o]ur position" that the FRT-15 is not a machinegun, that Defendants "conducted a tremendous amount of due diligence" prior to launching RBT by consulting former ATF officials, and that they were "currently involved in the court process" to contest the ATF's classification. Govt. Ex. 22 at 5–6. Pierson then recommended that the customer contact UPS about her package, reminded the customer of RBT's "no refund" policy, and warned the customer that any attempt to get her money back would be treated as a breach of contract to which RBT may respond with "legal action." Govt. Ex. 22 at 5–6. The customer replied:


replied
a month ago (Fri, 3 Dec 2021 at 2:28 PM)
To:customerservice@rarebreedtriggers.com

Jennifer,
I am sorry but I was unable to refuse delivery as the UPS driver just dropped the package and left. The package is unopened and I will return to your company at my expense for a refund. I will pay the shipping both ways. While your website does indicate no returns it does not indicate that the Federal government has issued an opinion that your product is illegal and that you should cease and desist from selling it. It also does not mention that the Federal government wants Rare Breed Triggers to formulate a plan to address the triggers that have already been sold. That sounds like confiscation. Your company's failure to disclose that it is CURRENTLY ILLEGAL for you to sell your product is a deceptive business practice at best, more realistically fraud, our personal opinions regarding ATF over reach are irrelevant. As are mine.

There is no way for me to legally utilize your product now that I know of the Federal restrictions on its use. I cannot sell it on a rifle, I cannot sell it on the secondary market. Your rationale that you need my money for legal fees is not justification for selling an unusable product. In any event, hasn't the Rare Breed lawsuit against the ATF been dismissed? Your threats not withstanding, I am totally willing to let VISA sort out the legalities of charging back the cost of an unusable product, the sales price of which you seem to be requesting as a donation to your company's legal defense fund.

It would be nice to work this out in an amicable and professional manner. Thank you.

Govt. Ex. 22 at 6 (highlight supplied).

Defendants received no shortage of similar emails from customers who sought a refund once they learned that the FRT-15 was illegal, and Defendants regularly replied that it was their position that the FRT-15 was legal, that they were fighting the ATF in court, and that the customer may be liable for breach of contract for seeking a refund. *See, e.g.*, Govt. Exs. 89 at 1–2, 92 at 1–4. The customers' inquiries and responses to Defendants' form email nearly uniformly support the inference that these customers—who are all gun owners—considered the legality of the FRT-15 to be material to their decision to purchase one, with one customer telling Defendants, "Well that's interesting. Your company had better

hope that this trigger is finally determined to NOT be a machinegun, or I may need to take legal action against you for having sold me one. How is that for standing my ground?" Govt. Ex. 89 at 1.

**\*38** Still other customers asked RBT if they would simply take the FRT-15 back, for *no* refund, rather than bear the risk of being caught in possession of one:


On Thu, 24 Mar at 2:13 PM, <           > wrote:
Thank you for this and I wish you good luck.

Having said that, I was not interested in a refund, rather, just as the ATF letter said, I simply want to "divest possession" and I figured I'd start with you guys. I really don't want to contact the ATF to surrender the item to them, potentially exposing myself to risk and "remedial action." While I fully believe that RBT will fight any attempt to gain access to its sales database, I also fully believe the ATF will ultimately do so.

If you still would rather not accept the item in return without any refund, I can completely understand, but it would ask you to reconsider.

Thanks again,

                    ———————
                    * * *

To:    admin[admin@rarebreedtriggers.com]
From:  Customer Service
Sent:  Fri 1/13/2023 9:06:13 PM
Subject: Ticket re-opened - [

Hi
Ticket                         has been reopened, please visit
https://newaccount1611179198205.freshdesk.com/freshdesk/ to view the ticket.

Ticket comment

Jon,

I totally get it and would never put you guys in a position to cause you financial issues, you need money to fight back and I get it. But I think I would rather surrender it to you guys and not the ATF. Only reason I brought up money was showing it changed possession (even if $1.00) but if you guys can receive it and give me a receipt, that works too.

Maybe since I am sending it back, and if the ATF ever get shot down in court, I could get a "coupon" to re-purchase.

Let me know if that is a possibility

Thank you

Govt. Exs. 135 at 1; Defs. Ex. H1 at 9. When it received a request of this type, RBT informed its customers that they were "welcome to send" their FRT-15 back to Defendants "with the understanding that you will not receive a refund." Govt. Ex. 135 at 1.

Defendants held themselves out as the only ones, in DeMonico's words, with "the balls" to sell the FRT-15. Tr. 495:18–22, 496:13–25. Yet they explicitly crafted RBT's "no refund" policy to shift the risk of an adverse ATF classification onto RBT's customers, knowing that many, if not all, of their customers—should the FRT-15 be classified as a machinegun—would want their money back when the product they bought suddenly became worthless. As one customer put it: "There is no way for me to legally utilize your product now that I know of the Federal restrictions on its

use. I cannot put it in a rifle, I cannot sell it on the secondary market." Govt. Ex. 22 at 6.

The legality of the FRT-15 was obviously material to Defendants' customers. Defendants' formal "no refund" policy—coupled with many customer emails explicitly inquiring about the legality for the FRT-15—supports this finding.[41]

\* \* \*

[35]   [36]   [37]   [38]  On the present record, the Court concludes that the Government is likely to succeed on the merits of its claims of mail and wire fraud.[42], [43]

### C. The Government Is Likely to Succeed on the Merits of Its Claims that Defendants Have Engaged in a Klein Conspiracy

**\*39**  The Fraud Injunction Act also permits the Government to bring a civil action in federal court to enjoin ongoing conspiracies to defraud the United States in violation of 18 U.S.C. § 371. *See* 18 U.S.C. § 1345(a)(1)(A). Section 371 prohibits "two or more persons" from "conspir[ing] either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose" as long as "one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371. The Second Circuit has interpreted this statute as having an "offense" clause—criminalizing conspiracies to "commit any offense against the United States"—as well as a "defraud" clause—criminalizing conspiracies to "defraud the United States." *See, e.g., United States v. Atilla*, 966 F.3d 118, 130 (2d Cir. 2020). A so-called "Klein" conspiracy, named after *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), focuses on the latter portion of § 371.

[39]   [40]  Whereas other anti-fraud statutes, such as those prohibiting mail and wire fraud, define "frauds" only as acts which deprive victims of money or property, "it is well established that the term 'defraud' as used in section 371 'is interpreted much more broadly.' " *United States v. Ballistrea*, 101 F.3d 827, 831 (2d Cir. 1996) (quoting *United States v. Rosengarten*, 857 F.2d 76, 78 (2d Cir. 1988)). That is because § 371 is "designed to protect the

integrity of the United States and its agencies" generally, not just the United States' financial interests. *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987). Therefore, "even if the Government is not 'subjected to property or pecuniary loss by the fraud,' " a defendant can commit a *Klein* conspiracy if he conspires to "interfere with or obstruct one of [the United States'] lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Ballistrea*, 101 F.3d at 831–32 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)).[44] Although *Klein* itself concerned unpaid taxes, § 371 by its plain terms is not limited to conspiracies to impede the functioning of the IRS, and "the defraud clause has been applied to conspiracies to obstruct the functions of a variety of government agencies and has not been limited to the IRS." *Atilla*, 966 F.3d at 130 (collecting cases). Indeed, other courts have affirmed convictions under § 371 when the defendants have interfered with the lawful jurisdiction of the ATF. *See, e.g., United States v. Rodman*, 776 F.3d 638 (9th Cir. 2015).

[41]   [42]  To prove a *Klein* conspiracy, the Government must demonstrate "(1) that the defendant entered into an agreement (2) to obstruct a lawful function of the Government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012) (quoting *Ballistrea*, 101 F.3d at 832). "[T]he impairment or obstruction of a governmental function contemplated by section 371's ban on conspiracies to defraud need not involve the violation of a separate statute." *Rosengarten*, 857 F.2d at 78.

**\*40**  [43]  On the present record, the Court concludes that the Government is likely to succeed on the merits of its claim under 18 U.S.C. § 371.

### 1. Existence of Agreement to Obstruct

[44]   [45]  "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (quotation marks omitted). For that reason, "circumstantial evidence alone" can be sufficient to find the

existence of a conspiratorial agreement. *United States v. Santos*, 449 F.3d 93, 103 (2d Cir. 2006).

Here, the Court finds that the Government is likely to succeed in demonstrating through both direct and circumstantial evidence—described at length *infra*—that Defendants DeMonico and Maxwell entered into a conspiracy, both among themselves and with non-defendants, to prevent the ATF from carrying out its lawful functions.

### 2. The ATF's Lawful Function

It is undisputed that the ATF is authorized by law to investigate "criminal and regulatory violations of the Federal firearms ... laws." 28 U.S.C. § 599A(b)(1); *Akins*, 82 Fed. Cl. at 623 ("Congress has granted ATF the authority to investigate criminal and regulatory violations of Federal firearms laws."); *United States v. John*, 20-cr-341, 2022 WL 1062998, at *9 (E.D.N.Y. Apr. 8, 2022) ("Title 28 of the United States Code (U.S.C.) provides the Bureau of Alcohol, Tobacco Firearms and Explosives (ATF) the authority to investigate criminal and regulatory violations of Federal firearms law."); *see also* Tr. 210:6–13 (ATF Agent Saier, in his capacity as Special Agent in Charge of the Tampa (FL) Field Division, was "in charge of all criminal enforcement and regulatory enforcement activities carried out by ATF" in that division).

Implementing regulations, in turn, give the ATF the authority to "[i]nvestigate, administer, and enforce the laws related to ... firearms," *see* 28 C.F.R. § 0.130(a), which includes the power to investigate and enforce the federal prohibition on the transfer or possession of a machinegun. *See* 28 C.F.R. § 0.130(a)(1), (2) (citing both 18 U.S.C. chapter 44, which includes 18 U.S.C. § 922(o)(1), and 26 U.S.C. chapter 53, which includes 26 U.S.C. § 5845(b)). These same implementing regulations give the ATF the authority to "seize[ ] and forfeit property involved in a violation or an attempted violation" of the same firearms laws. 28 C.F.R. § 0.130(b)(1). *See also Akins*, 83 Fed. Cl. at 623 ("The record shows that ATF was acting under this authority when it classified the Akins Accelerator as a machine gun, ordered Plaintiff to register or surrender the devices, and prohibited Plaintiff from selling them to anyone other than law enforcement agencies."). Federal law also requires machineguns to be registered, and that database must be maintained by the National Firearms Act Branch of the ATF. *See Rodman*, 776 F.3d at 640.

The Court has already concluded that the Government is likely to succeed in proving that the FRT-15 is an illegal machinegun within the meaning of 26 U.S.C. § 5845(b). The ATF was also of that opinion at the time it served its cease-and-desist letter on Defendants on July 27, 2021. The ATF clearly had the authority to investigate and seek the seizure of FRT-15s where, as here, the ATF had reason to believe that the sale, possession, and transfer of these devices violated federal law. This prong of *Klein*, therefore, is not meaningfully at issue.

### 3. Use of Dishonest Means

*41 The Government has presented evidence that supports the inference that Defendants conspired to use dishonest means to interfere with the ATF's ability to track and confiscate FRT-15s.

As a preliminary matter, this Court notes that—in response to direct questioning by the Court—the Government conceded that neither the ATF's July 15, 2021 classification letter nor its July 27, 2021 cease-and-desist letter were legally binding on Defendants. O.A. Tr. 65:25–66:7. That is, even after being served with the cease-and-desist letter and being informed that the ATF had classified the FRT-15 as a machinegun, Defendants had the right to dispute the ATF's determination and challenge it in court. As previously found by the Court *supra,* Defendants initially did so here, but essentially abandoned their lawsuit after losing two motions for injunctive relief in its preliminary stages. What Defendants could *not* do, however, was use deceitful and dishonest means to deliberately obstruct ATF's continued efforts to carry out its law enforcement function. That was true while Defendants' legal challenge was pending, and was certainly true during the numerous months in which Defendants had no such litigation in progress.

### a. Defendants Used False Addresses on the Packages They Sent Through the United States Postal Service

First, when mailing triggers to customers using the United States Postal Service, Defendants used fictitious return addresses.[45] Rather than write "Rare Breed Triggers" on the packages, Defendants used false company names with the same initials ("RBT"), such as "Red Beard Treasures" or

"Red Barn Tools." Tr. 445:20–446:3, 476:23–477:6; ECF No. 124-1 at 91:9–92:4, 93:23–94:2.

Defendant DeMonico testified that this company practice has an innocent explanation. RBT has, at various times, used both UPS and USPS to deliver forced-reset triggers to customers. *See* Tr. 444:22–23, 445:6–8. Defendants claim, however, that UPS was a more "reliable" service than USPS: according to DeMonico, UPS would not typically leave packages on someone's doorstep without knocking or physically handing it to the customer, which minimized the chance that the package would be lost or stolen, and UPS offered RBT a more dependable insurance system than USPS. Tr. 444:14–445:19; ECF No. 124-1 at 91:18–92:14. Because FRT-15s are expensive devices retailing for $380 each, DeMonico stated, Defendants believed that their packages would be more susceptible to theft when the word "trigger" was written on the package, since such a label would signal to a potential thief that the package contains firearm parts. Tr. 445:20–23. Because thieves have an easier time stealing USPS packages than UPS packages, Defendants felt the need to hide the true content of their packages only when mailing a trigger through USPS. ECF No. 124-1 at 91:25–92:4.

**\*42** This is, perhaps, a plausible explanation. However, a more plausible explanation is that UPS is a private company, whereas USPS is an agency of the United States government. In or around October 2022, Defendants acquired a supply of WOTs as a result of a patent dispute settlement with their former distributor. *See* O.A. Tr. 47:17–24. Because this post-dated the ATF's cease-and-desist letter and seizure of Defendants' property at 3rd Gen Machines, however, Defendants were at that time all-but-certainly aware that their packages could, at some point, be tracked by the Government or confiscated in transit. The Court therefore finds it very likely that Defendants used false company names to avoid Government detection.

DeMonico also explained that the policy was designed to protect his customers' privacy. Tr. 446:4–15; ECF No. 124-1 at 92:15–17. Indeed, the record demonstrates that many of Defendants' customers did wish to protect their information —from the ATF. Defendants had, in the preceding years, received numerous emails from their customers seeking assurances that Defendants were taking steps to prevent the ATF from locating them. This further supports a finding that Defendants used false company names on their USPS packages to hinder the Government from tracking their products' whereabouts:



Govt. Exs. 106 at 1; 87 at 2; 88 at 1, 107 at 1 (highlight supplied).

DeMonico's explanation for this company practice is further undermined by various emails that customers sent to RBT indicating that their UPS packages had likely been stolen from their doorsteps, Govt. Ex. 66 at 2, or that UPS drivers had in fact dropped off packages at customers' homes without knocking, Govt. Ex. 22 at 6; *see also* ECF No. 124-2 at 30:13–14. This evidence suggests that DeMonico's faith in UPS over USPS for purposes of preventing package theft was perhaps not his true reason for using false company names on RBT's packages.

DeMonico's version of events is further undermined by the fictitious company names that he actually chose, particularly "Red Beard Treasures." If a seller were concerned that a thief would steal a package whose label reveals that it

contains expensive "triggers," surely the seller would have the same concern when the package is labeled as containing "treasures."

Finally, Defendants testified that they only started using fictitious names on their USPS packages in November 2022, well after the ATF's July 2021 cease-and-desist letter, indicating that there is no connection between the two. Tr. 524:2–17. The Government, however, points out that in March 2022, Defendants lost their entire inventory of triggers after the ATF executed a search warrant at 3rd Gen Machines, the facility that shipped FRT-15s on Defendants' behalf. Defendants only finally had inventory to sell, therefore, in November 2022 after it received a trove of WOTs in a settlement dispute with a patent infringer—and when Defendants sold these triggers, they used false names on their USPS packages. The record supports the Government's version of events. *See* Tr. 583:24–584:16, 600:4–12; Govt Ex. 129 at 1. [46]

**\*43** In sum, it appears likely to the Court that Defendants' practice of using a false company name with USPS, but not with UPS, on packages that post-dated the ATF's seizure of Defendants' inventory at 3rd Gen was a deliberate attempt to interfere with the Government's ability to track and confiscate what it believed to be illegal machineguns. Although the use of fictitious company names on their USPS packages clearly did not succeed in tricking the Government, it is nonetheless sufficient for purposes of a 🖼 *Klein* conspiracy. *Cf.* 🖼 *Ballistrea*, 101 F.3d at 833 ("Although the creation of New Millennium ultimately failed to throw the FDA off Ballistrea's scent, such evidence of active concealment and evasion is more than sufficient to establish that Ballistrea agreed with Ricotta and others to obstruct, through deceit, trickery, or dishonest means, the FDA's lawful function.").

**b. Defendants Destroyed Sales Records that They Knew Were the Subject of an Ongoing ATF Investigation**

Second, the Court concludes that Defendants' use of a "digital shredding policy" also constitutes a dishonest act intended to thwart the ATF's jurisdiction to seize FRT-15s, at least insofar as Defendants continued that policy after receiving the ATF's cease-and-desist letter in July 2021. DeMonico testified that although RBT did have a policy of destroying each customer's name, address, and contact information roughly two weeks after a purchase, he implemented this policy simply because it

was a service offered by RBT's web host Word Press, and the policy protected RBT from liability in case the company was hacked in a data breach. Tr. 442:1–443:24. The goal of this company policy was not, DeMonico said, to hide anything from the Government. Tr. 444:7–9.

At the beginning of RBT's operations in December 2020, this policy, in a vacuum, would not constitute a deceitful act that obstructs the ATF's lawful functions. On this record, the Court has no reason to discredit DeMonico's testimony that the "digital shredding policy" was a standard option that a merchant could select in the web-sales platform that RBT used, and that they initially chose it to help protect customers' credit card information from hackers and other thieves. On July 27, 2021, however, Defendants received the ATF's cease-and-desist letter which explicitly informed Defendants of the ATF's conclusion that the firearms they had sold were illegal machineguns, and of the ATF's specific intention to develop "a plan for addressing those [FRT-15s] already distributed." Govt. Ex. 2 at 2; Defs. Ex. C1 at 2. At this point, Defendants became aware that the information in their sales data was the subject of an official investigation by the ATF. Nonetheless, after the ATF issued the cease-and-desist, RBT explained to its customers that it employed a digital shredding policy specifically to prevent customer data from ending up in the hands of the ATF:

On Mon, Sep 12, 2022, 11:29 AM Customer Service
<customerservice@rarebreedtriggers.com> wrote:

Hi ████████████████████

I'm sorry for the delayed response. We have not turned over a customer list to the ATF – we don't even have one to turn over, as we have a digital shredding policy.

\* \* \*

On Mon, Nov 7, 2022 at 4:52 PM Customer Service
<customerservice@rarebreedtriggers.com> wrote:

████████████████████

Doing business online in the digital age, it's almost impossible to remove any and all traces of a transaction, but we've put a great deal of thought into this. We have an attorney on staff and plan to defend our position tooth and nail. We will not voluntarily hand over anything to anyone. Additionally, we can't turn over what we don't have. We have a digital shredding policy. Once we no longer need a customer's personal information for legitimate business purposes, it is automatically scrubbed from our system.

Govt. Exs. 88 at 1; Defs. Ex. H1 at 1 (highlight supplied). Similarly, Defendants knew after the ATF's seizure of their inventory on March 26, 2022 that the ATF was actively attempting to confiscate FRT-15s, and had already obtained at least one federal court order authorizing its agents to do so. Nonetheless, Defendants chose to maintain a practice of "shredding" their sales records well after both of these events. [47]

#### 4. Overt Act

**\*44** The Government has also met its burden of demonstrating that it is likely to satisfy the fourth element of a *Klein* conspiracy—the commission of an overt act by one of the conspirators to interfere with the lawful functioning of a government agency—at a final trial on the merits. Defendants' use of false names on USPS packages and their digital shredding policy, described *supra*, would each likely constitute such an act. One more action by Defendants, however, would also likely constitute an overt act in furtherance of their conspiracy to obstruct the ATF's investigation into the FRT-15.

##### a. DeMonico Traveled to 3rd Gen to Collect a Pallet of FRT-15s, Knowing that the ATF Intended to Seize It

On March 24, 2022, the ATF received a search warrant from Magistrate Judge Jared C. Bennett of the United States District Court for the District of Utah to seize all FRT-15 devices from 3rd Gen Machine, as well as 3rd Gen's computers. ECF No. 120-3 at 3–9. On March 26, 2022, ATF executed that search. Shortly thereafter, however, a different facility, which had not been searched in the ATF's execution of this warrant, sent 3rd Gen a pallet of FRT-15s that Defendants asserted they had already paid for. Tr. 460:23–24; ECF No. 120-3 ¶¶ 5, 8. On or around April 13, 2023, 3rd Gen, through counsel, informed the ATF that it possessed this pallet of FRT-15s and wished to surrender it. ECF No. 105-4 ¶¶ 3– 4. On April 14, 2023, however, DeMonico flew to Utah, rented a U-Haul van, arrived at 3rd Gen, and told them he was there to take possession of all FRT-15s and component parts. Tr. 508:4–13; ECF No. 105-5 ¶¶ 13–15. The managers at 3rd Gen—whom DeMonico said were surprised to see him—said that the FRT-15s had been set aside for the ATF to retrieve, and that they would promptly call the ATF and warn the agents about DeMonico's presence. Tr. 460:3– 461:12, 510:22–24; ECF No. 105-5 ¶¶ 16–17. DeMonico reiterated that he still intended to take the devices, and told 3rd Gen's staff, "Give me a head start." Tr. 510:24; ECF No. 105-5 ¶ 17. He then loaded his van and drove off with the inventory, which consisted of nearly 2,000 triggers and 15,000 FRT-15 component parts. Tr. 463:25–464:2, 511:18– 22; ECF No. 105-5 ¶ 19.[48] After driving several hundred miles and crossing into New Mexico, DeMonico was stopped and detained by ATF agents, who seized the triggers and let him go. Tr. 464:15–467:19, 511:10–13

In this proceeding, DeMonico maintained that his actions did not, in fact, interfere with the ATF's ability to execute the search warrant because the warrant had expired by the time DeMonico arrived at 3rd Gen on April 14, 2023. Strictly speaking, this is true—the warrant had expired on April 7, 2023. *See* ECF No. 120-3 at 3. Upon direct questioning from the Court, however, it became clear that DeMonico did not actually know this fact at the time he traveled to 3rd Gen to collect the FRT-15s:

> MR. WARRINGTON: At any time surrounding this post raid to the pick up time, were you ever aware there was a seizure order on those triggers?
>
> MR. DEMONICO: I don't believe there was. Because even the warrant that had been served three weeks prior was already expired....
>
> THE COURT: Had you seen the warrant that had been executed about three weeks prior, before you went to Utah? Had you reviewed it yourself?
>
> MR. DEMONICO: I don't believe I had, ma'am.
>
> THE COURT: What is your basis at that time [to believe] that it was expired?
>
> **\*45** MR. DEMONICO: I didn't know at that time it was expired. Now I have come to know it was expired.
>
> THE COURT: What is your understanding at the time you got on the plane to Utah about the status of the warrant.
>
> MR. DEMONICO: I did know warrants had a period of time and then they were no good.
>
> THE COURT: Right. But you didn't know then with respect to this particular[ ] warrant?
>
> MR. DEMONICO: That's correct. I felt confident that that time period had expired.
>
> THE COURT: Based on what?
>
> MR. DEMONICO: They can't last for months. So I just assumed it's got to be a short period of time.
>
> THE COURT: Did you talk to a lawyer, Mr. Maxwell or anybody, about the time frame issue?

MR. DEMONICO: No, ma'am.

Tr. 461:13–462:18.

In addition, DeMonico testified that, as he drove off, he felt certain that the ATF would imminently arrest him, Tr. 463:25–464:16, further supporting the inference that he believed at the time that he took this pallet of FRT-15s that his actions interfered with an ATF investigation.

Contemporaneous emails between Maxwell and 3rd Gen also support the inference that Defendants believed that the ATF intended to seize that pallet and had the authority to do so. On March 30, 2023, Maxwell emailed 3rd Gen's attorney Mitch Vilos and asked 3rd Gen to facilitate the transfer of this pallet to RBT, notwithstanding the ATF's recent search of 3rd Gen's facility. Defs. Ex. A4 at 2. Vilos responded: "I am informing you of 3rd Gen's intent to not obstruct or refuse to cooperate with the government in its intent to seize and complete the process of forfeiture of any and all [FRT-15s] in 3rd Gen's possession." Defs. Ex. A4 at 1.

It appears likely to the Court, therefore, that DeMonico was fully aware that the ATF intended to retrieve this pallet of triggers. DeMonico's assertion that Judge Bennett's warrant had expired by the time he arrived at 3rd Gen, while true, appears to be a convenient *post facto* justification for his actions, not a true reflection of what DeMonico understood at the time. Further, the timing of his sudden flight to Utah (*i.e.,* within one day of when the ATF was informed that 3rd Gen's counsel told the United States Attorney for the District of Utah that 3rd Gen wished to voluntarily surrender all FRT-15s in its possession, *see* ECF No. 105-4 ¶¶ 3–4), along with the fact that DeMonico and Maxwell had specifically been informed by 3rd Gen's counsel that they intended to cooperate with the ATF's efforts to seize these devices, make it highly likely that DeMonico went to Utah as part of a last-ditch effort to prevent ATF from lawfully taking possession of the FRT-15s from 3rd Gen.

[46]    DeMonico has implied that retrieval of these triggers did not interfere with the ATF's ability to execute on this search warrant because these triggers were Defendants' property, since RBT had paid 3rd Gen for these triggers. Tr. 459:6–12, 507:14–16. The Court is unpersuaded by this argument. A search warrant aimed at seizing evidence from a suspect often involves property belonging to that individual. That fact alone does not make the warrant invalid, or interference with that warrant any less obstructionary. Were it otherwise, any owner

of "property" subject to an otherwise-valid warrant could obstruct law enforcement's efforts to execute that warrant, even when it covers items (for example, prohibited explosive devices) that are indisputably illegal for citizens to possess.

### b. The ATF Received a Call Threatening Violence at Its Office in Orlando in August 2021

**\*46**  On July 27, 2021, ATF agent Saier served Maxwell with a cease-and-desist letter instructing RBT to stop manufacturing and selling the FRT-15. A month later, an agent in the ATF's Orlando office received a threatening phone call. Tr. 221:5–223:7, 248:3–6; ECF No. 105-3 ¶¶ 2–9. According to the ATF's report, the call proceeded as follows:

> On August 27th, 2021, at 1606 hours, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Senior Industry Operations Investigator (SIOI) James Hitchcock received a threatening phone call .... The caller did not identify himself but stated "It's treasonous", "When are you going to stop trampling on our Second Amendment rights?" SIOI Hitchcock asked the caller if he had a question and the caller muttered "Second Amendment" and stated "We're coming down ... Coming down to ATF, your office. We are going to assemble. Going to assemble and protest at the office." The caller also said "We are bringing the rocket launcher."

Defs. Ex. P3 at 1.

ATF's investigation revealed that the person who made this threatening call did so from the fax line of Maxwell's law office. Defs. Ex. P3 at 1. However, Defendant Maxwell testified that although the call did come from the fax machine at the front desk of his commercial building, he himself never made any such call. Tr. 602:25–605:17.

Maxwell may well be telling the truth. Indeed, because he shares a law office with others, and both he and at least one other attorney who rent space in that office have represented individuals in litigation with the ATF, *see* Tr. 603:19–605:20, another attorney, law firm client, or other individual with access to the premises could have made the call at issue. Given the timing of the ATF's cease-and-desist letter, the fact that this call was made from a phone line associated with Maxwell's office is a troubling coincidence. Nevertheless, the Government has not demonstrated that Maxwell made this phone call, nor that he directed any other person to do so.

Accordingly, the Court does not rely on this evidence in its findings.

* * *

In sum, the Court concludes that the Government is likely to demonstrate at a trial on the merits that Defendants completed at least one overt act in furtherance of a conspiracy to obstruct the ATF's lawful jurisdiction to investigate Defendants' manufacture and distribution of illegal machineguns.

## II. Irreparable Harm

[47]  [48]  [49]  "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.' " *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). To demonstrate the existence of irreparable harm, a plaintiff must show that "absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation and quotation marks omitted). The plaintiff must also show that the alleged harm is "continuing" and "cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quotation marks omitted). Section 1345 also specifically authorizes the Government to seek preliminary injunction relief from a court to enjoin mail frauds, wire frauds, and frauds against the United States to "prevent a continuing and substantial injury" to these persons or entities. 18 U.S.C. § 1345(b).

**\*47**  [50]  The Court concludes that irreparable harm would befall the United States and Defendants' customers in the absence of a preliminary injunction. First, at oral argument, Defendants conceded that, although they did not believe that the FRT-15 satisfied the statutory definition of a machinegun, if the Court did conclude that the FRT-15 is a machinegun, then the FRT-15's continued illegal sale would constitute *per se* harm to the United States and its citizens. O.A. Tr. 10:9–22. As outlined *supra*, the Government is likely to prove that the FRT-15 is indeed an illegal machinegun. To date, Defendants have not registered their devices with the Government, and

do not keep track of the sales of these devices to third parties. The Court agrees with the Government that if Defendants were permitted to continue to sell the FRT-15 while this litigation is pending, the United States would have to spend significant resources retrieving those devices—on top of the approximately 100,000 sold by Defendants since 2020 that are already in circulation, *see* ECF No. 105-1 at 2, and it would likely be impossible to retrieve them all. O.A. Tr. 11:9–24. Although Defendants do not currently have a manufacturer, DeMonico testified that he currently possesses a large number of WOTs in storage. Tr. 475:4–17.

Similarly, irreparable harm would befall Defendants' prospective customers if Defendants are allowed to continue to sell the FRT-15. For Defendants' customers, such harm is not exclusively monetary. If the Government proves, as the Court finds likely that it will, that the FRT-15 is a machinegun within the meaning of § 5845(b), then every owner of an FRT-15 is violating federal law, even if many—if not most—are currently doing so unknowingly. By selling the FRT-15 while this action is pending a final determination, Defendants would expose still more customers, who may remain under the misimpression that the FRT-15 is unequivocally "legal," to at least some risk of future criminal prosecution.

Possession of a machinegun is punishable by a maximum of ten years in prison and a $10,000 fine. *See* 18 U.S.C. § 922(o)(1); 26 U.S.C. § 5871. Commission of certain crimes while using a machinegun is punishable by a statutory minimum of thirty years. 18 U.S.C. 924(c) (1)(B)(ii). Under federal law, a person convicted of a crime punishable by a prison term of more than one year can lose her right to possess a firearm for life. 18 U.S.C. § 922(g) (1). Thus, any such convictions would create downstream consequences particularly harmful to Defendants' customers, whom Defendants themselves characterize as "sophisticated firearms enthusiasts" who are "attuned to their Second Amendment Rights and the issues that concern them." ECF No. 133 at 4. That harm exists even if the Government ultimately does not prosecute the vast majority of Defendants' customers. *Cf. Simonsen v. Bremb_y*, 15-cv-1399, 2015 WL 9451031, at \*4 (D. Conn. Dec. 23, 2015) ("[T]here is Second Circuit and out-of-circuit appellate law holding that the mere *threat* of a loss of medical care, even if never realized, constitutes irreparable harm." (citation omitted)). Those who purchase FRT-15s may, understandably, experience fear and anxiety regarding that possibility and its serious collateral

consequences as this litigation proceeds (and certainly if final judgment is entered declaring the FRT-15s to be illegal); some may decide to seek their own legal counsel to advise them of how to safely divest possession or otherwise protect themselves from the risk of criminal prosecution. Even the threat of a grievous outcome like a criminal prosecution or conviction would likely cause Defendants' customers "emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities," which "taken together ... show harm that, in this sort of case, is 'irreparable.' " *United Steelworkers of America, AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987) (Breyer, J.).

Defendants' profit-driven actions have already put at risk the firearms rights of tens of thousands of Americans. Any future sales would expose new customers to that risk.

The Court therefore concludes that the Government has met its burden of demonstrating that irreparable harm would befall both the United States and Defendants' customers if a preliminary injunction does not issue.

### III. Balance of Hardships

**\*48** **[51]** The Court now turns to the balance of the equities among the parties. *See Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020) (instructing courts to "balance the competing claims of injury and ... consider the effect on each party of the granting or withholding of the requested relief." (citation omitted)). First, the Court recognizes that Defendants may face some difficulties from the issuance of a preliminary injunction. If the Court grants the Government's motion for a preliminary injunction but the Government ultimately fails to meet its burden at a trial on the merits —and, specifically, if a court ultimately concludes that the FRT-15 is a legal device—then Defendants' sales of the FRT-15 will certainly be delayed, since their customers will need to wait months or years before purchasing one. *Cf. Gov't Employees Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp. 3d 443, 455 (E.D.N.Y. 2020) ("If the court grants plaintiffs' motion to enjoin ... and [plaintiff] fails to prove its claims, then, at worst, [defendant's' recovery ... will be delayed."). Moreover, if an injunction issues, Defendants may forego certain sales altogether if customers seek to buy a similar product instead. To Defendants, this hardship is not insignificant—although the Court's concern is mitigated by the fact that the Government has made a strong showing that Defendants' entire business is built on the sale of an illegal

product anyway. *Cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 199–200 (E.D.N.Y. 2013) ("Based on the facts before the Court at this time ... any harm appears to stem from defendants' own wrongful conduct .... In such circumstances, the Court cannot say the harm to defendants outweighs the harm to plaintiffs.").

Conversely, the hardships to both the Government and to legal gun owners in the United States would be significant in the absence of a preliminary injunction. If the Court declines to enter preliminary injunctive relief but the Government ultimately succeeds after a final trial on the merits—that is, the Government secures a final judgment after proving that the FRT-15 is indeed a machinegun within the meaning of 26 U.S.C. § 5845(b), that Defendants have interfered with the Government's authority to regulate and confiscate FRT-15s, and that Defendants are engaged in a scheme to defraud their customers—then, during the pendency of this case, thousands of illegal machineguns could be added to the current stockpile of FRT-15s scattered throughout the country. Although Defendants do not appear to currently have a manufacturer for the FRT-15, DeMonico testified during his deposition that he does currently possess a stockpile of "many, many, many" boxes of inventory, each of which contain roughly one hundred triggers. ECF No. 124-1 at 48:2– 49:22. The Government would then be required to use its finite resources to track these devices down at the expense of other priorities. Tr. 225:6–229:10.[49]

**[52]** When comparing these two outcomes, the Court concludes that the balance of hardships decidedly tips in favor of the Government.[50]

### IV. Public Interest

**[53]** "[W]hen a court orders injunctive relief, it should ensure that the injunction does not cause harm to the public interest." *U.S. Sec. & Exch. Comm'n v. Citigroup Global Mkts., Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012). For the reasons already stated, the Court readily concludes on this record that the public interest would not be harmed by preliminary injunctive relief.

\* \* \*

**\*49** For the reasons outlined above, the Court concludes that the Government has met its burden of demonstrating that it

is entitled to preliminary injunctive relief. The Government's motion is therefore granted.

## V. Scope of Injunctive Relief

The Government initially urged this Court to order a broad array of injunctive relief against Defendants under 18 U.S.C. § 1345 if it granted the motion for a preliminary injunction. *See* ECF No. 5 at 40–41. However, after post-hearing oral argument, the Government filed a revised proposed injunction and supporting letter brief. *See* ECF 128. The Court also gave Defendants leave to respond in writing to the Government's new proposal, which they did on August 23, 2023. *See* ECF No. 133.

Currently, the Government seeks two forms of preliminary injunctive relief. First, the Government has moved that the Court's temporary restraining order—which bars Defendants from selling FRT-15s or similar devices and requires them to preserve all business records, *see* ECF No. 11—be converted into a preliminary injunction. ECF No. 128 at 1. For the reasons outlined *supra*, this motion is granted. [51]

[54]  Second, the Government has moved the Court to order Defendants to "create and implement a refund program to allow their customers to return FRT-15s or Wide Open Triggers ("WOTs") to them in return for cash payments." ECF No. 128 at 1. This motion is denied. The Court currently has the authority to issue only preliminary injunctive relief. It is true that preliminary injunctions against defendants in cases alleging fraudulent sales may encompass relief that is broader than merely enjoining future sales—for example, in some cases, courts have the established authority to freeze at least a portion of a defendant's assets to ensure that sufficient funds will still be available to pay restitution to the defendants' customers after a trial on the merits. *See, e.g.*, *United States*

*v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1183 (E.D.N.Y. 1991). But the Court agrees with Defendants that it has no authority to order the refund program proposed by the Government at this stage of the litigation. As a practical matter, a refund program would constitute final, not preliminary, relief, because if Defendants ultimately prevail in this action, they could not recover the money they issue in refunds to their customers.

## CONCLUSION AND ORDER

The Government's motion for a preliminary injunction is GRANTED pursuant to this Court's authority under 18 U.S.C. § 1345. Defendants, their agents, officers and employees, and all other persons and entities in active concert or participation with them, are:

**\*50**  1. Restrained from engaging in any sales of the FRT-15, the Wide Open Trigger, forced-reset triggers, and other machinegun conversion devices until and unless otherwise ordered by this Court; and

2. Required to preserve all documents related to the manufacture, possession, receipt, transfer, customer base, and/or historical or current sale of FRT-15s, Wide Open Triggers, forced-reset triggers, and/or machinegun conversion devices, including those generated or received after the date of this Order, until and unless otherwise ordered by this Court.

SO ORDERED.

All Citations

--- F.Supp.3d ----, 2023 WL 5689770

## Footnotes

1   Defendants also sell a trigger called the "WOT" which all parties agree, for purposes of this litigation, is identical to the FRT-15. *See, e.g.*, Tr. 150:25–151:14, 278:5–15. For ease of reference, the Court will refer only to the FRT-15 unless the distinction between the two devices is important.

2   For purposes of this description, the Court assumes that the firearm is in automatic mode. Tr. 50:17–51:1.

3    Descriptions of clockwise and counterclockwise motions assume that the weapon is pointed to the right from the perspective of the viewer.

4    The parties agree that if a shooter pulls the trigger of an FRT-15 back with too much force, she may overcome the reset mechanism, causing a malfunction. Tr. 178:24–179:6, 191:10–20, 294:15–23. In that scenario, the weapon will fire only one bullet and the firing sequence will cease. Tr. 179:7–8.

5    The locking bar also prevents "hammer follow," a malfunction described elsewhere in this opinion. *See, e.g.,* ECF No. 129-1 at 125:21–22.

6    The parties later amended RBT's articles of organization, removing DeMonico, Leleux, and Register as LLC members and making Maxwell the company's sole owner on December 9, 2020. ECF No. 105-1 ¶ 10; Govt. Ex. 49 at 3–6.

7    Although DeMonico testified that, to his memory, Defendants purchased the rights to the '223 patent before they incorporated RBT, Tr. 428:12–15, the contemporaneous documentation indicates that Defendants in fact incorporated RBT just before purchasing the '223 patent.

8    Defendants retained McMann and O'Kelly prior to selling the FRT-15. Tr. 430:19–431:5. In the months after they launched the FRT-15, Defendants also retained Vasquez and Luettke. Tr. 487:7–12; ECF No. 120-1 ¶ 9. DeMonico testified that he sought additional opinions from Vasquez and Luettke to assess the factory manufactured version of the FRT-15, rather than the prototype, in light of minor modifications that were necessary to facilitate mass production. Tr. 437:18–438:20.

9    The ATF classified the WOT as a machinegun for the same reason in a report dated October 20, 2021. *See generally* Govt. Ex. 4; Defs. Ex. V.

10   Although the ATF's cease-and-desist letter is stamped on July 26, 2021, *see* Govt Ex. 2 at 1; Defs. Ex. C1 at 1, the parties agree that the ATF served the letter on Defendants on July 27, 2021. *See, e.g.,* Tr. 230:18–19; Defs. Ex. F1 at 1.

11   According to Robinson, at the time of the ATF search, this pallet was at a different 3rd Gen facility that the ATF had not entered. ECF No. 105-5 ¶ 10. 3rd Gen President Evan Jones, however, recalled that the pallet had been delivered to 3rd Gen from an outside vendor after the ATF search. ECF No. 120-3 ¶ 5.

12   At some point after leaving 3rd Gen and before being apprehended in New Mexico, DeMonico switched vehicles. ECF No. 117-1 at 7.

13   The Government asks the Court to apply a standard for the issuance of a preliminary injunction in this case that is lower than the standard typically applied to parties seeking such relief, arguing that ▣18 U.S.C. § 1345 explicitly contemplates the availability of injunctive relief to stop ongoing frauds, and that the Government therefore need only prove that there is "probable cause" that Defendants are engaged in such a scheme, and need make no showing that they will experience irreparable harm if a preliminary injunction does not issue. *See, e.g.,* O.A. Tr. 11:4–7. The Government points to decisions by other courts that have issued preliminary injunctions under ▣18 U.S.C. § 1345 using the Government's proposed standard. *See, e.g., United States v. Palumbo,* 448 F. Supp. 3d 257, 260–61 (E.D.N.Y. 2020); *see generally* ▣*Luis v. United States,* 578 U.S. 5, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016). The text of the statute itself does not speak to the appropriate preliminary injunction standard, however, other than to note that "[a] proceeding under this section is governed by the Federal Rules of Civil Procedure." ▣18 U.S.C. § 1345(b). Because the Court finds that the Government has met its burden for preliminary injunctive relief under Defendants' preferred

14    standard, *see* ECF No. 50 at 10–15, which is also the standard that typically governs motions for a preliminary injunction under Fed. R. Civ. P. 65(a), it does not resolve this question here.

14    Neither party argues that the Second Amendment bears on Defendants' right to possess or sell the FRT-15. The Government clearly has the authority to prohibit the possession of machineguns. *District of Columbia v. Heller*, 554 U.S. 570, 624, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012). The parties only dispute whether the FRT-15 is such a device.

15    Defendants recorded this video "at 1461 frames per second" and "replayed [it] at 23.98 frames per second" for the Court. ECF No. 138 at 1.

16    Despite this language, *Olofson* supports, rather than undermines, the Government's interpretation of § 5845(b). In *Olofson*, a defendant appealed his conviction for the possession of an illegal machinegun to the Court of Appeals for the Seventh Circuit on the grounds that the district court failed to instruct the jury on the definition of a machinegun consistent with *Staples*. 563 F.3d at 656. The weapon that the defendant possessed, though capable of automatic fire, would frequently malfunction, allowing only a few shots to fire before jamming. *Id.* at 655. The defendant argued that such a weapon was not a machinegun since *Staples* held that a weapon is a machinegun if it keeps firing "until its trigger is released or the ammunition is exhausted," but, a shooter could, in principle, hold down the trigger on the defendant's defective weapon yet never exhaust its ammunition. *Id.* at 656 n.3. The Court rejected this argument on the grounds that *Staples* does not necessarily provide a "comprehensive" interpretation of § 5845(b)— that is, weapons which do satisfy the definition in *Staples* are machineguns, yet even those that do not may still be machineguns within the meaning of the statute. *Id.* at 658.

17    *Trigger*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/trigger (last visited Aug. 30, 2023).

18    *Trigger*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/trigger (last visited Aug. 30, 2023).

19    *Function*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/function (last visited Aug. 30, 2023).

20    *Function*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/function (last visited Aug. 30, 2023).

21    Defendants also argue that the word "function" cannot be read synonymously with "pull" because the definitions of other firearms in 26 U.S.C. § 5845, such as rifles and shotguns, include the word "pull," yet the definition of "machinegun" does not. *See* ECF No. 70 at 4–5; 26 U.S.C. §§ 5845(c), (d). From this difference, Defendants urge the Court to conclude that the word "function" must mean something other than the word "pull," invoking a canon of statutory interpretation that when Congress uses different words in the same statute, that difference must reflect an intended difference in meaning.

*Staples* forecloses this argument. But even if it did not, Congress did not, as relevant here, statutorily define "machineguns" at the same time it defined "rifles" and "shotguns." Although these definitions all appear in 26 U.S.C. § 5845, Congress defined "machineguns" in the National Firearms Act in 1934 but defined

"rifles" and "shotguns" in the Gun Control Act in 1968. It seems unlikely to the Court that Congress, by later using the word "pull" when defining other firearms thirty years after it had defined machineguns, intended to impliedly narrow the latter category in a statute called the "Gun Control Act." Simply, the word " 'function' was likely intended by Congress to forestall attempts by weapon manufacturers or others to implement triggers that need not be pulled." *Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1152 (D. Utah 2019), *aff'd,* ⌑*Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020).

22   This result is also consistent with the ATF's regulation interpreting "single function of the trigger" in ⌑26 U.S.C. § 5845(b) as "a single pull of the trigger and analogous motions." ⌑27 C.F.R. § 479.11. Although the Court need not defer to the ATF's regulation in light of its own analysis, the Court notes the consistency. *Cf.* ⌑*Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 34–35, 135 S.Ct. 513, 190 L.Ed.2d 410 (2014) (noting that an agency regulation was consistent with the Court's statutory analysis).

23   *Automatic,* Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/automatic (last visited Aug. 30, 2023) (emphasis added).

24   *Automatic,* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/automatic (last visited Aug. 30, 2023) (emphasis added).

25   The Court recognizes that a shooter firing a semi-automatic weapon may not always fully release the trigger in between shots, since the trigger can re-engage the hammer even if the shooter releases some, but not all, of the pressure on the trigger shoe. Nonetheless, semi-automatic weapons equipped with standard triggers would still not be machineguns within this meaning because the shooter must manually release pressure from the trigger before the trigger can begin the firing sequence again. Defendants introduced evidence that at least a small cadre of elite advanced shooters (including one whom they identified as "the fastest shooter in the world") can train themselves to manually pull and release a trigger rapidly and fire multiple rounds at a rate comparable to that achieved by a novice shooter using an FRT-15. *See* Tr. 286:19–287:10. But even those shooters cannot pull a semi-automatic trigger and fire multiple rounds simply by holding it in place.

26   Other circuit courts that have considered the legality of non-mechanical bump stocks have reached the opposite result as ⌑*Cargill,* concluding that the ATF did not exceed its authority when it classified non-mechanical bump stocks as machineguns within the meaning of ⌑26 U.S.C. § 5845(b). *See* ⌑*Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives,* 920 F.3d 1 (D.C. Cir. 2019); ⌑*Aposhian v. Barr,* 958 F.3d 969 (10th Cir. 2020); ⌑*Gun Owners of America, Inc. v. Garland,* 19 F.4th 890 (6th Cir. 2021); *but see* ⌑*Hardin v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 65 F.4th 895 (6th Cir. 2023) (applying the rule of lenity to exclude non-mechanical bump stocks from classification as machineguns ⌑§ 5845(b)).

27   ⌑*Cargill* at no point cites the Supreme Court's decision in ⌑*Staples,* even to distinguish it on the merits or to construe its "single pull of the trigger" interpretation of ⌑§ 5845(b) as dicta.

28   Similarly, ⌑*Cargill* cites approvingly to *United States v. Akins,* 312 F. App'x 197 (11th Cir. 2009). *Akins* concerned the legality of a device called an Akins Accelerator, a mechanical device which, when outfitted on a semi-automatic rifle, "maintains tension against the finger stops" such that the rifle "is pushed forward by tension supposed by [a] spring which pushes the trigger into the shooter's finger." *Akins,* 312 F. App'x at 198. The spring-loaded device allows a shooter to "fire continuously ... until the gunman releases the trigger or the ammunition is exhausted." *Id.* at 200. The *Akins* court, upholding the ATF's classification of the Akins

Accelerator as a machinegun, concluded that "[t]he plain language of [⬚§ 5845(b)] defines a machinegun as any part or device that *allows a gunman to pull the trigger once* and thereby discharge the firearm repeatedly." *Id.* at 201 (emphasis supplied). That was true even though the trigger on the device was repeatedly "pulled" when the device automatically pressed the trigger against the shooter's finger. ⬚*Cargill*, in turn, concludes that the Akins Accelerator would still be a machinegun under its interpretation of the phrase "single function of the trigger" in ⬚§ 5845(b) because "a *shooter* using an Akins Accelerator *need only pull the trigger once to activate the firing sequence*" and the weapon would thereafter "maintain[ ] the bump fire of its own accord." ⬚*Cargill*, 57 F.4th at 462 n.8 (emphasis supplied).

29    Defendants also cite supportively to ⬚*United States v. Alkazahg*, 81 M.J. 764 (N-M. Ct. Crim. App. 2021), but this decision similarly cabins its holding to non-mechanical bump stocks. In ⬚*Alkazahg*, the Court first concluded that a weapon qualifies as a machinegun within the meaning of ⬚§ 5845(b) if a "single pull of the trigger ... initiates the process" of automatic fire, and "hold[ing] the trigger" continues that process. ⬚81 M.J. at 782. However, if a weapon satisfies that definition but also requires additional human input in order to operate—such as the forward pressure that a shooter must place on a rifle with her non-shooting hand to operate a weapon equipped with a bump stock—it is no longer "automatic." ⬚*Id.* at 783. "That is because the former [weapon] is shooting automatically *by a single function of the trigger*, while the latter is relying on an additional human action beyond the mechanical self-action and impersonal trigger function." ⬚*Id.* (emphasis in original). This Court is not necessarily persuaded by the definition of "automatic" outlined in ⬚*Alkazahg*; but even if it were, an FRT-15 would fall on the "machinegun side" of this distinction, since all parties agree that the FRT-15 simply requires a shooter to pull and maintain pressure on the trigger to automatically fire a steady stream of bullets, with no "additional human action." ⬚*Id.* at 783; Tr. 84:3–5.

30    Despite Defendants' urging, the Court declines to apply the rule of lenity to ⬚§ 5845(b). Lenity applies when there is a "grievous ambiguity or uncertainty in the language and structure of a statute." ⬚*United States v. Trapilo*, 130 F.3d 547, 552 n.8 (2d Cir. 1997) (citing ⬚*Chapman v. United States*, 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)) (alteration omitted). However, a statute "does not become ambiguous merely because 'it has been applied in situations not expressly anticipated by Congress.' " ⬚*Id.* (citing ⬚*Nat'l Org. For Women v. Scheidler*, 510 U.S. 249, 262, 114 S.Ct. 798, 127 L.Ed.2d 99, (1994)) (alteration omitted). The Court recognizes that other courts have found ambiguity in ⬚§ 5845(b) as applied to non-mechanical bump stocks. *See, e.g.*, ⬚*Guedes*, 920 F.3d at 21. However, ⬚§ 5845(b) is simply not ambiguous when applied to the FRT-15. Outside of the context of non-mechanical bump stocks, every case that the Court can find has held that if a shooter can maintain pressure on a weapon's trigger and the weapon fires multiple shots, then that weapon is a machinegun. A word in a statute does not become ambiguous for purposes of lenity simply because the defendant proposes a different possible meaning to the Court. *Cf.* ⬚*Lockhart v. United States*, 577 U.S. 347, 361, 136 S.Ct. 958, 194 L.Ed.2d 48 (2016) (noting that the rule of lenity does not apply simply because the court may be able to select more than one interpretation from "multiple, divergent principles of statutory construction").

31    The Government also brings claims of conspiracy to commit mail and wire fraud against Defendants under 18 U.S.C. § 1349. In light of the Court's analysis of the Governments claims under 18 U.S.C. §§ 1341 and 1343, the Court need not reach these claims.

32    Although in the Government's original merits brief it argued in the alternative that even depriving a consumer of "the relevant facts necessary to make an informed economic decision" without a scheme to otherwise deprive a consumer of her money or property qualifies as mail or wire fraud, ECF No. 5 at 34, the Supreme Court has since rejected this conception of 18 U.S.C. §§ 1341 and 1343. *See* *Ciminelli v. United States*, 598 U.S. 306, 314, 143 S.Ct. 1121, 215 L.Ed.2d 294 (2023). In a supplemental brief, Defendants argue that *Ciminelli* defeats the Government's mail and wire fraud claims. However, this argument is foreclosed by Defendants' concession that the aim of the alleged scheme was not to deprive their customers of economically relevant information, but in fact to take their money. O.A. Tr. 86:12–19. *See, e.g.*, *United States v. Pasternak*, 18-cr-51, 2023 WL 4217719, at *2 (E.D.N.Y. June 27, 2023) ("[T]hese victims lost cold hard cash. This was fraud before *Ciminelli*, and it is fraud today.").

33    The Government argues in the alternative that a court can find that a defendant engaged in a scheme to defraud solely based on a finding that a defendant was "reckless" with regard to the truth or falsity of his statements. ECF No. 5 at 33; ECF No. 131 at 1–2 (citing, *inter alia*, *O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990)). In response, Defendants concede that the Government can indeed prove its case by showing that Defendants were merely "reckless" with regard to the truth or falsity of their statements to their customers, but that Defendants did not act recklessly because they believed in good faith that the FRT-15 was legal. *See* ECF No. 135 at 1–6. In light of the Court's conclusion that the Government is likely to prove that Defendants *knew* that they were defrauding their customers, it need not decide whether, as a legal matter, a finding of recklessness is sufficient for purposes of 18 U.S.C. §§ 1341 and 1343. However, were this Court to apply a recklessness standard as both parties suggest it may, it would readily find for the reasons outlined in this opinion that Defendants acted with a reckless disregard to the truth when they informed their customers that the FRT-15 was legal, given everything they knew to the contrary.

34    Defendants have also argued that the Government "has presented no evidence that Defendant Kevin Maxwell knew about the AR1, any connection between the AR1 and the FRT-15, or of the ATF's classification of the AR1." ECF No. 133 at 6. But Maxwell was RBT's general counsel, and Maxwell testified that DeMonico, Leleux, and Register specifically made him a partner in their business venture in light of his expertise in firearms law. Tr. 542:7–12, 588:5–11; *see* ECF No. 124-3 at 43:6–22. RBT also featured Maxwell in a marketing video in which Maxwell, seated in front of a wall of law books, touts his legal credentials and assures the public about the FRT-15's legality. *See* Defs. Ex. A. There is no conceivable scenario in which Rounds informed DeMonico and Leleux that the ATF had classified the AR-1 as a machinegun but DeMonico and Leleux did not share that information with Maxwell. That Maxwell knew about the ATF's classification of the AR-1 is a reasonable—indeed, overwhelming—inference from the evidentiary record.

35    Similarly, Vasquez testified by declaration that his classification of the FRT-15 was consistent with ATF standards because the ATF had concluded that, as a blanket matter, a weapon is a machinegun only if "each *movement* of the trigger resulted in more than one shot being fired." ECF No. 120-1 ¶ 8 (emphasis supplied). However, when working at the ATF, he classified devices as machineguns even when the trigger on those devices moved with each shot fired, as long as the weapon continued to fire when the shooter maintained constant pressure on the trigger. Tr. 126:10–127:7, 141:15–143:3.

36    Like machineguns, silencers, defined in ☐ 18 U.S.C. § 921(a)(25), are also "firearms" within the meaning of the GCA. *See* ☐ 26 U.S.C. § 5845(a)(7).

37    Each of the testifying co-founders also briefly referenced their familiarity with various "binary" triggers that ATF had previously classified as legal. *See, e.g.,* Tr. 436:5–7, 549:5–10, 592:9–10. But Defendants relied far more heavily on the 3MR, with good reason. A "binary" trigger shoots one round of ammunition with each pull *and* each release of the trigger. It does allow for more rapid shooting than a standard trigger, but contains no forced-reset function and is readily distinguishable from the FRT-15. While the parties have compared the FRT-15 to various other devices that facilitate very rapid fire, both parties agree, as does this Court, that the capacity for a rapid rate of fire does not make a device a machinegun.

38    O'Kelly's live and written testimony also provide other reasons to doubt his general credibility. For example, at one point in the preliminary injunction hearing, Defendants played a video of a professional shooter named Jerry Miculek—whom O'Kelly described as famed for being "the fastest shooter in the world." Tr. 287:1–3. In the video, Miculek is able to fire a standard semi-automatic rifle's trigger at such speed, and with such precise timing, that he fires multiple shots as quickly as with an FRT-15. *See* Defs. Ex. M. On cross-examination, O'Kelly refused to concede that Miculek is among a small class of truly elite shooters who can achieve such a rapid rate of fire with a standard trigger, *i.e.,* that no novice shooters could do so without an FRT-15 or a similar device. When asked whether anyone with zero experience firing a weapon might simply pick up a rifle and fire as quickly as Miculek, O'Kelly said, "I'm sure some can." Tr. 343:5–7. He then doubled down on this claim by explaining that some people are "insanely dexterous" guitar players, and a novice shooter with such extremely "fast" fingers might well be able to fire a gun with Miculek's speed and skilled timing. Tr. 343:17–24. This is akin to claiming that an "insanely dexterous" person who picks up a guitar for the first time could play it as well as Jimi Hendrix.

39    DeMonico testified that RBT did not post the cease-and-desist on its website because its web host Word Press could not accommodate it, and redesigning the website was a significant undertaking. Tr. 519:5–522:25. Given that RBT has made $39 million in two years from the sale of the FRT-15, ECF No. 105-1 at 2, the Court does not find this explanation credible.

40    The Akins Accelerator's initial approval letter was ultimately revoked by an ATF agent named Richard Vasquez. *See Akins*, 82 Fed. Cl. at 621.

41    Defendants correctly point out that their sales "exploded" shortly after the ATF issued its cease-and-desist, Tr. 451:21–24, 549:13–17; Defs. Ex. Q2 at 2, and urge the Court to conclude from this fact that the ATF's legal determination of the FRT-15 was not material to customers' decisions to purchase one. On the current posture, the Court does not draw that inference. Defendants, after suing the ATF, increased their marketing and hired a public relations firm. The Court agrees with the Government that the sales increase is likely attributable to these vastly expanded marketing efforts, and do not reflect any lack of interest on the part of RBT's customers as to the product's legal classification.

Indeed, for all their efforts to publicize their short-lived legal challenge to the ATF's classification, Defendants never included anything on their website—the actual point of purchase—informing prospective customers that the FRT-15 was, in the ATF's view, an illegal machinegun. And even crediting DeMonico's testimony that RBT employed a relatively rudimentary website platform that made it difficult to make extensive changes or add sophisticated features, DeMonico never suggested that Defendants could not have simply added a sentence or two disclosing the ATF's July 2021 classification. Nor, given RBT's tens of millions of dollars in sales, have Defendants suggested that they lacked the resources to upgrade their website, had it been necessary to do so in order to make disclosures to their customers about ATF's classification.

42    The Court, relying on the same factual basis as in its scienter and materiality analyses, also concludes that the Government is likely to prove the "existence of a scheme to defraud," to the extent that this element of the mail and wire fraud offenses is truly separate from scienter and materiality. *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). The caselaw is less than clear on this point. *See, e.g.*, *DeFilippo*, 2018 WL 11211500, at *3 ("To show the existence of a scheme to defraud, the Government must prove ... the existence of a scheme to defraud.").

In any event, a "scheme to defraud" can be "described as a plan to deprive a person 'of something of value by trick, deceit, chicane or overreaching.' " *Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quoting *McNally*, 483 U.S. at 358, 107 S.Ct. 2875). A scheme to defraud is further "characterized by a departure from community standards of 'fair play and candid dealings,' " and the Government can establish the existence of such a scheme through circumstantial evidence. *Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quoting *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992)) (citations omitted).

In light of Defendants' actions described *supra*, the Court readily concludes that the Government is likely to succeed in proving that Defendants engaged in a scheme to defraud.

43    18 U.S.C. § 1345 by its language is limited to imminent or ongoing frauds. *See* 18 U.S.C. § 1345(a)(1)(A). The Court recognizes that because the temporary restraining order has been in effect since January 19, 2023, any alleged fraud has effectively ceased, and Defendants have agreed not to sell any FRT-15s until it receives a final decision from a court as to the device's legality. Nonetheless, the Court concludes that the prerequisites of 18 U.S.C. § 1345(a)(1)(A) are satisfied both because Defendants sold FRT-15s as late as November 30, 2022, *see, e.g.*, Govt. Ex. 132 at 1, shortly before the Government brought this action, and because Defendants are currently holding a large cache of triggers in storage. ECF No. 124-1 at 49:13–22.

44    Defendants challenge this broad interpretation of the word "defraud" in 18 U.S.C. § 371, arguing that recent guidance from the Supreme Court regarding 18 U.S.C. §§ 1341 and 1343 urges an interpretation of § 371 limited to schemes that deprive the Government of money or property. O.A. Tr. 77:25–78:4; ECF No. 132 at 2–5 (citing *Ciminelli*, 143 S. Ct. at 1126). Because the Second Circuit has recently reaffirmed its controlling interpretation of § 371, however, this Court is bound to follow it. *Atilla*, 966 F.3d at 130 ("[A]lthough Atilla contends that the defraud clause incorporates the common law meaning of fraud, it has been well established that the term 'defraud' in § 371 is not confined to fraud as that term has been defined in the common law." (citation and quotation marks omitted)).

45    Defendants only apparently employed this practice when mailing WOTs, not FRT-15s, after they secured a stockpile of WOTs in or around October 2022 pursuant to a settlement agreement with RBT's former distributor Big Daddy Unlimited. *See* O.A. Tr. 47:17–24. The parties agree that FRT-15s and WOTs are, for purposes of this lawsuit, identical. *See, e.g.*, Tr. 150:25–151:14, 278:5–15.

46    In a supplemental brief, Defendants argued that this type of mislabeling to ward off thieves is a common practice within the firearms industry. ECF No. 130 at 3–4. Even if that were true, however, it does not explain why a firearms retailer would use different labels on UPS versus USPS packages, especially since the record indicates that Defendants were on notice that UPS packages might also be left without a signature for theft by so-called "porch pirates." *See, e.g.*, Govt. Ex. 22 at 6, 66 at 2. It also cannot be squared with Defendants' decision to (re)label their packages as containing "treasures"—indeed, in the counterexample that Defendants provide from another firearms manufacturer, the firearm package is mislabeled to make the box look like it contains a broomstick. ECF No. 130 at 4.

United States v. Rare Breed Triggers, LLC, --- F.Supp.3d ---- (2023)
2023 WL 5689770

Defendants also submitted a supplemental declaration on August 29, 2023, *see* ECF No. 136, in which DeMonico offered yet a third explanation for this practice. The WOT, DeMonico wrote, was a less expensive item than the FRT-15, so Defendants were not concerned about sending it via a less expensive and less reliable carrier like USPS. ECF No. 136 ¶ 4. But the WOT was apparently valuable *enough* to warrant using a false company name on the packaging to prevent theft (assuming, of course, that the purpose of the false company name was to prevent valuable packages from being stolen by so-called porch pirates, as Defendants contend). DeMonico's supplemental declaration does not change the Court's assessment that the likely purpose of the false labelling was, in fact, to obstruct the Government's efforts to track the sales of FRT-15s after the ATF classified these devices as machineguns.

47      The Government also argues that RBT's corporate structure, which consists of a series of interconnected limited liability companies, evidences Defendants' deceit and dishonesty, since the structure was purportedly designed to shields Defendants' ill-gotten assets. Defendants, for their part, testified that the purpose of this corporate structure was largely to protect the owners of RBT from personal liability lawsuits. *See, e.g.,* Tr. 424:5–22, 529:23–530:22. The Court does note the existence of a photo exhibit taken during a video presentation by RBT's financial advisor in which DeMonico's thumbnail photo is visible, which appears to corroborate Defendants' claim that they adopted their corporate structure at the recommendation of this advisor. *See* Defs. Ex. Z3 at 1. On the other hand, while the Government concedes that the corporate structure Defendants and their business partners adopted was not meaningfully different from the recommendations depicted in this exhibit, it urges this Court to find that they also did so specifically to shield their illegally-obtained profits from ready detection and seizure by the Government. Because the Court relies on other evidence to find that the Government is likely to succeed on its claim of a 🔲*Klein* conspiracy, it need not resolve the parties' conflicting interpretations of this evidence.

48      Maxwell's contemporaneous email correspondence with 3rd Gen indicates that this pallet contained 1,744 FRT-15s. Defs. Ex. A4 at 2. At a retail price of $380-per-unit, therefore, the pallet was worth roughly $660,000.

49      Defendants argue that the ATF is partially at fault for the quantity of FRT-15s in the country because they failed to act sooner in stopping Defendants' sales, and did not take more intrusive measures available to them (such as arresting and criminally prosecuting RBT's principals) to do so. Tr. 238:22–239:15; *see also* Tr. 237:22–238:10, 467:14–21. The Court does not find this argument persuasive.

50      Because the Court finds that the equities decidedly tip in the Government's favor, a preliminary injunction is also warranted because there is at least a "serious question" as to the legality of the FRT-15. 🔲*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (noting that regardless of whether a party moving for a preliminary injunction is likely to succeed on the merits, a court may grant the motion if it concludes that (1) a serious question exists going to the merits of the case and (2) the balance of equities tips decidedly in the movant's favor). At oral argument, Defendants disputed that the balance of the equities in this case favors the Government, but they all but conceded that, at least, a serious question exists as to the legality of the FRT-15. O.A. Tr. 3:12–6:10.

51      The Court's order applies to both the individual and corporate Defendants to this action. RBT and RBF, as corporate entities, can be liable for the criminal actions of their agents—*i.e.*, Defendants DeMonico and Maxwell. *Cf.* 🔲*United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 660 (2d Cir. 1989) ("It is settled law that a corporation may be held criminally responsible for antitrust violations committed by its employees or agents acting within the scope of their authority."). Defendants have also conceded that RBT may be held vicariously liable if the Court finds that either DeMonico or Maxwell "had the specific intent to defraud [the Government] or RBT's customers in the course of their duties for RBT," ECF 130 at 7–8, as this Court has in fact found.

United States v. Rare Breed Triggers, LLC, --- F.Supp.3d ---- (2023)
2023 WL 5689770

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit B

# D H I L L O N
## L A W   G R O U P   I N C.

2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

David A. Warrington
DWarrington@dhillonlaw.com

August 16, 2024

VIA FEDEX AND EMAIL (tanarra.james@atf.gov)
Tanarra James
Director, Industry Operations
Bureau Alcohol, Tobacco, Firearms and Explosives
5825 North Sam Houston Parkway West
Suite 300
Houston, TX 77086

Re:    *Request to Reconsider Notice to Deny Application for License for*
       *Rare Breed Firearms, LLC dated 05/20/2024*

Dear DOI James:

This firm represents Rare Breed Firearms, LLC and Lawrence DeMonico in the above-captioned matter. We write regarding the ATF's recent FFL denial for Rare Breed Firearms, LLC (FFL#: 5-74-453-07-PA-14130). There is currently a hearing scheduled for September 18, 2024, regarding that denial. However, circumstances have changed since that denial and, thus, to save time and resources, we write to inform you of the changed circumstances and request that the denial be reconsidered.

As you may be aware, on July 23, 2024, after your denial, U.S. District Court Judge Reed O'Connor in the Northern District of Texas issued a final judgment (attached for your convenience) on the legal status of Forced Reset Triggers, including specifically the Rare Breed Triggers FRT-15 ("FRT-15") and the Wide Open Trigger ("WOT"). The court declared the government's determination that FRTs are "machineguns" to be unlawful. Therefore, forced reset triggers are **not** machineguns. In addition, the court vacated the ATF's unlawful classification of FRTs as "machineguns" and enjoined ATF from asserting otherwise.

In the denial letter, you state "the Director, Industry Operations, United States Department of Justice, ATF, Houston Field Division, has reason to believe Applicant does not meet the criteria for licensing . . . ." You further state that "Applicant and its President and sole responsible person, Lawrence DeMonico, willfully violated the provisions of the GCA and/or regulations listed thereunder, and therefore does not meet the criteria for licensing . . . ."

Tanarra James
August 16, 2024
Page 2 of 2

The specific reasons you cited were:

1.  Lawrence DeMonico, individually and with others, between on or about December 2020 and the present, possessed and/or transferred machineguns, specifically the Rare Breed Triggers FRT-15 ("FRT-15") and the Wide Open Trigger ("WOT") machinegun conversion device, in willful violation of 18 U.S.C. § 922(o).

2.  Lawrence DeMonico, between on or about April 15, 2023, and April 16, 2023, transported machineguns in interstate commerce, specifically the FRT-15, from Utah to New Mexico, without being a licensed importer, manufacturer, dealer, or collector, in willful violation of 18 U.S.C. § 922(a)(4).

3.  Applicant aided and abetted Rare Breed Triggers, LLC; Lawrence DeMonico; and others, to possess and/or transfer machineguns, specifically the FRT-15, in willful violation of 18 U.S.C. § 2 and 922(o).

Now that there has been a final judgment vacating the government's classification of FRTs as "machineguns," and because the vacatur is universal with nationwide impact, the reasons cited for denial can no longer stand. In fact, it is quite reasonable to assume that ATF continuing to take this position would be seen as a violation of the court's order. And, to be clear, Rare Breed Firearms and Lawrence DeMonico are not excluded from any aspect of the Court's injunction in the context of FFL applications. Thus, we request that the denial be reversed and that an FFL be issued without the need for a hearing. We look forward to your response.

Sincerely,

*/s/ David A. Warrington*
David A Warrington

*Counsel for Rare Breed Firearms, LLC and*
*Lawrence DeMonico*



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Houston Field Division

September 6, 2024

www.atf.gov

Mr. David Warrington
DHILLON Law Group Inc.,
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

      Re:    In the Matter of the Denial of the Application for a Federal Firearms
              License Submitted by Rare Breed Firearms, LLC and Lawrence
              DeMonico

Dear Mr. Warrington,

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is in receipt of your
letter of August 16, 2024, in which you seek reconsideration of the Notice to Deny the
Application for a Federal Firearms License in the above-referenced matter.

The administrative hearing in this matter will proceed as scheduled on September 18,
2024.  During the hearing, you will have the opportunity to submit evidence and
arguments for my consideration.

Should you have any further questions or concerns, please contact ATF Division Counsel
Jennie Basile, at (281) 716-8223.

*Tanarra James*

Tanarra James
Director, Industry Operations

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024

```
 1                    U.S. DEPARTMENT OF JUSTICE
          BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES
 2                       HOUSTON FIELD DIVISION

 3

          UNITED STATES OF AMERICA
 4        IN THE MATTER OF THE NOTICE
          FOR DENIAL OF A FEDERAL
 5        FIREARMS LICENSE ISSUED TO:

 6        RARE BREED FIREARMS, LLC
          22503 West Highway 71
 7        Spicewood, Texas 78669
          ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 8

 9

10        REVIEW OF NOTICE TO DENY APPLICATION FOR FEDERAL

11                       FIREARMS LICENSE

12

13     DATE TAKEN:  Wednesday, September 18, 2024

14     TIME:        9:39 A.M.

15     PLACE:       Via Videoconference

16     BEFORE:      TANARRA JAMES, DIRECTOR

17

18

19                                                    .

20

21

22

23

24                  Reported By Whitney Stofel
                         Job No. 90566
25
```

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

| Page 2 | | Page 4 | | |
|---|---|---|---|---|

**Page 2**

```
 1              APPEARANCES OF COUNSEL
 2
 3  On behalf of the BUREAU OF ALCOHOL, TOBACCO, FIREARMS
    AND EXPLOSIVES:
 4
        JENNIE BASILE, ESQ.
 5      ATF HOUSTON FIELD DIVISION
        5825 North Sam Houston Parkway West, Suite 300
 6      Houston, Texas 77086
        713-703-8953
 7      jennie.basile@atf.gov
        APPEARED VIA VIDEOCONFERENCE
 8  AND
        MATTHEW MYERSON, ESQ.
 9      ATF DEPUTY ASSOCIATE COUNSEL
        32 Old Slip Street
10      Suite 3500
        New York, New York 10005
11      matthew.myerson@atf.gov
        APPEARED VIA VIDEOCONFERENCE
12
13  On behalf of the Applicant, RARE BREED FIREARMS, LLC:
14      JOSIAH CONTARINO, ESQ.
        DHILLON LAW GROUP INC.
15      50 Park Place
        Suite 1105
16      Newark, New Jersey 07102
        973-298-1723
17      jcontarino@dhillonlaw.com
        APPEARED VIA VIDEOCONFERENCE
18  AND
        DAVID WARRINGTON, ESQ.
19      DHILLON LAW GROUP INC.
        2121 Eisenhower Avenue
20      Suite 608
        Alexandria, Virginia 22314
21      415-433-1700
        dwarrington@dhillonlaw.com
22      APPEARED VIA VIDEOCONFERENCE
23  Also present:
24  Tanarra James, Presiding Officer
    Melissa Delvecchio, ATF Deputy Associate Chief Counsel
25  David Wright, Industry Operations Investigator
```

**Page 3**

```
 1              INDEX OF PROCEEDING
 2
 3  TANARRA JAMES, DIRECTOR
 4                                           PAGE
 5  Proceeding                                 8
 6  Reporter Certificate                      62
 7
 8              INDEX OF EXAMINATION
 9  WITNESS:  DAVID WRIGHT
10  EXAMINATION                              PAGE
11  By Ms. Basile                             10
12  By Mr. Contarino                          26
13  By Ms. Basile                             46
14
15  WITNESS:  LAWRENCE DEMONICO
16  EXAMINATION                              PAGE
17  By Mr. Contarino                          47
18
19  WITNESS: DAVID WRIGHT (RECALLED)
20  EXAMINATION                              PAGE
21  By Mr. Contarino                          51
22
23
24
25
```

**Page 4**

```
 1         INDEX TO GOVERNMENT S EXHIBITS RECEIVED
 2
 3  NO.          DESCRIPTION                    PAGE
 4  Exhibit 1    Perfected Application           22
 5  Exhibit 2    Notice to Deny Application       22
 6  Exhibit 3    Request for Hearing              22
 7  Exhibit 4    Notice of Hearing                22
 8  Exhibit 5    Amended Notice of Hearing        22
 9  Exhibit 6    Hearing Confirmation             22
10  Exhibit 7    Request for Reconsideration      22
11  Exhibit 8    ATF Response to Request for      22
12               Reconsideration
13  Exhibit 9    U.S. v. Miscellaneous Firearms   22
14               and Related Parts and Equipment,
15               Verified Complaint for Forfeiture
16               In Rem, (District of Utah, February
17               14, 2023)
18  Exhibit 10   U.S. v. Rare Breed Triggers, LLC 22
19               669 F. Supp. 3d, 169 (E.D.N.Y.
20               April 18, 2023)
21  Exhibit 11   U.S. v. Rare Breed Triggers, LLC 22
22               No.23-CV-369, Deposition Demonico
23               (E.D.N.Y. July 7, 2023)
24
25
```

**Page 5**

```
 1    INDEX TO GOVERNMENT S EXHIBITS RECEIVED (CONT.)
 2
 3  NO.          DESCRIPTION                    PAGE
 4  Exhibit 12   Transcript Day One Preliminary  22
 5               Injunction Hearing U.S. v. Rare
 6               Breed Triggers, LLC No.23-CV-369
 7               (NM)(E.D.N.Y. August 1, 2023)
 8  Exhibit 13   Transcript Day Two Preliminary  23
 9               Injunction Hearing U.S. v. Rare Breed
10               Triggers, LLC No.23-CV-369(NM)
11               (E.D.N.Y. August 2, 2023)
12  Exhibit 14   U.S. v. Rare Breed Triggers, LLC 23
13               No.23-CV-369(NRM)(RML) WL 5689770
14               (E.D.N.Y. August 2, 2023)
15  Exhibit 15   Docket, U.S. v. Rare Breed       23
16               Triggers, LLC, 2nd Circuit Case Number
17               23-7276, dated September 11, 2024
18  Exhibit 16   National Association for Gun     23
19               Rights, Incorporated v. Merrick
20               Garland, 4:23-cv-00830, Order Granting
21               Preliminary Injunction (N.D.T.X.
22               October 7, 2023)
23
24
25
```

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 6

```
 1        INDEX TO GOVERNMENT S EXHIBITS RECEIVED (CONT.)
 2
 3   NO.            DESCRIPTION                          PAGE
 4   Exhibit 17     National Association for Gun          23
 5                  Rights, Incorporated v. Merrick
 6                  Garland, 4:23-cv-00830, Supplemental
 7                  Brief for Appellants (N.D.T.X.
 8                  July 12, 2024)
 9   Exhibit 18     National Association for Gun          23
10                  Rights, Incorporated v. Merrick
11                  Garland, 4:23-cv-00830, Order on
12                  Summary Judgement (N.D.T.X.
13                  July 23, 2024)
14   Exhibit 19     National Association for Gun          23
15                  Rights, Incorporated v. Merrick
16                  Garland, 4:23-cv-00830, Notice of
17                  Appeal (N.D.T.X. September 4, 2024)
18   Exhibit 20     National Association for Gun          23
19                  Rights, Incorporated v. Merrick
20                  Garland, 4:23-cv-00830, Notice of
21                  Administrative Hearing (N.D.T.X.
22                  September 6, 2024)
23
24
25
```

Page 7

```
 1        INDEX TO GOVERNMENT S EXHIBITS RECEIVED (CONT.)
 2
 3   NO.            DESCRIPTION                          PAGE
 4   Exhibit 21     Docket, National Association for      23
 5                  Gun Rights, Incorporated v. Merrick
 6                  Garland, 5th Circuit Case Number
 7                  24-10707, dated September 11, 2024
 8
 9          INDEX TO APPLICANT S EXHIBITS RECEIVED
10
11   NO.            DESCRIPTION                          PAGE
12   Exhibit 1      Perfected Application                 45
13   Exhibit 2      Notice to Deny Application            45
14   Exhibit 3      Request for Hearing                   45
15   Exhibit 4      Notice of Hearing                     45
16   Exhibit 5      Amended Notice of Hearing             45
17   Exhibit 6      Hearing Confirmation                  45
18   Exhibit 7      Request for Reconsideration           45
19   Exhibit 8      Document                              45
20   Exhibit 9      Document                              45
21   Exhibit 10     Document                              45
22   Exhibit 11     Document                              45
23
24
25
```

Page 8

```
 1              (On the record at 9:39 A.M.)
 2        MS. JAMES:  The hearing has officially begun.
 3   The time is 9:39 a.m. Central Time.  The date is
 4   September 18th, 2024.  And this hearing is being held
 5   virtually via Microsoft Teams.
 6        My name is Tanarra James, J-A-M-E-S.  I am
 7   the Director of Industry Operations for the Houston
 8   Field Division and will be the officer presiding over
 9   this hearing by the direction and under the authority
10   of the Bureau of Alcohol, Tobacco, Firearms and
11   Explosives, United States Department of Justice.
12        This hearing is an administrative proceeding
13   and is informal in nature.  The hearing is to -- is to
14   review the Notice to Deny Application for License ATF
15   E-Form 5300.43 (4498), issued under the provisions of
16   Title 27 Code of Federal Regulations, Part 478,
17   Subpart E.  As a result of the issuance of a ATF E-Form
18   5300.43 (4498), you requested in writing that a hearing
19   be granted.  The focus of this hearing will be on the
20   evidence regarding whether the application should be
21   denied.
22        There are a couple of procedural issues I
23   will address before we get started.  A transcript is
24   being made of these proceedings for the record.
25   Because of this, I ask -- ask that you speak one at a
```

Page 9

```
 1   time so that a clear and accurate record can be made.
 2   Answers must be audible.  Please do not nod or shake
 3   your head in response to a question.
 4        At this time, I will ask the applicant and
 5   those present on its behalf to introduce themselves.
 6   Please give me your full name, spelling your last name
 7   for the record.
 8        MR. CONTARINO:  Josiah Contarino.  Contarino
 9   is C-O-N-T-A-R-I-N-O, and with me is my colleague David
10   Warrington.  Do you want to do the spelling?
11        MR. WARRINGTON:  Sure.  W-A-R-R-I-N-G-T-O-N.
12        MR. CONTARINO:  And we also have Lawrence
13   DeMonico.  You're on mute.
14        MR. DEMONICO:  Thank you.  Lawrence DeMonico.
15   D-E, capital M, O-N-I-C-O.
16        MS. JAMES:  Thank you.  We have an observer
17   for this hearing.  Please introduce yourself providing
18   your full name, spelling your last name for the record.
19        MS. DELVECCHIO:  I'm Melissa Delvecchio.
20   Last name is D-E-L-V-E-C-C-H-I-O.
21        MS. JAMES:  Jennie Basile, will you and
22   anyone producing evidence on behalf of ATF introduce
23   yourselves?  Please give me your full name, spelling
24   your last name for the record.
25        MS. BASILE:  Yes.  Jennie Basile, B-A-S-I-L-
```

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 10

1  E, Division Counsel, Houston Field Division.  Also, if
2  Mr. Myerson would introduce himself.
3         MR. MYERSON:  Good morning.  Matthew Myerson,
4  M-Y-E-R-S-O-N, on behalf of ATF.
5         MS. BASILE:  And also David Warren -- David
6  Wright.  Sorry.  If you would introduce yourself?
7         MR. WRIGHT:  Hello, David Wright.  W-R-I-G-H-
8  T.  I'm an Industry Operations Investigator.
9         MS. JAMES:  Do you have a statement that you
10  have to --
11         MS. BASILE:  Yes.  When you're done, I can do
12  it when you're done.
13         MS. JAMES:  Okay.  Ms. Basile, you may now
14  proceed with your presentation.
15         MS. BASILE:  Okay.  And I just have a little
16  sentence to read here as well.  I am Jennie Basile and
17  I will act as attorney for the Government on behalf of
18  the Director of Industry Operations, as provided by 27
19  CFR 478.76.  And the only witness I have today is
20  Industry Operations Investigator David Wright.
21               EXAMINATION
22  BY MS. BASILE:
23      Q.   And if you're ready, Mr. Wright, we'll get
24  started.
25      A.   Okay.

Page 11

1      Q.   And Mr. Wright, how are you employed?
2      A.   I'm an Industry Operations Investigator with
3  ATF.
4      Q.   How long have you been an Industry Operations
5  Investigator?
6      A.   Approximately 22 years.
7      Q.   Okay.  And as part of your official duties,
8  were you trained to perform this job?
9      A.   Yes.
10      Q.   Where did you complete that training?
11      A.   Glynco, Georgia, FLETC.
12      Q.   Okay.  And were you successful in your
13  training?
14      A.   Yes.
15      Q.   Okay.  If you could just briefly describe for
16  the record, what are the duties of an Industry
17  Operations Investigator?
18      A.   I help determine if applicants meet the legal
19  requirements for obtaining a federal license, conduct
20  firearms and explosives inspections to ensure
21  compliance with federal laws and regulations.  I also
22  assist special agents in investigations and act as a
23  resource to Industry members on compliance issues.
24      Q.   Okay.  And approximately how many of --
25  inspections have you completed during your 22 years?

Page 12

1      A.   Approximately 800.
2      Q.   And does that include both firearms and
3  explosives inspections as well as compliance and
4  qualification inspections?
5      A.   Yes, it does.
6      Q.   Okay.  And in addition to these inspections,
7  have you also done outreach at gun shows and assisted
8  in criminal investigations?
9      A.   Yes, I have.
10      Q.   Okay.  And then of those 800, approximately
11  800 inspections that you've completed, approximately
12  how many have either been recommended for a revocation
13  or a denial?
14      A.   Two to three, including this one.
15      Q.   Okay.  And let's -- let me direct your
16  attention to your current inspection.  In -- in
17  connection with your duties at ATF as an Industry
18  Operations Investigator, did you conduct a
19  qualification inspection of Rare Breed Firearms, LLC?
20      A.   Yes, I did.
21      Q.   Okay.  Did you go to Rare Breed alone or were
22  you accompanied?
23      A.   I was accompanied.
24      Q.   And who accompanied you?
25      A.   IOI Jeff Okonski and IOI Rebecca Broyles.

Page 13

1      Q.   Okay.  And the regulations for federal
2  firearms licensees are found in the law at Title 27 of
3  the Code of Federal Regulations, Section 478 in the
4  following, correct?
5      A.   Yes, that's correct.
6      Q.   Did you reference those during this
7  inspection?
8      A.   Yes, I did.
9      Q.   Okay.  What is a qualification inspection?
10  Could you just describe that for the record?
11      A.   Well, after a non-licensee applies for a
12  federal firearms license, we review that application
13  with the applicant to ensure that they're eligible to
14  receive that license.  We also inspect the proposed
15  business premises to make sure that it's suitable for
16  their proposed operations.
17         MS. BASILE:  I'm just going to ask them to
18  stop vacuuming.  If you could just hold on.
19  BY MS. BASILE:
20      Q.   Sorry about that.  Okay.  So you were saying
21  what you do -- what a qualification inspection is, and
22  --
23      A.   Yes.
24      Q.   -- you finished speaking?  Sorry if I
25  interrupted you.

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 14

1    A.   Yes.
2    Q.   Okay.  And then what are the preliminary
3    steps you take in a qualification inspection?  Like
4    when you get assigned this case, and then what do you
5    do?
6    A.   Well, first I would review Federal Firearms
7    Licensing Center database to see whether or not the
8    applicant had or has any other licenses or permits with
9    ATF.  When I'm in FLS, I'll also check for any special
10   attention flags on the applicant.  Next, I would verify
11   that the Federal Firearms Licensing Center has
12   initiated FBI criminal history checks on any RPs listed
13   on that application.
14        Once that is complete, I would review the ATF
15   Form 7, which is the Application for Federal Firearms
16   License.  And I'd review that for basically just
17   completeness, accuracy, that kind of stuff.  Next, I
18   complete all eligibility verification information prior
19   to any onsite visit.  While working on that eligibility
20   verification, I research and verify all applicable
21   items, such as business information, property
22   ownership, trade name, rental lease agreements.  And
23   then I would contact zoning or planning departments in
24   that applicant's area just to ensure that that business
25   would be allowed to operate from its proposed premises

Page 15

1    by the city or county.
2         Once -- once all that is done, I would then
3    reach out to the applicant to schedule an onsite visit.
4    Q.   Okay.  And did you do all of those checks for
5    this inspection?
6    A.   I did.
7    Q.   Okay.  I'm going to direct your attention at
8    this time to Government's Exhibit 1.  What is that?
9    A.   1 is the perfected application.
10   Q.   And how does a perfected application differ
11   from an original application?
12   A.   So Mr. DeMonico, on Item 12, which is the
13   second page, he just changed his business hours from
14   1:00 to 2:00 p.m. to 1:00 to 4:00 p.m.  And then on the
15   third page, Item 3, he just rearranged his name to go
16   last name then first and middle name, which is just
17   required by the document.
18   Q.   Okay.
19   A.   And those are the only changes he made.
20   Q.   Okay.  So he submitted an original
21   application that had all of the same information.  And
22   then while you were there, did you make these changes
23   with him?
24   A.   Yes.
25   Q.   And did he initial both of the changes?

Page 16

1    A.   He did.  He initialed and dated.
2    Q.   Okay.  So we only have Government's perfected
3    application, but the original application would be the
4    same without those two changes; is that correct?
5    A.   Without those two changes, it would be the
6    same, yes.
7    Q.   Okay.  And going back to the first change --
8    and let me check with the Director.
9         MS. BASILE:  Is yours hard to read?
10        MS. JAMES:  It's a little light, but I can
11   still make out that it says 1:00 p.m. to 4:00 p.m., I
12   believe.
13        MS. BASILE:  Okay.  Yeah, we have a
14   relatively bad copy.  Hopefully, everyone else can see
15   what I'm talking about.
16   BY MS. BASILE:
17   Q.   But on -- on --
18   A.   It's 1:00 p.m. to 4:00 p.m., is what it was
19   changed to.
20   Q.   Okay.  And what was it originally?  Could you
21   just tell us that?
22   A.   1:00 to 2:00.
23   Q.   And so he was going to be open 1:00 to 2:00,
24   what day of the week?
25   A.   Monday.

Page 17

1    Q.   And what about the other days of the week?
2    A.   No, he's closed on those days.
3    Q.   So he was going to be open one hour, one day
4    a week?
5    A.   Yes, ma'am.
6    Q.   And you had him change that why?
7    A.   Just to allow more time to operate.  It also
8    gives us more time to come out and do any inspections
9    in the future.
10   Q.   Okay.  And then the other change you made was
11   just a clerical type change --
12   A.   Yes.
13   Q.   -- on where you rearranged his name, correct?
14   A.   Yes.  I -- I just rearranged it because
15   that's what the document requests.
16   Q.   And then he initialed that.  Okay.
17   A.   He did.  He initialed and dated.
18   Q.   What type of license was Mr. DeMonico
19   applying for?
20   A.   A Type 7, Manufacturer of Firearms license.
21   Q.   Okay.  And what was he planning to
22   manufacture?
23   A.   AR-15s.
24   Q.   Okay.  And he, Mr. DeMonico signed and dated
25   this, correct?

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 18

1    A.   Yes.
2    Q.   And what was the date?
3    A.   5-13-24.
4    Q.   I believe you mean March 13th -- March 1 of
5  '24, correct?
6    A.   Oh, were you -- what are you talking about?
7  Any changes to the application?  Is that what you're
8  talking about or --
9    Q.   Not the changes.  When he dated the initial -
10  - the original application?
11    A.   Oh.  March 1st, 2024.  Sorry.
12    Q.   Okay.  That's okay.  And then who does he say
13  will be the responsible persons?
14    A.   Himself.  He's the only responsible person on
15  the application.
16    Q.   Okay.  Where is the -- the business address
17  going to be?
18    A.   It is located off of Highway 71 in Spicewood,
19  Texas.
20    Q.   And is the -- the exact address 22503 West
21  Highway 71?
22    A.   22503 West Highway 71, yes.
23    Q.   In Spicewood?
24    A.   Yes.  In Spicewood.
25    Q.   Okay.  I think that's it for Government's

Page 19

1  Exhibit 1.
2         Is that the premises you went to for your
3  onsite inspection?
4    A.   It is.
5    Q.   Okay.  And when did you go there?
6    A.   May 13th, 2024.
7    Q.   Okay.  And at the premises, who did you
8  interview and who -- who participated in the inspection
9  representing the applicant?
10    A.   Mr. DeMonico.
11    Q.   Okay.  Was anyone else present?
12    A.   No.  His wife showed up briefly, but she's
13  not a part of the license.
14    Q.   She didn't participate in -- in there?
15    A.   No.
16    Q.   Okay.  Could you describe for us the -- the
17  applicant's premises?
18    A.   So it's an unfinished Conex container on the
19  land that was being excavated.  Rare Breed Firearms
20  does not own that location, but they are renting from
21  another one of Mr. DeMonico's companies.
22    Q.   Okay.  So the -- the space is owned by Mr.
23  DeMonico, just by a different one of his companies?
24    A.   Yes.
25    Q.   Okay.  And you -- I think you already said

Page 20

1  this, but what type of business is he -- what did he
2  plan to do with his firearms license?
3    A.   A Type 7, Manufacturer of Firearms license.
4    Q.   And you said he planned to manufacture AR-
5  15s; is that correct?
6    A.   Yes.
7    Q.   Okay.  Did you ask the applicant while you
8  were there if he continued to possess any FRT-15s or
9  any wide open triggers?
10    A.   Yes, I did.
11    Q.   And what was his response?
12    A.   He stated -- he said he did not have any.
13    Q.   Okay.  Approximately how long were you on
14  site at the location?
15    A.   A little over two hours.
16    Q.   Okay.  And did the applicant comply with your
17  questions?
18    A.   He did.
19    Q.   Was there any issues with the inspection?
20    A.   No.
21    Q.   Okay.  Was a Notice to Deny Rare Breed
22  Firearms license sent to the applicant?
23    A.   Yes, it was.
24    Q.   And is that Government's Exhibit 2?
25    A.   Yes, it is.

Page 21

1    Q.   And did Mr. DeMonico e-mail the government
2  requesting today's hearing?
3    A.   Yes.
4    Q.   Is that Government's Exhibit 3?
5    A.   Yes, it is.
6    Q.   Are Government's Exhibit 4 and 5 a Notice of
7  Hearing and an Amended Notice of Hearing based on
8  applicant's request to change the dates?
9    A.   Yes, they are.
10    Q.   Is Government's Exhibit 6 a Confirmation of
11  Hearing?
12    A.   It is, yes.
13    Q.   And is Government's Exhibit 7 the Applicant's
14  Request for Reconsideration?
15    A.   Yes, it is.
16    Q.   Okay.  And did the Government respond and
17  ATF's Response, Government's Exhibit 8?
18    A.   Yes, the government did.
19    Q.   Okay.  And if you're aware, are Government's
20  Exhibits 9 through 21 different lawsuits involving
21  previous devices related to Mr. DeMonico?
22    A.   I believe so.
23         MS. BASILE:  Okay.  And at this time, I will
24  pass the witness and I also ask the Director to accept
25  Government's Exhibits 1 through 21 into evidence.

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024

Page 22

1      MS. JAMES:  I accept all Government's
2  Exhibits 1 through 21 for the record.
3          (GOVERNMENT'S EXHIBIT 1 RECEIVED INTO
4  EVIDENCE)
5          (GOVERNMENT'S EXHIBIT 2 RECEIVED INTO
6  EVIDENCE)
7          (GOVERNMENT'S EXHIBIT 3 RECEIVED INTO
8  EVIDENCE)
9          (GOVERNMENT'S EXHIBIT 4 RECEIVED INTO
10 EVIDENCE)
11         (GOVERNMENT'S EXHIBIT 5 RECEIVED INTO
12 EVIDENCE)
13         (GOVERNMENT'S EXHIBIT 6 RECEIVED INTO
14 EVIDENCE)
15         (GOVERNMENT'S EXHIBIT 7 RECEIVED INTO
16 EVIDENCE)
17         (GOVERNMENT'S EXHIBIT 8 RECEIVED INTO
18 EVIDENCE)
19         (GOVERNMENT'S EXHIBIT 9 RECEIVED INTO
20 EVIDENCE)
21         (GOVERNMENT'S EXHIBIT 10 RECEIVED INTO
22 EVIDENCE)
23         (GOVERNMENT'S EXHIBIT 11 RECEIVED INTO
24 EVIDENCE)
25         (GOVERNMENT'S EXHIBIT 12 RECEIVED INTO

Page 23

1  EVIDENCE)
2          (GOVERNMENT'S EXHIBIT 13 RECEIVED INTO
3  EVIDENCE)
4          (GOVERNMENT'S EXHIBIT 14 RECEIVED INTO
5  EVIDENCE)
6          (GOVERNMENT'S EXHIBIT 15 RECEIVED INTO
7  EVIDENCE)
8          (GOVERNMENT'S EXHIBIT 16 RECEIVED INTO
9  EVIDENCE)
10         (GOVERNMENT'S EXHIBIT 17 RECEIVED INTO
11 EVIDENCE)
12         (GOVERNMENT'S EXHIBIT 18 RECEIVED INTO
13 EVIDENCE)
14         (GOVERNMENT'S EXHIBIT 19 RECEIVED INTO
15 EVIDENCE)
16         (GOVERNMENT'S EXHIBIT 20 RECEIVED INTO
17 EVIDENCE)
18         (GOVERNMENT'S EXHIBIT 21 RECEIVED INTO
19 EVIDENCE)
20     MS. BASILE:  And Mr. Warrington and Mr.
21 Contarino, if you have any questions for this witness,
22 you could feel free to ask at this time.  And then --
23 we -- the Government has no additional witnesses.  So
24 after that --
25     Oh, we lost Mr. Warrington and he is back.

Page 24

1  Hold on.  Let me add him back in.
2      MR. CONTARINO:  He's on there twice.
3      MS. BASILE:  Yeah.  Mr. Warrington, you're on
4  there twice but one of you is frozen.
5      MR. WARRINGTON:  Yeah.  I don't know what
6  happened.  I -- it kind of died.
7      MS. BASILE:  Oh, sorry.  Did -- did you miss
8  anything?  Is there anything you'd like me to --
9      MR. WARRINGTON:  Yeah, I -- yeah, I did.  Can
10 you hear me?
11     MS. BASILE:  Yeah, I can hear you.
12     MR. WARRINGTON:  I -- I don't know why the
13 other window's open, but the -- the meeting dropped and
14 I had to log back in.
15     MS. BASILE:  Okay.  So what was the last
16 thing -- I could try and summarize.  What was the last
17 thing you were able to hear?
18     MR. WARRINGTON:  The last question that you
19 asked Mr. Wright, just before he started to answer.
20     MS. BASILE:  I finished his entire testimony.
21 So do you know which question it was?
22     MR. WARRINGTON:  Oh, well then I -- I missed
23 -- you were ask -- you had just finished asking him
24 about the other exhibits for the lawsuit -- that are
25 the pleadings and then that's when it cut out.

Page 25

1      MS. BASILE:  Okay.  You didn't miss anything,
2  then.  I'll tell you exactly what happened.  I just
3  asked him if he was aware that there are other
4  pleadings, which are Government's Exhibit 9 through 21.
5  He said, yes.  I then finished my examination and
6  entered -- asked the Director to accept my Government's
7  Exhibits 1 through 21.  And then I passed the witness
8  to you all.
9          And what I -- that's all -- really all that
10 you missed.  And then I was just about to say, you're
11 free to ask this witness questions about his inspection
12 if you'd like.  I did mention yesterday that he is not
13 an expert in these devices or the other lawsuits.  So
14 that would be outside of his testimony today.  And then
15 after -- that's the only witness the Government has.
16 So after you cross-examine him, you are free to tell
17 the Director anything you want her to -- to take under
18 advisement.
19     MR. WARRINGTON:  Okay.  Well, Mr. Contarino
20 is going to be -- got it.  Mr. Contarino is going to be
21 handling this.
22     MS. BASILE:  Okay.  That was really all I was
23 saying.
24     MR. WARRINGTON:  Thank you.
25     MS. BASILE:  Yeah.  You didn't miss anything

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 26

1  really.  Okay.
2              EXAMINATION
3  BY MR. CONTARINO:
4      Q.   Thank you.  Mr. Wright, my name is Josiah
5  Contarino, attorney with Dhillon Law Group, and we
6  represent the applicant here.  Nice to meet you and
7  good morning.
8      A.   Hello.
9      Q.   You're familiar with the IO Manual; is that
10  right?
11      A.   Yes, I am.
12      Q.   And part of the IO Manual lays out the IOI's
13  responsibilities in terms of assisting with either the
14  approval or denial of an -- an FFL; is that right?
15      A.   It is.
16      Q.   I'm going to go to the IOI Manual, and
17  specifically it is -- one of the responsibilities of
18  the -- the -- the IOI, the IO Manual, and it lays out -
19  - so just bear with me while I open this.
20              Are you able to see that, Mr. Wright?
21      A.   I can.
22      Q.   Okay.  So I'm going down to Page 34, and this
23  portion of it talks about a final recommendation.  Do
24  you see that there?
25      A.   Yes, I do.

Page 27

1      Q.   And am I reading this correctly, that part of
2  the IOI's responsibility for an FFL application is to
3  make a final recommendation regarding the issuance of
4  the license?
5      A.   Yes, it is.
6      Q.   And did you do that in this -- in this
7  matter?
8      A.   I did, yes.
9      Q.   And what was your recommendation?
10      A.   I recommend -- I recommended denial.
11      Q.   Okay.  And what was that denial based on?
12      A.   Well, it was based on the fact that Rare
13  Breed Firearms was denied based on the reasons stated
14  in Government Exhibit 2, Notice to Deny Application For
15  License.
16      Q.   Okay.  So if we could, do you have a copy of
17  that, Government's Exhibit 2?
18      A.   I do.
19      Q.   And if you look at Government Exhibit 2, the
20  first page is the -- the Form 4498; is that right?
21      A.   It's Form 5300.43.  Yes.
22      Q.   Okay.  And then the second page is more of a
23  narrative with the reasoning of the denial; is that
24  right?
25      A.   It is, yes.

Page 28

1      Q.   Before moving on through this document, did
2  you advise Mr. DeMonico of the reasons why the
3  application may be denied and discuss a voluntary
4  withdrawal -- withdrawal option?
5      A.   No, I did not.
6      Q.   That -- do you understand that to be part of
7  the IO Guide, the IO Manual?
8      A.   When I was on site I had no reason to believe
9  it was going to be denied.
10      Q.   When were -- when did you have a reason to
11  believe it was going to be denied?
12      A.   Following the inspection.
13      Q.   And how did you come to that understanding?
14      A.   I was provided this additional information.
15      Q.   And what additional information is that?
16      A.   The -- the information on Page 2 here.
17      Q.   Okay.  So looking at Page 2, the -- do you
18  understand this to be the -- the full extent of the
19  reasons why the denial -- why the application was
20  denied?
21      A.   To the best of my knowledge, yes.
22      Q.   Have you ever in -- you -- you mentioned that
23  you had two or three -- well, I think you mentioned two
24  or three revocations out of about 800 inspections.
25      A.   Yes.

Page 29

1      Q.   Was that revocations or was that denials?
2      A.   No, this is the only denial.
3      Q.   This is the only denial that you've been
4  involved with?
5      A.   Yes.
6      Q.   Okay.
7      A.   That I have been involved with.
8      Q.   For the revocations, the -- the two or three
9  revocations, do you similarly have the kind of onsite
10  inspection that you did here?
11      A.   Well, those would be compliance inspections,
12  not qualification inspections.
13      Q.   Okay.  Is there that same requirement that
14  you would advise the -- at that -- at that -- in that
15  instance the license holder of the reasons for the
16  revocation?
17      A.   I would usually, in a closing conference.
18      Q.   And what's that?
19      A.   It's just before I leave the premises.  We go
20  over basically everything that was found in the
21  inspection.  And at that time that's when I would go
22  over violations and that kind of stuff.
23      Q.   Okay.  And then in those two to three
24  instances for the revocation, and you had that -- what
25  was it called, the closing --

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 30

1    A.    Closing conference.

2    Q.    The closing conference.  When you had the

3  closing conference, in those -- in all those instances,

4  you advised that it would likely be revoked?  The

5  license would likely be revoked?  Is that what your

6  testimony was?

7    A.    Yes.  Yes.

8    Q.    Okay.  So then this is the only instance

9  where when you closed -- you had the closing conference

10  with an applicant or a licensee that you believed the

11  license should be given until you were provided further

12  information at a later point; is that correct?

13    A.    Yes, I didn't -- I -- I didn't have anything

14  at that point of my onsite visit.

15    Q.    To -- to justify a denial?

16    A.    No, I -- I didn't have anything at that

17  point, no.

18    Q.    Okay.  When you say you were provided these

19  three reasons on Government Exhibit 2, who provided

20  those to you?

21    A.    I believe it was counsel.

22    Q.    Moving to number one, it says -- actually,

23  would you read the first reason on the -- the notes,

24  the notice to deny?

25    A.    Sure.  "Lawrence DeMonico, individually and

Page 31

1  with others, between, on, or about December 2020 and

2  the present, possessed and/or transferred machine guns,

3  specifically the Rare Breed Triggers' FRT-15 and the

4  wide open trigger machine gun conversion device, in

5  willful violation of 18 USC 922(o)."

6    Q.    So after seeing that reason, your opinion

7  changed for the application from one of approval to

8  denial?

9    A.    Yes, it was probably all three of those.

10    Q.    And are you familiar with 18 USC 922(o)?

11    A.    Yes.

12    Q.    And that just says it's unlawful to possess

13  or transfer a machine gun, right?

14    A.    It does, yes.

15    Q.    Would you read the second reason in the

16  notice to deny for denying the application?

17    A.    Yes.  Yes.  "Lawrence DeMonico, between, on,

18  or about April 15th, 2023 and April 16th, 2023,

19  transported machine guns and interstate commerce,

20  specifically the FRT-15, from Utah to New Mexico

21  without being a licensed importer, manufacturer,

22  dealer, or collector, in willful violation of 18 USC

23  922(a)(4)."

24    Q.    And are you similarly familiar with 18 USC

25  922(a)(4)?

Page 32

1    A.    Yes.

2    Q.    And that just states that it's unlawful for

3  most people to transport in interstate or foreign

4  commerce machine guns, among other devices --

5    A.    Yes.

6    Q.    -- not relevant here, right?

7    A.    Yes.

8    Q.    And would you read -- and thank you for doing

9  this, the third -- the third reason --

10    A.    Yes.

11    Q.    -- in the notice to deny?

12    A.    "Applicant aided and abetted Rare Breed

13  Triggers LLC, Lawrence DeMonico, and others to possess

14  and/or transfer machine guns, specifically the FRT-15,

15  in willful violation of 18 USC(2) and 18 USC 922(o).

16    Q.    And we already went over 922(o).

17    A.    Yes.

18    Q.    Section 2.  So US -- 18 USC Section 2, do you

19  understand that to mean basically that Mr. DeMonico, as

20  president of Rare Breed Firearms, would be punishable

21  as the principal for something Rare Breed Firearms did?

22    A.    I believe so, yes.

23    Q.    Okay.  Would you agree that for all of these

24  reasons -- would you agree that all of these reasons

25  require that either an FRT-15 or a wide open trigger

Page 33

1  actually be a machine gun?

2    A.    I'm not really sure because I'm not an expert

3  in -- in that kind of stuff.

4    Q.    Well, in other words, these are all saying

5  that -- well, what is -- what is the basis for this

6  specific -- there are some reasons, I can pull them up

7  in the IO, for approving.  Basically, you have to

8  approve an application if there are certain criteria

9  met, right?

10    A.    Uh-huh.  Yes.

11    Q.    And the -- in -- in -- in those -- in that

12  list, do you know the criteria, which particular

13  criterion was -- the denial here was based on?

14    A.    Yes.  I would say specifically it's that he's

15  a willful violator of the GCA.

16    Q.    Okay.  And the GCA, that's the Gun Control

17  Act?

18    A.    Yes, sir.

19    Q.    Okay.  And to be a willful violator of the

20  GCA in this instance is predicated on what -- is

21  predicated on the FRT-15 and wide open trigger actually

22  being machine guns?  If they -- in other words, if they

23  weren't machine guns, would there be a violation here

24  of the -- the GCA?

25    A.    If they weren't machine guns, I -- I suppose

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 34

1    so.
2    Q.   There would be no violation, right?
3    A.   Probably not.
4    Q.   Well, what -- what would be a reason?  Can
5    you think of a reason --
6    A.   Oh, yeah.
7    Q.   -- how it could be a violation?
8    A.   No, it seems to be based around the FRT-15s.
9    Q.   Being machine guns?
10   A.   Yes.
11   Q.   Okay.  So before making your final
12   recommendation here, is there any instance in -- in
13   either this -- in this application where you make a,
14   like, a preliminary assessment that you relay to
15   someone else at ATF?
16       A.   No.  No.  I -- I just would do -- conduct my
17   on onsite visit and, as long as everything goes well
18   there, I would just go back to the office and do some
19   further work, and make my recommendation once that work
20   is done.
21       Q.   Okay.  Okay.  So can you lay out the sequence
22   of events here?  You finish your closing session with
23   Mr. DeMonico.  You go back to the office.
24           What transpires between that time, you know,
25   related to working on this application?  What

Page 35

1    transpires in that time from your in-person meeting
2    with Mr. DeMonico to your final recommendation?
3        MS. BASILE:  I'm going to object.  I'm going
4    to object.  The internal workings of how business is
5    conducted at ATF is not relevant to this proceeding.
6        MR. CONTARINO:  No, I'm -- I'm just asking
7    how he came to his recommendation.  That's all.
8        So if it's based -- I mean, I -- I -- I don't
9    know.  At this point I don't know what it's based on,
10   other than three sentences.  I don't know how he came
11   to the understanding of what's in these three
12   sentences.  So I'm just trying to find the -- the
13   reason -- what he based the -- the reasoning on.
14       MS. BASILE:  He already told you he based it
15   on the three sentences.  I -- I believe that's asked
16   and answered.
17   BY MR. CONTARINO:
18       Q.   So you were provided -- did you write any of
19   these three sentences, Mr. Wright?
20       A.   No, I did not.  No, I did not.
21       Q.   So you -- you were provided these three
22   sentences and did you try to -- that -- that -- and
23   these three sentences, just so the record is clear, all
24   allege that Mr. DeMonico in some way had an illegal
25   machine gun, right?

Page 36

1        MS. BASILE:  I'm going to object again.  He
2    did not write this notice.  This is not his work
3    product.
4    BY MR. CONTARINO:
5        Q.   That's not the question that I asked.  I
6    asked if he's aware of these three sentences being
7    predicated on Mr. DeMonico possessing, in some way, a
8    machine gun.  Are you aware of that, Mr. Wright?  Is
9    that your understanding?
10       A.   Yes.
11       Q.   Okay.  What did you do when you received
12   these three sentences to verify their validity?
13       A.   Spoke with counsel.
14       Q.   That's it?  No independent investigation?
15       A.   No, that's not part of my job.
16       Q.   So you based your -- your final
17   recommendation in this matter on what you were told by
18   counsel for the ATF?  Is that what I'm understanding?
19       A.   Yes, what I was provided by counsel.
20       Q.   You testified earlier that you understood --
21   bear with me for a second.  That you understood the
22   exhibits.  Actually, let me -- let me ask it
23   differently.
24           When you look at the notice to deny that
25   we've been looking at, underneath those three reasons

Page 37

1    for denial there are citations to -- to two court
2    decisions.  The first one is Rare Breed Triggers, EDNY
3    2023?
4        A.   Yes.
5        Q.   Without a date.  And then the second one is
6    Rare Breed Triggers -- United States v. Rare Breed
7    Triggers, and it's September 5th, 2023.
8            You -- did you look at those documents at
9    all?
10       A.   Very -- very briefly.
11       Q.   And what was the purpose of looking at them?
12       A.   I just was wondering what they were about,
13   was all.
14       Q.   Did you come to an understanding about what
15   they were about?
16       A.   No.  I'm not a lawyer so that was really
17   outside of my job purview.
18       Q.   When you said you spoke with ATF counsel
19   before, who was that?
20       A.   Ms. -- Ms. Basile.
21       Q.   When you were answering Ms. Basile's
22   questions before, were you reading from a script?
23       A.   I have a script, but I was not really reading
24   from it.  Just partially.
25       Q.   Partially reading from it?

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 38

1     A.    Yes.
2     Q.    Did you create that script?
3     A.    No.
4     Q.    Who did?
5     A.    It was per counsel.  My answers, though.
6     Q.    You testified earlier that, when you were in
7     person with Mr. DeMonico, you asked him if he had any
8     FRT or WOTs, right?
9     A.    Yes.
10    Q.    Did you ask that specifically regarding
11    whether he had any FRT-15s or WOTs on the premises?
12    A.    No.
13    Q.    Okay.  So your testimony today was in
14    general?
15    A.    Yes.
16    Q.    You also --
17    A.    There was nothing on -- there was -- there
18    was nothing on the -- there was nothing on the
19    premises.  It was just a -- a Conex container, but
20    there was nothing in it.  And it was just land that was
21    being excavated.  It was not a finished product.
22    Q.    Sure.  Why did you ask that question?
23    A.    I was asked to.
24    Q.    And who asked you to ask that question?
25    A.    I believe it was counsel.

Page 39

1     Q.    Ms. Basile?
2     A.    I -- I think so.
3     Q.    And -- and -- and did you understand the
4     relevance of asking that question?
5     A.    Yes.
6     Q.    Okay.  So you understood the relevance of
7     asking -- what -- what -- what was that understanding?
8     A.    Just that these were devices that were out
9     there and they just wanted to know whether he still had
10    any.
11    Q.    But that didn't impact your -- that didn't
12    impact your view of whether the application should be
13    granted at that point?
14    A.    No.  No, not at all.
15    Q.    Okay.
16    A.    It was pretty standard qualification.
17    Q.    What do you mean by that?
18    A.    It was just like any other qualification that
19    I would normally do.
20    Q.    Meaning asking if someone has an FRT or a
21    WOT?
22    A.    Oh, no.  I'm talking about just all the other
23    stuff that I -- we went over.
24    Q.    Okay.  So was that out of the ordinary,
25    asking about the FRT-15 or WOT possession?

Page 40

1     A.    Yes.
2     Q.    For Government's Exhibit 2, do you consider
3     the -- the reasoning here -- do you consider the -- the
4     narrative and reasoning on Page 2 to be based off of
5     your recommendation?
6     A.    No.
7     Q.    Okay.  So that's purely from ATF counsel,
8     right?
9     A.    Yes.
10    Q.    Okay.  The change of hours, you testified
11    earlier about the original application having a
12    different set of hours when initially submitted, right?
13    A.    Yes.
14    Q.    And then at some point that was changed to
15    make those hours more -- longer.  So that the --
16    A.    Yes.
17    Q.    -- the -- the shop would be open longer,
18    right?
19    A.    Yes.
20    Q.    Was -- was the additional hours added there
21    required by law?
22    A.    I'm not sure.  That's something my supervisor
23    prefers is to have more than just one hour.
24    Q.    Okay.  And are you sure you made -- those
25    changes were made when you went out there for the

Page 41

1     onsite inspection?
2     A.    Yes, pretty sure.
3     Q.    It didn't happen through e-mail
4     communications?
5     A.    Oh.  I don't remember.
6     Q.    Okay.
7          MR. CONTARINO:  Can I just ask a question
8     here about what number Government exhibits were -- up
9     until what number were entered?  All 21?
10         MS. JAMES:  Yes.
11         MR. CONTARINO:  All 21 were?
12         MS. JAMES:  Yes.
13         MR. CONTARINO:  Okay.  Thank you.
14    BY MR. CONTARINO:
15    Q.    Okay.  Just a -- a -- a few more questions,
16    Mr. Wright.  The -- you testified before, Mr. Wright,
17    that the reasoning on Government Exhibit 2 for the
18    denial is exhaustive.  Do you remember that?
19    A.    It -- it's in these three items here.
20    Q.    Right.  But that -- that's the list.  That's
21    the reason for the denial, right?
22    A.    Yes.
23    Q.    And just for the sake of completion here,
24    this regulation which we have as Applicant's Exhibit 8
25    is -- would you read 478.71?

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 42

1    A.   Okay.  "Whenever the Director has reason to
2  believe that an applicant is not qualified to receive a
3  license, under the provisions of 478.47, he may issue a
4  notice of denial on Form 4498 to the applicant.  The
5  notice shall set forth the matters of fact and law
6  relied upon in determining that the application should
7  be denied and shall afford the applicant 15 days from
8  the date of receipt of the notice in which to request a
9  hearing to review the denial.  If no request for a
10  hearing is filed within such a time, the application
11  shall be disapproved and a copy so marked shall be
12  returned to the applicant."
13    Q.   And that jives with your testimony before
14  that, basically those reasons, those three reasons are
15  the -- the facts and the law that must be included in a
16  denial, such as what Rare Breed Firearms received here,
17  right?
18    A.   Yes.
19    Q.   And then quickly, this is 18 USC Section 922
20  that we spoke about before.  And if we go down to --
21  oh, this is where it says that the -- it's unlawful for
22  a person to transfer or possess a machine gun, right?
23    A.   Yes.
24    Q.   And then do you see this one?  This is 18 USC
25  Section 2.  And this is the -- what we spoke about.

Page 43

1  The law regarding what we spoke about before, that the
2  deeds of the principal -- of the -- the company can be
3  deemed the deeds of the -- the owner of the principal,
4  right?
5    A.   Item 3, you're referring to?  Yes.
6    Q.   Yeah.  And then the last one is back to 922.
7  This is 2, Item 2, 922, Section 922 A4.  And this one
8  is where it says, the -- for most people, you can't
9  transport, among other things, machine guns in
10  interstate or foreign commerce, right?
11    A.   Yes.
12    MR. CONTARINO:  Okay.  So for -- I think
13  that's all the questions I have for you, Mr. Wright.
14  Thank you very much.
15    THE WITNESS:  Okay.  Thanks.
16    MR. CONTARINO:  Now --
17    MS. BASILE:  I do have one brief redirect, if
18  that's okay?
19    MR. CONTARINO:  Yeah.  Can I just deal with
20  the exhibits and then --
21    MS. BASILE:  Sure.  Sure.  Sorry.
22    MR. CONTARINO:  So all of the exhibits that -
23  - that we have are the same up until Exhibit 8.  So
24  Exhibits 1 through 7 were already entered on -- at the
25  request of the Government.  So I would request that

Page 44

1  those same exhibits be entered on our -- the
2  applicant's behalf.
3    MS. JAMES:  Sir, I -- although I have access
4  to your Exhibit 8 through 11, would you still provide
5  what specifically you want me to consider for your
6  Exhibits 8, 9, 10, and 11?
7    MR. CONTARINO:  Yeah, 8, 9, 10 and 11.  Sure.
8  So those -- those were just --
9    MS. JAMES:  Would you send that to my --
10  would you send that to my e-mail address?
11    MR. CONTARINO:  8, 9, 10 and 11?  Yeah,
12  absolutely.
13    MS. JAMES:  Okay, perfect.  And -- and I
14  think there's a typo on your list of exhibits.  You
15  have AFT, but that's supposed to be ATF, correct?
16    MR. CONTARINO:  Yes.  You're -- you're
17  absolutely right.
18    MS. JAMES:  Okay.
19    MR. CONTARINO:  Apologies there.
20    MS. JAMES:  Okay.  And so you want -- so
21  you're requesting me to accept your Exhibits 1 through
22  11 for the record?
23    MR. CONTARINO:  Yes.
24    MS. JAMES:  Okay.  I accept Applicant
25  Exhibits 1 through 11 for the record.

Page 45

1    MR. CONTARINO:  Thank you.
2    (APPLICANT'S EXHIBIT 1 RECEIVED INTO
3  EVIDENCE)
4    (APPLICANT'S EXHIBIT 2 RECEIVED INTO
5  EVIDENCE)
6    (APPLICANT'S EXHIBIT 3 RECEIVED INTO
7  EVIDENCE)
8    (APPLICANT'S EXHIBIT 4 RECEIVED INTO
9  EVIDENCE)
10    (APPLICANT'S EXHIBIT 5 RECEIVED INTO
11  EVIDENCE)
12    (APPLICANT'S EXHIBIT 6 RECEIVED INTO
13  EVIDENCE)
14    (APPLICANT'S EXHIBIT 7 RECEIVED INTO
15  EVIDENCE)
16    (APPLICANT'S EXHIBIT 8 RECEIVED INTO
17  EVIDENCE)
18    (APPLICANT'S EXHIBIT 9 RECEIVED INTO
19  EVIDENCE)
20    (APPLICANT'S EXHIBIT 10 RECEIVED INTO
21  EVIDENCE)
22    (APPLICANT'S EXHIBIT 11 RECEIVED INTO
23  EVIDENCE)
24    MS. JAMES:  Is there anything else you would
25  like for me to consider, or you're wanting to do your

Page 46

1  redirect?
2        MS. BASILE:  And then the redirect.
3        MS. JAMES:  Okay.  Okay.
4        MS. BASILE:  Thank you.
5        Just one -- I just have one quick question
6  for Mr. Wright and then you all can proceed with your
7  presentation.
8               EXAMINATION
9  BY MS. BASILE:
10       Q.   Mr. Wright, one thing that Mr. Contarino --
11       MS. BASILE:  Am I saying that right?
12       MR. CONTARINO:  That's right.  Contarino.
13       MS. BASILE:  Contarino.  Okay.  Sorry.
14  BY MS. BASILE:
15       Q.   One thing he asked you was if you had a
16  script today in front of you?
17       A.   Yes.
18       Q.   Okay.  And you said that was provided by me,
19  correct?
20       A.   Yes.  I did the answers.
21       Q.   And just -- well, that's where I was going.
22  Who provided the questions for the script?
23       A.   Counsel.
24       Q.   Which was me, right?
25       A.   Yes.

Page 47

1        Q.   Okay.  And then who provided the answers?
2        A.   Me.
3        Q.   Okay.  So I gave you a list of questions and
4  then together, you told me your answer and I typed
5  those in; is that correct?
6        A.   Yes.
7        Q.   Okay.  So the answers weren't provided by me,
8  correct?
9        A.   No, they were not.
10       MS. BASILE:  Okay.  That -- I just wanted to
11  clarify that.
12       MR. CONTARINO:  Yeah.  I'd like to call
13  Lawrence DeMonico for questioning.
14       MR. DEMONICO:  Yes, sir.
15               EXAMINATION
16  BY MR. CONTARINO:
17       Q.   When you -- so if we go to Government Exhibit
18  2, and you heard testimony extensively over the three
19  reasons for the denial here.  The question here is
20  going to just focus on that and -- and be relatively
21  brief.
22       For number 1, first reason for the -- the
23  denial alleges possessing and transferring the -- the
24  FRT-15s and the wide open triggers.  When you were
25  possessing and/or transferring the FRT-15s or wide open

Page 48

1  triggers, did you believe you were violating the Gun
2  Control Act or its related regulations?
3        A.   Absolutely not.
4        Q.   Moving to number 2, when you transported, as
5  is alleged, FRT-15 components or FRT-15s in interstate
6  commerce, did you believe you were violating the Gun
7  Control Act or its related regulations?
8        A.   Absolutely not.
9        Q.   And then for number 3 of the reasons for the
10  denial, as president of Rare Breed Firearms, when Rare
11  Breed Firearms allegedly aided or abetted others to
12  possess or transfer FRT-15s, did you believe you were
13  violating the Gun Control Act or its related
14  regulations?
15       A.   Absolutely not.  All three of those items
16  require that the FRT-15 or the wide open trigger be
17  machine guns, which we all know now to have been ruled
18  by Judge O'Connor in the Northern District of Texas in
19  his final judgment to not be machine guns.
20       Q.   But when you were asked about -- now moving
21  separately to the in-person investigation and -- and
22  meeting with IO -- IOI Wright.  When you were asked --
23  what was the -- what question was asked regarding
24  possession of FRT-15s or wide open triggers?
25       A.   It is my understanding that I was asked if I

Page 49

1  had any FRT-15s or wide open triggers in my possession
2  at that location.  He remembers it differently.  I
3  remember it differently.  But I know that I would not
4  have answered that I don't have any in general because
5  that would not have been true.  But it was absolutely
6  true that there were none in that location.
7        They went further on to ask me if I had
8  planned to sell forced reset triggers, and I went on to
9  explain that Rare Breed Firearms and Rare Breed
10  Triggers are completely two separate companies.  Rare
11  Breed Firearms would not have any reason to sell forced
12  reset triggers.  Forced reset triggers belonged, you
13  know, was a business model for Rare Breed Triggers, not
14  Rare Breed Firearms.
15       And so, not only did I not have any in
16  possession for Rare Breed Firearms in that location,
17  but Rare Breed Firearms would not sell.  Like, we spoke
18  extensively about Rare Breed Firearms' business model
19  and what it intended to sell, if it intended to sell --
20  you know, retail to customers, dealers, distributors,
21  whether it would be online, whether the rifles would be
22  complete, or -- and I further explained it would be
23  lowers, uppers, and rails only to begin with.  I didn't
24  even have plans to do complete rifles.
25       So when the subject of triggers came up, it

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 50

1  was -- it wasn't a quick question and answer. It was a
2  topic of discussion and I explained thoroughly that I
3  didn't have any in that location and Rare Breed
4  Firearms did not, would not sell forced reset triggers.
5      MR. CONTARINO: Thank you. That's all the
6  questions I have. And is there any cross?
7      MS. BASILE: No cross.
8      MR. CONTARINO: And -- and how does this
9  portion -- I have -- kind of have, like, a -- a -- a
10  closing. Does -- how does that work? Are -- are you
11  going to as well, Ms. Basile?
12      MS. BASILE: I probably won't say much, but
13  it's -- again, it's your hearing and -- and Mr.
14  DeMonico's hearing. Any information you want to
15  present in any fashion is acceptable.
16      MR. CONTARINO: Okay. I didn't -- I was just
17  going to give you the opportunity --
18      MR. DEMONICO: Is there any way we can take a
19  break before we move to closing?
20      MS. JAMES: Sure.
21      MS. BASILE: Sure. We can do that.
22      MS. JAMES: How long do you need?
23      MR. DEMONICO: Five minutes, tops.
24      MS. JAMES: Okay.
25      MS. BASILE: Let's do 10, just to --

Page 51

1      MR. DEMONICO: Thank you, ma'am.
2      MS. BASILE: -- for me to get to the restroom
3  is a little bit of a hike.
4      MR. CONTARINO: Sure thing.
5      MS. BASILE: Is that okay?
6      MS. JAMES: Sure. 10 minutes is fine. So
7  the time is 10:40 a.m., Central Time. We'll break for
8  10 minutes, so we'll -- we'll resume at 10:50 a.m.,
9  Central Time.
10      MR. DEMONICO: Thank you, ma'am.
11      MR. CONTARINO: Thank you.
12      (OFF THE RECORD)
13      MS. JAMES: It is 10:51 a.m., Central Time.
14      MR. CONTARINO: Thank you. And I just have a
15  couple other questions for Mr. Wright, if that's okay.
16          EXAMINATION
17  BY MR. CONTARINO:
18      Q. Mr. Wright, were you -- you -- you mentioned
19  that you were provided those two court documents that
20  were attached to the Notice of Denial, right?
21      A. Yes.
22      Q. I know you just kind of briefly looked at
23  those; is that right?
24      A. Yes. Just briefly.
25      Q. Were you ever provided with the -- final

Page 52

1  judgment from the -- the Texas case regarding FRTs and
2  WOTs?
3      A. No, I don't believe so.
4      Q. Are you aware of that judgment now?
5      A. I'm not very familiar with it, no.
6      Q. Okay.
7      A. I've briefly heard about it. I know there
8  was a case, but.
9      Q. And -- and -- and -- and do you understand
10  that the final judgment in that case, in the Texas
11  case, declared the ATF's classification of FRT-15s or
12  WOTs, that classification as machine guns, that
13  declared that classification illegal?
14      A. I'm not really very familiar with -- with
15  that case.
16      Q. Okay. So just to the extent that you had
17  been provided that, a federal -- a federal court
18  decision saying that FRT-15s and -- and WOTs are not
19  machine guns, would you change your recommendation for
20  this application?
21      A. I would speak to counsel about it.
22      Q. You testified before that in the three
23  reasons for denial, they all required that the FRT-15
24  or WOT were machine guns, right? Do you remember that
25  testimony?

Page 53

1      A. Yes.
2      Q. Okay. So now, if you were told that they
3  actually aren't machine guns, would you change your
4  recommendation for this application?
5      A. If counsel told me that, I probably would.
6      Q. Okay. Did counsel tell you to make a
7  recommendation for denial in this -- in this
8  application?
9      A. No.
10      Q. You did that on your own?
11      A. They just provide -- they just provided me
12  with that information.
13      Q. But if you were going to change your
14  recommendation, you would have to get approval by
15  counsel?
16      A. I didn't say I'd have to get approval. I
17  just said I would talk to them about it.
18      Q. Okay. And then if you understood that they
19  were not machine guns, would there be a basis to deny
20  the application?
21      A. No.
22      MR. CONTARINO: Okay. All right. That's all
23  I have for that. And I'm just going to go to closing,
24  unless there's anything else.
25      MS. JAMES: You have anything?

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 54

1    MS. BASILE: No, he can go to closing. I'll
2    just say one sentence after.
3         MS. JAMES: Okay. Go ahead, sir.
4         MR. CONTARINO: Thank you. There's one final
5    ruling in this country on forced reset triggers, and
6    it's Judge O'Connor's July 23rd, 2024, order and the
7    final judgment that was issued the next day, on the
8    24th of July. That ruling declares forced reset
9    triggers not machine guns. That ruling trumps any
10   findings made in the New York Court because the New
11   York Court's decision on September 5th, 2023, was a
12   preliminary injunction.
13        The ATF's notice to deny application in this
14   case attaches that preliminary injunction. And if you
15   look at it, on Page 1, it says that, "On the present
16   record, the Court concludes that the Government is
17   likely to succeed on the merits of the claim." You can
18   see that here. "On the present record, the Court
19   concludes that the Government is likely to succeed on
20   the merits of its claims." And then on Page 62, when
21   writing about the -- the FRT, specifically, the Court
22   writes, "As such, the Government is likely to succeed
23   on the merits of its contention that the FRT-15 is an
24   illegal machine gun." So obviously, likely to succeed
25   is not ultimate success. It's not a final ruling. And

Page 55

1    it actually has no preclusive effect on any other case.
2    And the scope of the preliminary injunction, if we go
3    all the way down to the bottom here, the scope of it is
4    limited to restricting the defendants from engaging in
5    sales of FRTs and also directs defendants to preserve
6    documents. It says nothing about a federal firearms
7    license. Certainly, it says nothing about possession.
8         In vivid contrast to that, the final judgment
9    from Judge O'Connor plainly states that the Government,
10   this is in Paragraph -- that the Government lost. And
11   then in Paragraph 2, it vacates and sets aside
12   Defendant's unlawful classification of FRTs as machine
13   guns. In Paragraph 3, it declares unlawful the
14   Government's determination that FRTs are machine guns.
15   These portions of the final judgment are separate from
16   the injunctive relief. So any carve out in the
17   injunctive relief for Lawrence DeMonico or Rare Breed
18   Firearms has no effect on these portions of the final
19   judgment. In other words, the vacatur and the
20   declaration that we just reviewed, those cover Lawrence
21   DeMonico and Rare Breed Firearms; and this can be seen
22   on Page 52 of the accompanying opinion that kind of
23   describes this final judgment. I'll get that now.
24        If you look at -- at Page 52 of the -- of
25   Judge O'Connor's order, that describes the final

Page 56

1    judgment, gives the rationale for it. It talks about
2    the vacatur. And it says under the heading, "Scope of
3    Vacatur," that the order, "The vacatur is inherently
4    universal." About five lines later, the order says
5    that, "By its very nature, a vacatur is universal in
6    scope because it erases an unlawful regulation from,"
7    in this case, it says, "an unlawful," yeah, "regulation
8    from the books." The order next says that erasure
9    cannot be limited to only one party when the agency
10   action no longer exists. So this means that ATF's
11   determination that FRTs are machine guns is no longer
12   usable. ATF cannot use that determination in regard to
13   the FFL -- the FFL application at issue here; and in
14   fact, it would be illegal to use it.
15        Moving on to Page 60 in this order, the order
16   states that the Court enjoins defendants from pursuing
17   criminal actions against the Rare Breed parties based
18   on the classification that FRTs are machine guns; and
19   the Rare Breed parties include Lawrence DeMonico and
20   Rare Breed Firearms. So in other words, this means
21   that Rare Breed Firearms and Lawrence DeMonico cannot
22   be charged for the allegations used as the basis for
23   the denial of this FFL.
24        There's one final ruling in this country on
25   forced reset triggers, and it's Judge O'Connor's July

Page 57

1    23rd -- order and the accompanying July 24th final
2    judgment that declares forced -- forced reset triggers,
3    not machine gun. There's an appeal of that order, and
4    that has no -- no bearing on the preclusive effects of
5    the order. This is from the Fifth Circuit decision in
6    Comer v. Murphy 718 F.3d 460, "A case pending appeal is
7    res judicata and entitled to full faith and credit,
8    unless and until reversed on appeal." The notice of
9    appeal filed by the Government in Judge O'Connor's case
10   has no bearing on the finality of his order. Second
11   Circuit has the same law.
12        By contrast, a preliminary injunction, such
13   as that of New York, has no preclusive effect. The
14   general rule is that rulings in connection with grants
15   or denials of preliminary relief will not be given
16   preclusive effect. That's out of the Seventh Circuit.
17   That's A.J. Canfield Co. v. Vess Beverages, 859 F.2d
18   36. And this makes sense, of course, because one of
19   the requirements for preclusive effect for collateral
20   estoppel is a final judgment. The general -- the final
21   -- the judgment actually has to be final. And that's
22   from U.S. Supreme Court, Blonder Tongue Laboratories
23   v. University of Illinois, 402 U.S. 313. So because
24   the New York preliminary injunction is not final, it
25   has no preclusive effect in this case because the FFL

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 58

1  denial here was based on the ATF's illegal position
2  that FRTs are machine guns.  And that's based on a
3  preliminary decision from the New York case that has no
4  preclusive effect.  The denial should be reversed and
5  the FFL application approved.  Indeed, under the final
6  judgment issued by Judge O'Connor, it would be illegal
7  for ATF to deny the FFL based on its vacated
8  determination that FRTs are a legal machine gun.  Thank
9  you.
10      MS. JAMES:  Ms. Basile, do you have anything
11  that you'd like to --
12      MS. BASILE:  Just briefly.  I would just,
13  again, rely on Government's Exhibit 2 as our reasons in
14  the Notice of Denial.  And I would just point out that
15  the Eastern District of New York ruling is unaffected
16  by the Fifth Circuit ruling.  The Fifth Circuit ruling
17  is only binding in the Fifth Circuit.  It is not
18  binding in the Second Circuit.  If Judge O'Connor's
19  ruling was a Supreme Court ruling, that would be a
20  different story.  But as it currently stands, it is a
21  Fifth Circuit ruling that is only binding in the Fifth
22  Circuit.  And that's it.
23      MS. JAMES:  Okay.
24      MR. CONTARINO:  And -- and I guess I'll just
25  add, we are in the First -- Fifth Circuit here.

Page 59

1      MS. JAMES:  Okay.  Is there anything else
2  that anyone would like to -- like for me to take into
3  consideration before I close this hearing?
4      MR. CONTARINO:  Nothing further.
5      MS. JAMES:  Ms. Basile?
6      MS. BASILE:  Do you want to remind them that
7  you want to receive the actual exhibits --
8      MS. JAMES:  Oh, yes.  Thank you for reminding
9  me.
10      MS. BASILE:  -- and date.
11      MS. JAMES:  Mr. Contarino, would you forward
12  to me by tomorrow, close of business tomorrow, those
13  specific areas you want me to review for your Exhibits
14  8, 9, 10, and 11?
15      MR. CONTARINO:  Yes, will do.
16      MS. JAMES:  Perfect.  Okay.  Well, thank you,
17  everyone.  I believe I have all the information I need.
18  I will make my final decision based on the information
19  provided at this hearing today and the record before
20  me.  If the decision is that the application will not
21  be denied, you will receive a written notice of that
22  decision.  In the event it is determined that the
23  application will be denied, you will receive a final
24  notice of denial of application, revocation,
25  suspension, and/or fine of firearms license.  You'll

Page 60

1  also receive a copy of my findings and conclusions.
2      If you receive a final notice, you may file a
3  request in Federal District Court in the district where
4  you plan to conduct business under the provisions of
5  Section 923, Subsection F, Subsection 3, Title 18,
6  United States Code for de Novo Hearing.  This request
7  must be submitted within 60 days of the receipt of the
8  final notice.
9      And once again, is there anything else anyone
10  would like to add to the record?
11      MR. CONTARINO:  I just have a question,
12  Director James.  Do we have an expected date for the
13  final notice?
14      MS. JAMES:  I do not.  I give myself between
15  two and -- four months.  I -- I want to receive the
16  transcript because I will go through that transcript,
17  just to make sure that I did not miss anything.  And so
18  I -- I'm not sure.  Typically, I get the transcript
19  within two weeks.  And then with all of my other case
20  work, like I said, I give myself between two and four
21  months, okay?
22      MR. CONTARINO:  Okay.  Thank -- thank you.
23  And we have an opportunity to order the transcript, I
24  understand?
25      MS. JAMES:  I believe so.  And we can get

Page 61

1  that information to you after we -- after I close the
2  hearing.
3      MR. CONTARINO:  Okay.  Thank you.
4      MS. JAMES:  Okay.  If there's not anything
5  else, if there's nothing further anyone would like to
6  add to the record, the time is 11:08 a.m., Central
7  Time.  This hearing is closed.
8      (HEARING CONCLUDED AT 11:08 A.M.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**

Page 62

```
 1                   REPORTER'S CERTIFICATE
 2
 3          I, WHITNEY STOFEL, do hereby certify that
 4   I was authorized to and did electronically report
 5   the foregoing remote proceedings [video
 6   teleconference/telephone] and that the foregoing is
 7   a true and accurate electronic recording of the
 8   proceedings.
 9          I FURTHER CERTIFY that I am not a
10   relative, employee, or attorney, or counsel of any
11   of the parties, nor am I a relative or employee of
12   any of the parties' attorneys or counsel connected
13   with the action, nor am I financially interested in
14   the action.
15          IN WITNESS WHEREOF, I have hereunto
16   subscribed my name this 23rd day of September, 2024.
17
18
19   WHITNEY STOFEL
20   Court Reporter and Notary Public
21   Commission Expires:  July 3, 2028
22
23
24
25
```

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024                    Index: (4498)..5th

**(**

**(4498)**  8:15,
  18

**1**

**1**  15:8,9
  18:4 19:1
  21:25
  22:2,3
  25:7 43:24
  44:21,25
  45:2 47:22
  54:15

**10**  22:21
  44:6,7,11
  45:20
  50:25
  51:6,8
  59:14

**10:40**  51:7

**10:50**  51:8

**10:51**  51:13

**11**  22:23
  44:4,6,7,
  11,22,25
  45:22
  59:14

**12**  15:12
  22:25

**13**  23:2

**13th**  18:4
  19:6

**14**  23:4

**15**  23:6
  42:7

**15s**  20:5

**15th**  31:18

**16**  23:8

**16th**  31:18

**17**  23:10

**18**  23:12
  31:5,10,
  22,24
  32:15,18
  42:19,24
  60:5

**18th**  8:4

**19**  23:14

**1:00**  15:14
  16:11,18,
  22,23

**1st**  18:11

**2**

**2**  20:24
  22:5
  27:14,17,
  19 28:16,
  17 30:19
  32:18
  40:2,4
  41:17
  42:25 43:7
  45:4 47:18
  48:4 55:11

**58:13**

**20**  23:16

**2020**  31:1

**2023**  31:18
  37:3,7
  54:11

**2024**  8:4
  18:11 19:6
  54:6

**21**  21:20,25
  22:2 23:18
  25:4,7
  41:9,11

**22**  11:6,25

**22503**  18:20,
  22

**23rd**  54:6
  57:1

**24**  18:5

**24th**  54:8
  57:1

**27**  8:16
  10:18 13:2

**2:00**  15:14
  16:22,23

**3**

**3**  15:15
  21:4 22:7
  43:5 45:6
  48:9 55:13
  60:5

**313**  57:23

**34**  26:22

**36**  57:18

**4**

**4**  21:6 22:9
  45:8

**402**  57:23

**4498**  27:20
  42:4

**460**  57:6

**478**  8:16
  13:3

**478.47**  42:3

**478.71**  41:25

**478.76**  10:19

**4:00**  15:14
  16:11,18

**5**

**5**  21:6
  22:11
  45:10

**5-13-24**  18:3

**52**  55:22,24

**5300.43**
  8:15,18
  27:21

**5th**  37:7
  54:11

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024                    Index: 6..and/or

| | | | |
|---|---|---|---|
| **6** | **9** | acceptable 50:15 | administrative 8:12 |

**6**  21:10
22:13
45:12

**60**  56:15
60:7

**62**  54:20

**7**

**7**  14:15
17:20  20:3
21:13
22:15
43:24
45:14

**71**  18:18,
21,22

**718**  57:6

**8**

**8**  21:17
22:17
41:24
43:23
44:4,6,7,
11  45:16
59:14

**800**  12:1,
10,11
28:24

**859**  57:17

**9**  21:20
22:19  25:4
44:6,7,11
45:18
59:14

**922**  42:19
43:6,7

**922(a)(4)**
31:23,25

**922(o)**  31:5,
10  32:15,
16

**923**  60:5

**9:39**  8:1,3

**A**

**A.J.**  57:17

**a.m.**  8:1,3
51:7,8,13

**A4**  43:7

**abetted**
32:12
48:11

**absolutely**
44:12,17
48:3,8,15
49:5

**accept**  21:24
22:1  25:6
44:21,24

acceptable
50:15

**access**  44:3

accompanied
12:22,23,
24

accompanying
55:22  57:1

accuracy
14:17

accurate  9:1

**act**  10:17
11:22
33:17
48:2,7,13

action  56:10

actions
56:17

actual  59:7

**add**  24:1
58:25
60:10

added  40:20

addition
12:6

additional
23:23
28:14,15
40:20

address  8:23
18:16,20
44:10

administrative
8:12

advise  28:2
29:14

advised  30:4

advisement
25:18

afford  42:7

**AFT**  44:15

agency  56:9

agents  11:22

agree  32:23,
24

agreements
14:22

ahead  54:3

aided  32:12
48:11

Alcohol  8:10

allegations
56:22

allege  35:24

alleged  48:5

allegedly
48:11

alleges
47:23

allowed
14:25

Amended  21:7

and/or  31:2

32:14
47:25
59:25

answering
37:21

answers  9:2
38:5 46:20
47:1,7

Apologies
44:19

appeal  57:3,
6,8,9

applicable
14:20

applicant
9:4 13:13
14:8,10
15:3 19:9
20:7,16,22
26:6 30:10
32:12
42:2,4,7,
12 44:24

applicant's
14:24
19:17
21:8,13
41:24 44:2
45:2,4,6,
8,10,12,
14,16,18,
20,22

applicants
11:18

application

8:14,20
13:12
14:13,15
15:9,10,
11,21 16:3
18:7,10,15
27:2,14
28:3,19
31:7,16
33:8
34:13,25
39:12
40:11
42:6,10
52:20
53:4,8,20
54:13
56:13 58:5
59:20,23,
24

applies
13:11

applying
17:19

approval
26:14 31:7
53:14,16

approve  33:8

approved
58:5

approving
33:7

approximately
11:6,24
12:1,10,11
20:13

April  31:18

AR-  20:4

AR-15S  17:23

area  14:24

areas  59:13

assessment
34:14

assigned
14:4

assist  11:22

assisted
12:7

assisting
26:13

ATF  8:14,17
9:22 10:4
11:3 12:17
14:9,14
34:15 35:5
36:18
37:18 40:7
44:15
56:12 58:7

ATF's  21:17
52:11
54:13
56:10 58:1

attached
51:20

attaches
54:14

attention
12:16

14:10 15:7

attorney
10:17 26:5

audible  9:2

authority
8:9

aware  21:19
25:3 36:6,
8 52:4

        B

B-A-S-I-L-
9:25

back  16:7
23:25
24:1,14
34:18,23
43:6

bad  16:14

based  21:7
27:11,12,
13 33:13
34:8 35:8,
9,13,14
36:16 40:4
56:17
58:1,2,7
59:18

basically
14:16
29:20
32:19 33:7
42:14

Basile  9:21,

25 10:5,
11,13,15,
16,22
13:17,19
16:9,13,16
21:23
23:20
24:3,7,11,
15,20
25:1,22,25
35:3,14
36:1 37:20
39:1
43:17,21
46:2,4,9,
11,13,14
47:10
50:7,11,
12,21,25
51:2,5
54:1
58:10,12
59:5,6,10

**Basile's**
37:21

**basis** 33:5
53:19
56:22

**bear** 26:19
36:21

**bearing**
57:4,10

**begin** 49:23

**begun** 8:2

**behalf** 9:5,
22 10:4,17

44:2

**believed**
30:10

**belonged**
49:12

**Beverages**
57:17

**binding**
58:17,18,
21

**bit** 51:3

**Blonder**
57:22

**books** 56:8

**bottom** 55:3

**break** 50:19
51:7

**Breed** 12:19,
21 19:19
20:21
27:13 31:3
32:12,20,
21 37:2,6
42:16
48:10,11
49:9,11,
13,14,16,
17,18 50:3
55:17,21
56:17,19,
20,21

**briefly**
11:15
19:12

37:10
51:22,24
52:7 58:12

**Broyles**
12:25

**Bureau** 8:10

**business**
13:15
14:21,24
15:13
18:16 20:1
35:4
49:13,18
59:12 60:4

**C**

C-O-N-T-A-R-I-
N-O 9:9

**call** 47:12

**called** 29:25

**Canfield**
57:17

**capital** 9:15

**carve** 55:16

**case** 14:4
52:1,8,10,
11,15
54:14 55:1
56:7 57:6,
9,25 58:3
60:19

**Center** 14:7,
11

**Central** 8:3
51:7,9,13

**CFR** 10:19

**change** 16:7
17:6,10,11
21:8 40:10
52:19
53:3,13

**changed**
15:13
16:19 31:7
40:14

**charged**
56:22

**check** 14:9
16:8

**checks** 14:12
15:4

**Circuit**
57:5,11,16
58:16,17,
18,21,22,
25

**citations**
37:1

**city** 15:1

**claim** 54:17

**claims** 54:20

**clarify**
47:11

**classification**
52:11,12,
13 55:12

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024                Index: clear..country

56:18

**clear** 9:1
35:23

**clerical**
17:11

**close** 59:3,
12

**closed** 17:2
30:9

**closing**
29:17,25
30:1,2,3,9
34:22
50:10,19
53:23 54:1

**Code** 8:16
13:3 60:6

**collateral**
57:19

**colleague**
9:9

**collector**
31:22

**Comer** 57:6

**commerce**
31:19 32:4
43:10 48:6

**communications**
41:4

**companies**
19:21,23
49:10

**company** 43:2

**complete**
11:10
14:14,18
49:22,24

**completed**
11:25
12:11

**completely**
49:10

**completeness**
14:17

**completion**
41:23

**compliance**
11:21,23
12:3 29:11

**comply** 20:16

**components**
48:5

**concludes**
54:16,19

**conclusions**
60:1

**conduct**
11:19
12:18
34:16 60:4

**conducted**
35:5

**Conex** 19:18
38:19

**conference**
29:17

30:1,2,3,9

**Confirmation**
21:10

**connection**
12:17
57:14

**consideration**
59:3

**contact**
14:23

**container**
19:18
38:19

**Contarino**
9:8,12
23:21 24:2
25:19,20
26:3,5
35:6,17
36:4 41:7,
11,13,14
43:12,16,
19,22
44:7,11,
16,19,23
45:1
46:10,12,
13 47:12,
16 50:5,8,
16 51:4,
11,14,17
53:22 54:4
58:24
59:4,11,15
60:11,22

**contention**
54:23

**continued**
20:8

**contrast**
55:8 57:12

**Control**
33:16
48:2,7,13

**conversion**
31:4

**copy** 16:14
27:16
42:11 60:1

**correct**
13:4,5
16:4
17:13,25
18:5 20:5
30:12
44:15
46:19
47:5,8

**correctly**
27:1

**counsel** 10:1
30:21
36:13,18,
19 37:18
38:5,25
40:7 46:23
52:21
53:5,6,15

**country** 54:5
56:24

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024                Index: county..deny

county  15:1

couple  8:22
 51:15

court  37:1
 51:19
 52:17
 54:10,16,
 18,21
 56:16
 57:22
 58:19 60:3

Court's
 54:11

cover  55:20

create  38:2

credit  57:7

criminal
 12:8 14:12
 56:17

criteria
 33:8,12

criterion
 33:13

cross  50:6,7

cross-examine
 25:16

current
 12:16

customers
 49:20

cut  24:25

**D**

D-E  9:15

D-E-L-V-E-C-C-
H-I-O  9:20

database
 14:7

date  8:3
 18:2 37:5
 42:8 59:10
 60:12

dated  16:1
 17:17,24
 18:9

dates  21:8

David  9:9
 10:5,7,20

day  16:24
 17:3 54:7

days  17:1,2
 42:7 60:7

de  60:6

deal  43:19

dealer  31:22

dealers
 49:20

December
 31:1

decision
 52:18
 54:11 57:5
 58:3
 59:18,20,

22

decisions
 37:2

declaration
 55:20

declared
 52:11,13

declares
 54:8 55:13
 57:2

deeds  43:2,3

deemed  43:3

Defendant's
 55:12

defendants
 55:4,5
 56:16

Delvecchio
 9:19

Demonico
 9:13,14
 15:12
 17:18,24
 19:10,23
 21:1,21
 28:2 30:25
 31:17
 32:13,19
 34:23
 35:2,24
 36:7 38:7
 47:13,14
 50:18,23
 51:1,10

55:17,21
 56:19,21

Demonico's
 19:21
 50:14

denial  12:13
 26:14
 27:10,11,
 23 28:19
 29:2,3
 30:15 31:8
 33:13 37:1
 41:18,21
 42:4,9,16
 47:19,23
 48:10
 51:20
 52:23 53:7
 56:23
 58:1,4,14
 59:24

denials  29:1
 57:15

denied  8:21
 27:13
 28:3,9,11,
 20 42:7
 59:21,23

deny  8:14
 20:21
 27:14
 30:24
 31:16
 32:11
 36:24
 53:19

54:13 58:7    49:2,3

**denying**    **direct**  12:15                    **E**
  31:16          15:7          **E-FORM**  8:15,

**Department**  **direction**       17
  8:11          8:9          **e-mail**  21:1

**departments**  **Director**  8:7      41:3 44:10
  14:23          10:18 16:8   **earlier**

**describe**       21:24          36:20 38:6
  11:15          25:6,17        40:11
  13:10          42:1 60:12   **Eastern**
  19:16        **directs**  55:5    58:15

**describes**    **disapproved**   **EDNY**  37:2
  55:23,25       42:11        **effect**  55:1,

**determination**  **discuss**  28:3    18 57:13,
  55:14                          16,19,25
  56:11,12    **discussion**       58:4
  58:8          50:2          **effects**  57:4

**determine**    **distributors**  **eligibility**
  11:18          49:20          14:18,19

**determined**   **district**      **eligible**
  59:22          48:18          13:13
                 58:15 60:3
**determining**                  **employed**
  42:6         **Division**  8:8    11:1
                 10:1
**device**  31:4                 **engaging**
             **document**        55:4
**devices**       15:17
  21:21          17:15 28:1   **enjoins**
  25:13 32:4                     56:16
  39:8         **documents**
                 37:8 51:19   **ensure**  11:20
**Dhillon**  26:5   55:6          13:13
                                 14:24
**died**  24:6   **dropped**
                 24:13        **entered**  25:6
**differ**  15:10                 41:9 43:24
             **duties**  11:7,     44:1
**differently**    16 12:17
  36:23

**entire**  24:20

**entitled**
  57:7

**erases**  56:6

**erasure**  56:8

**estoppel**
  57:20

**event**  59:22

**events**  34:22

**evidence**
  8:20 9:22
  21:25
  22:4,6,8,
  10,12,14,
  16,18,20,
  22,24
  23:1,3,5,
  7,9,11,13,
  15,17,19
  45:3,5,7,
  9,11,13,
  15,17,19,
  21,23

**exact**  18:20

**examination**
  10:21 25:5
  26:2 46:8
  47:15
  51:16

**excavated**
  19:19
  38:21

**exhaustive**
  41:18

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024          Index: Exhibit..Form

Exhibit  15:8
  19:1 20:24
  21:4,6,10,
  13,17
  22:3,5,7,
  9,11,13,
  15,17,19,
  21,23,25
  23:2,4,6,
  8,10,12,
  14,16,18
  25:4
  27:14,17,
  19 30:19
  40:2
  41:17,24
  43:23 44:4
  45:2,4,6,
  8,10,12,
  14,16,18,
  20,22
  47:17
  58:13

exhibits
  21:20,25
  22:2 24:24
  25:7 36:22
  41:8
  43:20,22,
  24 44:1,6,
  14,21,25
  59:7,13

exists  56:10

expected
  60:12

expert  25:13
  33:2

explain  49:9

explained
  49:22 50:2

explosives
  8:11 11:20
  12:3

extensively
  47:18
  49:18

extent  28:18
  52:16


        F

F.2d  57:17

F.3d  57:6

fact  27:12
  42:5 56:14

facts  42:15

faith  57:7

familiar
  26:9
  31:10,24
  52:5,14

fashion
  50:15

FBI  14:12

federal  8:16
  11:19,21
  13:1,3,12
  14:6,11,15
  52:17 55:6
  60:3

feel  23:22

FFL  26:14
  27:2
  56:13,23
  57:25
  58:5,7

Field  8:8
  10:1

file  60:2

filed  42:10
  57:9

final  26:23
  27:3 34:11
  35:2 36:16
  48:19
  51:25
  52:10
  54:4,7,25
  55:8,15,
  18,23,25
  56:24
  57:1,20,
  21,24 58:5
  59:18,23
  60:2,8,13

finality
  57:10

find  35:12

findings
  54:10 60:1

fine  51:6
  59:25

finish  34:22

finished

13:24
  24:20,23
  25:5 38:21

firearms
  8:10 11:20
  12:2,19
  13:2,12
  14:6,11,15
  17:20
  19:19
  20:2,3,22
  27:13
  32:20,21
  42:16
  48:10,11
  49:9,11,
  14,16,17
  50:4 55:6,
  18,21
  56:20,21
  59:25

Firearms'
  49:18

flags  14:10

FLETC  11:11

FLS  14:9

focus  8:19
  47:20

forced  49:8,
  11,12 50:4
  54:5,8
  56:25 57:2

foreign  32:3
  43:10

Form  14:15

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024          Index: forward..hold

27:20,21
42:4

**forward**
59:11

**found** 13:2
29:20

**free** 23:22
25:11,16

**front** 46:16

**frozen** 24:4

**FRT** 38:8
39:20
54:21

**FRT-15** 31:3,
20 32:14,
25 33:21
39:25
48:5,16
52:23
54:23

**FRT-15S** 20:8
34:8 38:11
47:24,25
48:5,12,24
49:1
52:11,18

**FRTS** 52:1
55:5,12,14
56:11,18
58:2,8

**full** 9:6,
18,23
28:18 57:7

**future** 17:9

**G**

**gave** 47:3

**GCA** 33:15,
16,20,24

**general**
38:14 49:4
57:14,20

**Georgia**
11:11

**give** 9:6,23
50:17
60:14,20

**Glynco** 11:11

**good** 10:3
26:7

**government**
10:17
21:1,16,18
23:23
25:15
27:14,19
30:19
41:8,17
43:25
47:17
54:16,19,
22 55:9,10
57:9

**government's**
15:8 16:2
18:25
20:24
21:4,6,10,
13,17,19,

25 22:1,3,
5,7,9,11,
13,15,17,
19,21,23,
25 23:2,4,
6,8,10,12,
14,16,18
25:4,6
27:17 40:2
55:14
58:13

**granted** 8:19
39:13

**grants** 57:14

**Group** 26:5

**guess** 58:24

**Guide** 28:7

**gun** 12:7
31:4,13
33:1,16
35:25 36:8
42:22
48:1,6,13
54:24 57:3
58:8

**guns** 31:2,
19 32:4,14
33:22,23,
25 34:9
43:9
48:17,19
52:12,19,
24 53:3,19
54:9
55:13,14

56:11,18
58:2

**H**

**handling**
25:21

**happen** 41:3

**happened**
24:6 25:2

**hard** 16:9

**head** 9:3

**heading** 56:2

**hear** 24:10,
11,17

**heard** 47:18
52:7

**hearing** 8:2,
4,9,12,13,
18,19 9:17
21:2,7,11
42:9,10
50:13,14
59:3,19
60:6

**held** 8:4

**Highway**
18:18,21,
22

**hike** 51:3

**history**
14:12

**hold** 13:18

24:1

holder   29:15

hour   17:3
40:23

hours   15:13
20:15
40:10,12,
15,20

Houston   8:7
10:1


        I

illegal
35:24
52:13
54:24
56:14
58:1,6

Illinois
57:23

impact
39:11,12

importer
31:21

in-person
35:1  48:21

include   12:2
56:19

included
42:15

including
12:14

independent

36:14

individually
30:25

Industry   8:7
10:8,18,20
11:2,4,16,
23  12:17

informal
8:13

information
14:18,21
15:21
28:14,15,
16  30:12
50:14
53:12
59:17,18

inherently
56:3

initial
15:25  18:9

initialed
16:1
17:16,17

initially
40:12

initiated
14:12

injunction
54:12,14
55:2
57:12,24

injunctive
55:16,17

inspect
13:14

inspection
12:16,19
13:7,9,21
14:3  15:5
19:3,8
20:19
25:11
28:12
29:10,21
41:1

inspections
11:20,25
12:3,4,6,
11  17:8
28:24
29:11,12

instance
29:15  30:8
33:20
34:12

instances
29:24  30:3

intended
49:19

internal
35:4

interrupted
13:25

interstate
31:19  32:3
43:10  48:5

interview
19:8

introduce
9:5,17,22
10:2,6

investigation
36:14
48:21

investigations
11:22  12:8

Investigator
10:8,20
11:2,5,17
12:18

involved
29:4,7

involving
21:20

IO   26:9,12,
18  28:7
33:7  48:22

IOI   12:25
26:16,18
48:22

IOI's   26:12
27:2

issuance
8:17  27:3

issue   42:3
56:13

issued   8:15
54:7  58:6

issues   8:22
11:23
20:19

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024                        Index: Item..log

| | | | |
|---|---|---|---|
| Item 15:12, 15 43:5,7 | Judge 48:18 54:6 55:9, 25 56:25 57:9 58:6, 18 | law 13:2 26:5 40:21 42:5,15 43:1 57:11 | 29:15 30:5,11 42:3 55:7 59:25 |
| items 14:21 41:19 48:15 | judgment 48:19 52:1,4,10 54:7 55:8, 15,19,23 56:1 57:2, 20,21 58:6 | Lawrence 9:12,14 30:25 31:17 32:13 47:13 55:17,20 56:19,21 | licensed 31:21 |
| **J** | | | licensee 30:10 |
| J-A-M-E-S 8:6 | | | licensees 13:2 |
| James 8:2,6 9:16,21 10:9,13 16:10 22:1 41:10,12 44:3,9,13, 18,20,24 45:24 46:3 50:20,22, 24 51:6,13 53:25 54:3 58:10,23 59:1,5,8, 11,16 60:12,14, 25 | judicata 57:7 | laws 11:21 | licenses 14:8 |
| | July 54:6,8 56:25 57:1 | lawsuit 24:24 | Licensing 14:7,11 |
| | Justice 8:11 | lawsuits 21:20 25:13 | light 16:10 |
| | justify 30:15 | lawyer 37:16 | limited 55:4 56:9 |
| | | lay 34:21 | lines 56:4 |
| | **K** | lays 26:12, 18 | list 33:12 41:20 44:14 47:3 |
| | kind 14:17 24:6 29:9, 22 33:3 50:9 51:22 55:22 | lease 14:22 | listed 14:12 |
| Jeff 12:25 | | leave 29:19 | LLC 12:19 32:13 |
| Jennie 9:21, 25 10:16 | knowledge 28:21 | legal 11:18 58:8 | located 18:18 |
| jives 42:13 | | license 8:14 11:19 13:12,14 14:16 17:18,20 19:13 20:2,3,22 27:4,15 | location 19:20 20:14 49:2,6,16 50:3 |
| job 11:8 36:15 37:17 | **L** | | |
| Josiah 9:8 26:4 | Laboratories 57:22 | | log 24:14 |
| | land 19:19 38:20 | | |

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
**Revocation Hearing on 09/18/2024**                    Index: long..Novo

long  11:4
  20:13
  34:17
  50:22
longer
  40:15,17
  56:10,11
looked  51:22
lost  23:25
  55:10
lowers  49:23

        M

M-Y-E-R-S-O-N
  10:4
machine
  31:2,4,13,
  19 32:4,14
  33:1,22,
  23,25 34:9
  35:25 36:8
  42:22 43:9
  48:17,19
  52:12,19,
  24 53:3,19
  54:9,24
  55:12,14
  56:11,18
  57:3 58:2,
  8
made  8:24
  9:1 15:19
  17:10
  40:24,25
  54:10

make  13:15
  15:22
  16:11 27:3
  34:13,19
  40:15 53:6
  59:18
  60:17
makes  57:18
making  34:11
Manual  26:9,
  12,16,18
  28:7
manufacture
  17:22 20:4
manufacturer
  17:20 20:3
  31:21
March  18:4,
  11
marked  42:11
matter  27:7
  36:17
matters  42:5
Matthew  10:3
Meaning
  39:20
means  56:10,
  20
meet  11:18
  26:6
meeting
  24:13 35:1
  48:22

Melissa  9:19
members
  11:23
mention
  25:12
mentioned
  28:22,23
  51:18
merits
  54:17,20,
  23
met  33:9
Mexico  31:20
Microsoft
  8:5
middle  15:16
minutes
  50:23
  51:6,8
missed  24:22
  25:10
model  49:13,
  18
Monday  16:25
months
  60:15,21
morning  10:3
  26:7
move  50:19
moving  28:1
  30:22
  48:4,20

56:15
Murphy  57:6
mute  9:13
Myerson
  10:2,3

        N

narrative
  27:23 40:4
nature  8:13
  56:5
Nice  26:6
nod  9:2
non-licensee
  13:11
Northern
  48:18
notes  30:23
notice  8:14
  20:21
  21:6,7
  27:14
  30:24
  31:16
  32:11
  36:2,24
  42:4,5,8
  51:20
  54:13 57:8
  58:14
  59:21,24
  60:2,8,13
Novo  60:6

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024          Index: number..portion

number    30:22
  41:8,9
  47:22
  48:4,9

        o

O'CONNOR
  48:18  55:9
  58:6

O'Connor's
  54:6  55:25
  56:25  57:9
  58:18

O-N-I-C-O
  9:15

object  35:3,
  4  36:1

observer
  9:16

obtaining
  11:19

office
  34:18,23

officer  8:8

official
  11:7

officially
  8:2

Okonski
  12:25

online  49:21

onsite  14:19
  15:3  19:3

29:9  30:14
  34:17  41:1

open   16:23
  17:3  20:9
  24:13
  26:19  31:4
  32:25
  33:21
  40:17
  47:24,25
  48:16,24
  49:1

operate
  14:25  17:7

operations
  8:7  10:8,
  18,20
  11:2,4,17
  12:18
  13:16

opinion  31:6
  55:22

opportunity
  50:17
  60:23

option  28:4

order  54:6
  55:25
  56:3,4,8,
  15  57:1,3,
  5,10  60:23

ordinary
  39:24

original
  15:11,20

16:3  18:10
  40:11

originally
  16:20

outreach
  12:7

owned  19:22

owner  43:3

ownership
  14:22

        p

p.m.  15:14
  16:11,18

Paragraph
  55:10,11,
  13

part  8:16
  11:7  19:13
  26:12  27:1
  28:6  36:15

partially
  37:24,25

participate
  19:14

participated
  19:8

parties
  56:17,19

party  56:9

pass  21:24

passed  25:7

pending   57:6

people   32:3
  43:8

perfect
  44:13
  59:16

perfected
  15:9,10
  16:2

perform  11:8

permits  14:8

person  18:14
  38:7  42:22

persons
  18:13

plainly   55:9

plan  20:2
  60:4

planned  20:4
  49:8

planning
  14:23
  17:21

plans   49:24

pleadings
  24:25  25:4

point  30:12,
  14,17  35:9
  39:13
  40:14
  58:14

portion
  26:23  50:9

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024          Index: portions..questions

portions
  55:15,18

position
  58:1

possess   20:8
  31:12
  32:13
  42:22
  48:12

possessed
  31:2

possessing
  36:7
  47:23,25

possession
  39:25
  48:24
  49:1,16
  55:7

preclusive
  55:1 57:4,
  13,16,19,
  25 58:4

predicated
  33:20,21
  36:7

prefers
  40:23

preliminary
  14:2 34:14
  54:12,14
  55:2
  57:12,15,
  24 58:3

premises
  13:15
  14:25
  19:2,7,17
  29:19
  38:11,19

present   9:5
  19:11 31:2
  50:15
  54:15,18

presentation
  10:14 46:7

preserve
  55:5

president
  32:20
  48:10

presiding
  8:8

pretty   39:16
  41:2

previous
  21:21

principal
  32:21
  43:2,3

prior   14:18

procedural
  8:22

proceed
  10:14 46:6

proceeding
  8:12 35:5

proceedings
  8:24

producing
  9:22

product   36:3
  38:21

property
  14:21

proposed
  13:14,16
  14:25

provide   44:4
  53:11

provided
  10:18
  28:14
  30:11,18,
  19 35:18,
  21 36:19
  46:18,22
  47:1,7
  51:19,25
  52:17
  53:11
  59:19

providing
  9:17

provisions
  8:15 42:3
  60:4

pull   33:6

punishable
  32:20

purely   40:7

purpose
  37:11

pursuing
  56:16

purview
  37:17

        Q

qualification
  12:4,19
  13:9,21
  14:3 29:12
  39:16,18

qualified
  42:2

question   9:3
  24:18,21
  36:5
  38:22,24
  39:4 41:7
  46:5 47:19
  48:23 50:1
  60:11

questioning
  47:13

questions
  20:17
  23:21
  25:11
  37:22
  41:15
  43:13
  46:22 47:3
  50:6 51:15

**quick**  46:5
  50:1

**quickly**
  42:19

**R**

**rails**  49:23

**Rare**  12:19,
  21 19:19
  20:21
  27:12 31:3
  32:12,20,
  21 37:2,6
  42:16
  48:10
  49:9,10,
  13,14,16,
  17,18 50:3
  55:17,21
  56:17,19,
  20,21

**rationale**
  56:1

**reach**  15:3

**read**  10:16
  16:9 30:23
  31:15 32:8
  41:25

**reading**  27:1
  37:22,23,
  25

**ready**  10:23

**rearranged**
  15:15

17:13,14

**reason**  28:8,
  10 30:23
  31:6,15
  32:9 34:4,
  5 35:13
  41:21 42:1
  47:22
  49:11

**reasoning**
  27:23
  35:13
  40:3,4
  41:17

**reasons**
  27:13
  28:2,19
  29:15
  30:19
  32:24 33:6
  36:25
  42:14
  47:19 48:9
  52:23
  58:13

**Rebecca**
  12:25

**receipt**  42:8
  60:7

**receive**
  13:14 42:2
  59:7,21,23
  60:1,2,15

**received**
  22:3,5,7,
  9,11,13,

15,17,19,
21,23,25
23:2,4,6,
8,10,12,
14,16,18
36:11
42:16
45:2,4,6,
8,10,12,
14,16,18,
20,22

**recommend**
  27:10

**recommendation**
  26:23
  27:3,9
  34:12,19
  35:2,7
  36:17 40:5
  52:19
  53:4,7,14

**recommended**
  12:12
  27:10

**Reconsideratio
n**  21:14

**record**  8:1,
  24 9:1,7,
  18,24
  11:16
  13:10 22:2
  35:23
  44:22,25
  51:12
  54:16,18
  59:19

60:10

**redirect**
  43:17
  46:1,2

**reference**
  13:6

**referring**
  43:5

**regard**  56:12

**regulation**
  41:24
  56:6,7

**regulations**
  8:16 11:21
  13:1,3
  48:2,7,14

**related**
  21:21
  34:25
  48:2,7,13

**relay**  34:14

**relevance**
  39:4,6

**relevant**
  32:6 35:5

**relied**  42:6

**relief**
  55:16,17
  57:15

**rely**  58:13

**remember**
  41:5,18
  49:3 52:24

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024    Index: remembers..sequence

remembers
  49:2

remind  59:6

reminding
  59:8

rental  14:22

renting
  19:20

represent
  26:6

representing
  19:9

request
  21:8,14
  42:8,9
  43:25
  60:3,6

requested
  8:18

requesting
  21:2 44:21

requests
  17:15

require
  32:25
  48:16

required
  15:17
  40:21
  52:23

requirement
  29:13

requirements

11:19
  57:19

res  57:7

research
  14:20

reset  49:8,
  12 50:4
  54:5,8
  56:25 57:2

resource
  11:23

respond
  21:16

response  9:3
  20:11
  21:17

responsibiliti
  es  26:13,17

responsibility
  27:2

responsible
  18:13,14

restricting
  55:4

restroom
  51:2

result  8:17

resume  51:8

retail  49:20

returned
  42:12

reversed

57:8 58:4

review  8:14
  13:12
  14:6,14,16
  42:9 59:13

reviewed
  55:20

revocation
  12:12
  29:16,24
  59:24

revocations
  28:24
  29:1,8,9

revoked
  30:4,5

rifles
  49:21,24

RPS  14:12

rule  57:14

ruled  48:17

ruling  54:5,
  8,9,25
  56:24
  58:15,16,
  19,21

rulings
  57:14

        S

sake  41:23

sales  55:5

schedule
  15:3

scope  55:2,3
  56:2,6

script
  37:22,23
  38:2
  46:16,22

Section  13:3
  32:18
  42:19,25
  43:7 60:5

sell  49:8,
  11,17,19
  50:4

send  44:9,
  10

sense  57:18

sentence
  10:16 54:2

sentences
  35:10,12,
  15,19,22,
  23 36:6,12

separate
  49:10
  55:15

separately
  48:21

September
  8:4 37:7
  54:11

sequence
  34:21

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024          Index: session..time

session
  34:22

set   40:12
  42:5

sets   55:11

Seventh
  57:16

shake   9:2

shop   40:17

showed   19:12

shows   12:7

signed   17:24

similarly
  29:9 31:24

sir   33:18
  44:3 47:14
  54:3

site   20:14
  28:8

space   19:22

speak   8:25
  52:21

speaking
  13:24

special
  11:22 14:9

specific
  33:6 59:13

specifically
  26:17
  31:3,20
  32:14

33:14
38:10 44:5
54:21

spelling
  9:6,10,18,
  23

Spicewood
  18:18,23,
  24

spoke   36:13
  37:18
  42:20,25
  43:1 49:17

standard
  39:16

stands   58:20

started   8:23
  10:24
  24:19

stated   20:12
  27:13

statement
  10:9

states   8:11
  32:2 37:6
  55:9 56:16
  60:6

steps   14:3

stop   13:18

story   58:20

stuff   14:17
  29:22 33:3
  39:23

subject
  49:25

submitted
  15:20
  40:12 60:7

Subpart   8:17

Subsection
  60:5

succeed
  54:17,19,
  22,24

success
  54:25

successful
  11:12

suitable
  13:15

summarize
  24:16

supervisor
  40:22

suppose
  33:25

supposed
  44:15

Supreme
  57:22
  58:19

suspension
  59:25

                T

talk   53:17

talking
  16:15
  18:6,8
  39:22

talks   26:23
  56:1

Tanarra   8:6

Teams   8:5

terms   26:13

testified
  36:20 38:6
  40:10
  41:16
  52:22

testimony
  24:20
  25:14 30:6
  38:13
  42:13
  47:18
  52:25

Texas   18:19
  48:18
  52:1,10

thing   24:16,
  17 46:10,
  15 51:4

things   43:9

time   8:3
  9:1,4 15:8
  17:7,8

**RARE BREED FIREARMS, LLC REVOCATION HEARING**
Revocation Hearing on 09/18/2024                    Index: Title..verify

21:23
23:22
29:21
34:24 35:1
42:10
51:7,9,13

Title 8:16
  13:2 60:5

Tobacco 8:10

today 10:19
  25:14
  38:13
  46:16
  59:19

today's 21:2

told 35:14
  36:17 47:4
  53:2,5

tomorrow
  59:12

Tongue 57:22

topic 50:2

tops 50:23

trade 14:22

trained 11:8

training
  11:10,13

transcript
  8:23
  60:16,18,
  23

transfer
  31:13

32:14
42:22
48:12

transferred
  31:2

transferring
  47:23,25

transpires
  34:24 35:1

transport
  32:3 43:9

transported
  31:19 48:4

trigger 31:4
  32:25
  33:21
  48:16

triggers
  20:9 32:13
  37:2,6,7
  47:24
  48:1,24
  49:1,8,10,
  12,13,25
  50:4 54:5,
  9 56:25
  57:2

Triggers'
  31:3

true 49:5,6

trumps 54:9

type 17:11,
  18,20
  20:1,3

typed 47:4

Typically
  60:18

typo 44:14

        U

U.S. 57:22,
  23

Uh-huh 33:10

ultimate
  54:25

unaffected
  58:15

underneath
  36:25

understand
  28:6,18
  32:19 39:3
  52:9 60:24

understanding
  28:13
  35:11
  36:9,18
  37:14 39:7
  48:25

understood
  36:20,21
  39:6 53:18

unfinished
  19:18

United 8:11
  37:6 60:6

universal

56:4,5

University
  57:23

unlawful
  31:12 32:2
  42:21
  55:12,13
  56:6,7

uppers 49:23

usable 56:12

USC 31:5,
  10,22,24
  32:18
  42:19,24

USC(2) 32:15

Utah 31:20

        V

vacated 58:7

vacates
  55:11

vacatur
  55:19
  56:2,3,5

vacuuming
  13:18

validity
  36:12

verification
  14:18,20

verify
  14:10,20

RARE BREED FIREARMS, LLC REVOCATION HEARING
Revocation Hearing on 09/18/2024          Index: Vess..zoning

| | | | |
|---|---|---|---|
| 36:12 | **Warren**  10:5 | **work**  34:19 | **yesterday** |
| **Vess**  57:17 | **Warrington** | 36:2 50:10 | 25:12 |
| **view**  39:12 | 9:10,11 | 60:20 | **York**  54:10, |
| **violating** | 23:20,25 | **working** | 11 57:13, |
| 48:1,6,13 | 24:3,5,9, | 14:19 | 24 58:3,15 |
| **violation** | 12,18,22 | 34:25 | |
| 31:5,22 | 25:19,24 | **workings** | **Z** |
| 32:15 | **week**  16:24 | 35:4 | **zoning**  14:23 |
| 33:23 | 17:1,4 | **WOT**  39:21, | |
| 34:2,7 | **weeks**  60:19 | 25 52:24 | |
| **violations** | **West**  18:20, | **WOTS**  38:8, | |
| 29:22 | 22 | 11 52:2, | |
| **violator** | **wide**  20:9 | 12,18 | |
| 33:15,19 | 31:4 32:25 | **Wright**  10:6, | |
| **virtually** | 33:21 | 7,20,23 | |
| 8:5 | 47:24,25 | 11:1 24:19 | |
| **visit**  14:19 | 48:16,24 | 26:4,20 | |
| 15:3 30:14 | 49:1 | 35:19 36:8 | |
| 34:17 | **wife**  19:12 | 41:16 | |
| **vivid**  55:8 | **willful** | 43:13 | |
| **voluntary** | 31:5,22 | 46:6,10 | |
| 28:3 | 32:15 | 48:22 | |
| | 33:15,19 | 51:15,18 | |
| **W** | **window's** | **write**  35:18 | |
| | 24:13 | 36:2 | |
| **W-A-R-R-I-N-G-** | **withdrawal** | **writes**  54:22 | |
| **T-O-N**  9:11 | 28:4 | **writing**  8:18 | |
| **W-R-I-G-H-** | **witnesses** | 54:21 | |
| 10:7 | 23:23 | **written** | |
| **wanted**  39:9 | **wondering** | 59:21 | |
| 47:10 | 37:12 | | |
| **wanting** | **words**  33:4, | **Y** | |
| 45:25 | 22 55:19 | **years**  11:6, | |
| | 56:20 | 25 | |

Exhibit E

**Josiah Contarino (Dhillon Law)**



**Subject:**        FW: Rare Breed Triggers proposed scheduling order
**Attachments:**   2024-07-23 Order_MSJ.pdf

**External Email**

**Darwin L. Overson**
Overson & Bugden PLLC
250 East 200 South
Suite 330
Salt Lake City, Utah. 84111
Office: 801-733-1308
Mobile: 208-275-9412
Facsimile: 801-528-1700
darwin@boslaw.com

---

**From:** darwin boslaw.com <darwin@boslaw.com>
**Date:** Tuesday, September 10, 2024 at 6:10 PM
**To:** Elggren, Adam (USAUT) <Adam.Elggren@usdoj.gov>
**Subject:** Re: Rare Breed Triggers proposed scheduling order

I have attached an order out of the Northern District of Texas that we believe impacts our case. The order has application nationwide and requires the return of seized property relating to the claims in our case. Are you available for a call tomorrow?

**Darwin L. Overson**
Overson & Bugden PLLC
250 East 200 South
Suite 330
Salt Lake City, Utah. 84111
Office: 801-733-1308
Mobile: 208-275-9412
Facsimile: 801-528-1700
darwin@boslaw.com

---

**From:** Elggren, Adam (USAUT) <Adam.Elggren@usdoj.gov>
**Date:** Wednesday, July 24, 2024 at 12:26 PM
**To:** darwin boslaw.com <darwin@boslaw.com>
**Subject:** RE: Rare Breed Triggers proposed scheduling order

Yes I am the 915-0192. Can talk now too

1

133

**From:** darwin boslaw.com <darwin@boslaw.com>
**Sent:** Wednesday, July 24, 2024 12:24 PM
**To:** Elggren, Adam (USAUT) <aelggren@usa.doj.gov>
**Subject:** [EXTERNAL] Re: Rare Breed Triggers proposed scheduling order

Are you available? Did I miss your call?


**Darwin L. Overson**
Overson & Bugden PLLC
250 East 200 South
Suite 330
Salt Lake City, Utah. 84111
Office: 801-733-1308
Mobile: 208-275-9412
Facsimile: 801-528-1700
darwin@boslaw.com
-

---

**From:** Elggren, Adam (USAUT) <Adam.Elggren@usdoj.gov>
**Date:** Wednesday, July 24, 2024 at 11:56 AM
**To:** darwin boslaw.com <darwin@boslaw.com>
**Subject:** RE: Rare Breed Triggers proposed scheduling order

Will call now

**From:** darwin boslaw.com <darwin@boslaw.com>
**Sent:** Wednesday, July 24, 2024 11:12 AM
**To:** Elggren, Adam (USAUT) <aelggren@usa.doj.gov>
**Subject:** [EXTERNAL] Re: Rare Breed Triggers proposed scheduling order

Anytime, I am working from home and not really taking anyone's calls except for yours.

**Darwin L. Overson**
Overson & Bugden PLLC
250 East 200 South
Suite 330
Salt Lake City, Utah. 84111
Office: 801-733-1308
Mobile: 208-275-9412
Facsimile: 801-528-1700
darwin@boslaw.com
-

---

**From:** Elggren, Adam (USAUT) <Adam.Elggren@usdoj.gov>
**Date:** Wednesday, July 24, 2024 at 11:03 AM

**To:** darwin boslaw.com <darwin@boslaw.com>
**Subject:** Re: Rare Breed Triggers proposed scheduling order

Yes, I would be available by phone today. What is a good time?

Get Outlook for iOS

---

**From:** darwin boslaw.com <darwin@boslaw.com>
**Sent:** Wednesday, July 24, 2024 8:12:09 AM
**To:** Elggren, Adam (USAUT) <aelggren@usa.doj.gov>; Tawni Bugden <tawni@boslaw.com>
**Cc:** Elder, Travis (USAUT) <TElder@usa.doj.gov>
**Subject:** [EXTERNAL] Re: Rare Breed Triggers proposed scheduling order

Adam,

The scheduling order is fine.  I would like to talk to you about where the case is going from your perspective given the Supreme Court Decision.  Can you call me today for a short conversation?

**Darwin L. Overson**
Overson & Bugden PLLC
250 East 200 South
Suite 330
Salt Lake City, Utah. 84111
Office: 801-733-1308
Mobile: 208-275-9412
Facsimile: 801-528-1700
darwin@boslaw.com
-

---

**From:** Elggren, Adam (USAUT) <Adam.Elggren@usdoj.gov>
**Date:** Thursday, July 18, 2024 at 4:54 PM
**To:** darwin boslaw.com <darwin@boslaw.com>, Tawni Bugden <tawni@boslaw.com>
**Cc:** Elder, Travis (USAUT) <Travis.Elder@usdoj.gov>
**Subject:** Rare Breed Triggers proposed scheduling order

Darwin and Tawni-

As you know, Judge Bennett has ordered us to submit a new schedule. Here is one proposal, attached. Let me know if it will work for you and I will go ahead and file it as a joint motion, and, with your permission, e-sign it for you, Darwin. Thanks-

Adam

Adam S. Elggren | Assistant U.S. Attorney
111 S. Main St. Suite 1800 | Salt Lake City, UT 84111
(801) 524-5682 | adam.elggren@usdoj.gov

3

Exhibit F



FOR GOVERNMENT AGENCY USE ONLY

DATE CLAIM RECEIVED: _____

CLAIM FILED TIMELY?   Y ☐    N ☐

## SEIZED ASSET CLAIM FORM

Name: Kevin Maxwell        Telephone No. (     )_____

Address: 1095 Tower PT

City, State, Zip Code: Geneva  Fl

Agency Case No.: Notice Letter ID - 478273

Asset ID No.: See Attached List

Date & Place of Seizure: 8/4/2023    Fargo, ND

## PART I

List the items in which you claim an interest. Include sufficient information to identify each item, such as make, model, and serial numbers, tail numbers, photographs, and so forth. Additional space is provided on the back of the form. You may attach additional sheets of paper if more space is needed.

1. See Attached List
2. 23-ATF-032144 Thru 23-ATF-033386
3. _____
4. _____
5. _____
6. _____

## PART II

State your interest in each item of property listed above. Please provide any documents that support your claim of interest in these items. Supporting documentation includes titles, registrations, bills of sale, receipts, etc. Additional space is provided on the back of the form. You may attach additional sheets of paper if more space is needed.

Owner - Property Taken from My Offices in Fargo, ND

_____

_____

_____

_____

136

# PART I (continued)

7._____
8._____
9._____

# PART II (continued)

.

_____
_____
_____

# PART III  -  INSURANCE

Did you file an insurance claim for the property you are claiming? ___ NO _____

Did you receive compensation from your insurance company for the property you are claiming?
_____ NO _____

If so, please provide the name and address of your insurance company. _____
_____

# PART IV  -  ATTESTATION AND OATH

I attest and declare under penalty of perjury that my claim to this property is not frivolous and
that the information provided in support of my petition is true and correct, to the best of my
knowledge and belief.

_____        _____10/11/2023_____
**Signature**                                              **Date**

_____Kevin C Maxwell_____
**Name (Print)**

For claims with NFA cost bonds, the cost bond <u>must</u> be in the form of a cashier's check or money order, payable to the
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

A FALSE STATEMENT OR CLAIM MAY SUBJECT A PERSON TO PROSECUTION UNDER TITLE 18, UNITED
STATES CODE, SECTIONS 1001 AND/OR 1621, AND IS PUNISHABLE BY A FINE AND UP TO FIVE YEARS
IMPRISONMENT.

THE DEPARTMENT OF JUSTICE WILL CONTACT YOU CONCERNING YOUR CLAIM WITHIN 120 DAYS
FROM THE DATE OF ITS RECEIPT.

2



U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Washington, DC 20226
www.atf.gov

**OCT 1 9 2023**

406040:  KM
3450

**FEDEX**

Kevin Maxwell
1095 Torren Pt
Geneva,  FL 32732

| | |
|---|---|
| Agency Case Number: | 778015-23-0077 |
| Asset Identification: | See attached list |
| Asset Description: | See attached list |

Dear Mr. Maxwell:

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) received a copy of your Claim for Seized Property (Claim) dated October 12, 2023. We have also received $ 5.000  cost bond cashier's check as required by 19 U.S.C. §1608.  If you do not receive a written response within 120 days regarding the final decision of your Claim, please email the Asset Forfeiture & Seized Property mailbox OM-AFSPD-LRT@atf.gov.

Sincerely,

Asset Forfeiture and Seized Property Division
Bureau of Alcohol, Tobacco, Firearms and Explosives

Exhibit H

# The Law Office of Kevin C. Maxwell

| ATTORNEY | LEGAL ASSISTANT |
|---|---|
| KEVIN C. MAXWELL | LINNETTE M. CONDE |
| KEVIN@KMAXWELLESQ.COM | LINNETTE@KMAXWELLESQ.COM |

September 17, 2024

OM-AFSPD-LRT@atf.gov
U.S. Department of Justice
Bureau of Alcohol, Tobacco,
Firearms and Explosives
Washington, DC 20226

Re: Agency Case Number 778015-23-0077; Asset ID 23-ATF-032144 thru 23-ATF-033386

Dear Sir/Ma'am:

As I am sure you are aware, on July 23, 2024, in case number 4:23-cv-00830-O, United States District Judge Reed O'Connor granted Summary Judgment to the plaintiffs, National Association for Gun Rights, Inc., et al (order attached) of which Rare Breed Triggers, Kevin Maxwell and Lawrence DeMonico were and continue to be members.

As the Court VACATED ATFs' unlawful classification of FRTs as machineguns. This final judgment is determinative of the forfeiture question. Additionally, the Court ORDERED the ATF to return to all parties, including manufacturers, distributors, resellers, and individuals, all FRTs and FRT components confiscated or seized pursuant to their unlawful classification. The deadline for the Government to *complete* certain affirmative actions (returning unlawfully seized FRTs and mailing corrective notices) was extended—not stayed—six months, and **specific requests for return must be acted on "as soon as practicable."** *Id.* at 15. I hereby specifically request, your offices return the property of Rare Breed Triggers (1242 units) taken in the above agency case on or about August 4, 2023, from Rare Breed Triggers office in Fargo ND. I further demand the return of the Five Thousand Dollar ($5,000.00) bond posted by Rare Breed Triggers on or about October 11, 2023.

As it is the apparent practice of your office to not sign your out going correspondence, should your office decline to follow this Court's order and not return my property and bond, I shall need the name of the person who made that decision so I may advise Judge O'Connor accordingly. Be advised I shall treat a failure to respond to this request as a refusal.

You may ship the above-described property to my law office at the address listed below.

Sincerely,

Kevin C. Maxwell

Kevin C. Maxwell, Esq.

255 Primera Blvd. Ste 160, Lake Mary Florida 32746
Telephone: (407) 480-2179
Fax: (407) 804-9769

139

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:23-cv-00830-O |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF ATTORNEY
GARY M. LAWKOWSKI**

I, Gary M. Lawkowski, being duly sworn, hereby depose and say as follows:

1.  I am a partner with the law firm of Dhillon Law Group Inc., which represents Plaintiffs in this matter.

2.  I submit this certification in support of Plaintiffs' motion for contempt.

3.  On September 1, 2024, ATF held a press conference: https://www.c-span.org/video/?538197-1/justice-department-meeting-machine-gun-conversion-devices

4.  During this press conference, ATF Director Steven M. Dettelbach stated that machinegun conversion devices ("MCDs") are illegal machineguns. *Id.* at 11:20-34.

5.  Deputy Attorney General Lisa Monaco announced a department-wide directive to combat MCDs. *Id.* at 25:20-32.

6.  United States Attorney for the Western District of Virgina, Christopher Kavanaugh, is a liaison to ATF. *Id.* at 34:22-37. In speaking about machinegun conversion devices, 35:48 – 36:01, US Attorney Kavanaugh specifically referenced FRTs and the E.D.N.Y.

1

lawsuit, stating that a "firearms company [] was illegally selling forced reset triggers, a device designed to convert AR-15 type rifles into machineguns themselves," *id.* at 37:18-36.

7.      Although not required for Individual Plaintiffs, Plaintiff Patrick Carey wrote to ATF to request the release of his FRTs.

8.      On September 24, 2024, the ATF reached out to Plaintiff's counsel to facilitate the return of Mr. Carey's FRTs.

9.      On October 21 and 22, 2024, I exchanged communications with ATF Agent Trey Landry to facilitate the release of Mr. Carey's FRTs.

10.     On October 28, 2024, ATF informed me that "the release has been denied" and that they "have some other lawyers getting involved so we can get this resolved."

11.     Thereafter, I wrote to Defendants' counsel to meet and confer on ATF's denial to Mr. Carey, along with ATF's other violations of this Court's orders. Attached as **Exhibit A** is a copy of the email communication between Gary Lawkowski and Laura B. Bakst (Oct. 28, 2024 – Nov. 5, 2024).

12.     Only after this meet and confer did ATF comply with its obligation to return Mr. Carey's triggers.

13.     Attached as **Exhibit B** is a copy of the United States of America's opposition brief in *U.S.A. v. Miscellaneous Firearms and Related Parts Listed in Exhibit A*, 1:23CV00017-TC-JCB (D. Utah Nov. 14, 2024).

Executed on November 26, 2024.

/s/Gary M. Lawkowski
GARY M. LAWKOWSKI

Exhibit A

## Josiah Contarino (Dhillon Law)

 

**Subject:**                    Fwd: Meet and Confer re: NAGR v. Garland, Case 4:2023-cv-00830-O

Sent from my iPhone

Begin forwarded message:

> **From:** "Bakst, Laura B. (CIV)" <Laura.B.Bakst@usdoj.gov>
> **Date:** November 5, 2024 at 12:17:45 PM EST
> **To:** "Gary Lawkowski (Dhillon Law)" <GLawkowski@dhillonlaw.com>
> **Cc:** "David Warrington (Dhillon Law)" <DWarrington@dhillonlaw.com>, "Jonathan Shaw (Dhillon Law)"
> <JShaw@dhillonlaw.com>, Glenn Bellamy <gbellamy@whe-law.com>, Whit Davis <whit@ekdlaw.com>,
> Julian Whitley <julian@ekdlaw.com>, "Michael Columbo (Dhillon Law)" <MColumbo@dhillonlaw.com>, "Erin
> Potter (Dhillon Law)" <EPotter@dhillonlaw.com>, "Resar, Alexander W. (CIV)"
> <Alexander.W.Resar@usdoj.gov>, "Clendenen, Michael P. (CIV)" <Michael.P.Clendenen@usdoj.gov>
> **Subject: RE: Meet and Confer re: NAGR v. Garland, Case 4:2023-cv-00830-O**

**External Email**

Gary,

Regarding Mr. Acosta and Mr. Thompson, our understanding is that neither has provided proof that they
were members of NAGR at the time the suit was filed. If you are able to represent that they were
members of NAGR as of August 9, 2023, ATF will proceed with the return process. Regarding Mr. Trapp,
our understanding is that he did not claim to ATF to be a member of NAGR, much less provide proof of
membership. Additionally, Mr. Trapp's FRT was forfeited and destroyed prior to entry of any injunctive
relief in this case.

Laura B. Bakst
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-3183

**From:** Gary Lawkowski (Dhillon Law) <GLawkowski@dhillonlaw.com>
**Sent:** Friday, November 1, 2024 5:16 PM
**To:** Bakst, Laura B. (CIV) <Laura.B.Bakst@usdoj.gov>
**Cc:** David Warrington (Dhillon Law) <DWarrington@dhillonlaw.com>; Jonathan Shaw (Dhillon Law)
<JShaw@dhillonlaw.com>; Glenn Bellamy <gbellamy@whe-law.com>; Whit Davis <whit@ekdlaw.com>;
Julian Whitley <julian@ekdlaw.com>; Michael Columbo (Dhillon Law) <MColumbo@dhillonlaw.com>;
Erin Potter (Dhillon Law) <EPotter@dhillonlaw.com>; Resar, Alexander W. (CIV)

1

<Alexander.W.Resar@usdoj.gov>; Clendenen, Michael P. (CIV) <Michael.P.Clendenen@usdoj.gov>
**Subject:** [EXTERNAL] RE: Meet and Confer re: NAGR v. Garland, Case 4:2023-cv-00830-O

To follow up:

1. I believe Mr. Trapp contacted the Tulsa Field Office and/or spoke with Agent Ashley Stevens

2. I believe Mr. Acosta interacted with the Fargo Field Office and/or Jeremy Schimdt.

3. I believe Mr. Thompson spoke with Agent Kevin Marsh.

Please let us know the status of their requests.

Sincerely,

*Gary M. Lawkowski*
Partner
Dhillon Law Group
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
703-574-1654
GLawkowski@dhillonlaw.com

*This communication and any attachments may contain information that is confidential, privileged, or otherwise protected by law and are only intended for use by the person to whom they are addressed. If you are not the intended recipient, do not copy, disclose, disseminate, or otherwise distribute this communication or any attachments. If you have received this communication in error, please contact the sender as soon as possible and delete this message and any attachments.*


**From:** Bakst, Laura B. (CIV) <Laura.B.Bakst@usdoj.gov>
**Sent:** Monday, October 28, 2024 3:33 PM
**To:** Gary Lawkowski (Dhillon Law) <GLawkowski@dhillonlaw.com>
**Cc:** David Warrington (Dhillon Law) <DWarrington@dhillonlaw.com>; Jonathan Shaw (Dhillon Law) <JShaw@dhillonlaw.com>; Glenn Bellamy <gbellamy@whe-law.com>; Whit Davis <whit@ekdlaw.com>; Julian Whitley <julian@ekdlaw.com>; Michael Columbo (Dhillon Law) <MColumbo@dhillonlaw.com>; Erin Potter (Dhillon Law) <EPotter@dhillonlaw.com>; Resar, Alexander W. (CIV) <Alexander.W.Resar@usdoj.gov>; Clendenen, Michael P. (CIV) <Michael.P.Clendenen@usdoj.gov>
**Subject:** RE: Meet and Confer re: NAGR v. Garland, Case 4:2023-cv-00830-O


**External Email**

Gary:

ATF takes its compliance obligations with the Court's order extremely seriously. At this point, we can confirm that ATF is working to effectuate return of Mr. Carey's device and is investigating the remaining allegations contained in your email. To that end, please provide the name of the agent(s) and/or office(s) that Mr. Acosta II, Mr. Trapp, and Mr. Thompson contacted.

Defendants are continuing to evaluate the remaining claims made in your email. However, as to the return of devices to Rare Breed Triggers, LLC, Defendants note that the injunction covers members only "to the extent that it does not interfere with other courts, such as the Eastern District of New York's civil

2

jurisdiction over the Rare Breed Parties and other pending criminal cases against individuals already subject to prosecution." ECF No. 101 at 2.

As to the statements that Plaintiffs claim were made at the FFL hearing, Defendants note that another federal district court has decided that the devices at issue are likely machineguns, and that the Northern District of Texas court's determination that the devices are not machineguns did not purport to (and could not) vacate that decision.

Best,

Laura B. Bakst
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-3183

**From:** Gary Lawkowski (Dhillon Law) <GLawkowski@dhillonlaw.com>
**Sent:** Monday, October 28, 2024 10:53 AM
**To:** Bakst, Laura B. (CIV) <Laura.B.Bakst@usdoj.gov>; Clendenen, Michael P. (CIV) <Michael.P.Clendenen@usdoj.gov>; Resar, Alexander W. (CIV) <Alexander.W.Resar@usdoj.gov>
**Cc:** David Warrington (Dhillon Law) <DWarrington@dhillonlaw.com>; Jonathan Shaw (Dhillon Law) <JShaw@dhillonlaw.com>; Glenn Bellamy <gbellamy@whe-law.com>; Whit Davis <whit@ekdlaw.com>; Julian Whitley <julian@ekdlaw.com>; Michael Columbo (Dhillon Law) <MColumbo@dhillonlaw.com>; Erin Potter (Dhillon Law) <EPotter@dhillonlaw.com>
**Subject:** [EXTERNAL] Meet and Confer re: NAGR v. Garland, Case 4:2023-cv-00830-O

Dear Counsel;

I am writing to meet and confer regarding the Government's failure to comply with the Court's July 23 and August 20 orders.

As you are aware, the court ordered the Government to return all FRTs and FRT components confiscated or seized pursuant to the unlawful classification of FRTs as machineguns. While the August 20 Order extended the time for compliance with the Court's affirmative obligations, it made clear "[t]his extension does NOT apply to the Individual Plaintiffs or members of the Organizational Plaintiffs who specifically request the return of their FRT devices and provide sufficient documentation to the ATF. ATF shall return those as soon as practicable following the specific request."

It is clear that the Government is not following this order.

First, Mr. Patrick Carey is an individual plaintiff. As such, he is known to the ATF and should not have to request the return of his devices. Nevertheless, he did so on or about September 5, 2024. Those devices still have not been returned. To the contrary, ATF agent Trey Landry informed counsel for Mr. Carey that the release of Mr. Carey's devices has been denied. This is a particularly flagrant violation of the Court's order given that Mr. Carey is a named plaintiff in the case; there is and can be no question regarding his entitlement to have his devices returned.

Second, Mr. Brian Trapp is a member of NAGR. He requested the return of his FRT following the Court's July decision and again following the Court's August order. The ATF has refused to return his FRT.

Third, Mr. Edgar Acosta II is a member of NAGR. Following the Court's July order, he requested the return of his FRT. The ATF refused.

Fourth, Mr. Chris Thompson is a member of NAGR. On August 6, 2024, he requested the return of his WOT. Following an August 20, 2024 conversation with the ATF, Mr. Thompson provided proof of his NAGR membership. The ATF refused to return his WOT, claiming his membership did not qualify.

Fifth, the Government is continuing to refuse to return FRTs to Rare Breed Triggers, LLC, which is a known NAGR member.

Finally, the Government has suggested in an FFL hearing held in Texas involving a known NAGR member that FRTs are machineguns, notwithstanding the Court's declaration and vacatur to the contrary.

These actions suggest a systemic disregard for the Court's order.

Please confirm by close of business today that you will correct these violations or we will be forced to bring this matter to the attention of the Court.

Sincerely,

*Gary M. Lawkowski*
Partner
Dhillon Law Group
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
703-574-1654
GLawkowski@dhillonlaw.com

*This communication and any attachments may contain information that is confidential, privileged, or otherwise protected by law and are only intended for use by the person to whom they are addressed. If you are not the intended recipient, do not copy, disclose, disseminate, or otherwise distribute this communication or any attachments. If you have received this communication in error, please contact the sender as soon as possible and delete this message and any attachments.*

4

# Exhibit B

TRINA A. HIGGINS, United States Attorney (7349)
ADAM S. ELGGREN, Assistant United States Attorney (11064)
TRAVIS K. ELDER, Assistant United States Attorney (11987)
Attorneys for the United States of America
111 South Main Street, Suite 1800 | Salt Lake City, Utah 84111
Tel: (801) 524-5682 | travis.elder@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MISCELLANEOUS FIREARMS AND RELATED PARTS AND EQUIPMENT LISTED IN EXHIBIT A,<br><br>Defendants *in rem*. | **RESPONSE TO MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:23CV00017-TC-JCB<br><br>Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |
| Rare Breed Triggers, LLC<br><br>Third-Party Claimant. | |

COMES NOW the Plaintiff United States of America and files the following Response to Third-Party Claimant Rare Breed Triggers' Motion for Summary Judgment (Dkt. No. 30) and respectfully requests the Court deny the Motion. While the government agrees that there is no material dispute between the parties as to the basic operation of the FRT-15, and that the only legal question before the court is whether FRT-15s and their component parts are machineguns under the statutory definition, the government believes the court would benefit from a hearing to better understand the technical operation of the FRT-15 and its rightful application to the statutory machinegun definition in 26 U.S.C. § 5845(b).

1

# BACKGROUND

## A.  Investigation and Procedural Posture

The National Firearms Act ("NFA") defines various firearms, including machineguns; and requires the registration of firearms under certain conditions.[1]  In 1986, Congress outlawed the possession and distribution of machineguns with exceptions that are not applicable here. This is codified in 18 U.S.C. § 922(o).  The NFA defines "machinegun" as follows:

> **(b) Machinegun**
> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).[2]

In the Spring of 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began an investigation into the FRT-15[3], an aftermarket drop-in replacement trigger manufactured and sold by Rare Breed Triggers, LLC ("RBT"), that ATF suspected might constitute a machinegun under federal law. In or about June of 2021, ATF sent the FRT-15 to its Firearms and Ammunition Technology Division ("FATD") for an examination to determine

---

[1] The NFA, 26 U.S.C. § 5845(a) *et seq,*
[2] The Gun Control Act defines "machinegun" by reference to the NFA definition.  *See* 18 U.S.C. § 921(a)(24).
[3] "FRT-15" and "RBT Trigger" will be used similarly throughout this brief.

2

whether the FRT-15 met the statutory definition of a machinegun.[4] On or about July 15, 2021, FATD issued a report, concluding that the FRT-15 is a machinegun under federal law.

The FATD found, in part, that "a device designed to prevent the hammer from positively resetting [like the RBT Trigger] could cause a firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, and would also be classified as a combination of parts designed and intended, for use in converting a weapon into a machinegun; thus a "machinegun" as defined in 26 U.S.C. § 5845(b)."[5]

Subsequently, on multiple occasions but including on July 27, 2021, ATF issued cease and desist letters to RBT and its principals, demanding the cessation of manufacturing and distribution of the RBT Trigger.[6] On multiple occasions but including on about August 19, 2021, RBT President Lawrence Demonico expressed that RBT would not be complying with the cease-and-desist letters.[7]

Following subsequent investigation, and pursuant to federal law, ATF agents seized FRT-15s on three separate occasions, from three separate locations: On or about March 26, 2022, Agents seized FRT-15s and component parts from a third-party contractor, 3rd Gen Machine, in Logan Utah; on or about April 15, 2022, agents seized another group of FRT-15s and component parts from a vehicle DeMonico was driving near Albuquerque, New Mexico; and in or about December 2022, agents seized a third group of FRT-15s from another third-party contractor, North East Coatings in Sanford, Maine.[8]

---

[4] *See* Verified Complaint for Forfeiture *In Rem* ("Complaint"), Dkt. No. 2, at p. 4.
[5] *Id.* at p. 8.
[6] *Id.* at p. 10.
[7] *Id.* at p. 11.
[8] *Id.* at pp. 13-15.

3

On February 14, 2023, Plaintiff United States filed a Verified Complaint for Forfeiture *In Rem*, Dkt. No. 2, against the defendants, the miscellaneous firearms and parts seized by ATF the previous year. The Complaint cites seven separate Causes of Action by which the FRT-15s are subject to forfeiture to the United States as machineguns, including the following federal statutes: 18 U.S.C. § 924(d) (forfeiture of firearms involved in violations of 18 U.S.C. § 922(o) or 18 U.S.C. § 922(a)(4)); and 26 U.S.C. § 5872 (forfeiture of firearms involved in violations of 26 U.S.C. § 5861(d), 26 U.S.C. § 5861(e), 26 U.S.C. § 5861(f), 26 U.S.C. § 5861(i), or 26 U.S.C. § 7302)).

On March 30, 2023, RBT filed a claim for the defendant property. Dkt. No. 6. About eighteen months later, the Claimant filed the instant Motion for Summary Judgment, Dkt. No. 30. In between the two filings, litigation over the legality of the FRT-15 was conducted in jurisdictions outside the District of Utah.

Prior to the filing of the complaint in this matter, litigation commenced in the Eastern District of New York over the FRT-15.[9]  The New York court determined on September 5, 2023, at the preliminary injunction stage, that "the Government has demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun." On July 23, 2024, the U.S. District Court in the Northern District of Texas issued a final order granting summary judgment against the United States[10] which enjoined the government from undertaking various enforcement actions against some of the parties to that suit premised on the view that the FRT-15 is a machinegun and purported to vacate ATF's classification of the FRT-

---

[9] *U.S. v. Rare Breed Triggers, LLC, et al*, E.D.N.Y 2024. This litigation also concerns the question of whether the FRT-15 is a machine guns and is ongoing.
[10] *National Association for Gun Rights, Inc. v. Garland*, 423-cv-0830 (N.D. Tex. July 23, 2024), 2024 WL 3517504.

15. Additionally, on June 14, 2024, the U.S. Supreme Court handed down a decision in *Garland v. Cargill*, 602 U.S. 406 (2024), that invalidated an ATF regulation classifying "bump stocks"[11] as machineguns.

 Claimant RBT filed the instant Motion for Summary Judgment on September 26, 2024. Dkt. No. 30.

**B. The Eastern District of New York**

 On January 23, 2023, the United States filed a complaint in the Eastern District of New York under the Fraud Injunction Act, 18 U.S.C. § 1345 against Claimant, its owner, Kevin Maxwell, Lawrence DeMonico, and an associated entity, Rare Breed Firearms, LLC, ("Rare Breed Parties") alleging that they engaged in mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, a conspiracy to defraud the United States under 18 U.S.C. § 371, and conspiracy to commit wire and mail fraud under 18 U.S.C. § 1349, with respect to their marketing, manufacture, sale, and distribution of the FRT-15. *See United States v. Rare Breed Triggers, LLC,* 690 F. Supp. 51, 59 (EDNY 2023). After holding a preliminary injunction hearing on August 1 and 2, 2023, the New York Court issued a preliminary injunction restraining the Rare Breed Parties from engaging in any sales of the FRT-15, forced reset triggers, and other machinegun conversion devices ("MCDs"). *Id.* at 123. The preliminary injunction extends, in addition to the named defendants, to "their agents, officers, employees, and all other persons and entities in active concert or participation with them…." *Id.* In issuing the preliminary

---

[11] A bump stock does not modify the trigger of a rifle in any way but instead replaces, or attaches to, the back end of a semiautomatic rifle. Essentially, when the rifle is fired, the bump stock harnesses the gun's own backward force to push forward off of the operator. This creates a back-and-forth motion that, as long as constant pressure is put on the trigger, can result in multiple firings of the weapon without ever releasing and re-pulling the trigger.

injunction, the Court determined that "the Government has demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun." *Id.* at 75, 88. The preliminary injunction is on appeal at the Second Circuit. *See* Case No. 23-7276 (2d Cir. 2023).

### C.     The Northern District of Texas

On August 9, 2023, while this matter and the matter in EDNY were pending, and after the Court in EDNY held its preliminary injunction hearing, an organization called the National Association of Gun Rights, along with others, filed suit in the Northern District of Texas asserting that the FRT-15 is not a machinegun. *National Ass'n for Gun Rights, Inc., et al., v. Garland, et al.*, No. 23-cv-830 (N.D. Texas) (hereinafter "*NAGR*"), Dkt. 1. Though Claimant did not reveal at the time of the filing of the complaint in NDTX that it was a member of NAGR, it asserted that it was a member at summary judgment. *NAGR* Dkt. 62 at 30-31. The Texas court initially entered a preliminary injunction. In doing so, it made clear that "to the extent" the Rare Breed Parties "are members of any Organizational Plaintiff" in that case, its injunction did not apply to those parties, citing the need to avoid "trenching on the E.D.N.Y. decision." *NAGR*, Dkt. 53, at 43-44. The parties cross-filed for summary judgment. On July 23, 2024, the court in Texas ruled in favor of the plaintiffs and the next day entered a Final Judgment. *See NAGR*, Dkts. 100-01. The court vacated ATF's classification of the FRT-15 as an illegal machinegun and enjoined the Government from taking criminal or civil enforcement actions against certain parties to that suit who made, sold, or possessed FRT-15s. In its opinion, however, the Texas court recognized that the Eastern District of New York had already entered an injunction against Claimant, and that other cases implicating the FRT-15 may be pending. *See National Ass'n for*

6

*Gun Rights, Inc. v. Garland*, ___ F. Supp. 3d ___, 2024 WL 3517504 at *27 (N.D. Texas July 23, 2024).  Accordingly, the Texas court applied the injunction only "to the extent that it does not interfere with other courts, such as the civil jurisdiction over the Rare Breed Parties and other criminal cases against individuals already subject to prosecution." *NAGR*, Dkt. 101 at 2.

The Texas court's final judgment has been appealed to the Fifth Circuit.  Dkt. 24-10707 (filed August 1, 2024).

**D.     *Garland v. Cargill***

On June 14, 2024, the Supreme Court issued its decision in *Garland v. Cargill*, 602 U.S. 406 (2024), in which the Court held that non-mechanical bump stocks—a different device than the FRT-15—are not machineguns under the statutory definition.  In doing so, it vacated an ATF regulation issued after an October 2017 mass shooting in Las Vegas, Nevada, in which the assailant, utilizing firearms equipped with bump stocks, murdered 58 people and wounded over 500 people.  The ATF regulation sought to clarify the statutory definition of a "machinegun," and the term "single function of the trigger" to include non-mechanical bump stocks as falling within these definitions.  *See generally, id.*

Importantly, *Cargill* dealt only with non-mechanical bump stocks and their use on firearms with standard semi-automatic triggers.  The FRT-15 is neither a non-mechanical bump stock nor a standard semi-automatic trigger.  Further, *Cargill* explains the mechanical operation of a semi-automatic trigger and directs courts to consider a firearm's entire firing cycle to determine whether a firearm is a statutory machinegun.  As will be discussed, *Cargill* supports ATF's long time view, consistent with the Eastern Districts of New York's findings, that the FRT-15 is a machinegun under the statutory definition.

7

153

**E.**     **Facts Not in Dispute**

1.     <u>The Claimant's List of "Undisputed Facts"</u>

a.     The Defendant Property consists entirely of forced reset triggers and component parts thereof ("FRTs"), specifically, Rare Breed Triggers FRT-15 and Wide Open Triggers WOT.

RESPONSE: Undisputed as to characterization of Defendant Property consisting entirely of FRT-15s and component parts.

b.     *NAGR* court vacated the ATF's classification of FRTs, including the Rare Breed Triggers FRT-15 and Wide Open Triggers WOT, as machineguns and expressly declared that FRTs are *not* machineguns.

RESPONSE: Undisputed as to what the *NAGR* court stated in its ruling. The parties dispute the legal significance and application of the ruling. Additionally, the ruling itself is under appeal and may not stand.

c.     In its judgment, the *NAGR* court specifically addressed and included the Rare Breed Triggers FRT-15 and Wide Open Triggers WOT.

RESPONSE: Undisputed. Again, the parties dispute the significance and application of the *NAGR* court's ruling.

d.     In its judgment, the *NAGR* court specifically identified Rare Breed Triggers as a member of the plaintiff organization.

RESPONSE: Undisputed that the *NAGR* court identified Rare Breed Triggers as member of the plaintiff organization, but the United States is contesting whether Rare Breed Triggers was properly shown to be a member of NAGR at the time

8

the suit was filed.  The United States does not concede that Rare Breed Triggers is entitled to any relief or was properly a party to the *NAGR* court's decision.

2.    There Is No Disagreement About How the FRT-15 Operates

As discussed, the manner in which the FRT-15 operates has been litigated before two district courts.  The United States believes the parties agree about its basic operation.  *See Rare Breed Triggers*, 690 F.Supp.3d at 62 ("Importantly, although the parties disagree as to whether the FRT-15 satisfies the legal definition of a machinegun, the parties do agree how the FRT-15 works as a technical matter, as compared to standard semi-automatic and automatic triggers."); *NAGR*, 2024 WL 3517504, at * 5 ("[T]he hearing made clear that there are no factual disputes regarding how [the FRT-15] work[s].  Instead, the hearing confirmed that the parties' dispute centers entirely on a legal question: whether [the FRT-15] qualif[ies] as [a] machinegun[] under the statutory definition.").  A full discussion of the FRT-15's cycle of operation can be found in *Rare Breed Triggers*, 690 F.Supp.3d at 64-65.

## ARGUMENT

**A.    Legal Standard for Summary Judgment**

The United States generally agrees with the Claimant's description of the appropriate legal standard to apply when reviewing a motion for summary judgment,[12] but would add the following: "Rule 56 … requires a district court to enter judgment on a claim or defense if 'there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Dupree v. Younger*, 596 U.S. 729, 731 (2023) (citing Fed. R. Civ. P. 56(a)).  Additionally,

---

[12] *Motion*, Dkt. No. 30 at 9-10.

summary judgment motions may be denied if the law is not on the movant's side. *Id.* at 737 ("Rule 56 … contemplates that the court will sometimes deny the motion because the facts are genuinely in dispute and other times because the law does not support the movant's position.") Courts must correctly apply the substantive law in granting a motion for summary judgement. *Clifton v. Craig*, 942 F.2d 182, 183 (1991). Finally, if "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-251 (1986) (analogizing summary judgment and directed verdict).

**B.**     <u>Claimant Is Not Entitled to Judgment as a Matter of Law</u>

Claimant is not entitled to summary judgment because the devices at issue here are machineguns as defined under Federal law. Claimant's argument to the contrary misreads Supreme Court precedent and improperly attempts to rely on a decision from another district court that expressly preserves this Court's ability to independently decide the merits.

**1.**     **The FRT-15 is a Machinegun**

The primary question in dispute is whether the FRT-15 is a machinegun under federal statutes. 18 U.S.C. § 921(a)(23) provides that the term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act. 26 U.S.C. § 5845(b) in turn defines machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically, more than one shot, without manual reloading, by a single function of the trigger." The provision goes on to define the term to include, in pertinent part, "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun…." 26 U.S.C. § 5845(b). These parts and combinations of parts, are generally referred to a "machinegun conversion devices" or "MCDs."

10

The term "forced reset trigger" is an industry term without a statutory definition. The FRT-15s at issue in this matter replaces the standard trigger assembly on a semiautomatic rifle and allow a shooter to engage the trigger once to fire the weapon repeatedly so long as the shooter continues to engage the trigger. In doing so, firearms equipped with an FRT-15 achieve rates of fire comparable to, or exceeding those, of commercially manufactured machineguns. The manner in which a forced reset trigger modifies or converts a semiautomatic firearm may bring the device within the definition of "machinegun" provided in 26 U.S.C. § 5845(b). This determination requires a factual assessment of the technical operation and function of the device, and application of that those facts to the statutory definition. ATF has long viewed devices operating on similar mechanical principles as those possessed by Defendant to be machineguns under federal law. *See Rare Breed Triggers,* 690 F. Supp.3d at 65-70 (discussing a predecessor device to the FRT-15 determined by ATF in 2018 to meet the statutory definition of a machinegun, and a similar device determined by ATF to meet the statutory definition of a machinegun in 2006).

As the Supreme Court stated in *Cargill,* a semiautomatic firearm with a standard trigger assembly, will fire "only one time" when the shooter "engag[es] the trigger," and "[t]he shooter must release and reengage the trigger to fire another shot." *Cargill,* 602 U.S. at 411-12. It is this manual "release" and "reengagement" that is the mechanical hallmark of a semiautomatic firearm. In contrast, "[m]achineguns can ordinarily achieve higher rates of fire than semiautomatic firearms because the shooter does not need to release and reengage the trigger between shots." *Id.* at 412. In other words, with a semiautomatic firearm, the shooter must

11

release the trigger to fire again; with a machinegun, the shooter must release the trigger to stop firing.

*Cargill* identifies several distinct mechanical components that will be present in a semiautomatic trigger assembly:

> The trigger is a simple lever that moves backward and forward. The square point at the top ledge of the trigger locks into a notch at the bottom of the hammer. The hammer is a spring-loaded part that swings forward toward the barrel and strikes the firing pin, causing a shot to fire. The disconnector is the component responsible for resetting the hammer to its original firing position after a shot is fired.

*Id.* at 417 (internal citations omitted). The Court then goes on to describe the cycle of operations in such a trigger:

> When the shooter engages the trigger by moving it backward … the square point of the trigger pivots downward…. This movement releases the spring-loaded hammer….
>
> At the top of the hammer's rotation, it strikes the firing pin, causing the weapon to fire a single shot.
>
> The firearm than ejects the spent cartridge from the chamber and loads a new one in its place. The mechanism that performs this task swings the hammer backward at the same time.
>
> As the hammer swings backward, it latches onto the disconnector. This latching … prevents the hammer from swinging forward again after a new cartridge is loaded into the chamber. The disconnector will hold the hammer in that position for as long as the shooter holds the trigger back, thus preventing the firearm from firing another shot.
>
> Finally, when the shooter takes pressure off the trigger and allows it to move forward … the hammer slips off the disconnector…. The trigger mechanism is thereby reset to the original position…. **A semiautomatic rifle must complete this cycle for each shot fired**.

*Id.* at 418-21 (emphasis added) (internal citations and illustrations omitted).

12

Importantly, in addition to noting that a semiautomatic firearm must complete this entire cycle for each shot fired, the Court stated that "this complete process is what constitutes a 'single function of the trigger." *Id.* at 421.  Thus, for purposes of the statutory definition of machinegun, the court must look to the entire firing cycle to determine whether a firearm "shoots, is designed to shoot, or can be readily restored to shoot, automatically, more than one shot, without manual reloading, by a single function of the trigger." *See* 26 U.S.C. § 5845(b).

As noted by the Court in *Cargill*, the need for release and reengagement in a semiautomatic firearm results from the operation of a component called the "disconnector," which prevents the firearm from firing again by retaining the weapon's "hammer" (the component that strikes the firing pin for each shot) until the trigger is released.  *Id.* at 419-21.  The disconnector stops the firing cycle, requiring a separate and distinct function of the trigger to fire another shot.  *Id.* at 420.

By contrast, a machinegun firing automatically does not use a disconnector.  Machineguns, like the M-16, instead employ a component called an "auto sear."  The auto sear "catches the hammer as it swings backwards, but will release [the hammer] again once a new cartridge is loaded if the trigger is being held back."  *Id.* at 420 n.4.  Functionally, the auto sear briefly retains the hammer between shots to allow the weapon to safely reload, and then is automatically tripped by the "bolt carrier" of the weapon to fire the next shot.  In this way, the auto sear serves two functions: (i) where present, it disengages the disconnector to allow automatic, continuous fire by a single function of the trigger; and (ii) it times the cycle of operation so that the hammer is released only when the next cartridge is properly chambered in order to avoid a malfunction.

13

159

Like the machineguns and auto sears discussed in *Cargill*, the FRT-15 also eliminates the need for the shooter to release and reengage the trigger between shots. Instead, the FRT-15 converts a semiautomatic firearm by replacing the entire standard semiautomatic trigger assembly to allow the shooter to engage the trigger only once to fire continuously. The FRT-15 lacks a disconnector to interrupt the firing cycle – the hallmark component of a standard semiautomatic trigger assembly. *See Cargill*, 602 U.S. at 417-21.

When the shooter engages the trigger, the trigger assembly will continue the firing cycle, causing the weapon to fire more than one round, automatically, until the shooter disengages the trigger or the firearm's ammunition supply is exhausted. The devices achieve automatic fire through a component called the "locking bar" which serves the same purpose as an auto sear. This component momentarily delays release of the hammer—timing the firearm as an auto sear would do—until the weapon is ready to be fired in order to prevent a malfunction. Like an auto sear, the locking bar is tripped by the bolt carrier[13] to enable the subsequent shot. The chief difference between an auto sear and the locking bar is that while an auto sear retains the hammer directly, the locking bar does so indirectly by briefly restraining the movement of the trigger as the shooter continues the initial engagement. In a firearm equipped with one of these devices, the trigger moves as part of the automatic mechanical process of retaining and releasing the hammer. But that difference does not change the status of the devices: with both types of firing mechanisms (auto sear and locking bar), the hammer is automatically and repeatedly released by

---

[13] An M16 machinegun uses a machinegun bolt carrier which has a sear trip surface area that trips the automatic sear disengaging the hammer from the automatic sear. To function properly, the FRT-15 must be used in a firearm equipped with a machinegun bolt carrier so the sear trip surface area may interact with the locking bar in the same manner as the automatic sear in a machinegun.

a single engagement—"single function"—of the trigger, and the firearm will continue to fire automatically so long as the shooter continues to engage the trigger.

That conclusion is further reinforced by *Cargill*'s discussion of the statutory definition as a whole. As the Court observed, "Congress defined a machinegun by what happens 'automatically' 'by a single function of the trigger,'" and "[s]imply pressing and holding the trigger down on a fully automatic rifle ... is what causes the trigger to function in the first place." *Cargill*, 602 U.S. at 408; *accord Cargill v. Garland*, 57 F.4th 447, 463 (5th Cir. 2023) (en banc) (plurality opinion) ("[T]he act of pulling and holding the trigger is one function, and that function produces more than one shot."). The same is true here: as the *Rare Breed Triggers* court observed, "the repetitive mechanism in the FRT-15 is entirely self-executing until the shooter releases the trigger, notwithstanding that the trigger mechanically pushes against the shooter's finger throughout the process." 690 F. Supp. 3d at 84.

In sum, the FRT-15 is a machinegun because the shooter engages the trigger just once to initiate the firing sequence, and that single engagement begins an automatic cycle of fire that is the product of "a single function of the trigger."

## 2. *NAGR* is Unavailing to Claimants

### a. The Texas Court Applied the Wrong Standard Under *Cargill*

The *NAGR* court read *Cargill* as establishing—and reaffirming its own view—that the statutory "definition is solely concerned with the mechanical operation of the trigger rather than the actions of the user," and concluded that "the operative mechanical function of the trigger is to release the hammer." *NAGR*, 2024 WL 3517504, *19. In the Texas court's view, FRT-15s are not machineguns because "for each and every round fired, the trigger moves forward into its

reset state and is depressed to release the hammer from its sear surface," which the district court regarded as multiple separate "functions" of the trigger. *Id.* Thus, the *NAGR* court concerned itself with only one aspect of the firing cycle – the release of the hammer – without taking into consideration the entire firing cycle.

For several reasons, *Cargill* did not embrace the rule the Texas court adopted. First, *Cargill* repeatedly emphasized that with a semiautomatic weapon a shooter "must release and reengage the trigger to fire another shot," while with a machinegun "a shooter can fire multiple times, or even continuously, by engaging the trigger only once." 602 U.S. at 410-411. The *NAGR* court did not address this language, or the Court's explanation that the "complete process" of "a 'single function of the trigger'" includes not only the initial engagement of the trigger but also the subsequent disengagement of the trigger by "tak[ing] pressure off" the trigger. *Id.* at 420.

Second, *Cargill* did not pin the "function of the trigger" exclusively to the release of the hammer. Rather, the release of the hammer is only one part of the complete firing cycle. *Id.* at 417-21. Instead, *Cargill* addressed several steps in the mechanical process—and the shooter's acts of engagement and disengagement required to carry out the mechanical process—that together constitute the entire firing cycle. It was this complete firing cycle that *Cargill* identified as the "function of the trigger." *Id.* at 421 ("A semiautomatic rifle must complete this cycle for each shot fired[]" and "ATF does not dispute that this complete process is what constitutes a 'single function of the trigger.'").

Third, the Texas court failed to consider the role of the disconnector in a standard semiautomatic rifle, much less the mechanical and legal consequences that follow from the

16

absence of that component in the FRT-15. *Id.; see generally NAGR*, 2024 WL 3517504. As *Cargill* explained, "[t]he disconnector is the component responsible for resetting the trigger to its original firing position after a shot is fired" and "[t]he disconnector will hold the hammer in that position for as long as the shooter holds the trigger back, thus preventing the firearm from firing another shot." *Garland v. Cargill*, 602 U.S. 406, 417, 420 (2024); *see also Rare Breed Triggers*, 690 F.Supp.3d at 64 ("However—unlike a trigger in a semi-automatic weapon—the FRT-15 has no disconnector.").

Having incorrectly tied the function of the trigger solely to the release of the hammer, and identified trigger movement as the operative mechanical process, the Texas court misconstrued the role of the locking bar in the firing cycle of the FRT-15 and its legal implication. *See NAGR* at *20 ("An FRT-equipped firearm contains a locking bar that prevents a subsequent trigger function until the weapon is safe to fire again. But this is not the same as an auto sear.... Because the FRT's locking bar does not alter the basic mechanical process where the trigger moves for every shot fired, this distinguishes an FRT from a fully automatic weapon with an autosear."). Though seemingly recognizing that the locking bar served the same function as an auto sear—to time the firearm and prevent a malfunction during automatic operation—the Texas court nonetheless mistakenly found that the locking bar was inconsequential to its analysis of the FRT-15 under the statutory definition. *But see Rare Breed Triggers*, 690 F.Supp.3d at 63, 64 ("[An] auto sear 'times' the device to make sure that a bullet is in the chamber by the time the hammer strikes the firing pin again" and "[t]he locking bar 'times' the device to make sure that a bullet is in the chamber by the time the trigger is free to release the hammer again.").

17

Moreover, *Cargill* does not suggest that a device is not a machinegun because the trigger moves automatically for each shot. And it does not call into question decisions holding that such devices are machineguns. In *United States v. Carter*, for example, the Sixth Circuit considered a firearm that lacked a standard trigger and would fire repeatedly if a shooter manually pulled back and released the bolt. Once the bolt was released it "would go forward [stripping] a cartridge off out of the magazine into the chamber and it would fire" and the bolt would then "retract" and go forward to fire again with no further engagement by the shooter. 465 F.3d 658, 665 (6th Cir. 2006) (*per curiam*). The bolt is the "trigger" on such a weapon because it initiates firing, but the repeated automatic movements of that trigger—even though necessary to fire the weapon and "reset" the trigger between shots—do not change its status as a machinegun. *Cargill* likewise declined to address any other device, including mechanical bump stocks such as the Akins Accelerator, in which a spring repeatedly and automatically forced the trigger against the shooter's stationary finger for each shot fired. *Cargill*, 602 U.S. at 406 n.1.

As noted, there is no point at which the FRT-15 is disengaged (or "released") to be re-engaged for another shot. Instead, after the initial engagement of the trigger, the weapon fires repeatedly as a result of the automatic operation of the device, so long as the shooter continues to engage the trigger. The subsequent movements of the trigger are not the result of separate and distinct "engagements" or "functions," but are rather the result of an automatic mechanical process after the shooter engages the trigger once.

The Texas court's failure to recognize key distinctions between the devices at issue here and the bump stocks at issue in *Cargill* is underscored by its mistaken belief that ATF's understanding of these devices was the outcome of the same rulemaking that concluded that non-

18

mechanical bump stocks were machineguns. The district court stated, for example, that it was three years after ATF "broadened its interpretation of the statutory definition" in the 2018 bump-stock rulemaking that ATF "appl[ied] the revised definition of 'machinegun' to FRTs." *NAGR*, 2024 WL 3517504, at *3.

That was manifestly incorrect, and the bump stock rule has no bearing on whether the statute applies to the devices at issue here. The bump stock rule was promulgated in December of 2018 and marked the first time that ATF concluded that non-mechanical bump stocks were machineguns. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018).

In contrast, ATF has regarded devices of the kind at issue here as machineguns since first encountering one in 1975, and reached the same conclusion in 1994, 2004, 2005, 2006, and 2017. *See e.g., Rare Breed Triggers*, 690 F.Supp.3d at 68-69 (discussing ATF's 2006 conclusion that a similar device was a machinegun and that the Rare Breed Parties were informed of that conclusion). Indeed, in August of 2018—four months before the bump stock rule was promulgated—ATF concluded that the AR1, the predecessor device to the FRT-15, was a machinegun. *Id.* at 65-67. That history was crucial to the district court's conclusion in *Rare Breed Triggers* that Claimant likely misled their customers about whether these devices would be regarded as machineguns under the statute. *Id.* at 91-101.

The Texas court never addressed ATF's consistent treatment of similar devices, the *Rare Breed Triggers* court's conclusions, or the uncontradicted testimony of ATF's expert. Nor has claimant ever disputed that the devices addressed by ATF in the past are materially similar to the FRT-15. Claimant and the Texas court fundamentally erred in their application of the Supreme

19

Court's decision addressing a significantly different device that is the subject of a very different regulatory history.

        b.     The *NAGR* Vacatur Has No Bearing Here

Claimant argues that the Texas court's vacatur of the ATF classification of the FRT-15 applies to this matter.  Claimant is incorrect in several respects.

As an initial matter, the Texas court was not specific about what ATF action it was "vacating" as reflecting "ATF's unlawful action—classification of FRTs as machineguns" *NAGR*, 2024 WL 3517504.  In fact, ATF has not promulgated any rule or regulation classifying the FRT-15 as a machinegun.  Regardless, the propriety or contours of that order do not change the fact that this Court is simply asked to engage in a *de novo* review and reach its own interpretation of the statute as applied to these devices, without relying on or deferring to any ATF "classification" of the FRT-15, or refutation thereof.  The same was true in the EDNY suit, where the court did not defer to or rely on any ATF classification when ultimately determining that the government was "highly likely to succeed in proving that the FRT-15 satisfies the statutory a machinegun" but relied on its own application of the statute to the device.  *Rare Breed Triggers*, 690 F.Supp.3d at 75.

The decision in *NAGR* does not and cannot control the meaning of the statute nationwide; only a decision of the Supreme Court can have that effect. Thus, whatever the propriety or practical effect of the Texas court's "vacatur" of ATF's "classification"—points contested in the pending Second and Fifth Circuit appeals—it plainly does not and cannot control whether the statute covers the FRT-15, and cannot dictate how other courts, including this Court, interpret the statutory language and apply that language to the Defendant Property.

20

      c.     <u>Collateral Estoppel Is Not Applicable</u>

Plaintiffs cannot avoid litigating the merits of this suit by invoking collateral estoppel. Collateral estoppel is fundamentally "an equitable doctrine" based on "considerations of fairness in the individual case." *PenneCom B.V. v. Merrill Lynch & Co., Inc.*, 372 F.3d 488, 493 (2d Cir. 2004); *accord Blonder-Tongue Labs. Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971) ("In the end, decision [on estoppel] will necessarily rest on the trial courts' sense of justice and equity."); *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1221 (10th Cir. 2013).

In entering judgment, the Texas court made clear that its ruling should not preclude further litigation by other courts. That court emphasized that "respect for coordinate courts . . . guides the scope of the relief awarded here." *NAGR*, 2024 WL 3517504 at *27. The Texas court's judgment thus made clear that its injunctive relief applied only "to the extent that it does not interfere with other courts, such as the Eastern District of New York's civil jurisdiction over the Rare Breed Parties." *Id.* at 28.[14]

Accordingly, by its express terms, the injunctive relief provided by the Texas Court applies to the Rare Breed Parties, which include claimant, only to the extent it does not interfere with the New York litigation. Further, by its express terms, the relief granted by the Texas court applies only to the extent that it would not interfere with "other courts," such as this one. *Id.*

---

[14] In the Fifth Circuit appeal, the government is contesting whether the Rare Breed Parties were properly shown to be members of NAGR at the time the suit was filed, and thus does not concede that the Rare Breed Parties were properly entitled to any relief or were properly parties to the Texas court's decision. But regardless of whether the Rare Breed Parties were actually parties to the Texas court's decision, the Texas court's express disclaimer of any intent to interfere with other cases would render application of collateral estoppel inappropriate.

21

The Texas court also appeared to recognize that under Fifth Circuit precedent it could not properly preclude the government from litigating the issue here. Fifth Circuit precedent makes clear that "where duplicative issues and parties exist in two cases the court with the first case should resolve the issues between the parties and the second court should defer," a rule "grounded in principles of comity and sound judicial administration." *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997); *accord West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-30 (5th Cir. 1985).

The district court acknowledged this general rule in limiting its relief, citing *West Gulf* in explaining that "Fifth Circuit precedent is clear regarding overlapping decisions from coordinate courts." *NAGR*, 2024 WL 3517504 at *27. By taking that course, the Texas court was able to grant relief to the other parties before it—including members of NAGR aside from the Rare Breed Parties—"without trenching upon the E.D.N.Y. decision," *id.*, or interfering with "other courts, such as the E.D.N.Y Lawsuit's civil jurisdiction over the Rare Breed Parties." *Id.* at *28.

Accordingly, under Fifth Circuit precedent, with respect to the Rare Breed parties, the *NAGR* court properly deferred. Both this action, and the New York court action, preceded the filing of the Texas case by many months, and are expressly carved out from the Texas court's judgment.

## CONCLUSION

Summary judgment for Claimant Rare Breed Triggers is not appropriate in this case, where there remains a dispute over whether FRT-15s are "machineguns," where evidence shows that the RBT Triggers are machineguns, and where Supreme Court precedent in *Cargill* supports that assertion. The Claimant's assertion that the *NAGR* decision supports summary judgment in

22

their favor is demonstrably incorrect for multiple reasons, and further, collateral estoppel is not available.

Respectfully submitted,

TRINA A. HIGGINS
United States Attorney

/s/ Adam Elggren
Adam Elggren
Assistant United States Attorney

23